**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
RENATO GUIMARAES, JR.,                                    Case No. 05-CV-2210(DC)

                Plaintiff,

    -against-                                              **DEFENDANT'S REPLY**
                                                            **IN SUPPORT OF**
                                                             **MOTION TO AMEND ANSWER**

SPEISER, KRAUSE, NOLAN & GRANITO,
a professional corporation, f/k/a SPEISER,
KRAUSE, MADOLE & LEAR, a professional
corporation,
                             Defendant.
-----------------------------------------------------------X

       Defendant, Speiser Krause Nolan & Granito "Speiser Krause" by its attorneys, Apuzzo & Chase Pursuant to Federal Rules of Civil Procedure 13(f) and 15(a) respectfully submits this Reply in further support of its motion to amend its Answer herein. Plaintiff Renato Guimaraes, Jr.'s ("Guimaraes") points in opposition are addressed *seriatim*.

**I.    DELAY AND PREJUDICE**

    A.    In the context of this litigation, defendant's "delay," if any, was reasonable.

As set forth in the following timeline, plaintiff's motion is both timely and reasonable:

October 7, 2005:    Plaintiff is deposed (1st session). Plaintiff admits the existence of a written agreement with Walter Lack, an attorney in California. Plaintiff had convinced several of Speiser Krause's TAM clients to fire Speiser Krause and substitute Mr. Lack's firm. Exhibit A, p. 141-144. Despite due

|  |  |
|---|---|
|  | demand, plaintiff refuses to produce any agreement he has with the Lack firm. |
| November 2, 2005: | Plaintiff's deposition is continued. During examination, plaintiff denies the existence of any understanding concerning the division of fees between himself and the law firm Engstrom, Lipscomb & Lack. At that time, Engstrom Lipscomb & Lack had substituted for Speiser Krause in representing 7 (now at least 8) Brazilian TAM clients. Exhibit A, p. 79, l. 7-9; p.81, l. 16-22. Guimaraes denies that he was to participate in any legal fee for convincing TAM clients to fire Speiser Krause and to retain Engstrom, Lipscomb & Lack. Plaintiff contradicted his own prior sworn testimony |
| March 24, 2006: | Walter Lack, an attorney at Engstrom, Lipscomb & Lack is deposed in Los Angeles, CA. Mr. Lack is asked whether his firm has an agreement with Guimaraes for the division of TAM legal fees, and replies, at p.15: "A. Yeah. Our deal is – I said 'whatever you got with Speiser, you can have with us.'" So, it was not until the Lack deposition that Speiser Krause discovered plaintiff had lied in his November 2, 2005 testimony regarding the absence of any fee arrangement he had with the Lack Firm for bringing TAM clients. Further discovery adduced proof of plaintiff's extensive |

undertaking to damage Speiser Krause and scuttle their relationship with TAM clients.

| | |
|---|---|
| April 21, 2006. | At a court conference, the parties started talking settlement. Mediation was requested and eventually ordered. In the time prior to mediation, Speiser Krause concentrated its efforts on attempting to settle this matter. If the case could be settled, there was no necessity to spend time and money on amending its Answer. |
| July 18-31, 2006. | Mediation progressed under the guidance of Magistrate Judge Ellis. Speiser Krause had a good faith belief that a reasonable settlement could be reached, but the plaintiff finally rejected Speiser Krause's offer during the afternoon mediation session on July 31, 2006. At that time, the defendant commenced drafting the proposed amendment and instant motion, to include the proposed tortious interference counterclaim. |
| August 11, 2006. | Prior to this court conference, Speiser Krause served its proposed motion to amend. The Court ordered Speiser Krause to file the same via ECF. |

During the course of discovery Speiser Krause adduced evidence of plaintiff's dishonesty and unfair tactics. Evidence of dishonesty and unfairness negates any alleged justification for his conduct. In addition, plaintiff improperly refused to completely respond to Speiser Krause's

discovery requests, causing Speiser Krause to resort to other sources to gather evidence. This process was difficult and time consuming.

The delays caused by plaintiff's misrepresentation and frustration of discovery should not be attributed to Speiser Krause. Plaintiff withheld documentary evidence of communications between himself and Walter Lack. Plaintiff continues to withhold these documents against 1) promises of forthcoming production, and 2) specious claims of privilege. Finally, the defendant's good faith belief that this matter was going to settle was a reasonable basis for not making this motion, pending the conclusion of the mediation.

**B.**   In the Absence of Prejudice, Speiser Krause's Motion Must be Granted

1.   No additional resources must be expended by the plaintiff for discovery or trial preparation. The parties agree that substantial discovery has been completed in this case. The facts are undisputed. Speiser Krause was retained by the TAM clients to pursue legal remedies for money damages. After several years of litigation, Speiser Krause successfully negotiated settlement offers for these clients. Plaintiff accused Speiser Krause of, among many other things, being dishonest with these clients. As a direct consequence of plaintiff's accusations, at least eight TAM clients fired Speiser Krause. Plaintiff then assisted these clients in finding a new lawyer. The plaintiff was not justified in committing tortious acts to destroy Speiser Krause's relationships with its TAM clients. There is no new extensive discovery required by the plaintiff. Plaintiff had served a notice of deposition of some of these clients and their local attorneys, but for some reason decided to cancel just prior to the discovery cutoff date. These non-party witnesses reside in Brazil, and it would be difficult for Speiser Krause to compel their testimony. So, except for a general statement that "plaintiff will need to conduct further discovery," not one

potential witness is named, nor is anything specific as to what they could add to the established facts. Plaintiff's blanket generalization cannot substitute for a factual showing of prejudice.

2.  There would be no delay in the resolution of the dispute. Dispositive motions are scheduled to be submitted by September 22, 2006. After the decision on the motions, the remaining issued will be tried by the Court pursuant to the Court's regular schedule.

3.  Speiser Krause's charging lien has no bearing upon its counterclaim cause of action against plaintiff for his unlawful conduct. If there is an enforceable charging lien, it is not a guarantee that fees will be collected from the clients. Plaintiff cannot avoid his own liability by stating that Speiser Krause might potentially recover fees in another proceeding. A charging lien is equitable in nature and the Court determines the reasonableness of the amount of the fees claimed by an attorney. *Sutton v. New York City Transit Authority*, ___ F.3d___ (No. 04-0429 2d Cir. 8/28/06) NYLJ 9/1/06, P.22, Col.1. In this case, Speiser Krause's retainer agreements with its clients provided that Speiser Krause would receive for its fees 25% of the net recovery. Prior to plaintiff's injurious falsehoods, Speiser Krause secured exact monetary offers of settlement for these clients. The equitable charging lien that will be fixed by the California court does not have to agree with the retainer agreements for a percentage fee.

## II.  **FUTILITY**

A.  Plaintiff's only legal challenge to Speiser Krause's application is that plaintiff was a party to the contract between Speiser Krause and its TAM clients. Plaintiff fails to distinguish

that there are two alleged contracts in this case. One is an alleged contract between Speiser Krause and its TAM clients, and the second is an alleged contract between plaintiff and Speiser Krause. Plaintiff's reliance on the following four cases that he cites do not stand for the proposition that Speiser Krause cannot sue plaintiff. Speiser Krause's counterclaim against plaintiff is not for tortious interference with the alleged contract between Speiser Krause and plaintiff; rather, it is for plaintiff's tortious interference with the contracts Speiser Krause had with its TAM clients.

Each of the cases plaintiff relies upon is easily distinguished from this case:

*Kosson v. Algaze*, 203 AD.2d 112, 61 N.Y.S.2d 227 (1st Dept. 1994), involved a hospital employee suing his employer for tortious interference with his alleged contract of employment. In the instant case, Speiser Krause claims that Renato Guimaraes tortiously interfered with the contracts Speiser Krause had with its TAM clients, not with any alleged contract between the parties to this litigation.

*Koret, Inc. v. Christian Dior, S.A.*, 161 A.D.2d 56, 554 N.Y.S.2d 867 (1st Dept. 1990), involved a licensee's claim against a parent company for tortious interference between the licensee and a subsidiary of the parent-defendant. The Appellate Division, First Department held that a corporate parent had a right to interfere with the contract of a subsidiary. In the instant case, Renato Guimaraes was neither a parent nor alter ego of any of the TAM clients.

*Shred-it USA, Inc. v. Mobile Data Shred, Inc.*, 202 F.Supp.2d 228 (SDNY 2002), involved a claim for breach of a covenant not to compete. The court held that a tortious interference claims would not lie between the purchaser and the seller of a business, where the contract of sale between them contained a non-competition clause. The defendant in that case

was a principal to the contract, not a third party. Plaintiff Renato Guimaraes was not a principal, had no legal duty to perform any legal services in the United States of America for the TAM clients, nor was he licensed to do so.

*NAS Electronics v. Transtech Electronics PTE*, 262 F.Supp.2d 134 (SDNY 2003) involved a contractual agreement created by a prior stipulation of settlement of an action. The plaintiff in that case alleged that the defendant interfered with their right to sell karaoke equipment in East Russia. The court dismissed the tortious interference claim because there was no third party to the settlement agreement, no interference with a contract with any third party, nor existence of any rights that plaintiff had. The court further held that because of plaintiff's prior breach, their agreement was terminated and plaintiff had no rights that could be interfered with. *NAS, supra,* 262 F.Supp.2d at 147-148.

**C.** <u>Discharge of Attorney</u>

There is no dispute that a client can fire his lawyer for any reason. The privilege, if any, to interfere with a contract terminable at will does not extend to the use of dishonest or unfair means. The issue is whether the campaign of criminal libel plaintiff waged against Speiser Krause was a factor in causing the destruction of the relationship between Speiser Krause and its TAM clients. Plaintiff admitted that the TAM clients trusted him when he accused Speiser Krause of "criminal treason" against the TAM clients. Exhibit A. Guimaraes Deposition at p.76. Plaintiff's conduct is consistent with the elements of the common law tort of injurious falsehood. He knowingly published false and derogatory matter concerning Speiser Krause with the intent of interfering with Speiser Krause's relationships with its TAM clients. This dishonest tortious conduct obviates any claim by the plaintiff that his actions were justified.

7

## CONCLUSION

The amendment of Speiser Krause's Answer to include one additional counterclaim should be permitted because the delay in making this motion was reasonable, the plaintiff will suffer no prejudice, no additional discovery is required, there will be no delay in disposing of this case and the proposed counterclaim has merit.

Dated: New York, New York
September 11, 2006

Respectfully submitted,

_____
William J. Apuzzo (WA-1312)
Attorney for Defendant-Counterclaimant
Speiser Krause Nolan & Granito
800 Third Avenue - 8th Floor
New York, NY 10022
(212) 297-0885

*Attorney's Certificate of Service*

This is to certify that a copy of the foregoing has been sent by FedEx Overnight Delivery on this date to each of the following:

Jose Riguera, Esq.
Berman, Kean & Riguera, P.A.
2101 West Commercial Blvd., Ste. 2800
Ft. Lauderdale, FL 33309

and that the foregoing was left with said overnight courier prior to the time for which that courier stops accepting overnight deliveries.

Dated: New York, New York
       September 11, 2006

_____
William J. Apuzzo (WA 1312)
Attorneys for Defendant
800 Third Avenue - 8th Floor
New York, NY 10022
Tel.: (212) 297-0885

## Exhibit A

## Deposition Excerpts

Deposition of Plaintiff Renato Guimaraes, Jr. taken November 2, 2005

| Page(s) | Line(s) |
|---|---|
| 72 | 22-25 |
| 73 | 1-4 |
| 76 | 10-25 |
| 77 | all |
| 79 | 7-9 |
| 81 | 16-22 |

Deposition of Plaintiff Renato Guimaraes, Jr. taken October 7, 2005

| Page(s) | Line(s) |
|---|---|
| 141-144 | |

Deposition of Walter Lack taken March 24, 2006

| Page(s) | Line(s) |
|---|---|
| 15 | 19-23 |

72

1                    Renato Guimaraes

2    will have a fair contract to make an acknowledgment

3    of representation of this family.

4              MR. APUZZO:  We'll identify the

5         letter for the record.  It's Exhibit 8,

6         on the letterhead of Engstrom, Lipscomb &

7         Lack, professional corporation of

8         California.  It's dated October 26th,

9         2004 and addressed to John Verth of

10        Speiser Krause, and the letter is signed

11        by Walter Lack.

12        Q.    In looking at this letter, you said

13   that you assumed that some similar type of letter

14   would have been sent but you haven't seen it; is

15   that correct?

16        A.    Yes, or call.

17        Q.    And Mr. Lack refers to several

18   clients here, if I may, just review them, Duarte,

19   Vaz de Mello, Janstein, Menin.  Those are four

20   cases; correct?

21        A.    Yes.

22        Q.    So, as of October 26th, 2004, did you

23   arrange for just four cases at that time to be

24   accepted by Mr. Lack?

25        A.    Yes.

1                    Renato Guimaraes

2       Q.    And then there came a time when you
3   got him an additional three cases?
4       A.    Right, correct.
5       Q.    And if you look at the second
6   paragraph of this letter where it says, "A number
7   of your former clients and their Brazilian counsel
8   have raised a variety of serious ethical claims and
9   case handling errors relating to the handling of
10  the case," is it your understanding that Walter
11  Lack was referring to you when he refers to
12  Brazilian counsel?
13      A.    That's for sure.
14      Q.    And can you tell us what you told
15  Walter Lack with respect to ethical claims about
16  Speiser Krause?
17            THE WITNESS:  Should I tell him?
18            MR. APUZZO:  This is not attorney-
19  client privilege with him.
20            MR. RIGUERA:  You're asking what
21  he told --
22            MR. APUZZO:  Walter Lack.  It has
23  nothing to do with attorney-client
24  privilege.
25      A.    I can tell you what I wrote in

1            Renato Guimaraes
2    TAM clients and the relative attorneys
3    may be discussed.
4            MR. APUZZO:  He wasn't asserting
5    privilege.
6            MR. RIGUERA:  Not with the TAM
7    clients, but if he has an individual case
8    where there's a lawyer involved, we're
9    not going to waive that privilege.  You
10   can disagree.
11           Q.   Let me ask you a question.  With
12   regard to the serious ethical claims against
13   Speiser Krause, what did you tell Walter Lack?
14           A.   In general I told him this family
15   authorized me to look for another attorney because
16   they are not satisfied with Speiser Krause, they
17   trust what I was saying, what is in the magazine,
18   they are not protecting the Brazilian families, so
19   on and so on.
20           Q.   You used the words ethical claims,
21   what breach of ethics did Speiser Krause do?
22           A.   In Brazil, and I say the Brazilian
23   meaning English, we don't say ethical, it's too
24   soft, this case is crime, so I talk about crime.
25           Q.   What crime did Speiser Krause commit?

1              Renato Guimaraes
2        A.    In Brazil, if attorney change the
3   sides, it's a crime.  If you have a conflict with
4   your client, you should stay away, you should not
5   help as Jerry Lear did Northrop Grumman.  It's a
6   crime in Brazil.
7              And I put this in all papers in
8   Brazil, look at this, the guy gave affidavit, and
9   so forth.  So, it's beyond ethical, the guy go to
10  jail in Brazil, never say something like that.  So,
11  that's the seriousness of the issue I told Lack.
12       Q.    So, the crime, if I understood you
13  correctly, was there was a conflict of the interest
14  of --
15       A.    We call in Brazil, the penal code in
16  Brazil called treason.
17       Q.    So, he committed a treason against
18  his client?
19       A.    Yes.
20       Q.    And this is what you described to
21  Walter Lack?
22       A.    That's correct.
23       Q.    Was the conduct of Speiser Krause
24  also a crime when they tried to obtain settlement
25  agreements for the clients?

79

1            Renato Guimaraes
2  They don't understand. They say lost and, of
3  course, it would not be forum nonconveniens, was
4  the stay, should be on the merits. We lost, well,
5  we heard rumors in the court, rumors in the court
6  we are going to lose, so.
7         Q.     Do you have an agreement to share
8  fees with Walter Lack for the seven cases?
9         A.     No.
10        Q.     So, if Walter Lack is successful in
11 enforcing the Jabaquara judgement in the United
12 States, how is Walter Lack going to get paid?
13        A.     He?
14        Q.     Yes.
15        A.     It's in the contract of Lack and the
16 families, these families, these seven families.
17        Q.     And you're not named in that retainer
18 contract?
19        A.     No, I'm not.
20        Q.     So, if I understand you correctly, if
21 Walter Lack gets an attorney's fee of one-third of
22 the recovery, you are not going to receive any part
23 of that one-third fee?
24        A.     Not by contract, maybe voluntarily as
25 a referee. But even as a referral, I have no

 1                    Renato Guimaraes
 2   Walter Lack that if they're successful and they get
 3   a great deal of money for fees on these cases then
 4   that he will give you something?
 5          A.     Maybe.  But it's different.  When I
 6   start with Speiser Krause it was zero.  Walter
 7   Lack, I can make no contribution at all.  I am an
 8   office boy to bring papers back and forth.  And the
 9   case is too complicated, it's not easy to find a
10   guy who understand aviation case, you know, lift
11   the stay.  So, I am desperate to find a reliable
12   attorney to take over.  So, I don't worry about my
13   fees, I have enough if I win.  So, my main
14   consideration, my duties, is with the families, I
15   have to have an attorney for the families.
16          Q.     And do you expect that because you
17   referred the families to Walter Lack that he would
18   give you some fee as a referral?
19          A.     Well, only if it is voluntarily,
20   Renato, you were a nice guy, this case, take a
21   beer, here is your check.  I will not knock on his
22   door, though, that's not our understanding.
23          Q.     What about your expenses you paid?
24          A.     About the sucumbencia?
25          Q.     No, your expenses, the airline

Page 141

1    Renato Guimaraes, Jr.
2    A. Yes. Management is Walter, Steve is
3 his second man, I understand.
4    Q. And which defendants are you bringing
5 this proceeding against in California next week?
6    A. Northrop.
7    Q. Just Northrop?
8    A. Yes, only Northrop because Teleflex
9 got free so far, well, it is on the appeal, so.
10   Q. And isn't it true that the same
11 application was performed in Miami?
12   A. In Miami, Jeffrey, yes, the same,
13 sir, yes, the same, Herman gave up.
14   Q. Do you have an agreement with Walter
15 Lack about the fees you will receive in
16 representing these seven clients?
17       MR. BERMAN: Objection,
18    relevancy.
19   A. Could you repeat? I'm not so sure,
20 if I have or the family has.
21   Q. Do you have an agreement with Walter
22 Lack about the division of fees from this case in
23 California?
24   A. Well, that's a different retainer
25 letter. I don't know if I am allowed to -- I don't

Page 142

1    Renato Guimaraes, Jr.
2 know if it's privilege, I don't have authorization
3 with Walter to release his information.
4       MR. BERMAN: The only question
5    pending is whether or not you have an
6    agreement with Mr. Lack?
7    A. Yes.
8       MR. BERMAN: As to fees?
9    A. The families and myself, yes.
10      MR. BERMAN: Can I talk to the
11   witness for a moment?
12      MR. APUZZO: Sure.
13      (Off the record at 4:25 p.m.)
14      (Resuming at 4:28 p.m.)
15   Q. The proceeding next week in
16 California, is that also a letters rogatory?
17   A. No, no, it's not. It's, I believe, a
18 motion, something like that. They're promising,
19 the last public hearing Speiser Krause was there
20 and they say I will present, Your Honor, before
21 October 20, something like that.
22   Q. With respect to your agreement with
23 Walter Lack about the fees for the seven clients,
24 is that in writing that agreement?
25   A. Yes, all writing, yes.

Page 143

1    Renato Guimaraes, Jr.
2    Q. When was that agreement made?
3    A. Year, year-and-a-half, ago probably.
4    Q. And how did you come to choose Walter
5 Lack?
6    A. How?
7    Q. Yes.
8    A. Well, somebody suggest me, you know
9 better than me. The aviation law field is very
10 small one, so it's a small community, so many
11 people worked with Speiser Krause, a big disaster.
12 You have a community. So, they are very reluctant
13 to sue Speiser Krause, so it was hard to find
14 except small, reliable, but small, law firm like
15 Herman and other people. So, along the line I
16 found Walter interested in this case, yes.
17      MR. APUZZO: We'll call for the
18   production of that written retainer
19   agreement with the Lack Law Firm.
20      (Production Request.)
21      MR. BERMAN: Okay. We may object
22   to that, I don't see the relevancy.
23      MR. APUZZO: All right, I just
24   wanted to call for it. I'll argue it
25   afterwards, but I am requesting it, let

Page 144

1    Renato Guimaraes, Jr.
2 me put it that way.
3       MR. BERMAN: Okay. And for the
4    record, you're talking about the
5    agreement between Mr. Lack and Mr. Lack's
6    clients?
7       MR. APUZZO: No, we're talking
8    about an agreement between the witness
9    Renato Guimaraes and Walter lack.
10      MR. BERMAN: I think you need to
11   lay a foundation for that, because I
12   think you misunderstood.
13      Do you have a written agreement
14   with Walter Lack?
15      THE WITNESS: I do have, yes.
16      MR. APUZZO: Yes, I thought I
17   understood it.
18      MR. BERMAN: Then I misunderstood
19   it.
20      MR. APUZZO: Okay.
21      MR. BERMAN: We'll look at it and
22   then we'll give you our response.
23   Q. Did you attempt to enforce the
24 Jabaquara judgement in Europe?
25   A. Europe, no.

```
 1   counsel.
 2           MR. APUZZO:  Okay.  I understand.
 3           MR. RIGUERA:  It may or may not be, but --
 4           MR. APUZZO:  Let me cure it.
 5   BY MR. APUZZO:
 6       Q.   The other persons who may have referred
 7   cases to your firm, do you know if they were
 8   lawyers?  Were they non-lawyers?
 9       A.   I don't know.  They're Brazilians.  I can
10   tell you that.
11       Q.   And your firm would have a record of who
12   referred these clients?
13       A.   We would only keep a record of who we have a
14   referral fee arrangement with.
15       Q.   Okay.
16       A.   As far as where the case comes from, we --
17   you know, after you get them signed up, we wouldn't
18   necessarily care.
19       Q.   All right.  Does your firm have an agreement
20   to pay compensation to Renato Guimaraes as a result
21   of the referral of these clients?
22       A.   Yeah.  Our deal is -- I said, "Whatever you
23   got with Speiser, you can have with us."
24       Q.   Was that agreement in writing?
25       A.   I think so.  I mean, we try to do that in
```