UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

### CASE NO.: 05 CV 02210 (DC)

RENATO GUIMARAES, JR.,

Plaintiff,

vs.

SPEISER, KRAUSE, NOLAN & GRANITO, a professional corporation f/k/a
SPEISER, KRAUSE, MADOLE & LEAR, a professional corporation

Defendant.

## PLAINTIFF'S MEMORANDUM IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Dated:     Fort Lauderdale, Florida
           October 20, 2006

*Prepared by:*
Richard E. Berman, Esq.
Jose R. Riguera, Esq.
Attorneys for Plaintiff
BERMAN, KEAN & RIGUERA, P.A.
2101 W. Commercial Blvd., Suite 2800
Fort Lauderdale, Florida 33309
Telephone:     (954) 735-0000
Facsimile:      (954) 735-3636

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    The TAM Air Disaster . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    The Fee Sharing Agreement Between Guimaraes and Speiser Krause . . . . . . . . . . . . . . . . . 4
    The Clients Retain Speiser Krause and Guimaraes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    The Litigation in the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    The Jabaquara Action (Litigation in Brazil) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    The Global Settlement and the Jabaquara Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.      THE STANDARD FOR GRANTING SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . 12

II.    THE FEE SHARING AGREEMENT IS A VALID, ENFORCEABLE CONTRACT . . . 14
    A.    Choice of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    B.    The Law of Virginia Applies to Issues Concerning the Execution, Interpretation,
        and Validity of the Fee Sharing Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    C.    The Parties Have a Valid, Enforceable Written Contract, Signed By the
        Party Against Whom It Is Being Enforced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
            1.    *The Agreement Was Definitive And Contained All Material Terms* . . . . . . . 16
            2.    *The Events Preceding The Agreement Show The Parties Meant To*
                *Be Bound And Had Reached A Final Contract* . . . . . . . . . . . . . . . . . . . . . . 22
            3.    *The Events Following The Agreement Show The Parties Meant To*
                *Be Bound And Had Reached A Final Contract* . . . . . . . . . . . . . . . . . . . . . . 23
            4.    *The Totality Of The Circumstances Remove All Doubt That The*
                *Parties Meant To Be Bound By Their Agreement* . . . . . . . . . . . . . . . . . . . . 27
    D.    The New York Test For Informal Writings Does Not Apply; Even if It
        Was Applied, The Test  Establishes Contract Liability In This Case . . . . . . . . . . . . . 27
            1.    *Speiser Krause Admits It Did Not Reserve A Right Not To Be Bound*
                *In The Fee Sharing Agreement* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
            2.    *The Context Of The Negotiations Further Shows The Parties Had A Final,*
                *Binding Agreement* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
            3.    *The Fee Sharing Agreement Did Not Have Any Open Material Terms* . . . . . . 31
            4.    *Part Performance Overwhelmingly Shows A Final and Binding Contract* . . . 31
            5.    *The Fee Sharing Agreement Was Reduced To Writing* . . . . . . . . . . . . . . . . 32

III.    GUIMARAES DID NOT FORFEIT HIS ENTITLEMENT TO AN ATTORNEYS' FEE
      FOR VOICING HIS PROFESSIONAL OPINION THAT THE AMOUNT OF THE
      SETTLEMENT WAS INSUFFICIENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

IV.    PLAINTIFF VOLUNTARILY DISMISSES HIS CONSTRUCTIVE TRUST,
      CONVERSION AND ACCOUNTING CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 05-CV-2210(DC)
THE HONORABLE DENNY CHIN

RENATO GUIMARAES, JR.,

      Plaintiff,

vs.

SPEISER, KRAUSE, NOLAN & GRANITO, a
professional corporation f/k/a SPEISER,
KRAUSE, MADOLE & LEAR, a professional
corporation,

      Defendant.

_____/

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, RENATO GUIMARAES, JR. ("Guimaraes"), pursuant to Fed.R.Civ.P. 56, respectfully submits this Memorandum in Opposition to Defendant's Motion for Summary Judgment (the "Motion").

### INTRODUCTION

Guimaraes, a Brazilian attorney, seeks to recover his contractual share of attorneys fees collected by Defendant, Speiser, Krause, Nolan & Granito ("Speiser Krause") pursuant to a signed, written fee sharing agreement entered into by the parties concerning the representation of 64 families of an aviation disaster that occurred in Brazil on October 31, 1996. Speiser Krause pocketed in excess of $7 million in fees from the settlement of the cases. Meanwhile, Guimaraes, who introduced Speiser Krause to the case, convinced the clients to retain he and Speiser Krause as counsel, and performed under the fee sharing agreement for nearly four years, all with the express knowledge and approval of Speiser Krause, has received nothing.

Incredibly, Speiser Krause not only refuses to pay Guimaraes his share of the attorneys' fees from the cases, but now claims that Guimaraes never even had an agreement with Speiser Krause concerning this

2

matter.  For the reasons detailed below, Guimaraes has a valid, enforceable fee sharing agreement with Speiser Krause, and he is entitled to receive his 25% share of the attorneys' fees collected by Speiser Krause. At a minium, there are genuine issues of material fact for consideration by a jury, as shown herein and in Plaintiff's Local Rule 56.1 Statement.  Accordingly, the motion for summary judgment should be denied.

## STATEMENT OF FACTS[1]

### The TAM Air Disaster

On October 31, 1996, an aircraft operated by Transportes Aereos Regionais, S.A. Airlines ("TAM Airlines") departing from Sao Paulo, Brazil, crashed shortly after take off, killing a total 99 people (the "TAM air disaster").  In the days and weeks following the accident, Guimaraes was contacted by several family members of victims of the crash and their local attorneys about representing the families in a claim against the responsible parties. Guimaraes Dep. 11/2/05 p. 130-134; Guimaraes Dec. ¶ 3.

During that time, several widows of the TAM air disaster organized a support group to discuss the families' legal rights.  Guimaraes was invited to participate in these early meetings and soon became one of the group's leaders.  Guimaraes Dec. ¶ 5; Freitas Dep. p. 8-13.  Guimaraes explained to the families that it would be beneficial for the victims to pursue litigation of their claims in the United States, rather than Brazil, because of the comparative efficiency of the United States legal system and the higher compensation traditionally obtained for victims in the United States versus less developed countries.  Guimaraes Dec. ¶ 6; Berman Aff. Ex. 8 (Doc. No. RG00002).  After some discussion, the families agreed with Guimaraes and authorized him to recommend a United States law firm to represent them.  Guimaraes Dec. ¶ 7; Freitas Dep. 12.

---

[1] All pleadings, deposition testimony excerpts, and documents cited in this memorandum are attached as exhibits to the Affidavit of Richard E. Berman, Esq., sworn to on October 20, 2006 ("Berman Aff.")  The following conventions are used when citing these exhibits: deposition excerpts are cited as: "[deponent name] Dep. p. [page number]" (where a multi-day deposition was taken, the transcript is also identified by date); documents produced by the parties in response to discovery requests in this action are cited as "Doc. No. [production number]."

**The Fee Sharing Agreement Between Guimaraes and Speiser Krause**

Guimaraes contacted Speiser Krause to inquire as to their interest in representing families of the victims. Berman Aff. Ex. 8 (Doc. No. RG00001-RG00002). Although Speiser Krause specialized in aviation matters, they had never handled a case in Brazil. Lear 10/11/05 Dep. p. 26. On November 19, 2006, Speiser Krause informed Guimaraes that it was willing to discuss "a potential effort to represent the victims and the families" in the TAM accident. Berman Aff. Ex. 8 (Doc. No. RG00004).

After further communications, in late December 1996, Guimaraes and his son attended a two-day meeting in Key Largo, Florida, at the home of Arthur E. Ballen ("A. Ballen"), a lawyer who was associated with Speiser Krause. Guimaraes 11/17/05 Dep. p. 7-8. During that meeting, Guimaraes and A. Ballen discussed jointly representing the families of the victims of the TAM air disaster and reached an understanding concerning their respective responsibilities as co-counsel. Guimaraes 11/17/05 Dep. p. 13-19; Guimaraes Dec. ¶ 10.

After returning to Brazil, Guimaraes and Speiser Krause continued to negotiate the fee sharing agreement. Guimaraes and A. Ballen discussed the fee that Speiser Krause would charge the clients, and also negotiated the compensation to be received by Guimaraes. Guimaraes Dec. ¶ 11. On February 5, 1997, Guimaraes and Speiser Krause finalized their deal. Guimaraes made clear to A. Ballen that unless Speiser Krause was willing to pay him 25% of the contingency fee, he would find other United States counsel to represent the clients. Guimaraes 11/17/05 Dep. p. 25-26; Guimaraes Dec. ¶ 12. The parties agreed that Speiser Krause would charge the client the sum of 33 1/3% for their services, and that Guimaraes would receive 25% of that fee. Guimaraes 11/2/05 Dep. p. 23-24, 64-66, 161-166; Guimaraes 11/17/05 Dep. p. 25-26; Guimaraes Dec. ¶ 12. That same day, Gerald Lear ("Lear"), the managing partner of Speiser Krause, faxed a letter from his Rosslyn, Virgina office at Guimaraes' request, and addressed specifically to Guimaraes, stating as follows:

> I would like to confirm the proposed arrangement between our firm and the

4

> families of the victims of the TAM Fokker disaster of October 31, 1996.
> Our firm will charge the sum of 33 1/3% for the handling of each such case.
> Of this fee, a total of 25% will be paid to Brazilian counsel for their
> services. We look forward to once again working actively with your office.
> Berman Aff. Ex. 8 (Doc. No. RG000006).

Lear's letter agreement memorialized the parties' agreement that Guimaraes would receive 25% of

Speiser Krause's fee. Guimaraes responded to the letter agreement on February 19, 1997, and expressed in

writing that he considered it "definitive." Berman Aff. Ex. 8 (Doc. No. RG0026-28).

## The Clients Retain Speiser Krause and Guimaraes

The fee sharing agreement was ratified in the following months when the clients began signing

retainer agreements listing Speiser Krause and Guimaraes as co-counsel. Guimaraes Dec. ¶ 24. Guimaraes

was the only Brazilian attorney whose name appeared as co-counsel with Speiser Krause on any of the

retainer agreements. Guimaraes Dec. ¶ 24; Apuzzo Aff. Ex. S. Also, in reliance on the February 5, 1997 fee

sharing agreement, Guimaraes had the contract translated into Portuguese, distributed it to the clients, and

informed them that he had reached an agreement with Speiser Krause. He then proceeded to perform his

contractual obligations thereunder. Guimaraes Dec. ¶ 19.

Guimaraes spearheaded the efforts to attract clients in Brazil. These efforts included attending

numerous informational meetings with the clients in preparation for Speiser Krause's initial visit to Brazil,

assisting Speiser Krause in translating and forwarding documentation to the clients, gathering documents and

client information requested by Speiser Krause, obtaining copies of the crash report and other documents

needed for the case, explaining legal strategies to the clients, dealing with the local media, and filing

preliminary legal notices in Brazil as required to protect the clients' rights. Guimaraes Dec. ¶ 21. In sum,

Guimaraes became Speiser Krause's "lead" in Brazil, and as Brazilian counsel, served as the primary contact

between Speiser Krause and the clients.

In March 1997, representatives of Speiser Krause traveled to Brazil for the first time to be

interviewed by the clients. In accordance with the fee-sharing agreement, Guimaraes attended the meetings,

and was universally recognized by the clients as the lead attorney working with Speiser Krause in Brazil on the TAM case. Guimaraes Dec. ¶ 22; Freitas[2] Dep. p. 14-18. Guimaraes continued these efforts, with the express knowledge and approval of Speiser Krause, for a period of several months. Guimaraes' activities are memorialized in extensive correspondence and other documents he exchanged with by the parties during that time. Berman Aff. Ex. 8 (Doc. No. RG00018-20; RG00023-42; RG00045; RG00047-48, RG00007-17). The record is devoid of any similar communications during this period between Speiser Krause and any other Brazilian counsel.

From March 1997 to October 1997, a total of 64 families executed retainer agreements. Guimaraes Dec. ¶ 24; Apuzzo Aff. Ex. S. Initially, consistent with the parties' fee-sharing agreement, the retainer agreements listed both Speiser Krause and Guimaraes as co-counsel. Inexplicably, and without notice to Guimaraes, in late September and October 1997, Speiser Krause revised the first page of the retainer agreement to remove Guimaraes' name as co-counsel. Guimaraes Dec. ¶ 24. Thus, of the 64 retainer agreements signed by the clients, Guimaraes' name appears as co-counsel with Speiser Krause on 29 agreements, and does not appear on 22. Also, 5 retainer agreements are conspicuously missing the first page, making it impossible to know whether Guimaraes' name originally appeared. Furthermore, 8 retainer agreements have not been produced at all by Speiser Krause. Apuzzo Aff. Ex. S.

Guimaraes, who relied on Speiser Krause to collect and maintain the executed retainer agreements, did not discover until years later that his name had been omitted from a number of the client retainer agreements. Guimaraes Dep. 11/17/05, p. 5-7. Nevertheless, Guimaraes' originated all of the Brazilian clients who executed retainer agreements, and he rendered legal services on behalf of all of those clients. Guimaraes Dec. ¶ 25.

On May 23, 1997, during one of his trips to Brazil, A. Ballen attended a large meeting with

---

[2]Dr. Elzoires Iria Freitas was one of the Brazilian attorneys who referred a client to Speiser Krause and Guimaraes.

Guimaraes and many of the local attorneys who had referred their clients to Guimaraes and Speiser Krause.

Guimaraes Dep. 11/2/05, p. 153-154; Guimaraes Dep. 11/17/05, p. 31-33. During that meeting, the attorneys

inquired about their compensation for referring their clients to Speiser Krause and Guimaraes. After

considering this request, A. Ballen wrote a letter, addressed to Guimaraes, stating:

> This is to confirm our agreement that all participating attorneys who refer
> cases to us shall receive 10% of the net attorney fee. You are authorized
> to tell the referring attorneys of this arrangement and our firm stands
> behind this commitment.

Berman Aff. Ex. 8 (Doc. No. RG000038). Thus, in contrast to Guimaraes (who was to receive 25% of

Speiser Krause's fee for serving as co-counsel for all of the clients), a local attorney who was merely

referring a particular client was to receive 10% of Speiser Krause's fee from that client. Guimaraes Dep.

11/17/05, p. 31-32, 66.

## The Litigation in the United States

Speiser Krause eventually filed a lawsuit in Orange County Superior Court in California against two

defendants, Northrop Grumman Corp. ("Northrop") and Teleflex Control Systems ("Teleflex") All of the

cases were consolidated with the lead case, Andrews, et al. v. Northrop Grumman Corp., Case No. 783990.[3]

During the course of the litigation, Guimaraes continued to support Speiser Krause as needed, assisting with

client communications, translating legal and other documents, and keeping the clients informed concerning

the litigation. Guimaraes Dec. ¶ 31. The defendants in the California action asserted the defense of *forum*

*non conveniens*, and sought to dismiss the Brazilian plaintiffs' claims in California. Guimaraes Dec. ¶ 33.

Guimaraes spent a significant amount of time assisting Speiser Krause in preparing its opposition to the

motion, providing expert information concerning the legal system in Brazil and other matters requested by

Speiser Krause. Guimaraes Dec. ¶ 34. As part of this effort, for instance, Guimaraes spent over a month

---

[3]Linda Andrews, who was also represented by Speiser Krause, was the widow of one of the few
victims of the TAM air disaster who was a United States citizen. Speiser Krause ultimately settled the
Andrews case for $6,000,000, an amount 6 to 15 times greater than the settlements achieved for the
Brazilian plaintiffs.

working at Speiser Krause's Irvine, California office assisting with the case. Guimaraes Dec. ¶ 34; Guimaraes Dep. 10/7/05, p. 107-108; Guimaraes Dep. 11/2/05, p. 31-32, 172. Various correspondence exchanged by the parties corroborate these efforts. Berman Aff. Ex. 8 (Doc. No. RG000050-69).

The California Court eventually entered an order granting the defendants' motion to dismiss the Brazilian plaintiffs' complaint on *forum non conveniens* grounds, but stayed execution of that order to give those plaintiffs an opportunity to file a new action in Brazil. Guimaraes Dec. ¶ 35. The California Court ruled that the cases would only proceed in California if the Brazilian court declined to exercise jurisdiction over the case. Guimaraes Dec. ¶ 35.

### The Jabaquara Action (Litigation in Brazil)

Upon the recommendation of Guimaraes, Speiser Krause retained attorney Irineu Strenger ("Strenger") who, together with Guimaraes, filed a lawsuit against Defendants Northrop and Teleflex in Brazil on June 30, 1998 (the "Jabaquara Action"). Guimaraes Dep. 10/7/05, p. 62-66; Berman Aff. Ex. 7 (Doc. No. SK000685-695). Strenger subsequently withdrew from the case due to tactical disagreements, and Guimaraes thereafter remained as lead counsel in the Jabaquara Action. Guimaraes Dec. ¶ 36.

The Brazilian court accepted jurisdiction, and the case was litigated by Guimaraes in Brazil, with Speiser Krause's full knowledge and approval, for approximately two years, until he ultimately obtained a judgment on June 30, 2000. Guimaraes Dec. ¶ 36. Speiser Krause, which has no attorneys that are admitted to practice law in Brazil, had no active participation whatsoever in the Jabaquara Action. Guimaraes Dec. ¶ 36. Thus, as a result of the ruling on the *forum non conveniens* issue, Guimaraes was required to do substantially more work in litigating the case in Brazil than had been contemplated. Nevertheless, he continued performing under the fee sharing agreement.

In July 1998, Guimaraes wrote to Speiser Krause about another issue that was on the horizon. As the 2-year anniversary of the crash approached, it was necessary to make a determination as to who would represent the families in a separate litigation to be filed in Brazil against TAM Airlines (a defendant not

8

named in the United States litigation). Guimaraes Dec. ¶ 37. Guimaraes and Speiser Krause had previously determined that it would be better to bring a separate lawsuit against TAM Airlines in Brazil because the liability case against TAM was clear, and there were no jurisdictional objections to overcome since TAM Airlines was a Brazilian company. Guimaraes Dec. ¶ 37; Guimaraes Dep. 10/7/05 p. 78.

In a letter dated July 17, 1998, Guimaraes asked Speiser Krause for a proposal concerning their contingency fee for handling the lawsuit against TAM Airlines in Brazil. Berman Aff. Ex. 8 (Doc. No. RG00082-83). In his letter, Guimaraes pointed out that it was necessary to discuss a separate fee-sharing arrangement[4] concerning that independent action against TAM Airlines (not the main action filed in the United States that was already the subject of the February 5, 1997 fee sharing agreement) because it was contemplated from the outset that Guimaraes (and not Speiser Krause) would be primarily responsible for handling this piece of the litigation in Brazil. Berman Aff. Ex. 8 (Doc. No. RG00082-83); Guimaraes Dep. 11/17/05 p. 30.

In that letter, Guimaraes suggested that Speiser Krause charge a certain percentage fee for its work as a "consultant" in the TAM Airlines case in Brazil, and that he would receive a fair share of that fee, keeping in mind that he would be doing the bulk of the work. This way, Guimaraes would derive his fee for this local action from Speiser Krause's overall fee, and not collect a separate fee from the clients. Berman Aff. Ex. 8 (Doc. No. RG00082-83). However, Speiser Krause rejected the notion of serving as a consultant on the TAM Airlines case. Berman Aff. Ex. 8 (Doc. No. RG00090-91). Accordingly, on August 1, 1998, Guimaraes informed Speiser Krause that he would proceed to represent the families that were interested in retaining him, and would charge those clients a 10% fee for his services as is customary in Brazil for this type of case. Berman Aff. Ex. 8 (Doc. No. RG00085-86).

On August 7, 1998, Lear wrote to the family members on behalf of Speiser Krause concerning the

---

[4]Thus, contrary to what is stated at p. 15 of defendant's memorandum, the parties were _not_ still discussing the fee February 5, 1997 fee sharing agreement.

9

status of the TAM litigation. Berman Aff. Ex. 8 (Doc. No. RG00088-89). In that letter, Lear confirmed his awareness of the need to file suit against TAM Airlines prior to the two-year anniversary of the crash, and indicated he wanted to "discuss . . . the potential for having a [sic] experienced Brazilian lawyer file suit on behalf of all families who ha[d] not hired their own Brazilian counsel." Berman Aff. Ex. 8 (Doc. No. RG00088-89). Speiser Krause confided in a separate letter sent the same day to Guimaraes that "although the letter contemplates hiring a [sic] 'experienced Brazilian lawyer' to file suit on behalf of all families who have not hired their own Brazilian counsel, this letter implies of course that should a family member wish for you to represent them, obviously you would be the person to do so, including filing the complaint and prosecuting the matter on their behalf." Berman Aff. Ex. 8 (Doc. No. RG00090-91).

Eventually, and with Speiser Krause's full knowledge, 26 clients retained Guimaraes individually to represent them in the separate lawsuit against TAM Airlines, while other clients retained other counsel. Guimaraes Dep. 10/7/05, p. 67-68, 77-78; Guimaraes Dep. 11/2/05, p. 62-63. These clients agreed to pay Guimaraes a 10% fee for his services in that action. Guimaraes Dep. 11/2/05, p. 90-92. There was no sinister "compensation scheme" as suggested by Speiser Krause. Defense Memorandum p. 15. Guimaraes represented 26 clients in a separate action in Brazil against TAM Airlines. Speiser Krause refused to participate, despite Guimaraes' invitation that they do so. Speiser Krause cannot now complain that Guimaraes earned this fee.[5]

### The Global Settlement and the Jabaquara Judgment

While Guimaraes was litigating the Jabaquara Action, Speiser Krause was trying to negotiate a settlement with the various insurance carriers for the defendants. Berman Aff. Ex. 8 (Doc. No. RG00088-89). In the early part of 2000, while the Jabaquara Action was still pending in Brazil, Speiser Krause negotiated

---

[5]This is particularly true because Speiser Krause improperly charged the clients for services it did not perform in the suit against TAM Airlines. In calculating its 25% contingency fee, Speiser Krause inappropriately included the sums awarded to the clients from the TAM Airlines suit (for which they had already paid a fee to local Brazilian counsel pursuant to the separate fee agreements described above), although Speiser Krause had done nothing to earn that fee. Guimaraes Dec. ¶ 42.

10

a global settlement (the "Global Settlement") for the total sum of approximately $37,000,000.00. Guimaraes Dec. ¶ 43; Berman Aff. Ex. 7 (Doc. No. SK002610-11).   Speiser Krause unilaterally allocated the total amount of the settlement among the settling families, without any discussion with Guimaraes or the clients. Guimaraes Dec. ¶ 43.   In April 2000, representatives of Speiser Krause visited Brazil and began holding individual meetings with the clients over the course of several days to announce the settlement offers negotiated by Speiser Krause. Guimaraes Dec. ¶ 44. Despite the fact that Guimaraes was co-counsel, and had enjoyed a cordial and cooperative relationship with Speiser Krause from the inception of the case, Speiser Krause excluded Guimaraes from many of these client meetings. Guimaraes Dec. ¶ 44; Freitas Dep. p. 32-34. During those meetings, Speiser Krause explained to the families that the cases in the United States had been lost, and that the offers being extended were "take it or leave it" offers. Guimaraes Dep. 11/2/05 p. 77-79; Guimaraes 11/17/05 Dep. p. 61-62; Freitas Dep. p. 36-37. The immediate reaction of many of the families was surprise and anger. Guimaraes Dec. ¶ 45. Many of the families rejected the settlements because they were too low. Guimaraes Dec. ¶ 46; Freitas Dep. p. 37-39. Guimaraes, who had also been kept in the dark by Speiser Krause, was similarly outraged by the offers, which he considered inadequate. Guimaraes Dec. ¶ 46; Freitas Dep. p. 34, 38-40.

On June 30, 2000, the Court in the Jabaquara Action entered a Judgment which, at then current monetary exchange rates, awarded each family $1,111,111.11, plus 2/3 of the last annual salary earned by each decedent from the date of the accident until that decedent would have been 65, plus a 20% contempt of court penalty against Northrop for failing to post a bond that the Court had required, plus another 20% for attorneys fees. Berman Aff. Ex. 8 (Doc. No. RG00215-RG00326). This result bolstered Guimaraes' conviction that the settlement values negotiated by Speiser Krause were unacceptable, since the settlements negotiated by Speiser Krause were significantly lower.[6]

---

[6]Attached is a list produced by Speiser Krause in this litigation detailing the amount of each settlement. Berman Aff. Ex. 7 (Doc. No. SK002610-11).

In those cases involving minors who were clients, it was necessary for the Court in Brazil to approve the settlement. Guimaraes 11/2/05 Dep. p. 98. Because he was firmly convinced that the settlement agreements were not in the best interests of the clients, Guimaraes refused to assist in seeking court approval of the settlements. Guimaraes Dec. ¶ 49. Although many of the clients agreed with Guimaraes' opinion that the settlement offers were too low, they decided to accept them because they needed the money. Guimaraes 11/2/05 Dep. p. 97 At Speiser Krause's behest, a total of 17 of the 64 families formally terminated Guimaraes' services. Apuzzo Aff. Ex. R; Guimaraes 11/2/05 Dep. p. 94-97. Moreover, because Guimaraes would not sign his approval of the settlement offers, Speiser Krause hired another local attorney, Luiz Roberto de Arruda Sampaio, to assist with the approval of the settlement offers. Guimaraes Dec. ¶ 49.

Contrary to Speiser Krause's representations, Guimaraes did not abandon the clients' cases or act contrary to the best interests of the clients. As their attorney, Guimaraes complied with his duty to exercise his independent judgment and counseled the clients concerning whether the settlements being proposed by Speiser Krause were fair and reasonable. Guimaraes Dec. ¶ 51. Guimaraes felt strongly that they did not. Although Guimaraes certainly attempted to persuade the clients not to accept the settlement offers, he did not in any way harm those clients who ultimately disagreed with his advice and chose to accept the settlement offers since they recovered the full amount they were offered. Guimaraes Dec. ¶ 51; A. Ballen Dep. p. 115-116.

## ARGUMENT

### I.     THE STANDARD FOR GRANTING SUMMARY JUDGMENT

Summary judgment is a "drastic procedural weapon." *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1988). This is because "its prophylactic function, when exercised, cuts off a party's right to present his case to the jury." *Donnelly v. Guion*, 467 F.2d 290, 291 (2d Cir. 1972). As a result, the Second Circuit has declared that "trial judges should exercise great care in granting motions for summary judgment. A litigant has a right to a trial where there is the slightest doubt as to the facts, and a denial of that right is

reviewable; but refusal to grant a summary judgment is not reviewable." *Doehler Metal Furniture Co. v. United States*, 149 F.2d 130, 135 (2d Cir. 1945).

Consequently, summary judgment may not be granted unless the moving party can show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. The rule authorizes summary judgment only "where it is quite clear what the truth is." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467 (1962), quoting *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627 (1944). "[T]he purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Id.*

In considering a motion for summary judgment, a court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Thus, "the moving party bears a heavy burden of demonstrating the absence of any material issues of fact." *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

This rule is especially important when dealing with "questions of motive, intent, and subjective feelings and reactions." *Empire Electronics Co. v. U.S.*, 311 F.2d 175, 180 (2d Cir. 1962). Hence, the issue of contract formation is definitively a question of fact where, as here, the parties' manifest intent is in dispute. *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 145 (2d Cir. 2001); *Ronan Associates, Inc. v. Local 94-94A-94B, Intern. Union of Op. Engineers, AFL-CIO*, 24 F.3d 447, 449 (2d Cir. 1994). In such cases, it is for the jury to decide whether a contract has been formed. *U.S. Titan*, 241 F.3d at 145; *Ronan Associates*, 24 F.3d at 449. A decision on summary judgment is premature. See *U.S. Titan*, 241 F.3d at 145; *Ronan Associates*, 24 F.3d at 449.

## II.    THE FEE SHARING AGREEMENT IS A VALID, ENFORCEABLE CONTRACT

### A.    Choice of Law

As a threshold matter, the Court must determine what law governs in this case. Throughout its memorandum, Speiser Krause cites only New York law, evidently assuming, without any explanation whatsoever, that New York law automatically applies to all issues in this case. That is not so. Under the doctrine of "depecage" applied by New York courts, rules of one legal system may be applied to regulate some issues arising from a given transaction or occurrence, while those of another system may regulate others. *Hutner v. Greene*, 734 F.2d 896 (2nd Cir. 1984).

It is well-established that a federal court sitting in diversity follows the choice of law rules of the state in which it is located. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). However, where a change of venue is granted pursuant to 28 U.S.C. § 1404, the transferee court must apply the choice of law rules of the transferor court. *Ferens v. John Deere Co.*, 494 U.S. 516, 519, 110 S.Ct. 1274, 1277-78, 108 L.Ed.2d 443 (1990); *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); *Hatfill v. Foster*, 415 F.Supp.2d 353 (S.D.N.Y. 2006); *Muller v. Walt Disney Productions*, 876 F.Supp. 502 (S.D.N.Y. 1994).

Guimaraes commenced this action in the United States District Court for the Southern District of Florida. Pursuant to a motion to dismiss or transfer filed by Speiser Krause, the Florida court transferred this action to the Southern District of New York. Accordingly, pursuant to the foregoing authorities, Florida choice of law rules must be applied to determine the applicable law in this case.

### B.    The Law of Virginia Applies to Issues Concerning the Execution, Interpretation, and Validity of the Fee Sharing Agreement.

Florida choice of laws rules follow the principle of *lex loci contractus*, which directs that "matters bearing upon the execution, interpretation, and validity of a contract are determined by the law of the place where it is made." *State-Wide Insurance Co. v. Flaks*, 233 So.2d 400 (Fla. 3rd DCA 1970); *Goodman v.*

14

*Olsen*, 305 So.2d 753 (Fla. 1974); *Fioretti v. Mass. General Life Ins. Co.*, 53 F.3d 1228 (11th Cir. 1995).[7]

Under Florida law, the determination of where a contract is executed, for purposes of determining which jurisdiction's laws govern interpretation of the substantive issues regarding the contract, is fact-intensive, and requires a determination of where the last act necessary to complete the contract is done. *Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.* 363 F.3d 1089 (11th Cir. 2004). As explained in greater detail below, the last act necessary to complete the fee sharing agreement between Speiser Krause and Guimaraes was the execution of the fee sharing agreement by Speiser Krause in Virginia, affirming the negotiations and agreement reached between Guimaraes and A. Ballen, that Guimaraes would receive 25% of Speiser Krause's fee in connection with the TAM cases. That act was accomplished when Lear drafted, executed and faxed the February 5, 1997 letter from Speiser Krause's Virginia office to Brazil. Thus, issues pertaining to the interpretation and validity of the fee sharing agreement between the parties are to be determined by Virginia law, the place where the contract was made.

Under Virginia law, a contract can be written on anything. *See generally Lucy v. Zehmer*, 84 S.E.2d 516 (Va. 1954). No formal writing is required. *Agostini v. Consolvo*, 153 S.E. 676, 679 (Va. 1930). To form a contract, there need only be "meeting of the minds," evidenced by an offer, acceptance of the offer, and valuable consideration. *See Montagna v. Holiday Inns, Inc.*, 269 S.E.2d 838, 844-45 (Va. 1980). The objectively-manifested intent of the parties governs. *Lucy*, 84 S.E.2d at 521-22; *Agostini*, 153 S.E. at 679. Where the parties have fully agreed and intend to be bound, a binding contract results. *Agostini*, 153 S.E. at 679. Correspondence between the parties is sufficient to evidence this intent. *see Agostini*, 153 S.E. at 679.

---

[7]     On the other hand, matters concerning performance under a contract (or lack thereof) are determined by the law of the place where the contract is to be performed. *Government Employees Ins. Co. v. A.C. Grounds*, 332 So.2d 13 (Fla. 1976), citing *State-Wide Insurance Co. v. Flaks*, 233 So.2d at 402.

Where the parties' representations are in dispute, the issue of contract formation is a question of fact. *Jessee v. Smith*, 278 S.E.2d 793, 794-95 (Va. 1981); *Mullins v. Mingo Lime*, 10 S.E.2d 492, 493 (Va. 1940). Where "doubt exists as to the character, or, indeed, the presence or lack of representations, the determination of the precise nature and extent of the representations is a question for the jury." *Jessee*, 278 S.E.2d at 795 (quoting *Mullins*, 10 S.E.2d at 493). In such cases, summary judgment is premature; a jury decides whether there has been a meeting of the minds. *Id.*

The elements of a cause of action for breach of contract are: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 594 S.E.2d 610, 619 (Va. 2004).

**C.     The Parties Have a Valid, Enforceable Written Contract, Signed By the Party Against Whom It Is Being Enforced.**

1.     <u>The Agreement Was Definitive And Contained All Material Terms</u>.

Guimaraes and Speiser Krause have a valid written contract in which they agreed upon all material terms. On February 5, 1997, Speiser Krause sent an executed document to Guimaraes which set forth the parties' agreement. This fee sharing agreement, which Speiser Krause drafted and signed: (1) confirmed Guimaraes' retention as Brazilian counsel; (2) stated the exact percentage of attorneys' fees (33 1/3 %) that Speiser Krause would receive; (3) stated the exact percentage of attorneys' fees that Guimaraes, as Brazilian counsel, would receive (25%); and (4) identified the legal matter on which they would jointly provide legal services. These were the material terms, all of which were expressly stated in the contract and signed by Speiser Krause. A meeting of the minds was consummated, and thus defendant's motion for summary judgment should be denied.

The plain language of the fee sharing agreement removes all doubt as to its finality and the fact that an agreement was reached. According to the fee sharing agreement, Speiser Krause "... <u>will</u> charge

16

the sum of 33 1/3 % for the handling of each such case." Berman Aff. Ex. 8 (Doc. No. RG000006)(emphasis added). The contract does not say that it "may" (the language of possibility or discretion), or that it "would" (the language of condition), or that "upon the occurrence of [some contingency]." It says - categorically and without qualification - that Speiser Krause <u>will</u> charge this sum. Likewise, the fee sharing agreement states that "[o]f this fee, a total of 25% <u>will</u> be paid to Brazilian counsel for their services." *Id.* (emphasis added). The intent is clear. Nothing is left open to future discussion. The fee sharing agreement is definitive on every material term, and thus a contract was reached.

To ensure that Guimaraes understood that the fee sharing agreement was complete, Speiser Krause put in language to seal the deal. The fee sharing agreement concludes: "[w]e look forward to <u>once again working actively with your office</u>." *Id.* (emphasis added). The contract does not, as Speiser Krause now suggests, state that "maybe" or "possibly" the two firms would work together - it says that they will be and that Speiser Krause was looking forward to it. This is a key indication of finality because Guimaraes had worked with Speiser Krause before, and this language was fairly understood by Guimaraes to mean that the parties had reached a final agreement on all material terms and thus were once again working together under the contract terms Speiser Krause memorialized. Note that the document does not say "let us know if this is acceptable to you," or words to that effect. There are no qualifiers, such as "we hope we can reach an agreement" or "someday, when we finalize our understanding." Tellingly, Speiser Krause made no reference to any future negotiations that might follow and it did not invite any further discussion. Instead, Speiser Krause expressly states that it <u>will</u> be working with Guimaraes again, as it had done in the past. The plain meaning of this language shows that Speiser Krause was confirming a binding contract, with Guimaraes, that was complete.

Likewise, <u>Speiser Krause admits it never expressed any intent not to be bound</u>. Speiser Krause's memorandum states "... the Lear Fax contains no explicit reservation of Speiser Krause's right not to be

bound ...." (Defense Memorandum, p. 19)(emphasis added).  Speiser Krause cannot make this statement and, in the same breath, claim that some word or phrase in the fee sharing agreement such as "proposed' (overlooking words like "confirm" and "will pay" and "working with") makes it expressly preliminary and non-binding.

There is stark contrast between what Speiser Krause deems a final and complete agreement when it is receiving money, and what it deems is necessary to create a contract when they have to pay money. According to Speiser Krause, the fee sharing agreement is a "short, informal communication." Memorandum, p. 19.  Yet the <u>client</u> fee agreements (which Speiser Krause also drafted), just like the fee sharing agreement, <u>also have only one page of text</u> (the second page merely being for their signature). Obviously  Speiser Krause is comfortable binding itself using an economy of words, as it did with the clients.  Likewise, the client fee agreements, just like the fee sharing agreement, <u>are all letter agreements on Speiser Krause letterhead</u>.  In another example, Speiser Krause contends the fee sharing agreement lacks the appropriate language of agreement (despite the use of "confirm," "will pay," "look forward to working" and other definitive statements).  Yet the client fee sharing agreements repeatedly uses terms such as "understood" or "will" (or even no such words at all) in substitution for "agree."  As another example, Speiser Krause claims that for the fee sharing agreement to be enforceable, it would have to specify the forum for the litigation, break out all of the costs and expenses in some line item fashion, differentiate the roles of the various attorneys, and so on.  Yet the client fee agreements, which Speiser Krause drafted and which they claim are enforceable, do none of these things; they do not identify a forum, or break out any costs, or differentiate any roles, or <u>any</u> of the other things Speiser Krause now finds it convenient to suggest are "open terms"in the fee sharing agreement.  If greater specificity were needed with co-counsel, *a fortiorari* it would be more important to the clients on whose behalf the work was to be done.  Yet  the client fee agreements state merely that the attorneys (Speiser Krause <u>and</u> Guimaraes) can "pursue such actions as are necessary <u>by whatever form of action you deem appropriate</u>

18

...." This language – that Speiser Krause selected, drafted, signed, accepted millions of dollars under, and at no time has ever challenged – is they contend, sufficient to create a valid, enforceable contract. Thus, Speiser Krause cannot now be heard to claim that their fee sharing agreement (which is for the same cases, the same clients, to be serviced by the short and succinct client fee agreements) needs to read like the mortgage on the Empire State Building.

There was no need, contrary to Speiser Krause's argument, for a signature line in the fee sharing agreement for Guimaraes. The fee sharing agreement was signed by the party against whom it is being enforced - Speiser Krause. Guimaraes responded in writing and acknowledged the fee sharing agreement to be "definitive." Berman Aff. Ex. 8 (Doc. No. RG0026-28). Moreover, as shown, Guimaraes was listed in the client fee agreements as counsel, and identified as having an entitlement to the contingency fee, which agreements which Speiser Krause also signed. *Baysden v. Roche*, 563 S.E.2d 725, 726-27 (Va. 2002) ("Documentary evidence of the existence of a contract may be evidence that is separate and apart from the contract itself.") Thus, under both the case law and the facts of this case, no signature line is required for the fee sharing agreement to be enforceable.

Speiser Krause undertakes a "grammatical" analysis of its own contract, the purpose of which is to urge that the words they chose, they drafted, and they signed have no meaning at all.[8] It begins with denying who "Brazilian counsel" is. According to Speiser Krause, the fact that: (1) Guimaraes, a Brazilian lawyer, is the only addressee of the fee sharing agreement; (2) Guimaraes is the only recipient of the fee sharing agreement; (3) Guimaraes is the only Brazilian counsel Speiser Krause had negotiated with about the fee sharing agreement; (4) Guimaraes, and no one else, asked for the fee sharing agreement; (5) no other Brazilian lawyer worked on the case; (6) no other Brazilian lawyer is mentioned or referenced in the fee sharing agreement; (7) there is no testimonial evidence that at the time of the fee

_____

[8]     Any doubt as to the meaning of a contract term must be resolved in Guimaraes' favor. *Winn v. Aleda Construction Co.*, 315 S.E.2d 193, 195 (Va. 1984); *Hutchison v. King*, 145 S.E.2d 216, 220 (Va. 1965).

sharing agreement any other Brazilian attorney was in the litigation; (8) it was Guimaraes' case and Guimaraes' clients - he was referring cases to Speiser Krause (not the other way around); (9) the fee sharing agreement states that Speiser Krause looks forward to working with Guimaraes, i.e., your office (not anyone else); and (10) the subsequent client fee agreements list Guimaraes as the only Brazilian counsel - all of this is mere happenstance and should fall to the absurdly hyper-technical and counterintuitive proposition that the fee sharing agreement says "Brazilian counsel" and not "Guimaraes." Somehow, Guimaraes was expected to think, when he read the fee sharing agreement he requested, addressed to him for his benefit, that "Brazilian counsel" meant some hypothetical strangers to these cases instead. This is a completely unreasonable construction of the fee sharing agreement that is unsupported by the evidence and the remainder of the letter. Tellingly, the record is devoid of so much as one Brazilian lawyer other than Guimaraes who contends the language in the fee sharing agreement refers to them.

Speiser Krause next makes the frighteningly picayune argument that despite all the evidence of a binding, valid agreement, this case should boil down to the precise use of the word "their" because the fee sharing agreement refers to "their services." According to the State University of New York,[9] misuse of the word "their" is one of the most common grammatical mistakes.[10]  That is because in spoken English there is "... widespread use and evident convenience of the 'singular their' construction." For example, "[t]he catalogue should explain what a student needs to complete their studies." Id. (emphasis in original).  If college educated Americans routinely use a singular form of "their," and fail to apprehend

---

[9]      The Guide, SUNY Geneseo's Online Writing Guide; www.geneseo.edu/~writing.

[10]      So common, in fact, that the Defendant itself misused the word "their" at least three times in its memorandum.  "Among other things, plaintiff accused Speiser Krause of "betraying" **their** clients, and engaging in criminal acts." (Defendant's memorandum, p. 5).  "Of course, Speiser Krause remained under retainer by **their** TAM clients." (Defendant's memorandum, p. 14).  "Indeed, very early on, Speiser Krause experienced difficulties coordinating **their** activities with Guimaraes." (Defendant's memorandum, p. 25).

the precise use of this term (to the point that it is one of the most common grammatical English mistakes), it would be wholly unjust to expect Guimaraes, a foreign national and non-native English speaker, to identify this tiny, immaterial nuance in the fee sharing agreement.[11] *Krikorian v. Dailey*, 197 S.E. 442, 446 (Va. 1938) (holding that the purpose of a covenant is more important than the academic definition of words). But even if Guimaraes could reasonably be expected to know the precise use of this word, the use of "their" in the fee sharing agreement changes nothing because, as shown in the previous paragraph, there was no "their" - only Guimaraes, and Speiser Krause knew that and agreed to it and reflected it in the client fee agreements executed thereafter. Regardless, the fee sharing agreement must be read in its totality, and in the context of the parties' dealings with one another and their conduct, and not as one isolated word. *Plunkett v. Plunkett*, 624 S.E.2d 39, 42 (Va. 2006) (holding that contracts must be considered as a whole, without giving emphasis to isolated terms).

Speiser Krause' argument – that it is entitled to $7 million and Guimaraes is entitled to nothing for four years of legal work, all because of the word "their" -- would work a travesty of justice; if not rejected outright based on the clear intent of the fee sharing agreement and the parties' course of dealings, at a minimum it presents a genuine issue of material fact to be determined by a jury. *Zirkle v. Allison*, 101 S.E. 869, 871 (Va. 1920)("When an instrument is susceptible of two constructions, the one working injustice and the other consistent with the right of the case, that one should be favored which standeth with the right.").

---

[11]    Not long after the fee sharing agreement was reached, Guimaraes did notice this word, at which point he wrote to Speiser Krause and asked for clarification. Speiser Krause gave no clarification and allowed Guimaraes to continue to believe that "their" referred to him. For this additional reason. Speiser Krause should not be heard to make this argument. Lear 10/12/05 Dep. p. 81-82.

2.     The Events Preceding The Agreement Show The Parties Meant To Be Bound And Had Reached A Final Contract.

The finality of the fee sharing agreement is further supported by the context in which it was written, which shows that the contract was complete because it <u>had</u> to be complete; otherwise, Speiser Krause would never have been permitted to serve as United States counsel on these matters. According to the deposition testimony, the parties entered into extensive fee sharing negotiations. During those negotiations, Guimaraes had choices. Guimaraes had clients, and through them and his extensive Brazilian contacts the ability to sign up more clients. <u>Speiser Krause had no clients</u>. It had never even handled a matter in Brazil. Guimaraes was a native Brazilian, licensed to practice in that country who spoke Portugese (the language spoken by the clients). Speiser Krause did not. Guimaraes could chose between many hundreds of United States firms to serve as American legal counsel. Speiser Krause was limited to whatever Brazilian firm had the clients and was willing to consider hiring them, which, of course, was Guimaraes. For these reasons, Guimaraes had made clear to Speiser Krause during their final negotiations that unless Speiser Krause was willing to pay him 25% of the contingency, Guimaraes would find other United States counsel. The negotiations had reached the point of walk away. It was precisely and directly because of this that Speiser Krause sent the fee sharing agreement - to lock itself in as U.S counsel, ensure its ability to participate in the case, and to keep Guimaraes from signing up any one of hundreds of other law firms as American counsel. Speiser Krause was not seeking a mere "agreement to agree" - they wanted to be on the case and saw that opportunity fading quickly. Given these facts, the fee sharing agreement, and its finality, makes absolute sense.

Contrast this with Speiser Krause's feeble and self serving interpretation of the contract and the events preceding it. According to Lear, at the time he drafted, signed and sent the fee sharing agreement, he was not ready to even discuss a fee sharing arrangement with Guimaraes. Lear 10/12/05 Dep. p. 81. This begs the question, then what *was* Lear doing? The same lawyers who allegedly are so precise with

22

their words that they ask the Court to parse through "plural possessive pronouns" to interpret their writings take the time to author a document setting forth a specific fee sharing arrangement, sign it, and send it to Brazil with no qualifications, directly contradicting their assertion that they were not ready to reach any agreements? This makes no sense at all.  Still further, clientless Speiser Krause would have the bargaining position to forestall such negotiations and make Guimaraes wait for as long as they wished, and accept whatever terms Speiser Krause wished, based on what? Martindale Hubbel lists 241 attorneys in New York alone, much less the United States, with aviation law experience.  It is plainly apparent from the context of the fee sharing agreement that Speiser Krause intended to be bound by its terms, and intended for Guimaraes to be bound by its terms, because the only other alternative was that Guimaraes would have easily found other United States counsel, as he told them he would if no agreement was reached.

      3.    <u>The Events Following The Agreement Show The Parties Meant To Be Bound And Had Reached A Final Contract</u>.

There is no possibility that Speiser Krause failed to realize that Guimaraes had accepted and intended to be bound by the fee sharing agreement.  That is because Guimaraes <u>told</u> Speiser Krause, in writing, only two weeks after the fee sharing agreement was signed, that he deemed their agreement "definitive." Berman Aff. Ex. 8 (Doc. No. RG0026-28).  In fact, Speiser Krause had said something to Guimaraes in the interim, to the effect they might breach the agreement, and Guimaraes expressed shock and outrage and insisted in writing  that they perform.  *Id*.  If ever there was a time when it would be most appropriate, and legally necessary, for Speiser Krause to deny the existence of a valid agreement, this was it.  Still, they said nothing.  Moreover, according to Lear's deposition testimony, they <u>consciously chose to say nothing</u>. Lear 10/12/05 Dep. p. 82.  In the face of Guimaraes' express, written contention that the parties had a definitive agreement, and upon his express written demand for their performance, Speiser Krause was obligated to speak if it believed no contract existed; its silence cannot

now shield it from its obligations under the fee sharing agreement or support the fiction that Speiser Krause did not intend to be bound.

It was not just Guimaraes, but all of the parties, who conducted themselves consistent with a final agreement being in place. After receipt of the fee sharing agreement, Guimaraes referred Speiser Krause its first client. A formal, written fee agreement was then signed by that family. The fee agreement states that "The undersigned claimant hereby retains the law firms of SPEISER KRAUSE and RENATO GUIMARAES ...." Apuzzo Aff. Ex. S (emphasis added). It further states that "... you are authorized to retain out of any moneys that may come into your hands by reason of settlement or otherwise, as your contingent legal fee, THIRTY-THREE and ONE THIRD Percent (33 1/3 % of the lump sum recovered ....". *Id.* Thus, there is yet another writing, authored and signed by Speiser Krause, which reflects that Guimaraes was to share the contingency fee. Nowhere in that client fee agreement does Speiser Krause state that the previous fee sharing agreement would not be honored. Nor did Speiser Krause tell Guimaraes that before entering into the first client fee agreement. Instead, they allowed Guimaraes to continue relying on the fee sharing agreement and drafted a client fee agreement consistent with it. Then Speiser Krause proceeded to sign more written client retainer agreements, stating that Guimaraes was co-counsel, and repeatedly stating he was to share in the contingency fee.[12] Again, at no time during the process of entering into the client fee agreements did Speiser Krause ever indicate that it would not honor the fee sharing agreement, again reflecting its intent to be bound by its contract.

Once the fee sharing agreement was signed, and after the client fee agreements were also signed, in reliance on them Guimaraes spent four years of his life working on these cases. At some point, during that monumental effort (which is documented in the statement of facts and in his supporting declaration), one would expect Speiser Krause, if it honestly believed the parties had not yet reached an agreement, to

---

[12]    As explained above in the Statement of Facts section, Speiser Krause surreptitiously omitted Guimaraes' name from numerous retainer agreements.

tell Guimaraes, in substance, "it's time for us to finalize the terms of our fee sharing because we don't have a contract." That never happened. Instead, Guimaraes, with Speiser Krause's full knowledge, consent, and approval, toiled away on these lawsuits for years to help these unfortunate victim's families obtain a recovery. Now Speiser Krause contends that, despite its fee sharing agreement, the stack of client fee agreements, and all of Guimaraes' hard work over many years, he is entitled to nothing.[13] The law does not permit such obvious exploitation. "No reasonable person, adult or infant, would make a practice of so working for another unless he expected to be paid therefor." *Nolde Brothers v. Chalkley*, 184 Va. 553, 567 (Va. 1945). "When the circumstances demand that a party speak out, he cannot remain silent. If he does not speak, an estoppel arises." *Id*. It is abundantly clear from the facts of this case that Speiser Krause acted, at all times, as if its fee sharing agreement was a binding contract (because it was) and Speiser Krause is estopped from contending otherwise.

As the foregoing facts show, there is a hole, an enormous one, in Speiser Krause's treatment in their memorandum of the contract and its negotiation. If, as Speiser Krause agues, it was not ready to negotiate a fee sharing agreement, and if, as they further argue, this was something that would occur later, *when was later*? They entered into multiple client fee agreements, yet there was no new agreement or any Speiser Krause ever suggested. They worked on the case together for four years, and there was no new fee agreement or any Speiser Krause ever suggested. The case settled and was approved by another court, and there was no new fee agreement or any Speiser Krause ever suggested. The parties stand before this Court now, after years of litigation, and still Speiser Krause has not informed the court what Guimaraes' share was supposed to be, if not what is reflected in the fee sharing agreement. Evidently Speiser Krause is arguing that Guimaraes was meant to wait indefinitely, which is absurd. It is specious to argue that the very lawyer who was originally contacted by the clients, and whose case it was, was

---

[13]     Although, revealingly, Speiser Krause did repeatedly paid Guimares' reimbursement expenses, which further shows Speiser Krause believed it had contractual obligations to Guimares. Lear Aff. ¶ 7.

supposed to labor for four years and longer before learning what Speiser Krause, in its largess, was willing to give him.  That is not what happened.  The parties had a deal and they both knew it, because it was not solely up to Speiser Krause to decide who would get what - it was Guimaraes' origination and the clients hired both firms and agreed to pay both firms.[14]

In the face of this avalanche of evidence supporting the existence of a valid contract (which, at a minimum, creates a genuine issue of material fact that would preclude summary judgment), Speiser Krause resorts to selectively quoting from documents, out of chronology and context.  For example, the motion for summary judgment excerpts deposition testimony in an effort to  suggest that Guimaraes somehow doubted whether he had an agreement (although of course Guimaraes never said there was no agreement, and, as shown above, insisted in writing that there was).  Some of the excerpts deal with Guimaraes simply asking questions about the contract.  This is, obviously, a far cry from contending that no contract exists.  Furthermore, if parties to contracts were deemed not to be bound merely because they asked a question, this would add an entirely new dimension to long established contract law.  Indeed, even parties who later testify they never read their contract are held to their obligations unless they were somehow coerced or denied the opportunity to review it.  So the fact that Guimaraes asked some questions after the fee sharing agreement was signed - an agreement he has never once denied or repudiated - does not affect whether a contract existed.  Equally important, in all but one instance the

---

[14]    In fact, because of these signed, written client fee agreements (listing Guimaraes as co-counsel and stating that he has an entitlement to the contingency fee), even if Speiser Krause's position in its motion for summary judgment were correct, and the February 5, 1997 fee sharing agreement was somehow, despite its clarity on every material term, invalid, Guimaraes still has a claim for breach of contract. In fact, he would have an even larger claim because, in the absence of any language to the contrary, under the client fee agreements Guimaraes has the exact same rights to the contingency fee as Speiser Krause, meaning that he would be entitled to 50%. Thus, it is puzzling that Speiser Krause would contend that the only document preventing Guimaraes from receiving twice as much in attorneys' fees should be disregarded. It is even more curious why, in light of Speiser Krause's position that it was not prepared to discuss splitting fees with Guimaraes, it repeatedly drafted and signed client fee agreements documenting that both their firm and Guimaraes were entitled to such contingency fees. Speiser Krause's arguments are belied by their own conduct and an entire stack of written client fee agreements they drafted and executed, intending to be bound.

26

referenced language occurred after Guimaraes had already stated in writing that he deemed the fee sharing agreement "definitive."[15]

4.    The Totality Of The Circumstances Remove All Doubt That The Parties Meant To Be Bound By Their Agreement.

It is abundantly clear from: the fee sharing agreement itself; Speiser Krause's admissions; the negotiations leading up to the contract; the context in which it was drafted and signed; the many related client fee agreements thereafter and their terms; Guimaraes' written statement to Speiser Krause that he deemed the fee sharing agreement "definitive;" the conduct of the parties afterwards in reliance; four years of performance under the agreement; and the absence of any statement, ever, by Speiser Krause that no agreement was reached, that the parties' have a valid, enforceable contract and always conducted themselves as if they had. At a minium, there exist material issues of fact for consideration by a jury. The suggestion now, after Speiser Krause has pocketed $7 million and given Guimaraes _nothing_ under the fee sharing agreement, that no contract was reached, should ring hollow in this Court. The motion for summary judgment should be denied.

D.    The New York Test For Informal Writings Does Not Apply; Even if It Was Applied, The Test Establishes Contract Liability In This Case.

There are two reasons why _Teachers Ins. & Annuity Assoc. v. Tribune Co._, 670 F. Supp 491 (S.D.N.Y. 1987) and its progeny are inapplicable to this case. First, _Tribune_ applies New York law and, as previously established, Virginia law governs the fee sharing agreement. Second, it is a test applied to "informal writings," and, as shown above, the fee sharing contract is a formal writing that memorializes a present agreement on all material terms, drafted and signed by an attorney (the party against whom it is being enforced). There is nothing "informal" about it. However, in an abundance of caution, this section

---

[15]None of the excerpts contradict Guimaraes' allegations. These issues are explained in the Statement of Facts.

will assume, *arguendo* only, that *Tribune* applies and demonstrate that under its guidelines there is an enforceable contract, for which summary judgment should be denied.

Defendant's motion for summary judgment treats *Tribune* as if there is only one kind of "informal writing." In fact, New York recognizes two distinct types of preliminary agreements. *Tribune*, 670 F. Supp. 491 at 498. The first type occurs when the parties have reached a full agreement on all material terms. *Id.* These contracts are preliminary only in form; they are complete when made, even though a later formal memorial is contemplated. *Id.* A type-I agreement allows a party to enforce the whole transaction. *Id.* The second type of agreement is a "binding preliminary commitment," or "binding preliminary agreement." *Id.* These "type-II" agreements occur when the parties agree to certain major terms, while recognizing the existence of open terms still to be negotiated. Type-II contracts are also binding. *Id.* The difference is that, in the type-II scenario, a party may not demand full performance but can still prevent a party from "renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement." *Id.* A party to the second type may force the other party to come to the table and attempt to negotiate the open terms in good faith toward a final contract. *Id.* Under either version, Speiser Krause has contract liability to Guimaraes.

      1.    <u>Speiser Krause Admits It Did Not Reserve A Right Not To Be Bound In The Fee Sharing Agreement .</u>

The first factor in the *Tribune* test is not, as Speiser Krause, merely "the language of the agreement," but rather, as that test has evolved through subsequent decisions, "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing." *Adjustrite*, 145 F.3d at 549. Defendant cites a case for the proposition that this is the most important factor, and then admits the fee sharing agreement "contains no explicit reservation of Speiser Krause's right not to be bound ...." (Defendant's memorandum, p. 19). Based on Speiser Krause's own admission, and based on the analysis

28

of the language in the fee sharing agreement in the preceding section,[16] the first prong of the *Tribune* test - the most important prong - favors Guimaraes and warrants denial of the motion for summary judgment.

2.    The Context Of The Negotiations Further Shows The Parties Had A Final, Binding Agreement.

The context of the parties' negotiation, as supported by the testimonial evidence and Guimaraes' declaration, was that Guimaraes told Speiser Krause that if he did not receive 25% of the 33 1/3 % contingency fee, that he would take his clients to another United States law firm. Speiser Krause responded to that offer by drafting and signing a confirming letter - the fee sharing agreement - embracing those terms. Guimaraes responded in writing and referred to the fee sharing agreement as "definitive." The parties entered into numerous client fee agreements thereafter, with both firms listed as counsel and both firms listed as having an entitlement to the contingency fee. Speiser Krause never denied the finality of the fee sharing agreement and the parties operated under it for four years. At no time did Speiser Krause ever furnish a new or different version of the fee sharing agreement, or prepare a draft of one, or make reference to one that was forthcoming or needed, or request Guimaraes prepare a new document; that is because the fee sharing agreement was the parties' contract. This issue is dealt with in greater detail in the previous section, and those facts and argument are incorporated by reference, but this factor of the *Tribune* test weighs heavily in favor in favor of Guimaraes' position that a final, binding agreement was reached.

The language in the fee sharing agreement about the families (and its context), rather than reflecting an open or unfinished agreement, further shows the fee sharing agreement was final and binding between Speiser Krause and Guimaraes. The attorneys reached agreement on the sharing of a fee between them in the February 5, 1997 contract. That is why the fee sharing agreement is addressed to Guimaraes (and not the families) and contains definitive language such as "will pay," etc. The families,

---

[16]    The arguments from the previous section regarding the binding language in the fee sharing agreement are incorporated here by reference.

29

however, still had to hire Speiser Krause. That is why the fee sharing agreement states "proposed arrangement between *our firm* [Speiser Krause] and *the families*." This did not mean the entire contents of the letter were "proposed," because if that is what was meant, the document would have said "proposed arrangement between our firm, [Guimaraes or "our firms"], and the families, which it did not.[17] It meant that the 33 1/3 fee from the clients to the lawyers was to be proposed to the families (which it was, in writing, and accepted, and signed). The fee sharing agreement simply takes into account that although a final agreement had been reached between the lawyers, the clients still needed to hire Speiser Krause.

Promptly after this fee sharing agreement Speiser Krause prepared client fee agreements (final ones that Speiser Krause accepted $7 million pursuant to),[18] which the clients signed. Those agreements state that Speiser Krause and Guimaraes would share in the 33 1/3 contingency fee (because both firms are listed as being entitled to it, and no other).[19] Guimaraes had the fee sharing agreement translated into Portugese and circulated it to the families. Berman Aff. Ex. 8 (Doc. No. RG0026)[20] Moreover, Guimaraes told the families about the fee sharing agreement, and he told Speiser Krause it has been circulated to them and discussed. Speiser Krause did not inform the clients that it had any objection to the fee sharing agreement that had been sent to them. Thus, taken in proper context, the fee sharing

---

[18]    Speiser Krause's reliance on case law regarding "hoped for" contracts that "never materialized" are completely inapposite; the fee sharing agreement did materialize; the client fee agreements materialized; the four years of work together as co-counsel materialized; and the $7 million Speiser Krause was paid absolutely materialized.

[19]    This renders specious Speiser Krause's argument that other Brazilian law firms would share in the fee, not just Guimaraes, because if that was true the client fee agreements would have spoken to that issue, and referenced Brazilian counsel other than Guimaraes, and they do not.

[20]    Furthermore, Speiser Krause has already admitted there are no express terms in the fee sharing agreement reserving the right not to be bound, so they cannot claim this is such a reservation. They have also claimed the language is unambiguous so they cannot in the same breath claim something was "implicit."

agreement was clearly intended to be final, and Speiser Krause was informing Guimaraes that they had reached a deal with him and that the clients would be signed up accordingly (which they were).

     3.     <u>The Fee Sharing Agreement Did Not Have Any Open Material Terms</u>.

All of the material terms of the fee sharing agreement were expressly included in the document. It stated what matter was being handled. It stated how much Speiser Krause would receive. And it stated how much Guimaraes would receive. Despite arguing that such agreements "customarily" include more terms, Speiser Krause has failed to produce a scrap of evidence to support that contention, which, in any event, would be a disputed issue of material fact because Guimaraes denies it is true based on his personal and professional experience. Guimaraes Dec. ¶ 20.

As shown in a previous section, Speiser Krause's <u>client</u> fee agreements, which it drafted and contends are valid (and which are equally succinct and short) do not specify the matters which it now claims would be necessary in the fee sharing agreement. Rather, using language Speiser Krause selected and authored, the attorneys are given broad discretion by the clients to resolve the case using any means they deem appropriate. Moreover, Speiser Krause has not refunded any of the clients' money on the basis that its fee agreement with them needed the additional terms listed in Defendant's memorandum to be enforceable. Speiser Krause is taking the untenable, contradictory position that it can collect $7 million based on a short, 2 page client agreement on its letterhead (one page of which is just for signatures) in "complex, multinational litigation," but for Guimaraes to collect any money each and every detail of the representation would have to be carefully documented in some extensive legal tome. On this point, Guimaraes adopts his previous arguments by reference, and for these reasons the third prong of the *Tribune* test supports the enforceability of the contract.

     4.     <u>Part Performance Overwhelmingly Shows A Final and Binding Contract</u>.

After four years of accepting Guimaraes' work, which is documented in the statement of facts, and despite Speiser Krause's admission that "... there is no dispute that Guimaraes spend (sic) - and

continues to spend - time performing both legal and non-legal work in connection with the various legal proceedings ....," Speiser Krause makes the astonishing contention that the part performance prong of the *Tribune* test is "neutral." This is a wholly unsupportable contention under the facts of this case, as this prong of the scale has a veritable anvil of evidence on it in favor of an enforceable agreement. It is likewise inaccurate for Speiser Krause to say that there is no proof that Guimaraes performed the work under the fee sharing agreement, because he did. Guimaraes Dec. ¶ 21-36. The fact that Speiser Krause and Guimaraes experienced some differences of professional opinion during the representation does not change the fact that he performed for four years. This element of the *Tribune* analysis strongly supports Guimaraes' position and warrants denial of the motion for summary judgment.

> 5.    The Fee Sharing Agreement Was Reduced To Writing.

The final element of the *Tribune* test - whether the agreement is of a type normally reduced to writing - favors Guimaraes because the agreement <u>was</u> reduced to writing; that writing <u>was</u> given to the clients; and the clients entered into yet another written agreement approving the fact that Speiser Krause and Guimaraes would serve as co-counsel and share in the contingency fee. Speiser Krause cites a New York rule of professional responsibility, which surely they do not contend was violated after they accepted payment from their clients of $7 million and have never sought to refund that money on the grounds that their acceptance of it was unethical. Moreover, as shown in the statement of facts, Guimaraes did not passively refer clients and then seek to receive a fee without doing any work (not even Speiser Krause would suggest otherwise). He labored extensively on the file for many years and those efforts are well documented.

Thus, although it is Virginia law and not New York law that governs these issues, even if the *Tribune* test were applied, Guimaraes has established contractual entitlement, or, at the least, that there are disputed issues of material fact which preclude summary judgment.

32

III.  **GUIMARAES DID NOT FORFEIT HIS ENTITLEMENT TO AN ATTORNEYS' FEE FOR VOICING HIS PROFESSIONAL OPINION THAT THE AMOUNT OF THE SETTLEMENT WAS INSUFFICIENT.**

Speiser Krause alleges that Guimaraes has forfeited his right to receive any fee from the TAM litigation because he was discharged "for cause." In support of this argument, Speiser Krause relies on New York cases. However, Speiser Krause fails to explain why New York law should apply to this issue. As explained above, under Florida's choice of law rules, issues pertaining to the performance of a contract are determined by the law of the place where the contract is to be performed. *Government Employees Ins. Co. v. A.C. Grounds*, 332 So.2d 13 (Fla. 1976), citing *State-Wide Insurance Co. v. Flaks*, 233 So.2d at 402.

Guimareas is a licensed Brazilian attorney who entered into client retainer agreements in Brazil with Brazilian citizens. Moreover, the parties at all times contemplated that Guimaraes would perform his services on behalf of the clients in Brazil. As such, the propriety of his conduct vis-a-vis those clients (which as shown below was proper) is governed by Brazilian law [21] and not, as Speiser Krause argues, by New York law.

Guimaraes has provided this Court with a Declaration from University of Miami law Professor Keith S. Rosenn, an expert in Comparative and Inter-American law, attesting and citing authority that under Brazilian law, an attorney does not forfeit his right to be paid a fee for professional services that he has already rendered prior to his discharge regardless of whether the client contends that there was a

---

[21]  Pursuant to Fed.R.Civ.P. 44.1: "A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice." (emphasis added). Notice of the applicability of foreign law provided in response to a motion for summary judgment is deemed timely and reasonable because the opposing party has the opportunity to reply. See *Torah Soft Ltd. V. Drosnin*, 224 F.Supp.2d 704, 718 (S.D.N.Y. 2002); *Canadian Imperial Bank of Commerce v. Saxony Carpet Co.*, 899 F.Supp. 1248, 1253 (S.D.N.Y. 1995). Moreover, district courts are urged to apply the provisions of Rule 44.1 flexibly to allow the determination of foreign law through any relevant material or source, whether or not admissible in evidence. *Curley v. AMR Corp.*, 153 F.3d 5 (2nd Cir. 1998).

basis for the discharge." Rosenn Dec. ¶ 2. Thus, there is no basis under the governing law to deny Guimareas his legal fee based on allegations of misconduct.

Even if this Court were to apply New York law to the issue of Guimareas' opposition to the settlements, there is no basis for a finding that Guimareas was terminated "for cause." Under New York law, "for cause" requires proof of serious misconduct that adversely impacts the client's case. *Desousa v. Rappaport, Glass, Green, Levine, LLP*, 12 Misc.3d 1183(A), Slip Copy, 2006 WL 2000133 (Table)(N.Y.Dist.Ct. 2006)(finding that "[a]ttorney-client relationships frequently end because of personality conflicts, misunderstandings or differences of opinion having nothing to do with any impropriety by either the client or the lawyer"; *DeLuccia v. Village of Monroe*, 180 A.D.2d 897, 580 N.Y.S.2d 91, (N.Y.A.D. 3 Dept.,1992)(a "general dissatisfaction" was insufficient where client failed to " ... demonstrate an interrelational impact between [the attorney's] action or non-action and the prosecution of her lawsuit ...."). Certainly, under New York law, the mere allegation of termination "for cause" does not end the inquiry. Speiser Krause has not proven such cause exists.

Here, there has neither been a showing of misconduct nor any demonstration that Guimareas had a negative impact on the case. Guimareas represented numerous clients in Brazil. He met with his clients. He spoke with them on the telephone. He corresponded with the clients. He attended meetings where the clients gathered and discussed the case. All of this was done with the intent of divining their wishes and keeping them informed about the progress of the case and their legal rights and options. Guimareas spoke the client's language and knew their customs and culture. He was the attorney the clients first reached out to for help, and part of his role on the case was to communicate their wishes to Speiser Krause (which he did). Moreover, he frequently made court appearances in Brazil on their behalf, consistent with their instructions. Guimareas had a good faith, informed understanding of what the victim's families wanted and expected, and he acted in accordance with that understanding to the best of his ability. Far from being unethical, this is precisely what any attorney is supposed to do. Moreover, he had the clients' express written permission in the client fee agreements (where he was identified as

34

one of the attorneys) to "... pursue such actions as are necessary *by whatever form of action you deem appropriate ....*" Apuzzo Aff. Ex. S.

The issues arose after the California court stayed the United States litigation pending a judicial outcome in Brazil. As a result, Guimaraes spent two years prosecuting that action and ultimately obtained a large judgment.[22] The issues arose when Speiser Krause presented a settlement offer to the clients in a manner that was objectionable and improper. At a meeting where Guimareas was present, Speiser Krause told the clients that the United States case was lost (which was not accurate), that they had to take or leave the settlement offer (which was unfounded speculation), that if they did not take the offer they would never receive any money (which was more unfounded speculation, and also represented an opinion on the merits of the Brazilian proceeding, which Speiser Krause was unqualified to give, not being licensed in that country to practice law).

Guimaraes was present to witness the reaction to Speiser Krause's statements and has attested that the clients were outraged. Guimaraes Dec. ¶ 45. It bears reminding that this was not a breach of contract case. The client families had lost loved ones who died horribly in a plane crash. Thus, a considerable amount of pain and emotion attended the lawsuit. From that meeting and the clients' statements during the meeting, Guimaraes formed the opinion that Speiser Krause was proceeding against the clients' wishes and against their best interests, or, at a minium, had not fully and fairly informed them of their legal options. He also formed the opinion that Speiser Krause was recommending the clients settle the case at a fraction of its value, since Speiser Krause had previously made estimates to the victim's families that they would each receive millions of dollars in compensation. Guimaraes Dec. ¶ 45.

There is documentary proof that Guimareas believed the clients would not accept anywhere near the settlement amount. On February 14, 2000, Guimareas wrote a letter to Speiser Krause in which he

---

[22]    During those years, while Guimareas worked tirelessly to gather evidence, make court appearances and prove his case, Speiser Krause, who now claims total entitlement to all fees, was merely having settlement discussions.

stated that he had met with one of the clients "... and she authorized me to tell you that she has a felling (sic), after so many conversations with so many average families, that most of them would accept a deal for the entire case, including those against TAM in Brazil, for R$ 3 (three) millions net, say after the payment of our fees ...." Berman Aff. Ex. 8 (Doc. No. RG00178). Thus, Guimareas had been specifically told by his clients how much they were expecting in settlement and was acting according to those instructions, because the settlement amount was radically less than he had already confirmed they expected.

Speiser Krause makes an admission in its pleadings which shows that Guimaraes had a good faith basis to oppose the settlement until certain issues were fully considered. At the time Speiser Krause announced the settlement offers, the Jabaquara Action, potentially worth over $100 million, was still pending. Guimaraes wrote to Speiser Krause on February 8th, 2000, expressing his opinion that a favorable outcome of the Jabaquara Action was imminent, and asking that Speiser Krause speak to the families about that action and how it would fit in with a global resolution of the cases. Berman Aff. Ex. 8 (Doc. No. RG00176). Yet Speiser Krause did not wait to see the outcome of the Jabaquara Action or meet with the clients about that issue, as requested. Moreover, by its own admission, Speiser Krause never even tried to inform itself, much less the clients, as to the merits and value of that case. This cannot be disputed because as late as the date Speiser Krause answered the complaint in this litigation (long after the settlement was concluded), Speiser Krause states that: "Speiser Krause denies knowledge or information sufficient to form a belief as to the existence, status, enforceability, or validity of the 'Brazilian Judgment.'" (Answer, ¶ 25).[23] If Speiser Krause still did not know this information, even at the time of its Answer, how then could it ever have fairly and competently advised its clients to forego an action potentially worth hundreds of millions of dollars and accept far less? This is one of many reasons

---

[23]     The Answer contains many other statements as to things which Speiser Krause contends it does not know, which, to have fairly advised its clients of their rights, one would expect them to have knowledge about.

why Guimaraes believed, in good faith, that the clients were being inadequately informed of their rights, if not outright misled, and felt compelled to voice his opinions.

While reasonable minds, with the advantage of hindsight, may differ as to the merits of Speiser Krause's recommendations, the evidence strongly supports the fact that Guimareas believed in good faith that the clients were not receiving accurate advice and that their wishes were being subverted. When this happened, Guimareas was at a disadvantage. As a Brazilian attorney unfamiliar with the legal mechanisms for resolving disputes in the United States with United States attorneys, he became vocal in his opposition to Speiser Krause's conduct, to the point of filing charges against them. This was not, however, a personal vendetta. Guimareas thought he was protecting the clients and believed Speiser Krause was guilty of wrongdoing.

Even Speiser Krause admits that Guimares believed he was acting in the best interests of the families. Leigh Ballen, one of the Speiser Krause attorneys who worked on the cases and made trips to Brazil, testified in deposition that Guimares believed he was acting in the best interest of the families. L. Ballen Dep. p. 241. As to the clients who accepted the settlement offer (after Speiser Krause eventually persuaded them they must), nothing Guimareas did cost them any money. He did not keep them from settling their case. They received exactly the same settlement they would have received whether Guimareas opposed the settlement or not.

Thus, while as shown above, and in the declaration of Keith S. Rosenn, the applicable law in Brazil would preclude a finding that Guimares has forfeited his legal fee, even if New York law were applied, the question of whether Guimareas acted according to his clients' wishes and directions presents numerous issues of material fact which would make summary judgment inappropriate.

Speiser Krause's argument about "for cause" termination is, in the final analysis, a red herring, the purpose of which is to draw attention away from the fact that Speiser Krause took the money Guimares supposedly forfeited and put it in its pocket. If, as Speiser Krause argues, the clients' termination of Guimares meant the clients do not owe Guimares a legal fee, by what right does Speiser Krause take the money that they say is not owed and keep it? According to the client retainer agreements

37

(the ones Speiser Krause does not dispute), Speiser Krause and Guimares were jointly hired and were to jointly receive a contingency fee. The clients have already payed that entire fee and Speiser Krause has not offered the clients any of the money back.

## IV.    PLAINTIFF VOLUNTARILY DISMISSES HIS CONSTRUCTIVE TRUST, CONVERSION AND ACCOUNTING CLAIMS.

This case has progressed for two years with an opportunity for discovery and consequently, Guimaraes elects to voluntarily dismiss Counts IV (Constructive Trust), V (Conversion), and VI (Accounting). The reasons for this decision are that Guimaraes believes that, upon a favorable verdict in this case, Speiser Krause would be a collectable defendant and that no constructive trust is necessary. Furthermore, Guimaraes has had an opportunity through discovery to ascertain the amount of the settlements and the amount of the fees collected by Speiser Krause such that a judicially ordered accounting is no longer necessary. Finally, regarding the conversion claim, Guimaraes elects his remedy to pursue his contract and equitable rights versus his tort remedy. The dismissal does not concede the accuracy of any factual or legal argument advanced by Speiser Krause in its memorandum, nor suggest a lack of support for the claims Guimaraes has voluntarily chosen to forego in the interest of cost savings and judicial economy. Defendant has not moved for summary judgment as to counts II (Quantum Meruit) and III (Unjust Enrichment), and Guimaraes continues to assert those claims.

## CONCLUSION

For all of the foregoing reasons and citations of authority, and based on the numerous genuine issues of material fact, the Motion for Summary Judgment should be denied.

38

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing document has been electronically filed and a true and correct copy of the foregoing was also sent via Federal Express, this 20th day of October, 2006, to:

William J. Apuzzo, Esq.
Apuzzo & Chase, LLC
800 Third Avenue, Suite 800
New York, NY 10022

**BERMAN, KEAN & RIGUERA, P.A.**
2101 W. Commercial Blvd.
Suite 2800
Fort Lauderdale, FL 33309
Telephone: (954) 735-0000
Facsimile: (954) 735-3636

By: s/ Richard E. Berman
　　　Richard E. Berman
　　　RB2715
　　　Jose R. Riguera
　　　Florida Bar No.: 860905

\\Server-MS\REBData\Guimaraes, Renato\1147-001\Attached Document\20090_2.wpd