UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 05-CV-2210(DC)
THE HONORABLE DENNY CHIN

RENATO GUIMARAES, JR.,

    Plaintiff,

vs.

SPEISER, KRAUSE, NOLAN & GRANITO, a
professional corporation f/k/a SPEISER,
KRAUSE, MADOLE & LEAR, a professional
corporation,

    Defendants.

_____/

## DECLARATION OF RENATO GUIMARAES, JR.

Pursuant to 28 U.S.C. 1746, Renato Guimaraes, Jr. attests:

1.     My name is Renato Guimaraes, Jr. I am an attorney in Brazil and the plaintiff in this action.

2.     I am over the age of 18 and make this declaration based upon my personal knowledge.

3.     In the days and weeks following the October 31, 1996 crash of TAM Airlines flight 402 departing from Sao Paulo, Brazil (the "TAM air disaster"), I was approached by several family members of victims of the crash and their local attorneys about possibly representing them in a claim against the responsible parties.

4.     During the weeks following the accident, the family members of the victims of the TAM air disaster organized a support group to discuss the families' legal rights and held various meetings.

5.     I was invited to participate in those meetings and soon became one of the group's leaders because of my prior experience and reputation as a Brazilian attorney who had worked on aviation disaster litigation matters.

6.     Based on my experience, I knew that it would be highly beneficial, if possible, for the families of the victims to pursue litigation of their claims in the United States, rather than in Brazil, because of

the comparative efficiency of the United States legal system and the higher compensation traditionally obtained in the United States versus less developed countries.

7. Accordingly, I suggested this to the families during these early meetings, and they agreed and authorized me to interview and recommend a United States law firm to represent them in filing a lawsuit in the United States.

8. Immediately after the accident occurred, I contacted the Speiser, Krause, Nolan & Granito ("Speiser Krause"), the defendant in this action, to inquire if they would be interested in potentially representing families of the victims of the TAM air disaster.

9. On November 19, 2006, Leigh Ballen of Speiser Krause faxed me a letter indicating that Speiser Krause would in fact be interested in discussing "a potential effort to represent the victims and the families" in the TAM air disaster.

10. In late December 1996, my son and I attended a two-day meeting in Key Largo, Florida, at the home of Arthur E. Ballen ("A. Ballen"), a lawyer who was associated with Speiser Krause. We discussed jointly representing the families of the victims of the TAM air disaster and reached an understanding concerning our respective responsibilities as co-counsel.

11. After returning to Brazil, Speiser Krause and I continued to negotiate the fee sharing agreement. We discussed the fee that Speiser Krause would charge the clients, and also negotiated the compensation I would receive.

12. On February 5, 1997, Speiser Krause and I finalized our deal. I told A. Ballen that unless Speiser Krause was willing to pay me 25% of the contingency fee, I would find other United States counsel to represent the clients. After that, we agreed that Speiser Krause would charge the client the sum of 33 1/3% for their services, and that I would receive 25% of that fee.

13. That same day, Gerald Lear ("Lear"), the managing partner of Speiser Krause, faxed me a letter from his Rosslyn, Virginia office, as I had requested of his firm, which was addressed specifically to me, and which stated as follows:

> I would like to confirm the proposed arrangement between our firm and the families of the victims of the TAM Fokker disaster of October 31, 1996. Our firm will charge the sum of 33 1/3% for the handling of each such case. Of this fee, a total of 25% will be paid to Brazilian counsel for their services. We look forward to once again working actively with your office.

14. Lear's letter memorialized our agreement that I would receive 25% of Speiser Krause's fee.

15. There was no term or phrase in the fee sharing agreement that, based on my discussions and dealings with Speiser Krause or the language itself (as I understood it as a non-native English speaker), that meant to me that the fee sharing agreement was non-binding or preliminary, or that the fee sharing agreement referred to any attorney other than myself and Speiser Krause. To the contrary, the plain language of the agreement meant what I have attested to in this Declaration and what is set forth in my opposition memorandum. I have reviewed the memorandum of law in support of Defendant's Motion for Summary Judgment and the construction and interpretation argued in it by Speiser Krause is inaccurate.

16. I responded to the letter agreement on February 19, 1997, and expressed in writing that I considered it "definitive."

17. No other Brazilian attorney received such a letter from Speiser Krause concerning the TAM air disaster. Also, I was the only Brazilian attorney that had any communications with Speiser Krause about a fee sharing agreement concerning the potential representation of the TAM air disaster clients.

18. Thereafter, from time to time I asked Speiser Krause questions, or raised issues during the course

of the representation, but I never treated the fee sharing agreement as preliminary or non-binding, and I never repudiated it or gave any indication I was not bound by it. I believed at all times that I was bound by the fee sharing agreement and that Speiser Krause was also bound by our contract. Speiser Krause never told me that they deemed the fee sharing agreement preliminary or non-binding, or that some other agreement would be struck in the future, and they acted at all times as if we were bound by our fee sharing agreement.

19. I had the fee sharing agreement translated into Portuguese, distributed it to the clients, and informed them that I had reached an agreement with Speiser Krause. I also informed Speiser Krause that I had done this.

20. Over the course of my legal and professional education and experience, I have seen many fee sharing agreements between attorneys, and the fee sharing agreement in this case was consistent with others I have seen.

21. Having finalized the fee sharing agreement, I spearheaded the efforts to communicate with clients in Brazil. These efforts included attending numerous informational meetings with the families in preparation for Speiser Krause's initial visit to Brazil, assisting Speiser Krause in translating and forwarding documentation to the clients, gathering documents and client information requested by Speiser Krause, obtaining copies of the crash report and other documents needed for the case, explaining legal strategies to the clients, dealing with the local media, and filing preliminary legal notices in Brazil as required to protect the clients' rights.

22. In March 1997, representatives of Speiser Krause traveled to Brazil for the first time to be interviewed by the clients. I attended the meetings, and was universally recognized by the clients as the lead attorney working with Speiser Krause in Brazil on the TAM case.

23. I continued these efforts, with the express knowledge and approval of Speiser Krause, for a period of several months.

24. From March 1997 to October 1997, a total of 64 families executed retainer agreements. Initially, consistent with the parties' fee-sharing agreement, the retainer agreements listed both Speiser Krause and myself as co-counsel. However, without notifying me, Speiser Krause revised the first page of the retainer agreement to remove my name as co-counsel.

25. I relied on Speiser Krause to collect and maintain the executed retainer agreements, and did not discover until years later that my name had been omitted from a number of the client retainer agreements. Nevertheless, I originated all of the Brazilian clients who executed retainer agreements, and I rendered legal services on behalf of all of those clients in accordance with the fee sharing agreement and the client retainer agreements.

26. I am the only Brazilian attorney whose name appeared as co-counsel with Speiser Krause on any of the Retainer Agreements.

27. Throughout the entire period of time that the Retainer Agreements were being signed, Speiser Krause never indicated to me that they did not consider themselves bound by the fee sharing agreement confirmed by Lear in his February 5, 1997 letter.

28. On May 23, 1997, during one of his trips to Brazil, A. Ballen attended a large meeting with me and many of the local attorneys who were referring their clients to Speiser Krause and myself. The attorneys wanted to know how they would be compensated for referring their clients to us. In response, A. Ballen wrote a letter, addressed to me, stating:

> This is to confirm our agreement that all participating attorneys who refer cases to us shall receive 10% of the net attorney fee. You are authorized to tell the referring attorneys of this arrangement and our firm stands

behind this commitment.

29. It was my understanding that the 10% referral fee to local attorneys would be paid from Speiser Krause's portion of the attorney's fees because A. Ballen had fixed the 10% figure alone, without consulting me. He could not have made this decision on my behalf.

30. Speiser Krause filed a lawsuit on behalf of the clients and against two of the defendants, Northrop Grumman Corp. ("Northrop") and Teleflex Control Systems ("Teleflex") in Orange County Superior Court in California.

31. During the course of the litigation, I continued to support Speiser Krause as needed, assisting with client communications, translating legal and other documents, and generally maintaining the families and their local attorneys informed concerning the status of the litigation. During this time, I was the only Brazilian attorney that kept in regular contact with Speiser Krause concerning the TAM air disaster litigation.

32. Once again, Speiser Krause never indicated to me during that entire period of time that they did not consider themselves bound by the fee sharing agreement confirmed by Lear in his February 5, 1997 letter.

33. The defendants in the California action asserted the defense of *forum non conveniens*, and sought to dismiss the Brazilian plaintiffs' claims in California.

34. I spent a significant amount of time assisting Speiser Krause in preparing its opposition to the motion, providing expert information concerning the legal system in Brazil and other matters requested by Speiser Krause. As part of this effort, for instance, I spent approximately one month working in Speiser Krause's Irvine, California office assisting with the case.

35. The California Court entered an order granting the defendants' motion to dismiss the Brazilian

plaintiffs' complaint on *forum non conveniens* grounds, but stayed execution of that order to give those plaintiffs an opportunity to file a new action in Brazil. The California court ruled that the cases would only proceed in California if the Brazilian court declined to exercise jurisdiction over the case.

36. On June 30, 1998, Irineu Strenger ("Strenger") (a distinguished Brazilian law professor and attorney I recommended to Speiser Krause) and I filed a lawsuit against defendants Northrop and Teleflex in Brazil (the "Jabaquara Action"). The Brazilian court accepted jurisdiction, and I litigated the case in Brazil, with Speiser Krause's full knowledge and approval, for approximately two years. Shortly after the commencement of the Jabaquara Action, attorney Strenger withdrew from the case due to tactical disagreements, and I thereafter remained as lead counsel in the Jabaquara Action until the entry of a judgment in June 2000. Speiser Krause, which has no attorneys that are admitted to practice law in Brazil, had no active participation whatsoever in the Jabaquara Action.

37. During 1998, I had several communications with Speiser Krause to discuss who would represent the families in a separate litigation to be filed in Brazil against TAM Airlines before the 2 year statute of limitations expired. Speiser Krause and I agreed that it would be better to bring a separate lawsuit against TAM Airlines in Brazil because the liability case against TAM was clear, and there were no jurisdictional objections to overcome since TAM Airlines was a Brazilian company.

38. In a letter dated July 17, 1998, I asked Speiser Krause for a proposal concerning their contingency fee for handling the lawsuit against TAM Airlines in Brazil. I indicated that it was necessary to discuss a separate fee-sharing arrangement concerning that independent action against TAM Airlines because it was contemplated from the outset that Guimaraes (and not Speiser Krause) would be primarily responsible for handling this piece of the litigation in Brazil.

39. I suggested that Speiser Krause charge a certain percentage fee for its work as a "consultant" in the TAM Airlines case in Brazil, and that I would receive a fair share of that fee, keeping in mind that I would be doing the bulk of the work. This way, I would derive my fee for this local action from Speiser Krause's overall fee, and not collect a separate fee from the clients. However, Speiser Krause rejected the notion of serving as a consultant on the TAM Airlines case.

40. On August 1, 1998, I informed Speiser Krause that I would proceed to represent the families that were interested in retaining me, and would charge those clients a 10% fee for my services as is customary in Brazil for a case of that nature, litigated in Brazil.

41. Eventually, and with Speiser Krause's full knowledge, 26 clients retained me individually to represent them in the separate lawsuit against TAM Airlines. These clients agreed to pay me a 10% fee for his services in that action.

42. Speiser Krause improperly charged the clients for services it did not perform in the suit against TAM Airlines. In calculating its 25% contingency fee, Speiser Krause inappropriately included the sums awarded to the clients from the TAM Airlines suit (for which they had already paid me and other Brazilian counsel pursuant to the separate fee agreements described above), although Speiser Krause had done nothing to earn that fee.

43. In early 2000, while I was litigating the Jabaquara Action in Brazil, Speiser Krause negotiated a global settlement (the "Global Settlement") with the insurance carriers for the various defendants for the total sum of approximately $37,000,000.00. Speiser Krause unilaterally allocated the total amount of the settlement among the settling families, without any prior discussion or communication with me or the clients.

44. In April 2000, representatives of Speiser Krause visited Brazil and began holding individual

meetings with the clients over the course of several days to announce the settlement offers negotiated by Speiser Krause. During the client meetings, Speiser Krause informed the families that the cases in the United States had been "lost," and that the offers being extended were "take it or leave it" offers.

45. Many of the clients were surprised and angered by the settlement offers presented by Speiser Krause because they were far lower than what the families had anticipated. Speiser Krause had repeatedly told them that they could expect between $4 million and $8 million each. They were also shocked to hear for the first time that the case in the United States had been "lost" and that they had no further opportunity to negotiate the amounts being offered.

46. Many of the families rejected the settlements because they were too low. I agreed with the clients that the settlement offers were too low and advised the families to reject the offers. As a result, Speiser Krause excluded me from participating in many of these client meetings where the individual settlement offers were being discussed.

47. On June 30, 2000, the Court in the Jabaquara Action entered a Judgment which, at then current exchange rates, awarded each family $1,111,111.11, plus 2/3 of the last annual salary earned by each decedent from the date of the accident until that decedent would have been 65, plus a 20% contempt of court penalty against Northrop for failing to post a bond that the Court had required, plus another 20% for attorneys fees.

48. Over the next several months, I tried to convince Speiser Krause and the clients that they should not accept the settlement offers. Nevertheless, Speiser Krause persisted in recommending the settlement offers to the clients. Although many of the clients agreed with my opinion that the settlement offers were too low, they decided to accept the settlement offers because they needed the money.

Guimaraes v. Speiser Krause<br>Case No.: 05-CV-2210(DC)

49. Because I was opposed the settlement offers, I refused Speiser Krause's request that I assist in processing the settlements. Speiser Krause hired another local attorney, Luiz Roberto de Arruda Sampaio, to assist with the approval of the settlement offers.

50. As a result, Speiser Krause urged the clients to discharge me. A total of 17 clients discharged me.

51. Under the Brazilian bar rules, I was ethically obligated to exercise my independent judgment in advising the clients whether they should accept the settlement offers negotiated by Speiser Krause. All of my efforts to oppose the settlement offers were made in good faith in attempting to fulfill my duty as an attorney, carry out my understanding of the client's wishes and best interests, and were not motivated by any malice or intent to harm the clients in any way. I never abandoned the clients and dispute Speiser Krause's allegation that I was justifiably terminated "for cause." Furthermore, I was never disciplined in any way by the Brazilian Bar or any other tribunal as a result of my opposition to the settlements.

52. Through my continued close contact with the families over several years, I came to care about them and their futures a great deal and wanted them to fully and fairly succeed in being compensated for their enormous and irreparable loss. That is why I went to great lengths to protect them from being taken advantage of, as I honestly felt was taking place by Speiser Krause. As their counsel I felt I could do no less.

53. Eventually, all clients who chose not to follow my advice were able to receive the full amount of the settlements they agreed to. Also, Speiser Krause collected the full amount of its fee from the settlement agreements.

54. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Guimaraes v. Speiser Krause
Case No.: 05-CV-2210(DC)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Renato Guimaraes, Jr.

Date: October 17, 2006