UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 05-CV-2210(DC)
THE HONORABLE DENNY CHIN

RENATO GUIMARAES, JR.,

      Plaintiff,

vs.

SPEISER, KRAUSE, NOLAN &
GRANITO, a professional corporation f/k/a
SPEISER, KRAUSE, MADOLE & LEAR, a
professional corporation,

      Defendants.

_____/

## AFFIDAVIT OF RICHARD E. BERMAN

**STATE OF FLORIDA**      )
**COUNTY OF BROWARD**    )    **ss.:**

Richard E. Berman, being duly sworn, deposes and says:

1. I am an attorney duly admitted to practice law before the United States District Court for the Southern District of New York. I am a partner at Berman, Kean & Riguera, P.A., attorneys for the Plaintiff, Renato Guimaraes ("Guimaraes"), in this matter. I submit this affidavit in support of Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment in this matter.

2. Discovery was completed on August 11, 2006.

3. Annexed hereto as Exhibit "1" are relevant excerpts from the transcript of the deposition of Guimaraes taken October 7, 2005.

4. Annexed hereto as Exhibit "2" are relevant excerpts from the transcript of the deposition of Guimaraes taken November 2, 2005.

5.      Annexed hereto as Exhibit "3" are relevant excerpts from the transcript of the deposition of Guimaraes taken November 17, 2005.

6.      Annexed hereto as Exhibit "4" are relevant excerpts from the transcript of the deposition of Dr. Elzoires Freitas taken on June 27, 2006.

7.      Annexed hereto as Exhibit "5" are relevant excerpts from the transcript of the deposition of Arthur Ballen taken on October 11, 2005.

8.      Annexed hereto as Exhibit "6" are relevant excerpts from the transcripts of the deposition of Gerard Lear taken on October 11, 2005 and October 12, 2005.

9.      On May 16, 2005, Guimaraes served Speiser Krause with his First Request for Production of Documents.

10.     Annexed hereto as Exhibit "7" are the relevant documents produced by Speiser Krause in response to Plaintiff's First Request for Production bearing production numbers SK000685-695 and SK002610-2611.

11.     On May 19, 2005, Speiser Krause served Guimaraes with its First Request for Production of Documents.

12.     Annexed hereto as Exhibit "8" are the relevant documents produced by Guimaraes in response to Defendant's First Request for Production bearing various production numbers between RG00001 through RG00326.

13.     Submitted along with Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment is the Declaration of Renato Guimaraes, sworn to October 17, 2006.

14.     Submitted along with Plaintiff's Memorandum in Opposition to Defendants Motion

Guimaraes v. Speiser Krause
Case No.: 05-CV-2210(DC)

for Summary Judgment is the Declaration of Professor Keith Rosenn, sworn to October 20, 2006.

15.    Submitted along with Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment is Guimaraes' Statement pursuant to Local Civil Rule 56.1.

WHEREFORE, your deponent respectfully prays for an order denying Defendant's Motion for Summary Judgment, and for such other and further relief as this Court deems just, proper or equitable.

***FURTHER AFFIANT SAYETH NOT.***

Richard E. Berman (RB-2715)

SWORN TO BEFORE ME, this **20th** day of October, 2006.

Notary Public - State of Florida

Deanne L. Ferrese
Print Name of Notary

DEANNE L. FERRESE
MY COMMISSION # DD 444265
EXPIRES: July 8, 2009
Bonded Thru Notary Public Underwriters

Seal:

Personally Known  X  or Produced Identification _____
Type of Identification Produced _____

\\Server-MS\REBData\Guimaraes, Renato\1147-001\affidavit\20071.wpd

```
1                    Renato Guimaraes, Jr.

2           A.      That's correct, Northrop in

3    Jabaquara, TAM case is in central forum.

4           Q.      Did any other lawyers work with you

5    on these cases?

6           A.      I was by far the leading attorney for

7    the Northrop case, but few work, help me, say so.

8    Like right now I am here, if I see internet

9    problems there, I send a fax or e-mail and a fellow

10   attorney, in Northrop or any other case, will sign

11   by me, say so.  I hope I answered your question.

12          Q.      Can you give us the names of some of

13   the attorneys who were associated with you in

14   working on the cases, the TAM cases, in Jabaquara

15   and the central court?

16          A.      Okay.  Central court would be, for

17   example, the female attorney Edna Penha.  And in

18   Jabaquara court there would be a Dr. Freitas, he is

19   a referral attorney for me in one case and, of

20   course, for Speiser Krause, so he helped me.  I

21   sent the motion, he signed, and so forth.

22          Q.      Can you spell Dr. Freitas' name for

23   me?

24          A.      F-R-E-I-T-A-S.

25          Q.      And his first name?
```



EXHIBIT

1

1                      Renato Guimaraes, Jr.

2           A.      The first name, that's a hard name,

3    Osonires.  Very unusual, nobody call him, just Dr.

4    Freitas, he is from the north country.

5           Q.      And Garcia & Keenan, did they assist

6    you in the Jabaquara case?

7           A.      Garcia & Keenan, just a business,

8    they work by hours.  But in this case Arthur Ballen

9    I thought was right, Renato, in this case don't be

10   again the leader attorney, because of jealousy, and

11   so forth, ask for a big name to help you, say so.

12              And my first choice was Professor

13   Irineu, who was one of the top attorney for Garcia,

14   and he was my examiner for my Doctoral Degree, and

15   he has expertise in international law.

16              And I suggested to -- I have two

17   names, and Arthur Ballen ask me some advice.  I say

18   I pick Professor Irineu.  By the way, he had an

19   interesting theses when he talked about a

20   ridiculous case about aviation law when he was in

21   Brazil, so maybe he will be a good guy.

22              And Speiser Krause, I introduce

23   Speiser Krause to Dr. Irineu because the case maybe

24   sued in Brazil, filed in Brazil, and I would work

25   behind the scenes, say so.  And Professor Irineu

64

1                   Renato Guimaraes, Jr.

2    accept, he say, "Renato, I don't have time, I don't

3    know anything on that, don't ask the family to call

4    me but I sign what you wish.

5                   So, Speiser Krause made a contract

6    with the Professor Irineu.  Speiser Krause paid

7    down a part and Professor Irineu is still waiting

8    for money.  He is very sick now.

9              Q.    Can you spell his name?

10             A.    I-R-I-N-E-U.  Family name is Strager,

11   S-T-R-A-G-E-R.

12             Q.    And I understood you to say Garcia &

13   Keenan charge by the hour.  Do you know what they

14   charge?

15             A.    Not in this case.

16             Q.    In other cases?

17             A.    I expect yes, but they're regular

18   commercial business clients, I have no personal

19   knowledge.  I think maybe mix it up, I don't know

20   things of charging the clients.

21             Q.    Rates per hour?

22             A.    Yes.  Or both of them, I don't know.

23             Q.    Do you have any idea what the highest

24   rate is that's charged by Garcia & Keenan?

25             A.    I have no idea.  They work as

ASA REPORTING SERVICE, INC.
(914) 588-3358

65

Renato Guimaraes, Jr.

1    consultant, not too much litigators.  Arbitration.

2    Q.    Who are the clients who you

3    represented in Jabaquara and in the central court

4    in Sao Paulo?

5    A.    In the central court of Sao Paulo,

6    that means the cases against TAM Airline in this

7    case.  I used to represent 26 family, about

8    one-third of the total.

9        In Jabaquara case, of course, I

10    represent those 26 and because, according to what I

11    said, the suggestion from Speiser Krause was

12    acceptable, all families were orientated to hire

13    Professor Irineu Strager, and most of them did.

14        But I sign the complaint, the initial

15    motion, along with Professor Irineu.  Professor

16    Irineu was enthusiastic in the beginning, he signed

17    two or three motions, and then somehow he let me to

18    do everything, everything.  And some attorneys did

19    not agree, or want to have his important case.  And

20    there's some few representatives of specific

21    families, they are direct clients.

22    Q.    I don't want you to repeat yourself

23    but in Jabaquara there were some defendants and in

24    the central court there were some defendants, can

1                    Renato Guimaraes, Jr.

2      you tell me which defendants were in Jabaquara and

3      which defendants's were in the central court

4      actions?

5              A.      The same families.

6              Q.      No, no, no, defendants.

7              A.      Oh, defendants.

8              Q.      Yes.

9              A.      Again, in Jabaquara case only

10     Northrop and Teleflex.  The central forum defenders

11     were TAM Airlines.  Sometimes TAM Airlines plus

12     Fokker.  Some attorneys have these ideas with

13     Fokker there.  By law is requested the Brazilian

14     Insurance Institute and the insurance banking who

15     sells, transfers, the insurance to Lloyd's of

16     London, but normally the main defenders is TAM

17     Airline, was TAM Airline.

18             Q.      Were Northrop and Teleflex defendants

19     in any of the actions in the central court?

20             A.      As far as I know, no.

21             Q.      Mr. Guimaraes, please identify for us

22     what these documents represent.

23             A.      Yes.

24             Q.      Please identify what these documents

25     are.

67

1                    Renato Guimaraes, Jr.

2          A.      Number 57, one of them.

3          Q.      They're both 57, let's take one at a

4      time.

5          A.      Okay.

6          Q.      What does this document mean?

7          A.      What means this?

8          Q.      Yes.

9          A.      Well that's, a typical Brazilian

10     retainer letter.

11         Q.      Do you know what these two documents

12     were executed, for what reasons were these

13     documents signed?

14         A.      Because the family Romero want me as

15     an attorney.

16         Q.      What is the date that they wanted you

17     as their attorneys?

18         A.      I read here 9, October '98, and 9,

19     October '98.

20         Q.      Do these request that you represent

21     them in the central forum?

22         A.      Yes, that was their idea.

23         Q.      Do these also request that you

24     represent them in Jabaquara?

25         A.      No.  Originally, no, but because at

1                    Renato Guimaraes, Jr.

2    that point we don't know what would happen with the

3    forum non-convenience.  And, so far, Northrop want

4    this case in Jabaquara to be consolidate with the

5    TAM case to make a big confuse.  And on the reverse

6    TAM want to put their case in Northrop case to make

7    another confuse.

8                    We did not know.  So I put a general,

9    very unlimited, clause saying somewhere, this days,

10   whatever it would be, pursued against anybody.

11   That's a typical Brazilian clause.  You don't know

12   who else you are going to put in here.

13          Q.      So I understand, you had 26 clients

14   in those cases; correct?

15          A.      I used to.

16          Q.      Did all 26 clients sign retainers

17   similar to this?

18          A.      Similar but not identical, one guy

19   changed a clause.

20          Q.      And this retainer agreement, you were

21   going to charge the clients a 10 per cent fee?

22          A.      Yes, that was standard in this case.

23          Q.      And that was pursuant to sucumbencia?

24          A.      Yes, congratulations, that means the

25   attorney winner fee.

```
1                     Renato Guimaraes, Jr.
2     have too broad.
3                     MR. BERMAN:  I just move to
4           strike.  It's clear he didn't understand
5           your question.
6                     MR. APUZZO:  I think he did.
7                     MR. BERMAN:  You asked him what a
8           cause of action was and he told you what
9           the cause of an accident was.
10          Q.     With respect to the reason why --
11                    MR. BERMAN:  And, Bill, if you
12          want to hear it back, you'll see what I
13          mean.
14          Q.     The subject matter of the litigation
15    with the 65 clients, the first 65 retainers, what
16    were these people suing for?
17          A.     They wanted the money for their
18    material, as we call, or earning.
19          Q.     The negligence of these defendants?
20          A.     Earning and spiritual moral, pain and
21    suffering.
22          Q.     Damages?
23          A.     Damages, yes.
24          Q.     And the subject matter for these
25    clients, these 26, what were they making a claim
```

78

1                   Renato Guimaraes, Jr.

2     for?

3          A.    The same thing, that they wanted from

4     TAM because that was just for Northrop.  The

5     strategy, Speiser & Krause and myself would

6     develop, was this:  Let's put each foot in each

7     boat, and that's what please the Brazilian because

8     they are scared to come to America.  So, let

9     America take care of Northrop, too mysterious for

10    us, but our neighbor is here, TAM, so it's very

11    easy for us, let's fight it down here in Brazil.

12    That's very reasonable strategy, everyone agree on

13    that, or some people lost.

14         Q.    So, is it your understanding that

15    Speiser Krause was representing these clients

16    against Northrop, Teleflex in the United States and

17    Europe, or whatever the case may be, and you were

18    representing these clients in Brazil?

19         A.    That's correct.

20         Q.    And whatever you received in Brazil

21    for fees belonged to you?

22         A.    And Professor Irineu Strager, too.

23         Q.    And the fees that you earned in

24    Brazil were not going to be shared with Speiser

25    Krause?

1                        Renato Guimaraes, Jr.

2            A.      Could be, because my timetable was 90

3    day, three months, or two months, I don't know, the

4    judge gave Northrop to show up in Brazil and do not

5    raise the no jurisdiction, you must accept there,

6    you must defend yourself and behave well.  And they

7    did not, and Speiser & Krause did not tell this to

8    the judge in California.

9            Q.      So, before the complaint was filed by

10   Garcia & Keenan of which you signed for Jabaquara,

11   before that complaint was filed in the court, how

12   many days did you spend preparing to go to that

13   court?

14         .  A.      In fact, sir, I prepare for the

15   foreign non-convenience.  I stay less, little less,

16   than one month in Irvine, California offices of

17   Speiser Krause working very close with Tim Cook.

18   Tim Cook and also John Veth, not with Wanita, just

19   an informal lunch, working hard on foreign

20   non-convenience.

21                    My task was to help, as we call,

22   interface between Brazilian and American law, and

23   how we could manage to take advantage to have

24   jurisdiction here, U.S., first.

25                    Speiser Krause do your best to have

1          Renato Guimaraes, Jr.

2    Andrew's case as our client because, you know, we

3    will be fix because they live in San Jose,

4    California and the family will be along, it will be

5    easy, and they did.

6              Then they ask me for what, good

7    expert in Brazilian law to give opinion, affidavit,

8    to the court in LA, I mean Santa Ana.

9              MR. APUZZO:  All right, I think

10   you're going far afield.  Focus on this question:

11             There came a time when there was a

12   decision to bring an action in Brazil.  Sometime

13   after the United States actions, there was a time

14   you said okay, we need too bring an action in

15   Brazil, right?

16             So, from that time when the decision

17   to bring an action in Brazil was made until the

18   time that you actually signed the complaint with

19   Garcia & Keenan, how many days did you work on the

20   Jabaquara case?

21        A.    I would say less than three months or

22   two months.  I don't recall exactly timetable Tim

23   Cook gave me, according to judge instruction, but

24   it was very short.  We must have people to sign

25   with a professor here, otherwise we will break the

1                    Renato Guimaraes

2    trust when you were dealing in the beginning with

3    Speiser Krause?

4           A.      Yes, yes, but more than that we made

5    a written statement as you recall, 25 over 25,

6    written letter from Jerry Lear to me after

7    conversation with Arthur Ballen, you accept or go

8    to Kreindler & Kreindler.  He say okay, I accept.

9           Q.      Could you explain that; in other

10   words, you gave him the choice that either he

11   accept it or you would go to Kreindler & Kreindler,

12   another firm?

13          A.      Yes, because I was scared to lose the

14   families in Brazil, our clients.  It was a kind of

15   speed, I was on a public telephone in Sao Paulo and

16   I think he want to give me 15, then 20.  Well, 25

17   is the minimum Kreindler & Kreindler gave me, so I

18   have to decide, you accept or not.

19                  He took the wire and said okay, I

20   accept 25 five, so please send a letter to me.  And

21   I was surprised, it was not his signature that was

22   there, it was Jerry Lear, never had talked with him

23   before.

24          Q.      So, the conversation you had was with

25   Leigh Ballen?



EXHIBIT

2

24

                        Renato Guimaraes

    A.      No, Arthur Ballen.  That's well after

my stay at his home in Key Largo.

    Q.      It had to be after the visit to Key

Largo and before you saw this writing, that's the

period of time?

    A.      Before what?

    Q.      Before the writing was sent to you;

correct?

    A.      Yes.  In 30 minutes I send it.  I

have a fax number here, public fax here in town,

Sao Paulo, I was not in Campinas, sending letter

confirming our talk.

            So, the level of confidence was much

shorter than I have with Clito, I know him 40

years, or Professor Strager who was my teacher.

You know, it was a foreigner.  I trust Speiser

Krause, but let's put on paper.  He said okay, I

send letter to this, and he did.  But who signed

it, Jerry Lear, that's the letter here, 25 over 25.

    Q.      Do you remember the name of the

attorney at Kreindler & Kreindler who made you an

offer of 25 per cent?

    A.      No, I never talked with Kreindler &

Kreindler regarding TAM case at that point.  I knew

                ASA REPORTING SERVICE, INC.
                     (914) 588-3358

1                          Renato Guimaraes

2                    So, I came by my own pocket here

3        several times.  For example, when I stay one month

4        in Irvine, I pay all my own expenses, car, hotel,

5        food, everything.  It would not make sense, it's a

6        kind of dignity, you know, I trust on this.  We are

7        working well, in the end you give my 25 per cent,

8        it will be nothing of what I spend, say so.

9                    But when they go to Brazil, he stayed

10       at the best hotel, it would be very tough for me,

11       and he paid me because we sleep in the rooms

12       together.  So, it was all Speiser Krause payment.

13       And one trip I made with Leigh Ballen to Parana

14       State, south part of Brazil, Curitiba, he payed my

15       hotel, one, two days, I don't know, one client

16       there.

17                   Then, what else, when Arthur Ballen

18       asked me at the end to go to Rio, he stayed in the

19       Intercontinental three or four days.  He want me

20       there, he paid for the expenses for doing nothing.

21       He told me he was talking with Lloyds of London and

22       he want me to be standby if need some information,

23       and they pay me, also.

24                   And I think that's about all.  And at

25       the end when Frizzel told me they are hiding from

32

1                    Renato Guimaraes

2    the families and Granito asked me to talk with

3    Jerry Lear, they say come over here, don't be too

4    aggressive Renato, come, let's talk.  We pay for

5    your fare from New York to Washington, D.C.  It was

6    wasting time, I never went to Washington, D.C., he

7    never paid me.

8                    So, that's the answer to your

9    question, the different situation of paying and not

10   paying between Speiser Krause and myself.

11        Q.    If the TAM cases were not successful,

12   did you understand that the $5,000 or $10,000 that

13   Speiser Krause gave you, that you would have to

14   give them this money back?

15        A.    No, as much I would never ask for

16   reimbursement, I did my best, we lost, Northrop is

17   not in fault.

18        Q.    But the money that they paid to you

19   to reimburse you, you said the money, I think

20   $5,000 or $10,000, did you understand that you

21   would have to pay them back?

22        A.    I don't think so, as much as they

23   will not pay me for my stay in Irvine, it was too

24   little outcome, it never happen that way.

25        Q.    Did Speiser Krause ever give you

1                    Renato Guimaraes

2    families.  Did I answer your question?

3             Q.      I think you did, I would like just to

4    clarify.

5                    MR. CHASE:  Can we step out?

6                    (Off the record.)

7             Q.      My partner has pointed something out,

8    I just want to make sure there's no confusion.

9                    Besides for the written retainer

10   agreements that were prepared by Speiser Krause for

11   the TAM clients, there's another set of retainer

12   agreements that was prepared by you for I think 26

13   families for the Jabaquara action; is that

14   correct?

15                   In other words, there were two sets

16   of retainer agreements with the clients; is that

17   correct?

18                   I want to just clarify the point so

19   we're focusing on the right questioning.  Let me

20   rephrase this.

21                   Originally there were retainer

22   agreements, documents, prepared by Speiser Krause

23   that were given to all 65 families, that we know.

24   Sometime after that there was a second round of

25   written retainer agreements that you, Dr.

63

1                          Renato Guimaraes

2    Guimaraes, had with 26 of the families; is that

3    correct?

4         A.      That's correct along with many, many

5    other attorneys with the other families.

6         Q.      So, now, I want to focus only on the

7    first set of retainer agreements that Speiser

8    Krause had created for these clients.

9         A.      Okay.

10        Q.      Do we agree that this retainer

11   agreement, the first set, was a contract defining

12   the fees that will be paid to the attorneys for

13   their work on the TAM cases?

14        A.      Yes.

15        Q.      And your agreement that you claim

16   with Speiser Krause to share in the legal fees,

17   that depended upon this written agreement with

18   these first clients, the first written agreement;

19   is that correct?

20             MR. RIGUERA:  Object to the form.

21             MR. APUZZO:  I'm trying to be very

22        clear so, therefore, my question was not

23        properly in form.

24        Q.      Did you understand that your

25   agreement to share the legal fees with Speiser

64

1                    Renato Guimaraes

2     Krause depended upon the agreement in the form of

3     the first retainers with the clients?

4          A.      Yes, worked both ways.

5          Q.      Did Speiser Krause ever tell you they

6     would pay you some legal fee for your work whether

7     or not they received any money from the TAM air

8     disaster?

9          A.      They would pay only contingent on

10    receiving.

11         Q.      Did they tell you that?

12         A.      Yes.  It's written there, that's the

13    only contract Speiser Krause and Renato had, if we,

14    Speiser Krause and Renato, we are going to share,

15    how much.  Then come another letter just between

16    us, clients don't have to pay, any rules here, just

17    between Speiser Krause and Renato, we make the

18    division, 75 to Speiser Krause, 25 per cent to

19    Renato.

20         Q.      You're referring to two documents,

21    you said the first one was you agreed to share and

22    then the second one was that it actually came up

23    with the percentage, 75/25?

24         A.      Yes.

25         Q.      I know the document you're referring

```
1                        Renato Guimaraes
2     to 75/25, but can you tell me a little bit more
3     about the first document that Speiser Krause said
4     we agree to share with Renato?
5          A.      That was the second one.  No, no, the
6     first one was the sharing then came the formal
7     retainer.  First I demanded how much I will get,
8     and they produced, Jerry Lear two paragraph
9     letter.  Then they come to Brazil, we have some
10    first clients, and they produced the long retainer
11    letter with our both names in and the families
12    signed on the second page.
13              MR. APUZZO:  I just want to be
14              very clear on this.
15              MR. RIGUERA:  I understand.  He's
16              saying there's one written agreement with
17              Speiser Krause about the fee sharing,
18              then came the retainer agreements.
19         Q.      What your attorney just stated; is
20    that correct?
21         A.      Yes, because I wanted to make sure
22    how much would be my share.
23         Q.      In other words, the first one is the
24    written letter saying 75/25 to the Brazilian
25    attorneys, all right?
```

66

1                        Renato Guimaraes

2          A.      Yes.

3          Q.      And the second one is when they came

4    to Brazil and made a retainer agreement with the

5    clients that had your name on it?

6          A.      Yes.

7          Q.      Did you know that some of the TAM

8    clients discharged Speiser Krause by revoking their

9    retainer agreements?

10         A.      Yes.  There are ten so far, ten,

11   seven.  Three are waiting in California.

12         Q.      I'm sorry, tell me that again.

13         A.      Seven fired Speiser Krause, they are

14   in California, and three more are waiting for the

15   outcome of California to join and fire Speiser

16   Krause, too.

17         Q.      Can you tell me the names of the

18   seven in California?

19         A.      By heart it would take long, may I

20   read my own letter?

21                 MR. RIGUERA:  Didn't we cover that

22            in the first one, Bill?

23         A.      I can try.  Menin.

24         Q.      M-E-N-I-N?

25                 MR. RIGUERA:  Bill, I have a list

1                           Renato Guimaraes

2           A.        In Brazil, if attorney change the

3    sides, it's a crime.  If you have a conflict with

4    your client, you should stay away, you should not

5    help as Jerry Lear did Northrop Grumman.  It's a

6    crime in Brazil.

7                     And I put this in all papers in

8    Brazil, look at this, the guy gave affidavit, and

9    so forth.  So, it's beyond ethical, the guy go to

10   jail in Brazil, never say something like that.  So,

11   that's the seriousness of the issue I told Lack.

12          Q.        So, the crime, if I understood you

13   correctly, was there was a conflict of the interest

14   of --

15          A.        We call in Brazil, the penal code in

16   Brazil called treason.

17          Q.        So, he committed a treason against

18   his client?

19          A.        Yes.

20          Q.        And this is what you described to

21   Walter Lack?

22          A.        That's correct.

23          Q.        Was the conduct of Speiser Krause

24   also a crime when they tried to obtain settlement

25   agreements for the clients?

Renato Guimaraes

1

2     A.     In the way they lied to the clients,

3    yes.

4     Q.     And you refer also in this letter to

5    case handling errors, that's right after ethical

6    claims.  Which errors did you tell Walter Lack that

7    Speiser Krause committed?

8     A.     If I understand, error is an

9    unconscious mistake, everyone can do it.  I never

10   complain about errors.  He went well beyond that,

11   as I said, lied to the people, we lose the case in

12   America.  That's not true, it's false.  It's not an

13   error, it's consciously misleading the clients.

14     Q.     So, in other words, by telling the

15   client that the case was lost in the United States,

16   that was a lie, you're saying that?

17     A.     Yes.  My understanding, we lost the

18   case, not forum nonconveniens, on the merits, we

19   lost.  Last week I was there, it was on.

20     Q.     On what do you base your understand-

21   ing that Speiser Krause was referring to the merits

22   of the United States case and not the forum

23   nonconveniens dismissal?

24     A.     To the level of communication to the

25   clients we never specified forum nonconveniens.

ASA REPORTING SERVICE, INC.
(914) 588-3358

1                     Renato Guimaraes

2    They don't understand.  They say lost and, of

3    course, it would not be forum nonconveniens, was

4    the stay, should be on the merits.  We lost, well,

5    we heard rumors in the court, rumors in the court

6    we are going to lose, so.

7          Q.     Do you have an agreement to share

8    fees with Walter Lack for the seven cases?

9          A.     No.

10         Q.     So, if Walter Lack is successful in

11   enforcing the Jabaquara judgement in the United

12   States, how is Walter Lack going to get paid?

13         A.     He?

14         Q.     Yes.

15         A.     It's in the contract of Lack and the

16   families, these families, these seven families.

17         Q.     And you're not named in that retainer

18   contract?

19         A.     No, I'm not.

20         Q.     So, if I understand you correctly, if

21   Walter Lack gets an attorney's fee of one-third of

22   the recovery, you are not going to receive any part

23   of that one-third fee?

24         A.     Not by contract, maybe voluntarily as

25   a referee.  But even as a referral, I have no

94

1                    Renato Guimaraes

2    Decat Manhaes, M-A-N-H-A-E-S.  Three family members

3    of the family which wrote a letter in Portuguese to

4    Dr. Guimaraes which was translated, which Dr.

5    Guimaraes has produced for this litigation, Bates

6    stamped RG00357, 358, 359.

7                    Can you tell us what these three

8    documents refer to?

9          A.    Yes, they say Mr. Renato you are not

10   any longer my attorney, the reason being your

11   numberless obstacles you have raised.

12         Q.    Do you recall seeing a document

13   revoking your authority by the three members of the

14   Manhaes family?

15         A.    Yes.

16         Q.    And is this an accurate translation

17   of that?

18         A.    I expect, sure.  I don't have the

19   original with me but sounds similar.

20         Q.    And you have the original in your

21   records?

22         A.    I think Dr. Clito does have the

23   original.  The original according to the Brazilian

24   law should be together.

25                    MR. APUZZO:  Since this was produced

1                    Renato Guimaraes

2          by you to us in discovery, I would

3          respectfully request that you produce the

4          original of this document.

5                    (Production Request.)

6                    MR. RIGUERA:  When you say the

7          original, you're talking about a physical

8          original or a copy of --

9                    MR. APUZZO:  Well, we want to get

10         this into evidence at trial, you're not

11         going to object, as long as we have the

12         Portuguese document so that he can

13         compare it, I have no problem.

14         Q.      Did you understand by this letter

15    that the Manhaes family was firing you as their

16    attorney?

17         A.      That's correct.

18         Q.      And that the reason that they were

19    giving was that you had had numberless obstacles

20    and you have raised executing the settlement

21    proposed by the American attorneys retained to file

22    indemnity proceedings in the United States courts.

23    Is that the reason you understood they fired you?

24         A.      Well, they signed this reason as we

25    can read, yes, that's what I read here, yes.

1                    Renato Guimaraes

2          Q.     And did you have a written retainer

3    agreement with the Manhaes family for the action in

4    the United States?

5          A.     Together with Speiser Krause for all

6    65 families.

7          Q.     How many letters of revocation were

8    received by you similar to this?

9          A.     26 less nine, 15 probably.

10         Q.     Was the reason that these clients

11   revoked your authority basically the same reason as

12   described in this letter from the Manhaes family?

13         A.     The facts are the same.  I

14   understand, however, this is quite different, they

15   say numberless obstacles, the standard form was

16   because of your opinion, because of your opinion,

17   many times, I don't know any attorney has no

18   opinion.

19         Q.     I'm not too sure I understand.  The

20   question, again, the letters from the 15 other, we

21   call this a revoca, is that how it's pronounced?

22         A.     Yes.

23         Q.     Revocation of your authority?

24         A.     Yes.

25         Q.     The letters of revoca that you

97

1                           Renato Guimaraes

2       received, did they all say about the same reason as

3       this letter here, the reason for the clients to

4       revoke your authority, was it the same?

5               A.      No, it was because of your opinion,

6       period.  I inject my observation, I don't know an

7       attorney without an opinion.

8               Q.      So, some letters say numberless

9       obstacles --

10              A.      Very few, I think only this family.

11              Q.      -- and some of them said it was a

12      difference of opinion?

13              A.      No, they don't say difference of

14      opinion.  They say because of your opinion, most of

15      them, by far, most of them because of my opinion.

16              Q.      And your opinion was different from

17      their opinion?

18              A.      My opinion was different of Speiser

19      Krause opinion.  They agree with me but they say we

20      need the money, so I agree, but we cannot change

21      the world, they are Americans, I want the money,

22      the way to do this is to fire you, I'm sorry I fire

23      you, and they did.  Some pay me back, some did not.

24              Q.      Were any of the TAM settlements the

25      ones that were settled with Speiser Krause as the

98

```
 1                        Renato Guimaraes

 2    attorney, were they required to be approved by a

 3    Brazilian lawyer?

 4           A.     Brazilian court.

 5           Q.     Brazilian court?

 6           A.     Yes.  All of them with minors.

 7    Without minors, the court don't care, as long as

 8    you are adult, you can throw your money away, but

 9    when kids, orphans, little kids, the curator of the

10    minor has to give opinion.

11           Q.     And the settlement agreements, in

12    order to get the Brazilian court to consent to

13    these settlements, did the clients have to be

14    represented by a Brazilian attorney?

15           A.     That's correct.

16           Q.     Did any of the TAM clients ask you to

17    serve as their attorney for the purposes of

18    obtaining the Brazilian court's approval of a

19    settlement agreement?

20           A.     No.  That would be the last step.

21    The first step they knew I was pretty much against

22    it.  I went to the attorney general office, hey, we

23    have a problem here, so I do not sign and made you,

24    attorney general office, aware of what's going on

25    here.
```

1                    Renato Guimaraes

2    crash of October 31st, 1996?

3         A.     If I had plans?

4         Q.     Did you have a program, how could I

5    say it.  Did you engage in a course of conduct to

6    go out and find clients for the TAM cases?

7         A.     No.  I expect I would be very

8    disappointed if nobody called me.  But,

9    immediately, I believe before Dr. Cestare the

10   attorney for the mother of the copilot who he was

11   in a city nearby called me, and the priest of

12   another, Catholic priest from another town, another

13   city, called me because the widow of the pilot was

14   a friend and he want my help, and things like that.

15        Q.     Was the pilot one of the 65 clients?

16        A.     No, Speiser Krause did not accept it

17   because they don't want to mix up the crew with the

18   passenger.

19        Q.     Now, going back to my other question

20   that was confusing, did you have an idea in your

21   mind of how you would go out to obtain the clients

22   of the air crash?

23        A.     I believe my work with Varig case,

24   with the high publicity would be enough to say

25   who's the guy who help us, you know, refer us.  So,

1                      Renato Guimaraes

2    I have no need.  And soon after I start my name in

3    the newspaper because I took actions, and so forth.

4         Q.     That's what I was trying to get at,

5    part of your plan was to get your name into the

6    newspaper?

7         A.     Yes.  I recall now some newspaper, at

8    least one, call me what I should advise the

9    families, things like that.  I said, well, first

10   step to not sign any release because in Varig case

11   it happened.  And then my name started to move on.

12        Q.     So, do you have a copy of this

13   newspaper article?

14        A.     Not specifically, I don't know.  I

15   remember a helicopter from the TV come to where I

16   work.  I was not prepared to be shown on TV, I was

17   in resort, and so forth.  It was in the very

18   beginning.  And they went to the beach and I made

19   interview there.  Things like that.  I have no

20   copy.

21        Q.     Who interviewed you?

22        A.     A reporter from Bandeirantes.

23        Q.     Can you spell that?

24               THE INTERPRETER:  Sure, it is

25   spelled B-A-N-D-E-I-R-A-N-T-E-S.

132

Renato Guimaraes

1

2      Q.     Did you ever see any of these news

3   articles?

4      A.     No.  I was invited to make discussion

5   on TV, more formal way, afterward when the report

6   was denied by the aeronautical authorities.

7      Q.     Let me limit the time.  Going from

8   the time of the air crash, October 31st, 1996, up

9   to the time when the clients came in to see you and

10  Speiser Krause at the hotel in Sao Paulo, that

11  period of time.

12     A.     Oh, yes.

13     Q.     Did you give interviews during that

14  short period of time?

15     A.     I got news on the newspaper when I

16  took the very preliminary action.  Which action was

17  that?  I believe was a notification, it's not a

18  lawsuit yet, saying TAM to not try to have -- I

19  don't want to say bad words -- don't try to have

20  release from the families.  Then that notification

21  went to the newspaper.  That was enough.

22     Q.     Which newspaper was it?

23     A.     I believe was Folha De Sao Paulo.

24     Q.     Could you spell that?

25            THE INTERPRETER:  F-O-L-A, D-E, Sao

133

```
 1                    Renato Guimaraes
 2          Paulo.
 3          Q.      And is this something this newspaper
 4   found out by there own investigation or did you
 5   call them and tell them that you filed this notice
 6   against TAM?
 7          A.      If I called them about the
 8   notification?
 9          Q.      Yes.
10          A.      No.  In court, by the court.  When
11   somebody call me, I send a fax.  Another attorney,
12   things like that.  They called me, the families,
13   things like that, also.  But when Speiser Krause
14   was there it was all broad, my name, that was two
15   or three months later.
16          Q.      So, during that period of time, the
17   time you were interviewed on the beach?
18          A.      No, later.
19          Q.      So, do I understand you correctly
20   that the way that you obtained the attention of
21   these clients was the notice that you filed in the
22   court against TAM which was picked up by the
23   newspaper?
24          A.      Yes.  Well, let's put it this way,
25   the mother of the pilot, before that, the mother of
```

1                    Renato Guimaraes

2    the copilot, the priest of the pilot, maybe now Dr.

3    Cestare and that's more hear, because they went to

4    my home, they are close.

5              And then I started, really all the

6    attorneys in the papers, and I start change.  I

7    found this guy, hey, you have a family here, be

8    careful, and so forth.  So, we start having

9    meetings.

10        Q.    And this was before they came to sign

11    with Speiser Krause's retainer agreement?

12        A.    I guess so, yes.

13        Q.    Do you remember the names of these

14    attorneys who you saw in the newspaper?

15        A.    I know the fellow, I can find his

16    name.  No, right now I am not in position to give

17    you his name.

18        Q.    So, there was one attorney we're

19    talking about?

20        A.    Yes.  He is a young fellow and he did

21    not like my idea or Speiser Krause, he never came

22    to California, only in Brazil.

23        Q.    Did you ever obtain a manifest of the

24    people who were on board of the plane that crashed?

25        A.    Manifest?

153

1                          Renato Guimaraes

2          A.      Very few, 10 maybe.

3          Q.      10?

4          A.      Yes, but soon they bring the

5   attorney, always have the attorney because of the

6   estate.

7          Q.      And at the time that they signed this

8   agreement, the retainer agreement, was there an

9   agreement between Speiser Krause and the family

10  lawyer as to the compensation to be given to that

11  lawyer?

12         A.      No, the compensation for a referral

13  came along with a collective huge meeting when I

14  told Arthur, see, attorneys for the families are

15  demanding some compensation.  At the meeting I

16  think I told you, he think about.  I said take your

17  time, call Washington.

18                 He said no, I decide now, 10 per

19  cent.  Everyone agreed, he called Washington, gave

20  me the letter, Renato you are authorized to give to

21  everyone.

22         Q.      So, the agreement to pay the lawyers

23  10 per cent came after the clients signed these

24  documents?

25         A.      In the process, not the beginning,

154

1                    Renato Guimaraes

2    not in the end.

3          Q.    And this was 10 per cent of the

4    lawyer's fees, not 10 per cent of the entire

5    recovery; correct?

6          A.    That's correct, for the entire it

7    would be two per cent only.

8          Q.    Was there any agreement with the

9    family lawyers which was in a writing like this, a

10   contract?

11         A.    No, that was a unilateral letter from

12   Speiser Krause to Renato authorizing Renato to give

13   the letter to Brazilian referral attorneys.  And

14   Speiser Krause, and I quote, "We will stand behind

15   it," something like that.

16         Q.    Did you give any writing to any of

17   the family lawyers about their compensation?

18         A.    Not in the case to be filed in

19   America, but in the case against TAM only I have a

20   particular six or seven with those, not in this

21   one.

22         Q.    Nothing on this?

23         A.    No.

24         Q.    But you did do it with the TAM cases?

25         A.    Yes.

1                          Renato Guimaraes

2     lawsuit, had it started as of this date August

3     11th, 1997?

4              A.      I don't think so because, of course,

5     Speiser Krause delay most of the time to get more

6     client so it should be around the last days of

7     October.

8              Q.      And you didn't commence the Jabaquara

9     action yet?

10             A.      No.

11             Q.      When this letter came in which

12    modified the attorneys' fees from 33 and one-third

13    approximate per cent to 25 per cent, was there any

14    change in the compensation that was agreed to be

15    paid to the family lawyers?

16             A.      The 10 per cent, no, keep the same.

17             Q.      They were going to get 10 per cent of

18    the 25 per cent?

19             A.      Yes.

20                    MR. APUZZO:   Let's mark this as

21             Exhibit 19.

22                    (Speiser Krause Letter to Renato

23             Guimaraes Dated 2/5/97, marked for

24             identification, Exhibit 19.)

25             Q.      This is a Speiser Krause letter on

162

1                    Renato Guimaraes

2     their letterhead dated February 5th of 1997

3     designated RG00006.  Can you identify this letter?

4                    (The witness examines document.)

5          A.    Sure.

6          Q.    And this is a letter that was sent to

7     you by Gerard Lear?

8          A.    Somebody in his office.

9          Q.    Do you know when you received this

10    letter?

11         A.    When?

12         Q.    Yes.

13         A.    Half-an-hour after I discussed

14    verbally with Arthur Ballen for the 25 per cent.

15         Q.    And you were working in your office

16    at the time you received this?

17         A.    No, I was in town, Sao Paulo, so I

18    gave a public fax number on the phone, I went.

19         Q.    What was your understanding when you

20    received this, what did this mean to you?

21         A.    Just like today, it was a

22    complimentary written evidence of our understanding

23    which was left open in Key Largo, you know, well,

24    depend, Renato, how many clients, let's see, we'll

25    discuss this later, and then it's time to fix it.

163

1                         Renato Guimaraes

2          Q.      So, out of the 33 and one-third per

3     cent, he's saying a total of 25 per cent will be

4     paid to Brazilian counsel, you were one of the

5     Brazilian counsel, I assume?

6          A.      No, here, Renato Guimaraes, counsel.

7          Q.      No, in other words, where he says

8     Brazilian counsel, you took that to understand that

9     he was saying Renato Guimaraes is going to get 25

10    per cent?

11         A.      Yes, my name is there.

12         Q.      The letter is addressed to you, dear

13    Mr. Guimaraes?

14         A.      Yes.

15         Q.      Why didn't he say of this fee a total

16    of 25 per cent will be paid to Renato Guimaraes for

17    his services?

18                 MR. RIGUERA:  Objection.  Calls

19            for speculation as to what he meant.

20         Q.      Do you understand that to be what was

21    meant by their services?

22                 MR. RIGUERA:  Same objection.

23         A.      I follow his rules.

24                 MR. RIGUERA:  His rules.

25                 I'm not telling you not to

```
1                    Renato Guimaraes
2       answer.  If you know what Arthur or
3       Gerard Lear were thinking when he wrote
4       that, go ahead.
5                    MR. APUZZO:  Please.
6       A.       In retrospect --
7       Q.       No, at the time you received this.
8       A.       I have no question, I talk to the
9   guy, you take 25 five per cent or good luck, I go
10  to Kreindler & Kreindler.  He said okay, he
11  accept.  And I receive this, my fee.  You know the
12  trick they put in I recognize later on, but I was
13  sure it was referred to me.
14      Q.       And when he uses the words "their
15  services," did you have any question of the English
16  use of the words their services?
17      A.       Much later, much later professor in
18  America told me counsel is a word is used singular
19  and plural.  I was not aware of that, so I said
20  they think I have other employees in my office, but
21  I have a suspicion right from the beginning he was
22  making a trap.
23                   MR. CHASE:  Can we go off the
24          record.
25                   (Off the record at 4:30 p.m.)
```

1              Renato Guimaraes

2           (Resuming at 4:35 p.m.)

3    EXAMINATION CONTINUING BY MR. APUZZO:

4         Q.    Dr. Guimaraes, an answer to one of

5    the questions, I think you referred to something to

6    the effect that you thought that Speiser Krause

7    assumed you had other employees in your office; is

8    that correct?

9         A.    That's the way to accommodate their

10   service, their is plural.  And I start reading all

11   kinds of grammar books to discover why they say

12   their.  Their should be another attorney.  Make no

13   sense, should be counsel and employee of my office,

14   so that's what I tried to explain to you.

15        Q.    Did they know at the time that you

16   didn't have other employees?

17        A.    I think they should, Renato, where

18   you work, it's a large firm or a solo

19   practitioner.  I'm sure I told them.

20        Q.    You told them it was a solo

21   practitioner?

22        A.    Yes.

23        Q.    And you did not have any other

24   lawyers who were working for you at that time?

25        A.    No, not on permanent basis, no, only

1                          Renato Guimaraes

2    case by case.

3           Q.     And when it said the total of 25 per

4    cent is going to be paid to Brazilian counsel,

5    singular or plural, did this also include the 10

6    per cent?

7           A.     No, 10 per cent was long after that.

8           Q.     If there were two Brazilian attorneys

9    who were working for one client, would that mean

10   that those attorneys would get 25 per cent each?

11          A.     No.

12          Q.     They would get a total?

13          A.     For each family, yes.  That's what I

14   understand.  We never had this problem.

15          Q.     That was your understanding at the

16   time of this letter?

17          A.     Say again, that was --

18          Q.     That was what was understood with

19   this letter?

20          A.     Yes, but this letter has nothing to

21   do with the 10 per cent.

22                 MR. APUZZO:  Let's mark this as

23          Exhibit 20.

24                 (Speiser Krause Letter to Renato

25          Guimaraes Dated 5/23/97, marked for

1                     Renato Guimaraes

2          A.        No, only the contact with Speiser

3    Krause.

4          Q.        What legal work did you perform in

5    the California proceeding?

6          A.        Linda?

7          Q.        Legal work.

8          A.        All for the forum nonconveniens issue

9    as far as the Brazilian expert scholar, opinion and

10   the affidavit, how this works in Brazil, one month

11   working there.

12         Q.        You spent one month working there?

13         A.        One month, Irvine, near L.A.

14         Q.        Did you have an office in their

15   office?

16         A.        No, Speiser Krause did.

17         Q.        Did you have an office in Speiser

18   Krause's office?

19         A.        Yes, I have a room there.

20         Q.        And what did you do in the office?

21         A.        I worked on the forum nonconveniens.

22   Call everyone in Brazil, John Verth was with me.

23   More than John Verth, Tim Cook, seven days a week,

24   even weekends.

25         Q.        So, other than you telling Speiser

ASA REPORTING SERVICE, INC.
(914) 588-3358

1    of your recollection in general, what matters

2    were discussed at those initial meetings?

3            A.    Initially when it was discussed the

4    possibility of setting up this association, the

5    issues that were raised was starting an action.

6            Initially we thought about starting

7    it in Brazil.  However as it became clear that

8    what caused the accident was a defective part

9    called reverso by Northrop, the manufacturer,

10   Northrop, Renato Guimaraes and the others decided

11   to initiate the action in the US because the

12   courts here would be faster as well as the amount

13   of the recovery would be higher.

14           Q.    Did you know Renato Guimaraes prior

15   to these meetings that you're testifying about?

16           A.    No.  I only met him at the time of

17   the meetings.  I did not know him before that.

18           Q.    Do you know who initially contacted

19   Dr. Guimaraes to assist in - to assist the

20   association with pursuing a claim for the

21   accident?

22           A.    It was Sandra Sales as well as her

23   sister-in-law named Duda.

24           Q.    During this initial phase of the

25   association, were any other attorneys being

12

considered to represent the families?

A.   Each family would have its own
private attorney who would meet with Renato
Guimaraes who would coordinate it, the entire
action.

Q.   As a result of those initial meetings
held by the association, did the association
reach a conclusion or decision as to what steps
they would take to pursue their claims?

MR. APUZZO:  Note my objection to the
form, but go ahead.

THE WITNESS:  There was no opinion to
the contrary from the group.  Renato was
authorized to find an attorney who in the US who
would represent the families and initiate the
action in the USA.

BY MR. RIGUERA:

Q.   And sir, do you know whether Renato
Guimaraes took any steps to attempt to retain a
law firm in the US to represent the families?

A.   Yes.

Q.   And did he eventually recommend a law
firm to represent the families?

A.   Yes.

Q.   And what law firm was that?

13

1          A.    Speiser, Krause.

2          Q.    Were you familiar with the Law Firm

3     of Speiser, Krause prior to that time?

4          A.    No.

5          Q.    Do you know whether any of your other

6     colleagues in Brazil who were representing other

7     family members had ever heard of the firm of

8     Speiser, Krause?

9          A.    I believe they did not.  They became

10    familiar with this firm after Renato told them

11    about it.

12         Q.    Do you recall -- Well, did Mr.

13    Guimaraes represent or, I'm sorry, did Mr.

14    Guimaraes recommend any other law firm other than

15    Speiser, Kraus at that time?

16         A.    No.

17         Q.    Were there any meetings where you and

18    your colleagues and the families and Mr.

19    Guimaraes was present where the decision to

20    attempt to retain Speiser, Krause was discussed?

21         A.    Yes.  I did participate in such a

22    meeting.

23         Q.    Do you recall approximately when that

24    meeting occurred?

25         A.    I believe that the first meetings

14

took place in January 1997.

Q.   Was - was there any representative of Speiser, Krause at those initial meetings or are these meetings still between members of the association?

MR. APUZZO:   Objection, but answer it.

THE WITNESS:   Perhaps not initially in the first meetings in January 1997 but perhaps in February or March Speiser, Krause did have a representative who was Mr. Artur Ballen?

BY MR. RIGUERA:

Q.   At the time that Mr. Guimaraes first recommended Speiser, Krause, did he provide the members of the association any information concerning Speiser, Krause and why he was recommending them?

A.   Yes.   He actually submitted to the families information pertaining to the fact that Speiser, Kraus was a firm in the United States who specialized in aeronautic accidents.

Q.   Let me direct you to the first meeting that you recall with any representative of Speiser, Krause in Brazil.

Could you tell us who was present at

15

1    that meeting - who was present at that meeting

2    and what occurred?

3        A.   Yes.  I do remember that representing

4    Speiser, Krause there was an individual named

5    Artur Ballen as well as Mr. Renato Guimaraes and

6    I also was familiar with a couple of other

7    attorneys.  One of them was named Ribas and the

8    other one was Ferrera.  I don't recall what was

9    his first name but Mr. Renato game Guimaraes was

10   present in all of them.  Oh, including also Dr.

11   Edna.  And that I recall.

12       Q.   Where did that meeting take place?

13       A.   The first meeting took place at

14   Duda's home.  It was actually an apartment.

15       Q.   And, to the best of your

16   recollection, what was discussed during that

17   first meeting?

18       A.   What was discussed during that

19   meeting was how to write the initial complaint

20   against Northrop Teleflex Foker as well as the

21   insurance companies and that's what was discussed

22   among those who were representing the families.

23       Q.   Was Arthur Ballen giving any

24   information or advice as to his opinion about the

25   ability to file a lawsuit concerning the airline

16

accident in the United States?

A.   Yes.

Q.   Could you tell us, to the best of your recollection, what he said about that?

A.   What was discussed was that the firm Speiser, Krause was very experienced in these kinds of aeronautic accidents and because it hadn't been proved but there was some indication that the accident had been caused by a defective reverso and therefore the action could be initiated in the United States against Northrop, in addition to that one of the victims was a male US citizen.

Q.   Was anything discussed during that meeting concerning the details of retaining the Law Firm of Speiser, Krause?

A.   What was discussed initially was mainly the attorneys fees that Speiser, Krause would charge as well as the writing of the contract of provision of services as well as the inclusion of resumes of the attorneys of the firm.

Q.   During that trip that Mr. Ballen took to Brazil, was there more than one such meeting?

A.   Yes.  Before the execution of the

17

1    contract he traveled to Sao Paulo two or three

2    times.

3        Q.    What -- Could you tell us any other

4    places where any of these initial meetings

5    occurred?

6        A.    Yes.   There were.

7        Q.    What - what other locations did you

8    meet?

9        A.    One meeting was at the Hotel Lotel.

10   The other one was at the Maksud Plaza Hotel.

11       Q.    And was Renato Guimaraes present at

12   each of these meetings with - with - between the

13   members of the - of the victims of the fam - of

14   the victims of the accident and, I'm sorry, the

15   family members of the accident victims and

16   Speiser, Krause, was Mr. Guimaraes present at all

17   of those meetings, as well?

18       A.    Yes.

19              In some of the meetings he was the

20   translator and in some of the other meetings Duda

21   would be the translator.

22       Q.    During those meetings when the

23   families were considering retaining Speiser,

24   Krause as their attorney, was there any

25   discussion about retaining Renato Guimaraes or

1    what his role was to be?

2              MR. APUZZO:  Note my objection, but

3    please answer.

4              THE WITNESS:  Yes, there were.

5    BY MR. RIGUERA:

6         Q.   And what was - to your understanding,

7    what was Mr. Guimaraes' role going to be in

8    connection with the cases?

9         A.   Renato Guimaraes because he was the

10   coordinator of the group which included Speiser,

11   Krause as well as the families, he - it was

12   decided that he would be the one that would

13   actually write the - the initial petition and

14   initiate action because the other attorneys did

15   not know the US court systems.

16        Q.   Let me understand what you said.

17              Was it your understanding that Dr.

18   Guimaraes was to actually file the action in the

19   US or simply to assist Speiser, Krause in filing

20   the action in the US?

21        A.   He would provide assistance only.

22        Q.   Did there come a time when the

23   various families that were participating in the

24   association you've described sign retainer

25   agreements with Speiser, Krause and Mr.

32

1          Q.    Could you tell us, did you have one

2    meeting or more than one meeting?

3          A.    More than one.

4          Q.    Could you tell us beginning with the

5    first meeting who - who was present at the

6    meeting where you first discussed a settlement

7    proposal for the Arjona family?

8          A.    Myself, the wife and the

9    brother-in-law of the Arjona family.

10         Q.    Who else was at that meeting?

11         A.    The meeting took place within closed

12   doors in the room of Maksud Plaza.

13         Q.    Was it just yourselves present at the

14   meeting or was there a representative of Speiser,

15   Krause, as well?

16         A.    The meeting took place including

17   Speiser, Krause and also his son, I believe

18   Arturo Ballen.  Lee is the son actually.  His

19   name is Lee, I believe.

20         Q.    All right.

21               So, then the meeting was between

22   Arthur Ballen, Lee Ballen, yourself and the two

23   members of the Arjona family?

24         A.    Correct.  The wife and the

25   brother-in-law, they did not allow Renato

33

1      Guimaraes to participate.

2              Q.    Do you know why?  When you say they,

3      who did not allow Mr. Guimaraes to participate in

4      that meeting?

5              A.    Arthur Ballen and his son Lee.

6              Q.    Do you know why they did not allow

7      Mr. Guimaraes to be present?

8              A.    Because they believed, according to

9      the brother-in-law, was translating it, that

10     Renato Guimaraes would hinder the agreement they

11     were attempting to make.

12             Q.    Is this something that Arthur Ballen

13     or Lee Ballen said during that meeting?

14             MR. APUZZO:  Note my objection.

15             THE WITNESS:  No, no.

16     BY MR. RIGUERA:

17             Q.    So, how did you get that

18     understanding?

19             A.    The other family mentioned so.

20             Q.    And do you know why they thought

21     that?

22             MR. APUZZO:  Objection.

23             THE WITNESS:  Let me think about it.

24     Because some of the families wanted to enter into

25     an agreement and Renato would prevent them from

34

1    doing so.

2    BY MR. RIGUERA:

3        Q.    And what -- Did you have any

4    discussions with Renato Guimaraes concerning

5    whether the families should accept a settlement

6    or not?

7        A.    Yes.   I spoke with him and his advice

8    was for us not to accept the agreement because it

9    was under value.   It should have been much more.

10            MR. APUZZO:   Note my objection,

11   please.

12            MR. RIGUERA:   Mark this as Exhibit 3.

13            (Whereupon, Plaintiff's Exhibit No. 3

14   was marked for identification by the Reporter.)

15   BY MR. RIGUERA:

16       Q.    Sir, I've handed you a document

17   that's entitled authorization to settle marked as

18   Exhibit 3.

19            Do you recognize that document?

20       A.    Yes.

21       Q.    Would you please tell us what - what

22   this document is?

23       A.    This document is about the proposal

24   that was submitted by Arthur Ballen on behalf of

25   Speiser, Krause representing the amount that was

36

1    initially explain - explain in detail how he

2    reached that amount.

3              MR. APUZZO:  Note my objection to

4    everything after "no".

5    BY MR. RIGUERA:

6         Q.   All right.

7              So, did you ask Mr. Ballen to explain

8    to you how they arrived at this settlement offer

9    of $903,371.79?

10             MR. APUZZO:  Objection to leading.

11   But --

12             THE WITNESS:  Yes

13   BY MR. RIGUERA:

14        Q.   Okay.

15             What did he tell you in response?

16        A.   That this was the amount that he

17   could offer and he had no further details to

18   give.

19        Q.   Were you satisfied with that

20   explanation?

21        A.   No.  And we did not accept the

22   agreement.

23        Q.   Did Mr. Ballen tell you who came up

24   with the figure that appears on this document?

25        A.   He said that this was - that this was

1     the amount that the insurance companies and the

2     other companies offered and he could not give

3     anymore cents.

4          Q.    Did you ask whether there was any

5     further opportunity to negotiate this figure?

6          A.    He said that we had 30 days to take

7     it or leave it.  If we didn't take it, that the

8     proposal would be considered to be withdrawn.

9          Q.    Did Mr. Ballen -- In the event you

10    decided - you and your clients decided not to

11    accept the offer, did Mr. Ballen indicate whether

12    Speiser, Krause would continue to pursue the

13    claim?

14               MR. APUZZO:  Objection.

15               THE WITNESS:  Not with the claim per

16    se.  But as far as the amount of the proposal, it

17    was take it or leave it.

18    BY MR. RIGUERA:

19         Q.    And during that meeting, did you

20    indicate one way or the other whether your client

21    was going to accept it?

22         A.    My client was there and I was adamant

23    that my client would not accept it.

24         Q.    Following that meeting, did you have

25    any discussion with Renato Guimaraes about the

38

1    settlement proposal?

2            A.    Yes.

3            Q.    And what did you discuss?

4            A.    He said that he would respect the

5    wish of the families.

6            Q.    Did you discuss anything else?

7            A.    No.

8            Q.    Did Mr. Guimaraes have an opinion as

9    to whether the settlement was - should be

10   accepted or not?

11                 MR. APUZZO:  Objection.

12                 THE WITNESS:  He stated that he

13   believed that the amount was indeed too low and

14   that we should continue fighting for a higher

15   amount.

16   BY MR. RIGUERA:

17           Q.    Did you have any discussions with any

18   of your other colleagues concerning the

19   settlement offers that - that they received on

20   behalf of their clients?

21           A.    Yes, I did.

22           Q.    And who did you speak with?

23           A.    With Dr. Edna, Ferrera, Ribas.  There

24   were some other attorneys also.  I do not recall

25   their names.

39

1          Q.    Did these attorneys have similar

2     meetings with Speiser, Krause to discuss the

3     settlement similar to the one that you - that you

4     had with your clients?

5          A.    On that day Ballen and his son set up

6     meetings with various other families on a

7     successive fashion but on the same day.

8          Q.    Did these meetings occur over - in

9     one day, all of the meetings, or did they occur

10    over a period of several days?

11         A.    No.   They occurred over the period of

12    three days.

13         Q.    When you had discussions with your -

14    with your colleagues concerning the settlements,

15    did you have any discussion as to whether the

16    settlements should be accepted or not?

17         A.    Some of the families who had higher

18    needs believed that the agreements, settlements

19    should be accepted.   Others did not.

20         Q.    When you had - when you had

21    conversations with the other attorneys, were

22    those individual conversations or were there any

23    group meetings?

24              MR. APUZZO:  Objection.

25              THE WITNESS:  Sometimes we would talk

40

1    individually, sometimes in groups, but nobody

2    would actually mention the amount proposed, just

3    the principal in general.  And I am referring to

4    small groups including two or three.

5         Q.    Following the set of meetings that

6    you have described where the settlement proposals

7    were made, did you - did there come a time when

8    there was a disagreement that arose between

9    Renato Guimaraes and Speiser, Krause concerning

10   the settlement?

11        A.    Yes.

12        Q.    How did you learn of that

13   disagreement?

14        A.    Renato Guimaraes himself told me.

15        Q.    What did he tell you concerning this

16   agreement?

17        A.    He mentioned that the amount proposed

18   was much too low and he cited a US case in which

19   the American victim received three million and

20   also another case pertaining to Banco Rural

21   including the Rabelo family in which the amount

22   received was 30 million.

23        Q.    Was that a different case or was that

24   one of the TAM cases?

25        A.    The one in which the victim was an

1                   Arthur Ballen

2          Q.     Tell me every settlement that you

3    made with the TAM defendants that didn't go through

4    because of Dr. Guimaraes.

5          A.     The seven to ten people Dr. Guimaraes

6    sued for fees in the Brazilian courts.  Sandra Sale

7    was -- No, hers went through.  The cases he

8    referred to Herman Mirmalstein, attorneys in Miami,

9    I don't know if that's you or not.

10                MR. BERMAN:  No.

11         A.     The cases he took from us and

12   referred, if you want to use that word, to Walter

13   Lack, L-A-C-K, in California.

14                Some of these holdouts are Renato's.

15   I can't tell you the names but they are people that

16   he's, for some reason, not signing.  We called them

17   to -- Never mind.

18                I would say that also includes the

19   people who remain in the Jabaquara litigations, in

20   of the 28 million dollars that has been collected.

21         Q.     How much of that 28 million dollars

22   paid to Speiser Krause was thwarted by Dr.

23   Guimaraes?

24         A.     Well, if you use the word delayed

25   rather than thwarted, I would say a considerable


EXHIBIT
5

1                          Arthur Ballen

2    number.  I can't give you the specific names at

3    this time.  If you indicated you wanted that, I

4    guess we could have gotten it for you.  That's the

5    answer.

6              Q.    Didn't that 28 million dollars of

7    settlements get paid anyway in spite of his

8    objections?

9              A.    Eventually, yes, through the years.

10             Q.    And Speiser Krause collected its fees

11    on that 28 million dollars?

12             A.    If it was 28, whatever it was, they

13    collected their fees, the answer is yes, they

14    collected their fees.

15             Q.    And you got your share?

16             A.    Yes, sir.

17             Q.    Were there any other factors that led

18    to the delay in payment other than the fact that

19    Dr. Guimaraes was opposed to them?

20             A.    Yes.

21             Q.    What other issues were there to cause

22    delay?

23             A.    The guardians for the children were

24    delaying the receipt of the funds.

25             Q.    How long were those delays?

1                              Gerard Lear

2          A.      Yes.

3          Q.      When was that?

4          A.      In 1973, a Varig airliner crashed

5    outside of Paris and the Speiser firm and another

6    firm, my firm at the time, became involved in it.

7          Q.      When did your firm get involved?

8          A.      1973.

9          Q.      My question was, was the Speiser

10   Krause firm ever involved in the crash of an

11   airplane that crashed in Brazil prior to the TAM

12   litigation?

13         A.      I'm sorry, you meant in Brazil, you

14   had given me the impression it was a Brazilian

15   crash, which a Brazilian airplane crashed in

16   Paris.  No.  If they did, I'm not aware of it.

17         Q.      When was the Varig case concluded?

18         A.      '76, I think.

19         Q.      Did you ever get involved in any

20   other Varig cases?

21         A.      No.

22         Q.      You sat through depositions and heard

23   discussions about other Varig litigation?

24         A.      I have.

25         Q.      Was Speiser Krause involved in any of

                ASA REPORTING SERVICE, INC.
                      (914) 588-3358



EXHIBIT

6

1                        Gerard Lear

2      notification of David Andrews having been killed on

3      the airplane?

4                        MR. APUZZO:  Objection to the

5                  form.

6                        Notification?  You mean the date

7                  of the letter?

8                        MR. BERMAN:  Strike that.  Yes.

9            A.      There's no connection between the

10     two.

11           Q.      So, the fact that you were told about

12     a person died on the airplane and given some

13     information about him, and then ultimately signed

14     that person's survivors is unrelated to you?

15           A.      Correct, that's unrelated.  I got the

16     letter, I wouldn't have acted on it.

17           Q.      So, you wouldn't take this letter and

18     then use this to go and contact the Andrews family?

19           A.      Of course not.

20           Q.      Did anyone do that on your behalf?

21           A.      No.

22           Q.      And when you say "of course not," why

23     do you say "of course not"?

24           A.      I wouldn't solicit a widow.

25           Q.      Now, the first paragraph of the

```
 1                    Gerard Lear
 2   letter relates to an understanding on an
 3   interpretation of the "total of 25 per cent to
 4   Brazilian counsel for their service that we just
 5   discussed and reviewed in your letter of February
 6   5th, 1997."
 7              MR. APUZZO:  Objection to form.
 8              Answer the question if you can.
 9         A.   I gather it does.
10         Q.   Did you ever respond to Exhibit 60?
11         A.   No.
12         Q.   Did you ever see a response from
13   anyone in your firm to Exhibit 60?
14         A.   I trust not.
15         Q.   What do you mean by that?
16         A.   Well, I wasn't going to respond to
17   it, I wasn't go going to talk about fees with
18   Renato at this time.
19         Q.   Did you write a letter to him saying
20   it's premature to talk about fees at this time?
21         A.   No, I didn't.
22         Q.   You made a decision not to respond to
23   the letter?
24         A.   That was not a conversation that was
25   going to take place until further along in the
```

82

1                          Gerard Lear

2     case, and I saw what he could bring to the case or

3     cases.

4            Q.      The question was whether you made a

5     decision not to respond to Exhibit 60.

6            A.      I was not going to respond to it.

7            Q.      Is that a yes?

8            A.      I did not respond to it.

9            Q.      In your mind it was premature?

10           A.      Absolutely.

11           Q.      And there are three different

12    interpretations given of what the 25 per cent could

13    mean, you didn't respond to any of them?

14           A.      No.  I had no intention of making any

15    agreement concerning fees with Renato at that time.

16           Q.      Did you ever discuss this letter with

17    Mr. Guimaraes?

18           A.      No.

19           Q.      How did you come to represent the

20    Andrews family?

21           A.      I believe a call came in to the firm

22    from perhaps, I think it was the general counsel

23    for the company that employed Mr. Andrews at some

24    time, I don't know when.  And we, or who whoever

25    took the call, and I recall I knew this, I may have

**GARCIA & KEENER**
Advogados

EXMO. SR. DR. JUIZ DE DIREITO DA          VARA CÍVEL DO FORO REGIONAL DO
JABAQUARA

Sandra Luiza Signorelli Assali, advogada, viúva, e, seus filhos Samir Signorelli Assali,
menor, nascido em 01/03/89, e, Rafaela Signorelli Assali, menor, nascida em 01/04/92,
residentes e domiciliados à Rua dos Democratas, 691 apto.31 - São Judas, nesta, todos
brasileiros, viúva e órfãos da vítima morta, Dr. José Rahal Abu Assali, médico, (doc.01)

Suzana Greco de França Klepetar, matemática, viúva, e, seus filhos, Ana Karina de
França Klepetar, menor, nascida em 29/10/81, e, Davi de França Klepetar, menor, nascido
em 19/03/83, residentes e domiciliados à Rua Apiacás, 630 apto. 24 - Perdizes, nesta, todos
brasileiros, viúva e órfãos da vítima morta, George Klepetar; (doc.02)

Heloisa Vaz Guimarães Sampaio Gouvêa, bailarina, viúva, e, seus filhos Roberta Vaz
Guimarães Sampaio Gouvêa, menor, nascida em 22/01/82, Fernando Vaz Guimarães
Sampaio Gouvêa, menor, nascido em 23/08/83, e, Camila Vaz Guimarães Sampaio
Gouvêa, menor, nascida em 16/06/89, residentes e domiciliados à Alameda Lorena, 1246
apto 902 - Jardim Paulista, nesta, todos brasileiros, viúva e órfãos da vítima morta, Luiz
Fernando Sampaio Gouvêa; (doc.03)

Lúcia Borda de Bello Aquino, secretária, viúva, e, seus filhos, Felipe de Borda Aquino,
menor, nascido em 12/02/92, e, Gabriel Borda Aquino, menor nascido em 30/12/94,
residentes e domiciliados à Rua Adolpho Bozzi, 257 apto.13, - Osasco -São Paulo, todos
brasileiros, viúva e órfãos da vítima morta, Gilberto Aquino; (doc.04)

Maria Guiomar Ambra Fournier Vieira, administradora de empresas, viúva, e, seus filhos,
Mariana Ambra Fournier Vieira, menor nascida em 09/09/88, e, Cássio Suplicy Vieira
Neto, menor, nascido em 08/03/91, residentes e domiciliados à Avenida Lavandisca, 596 apto
31 - Moema, nesta, todos brasileiros, viúva e órfãos da vítima morta, Carlos Mario Fournier
Vieira; (doc.05)

Monica Knútz Bleinat, do lar, viúva, e, seus filhos, Gisele Bleinat, nascida em 02/04/80,
Paulo Bleinat, menor, nascida em 02/12/81 e, Rodrigo Bleinat, menor nascido em 11/10/83,

AV. PAULISTA, 777 - CONJ. 141 - 14° ANDAR - 01311-914 - SÃO PAULO - SP
TEL - (011) 251-0466 FAX: (011) 284-9503
e.mail-garciaep@netpoint.com.br


EXHIBIT
7
ALL-STATE LEGAL®

CONFIDENTIAL     SK  000685

**GARCIA & KEENER**
Advogados

residentes e domiciliados à Rua Pedro Doll, 391 apto.41 - Santana, nesta, todos brasileiros, viúva e órfãos da vítima morta, Sérgio Aparecido Bleinat, empresário; (doc.06)

Terezinha de Jesus Fernandes Duarte, viúva, e, seus filhos, Eric Fernandes Duarte, menor, nascido em 02/03/88, e, Ellen Fernandes Duarte, menor, nascida em 31/10/91, residentes e domiciliados à Rua Pedro Cardoso, 66 - Conjunto Maria Aparecida Pedrossian - Campo Grande - Mato Grosso do Sul, todos brasileiros, viúva e órfãos da vítima morta, José Pereira Duarte; (doc.07)

Márcia Gonçalves Dias de Barros, viúva, e, seus filhos, Eduardo Gonçalves Dias de Barros, menor, nascido em 26/10/87, e, Gabriel Gonçalves Dias de Barros, menor, nascido em 04/10/96, residentes e domiciliados à Rua Conde de Bernardote, 26 apto. 702 - Leblon - Rio de Janeiro, todos brasileiros, viúva e órfãos da vítima morta, Geraldo Luis Arede de Barros; (doc.08)

Maria Bibiana Pinto Pizarro Sá Fortes, do lar, viúva, e, seus filhos, Camilla Pizarro Sá Fortes, menor, nascida em 25/09/90, e, Bruno Pizarro Sá Fortes, menor, nascido em 25/07/93, residentes e domiciliados à Rua Francisco Dutra, 37 apto. 1101 - Niterói - Rio de Janeiro, todos brasileiros, viúva e órfãos da vítima morta, Mauricio F. Sá Fortes; (doc.09)

Veneranda Aparecida Simões de Almeida, universitária, viúva, e, seus filhos, Lívia Maria Simões de Almeida, nascida em 28/02/80, e, Lucas Simões de Almeida, menor, nascido em 01/06/83, residentes e domiciliados à Av. Jurema, 45 apto.12 - Moema - São Paulo, todos brasileiros, viúva e órfãos da vítima morta, Luis Carlos Simões de Almeida; (doc.10)

Débora Regina Gonçalves Tamiello, analista de sistemas, viúva, e, seus filhos, Vítor Tamiello, menor, nascido em 30/03/87, Vanessa Tamiello e Vivian Tamiello, menores, nascidas em 03/02/89, residentes e domiciliados à Rua Lefosse, 168, apto.114, - Tatuapé - São Paulo, todos brasileiros, viúva e órfãos da vítima morta, Luiz Cláudio Tamiello; (doc.11)

Maria do Carmo Brandão Figueiredo, viúva, e, sua filha Ana Clara Brandão de Figueiredo, menor, nascida em 19/08/95, residentes e domiciliadas à Rua Gabriel José Rodrigues, 76 - São Paulo, ambas brasileiras, viúva e órfã da vítima morta, Aguinaldo Barbosa de Figueiredo; (doc.12)

Kátia Costa de Albuquerque Alecrim , bancária, viúva, e seus filhos, Roberta Alecrim Trindade, menor nascida em 10/07/95, e, Henrique Alecrim Trindade, menor, nascido em 03/03/97, residentes e domiciliados à Al. Jauaperi, 1317 2°. andar - Moema - São Paulo, todos brasileiros, viúva e órfãos da vítima morta Henrique Marques Trindade; (doc.13)

Miriam Ramos Gutjahr, agrônoma, viúva, e suas filhas, Eva Gutjahr, nascida em 25/09/78, Isadora Gutjahr, menor, nascida em 21/09/81, e, Melanie Gutjahr, menor, nascida em 12/06/83, residentes e domiciliadas à Rua Bolivar, 293 - São Paulo, todos brasileiros, viúva e órfãs da vítima morta Ivo Roberto Gutjahr; (doc.14)

Wanda Moreira Vieira, do lar, viúva, e, seus filhos, Rodrigo Moreira Coimbra Vieira, nascido em 13/07/77, e, Carolina Moreira Coimbra Vieira, nascida em 10/08/79, residentes e domiciliados à Rua Ministro Godoi, 533 apto. 171 - Perdizes - São Paulo, todos brasileiros, viúva e órfãos da vítima morta, Alberto Coimbra Vieira; (doc.15)

Catherine Fisher, menor nascida em 15/05/81, e, Leonardo Fisher, menor nascido em 07/05/85, neste ato representados pela mãe, Elione Elena Denise, separada judicialmente, e primeira esposa da vítima morta Roberto Fisher, residentes e domiciliados à Rua Bruno

AV. PAULISTA, 777 - CONJ. 141 - 14° ANDAR - 01311-914 - SÃO PAULO - SP
TEL  (011) 251.0486 FAX (511) 284.6002
e.mail-garciasp@netpoint.com.br



CONFIDENTIAL    SK  000686

**GARCIA & KEENER**
Advogados

Figueira, 2045 apto. 1104 - Curitiba - Paraná, todos brasileiros, órfãos da vítima morta Roberto Fisher; (doc.16)

Silvia Lúcia Peixoto Arjona, do lar, viúva, e, seus filhos, Silvana Peixoto Arjona, nascida em 13/05/68, Daniela Peixoto Arjona, nascida em 06/04/72 e, William Peixoto Arjona, nascido em 31/07/79, residentes e domiciliados à Rua Cel. Oscar Porto, 1091 apto.64 - Paraíso - São Paulo - SP, todos brasileiros, viúva e órfãos da vítima morta, William Arjona Chong, naturalizado brasileiro; (doc.17)

Neuza Maria Vicentini Amando de Barros, do lar, viúva, e, filhas, Juliana Amando de Barros, separada, nascida em 13/12/70, Luciana Amando de Barros Rodrigues, casada, nascida em 03/08/72 e, Mariana Amando de Barros, nascida em 29/10/74, residentes e domiciliadas à Rua Capote Valente, 361 apto.251 - Pinheiros - São Paulo, todas brasileiras, viúva e órfãs da vítima morta Luiz Antonio Amando de Barros; (doc.18)

Maria Adelaide Decat Manhães, viúva, e, seus filhos, Walter Luis Decat Manhães, nascido em 23/02/69, Maria Fabiana Decat Manhães da Costa, nascida em 06/05/71, e, Marcella Maria Decat Manhães, nascida em 21/09/73, residentes e domiciliados à Al. Dr. Walter Luis Manhães, médico; (doc.19)

Iviana Zizza Romero, viúva, e, seus filhos, Leonardo Zizza Romero, nascido em 21/05/72, Adriano Zizza Romero, nascido em 17/11/75, e, Roberta Zizza Romero, nascida em 15/12/78, residentes e domiciliados à Av. Sernambetiba, 3604 apto.1503 Bl. 2 - Rio de Janeiro - RJ, todos brasileiros, viúva e órfãos da vítima morta, Luis Lauro Romero; (doc.20)

Marizete Aparecida Strapasson Simioni, empresária, viúva, e seus filhos, Alexandro Simioni, nascido em 06/10/73, Lisimary Simioni, nascida em 07/04/75, e, Elisangela Simioni, nascida em 09/09/79, residentes e domiciliados à Rua Calisto Cumin, 30 - Curitiba - Paraná, todos brasileiros, viúva e órfãos da vítima morta, Hamilton Sebastião Simioni; (doc.21)

Shoghieh Taeed Kashani Shaikhzadeh, persa, naturalizada brasileira, do lar, viúva, residente e domiciliada à Rua Alm. Protógenes, 179 apto.173, Santo André - São Paulo, e seus filhos, Foad Shaikhzadeh, persa, naturalizado brasileiro, casado, nascido em 29/11/56, residente e domiciliado à Rua Cel. Dulcídio, 1240 apto. 111, - Curitiba - Paraná, Fariba Shaikhzadeh Vahdat, brasileira naturalizada, professora, casada, nascida em 25/09/59, residente e domiciliada à Alameda Cassaquera, 322 apto.132 - São Caetano - São Paulo, e, Faezeh Shaikhzadeh Santos, brasileira, casada, nascida em 11/03/73, residente e domiciliada à Rua Catequese, 1085 apto 63, - Santo André - São Paulo, viúva e órfãos da vítima morta Mohamad Shaikhzadeh; (doc.22)

Rosa Nhuch Boianovsky, viúva, e seus filhos, Mauro Boianovsky, brasileiro, casado, nascido em 12/04/59, Daniela Boianovsky, brasileira, casada, nascida em 17/07/60, André Boianovsky, brasileiro, casado, nascido em 30/03/63, e, Celso Boianovsky, brasileiro, casado, nascido em 23/09/65, residentes e domiciliados à SHIS Ql 16 cj. 1, casa 12 - Brasília - DF, viúva e filhos da vítima morta Dr. Davi Luiz Boianovsky, médico; (doc.23)

Cibele Monteiro da Rocha Ferrão, brasileira, viúva, residente e domiciliada à Rua Dr. Amando Franco Soares Caiuby, 88 apto.52 - Morumbi - São Paulo, viúva da vítima morta Marcelo do Amaral Ferrão; (doc.24)

AV. PAULISTA, 777 - CONJ. 141 - 14° ANDAR - 01311-914 - SÃO PAULO - SP
TEL. (011) 251-0486 FAX: (011) 284-6565
e-mail-garciasp@netpoint.com.br

CONFIDENTIAL    SK  000687

Advogados

**Renata Oliveira da Silva Castro**, brasileira, viúva, residente e domiciliada à Rua Macuco, 550 apto.122 - Moema - São Paulo, viúva da vítima morta Christiano de Gusmão Neto; (doc.25)

**Fernando Lobo Vaz de Mello**, casado, **Maria da Conceição Magalhães Vaz de Mello**, casada, e, **Luciana Magalhães Vaz de Mello**, nascida em 09/11/73, residentes e domiciliados à Rua do Ouro, 1170 apto. 1400 - Belo Horizonte - Minas Gerais, todos brasileiros, pai, mãe e irmã da vítima morta, Alexandre Magalhães Vaz de Mello; (doc.26)

**Airton Francisco Rodrigues**, casado, **Maria das Graças de Oliveira Rodrigues**, residentes e domiciliados à Rua Antuérpia, 158 - Volta Redonda - Rio de Janiero, todos brasileiros, pai, mãe da vítima morta, Rilton de Oliveira Rodrigues; (doc.27)

**José Orval Palma**, casado, **Zélia de Almeida Palma**, casada, e, seus filhos, **Marcelio de Almeida Palma**, nascido em 20/12/63, **Marcus de Almeida Palma**, nascido em 20/12/63, e, **Renata de Almeida Palma**, nascida em 29/10/71, residentes e domiciliados à Rua Ministro Corroo do Melo, 127 apto.1104 - Rio de Janeiro - RJ, todos brasileiros, pai, mãe e irmãos da vítima morta Marta de Almeida Palma; (doc.28)

**Fátima Aparecida Vargas Nogueira**, do lar, viúva, e, seus filhos, **Camila Vargas Nogueira**, menor, nascida em 15/04/83, e, **Vinicius Vargas Nogueira**, menor, nascido em 21/09/87, residentes e domiciliados à Av. Nova Cantareira, 4211, apto.71 - Santana - São Paulo, todos brasileiros, viúva e órfãos da vítima morta, José Wilson Nogueira; (doc.29)

**Elinua Mestrinelli Cremasco**, do lar, viúva, e, seus filhos, **Euler Mestrinelli Cremasco**, nascido em 22/08/77, **Eric Mestrinelli Cremasco**, menor, nascido em 02/02/81 e, **Evandro Mestrinelli Cremasco**, menor, nascido em 27/06/91, residentes e domiciliados à Rua Ubaitaba 225, Vila das Mercês, São Paulo, Capitla, todos brasileiros, viúva e órfãos da vítima morta Laércio Cremasco; (doc.30)

**Olavo Augusto S.C. de Siqueira Ferreira**, brasileiro, casado, **Cecília Maria Dins Camargo**, brasileira, casada, residentes e domiciliados à Rua Pedroso Alvarenga 157 ap. 51, São Paulo e Rua Francisco Leitão 308 - Pinheiros - São Paulo - SP, pai, mãe da vítima morta, Olavo Ruy Camargo de Siqueira Ferreira; (doc.31)

**Simone Pires Ferreira**, brasileira, viúva, residente e domiciliada à Rua Jequitibás, 121 apto.101, viúva da vítima morta Amauri Pimenta da Veiga; (doc.32)

por seus procuradores que esta subscrevem, vêm respeitosamente à presença de V.Exa., ajuizar, nos termos do art. 159 e correlatos do Código Civil,

## AÇÃO DE INDENIZAÇÃO

em face das empresas norte-americanas NORTHRUP GRUMMAN CORPORATION e TELEFLEX CONTROL SYSTEMS, INCORPORATED, com sede em 1840 Century Park Esat, Los Angeles, Califörnia, 90067, e 1950 Williams Drive Oxnard, Califormia, 93030, respectivamente, pelas razões de fato e de direito a seguir deduzidas, articuladamente:

AV. PAULISTA, 777 - CONJ. 141 - 14º ANDAR - 01311-914 - SÃO PAULO - SP
TEL. (011) 251-0480 FAX: (011) 284-8583
e.mail-garciasp@melpoint.com.br

CONFIDENTIAL    SK  000688

**GARCIA & KEENER**
Advogados

## I - HISTÓRICO DOS FATOS

01.     Os autores são parentes de vítimas fatais do desastre aéreo ocorrido próximo do aeroporto de Congonhas, em São Paulo, na manhã em 31 de outubro de 1996. Como deve ser de conhecimento de V.Exa., o avião Fokker 100 da TAM, vôo 402 com destino ao aeroporto Santos Dumont, na cidade do Rio de Janeiro, caiu sobre várias casas, vinte e quatro segundos após ter decolado, matando todos os passageiros acima nomeados, inclusive tripulantes.

02.     Ficou apurado que a causa de referido desastre se deve a defeito de fabricação de peça da aeronave denominada " thrust reverser" que abriu na hora da decolagem, e a defeito de fabricação de cabo denominado *teleflex*.  Tanto o "thrust reverser", como o cabo "*teleflex*", foram projetados e fabricados, nos Estados Unidos, pelas co-rés, respectivamente.

03.     Tendo em vista que os responsáveis pela fabricação das peças defeituosas que ocasionaram a queda da aeronave são estrangeiras, e sediadas no exterior, os autores ajuizaram ação de indenização nos Estados Unidos, Corte do Condado de Orange, Califórnia.

04.     Cumpre salientar que os autores optaram por esse caminho considerando ser as rés empresas sediadas nos Estados Unidos, e também o fato de, pericialmente, as apurações serem mais fáceis no que concerne à colheita dos elementos comprovadores da alusão causal do acidente, e, ainda, em termos meramente processuais, a questão do *forum conveniens*, dado que a sistemática do procedimento indenizatório, de certo modo, é colidente com aquele vigorante no Brasil, abrindo possibilidades mais amplas para o atingimento dos propósitos dos autores.

05.     Além disso, essa iniciativa dos autores se deveu à informação de que um *exequatur* da decisão brasileira seria extremamente difícil, porquanto os precedentes processuais no Estado da Califórnia indicam dificuldades nesse sentido, e, aliado a isso, o fato de não existência de bens das rés, no Brasil.

06.     Nesse procedimento, estabeleceu-se nos Estados Unidos controvérsia quanto à competência da jurisdição americana em face de terem os réus levantado preliminares de incompetência do juiz local.

07.     Depois de discutidas as diferentes argumentações, o magistrado americano concluiu a possibilidade de admitir-se competente mediante a condição de se apurar qual a conclusão a que chegaria o juiz brasileiro a respeito, entendendo de fixar um prazo de 120 (cento e vinte) dias no qual os autores se comprometeriam a demonstrar a que decisão, a propósito, chegou a Justiça brasileira. Após esse prazo, o juiz americano irá considerar novamente a questão de sua competência jurisdicional.

08.     Vê-se portanto, que muito embora tenham escolhido os autores inicialmente o foro do domicílio das ora requeridas, a Justiça americana, sem necessariamente ter-se eximido de conhecer da ação, determinou se efetuasse ajuizamento da ação no Brasil, como forma de cognição oficial a respeito do posicionamento da Justiça brasileira. É portanto, em obediência a esse ônus processual imposto nos autos do processo norte-americano, por ora meramente sobrestado e não extinto, que se ajuiza a presente ação no Brasil efetivamente baseada exatamente nos mesmos pedidos e causa de pedir, contra as mesmas rés do que o procedimento judicial promovido na justiça alienígena. Não tendo, por conseguinte, as rés domicílio no Brasil, nos termos do artigo 94, § 3º do CPC, a ação está sendo ajuizada no foro do domicílio de um dos autores.

## II - DEFEITO DE FABRICAÇÃO

AV. PAULISTA, 777 - CONJ. 141 - 14º ANDAR - 01311-914 - SÃO PAULO - SP
TEL.: (011) 251-0405  FAX: (011) 284-6503
e.mail-garciasp@netpoint.com.br

CONFIDENTIAL     SK  000689

**GARCIA & KEENER**
Advogados

09.    A razão fundamental do acidente, se deve a um defeito de fabricação do equipamento denominado *thrust-reverser* que, no momento da decolagem, não funcionou adequadamente como resulta conclusivamente da perícia efetivada no aparelho acidentado. Além disso, as fabricantes deixaram de alertar tecnicamente a que perigos estaria exposto tal equipamento, além de garantirem, enganosamente, a respeito da manutenção de reparos no *thrust-reverser* da turbina direita localizada no avião da TAM, vôo 402.

10.    A jurisprudência brasileira tem considerado iterativamente que o defeito de fabricação naturalmente é imputável à empresa que elaborou o produto e, no caso, o equipamento sem as necessárias condições técnicas, o que se agrava quando se trata de sua utilização em um avião onde acontecimentos dessa ordem podem expor pessoas inocentes a perigos fatais, como aconteceu com a mencionada aeronave.

11.    Nem mesmo são necessárias extensas considerações para chegar-se à conclusão de que os danos causados sujoitam-se à reparação dos prejuízos sofridos pelas vítimas fatais na pessoa de seus herdeiros ou sucessores, pois seria impossível alegação de qualquer escusativa válida, uma vez que, na verdade, o fundamental é avaliar quais bens de ordem material e moral foram suprimidos da titularidade da pessoa.

12    A responsabilidade decorrente do acidente ora em questão se deve precipuamente ao mau engenho das    co-rés,    identificadas como sendo a causa eficiente do lamentável acontecimento. Trata-se, é óbvio, de irrecusável negligência na manufaturação do equipamento acima identificado e, portanto, essa identificação não admite qualquer refúgio, dado que o nexo causal encontra-se nitidamente evidenciado.

13.    Não se pode deixar, nesta altura, de invocar a proficiente petição inicial elaborada pelos patronos dos autores na iniciativa processual ocorrida perante a justiça norte-americana, na qual as razões fáticas e jurídicas são expostas, e onde de forma bastante explícita, são consideradas todas as questões pertinentes ao caso, servindo até mesmo como uma declaração testemunhal a forma pela qual foram apurados os atos praticados pelas co-rés, incriminadores dos mesmos pela sua negligente conduta técnica e omissão quanto aos requisitos certificadores da boa qualidade, fatos esses que resultaram culposamente nas consequências trágicas aludidas. (Doc. 33 )

14.    A doutrina moderna é unânime em reconhecer que, embora a sistemática brasileira de responsabilidade civil exija o pressuposto da culpa, o que mais importa como consequência de episódios danosos é o resultado, vale dizer, os prejuízos causados pelo evento. No presente caso, estamos diante de amplo espectro, pois associam-se as duas hipóteses, isto é, a culpa e o resultado danoso, verificando-se desrarte, aprisionamento das co-rés a um círculo fechado onde se bloqueia qualquer argumentação ilidiva.

15.    Todo encadeamento fático é, evidentemente, demonstrativo de que está plenamente tipificada a responsabilidade do fabricante pelo fato do produto. Essa matéria é exaustivamente conhecida na doutrina brasileira e alienígena no sentido de que os defeitos de fabricação são diretamente imputáveis àqueles que elaboraram, para o consumo, o produto.

16.    Por outro lado não se alude que as vítimas são pessoas estranhas à distribuição do produto, quebrando-se aí a sustentação relacional de causa e efeito. Impõe-se, nesta altura, a sustentar que qualquer defesa louvada no argumento de que teria havido um mau uso do aludido reversor , ou falha nas instruções, não é acolhível pois, modernamente, a unanimidade doutrinária é no sentido de que nessas condições ocorre a culpa presumida do fabricante que, igualmente, não o livra da responsabilidade

AV. PAULISTA, 777 - CONJ. 141 - 14° ANDAR - 01311-916 - SÃO PAULO - SP
TEL.: (011) 251-0496  FAX: (011) 264-8565
e.mail-garciasp@melpoint.com.br

CONFIDENTIAL       SK  000690

**GARCIA & KEENER**
Advogados

17.    Não existe qualquer embaraço técnico no que tange ao aforismo prevalecente no regime do common law de que negligence must be proved and never will be presumed. Estamos perfeitamente enquadrados nessa concepção de natureza judiciária, porquanto na evidência se apurou o mau funcionamento do mencionado reversor, significando que esta foi a causa única e principal do acidente, e, somente  a cabal demonstração em contrário, beneficiaria as co-rés.

18.    Qualquer coisa, produto ou substância pode ser instrumento de dano; no caso, porém, interessam tão-somente os bens materiais que se tornam danosos por conterem uma deficiência imputável à conduta humana, e não por efeito de suas propriedades intrínsecas, Os produtos a que nos referimos são as coisas resultantes de alguma intervenção do trabalho humano ou mecânico;  o produto fabricado.

19.    A hipótese da presente demanda é precisamente essa, ou seja, aquela situação coincidente com o seguinte conceito: produto defeituoso é aquele que se desvia das características gerais de uma produção determinada, considerada em seu conjunto (deviation from the norm).

20.    A atuação das co-rés está plenamente tipificada nesse conceito, pois o instrumento de fundamental importância no mecanismo operacional do avião acidentado, não estava em condições de obedecer aos comandos de pilotagem resultando de seu mau funcionamento a impossibilidade de sustentar o aparelho no ar, daí decorrendo a queda incontrolável.

21.    Se assim é, não há como contornar a responsabilidade das co-rés para outras circunstâncias, dado que, especificamente, foi esse o móvel do trágico acidente.

## III - DO DIREITO DOS AUTORES

22.    Em face da exposição fático-jurídica, não resta qualquer dúvida de que os autores se tornaram legítimos titulares de uma reparação pelos danos materiais e morais sofridos com a perda de seus entes queridos, deixando essas famílias ao desamparo, quase todas com parcos recursos econômicos pela perda de arrimo.

23.    A maioria das vítimas se compunha de pessoas em boas situações funcionais, que possibilitavam um status de vida equivalente a uma classe média economicamente bem dotada, mas sempre dependente da proteção e do trabalho daqueles que, infortunadamente, sucumbiram.

24.    Decretada a procedência judicial da presente ação, em execução se procederá, mediante arbitramento, quais os direitos economicamente cabentes a cada autor, levando-se em consideração o nível de cada qual e os standards de vida e sobrevida dos falecidos.

## IV - DO DIREITO DE REPARAÇÃO DE DANOS MATERIAIS E MORAIS

25.    O direito de reparação de danos materiais se encontra inserido no artigo 159 do Código Civil, com a seguinte redação:

> "art. 159 - Aquele que, por ação ou omissão voluntária, negligência ou imprudência, violar direito, ou causar prejuízo a outrem, fica obrigado a reparar o dano. (...)"

AV. PAULISTA, 727 - CONJ. 141 - 14ª ANDAR - 01311-914 - SÃO PAULO - SP
TEL - (011) 251-0486  FAX: (011) 284-8363
e-mail-garciken@naipaini.com.br

CONFIDENTIAL    SK  000691

**GARCIA & KEENER**
Advogados

26.    No caso em pauta, a negligente conduta técnica das co-rés de fabricar produtos defeituosos capazes de impedir o funcionamento seguro da aeronave encontra-se plenamente caracterizado, importando na obrigação das rés de repará-la.

27.    O direito de reparação por danos morais decorrentes dos gravames ocasionados nos autores pela perda de seus entes queridos está consubstanciada em nosso direito até mesmo em nível constitucional nos termos do artigo 5, inc X.

## V - DO LITISCONSÓRCIO NECESSÁRIO

28.    À evidência a presente ação está submissa ao regime do litisconsórcio ativo necessário por força do que dispõe o artigo 47 do CPC, dado que pela natureza da relação jurídica a decisão da lide deve ocorrer de modo uniforme para todas as partes.

29.    Assim sendo, igualmente deverão os autores promover a citação de todos os litisconsortes necessários, no prazo que V.Exa assinar, ressalvados, naturalmente, os autores que já constituíram patronos diretamente, ou por meio de substabelecimento.

30.    Por conseguinte, requerem a citação dos seguintes litisconsortes:

Maria Tereza Bernardo Mentone, professora, viúva, e, suas filhas, Giovanna Bernardo Mentone, menor, nascida em 16/03/92 e, Giuliana Bernardo Mentone, menor, nascida em 16/08/90, residentes e domiciliadas à Rua Rui Barbosa, 262 apto. 14 - Ribeirão Preto, São Paulo, todos brasileiros, viúva e órfãs da vítima morta, Henrique Mentone Filho;

Ligia De Paoli Botelho, viúva, e, sua filha, Luísa Carolina De Paoli Botelho, menor, nascida em 27/11/95, residentes e domiciliadas à Av. Washington Luiz, 1576 apto.123, nesta, todos brasileiros, viúva e órfã da vítima morta André Estevão Marques Botelho;

Meire Lúcia Trujillo Gerônimo Hoogerheide, viúva, e, seus filhos, Andréa Cristiane Hoogerheide, nascida em 17/05/78, Raphael Cornelis Hoogerheide, menor, nascido em 23/10/80, Carla Gabrielle Hoogerheide, menor, nascida em 23/12/82, e, Suzanna Liberté Hoogerheide, menor, nascida em 04/07/84, residentes e domiciliados à Av. Atlanta, 88 - Carambei - Paraná, todos brasileiros, viúva e órfãos da vítima morta, Louwerinus Hoogerheide;

Elcione Augusta Franco de Queiróz, viúva, e, seus filhos, Bruno Franco de Queiróz, nascido em 19/09/77 e, Otávio Franco de Queiróz, menor, nascido em 03/11/81, residentes e domiciliados à SQN 309, Bl.N, apto.304 - Brasília - DF, todos brasileiros, viúva e órfãos da vítima morta, Elias Alves Rocha de Queiróz;

Felícia Barros Dutra de Toledo, física-médica, viúva, e, seu filho, Roberto Barros Dutra de Toledo, menor, nascido em 02/12/91, residentes e domiciliados à Al. Franca, 853 apto. 22, - Jardim Paulista - São Paulo, ambos brasileiros, viúva e órfão da vítima morta, Dr. Júlio Dutra de Toledo, médico;

Elaine Eglacy Soares Ricioli, viúva, e, seus filhos, Gabriella Carolina Soares Ricioli, menor, nascida em 18/02/92, e, Isabella Soares Ricioli, menor, nascida em 10/07/94, residentes e domiciliadas à Av. D. Pedro I, 230 apto. 64 - Osasco - São Paulo, todos brasileiros, viúva e órfãs da vítima morta Ariovaldo Ricioli;

Maria Adriana Francisco Haydt, viúva, e, seus filhos, Carlos Eduardo Francisco Haydt, nascido em 28/07/79 e, Carlos Fernando Francisco Haydt, menor, nascido em 29/04/82,

CONFIDENTIAL    SK  000692

**GARCIA & KEENER**
Advogados

residentes e domiciliados à Rua Gabriel Passos, 1304 apto. 801 - Volta Redonda - Rio de Janeiro, todos brasileiros, viúva e órfãos da vítima morta Eduardo Silva Tavares Haydt;

Maria Tereza Caiado Baiassiano, viúva, e, seus filhos, Diana Caiado Balassiano, menor, nascida em 23/12/88, Bruno Caiado Balassiano, menor, nascido em 04/05/91, e, André Caiado Balassiano, menor, nascido em 22/05/93, residentes e domiciliados à Rua Min. Viveiros de Castro, 47 apto.401 - Copacabana - Rio de Janeiro, todos brasileiros, viúva e órfãos da vítima morta Felix Elias Baiassiano;

Vanessa Pereira Ramos, viúva, e seu filho Pedro Ricardo Ramos Maciel, menor, nascido em 14/12/91, residentes e domiciliados à Rua Argemiro Correia Machado, 66 - Montes Claros - Minas Gerais, ambos brasileiros, viúva e órfão da vítima morta, Ricardo Alan Calonico Maciel;

Marlene Eunice Beck, viúva, residente e domiciliada à Rua Gal. Aristides Athayde Jr.,530 apto.50 - Curitiba - Paraná, viúva da vítima morta Roberto Fischer;

Maria Carolina Sampaio de Araújo, menor, nascida em 18/11/80 e, Gabriel Sampaio de Araújo, menor nascido em 02/10/82, neste ato representados por sua mãe Rita de Cássia Seixas Sampaio de Araújo, residentes e domiciliados à Rua Dr. João Passos, 73 - Sumarezinho - São Paulo, todos brasileiros, viúva e órfãos da vítima morta, Flávio de Araújo Filho;

Jean Patrik de Oliveira Mattos, órfão, menor, nascido em 28/04/86, e, Edmilson Cezar de Oliveira Mattos, órfão, menor, nascido em 28/09/82, neste ato representados por sua mãe, Zeila de Oliveira Mattos, residentes e domiciliados à Rua Maracanã, 8 - Várzea Grande - Mato Grosso, todos brasileiros, órfãos da vítima morta Mauro Rodrigues de Mattos;

Benedita Aparecida Ferreira Britto, do lar, viúva, e, seus filhos, Adriano Ferreira Britto, nascido em 10/04/74 e, Andrezza Ferreira Britto, nascida em 10/03/76, residentes e domiciliados à Rua Capitão Fonseca Rosa, 105 apto.111 - São Paulo -SP, todos brasileiros, viúva e órfãos da vítima morta Rubens Azevedo de Britto;

Nilce Maria Viliani Fonseca, do lar, viúva, e, seu filho Marcelo Camargo Fonseca, nascido em 23/02/74, residentes e domiciliados à Al. Campinas, 834 apto.142 - Jardim Paulista - São Paulo - SP, ambos brasileiros, viúva e órfão da vítima morta Aluísio Camargo Fonseca;

Tereza Cristina Barcellos Rodrigues, viúva, e seus filhos, André Luiz Barcellos Rodrigues, nascido em 19/10/74, Alexandre Augusto Barcellos Rodrigues, nascido em 05/04/79,e, Ana Cristina Barcellos Rodrigues, menor, nascida em 25/03/81, residentes e domiciliados à Rua Gal. Garçon, 28 apto304 - Lagon - Rio de Janeiro - RJ, todos brasileiros, viúva e órfãos da vítima morta Francisco José Rodrigues;

Nair de Carvalho Janstein, viúva, e, suas enteadas, Elizabeth Janstein, nascida em 02/10/60 e, Maria Cristina Janstein, nascida em 27/06/62, residentes e domiciliadas à Rua Conselheiro Brotero, 755 apto. 121 - Higienópolis - São Paulo, todas brasileiras, viúva e filhas da vítima morta Wolfgang Hans Janstein;

Marilda Vaz Gasparian, brasileira, do lar, viúva, residente e domiciliada à Rua Prof. Arthur Ramos, 350/E apto 201, e, Daniel Eduardo Locatelli Gasparian, brasileiro, órfão, nascido em 14/06/69, viúva e órfão da vítima morta, Arthur Eduardo Gasparian;

Lidia Angelini Morishito, viúva, e, seu filho Daniel Angelini Morishito, nascido em 27/01/84, residentes e domiciliados à Rua Germano Ulrich, 96 apto.41,- Ipiranga - São Paulo -SP, ambos brasileiros, viúva e órfão da vítima morta Carlos Yukio Morishito;

AV. PAULISTA, 777 - CONJ. 141 - 14º ANDAR - 01311-914 - SÃO PAULO - SP
TEL. (011) 251-0482. FAX. (011) 284-0562
e.mail-garciaenp@nelpoint.com.br

**GARCIA & KEENER**
Advogados

Vera Lucia Neves, brasileira, viúva, residente e domiciliada à Rua da Mata, 57 apto.81, - Itaim - São Paulo, viúva da vítima morta Paulo Marcelo Cayubi Araujo;

Lys Leonis Dias Cintra Rios, brasileira, viúva, residente e domiciliada à Rua Barra Funda, 101 apto. 41 - Santa Cecília - São Paulo - SP, e, Edmundo João Rios, brasileiro, casado, residente e domiciliado à Rua José Getúlio, 336 apto.32 - Aclimação - São Paulo -SP, viúva e pai da vítima morta, Marcos Aurélio Rios;

Michael Heinrich Bauer, brasileiro, viúvo, residente e domiciliado à Rua Armando da Silva Prado, 174 - Campo Belo - São Paulo - SP, viúvo da vítima morta, Cornélia Gnugge Bauer;

Wadih Roberto Haddad Neto, viúvo, e, seu filho, Leandro Gimenes Haddad, nascido em 16/08/78, residentes e domiciliados à Rua Rafael de Oliveira, 348 apto 22, viúvo e órfão da vítima morta Marilene Gimenes Haddad;

Luiz Carlos Beltramin, viúvo, e, seus filhos, Fausto Pereira Beltramin, nascido em 26/09/79, Carolina Pereira Beltramin, nascida em 24/02/77 e, Angélica Pereira Beltramin, nascida em 18/04/74, residentes e domiciliados à Rua Nabih Razuk, 0-760 - Pederneiras - São Paulo, viúvo e órfãos da vítima morta Maria Helena Pereira Beltramin;

Luiz Carlos Ruiz Pereira, brasileiro, casado, Heloisa Ruiz Pereira, brasileira, casada, órfãos da vítima morta Trindade Ruiz Fernandes, e, Fausto Pereira Beltramin, nascido em 26/09/79, Carolina Pereira Beltramin, nascida em 24/02/77,e, Angélica Pereira Beltramin, nascida em 18/04/74, todos brasileiros, residentes e domiciliados à Rua Gastão do Amaral Carvalho, 0-570 - Pederneiras - São Paulo, netos da vítima morta, Trindade Ruiz Fernandes;

Luiz Carlos Ruiz Pereira, brasileiro, casado, Heloisa Ruiz Pereira, brasileira, casada , irmãos da vítima morta José Celso Ruiz Pereira, e, Fausto Pereira Beltramin, nascido em 26/09/79, Carolina Pereira Beltramin, nascida em 24/02/77,e, Angélica Pereira Beltramin, nascida em 18/04/74, todos brasileiros, residentes e domiciliados à Rua Gastão do Amaral Carvalho, 0-570 - Pederneiras - São Paulo, sobrinhos da vítima morta, José Celso Ruiz Pereira;

Antonio C. Nazareth, brasileiro, casado, e, Maria Lúcia Generalli Nazareth, brasileira, casada, residentes e domiciliados à Av. Nova Cantareira, 599 apto.72 - Santana - São Paulo - SP, pai e mãe da vítima morta Carla Generalli Nazareth;

Deise Dutra de Oliveira Prado, brasileira, viúva, e, seus filhos José Roberto de Albuquerque Prado, casado, nascido em 17/05/54, e, Carlos Alberto de Albuquerque Prado, casado, nascido em 02/05/66, residentes e domiciliados à Rua Bahia, 160 2º. andar - Higienópolis - São Paulo - SP, mãe e irmãos da vítima morta Paulo de Albuquerque Prado Filho;

Luis Carlos de Lima, casado, Ornilda Medrado de Lima, casada e, Ingrid Amanda Lima dos Santos, nascida em 30/05/94 e, neste ato representada pelo avô Luis Carlos de Lima, residentes e domiciliados à Rua 1, sem número - Q13-L7 - Bairro São José - Pontes de Lacerda - Mato Grosso, todos brasileiros, pai, mãe, e filha da vítima morta Maria Silvanete de Lima;

Ugo Caretti Capelia, viúvo, e, Rani Fantini, brasileiros, viúvo e pai da vítima morta Marta Costa Fantini;

Daniel Menin, casado, Ana Motter Menin, casada, e, Jaime Menin, nascido em 14/03/55, residentes e domiciliados à Av. Bernardo Vieira de Melo 5422 apto. 401 - Jaboatão - Recife - Pernambuco, todos brasileiros, pai, mãe e irmão da vítima morta, Zélia Menin;

CONFIDENTIAL    SK  000694

**GARCIA & KEENER**
Advogados

Ines Lemos Raddatz, casada, nascida em 30/08/71, residente e domiciliada na Alemanha, no endereço Maikammerer Strasse, 14 - 81539 - Münique - Alemanha, brasileira, orfã da vitima morta Regina Lúcia Lemos Valério;

José Maria Serrano Belmonte, casado, Rosa Matilde de Almeida Maffei Serrano, e, seus filhos, Enrique de Almeida Maffei Serrano, nascido em 25/02/63 e, Murilo de Almeida Maffei Serrano, nascido em 07/02/67, residentes e domiciliados à Alameda Tietê, 460 apto 08 - Jardim Paulista - São Paulo -SP, todos brasileiros, pai, mãe e irmãos da vitima morta Gustavo de Almeida Maffei Serrano;

Sandra Ribeiro, brasileira, viúva, residente e domiciliada à Rua Camberra, 233 apto.102, viúva da vitima morta Lúcio de Castro Pinto;

### V - DO PEDIDO

31.    Ante o exposto, deve a presente ação ser julgada inteiramente procedente para condenar as rés a pagar aos autores o valor correspondente aos danos materiais, inclusive de carater alimentar, e morais causados pela fabricação defeituosa dos componentes que causaram o acidente da aeronave no qual os parentes dos autores foram vitimados.

32.    O valor da condenação deverá ser apurado em liquidação apropriada, que deverá ser acrescida na condenação dos ônus sucumbenciais de praxe.

33.    Requer digne-se V.Exa. de determinar a citação das requeridas por carta rogatória para que querendo, respondam aos termos da presente demanda.

34.    Protestam provar o alegado por todos os meios de prova em direito admitidos especialmente, depoimento pessoal das partes, oitiva de testemunhas, juntada de novos documentos, pericias, inspeções, etc.

35.    Dando-se à causa o valor de R$ 50.000,00 (cinquenta mil reais) para efeitos fiscais e de alçada.

p. deferimento.
São Paulo, 30 de junho de 1998

Irineu Strenger
OAB/SP 10.068

Renato Guimarães Jr
OAB/SP 80.113

AV. PAULISTA, 777 - CONJ. 141 - 14° ANDAR - 01311-914 - SÃO PAULO - SP
TEL - (011) 251-0480       (011) 284.8562
e-mail-garciasp@n......ntl.com.br

CONFIDENTIAL         SK  000695

8/25/2005

# Master SK Tam Case Status - Privileged and Confidential

| se # | Decedent | Status of Case | Amount of Settlement | Gross Amount Received by SK for Fees and Costs | Amount Paid to Forwarding/Local Attorney other than Luiz Roberto De Arruda Sampaio | Forwarding/Local Attorney Receiving Said Fees |
|---|---|---|---|---|---|---|
| 729.001 | Mohamad Shaikhzadeh | Completed | $495,000.00 | $110,300.00 | | |
| 729.002 | Lucio De Castro Pinto | Releases pending | $469,926.73 | | | |
| 729.003 | Davi Luiz Bojanovsky | Completed | $355,000.00 | $95,850.00 | | |
| 729.004 | Carlos Mario Fournier Vieira | Completed | $880,000.00 | $237,600.00 | $22,000.00 | Priscila M.P. Correa da Fonseca |
| 729.005 | Marcelo Do Amaral Ferrao | Completed | $570,000.00 | $153,900.00 | $14,250.00 | Priscila M.P. Correa da Fonseca |
| 729.006 | Wolfgang Hans Jansten - Wife and Daughter Maria Cristina - Daughter Elizabeth Jansten - | Releases pending | $150,000.00 | | | |
| 729.007 | Cornelia Gnugge Bauer | Completed | $465,000.00 | $80,149.26 | | |
| 729.008 | Laercio Cremasco | Completed | $460,000.00 | No fee charged | | |
| 729.009 | Jose Rahal Abu Assali | Completed | $800,000.00 | $252,035.00 | $20,000.00 | Jose Antonio Ribas Paiva |
| 729.010 | George Klepsler | No settlement | $515,000.00 | | | |
| 729.012 | Rubens De Azevedo Britto | Completed | $200,000.00 | $54,000.00 | $20,720.00 | Fernando Lottenberg |
| 729.013 | Ivo Roberto Gobahr | Completed | $560,000.00 | $171,920.00 | $30,100.00 | Richard H. Silver |
| 729.014 | Carla Generalli Nazareth | Completed | $150,000.00 | $40,500.00 | $3,250.00 | Felipe Luffalla Neto |
| 729.015 | Alberto Coimbra Vieira | Completed | $1,085,000.00 | $292,950.00 | $27,125.00 | Antonio Ferreira |
| 729.016 | Ricardo Alan Calonico Maciel | Awaiting Jabaquara appeal | $410,000.00 | | | |
| 729.017 | Paulo de Albuquerque Prado Filho | Completed | $380,000.00 | $102,600.00 | $20,000.00 | Jose Antonio Ribas Paiva |
| 729.018 | Luiz Fernando Sampaio Gouvea | Completed | $745,000.00 | $217,763.97 | | |
| 729.019 | Sergio Aparecido Bdenat | Completed | $1,120,000.00 | $279,700.00 | $28,000.00 | Ruy De Oliveira Pereira |
| 729.020 | William Arjona Chong | Awaiting Jabaquara appeal | $903,371.29 | | | |
| 729.021 | Henrique Mentone Filho | Completed | $700,000.00 | | | |
| 729.022 | Jose Pereira Duarte | Awaiting Jabaquara appeal | $427,927.30 | | | |
| 729.023 | Luis Antonio Amando De Barres | Completed | $1,001,368.69 | $270,369.46 | | |
| 729.024 | Gilberto Alves Aquino, Jr. | Completed | $720,000.00 | $197,900.00 | | |
| 729.025 | Olavo Ruy Camargo de Siqueira Ferreira | Completed | $355,000.00 | $95,850.00 | $8,875.00 | Romano e Freitas Advogados |
| 729.026 | Paulo Marcelo Cauby de Araujo | No settlement | $450,000.00 | | | |
| 729.027 | Aloisio Camargo Fonseca - Wife - Mistress - | Completed | $1,030,000.00 | $251,100.00 | | |
| 729.028 | Andre Estevao Marques Botelho | Completed | $475,000.00 | $126,096.73 | $11,675.77 | Joaquim Lopez |
| 729.029 | Walter Luis Menkses | Pending | $799,722.82 | $193,227.04 | | |
| 729.030 | Alexandre Magalhaes Vaz de Mello - Father - Fiancee - | No settlement | $305,000.00 | | | |
| 729.031 | Maria Silkeanete De Lima | Completed | $175,000.00 | $47,843.51 | | |
| 729.032 | Eduardo Silva Tavares Haydt | Pending | $705,000.00 | | | |
| 729.033 | Geraldo Luis Arede de Barros | Completed | $760,000.00 | $190,000.00 | 38,000 ? | |
| 729.034 | Mauricio F. Sa Fortes | Completed | $1,050,000.00 | $262,500.00 | | |
| 729.035 | Luis Carlos Simoes de Almeida | Completed | $1,090,000.00 | $336,605.00 | $69,555.00 | Antonio Ferreira |
| 729.036 | Roton de Oliveira Rodrigues | Awaiting Jabaquara appeal | $360,000.00 | | | |
| 729.037 | Felix Elias Balassiano | Completed | $1,100,000.00 | $335,500.00 | $110,000.00 | Martins e Castro Advogados (payment pending) |
| 729.038 | Luis Lauro Romero | Completed | $812,188.63 | $196,590.93 | | |
| 729.039 | Jose Wilson Nogueira | Completed | $420,000.00 | $113,400.00 | $10,500.00 | Cecilia Daher Montes |
| 729.040 | Francisco Jose Rodrigues | Pending | $790,000.00 | $0.00 | | Martins e Castro Advogados |
| 729.041 | Luiz Claudio Tamiello | Awaiting court approval | $710,000.00 | | | |
| 729.042 | Arthur Eduardo Gasparotti | Pending | $715,000.00 | | | |
| 729.043 | Hamilton Sebastiao Simioni | Completed | $710,000.00 | $218,083.00 | $44,132.00 | Fernando Lottenberg |

Ex 59 CONFIDENTIAL

SK - 002610

8/25/2005

# Master SK Tam Case Status - Privileged and Confidential

| ase # | Decedent | Status of Case | Amount of Settlement | Gross Amount Received by SK for Fees and Costs | Amount Paid to Forwarding/Local Attorney other than Luiz Roberto De Arruda Sampaio | Forwarding/Local Attorney Receiving Said Fees |
|---|---|---|---|---|---|---|
| 729.044 | Marta De Almeida Palma | Completed | $400,000.00 | $108,000.00 | | |
| 729.045 | Louwerinus Moogerheide | Completed | $1,120,000.00 | $302,400.00 | | |
| 729.046 | Elias Alves Rocha De Queiroz | Completed | $1,020,000.00 | $252,700.00 | | |
| 729.047 | Roberto Fischer | Completed | $575,000.00 | $155,799.17 | | $8,250.00 Fernando Lottenberg |
| | - Ex-Wife and Children - | | | | | |
| | - Mistress - | | | | | |
| 729.048 | Amauri Pimenta De Almeida | Completed | $435,000.00 | $117,450.00 | | |
| 729.049 | Aguinaldo Barbosa de Figueiredo | Completed | $510,000.00 | $137,700.00 | | $12,750.00 Escritorio De Adv. Sergio Bermudes |
| 729.050 | Julio Dutra De Toledo | Completed | $700,000.00 | $189,000.00 | | $17,500.00 Luiz Roberto De Arruda Sampaio |
| 729.051 | Christiano De Gusman Neto | Completed | $600,000.00 | $162,000.00 | | $15,000.00 Ricardo Tepedino/Maria Salgado |
| 729.052 | Henrique Marques Trindade | Completed | $1,030,000.00 | $278,100.09 | | $25,750.00 Sergio Enrique Bermudes |
| 729.053 | Zelia Menin | Awaiting Jabaquara appeal | $150,000.00 | | | |
| 729.054 | Marlene Gimenes Haddad | SK Discharged | $400,000.00 | | | |
| 729.055 | Anivaldo Reioli | SK Discharged | $410,000.00 | | | |
| 729.056 | Regina Lucia Lemos Valerio | Pending | $235,000.00 | | | |
| | - Daughter - | | | | | |
| | - Granddaughter - | | | | | |
| 729.057 | Gustavo De Almeida Maffei Serrano | Court-Approved/Awaiting Funding | $150,000.00 | | | |
| 729.058 | Marcos Aurelio Rios | Completed | $850,000.00 | $229,500.00 | $47,812.50 Podhurst Orseck, et al | |
| | | | | | $21,250.00 Priscila M.P. Correa da Fonseca | |
| 729.059 | Trindade Ruiz Fernandes Pereira | Completed | $355,000.00 | $106,800.00 | $8,333.33 Marcelo Zanoto | |
| 729.060 | Jose Celso Ruiz Pereira | Completed | $325,000.00 | $276,800.00 | $8,333.33 Marcelo Zanoto | |
| 729.061 | Maria Helena Pereira Beltramin | Completed | $380,000.00 | $102,600.00 | $8,333.34 Marcelo Zanoto | |
| 729.062 | Marta Costa Fartini | Completed | $365,000.00 | $77,684.26 | $20,580.83 Fernando Lottenberg | |
| 729.063 | Carlos Yukio Morishito | Completed | $380,000.00 | $78,333.34 | $24,816.00 Montero Finizo Velasquez | |
| | | | | | $12,393.33 Fernando Lottenberg | |
| 729.064 | Mauro Rodrigues de Matos | Awaiting Jabaquara appeal | $155,000.00 | | | |
| 729.065 | Flavio de Araujo Filho | SK Discharged | $375,000.00 | | $24,456.00 Montero Finizo Velasquez | |
| | | **Total:** | $37,294,512.96 | $7,299,200.17 | $696,241.43 | |

CONFIDENTIAL    SK-002611

### RENATO GUIMARÃES JR.

Doutor pela USP, Professor da UNICAMP
*Master of Comparative Law, GWU, IASP*
DDD (019) fone 234-1214, 239-2921, fax 239-4315
Rua Ferreira Penteado. 709/83. 13.010-041. Campinas, SP

*Fax* to USA: 703-522-7905

Attorney **LEIGH J. BALLEN**
Speiser, Krause, Madole & Lear
Washington, D.C.

Campinas, Brazil, 31, outubro, 1996.
**m o s t   u r g e n t**

Dear Leigh:

*COPY*

Our clients Helio Teixeira and wife are very please and hopeful with the warm interview they had with Joseph Cook, in L.A. We are waiting for your information on the advance of the proceedings.

By December 19 afternoon, I shall be in Miami and would like to discuss with your Office there, among other issues, that case. I mentioned to you earlier regarding my share on attorney fee. Would you please make arrangement for such a meeting with one of your fellows attorney there ?

Former President of the First Sao Paulo State Court of the Appeal, and now a leading attorney in Brazil (indeed he works with me in the case of the crash of the Varig Boeing 707 in Africa, January 1987), Nelson Altemani, will be in Orlando, Florida, in the second week of December. He does not speak English but would like to talk with an American lawyer about your legal system in general. Do you know somebody there who would like to have such an interesting meeting ? It may have some potential, professional return in a long term.

Now, the **most urgent** question: less than one hour ago, a Fokker 100 (I repeat **Fokker 100**, 5 in the crew) from the Brazilian domestic, and recently also limited international, airline **TAM-Transport Aéreo Marília**, crashed right in the Sao Paulo downtown with some 95 people abroad (probably all dead) soon after the takeoff. Many were injured or dead on the ground, under fire. The airplane was going to Rio - what make almost certain at least some connections with international trips. The rights of Warsaw Convention may be also involved. Because soon the news media may ask me some legal aspect to the tragedy, **please provide me with some information about this kind of airplane, its record in accidents, cases already in court, your experience on it, insurance requirements and other related matters you may deem as needed right now.**

I look forward to hearing form you soon.

Very Sincerely Yours,

*Renato Guimarães Jr.*

FAX (019) 239-4315

EXHIBIT
ALL-STATE LEGAL
8

fax (703) 522-7905, phone (703) 522-7500 - Campinas, Brazil, October 11, 1996.

*November*

To: **LEIGH J. BALLEN** - Speinser, Krause, Madole & Lear, Washington, D.C.

**urgent, please**

Dear Mr. Ballen:

Somehow you may have not receive the fax-letter copied below I sent to you last week; at least I did not receive your reply.

Regarding the Fokker 100 accident in Brazil, killing some 105 people 10 days ago, the preliminary examination reports that the very structural project of the of the altitude sensor plus the starter of the reversal mechanism, including the switch *(relay* in French, I guess) and the hydraulic valve (or throttle) of the turbine (motor), could be the real cause of the disaster. In fact, Leigh, the Fokker company in Netherlands called for general a review and urgent checks in that system of all (I repeat "all") Fokker-100 in operation worldwide, including those many in USA.

Because of my contacts with some families of the victims and requests from the press, I need right away your clarification on the following issues, please: if the final inquiry, most made in USA conclude at the end that such a fabrication or/and project problem of the airplane in Holland, by Fokker, or in UK, by Rolls Royce, the motor maker, is, or are, the cause of the tragedy, can, or can not, the families sue the factories in these countries instead of suing them in Brazil ? How much can the families expect from the Holland and/or United Kingdom courts in award for their losses from the crash ? Since Fokker is in bankrupt situation, what about the recovery ?   Would your firm consider to handle these cases in Europe ?

So, could you provide me with some insights on legal aspects of the tragedy, please, including information about the record of accidents in Fokker airplanes, cases already in court, your experience on them, insurance requirements in those countries and other related matters you may deem as needed to me right now.

Thank you again for your kind attention. I look forward to hear from you as soon as possible.

Very Sincerely Yours,

*Renato Guimarães, Jr.*

Leigh, any recommendation on my visit to your office in Miami, Florida, on this December 19, in order to talk personally with someone there about the prospective case, maybe to be settled by negotiation, with another large law firm, regarding my share in their attorneys fees ? All the best,

**RG-00002**

FROM : Guimarães Jr          PHONE NO. : 55 019 2394315          OCT. 20 2004 12:24AM P2

NOV-19-1996  15:58          S.K.M.&L.                    703 522 7905    P.02/02

METROPOLITAN WASHINGTON, D.C. OFFICE

# SPEISER, KRAUSE, MADOLE & LEAR

SPEISER, KRAUSE, MADOLE & NOLAN
140 EAST 45TH STREET, 34TH FLOOR
NEW YORK, NEW YORK 10017
(212) 661-0011  FAX: (212) 953-9445

SPEISER, KRAUSE, MADOLE & COOK
TWO PARK PLAZA, SUITE 1040
IRVINE, CALIFORNIA 92714
(714) 553-1421  FAX: (714) 553-1948

1300 NORTH SEVENTEENTH STREET, SUITE 310
ROSSLYN, VIRGINIA 22209-3800
703 522-7500
FAX 703 522-7905

8430 LBJ FREEWAY #1575
DALLAS, TEXAS 75240-6455
(972) 404-1401   FAX: (972) 404-9707

SPEISER, KRAUSE & MADOLE
201 SOUTH BISCAYNE BOULEVARD
MIAMI, FLORIDA 33131
(305) 375-9400  FAX: (305) 375-0337

November 19, 1996

<u>**VIA FACSIMILE 011 55 019 239 4315**</u>

Renato Guimarães, Esq.
Campinas, Brazil

RE:    Fokker 100 accident in Sao Paulo, Brazil

Dear Mr. Guimarães:

Please note that we have new information concerning the possibility of a connection between the Fokker 100 crash and potential United States jurisdiction. I would like to speak to you on the telephone regarding a potential effort to represent the victims and their families in this accident. Please contact me at your earliest convenience.

Sincerely,

SPEISER, KRAUSE, MADOLE & LEAR

LEIGH J. BALLEN

/js

RG-00004

METROPOLITAN WASHINGTON, D.C. OFFICE

# SPEISER, KRAUSE, MADOLE & LEAR

SPEISER, KRAUSE, MADOLE & NOLAN
140 EAST 45TH STREET 34TH FLOOR
NEW YORK, NEW YORK 10017
(212) 661-0011   FAX (212) 683-0483

SPEISER, KRAUSE, MADOLE & COOK
TWO PARK PLAZA SUITE 1280
IRVINE, CALIFORNIA 92714
(714) 553-1421   FAX (714) 553-1348

1300 NORTH SEVENTEENTH STREET, SUITE 310
ROSSLYN, VIRGINIA 22209-3800
703 522-7500
FAX 703 522-7905

February 5, 1997

SPEISER, KRAUSE & MADOLE
5430 LBJ FREEWAY #1875
DALLAS, TEXAS 75240-2636
(972) 404-1401   FAX (972) 404-0797

SPEISER, KRAUSE & MADOLE
201 SOUTH BISCAYNE BOULEVARD
MIAMI, FLORIDA 33131
(305) 375-8400   FAX (305) 375-0337

<u>VIA FACSIMILE 011 55 19 239 4495</u>

Renato Guimarães, Esq.
Campinas, Brazil

RE:    TAM Fokker 100 accident in Sao Paulo, Brazil on October 31, 1996

Dear Mr. Guimarães:

I would like to confirm the proposed arrangement between our firm and the families of the victims of the TAM Fokker disaster of October 31, 1996. Our firm will charge the sum of 33 1/3% for the handling of each such case. Of this fee, a total of 25% will be paid to Brazilian counsel for their services.

We look forward to once again working actively with your office.

Sincerely,

SPEISER, KRAUSE, MADOLE & LEAR

GERARD R. LEAR

/js

EX. 19

RG-00006

Excerpt from:

*RECOVERY FOR WRONGFUL DEATH AND INJURY, 3rd Ed.*, Stuart M. Speiser,
Charles F. Krause and Juanita M. Madole; Clark-Boardman-Callaghan, 1992.



# APPENDIX D

## CHECKLIST OF DAMAGE INFORMATION FOR WRONGFUL DEATH ACTIONS

*[The following information, where applicable to the claims involved, should be obtained as soon after death as possible. Please note that all information may not be relevant to all decedents. Full and complete responses to all questions and the collection of all documents will provide the attorney with the essential proof of a damages claim. However, in the initial stages of complaint preparation, answers to questions A. 1, 2, 6, 8, 12, 13, 16 and a copy of the Letters Testamentary will suffice to start proceedings.]*

A.  INFORMATION REGARDING DECEDENT:
    1. (a) Full name
       (b) Date of birth
       (c) Marital status and date and place of marriage
    2. Permanent residence addresses.
       (a) As of date of death
       (b) For five year period prior to death
    3. Health.
       (a) State general condition of health as of time of accident
       (b) If decedent suffered from any disease, or from any injury or condition
           resulting from an accident, during the five year period prior to
           death which required hospitalization or treatment by physicians:
           (1) State the nature thereof
           (2) State whether such disease, injury or condition was diagnosed as
               affecting decedent's life expectancy
           (3) State periods and locations of all hospitalizations
    4. Educational background. State names and addresses of, and years
       attended, and degrees, if any:
       (a) Grammar or elementary school
       (b) High school or secondary school, pre-college
       (c) College
       (d) Postgraduate schools
       (e) Other
    5. Military Service (if applicable).
       (a) Approximate date of entry and discharge
       (b) Branch of service
       (c) Serial number
       (d) Rank at discharge
       (e) Type of discharge
       (f) Honors and decorations, if any
    6. Employment for five year period prior to death.
       (a) Names of employers
       (b) Title of positions held with each

[IT-308]

1

RG-00007

(c) Nature of work or occupation with each
(d) Did last employer have compulsory retirement plan? If so, at what age is retirement compulsory?

7. Self-employment (if applicable).
(a) Name and address of business
(b) Date of commencement of business
(c) Type of business and decedent's duties
(d) Extent of decedent's ownership

8. Income record for five-year period prior to death. (Note: If possible, please list income under categories I and II below for each of the last five years).

I. Employment Income
(a) Total annual employment income (gross) for each year.
(b) What part of such income represented
    (1) Basic salary
    (2) Bonus
    (3) Commissions
    (4) Fringe benefits (describe types).
(c) Monthly or annual salary rate as of date of death.
(d) Arrangements or agreements for income other than salary (bonus, commission, fringe benefits), on monthly or annual basis, as of date of death.

II. Self-Employment Income (if applicable)
(a) Total annual self-employment income for each year.
(b) If breakdown is available, state what part of such income represented:
    (1) Salary or regular drawings.
    (2) Distribution of profits or dividends.
(c) Monthly or annual self-employment income as of date of death.

9. Future Income Expectancy. This is perhaps the most important item of information requested, since damages in wrongful death cases are based upon the loss of future income to a great extent. Please provide any information you can obtain which indicates the possibility of advancement or increased income for decedent. If possible, a letter should be obtained from decedent's employer, indicating his value and future prospects for advancement. The employer's letter should list the promotions which would have been available to decedent, including the job title and current salary of incumbent, and finally should state the highest position which the decedent might attain in the future, and the current salary of the incumbent. If possible, letters should also be obtained from others in the same trade or profession as decedent, attesting to his abilities and prospects for advancement. Letters may be addressed "To whom it may concern" or any other way; affidavits or sworn statements are not required. Letters should contain details of any special knowledge, training, aptitude or characteristics of decedent which made him particularly valuable and likely to advance. If there are special factors which would put decedent in a category above average, please be sure to bring these factors out in reply to this Item 9. Also, if there are any special factors relating to expansion or advancement of the company which employed decedent, these should be covered in the employer's letter.

10. Retirement benefits; deferred income plans; stock options. Describe each

2

RG-00008

APPENDIX D

plan in which decedent was entitled to participate; extent of his participation up to date of death, and benefits payable to his beneficiaries as a result thereof, particularly considering his prospects for advancement as set forth in reply to item 9 above.

11. Total amount of funeral and burial expenses, and what part of total has been paid.

B. INFORMATION REGARDING HEIRS AND DEPENDENCY

12. Heirs
   (a) Full name of each heir of the decedent, as determined by the law of the state in which decedent was domiciled on date of death.
   (b) Relationship of each heir to decedent.
   (c) Date of birth and country of birth of each heir.
   (d) Residence address of each heir as of date of death, and present residence address of each. (If heir resided with decedent, answer "with decedent").
   (e) State general condition of health of each heir, giving the same information as was requested for the decedent in Item 3(a) and (b) of these instructions.
   (f) State marital status, educational background and military service of each heir, as in Items 4 and 5 of these instructions.

13. Dependents other than heirs.
   (a) Full name of each person who was receiving any support or contribution from decedent as of date of death, other than those listed as heirs in Item 12 above.
   (b) Relationship of each to decedent.
   (c) Date of birth and country of birth of each.
   (d) Residence address of each as of date of death, and present residence address.
   (e) State amount or value of support or contribution each received from decedent, during the last five years; and amount of support each was receiving on monthly or annual basis as of date of death.
   (f) State general condition of health of each.
   (g) State marital status and employment status of each, as of date of death and as of present time.

14. Disposition of decedent's income (if known).
   (a) During the last five years, approximately what amount of money or percentage of decedent's gross income was retained or used by decedent for decedent's own personal expenses such as food, recreation, clothing, etc.?
   (b) If decedent made any special cash contribution to any person(s) listed in reply to 12(a) or 13(a) above, during the five years prior to death, please list the annual amounts thereof to each such person. NOTE: It is assumed that all funds not spent by decedent on himself as listed in 14(a) above, or not saved or invested as listed in 14(c) below, were devoted to routine maintenance and support of dependents. Therefore, in reply to this Item 14(b), please list only special or unusual cash contributions, apart from regular support.
   (c) For the last five years, and as of date of death, list sums saved by decedent or invested in real or personal property, including shares of stock. NOTE: Do not list the specific investments, but merely the total savings and investments for each year.

## C.  MISCELLANEOUS INFORMATION

15. If any of the persons named in reply to 12(a) were employed or received any income in the three-year period prior to decedent's death, state the type of employment and the annual income earned for such years.

16. State the names and permanent residence addresses of all guardians appointed for any infant named in answer to 12(a) and
    (a) The date of such appointment(s)
    (b) The full names of the courts making each such appointment (or attach Letters of Guardianship).

17. If any of the persons named in your answer to 12(a) are receiving any workmen's compensation death benefits, please state
    (a) The weekly, bi-weekly or monthly amounts awarded to each
    (b) Under what law such compensation is given (or attach compensation award)
    (c) Name and address of the workmen's compensation carrier

18. If decedent or spouse were married prior to their marriage to each other, please state
    (a) The date such marriage was terminated
    (b) The manner in which such marriage was terminated
    (c) Whether decedent was paying any alimony or child support at the time of his death and, if so, the annual amount of such payments.

19. List the names and addresses of all banks in which decedent maintained a checking and/or savings account, type of account, and the names of each person besides decedent authorized to withdraw monies therefrom.

20. Describe the personal relationship of the decedent to the person(s) listed in reply to 12(a) and 13(a), with regard to care, comfort, society, protection, love, affection, attention and companionship which decedent afforded to them. Describe any special factors such as closeness of relationships, and grief suffered as result of decedent's death.

21. If there are any person(s) not listed in reply to 12(a) or 13(a) who suffered extensive grief as result of decedent's death, list their names, residence addresses and dates of birth, and describe their relationship to the decedent.

22. Describe the professional, business and social background of decedent (e.g., clubs, societies, writings, civil affairs, etc.) identifying all honors and awards received and any unusual talents, characteristics and abilities possessed by decedent. NOTE: It is not necessary to repeat information given in reply to any other questions.

23. List the names and addresses of prospective witnesses pertaining to the decedent's personal, family and business life, stating the relationship of each prospective witness to the decedent, and the matters of which each has knowledge.

## D.  DOCUMENTS

24. Please send copies of the following documents which are applicable and available. Certified copies are not required but are welcome if available. Irreplaceable documents such as photographs will be returned on conclusion of the case upon request. If any of these documents do not exist, please answer "none".

4

## APPENDIX D

(a) Letters testamentary
(b) Decedent's income tax (inland revenue) returns for the last five years.
(c) Decedent's estate tax (death duty) return, if filed.
(d) Decedent's birth certificate.
(e) Decedent's death certificate.
(f) Decedent's military discharge papers.
(g) A good photograph of decedent, preferably head portrait, also good family photographs, and any other photos which illustrate special events or special accomplishments of decedent.
(h) Letters of guardianship as referred to in reply to Item 16.
(i) Decedent's marriage certificate.
(j) Birth certificate of each heir named in reply to 12(a).
(k) Decedent's last will and testament.
(l) Airline ticket issued to decedent for the fatal flight and any other papers relating thereto (if applicable).
(m) All bills and statements relating to funeral and burial expenses.
(n) Written descriptions and other documents issued by decedent's employer relating to fringe benefits, pension and retirement plans.
(o) Decedent's employment contract or union contract under which he was working at date of death.
(p) Obituaries; letters of condolence; periodical articles and anything else published about decedent before, at or after death.
(q) Any other documents which you feel may be helpful in compiling a complete presentation of the damage factors referred to in these instructions.

5

Tradução do *Apêndice D* extraído do livro Recovery For Wrongful Death and Injury (*Indenização por Morte e Ferimentos por Culpa*, SPEISER, Stúart M., KRAUSE, Charles F. e MADOLE, Juanita M., Editora Clark-Boardman-Callaghan, 3ª ed., 1992.



## Lista de Informação Sobre Danos
### para
### Ações Indenizatórias por Culpa

*(As informações a seguir, onde forem apropriadas para os respectivos pedidos indenizatórios, devem ser obtidas o mais cedo possível após a morte. Mas note que nem toda informação será relevante para todas as famílias dos mortos. Respostas inteiras e completas para todas questões e a coleção de todos documentos darão ao advogado a prova essencial do pedido de indenização. Todavia, nos estágios iniciais da preparação do pedido, as respostas às perguntas A.1,2,6,8,12,13 e A.16 e uma cópia dos Testamentos serão suficientes para o início do processo)*

A.    INFORMAÇÃO RELATIVA AO FALECIDO:

    1.(a) Nome Completo
      (b) Data do Nascimento
      (c) Estado civil e data e lugar do casamento

    2. Endereço permanente da residência.
      (a) Na data da morte
      (b) No período de cinco anos antes da morte.

    3. Saúde.
      (a) Descreva as condições gerais da saúde ao tempo do acidente
      (b) Se o falecido sofria de alguma doença, ou ferimento ou condição
          resultante de um acidente, durante o período de cinco anos antes da —
          morte, que exigira hospitalização ou tratamento por médicos:
          (1) Descreva a natureza disso
          (2) Descreva se essa doença, ferimento ou condição foi diagnosticada como
              afetando a expectativa de vida do falecido —
          (3) Descreva os períodos e locais de todas hospitalizações

    4. Histórico Escolar. Indique os nomes e endereços, os anos de freqüência e
      os diplomas, se houver:
      (a) Escola primária
      (b) Escola secundária
      (c) Faculdade
      (d) Escolas de pós-graduação.
      (e) Outras

    5. Serviço Militar (se cabível).
      (a) Data aproximada de ingresso e baixa

RG-00012

(b) Lugar do Serviço
(c) Registro
(d) Patente ao dar baixa
(e) Tipo da baixa
(f) Honrarias e decorações, se alguma

6. Emprego pelo período de cinco anos antes da morte.
  (a) Nomes dos empregadores
  (b) Nomes dos cargos desempenhados para cada empregador
  (c) Natureza do trabalho ou ocupação com cada empregador
  (e) O último empregador tinha um plano de aposentadoria compulsória? Em caso positivo, em que idade era a aposentadoria compulsória?

7. Autônomo (se cabível).
  (a) Nome e endereço do negócio
  (b) Data do início do negócio
  (c) Tipo do negócio e obrigações do falecido
  (d) Parte do falecido na sociedade

8. Histórico dos rendimentos durante o período de cinco anos antes da morte.
  (Nota: se possível, queira colocar as rendas sob as categorias I e II abaixo para os cinco anos de cada).
  I. Rendimento de emprego
    (a) Total anual do rendimento (bruto) do emprego para cada ano.
    (b) Que parte desse rendimento representava
      (1) Salário básico
      (2) Bônus
      (3) Comissões
      (4) Benefícios (descreva os tipos dos benefícios).
    (c) Nível do Salário mensal ou anual ao tempo da morte.
    (d) Mecanismos ou acordos para rendimentos outros que o salário (bônus, comissão, benefícios), em bases mensais ou anuais, ao tempo da morte.
  II. Renda de Autônomo (se aplicável)
    (a) Total anual do rendimento de autônomo para cada ano.
    (b) Se for possível diferenciar, descreva qual parte de tal rendimento representava:
      (1) Salário ou retiradas regulares.
      (2) Distribuição de lucros e dividendos.
    (c) Rendimento autônomo mensal ou anual na data do falecimento.

9. Expectativa de Rendimento Futuro. Este talvez seja o mais importante Item de informação exigido, uma vez que os danos em casos de morte por culpa são baseados em grande medida sobre a perda dos rendimentos futuros. Por favor, forneça qualquer informação que você puder obter que indique a possibilidade de avanço ou aumento dos rendimentos do falecido. Se possível, uma carta deve ser obtida do empregador do falecido, indicando seu valor e futuras perspectivas de aumento. A carta do empregador deve registrar as promoções que seriam possíveis ao falecido, incluindo o nome do cargo e o salário presente do ocupante atual, e finalmente deve descrever a posição mais alta que o falecido poderia ocupar no futuro, e o salário do ocupante atual. Se possível, devem ser obtidas também cartas de outras pessoas do mesmo ramo ou profissão do falecido, atestando suas habilidades e perspectivas de





progresso. As cartas podem ser dirigidas "a quem possa interessar" ou algo semelhante; não são necessários *reconhecimento de firma*, autenticação ou registro em tabelionato. As cartas devem conter detalhes de qualquer conhecimento especial, treinamento, aptidão ou características do falecido que o faziam particularmente valioso e propenso a progredir. Se houver fatores especiais que colocariam o falecido numa categoria acima da média, por favor, não se esqueça de indicar esses fatores ao responder este item 9. E se houver quaisquer fatores especiais relacionados à expansão ou desenvolvimento da empresa que empregava o falecido, estes devem ser indicados na carta do empregador.

10. Benefícios da aposentadoria: planos de rendimento a longo prazo; opções de ações. Descreva cada plano em que o falecido tinha direito de participar; extensão de sua participação até a data de sua morte, e benefícios pagáveis a seus beneficiários como seu resultado, particularmente considerando as perspectivas de progresso dele como descrito na resposta ao item 9 acima.

11. Soma total das despesas do funeral e enterro, e que parte do total foi paga *(e por quem)*.

B.    INFORMAÇÕES RELATIVAS AOS HERDEIROS E DEPENDENTES

12. Herdeiros
    (a) nome completo e cada herdeiro do falecido, como definido pela lei do Estado *(país)* no qual o falecido tinha domicílio na data da morte.
    (b) Parentesco de cada herdeiro com o falecido.
    (c) Data do nascimento e país do nascimento de cada herdeiro.
    (d) Endereço de residência de cada herdeiro na data da morte, e endereço da residência atual de cada um (se o herdeiro residia com o falecido, responda "com o falecido").
    (e) Descreva as condições gerais da saúde de cada herdeiro, dando as mesmas informações como foi solicitadas para o falecido nos itens 3(a) e (b) desta lista.
    (f) Descreva o estado civil, o histórico escolar e o serviço militar de cada herdeiro, como nos itens 4 e 5 desta lista.

13. Outros dependentes que não são herdeiros:
    (a) Nome completo de cada pessoa que estava recebendo qualquer auxílio ou contribuição do falecido na data da morte, e que não esteja entre aquelas indicadas como herdeiros no item 12 acima.
    (b) Parentesco de cada um com o falecido.
    (c) Data do nascimento e país do nascimento de cada um.
    (d) Endereço de residência de cada um na data da morte, e endereço da residência atual.
    (e) Descreva o montante ou o valor do auxílio ou contribuição que cada um recebia do falecido durante os últimos cinco anos; e o montante de auxílio que cada um estava recebendo em bases mensais ou anuais na data da morte.
    (f) Descreva as condições gerais de saúde de cada um.
    (g) Descreva o estado civil e a situação empregatícia de cada um na data da morte e no momento presente.



14. Rendimento disponível do falecido (se conhecido).

    (a) Durante os últimos cinco anos, qual aproximadamente a quantidade de dinheiro ou porcentagem do rendimento bruto do falecido que foi retido ou usado pelo falecido para as despesas pessoais do próprio do falecido, como alimentação, lazer, roupas, etc. ?

    (b) Se o falecido fez alguma contribuição especial em dinheiro para quaisquer da(s) pessoa(s) indicada(s) nas respostas aos itens 12(a) ou 13(a) acima, durante os cinco anos anteriores à morte, por favor quantifique essas somas anuais relativas a cada pessoa. NOTA: Presume-se que todos os fundos que não foram gastos pelo falecido para si próprio, como indicado no item 14(a) acima, ou não foram economizados ou investidos como indicado no item 14(c) abaixo, foram usados para manutenção de rotina e para auxílio dos dependentes. Portanto, ao responder a este item 14(b), por favor indique apenas as contribuições especiais extraordinárias dinheiro, e assim diferentes do auxílio regular.

    (c) Sobre os últimos cinco anos, e até a data da morte, indique as quantias economizadas pelo falecido ou investidas em propriedade imóvel ou pessoal, incluindo ações da bolsa. NOTA: Não indique os investimentos específicos, mas apenas o total das economias e investimentos de cada ano.

C.   INFORMAÇÕES COMPLEMENTARES

15. Se quaisquer das pessoas indicadas na resposta ao item 12(a) foi empregada ou recebeu qualquer rendimento no período de três anos anteriores à morte do falecido, descreva o tipo de emprego e o rendimento anual ganho para cada ano.

16. Descreva os nomes e endereços permanentes da residência de todos os responsáveis nomeados para a guarda de qualquer menor de idade indicado na resposta ao item 12(a) e

    (a) A data de tal nomeação (ou de tais nomeações)

    (b) Os nomes completos das Varas em que foram feitas tais nomeações (ou junte uma cópia do documento do Termo de Responsabilidade).

17. Se quaisquer das pessoas indicadas em sua resposta ao item 12(a) está recebendo qualquer benefício por morte de indenização acidentária trabalhista, queira declarar isso.

    (a) O montante pago para cada um semanalmente, quinzenalmente ou mensalmente.

    (b) Sob qual lei tal indenização é paga (ou junte o documento da indenização).

    (c) Nome e endereço do transportador da indenização acidentária.

18. Se o(a) falecido(a) ou esposa(o) foi casado(a) antes do casamento deles, queira indicar

    (a) a data em que o primeiro casamento terminou

    (b) a forma pela qual o primeiro casamento terminou

    (c) se o falecido pagava qualquer pensão alimentícia, ou pensão a menor de idade, ao tempo de sua morte e, nessa hipótese, qual o total anual de tais pagamentos.



19. Indique os nomes e endereços de todos os bancos nos quais o falecido tinha conta corrente e/ou de poupança, o tipo da conta, e o nome de cada pessoa, além do falecido, autorizada a sacar dinheiro delas:

20. Descreva as relações pessoais do falecido com as pessoas indicadas nas respostas aos itens 12(a) e 13(a), a propósito do cuidado, afeto, intimidade, proteção, amor, afeição, atenção e companheirismo, que o falecido dedicava a elas. Descreva quaisquer fatores especiais tais como aproximação dos relacionamentos e sofrimento experimentado como resultado da morte do falecido.

21. Se houver qualquer pessoa não indicada nas respostas aos itens 12(a) ou 13(a), que sofreu muita dor por causa da morte do falecido, indique os nomes, endereços de residência e datas de nascimento delas, e descreva suas relações com o falecido.

22. Descreva a vida profissional, de negócios e social do falecido (por exemplo, clubes, associações, escritos, atividades cívicas, etc.) identificando todas as homenagens e prêmios recebidos e quaisquer dons, características e habilidades que o falecido tinha. NOTA: não é necessário repetir as informações já dadas em resposta a quaisquer dessas outras perguntas.

23. Indique os nomes e endereços das possíveis testemunhas que saibam da vida pessoal, familiar e profissional do falecido, descrevendo o relacionamento de cada uma dessas possíveis testemunhas com o falecido, bem como os assuntos sobre os quais cada uma delas tem conhecimento.

D.    DOCUMENTOS

24. Queira enviar cópias dos seguintes documentos, desde que sejam pertinentes e possíveis. Não é necessário que as cópias sejam autenticadas mas, se a autenticação for possível, será melhor. Documentos insubstituíveis, como fotografias, serão devolvidos a pedido após a conclusão do processo. Se algum desses documentos não existir, queira responder "nenhum".

(a)  Carta testamentária.
(b)  Declaração de imposto de renda (inclusive dos rendimentos) dos últimos cinco anos.
(c)  Declaração do imposto *causa-mortis*, se preenchida.
(d)  Certidão de nascimento do falecido.
(e)  Certidão de óbito do falecido.
(f)  Certificado de serviço militar do falecido.
(g)  Uma foto do falecido, de preferência um retrato em pose clássica, e também boas fotografias da família, e quaisquer outras que documentem eventos especiais ou cerimônias de realizações do falecido.
(h)  Prova do falecido como tutor ou curador ou responsável como indicado na resposta ao item 16.
(i)  Certificado de casamento do falecido.
(j)  Atestado de nascimento de cada herdeiro indicado nas respostas ao item 12(a).
(k)  Testamento e última vontade do falecido.
(l)  Bilhete da viagem vendida pelo falecido para o vôo fatal e qualquer outro papel relativo à viagem (se aplicável).



(m)  Todos recibos e comprovantes relativos às despesas funerais e de enterro.
(n)  Declarações escritas e outros documentos fornecidos pelo empregador do falecido e relativos aos benefícios, pensões e planos de aposentadoria.
(o)  Contrato empregatício ou acordo sindical *(contrato coletivo)* do empregador sob o qual ele estava trabalhando no dia da morte.
(p)  Notícias fúnebres, cartas de condolências, escritos publicados e qualquer outra referência a respeito do falecido, ante ou depois da morte, *(ou por causa dela, como reportagens, fotos de jornais e revistas, etc.)*
(q)  Qualquer outro documento que você sente que possa ser útil para formar uma apresentação completa *(para os jurados)* dos danos *(prejuízos morais e materiais)* referidos nestas listas.

### Observações do Dr. Renato Guimarães Jr.:

Como se vê, o questionário acima tem a finalidade de fornecer aos nossos advogados no estrangeiro o máximo de provas para que eles obtenham, na Justiça, ou por acordo, a maior indenização possível. Por isso, apesar de os pedidos do questionários parecerem exagerados, todo esforço e paciência devem ser empregados porque, dessa documentação dos danos morais e materiais, é que o juiz irá avaliar o montante a ser pago, em caso de condenação dos fabricantes da peça ou peças defeituosas - e suas seguradoras que irão se defender, atacando toda documentação incompleta.

O questionário foi montado para famílias do mundo inteiro e dentro da perspectiva da vida no exterior, em especial quanto suas documentações legais. Caberá a cada família e seu advogado de confiança, para cada caso em particular, adaptar a resposta adequada à questão geral, feita para todos, e que pode à primeira vista parecer estranha. Nem deverão as famílias e seus advogados se limitar a simplesmente responder às questões. Por exemplo: se houver uma fita gravada mostrando as alegrias que a vítima morta proporcionava aos seus, ou a importância de seu trabalho - uma cópia desse *vídeo* poderá ser utilíssima no julgamento. Ou se algum parente ou testemunha reside no estrangeiro, essa circunstância - embora não perguntada no questionário acima - deve ser esclarecida.

Enfim, as boas respostas ao questionário são as armas para cada família obter a indenização maior possível. Se for possível responder já em inglês, muito melhor, porque o tradutor poderá, então, discutir junto com cada família a palavra em particular que melhor reflita o fato ou a idéia e, havendo dúvida, optar pela alternativa mais favorável - ao invés de se arriscar que o tradutor, no exterior, não capte o real significado de uma ou outra expressão em Português, enfraquecendo o impacto da resposta para a apreciação da Justiça lá fora.

Dispensável advertir que, se os investigadores das rés e seguradoras, descobrirem alguma *inverdade* nas respostas, - o que é diferente da resposta que é verdadeira mas que *não pode ser provada* - toda a causa daquela família estará seriamente prejudicada dado o grande valor de credibilidade que os estrangeiros, principalmente os americanos, dão às declarações à Justiça: uma só inverdade destrói toda a fé que a testemunha ou o interessado mereceriam e o juiz e os jurados passam a desprezar o mérito totalmente porque sentem como se fossem eles as vítimas da inverdade descoberta, além de o fato poder constituir crime de falsidade.

Campinas, 19, fevereiro, 1997.

*Renato Guimarães Jr.*

RG-00017

fax (703) 522-7905, phone (703) 522-7500 - Campinas, Brazil, February 11, 1996.[7]

To: Speinser, Krause, Madole & Lear, Washington, D.C.

**urgent**

Dear Mr[s] Gerald Lear, Arthur Ballen and Leigh Ballen:

Thank very much for your two *fax* of February 5, 1997.

Even though today is Carnival in Brazil, I will have a meeting at home at 1 PM this afternoon with a few attorneys and families who will came from São Paulo and other cities to discuss our case in USA. There is a possibility that at least one of them will be ready to sign the retainer agreement to both of us. Thus, please, be ready to have your retainer agreement already printed and at hand in order to send it to me right away by *fax* this afternoon here (this morning there) to their signatures, as soon as I send you their names.

Your retainer agreement for the alligator case may serve as a model. I will show it to them. Accordingly, my name as shown in that retainer agreement (clause 1) and the clear statement that they will not own any fees, expenses or additional sum of money whatsoever in the unlikely event that the expenses exceed the recovery or settlement, shall be printed (clauses 4 and 5) - I suggest.

It is also possible that I have to call you at any time this afternoon (morning there) in order to know your answers to some questions our potential clients can make in case I am not be sure on how to clarify these questions they may require from me at the spot. The total of the net recovery they may expect as a guess, rough average, say for a man 45 years old, two kids and wife, making US$ 100,000.oo a year; your confirmation that no deal whatsoever will be closed by you without their previous written consent; how long they may have to wait until they receive the recovery either by settlement or judicial decision, and alike, are the kind of questions they may made to us. Remember, we are three hours ahead of you.

There is a general impression that - unless you do right away some formal, even though preliminary, request on behalf of at least one relative who will then retain you, asking, for example, the U.S. National Transportation Safety Board to release to you the conclusions of the evidence and allow us to release it to the Brazilian press this Friday - at least this one relative shall then ask a Brazilian judge to *order a formal information* to TAM, D.A.C.-Brazilian Department of Aeronautic Civil and UNIBANCO Insurance that, if they continue to refuse to release some informations to us about the names and addresses of other families and about some legal aspects of the future case TO BE PRESENTED IN U.S.A. (not in Brazil) BY YOU, then TAM, Brazilian Aeronautic Authority and UNIBANCO insurance may face in the future civil responsibilities for such a deny.

RG-00018

(page 2)

     This judicial *order to a formal information*, as I said before, is NOT a lawsuit: it is only a preparatory step (just, a warm, a *"remember, so latter on you will not be permitted to an excuse based on ignorance of these facts")* and specifically toward your *possible* lawsuit in U.S.A. - not in Brazil. Therefore we fell that this *order to a formal information* will not close the U.S. jurisdiction for the case at all, not even to this one relative who may ask it to the Brazilian judge - but, of course, the final decision on if we shall or shall not proceed with such a step will have do come from you. As we are prepared to proceed so to the Brazilian judge this Friday you have time until next Thursday to do a research in order for send us your sound answer on this question to us. You do not have to hurry.

     In any event we shall be prepared to go to the news as soon as possible after either (1) you or (2) I do something formal toward a possible lawsuit outside Brazil.

     If you agree in either of the above alternatives (1) or (2) you shall be ready also this Friday to answer questions-but then from the Brazilian press as early as the first hours of your office, because that difference of hours between us.

     Friday is a strategic day to the news: it will caught the TAM, D.A.C. and UNIBANCO officers by surprise when their offices are closing for the weekend, so the families will have a 48 hours period free to contact us before TAM and UNIBANCO respond with a still higher offer than the 147,000 figure to deal with the families. This timing also is aimed to keep the aggressive lawyers from U.S.A. away from competing with us at least for another 48 hours or so.

     The reason to our insistence on such a mere preparatory, preventive step, to which no lawsuit may follow at all - the law calls it a *judicial caution measure* - (not a "action" because it is unilateral only and does not permit even a defense or reply) - is that, by divulging this petition to the judge throughout the midia this Friday, we will have the most powerful public notice to all the other families and attorneys who are now in unknown places spread around the country and who, we hope, will immediately contact us for further details and then very likely they will enjoin your lawsuit, therefore largely diminishing the adverse chances of (1) the US$ 147,000 deal, or whatever the UNIBANCO (read it *Lloyd's*, of London) may offer them, as the UNIBANCO is saying to the families that several deals have already been made (because UNIBANCO does not give us the names of those who it says have accepted the deal, some of us doubt that it is saying the true); and also of (2) lawsuits in Brazil, thereby making these families without the USA jurisdiction, according to your early instructions to me.

     I look forward to have your answers as early as possible today on these matters.

            Very Sincerely Yours,

RG-00019

fax 00-55-19-239-4315, phpne 00-55-19-239-2921

fax (703) 522-7905, phone (703) 522-7500 - Campinas, Brazil, February 11, 1996.

To: Speinser, Krause, Madole & Lear, Washington, D.C.

**urgent**

Dear Mr$^s$ Gerald Lear, Arthur Ballen and Leigh Ballen:

Thank very much for your second *fax* of yesterday.

Since no proposed retainer has being received yet and as a family is already traveling to be here in Campinas tomorrow morning - *and we are tree hours ahead of you* - in order to take your proposed retainer to seven or six other families who live far away from our State of São Paulo, in case your computer system is still down, please try to send your proposed retainer through your offices in New York, Dallas, Miami or L.A.

We have good news also.

Very Sincerely Yours,

RG-00020

7

fax  (703) 522-7905, phone (703) 522-7500 – Campinas, Brazil, February 12, 1996.

To: Speinser, Krause, Madole & Lear, Washington, D.C.

Dear Mr* Gerald Lear, Arthur Ballen and Leigh Ballen:

Thank very much for your *fax* of yesterday with the retainer agreement, which a translated into Portuguese and handed down to those interested in signing it. All families of the eight executive officers from UNIBANCO Insurance will be contacted in the coming days, plus the families of twelve of businessmen (one of them was a millionaire) from the Paraná State. If the fellow attorney who is flight there, to the Curitiba City, day after tomorrow, is luck in a meeting organized by a friend of my, the best criminal lawyer in the South of Brazil, you shall go there after the meeting with the families of Sao Paulo.

Now, we gave up to go to the Court to "ask a Brazilian judge to *order a formal information* to TAM, DAC-Department of Aeronautic Civil and UNIBANCO Insurance", in order to avoid problems latter on with the *forum non conveniens* there. Instead we changed the idea toward a popular program made by TAM ("Fale com o Presidente", *"Tall with the TAM President"*, or *"Speak with me, the President of TAM"*), a Consumer Relations service, a PR sort, kind of *"We welcome your comments!"* of American Airlines, as published in the American Way, the *"Yours Free to Take"*, complimentary copy given to all those on flight. See below a copy of the cover and of the *"From the President"* article, ritten by the very TAM President, Commander Amorin (in photo).

Well, we imagined that a naive, colloquial, even ironic, sarcastic and funny letter, from me to him, will create to us the same public fact which, going to the news media as soon as I delivered it to TAM, we desperate need now to reach all the families in one shot. The style will be of an innocent hillbilly, full of silly questions on obvious questions about the very serious *matters of the damages* caused by the tragic crash – and the core of the massage will be the names, addresses and phones of the families we need to sue, if needed, the insurance companies in USA by you (read it bellow: your name is show in it).

We guess, therefore, that neither such an unusual text of public letter called "Talk to us, President", neither my interview with the press afterward could be held as a treat or even a promise to sue them here in Brazil which could be legally explored in US Court to prevent American jurisdiction for the case on base of *forum non conveniens*. But, again, the decision on if we shall, or shall not, send this open letter and talk to the press, is up to you and we do not want make any mistake which will give you any problem there. If you need more information before send me your final word on this import issue, just call me.

By the way, did you reach at my request any of the two families of the two VIP American who died in the crash, as indicated in my second *fax* of last Monday (David Francis Tobolla, 40, finance director of Citibank in São Paulo, married to a Brazilian, and David Andrews, 49, vice-President of Behring, of the giant Hoechst group, who lived in San Jose, California, with wife and two sons, 17 and 22 years old) ? If you prefer, I can try to talk with them, provide you find me their telephone numbers and where they are.

Andrews

Thank you again for your guidance. I look forward to have your answers.

Very Sincerely Yours,

RG-00023

EX. 61

7

fax  (703) 522-7905, phone (703) 522-7500 - Campinas, Brazil, February 19, 1996.

To: Speinser, Krause, Madole & Lear, Washington, D.C.

Dear Mr⁵ Gerald Lear, Arthur Ballen and Leigh Ballen:

Thank you very much for your proposed visit to Brazil, tentatively starting March 3. Welcome... even though Carnival is over now.

Your determination to come down here even without a single retainer agreement signed, besides those from the pilot and co-pilot families that I would have had already at hand for you, had a great impact on our potential clients and their attorneys: tomorrow, for example, a fellow lawyer will fly to Curitiba, the Capital of Paraná, trying to arrange a preliminary meeting with the families and their attorneys there, with an eye on our trip to that city too. A son of a millionaire dead, also from Paraná, called me, and people from at least three cities (Pederneiras, Uberlandia and Campo Grande) are in process of deciding to retaining us - as well several others, of course, of Sao Paulo itself. All families of the eight executive officers from UNIBANCO Insurance may be in contacted with me in the coming days also. Thanks God, no sight of American competitors in the horizon yet.

Veja (our Time magazine) shall publish a long story, including, maybe, an interview made with me under those lines you gave me: "give them a hell !"

There are indications that TAM is doing the best to support the pilot behave and that the 60 day delay for the release of the conclusion and publication of the Governmental Report-Inquiry about the causes of the accident was indeed asked for by the very TAM who seems to try to postpone it as much as possible. Meanwhile - what is worse - lawyers of UNIBANCO is literally inviting, challenging on the phone, the families to go to Court immediately (in Brazil, of course - even though they do not say so, only going without mentioning, absolutely nothing, the potential foreign jurisdiction, therefore keeping fellow attorneys of the families on dark on this our alternative) - so, we guess, intentionally fabricating the impossibility to them to sue in USA afterward. What can we do against this new, indirect attack against our cause ?

Your retainer agreement and your Appendix D (Checklist of Damage Information) have been translated into Portuguese and will be spread around among those growing interested, along with other materials I have - as soon as you clarify to me two questions: (1) on the Item 17(c) what is the meaning of "carrier", because the a workmen's compensation can have nothing to do with an accident of a transportation company at all, right ? (2) on the Item 24(b) what means "inland-revenue" ?

Now, I need with urgency: a copy of your books Aviation Tort Law and Recovery for Wrongful Death; you don't have to send me Lawsuit, because, as you know, I already have it for years. Kindly also send me a copy the Biographical Data of Arthur and Leigh Ballen. Send also two collections of the last years of SKM Tort NewsLetter. Finally, please send me 90 copies of the Spanish edition and 50 of the English edition of the tri-

RG-00024

page 2 -

(tri-)cover brochure *SKM Specialists in Complex Litigation*, with the third part (*Experienced Advocacy Counts*) full of free 10 pages called "Of Counsel", "Publications", "Settlements, Judgments & Jury Awards" and "Attorney Profiles". The xerox copies I tried to made from it become no good. Of course, any other materials on your firm, besides those you gave me during my visit in Washington, D.C., will be more than helpful. Please, do not bring the above material with you, but rather send it all at once and by Federal Express, DHW, Extremely Urgent International Express Mail, US Postal Service, EMS, or any other very fast deliver.

In order to save time, from now on kindly use the following address:

| Renato Guimarães Jr. | *again:* | Renato Guimarães Jr. |
| rua Francisco de Toledo, 501 | *for* | rua Francisco de Toledo, 501 |
| Cidade Universitária | *sure* | Cidade Universitária |
| 13.083-470 - Campinas, SP - Brazil | | 13.083-470 - Campinas, SP - Brazil |
| Brazil | | |

By regular mail I am sending you copies of the best reports of the accident, including those by Veja where you can see the photos of several victims whose families I have talked to.

Feed me with new developments of both your legal research on USA jurisdiction and your investigation and discovery of evidences against North Grumman. Any papers on these matters you can take with you when you came here will be very impressive too.

Let's keep in touch. I may call you at any time.

Very Sincerely Yours,

7

fax  (703) 522-7905, phone (703) 522-7500 - Campinas, Brazil, February 19, 1998.

To: Speinser, Krause, Madole & Lear, Washington, D.C.

## most  urgent, please, to be read before my call at 12 noon

Dear Mr' Gerald Lear, Arthur Ballen and Leigh Ballen:

Still shocking with your saying of yesterday that now there is chance to you to retreat from your definitive letter of as early as February 5, signed by SKML-Gerard R. Lear - "*to confirm the proposed arrangement... for handling of each such case...*" - on behalf of all families and their attorneys I respectfully urge you to consider the fact that in the last two and half weeks that latter, your retainer agreement ("*... to prosecute or settle all claims for damages... will file and pursue such actions as are necessary by whatever form of action you deem appropriate*"...) and the *Appendix D (Checklist of Damage Information for Wrongful Death Actions)* have been all copied and circulated (distributed) along with their translations into Portuguese, among at least the families and their attorneys of about 25 (twenty five) victims, from seven States - plus a four-page letter from me explaining all the details of your commitment, fees, etc.; it is possible that some of these documents has been shown or given, by leaks, to the press.

Since then these matters have being object of hundreds of hours of conversation on long distance calls (several of them with me for over an hour and half of duration) and of meetings all over among these people themselves without me. The number Leigh gave to the widows of the pilot and of the co-pilot on the phone on the afternoon of February 10 - something around three million dollars and half million for the widow of the other TAM employees dead - have being used by all them as a reference to calculate accordingly their own cases.

Only to grasp the dimension of the problem, I repeat, one widow, Mrs. Solange Godoy (see next paragraph) confirmed to me on the phone last Friday that she did receive - and signed the "partial" receive - for seventeen thousand dollars. TAM has claimed that so far six families also did so.

The informations that Leigh authorized me to answer to reports at the demands from the press were confirmed by me last Friday - *after the challenging letter of the widow Godoy (above and bellow) was published that day* - to "our NYTimes and TIME Magazine" *(Folha de S. Paulo  and VEJA)*", by far the largest and most-influenced media in Brazil. Several families and at least one attorney gave, including by *fax*,  my name and phone to them, so I had of course to make some comments. During my interview with *VEJA*  Leigh was kind enough to clarify several questions the journalist posed to me beyond my knowledge, even sending us a *fax*  of the "*Settlements, Judgments & Jury Awards*", out of the brochure *SKM - Specialists in Complex Litigation*, and which I promptly passed to her.

The TAM President published today a full page (with the headline right in the first page of this Sunday edition of the second most important newspaper in the country, the *Estado de S. Paulo*), with his interview - the very first one since the accident.

RG-00026

It appears that TAM, knowing that *Folha* and *VEJA* were about to publish my interview along with those with several families and their attorneys, antecipately took the lead to tell to the public the airline and insurance stories before ours.

The TAM story today in short confirms that the cause of the accident was indeed the malfunction of the locker, or *relê*, switch-throttle, but of course the President did not say which factory made that locker, neither even in which country is was made. He said that both TAM and the pilot were also victims without fault and that, among other things, six families already received their money.

I promptly updated today my interviews, with my proper reaction to the remarks of the TAM President, with *Folha*, which will published it by this Tuesday or Wednesday, and I will do the same tomorrow with *VEJA*, which will publish it next Sunday.

The families and their attorneys therefore are all very exciting waiting to see you starting March 3. A prominent industrialist, who lost his father, was even about to see you there in Washington, D.C., during his next trip to USA this coming March 12 but now he is waiting for you here on March 3. He also checked your firm in Internet along with the news about the strike of American Airlines and the intervention of President Clinton.

So, in the verge of a desperate public situation - if you cancel your confirmation signed on February 5 about our arrangement - let me offer your some insights which in this critical hour may help your legal researchers and specialists in legal strategy.

TAM is not an *indispensable part:* both US authorities and Fokker, soon after the accident ordered a review to fix the locker (this orders have being publicly confirmed by pilots at large here and today by TAM, by its Presidential interview). Being "this review to fix" the most eloquent confession of evidence of the wrongdoing of the maker of the fatal locker, nothing else is due to show in court the North Grumann/Fokker fault. TAM, indeed, looks like more as another victim of their fault - don't you agree ? Why TAM could conceivable be an indispensable part if it does not understand nothing of making, fabricating a locker ?

Now, even if TAM is considerable an *indispensable part,* there is, oh yes, a routine legal way to force TAM to know that, if it wants to, it shall respond (it may defend itself) to the charge in US court. Rogatory letters are a serious mechanism here, mostly when the demand comes form the American Judiziary, but normally a correspondent attorney in Brazil, like me, has only to present the US notice to our court to call the party there. In a national disaster like this each move will be highly noticed by the press. Of course, we can not force TAM to defend itself; we only must have to give TAM an opportunity to defend itself. Then to collect the money from TAM will be still easier.

But - an additional factor - TAM is pretty much involved with US industry. Just one example, the pilot was licensed in USA only a few moths before the accident. More than that, TAM is eager to flight to US. TAM is a very fast growing regional airlines that is now already flying around South America, and is ready to ask permission to go to Europe, USA and Japan too. So, politically, TAM never will turn its back to a USA judge.

RG-00027

Finally, since the beginning of our negotiations, starting with your letter of November 19, and fully explained by Arthur to me in Largo Key, the first approach of SKML would always start with a conversation with the insurance companies trying to make a fair deal, a settlement, and only if impossible this preliminary part, then you would consider to go, or not to go, to the court.

Therefore, even (1) is TAM is considered an *indispensable part*, (2) beyond the reach of US Court either by the trivial legal process of Rogatory Letter or (3) for political reason - and (4) why would TAM would not answer a notice from US Court, if who would pay for TAM would be rather *Lloyd's*, of London - then (5) at least the sole conversation with the insurance company must take place - or we all here in Brazil, people who are studding your new position over the weekend, are all wrong ?

Because it is hard to me to give you, by this letter or on the phone, thousand of miles away and in a few minutes, in another culture, a realistic picture on how it is hot the situation here, the faces of those dead and the short stories of some of those 99 families involved in this legal drama, very much concentrated and consolidated in my own words - the following photos of *VEJA* may help me to illustrate you this real saga.

I even refuse to imagine the overwhelming, frightening problems I and other attorneys will have to face with our potential clients, the bar (ethical and disciplinary charge), the legal community (judges, prosecutors, Superior Courts, etc.), with TAM and UNIBANC insurance company (libel, "insulting" *("give them a hell"*, Leigh) remarks) and, of course, my own credibility - build along 35 years of professionalism, hard with the big guys who hate me (Mrs. Ballen knows one of two of these cases, including one against MasterCard on which the US Department of Justice (Attorney General Janet Reno) paid attention) - and preserved with the public (circulation: over 2.000.000 copies the issues of both publications together), by clearly confirming to them international, sophisticate, reliable legal services committed to this complex litigation and suddenly, after two and half weeks of big and deep, very deep activities toward this most essential goal for harmed, devastated people, giving them an unprecedented hope for Justice, both in wide public and in confidential meetings - I and other attorneys, who trusted me, may not offer your representation to these families anymore.

Forgive me if I am too candid and straight, or if I even may appear a little rude in my broken English, but I am just trying to be only sincere in expressing my perception of the facts at this point. The attorneys of the families and I are firm in repeating what Gerard R. Lear wrote to us on February 5: "we look forward to once again working actively with your office" - and also hearing so at 12 noon today.

Sincerely,

Renato Guimaraes, Jr.

RG-00028

fax (703) 522-7905, phone (703) 522-7500 - Campinas, Brazil, February 24, 1996.

To: Speinser, Krause, Madole & Lear, Washington, D.C.

## most urgent, please.

Dear Mr<sup>s</sup> Gerald Lear, Arthur Ballen and Leigh Ballen:

The Board of Editors of VEJA (remember, the Brazilian counterpart of the TIME, the American weekly newsmagazine) decided that my interview will be published this Sunday - along with the stories of some twenty families - many of them our potential clients and whose addresses I provided to VEJA - only if I could say more in it than I have already said to them by following the general lines Leigh suggested me: "yes, I confirm that I have being in touch with a great foreign law firm to negotiate and to sue outside Brazil; yes, the cause is a locker made in a foreign country", and a little more.

VEJA believes that this much is too little and too speculative, and wants more from me: which law firm, which industry fabricated the defective locker, why the locker was the sole cause of accident. Today is the last day for the writing and printing of the text of the issue for this coming Sunday.

Therefore we must decide in the next few hours: (1) shall we tell VEJA the whole story and thus attract many more interested potential clients to us who will read my more detailed interview this week, but at the risk of also attracting competitive American law firms to the case ? Or (2) shall we accept the VEJA silence on my interview now and postpone its publication for another opportunity, say, for example, when you will be here, on the week of March 17, but then at the risk of meanwhile having more families signing the US$ 17,000.oo deal with the UNIBANCO insurance company ?

If you prefer to talk to VEJA directly, trying to have somehow a middle route between the two alternatives above, like my interview, with a little more of information, printed this weekend, but without tell them the whole base for the case in USA jurisdiction - I can arrange to you to call them after 1 PM, Washington, D.C. hour, today.

**I will call you around noon, Washington, D.C. hour, today,** to have your comments and answers to these urgent questions and following them accordingly.

Very Sincerely Yours,

RG-00029

7

fax (703) 522-7905, phone (703) 522-7500 - Campinas, Brazil, March 4, 1996.

To: Speinser, Krause, Madole & Lear, Washington, D.C.

*second fax*

Dear Mr² Gerald Lear, Arthur Ballen and Leigh Ballen:

VEJA decided NOT to publish my interview at all - yet, in this issue - according to our conversation last Saturday to give them only a few more clues on our case in USA. See the whole story bellow. VEJA however is very interested in our story in the future - of course, when our informations become available to the public for its next issues.

But - and this is <u>very important for more clients to us</u> - VEJA did print an advance story on the conclusions of the Report about the causes of the accident, to be published in early March by the Government. Those kinds of leaks VEJA uses to print do have high credibility as a reliable source in Brazil. Normally VEJA is correct with the informations it publishes thanks to its confidential sources. TV-Globo, the largest in Brazil, also confirmed those conclusions at the *evening news* last Saturday.

As you can read, pages 106-109, VEJA says it did hear the taped conversations of the pilot and co-pilot, made confidential interviews with officers in charge of the investigations, including an American instructor of pilots, and had full access to *(or into?)* the records of the so-called "black-box", opened in Seattle, Washington.

In short, VEJA says that, yes, the original and most important cause of the accident was in fact the auto-throttle (is it *our locker ?*), not the "ATS" (what does it mean ? Automatic T (?) System ? ). It seems it was an new kind of locker to save energy. BUT VEJA ALSO SAYS THAT THE PILOT COULD HAVE SAVE THE AIRPLANE. HE AND OTHERS EMPLOYERS OF TAM DID NOT PAY ATTENTION TO THE CLEAR SIGNS OF THE DANGER. THEY SHOULD NOT EVEN START THE TAKEOFF. THEY MADE MISTAKES IN MISUNDERSTANDING THE PROBLEM BEFORE EVEN GETTING INTO THE COCKPIT. LATTER, THEY DISREGARD THREE ALARMS. THE PILOT AND THE CO-PILOT HAD NOT A CREW RESOURCES MANAGEMENT COURSE AND HAD NOT SPECIFIC TRAINING ON THE PROBLEM BECAUSE TAM SAID FOKKER TOLD THEM THAT THE SPECIFIC TRAINING WOULD NOT BE NECESSARY. SO FOKKER ALSO MADE MISTAKE. THE U.S. NATIONAL TRANSPORTATION SAFETY BOARD WILL REVIEW THESE FINDINGS BEFORE THEY ARE PUBLISHED.

Pilots are criticizing any complain against the pilot dead: the accident was too fast and too unpredicted: even Fokker believe it would be impossible to happen. And our group of attorneys believes that the insurance companies pressing the Authorities to blame TAM exactly to avoid foreign jurisdiction.

Please, try to translate pages 106-109 into English, or read them through your

RG-00030

Spain to give me some guidances NOW on how to respond to the demands of explanations the families and their attorneys are asking me **FROM YOU. WHAT YOUR REACTION ON THIS VERSION ? DOES IT OR DOES NOT IT DIMINISH OUR CHANCES TO SUE IN USA ?** Assuming that the version of the fault on the part of the pilot and others from TAM is true, how about the rule of "more than 75%" of responsibility for the *forum non conveniens* rule ? Thank you for your prompt answers to me.

To make our position stronger to force TAM to respond in USA, if it is found as an indispensable part, I found that the pilot, as all others from TAM, was regularly re-checked, annually, in New Castle, in or near NY, plus Philadelphia, Dallas, Texas, and in Holland, where they go through simulator flies.

Anyway I expect that, because of this new widespread information, more potential clients will know of us and will come to us as we have your wise decision to keep fighting for the American jurisdiction - if the deals with the insurance companies are not settled.

Other new questions I have to answer to them: in the US$ 3,000,000.00 figure Leigh gave us is *before* or *after* you take off our 33,33% fee and/or expenses ? Which items do you include as expenses ? Please, give us examples of amounts and so for. Am I correct when I believe that the hours of our work are not included as expenses ? How do you divide the shares of the expenses among the different families ?

The letter inviting those families interested in talking with you will be sent today. Would it be O.K. with you to meet with each of them from 8,30 AM until 9,30 PM, if needed - with two breaks, 12,30 PM to 1,30 PM for the lunch, and from 5,30 PM to 7,30 PM for the dinner - so we may have some five families, with their own attorneys, a day ? I am asking them to bring as much as possible all the materials and documents required by your *Appendix D, Checklist of Damage Information for Wrongful Death Actions.* If you have any other suggestion to them or to our agenda, please inform me so as soon as possible.

Arthur, would you like to have some fellow Prosecutors at hand to eventually play chest with (or against) you during your free time here ? Our clients on the alligator case, will like to see copies of their proceedings.

Our reservations with the Maksound Plaza Hotel, from March 16 to March 22, 1997, have been confirmed. The address is Alameda Campinas, 150, near Avenida Paulista, Sao Paulo, phone 0055-11-251-2233. A small room for our meetings with the families has been reserved too. Maksound Plaza Hotel is asking your credit card number in order to secure the reservation. So please send it either to me or to the hotel directly as soon as possible, but advice me so in this last alternative. I will leave Campinas on Friday, 14, afternoon, to Rio de Janeiro, and will be at the Maksound on Sunday, 16 at evening.

RG-00031

I did not receive yet the materials from SKML I asked for from you as early as my *fax* of February 19 to you, so - in case you did not send me those materials - please, speed up with the express remittance of them to me. Also send me a summary of our *forum non conveniens* situation in California. It does not have to be a comprehensive legal study as required by the regular American standard, with full texts of precedents. A general overview, say four- or five-page long, with the mere citations of the cases would be enough. Several attorneys of the families are Law Professors, some have written legal books and/or do have experience in US system, either by doing business with other American law firms or having cases there with them - so I have to satisfy their requirements for due legal explanation.

Now, I am preparing to present in court, on behalf of the widow Mrs. Solange Godoy - who, as said you on the phone, already accepted (therefore, nothing to loose in going to the court here in order to try to make your work for her possible there) US$ 17,000.oo, giving to the UNIBANCO insurance company a receive for that amount - that petition to the judge for a so-called *order to formal acknowledge* as explained to you in my *fax* of February 11.

But now the situation is worse. The *order to formal acknowledge* is no more intended only to prevent other families to receive such a so ridiculous amount of money but mostly to try to salve Mrs. Godoy's and other families' chances to go to American courts too. As I wrote you before, your name will not be shown in this proceeding which, again, is not a case neither a controversy as such. It is just a notification, an unilateral letter without defense at all, without claim, without accusation against anybody. It is just a clarification on the interpretation of that receive, so UNIBANCO, TAM or anybody else will not explore the receive given by Mrs. Godoy's and possibly also by other families, as an obstacle or barrier to Mrs. Goody or any other family in similar situation to go to a foreign courts. This step, as I said, is also a must in order to prevent other families to give similar receives. The President of TAM has claimed that six families already gave them similar receives. VEJA said that only five families did. That means that, according to your opinion, five or six potential clients of us, so far, will be in a serious problems to have USA jurisdiction. That is what the *order to formal acknowledge* will intend to prevent.

Did you have contacts - saying, if needed, that you are doing so at the request of those I represent - with the American families of Tobolla and Andrews ? Those are two great cases for us, please !

Tomorrow (5) morning, I will be in Sao Paulo with the prominent industrialist, Mr. Foad Shaikhzadeh, who lost his father Mohamed and he wants to see you there either in New Orleans during his next trip to USA, starting this coming March 12, or at the Miami Airport, where he will be for some three hours only, before March 14. Where it will be better for you ? During our meeting on Wednesday, 5, it is well possible that he and I will call you at morning. As you may recall from my previous *fax*, he also checked your firm in Internet along with the news about the strike of American Airlines and the intervention of President Clinton.

I will call you this afternoon. Very Sincerely Yours,

RG-00032

fax  (703) 522-7905, phone (703) 522-7500 – Campinas, Brazil, March 4, 1996.

7

To: Speiser, Krause, Madole & Lear, Washington, D.C.

Dear Mr's **Stuart M. Speiser**, Gerald Lear, Arthur Ballen and Leigh Ballen:

VEJA is interested in publishing a "cover" interview with Mr. Speiser.

It would be for the VEJA edition of the week of March 16 - exactly one day before we start our meetings with the potential clients and their attorneys. It well could be our turning point: so far we all here were not able to reach families of more than twenty seven victims. But there are ninety nine ! So Mr. Speiser's interview with VEJA could reach twice or three times more families to us.

The line of the interview would be along those ideas and facts exposed in the book LAWSUIT - Nader, Onassis, Varig (Orly, Paris *and* Ivory Coast, my case, ten years without any money besides four judicial decisions against Varig), the evolution of tort in the American Jurisprudence of Aviation Law and its worldwide impact, products liability, scientific tort lawyer, the story of the firm SKL, the future, new cases, those in Latin America, like American Airline in Cali, environmental problems in Equator, Peru, Chile, Panama, and why you are sending two attorneys from his office to Brazil regarding the Fokker 100 accident of TAM, and so on.

Only VIP-very important people appears in the so called "cover" interview, a three page, fifteen question long with one picture. Bellow there are two examples: one is the future Brazilian Chief Justice (of our Supreme Court), Celso de Mello, by the way my old friend as a former Prosecutor in Sao Paulo, like me, and the other is of the key executive of Bill Gates of Microsoft, Steven Ballmer.

I urge Mr. Speiser - or somebody from the firm in his place - to take advance of this unique opportunity for our case. If accepted by you the preliminary request of VEJA for the interview, VEJA will send somebody from their New York bureau to meet with Mr. Speiser somewhere ( Texas ? ) in the beginning of this coming week for the photos and the interview. It shall not take too long.

As soon as you have Ms. Speiser's decision, please let me know to develop this plan right away. Thank you very much for your attention.

Very Sincerely Yours,

RG-00033

fax  (703) 522-7905, phone (703) 522-7500 - Campinas, Brazil, April 4, 1997.

To: Speiser, Krause, Madole & Lear, Washington, D.C.

Dear Mr. Leigh Ballen:

1) After some conversations with the families around here, we decided to ask you to postpone once again your next trip to Brazil for another week, from May 7 to May 14 instead, for a number of reasons - the most important one being the greater, larger possibility to give us down here more time, so when you come here on May 14, probably all families out of the 99 victims would be aware of our services. So far we have being able to reach only about half of this number.

2) Meanwhile, send me information about the following matters which I have talked about with your father during his last visit here and also with you on the phone:

2.a) what the answers of the insurance company to your letters saying you do represent several families ? Is the insurance company willing to make a deal - or not ? Some clients, like Mr. Foad Shaikhzadeh, who retained you as early as March 16, have called me about the progress of your promised conversations with the insurance company at this stage and I must give them a sound explanation so our credibility with potential clients will be much stronger with facts we have done already for those first clients - and they will have not to rely only my distant words for their decisions to come with us to; and

2.b) did Gene get those important details of the accident with Comte. Haymann ? They have been published in the news during the last weeks over here and Gene's acknowledge of these details will be critical for two coming events: (I) - the release of the Brazilian Report is due at any time now and we must be fully prepared to react to whatever its conclusions may be; and (II) Gene's answers to the questions the Attorney General will like to ask him during his trip here on May 14.

3) Ana Beatriz went to Rio another day to work for us and she is doing a great job in helping me to get more clients for us, including with those two American widows. I expect a good exposure with the midia soon about a judicial declaration in favor of the family from Swiss who gave complete release to TAM for those 145.000 bucks and with whom I have talked to for weeks, besides their attorneys. If this happen it will be almost certain that new families will contact me. Cross your fingers!

Finally, a great news for the "indispensable part" question on retaining the US jurisdiction - and this is official: (a) TAM will be a partner of American Airlines on common flyies among US and Brazil and (b) TAM will be flying to US regularly starting this October. Tell this to Arthur and to your legal researchers.

I will call you within a few hours to have your reply on these questions. Thanks you very much for attention. Best regards to your Dad.

Very Sincerely Yours,

RG-00034

fax (703) 522-7905, phone (703) 522-7500 - Campinas, Brazil, April 4, 1997.

To: Speiser, Krause, Madole & Lear, Washington, D.C.

Dear Mr⁵ Gerald Lear, Arthur Ballen and Leigh Ballen:

**Tomorrow, Wednesday 30**, the Report on the accident may the published by the Brazilian government: please make sure Gene has talked with Harman so Gene or you may react immediately to the Brazilian press to on the legal outcome due to the coming conclusions and with more knowledge on the causes do the tragedy. This date may be delayed but not beyond May 9 - according to other sources.

There are rumors that TAM and UNIBANK will raise their offer to release the responsible parts from 145,000 dollars up to one million dollars.

So try your best to provide me with some facts on the progress for the families who had signed the retainer-agreements one and half month ago - so we may not loose other clients for this new, larger offer to settle their cases down here in Brazil.

Congratulations: the Attorney General for the State of Sao Paulo will receive Gene on May 14, Thursday, at 10:30 AM. Because he has broad authority to investigate any accident which causes a large number of victims, this meeting is giving us an extra credibility among potential clients.

Ana Beatriz and I (or me ?) will be in Sao Paulo tomorrow, trying to have a good exposure with the midia because of the judicial declaration I will seek in favor of the family from Swiss who gave complete release to TAM for those 145,000 bucks. Bellow the signature of the widow, our new, 10th client. Please sing it or ask either Gerald or Arthur to do so and fax it back to me so I can give its copy to her tomorrow night. We shall do two more videos...one in Sao Paulo, with our very first family, Mr. Foad Shaikhzadeh 's, and another one, some 280 miles away. A few other new clients may come soon to us.

Let's be in touch. See you on May 14.

Very Sincerely Yours,

fax  (703) 522-7905, phone (703) 522-7500 - Campaigns, Brazil, May 8, 1997.

To: Speiser, Krause, Madole & Lear, Washington, D.C.

Dear Mr$^s$ Gerald Lear, Arthur Ballen and Leigh Ballen:

The meeting of Gene with the Attorney General for the State of Sao Paulo, in downtown on May 14, Thursday, at 10:30 AM, is expected to kill many doubts which have **prevented families to become our clients**.

The brunette journalist Ivana, for example, was very candid with me: she told me that her leading newspaper stopped publishing stories about our cause because, according to the Brazilian authorities, **we are wrong** since it was not Northrop Grumman's  fault, but rather Fokker's, which changed the "reverse". She also complained that Gene had to conceded that "he didn't  know many details", that "he said that he wanted to see the Brazilian Report yet" and so on - too limited, general views, with superficial approach, enable to solve many questions important to the decision     of     the     families     to     come     to     us.

She challenged me to show her the copy of the "public notice" of the Netherlands government and Fokker blaming Northrop for the accident, according to your account, and also evidences that you may have from the *black box*  showing Nortrop's fault. She then will publish all these facts in the very **first page and give us credit** for taking the right position as oppose to the Brazilian government's  which, according to her and other sources, will not blame Northrop at all in the Report.

To solve the this problem - the only one we have to get many more clients right away - I urge you again to make sure that Gene have talked with Haimann already.
**We have to convince the Attorney-General because the press will be there !**

Your first steps, due since Mr. Foad Shaikhzadeh retained us two months ago (next week), are also deeply needed: everybody are asking about our "first cases" - just like the crocodile case - and we must give them either some facts from the insurance reply or good explanation because Arthur always said deal "within 90 days" or lawsuit. I am increasing scare on the possibility of some of our clients to consider the annulment of our agreement if we do not provide them with some results soon.

Kindly find bellow our new  12$^o$ (is this number  correct  ?) client - congratulations!   Ana Beatriz is working hard indeed ! Also, the confirmation that TAM and American Airlines joint services worth US$ 10,000,000.oo, which made TAM under US jurisdiction if an "indispensable part", right ? Congratulations again ! Finally, the news in the largest Brazilian newspaper about our lawsuit to seek a judicial declaration to make clear that our client can to sue in USA, as far as Brazilian law is concerned.

From tomorrow until Sunday morning I will be at a Conference of Judges at the phone number (014) 642-1400.                         Again:  (014) 642-1400.

RG-00036

See you on the morning of Wednesday 14, next week. Have a nice trip !

Very Sincerely Yours,

RG-00037

LAW OFFICES

## SPEISER, KRAUSE, MADOLE & NOLAN

METROPOLITAN WASHINGTON, D.C. OFFICE
SPEISER, KRAUSE, MADOLE & LEM
*300 NORTH SEVENTEENTH STREET
SUITE 3*0
ROSSLYN, VIRGINIA 22208
(703) 522-7500
FAX: (703) 522-7906

CALIFORNIA OFFICE
SPEISER, KRAUSE, MADOLE & COOK
TWO PARK PLAZA, SUITE 1000
IRVINE, CALIFORNIA 92714
(714) 553-1421
FAX: (714) 655-1340

TWO GRAND CENTRAL TOWER
140 EAST 45TH STREET
34TH FLOOR
NEW YORK, NEW YORK 10017
(212) 661-0011
FAX: (212) 599-8463

TEXAS OFFICE
SPEISER, KRAUSE, MADOLE & VENDER
300 CONVENT STREET, SUITE 2090
SAN ANTONIO, TEXAS 78205-3706
(210) 220-9300
FAX: (210) 220-9313

May 23, 1997

6.° Oficial de Registro de Títulos e Documentos
e Civil da Pessoa Jurídica

Cópia arquivada
em Microfilme
sob N.° 906286



Dr. Renato Guimaraes, Jr.
Campinas,
Sao Paulo, Brazil

RE:    T.A.M. Accident - Case against Northrop Grumman

Dear Dr. Guimaraes:

This is to confirm our agreement that all participating attorneys who refer cases to us shall receive 10% of the net attorney fee.

You are authorized to tell the referring attorneys of this arrangement and our firm stands behind this commitment.

Most cordially yours,

ARTHUR E. BALLEN

AEB/rp

VIA FAX (To Maksoud Hotel - 011-55-11-253-4544)

B× L°

RG-00038

As we talked on the phone Monday, enclosed the documents I got so far. From four separate and confidential sources they are, as numbered in the first page of each of them:

(1) four pages concerning the Reverse Thrust (read "very remote"). They have been faxed to you on June 20;

fax  (703) 522-7905, phone (703) 522-7500 - Campinas, Brazil, June, 7, 1997.

To: Speiser, Krause, Madole & Lear, Washington, D.C.

Dear Mr Gerald Lear, Arthur Ballen and Leigh Ballen:

As we talked on the phone Monday, enclosed the documents I got so far. From four separate and confidential sources they are, as numbered in the first page of each of them:

(1) four pages concerning the Reverse Thrust (read "very remote"). They have been faxed to you on June 20;

(2) copies of previous TAM problems with the reverse of *other* Fokker 100 airplanes; it is unlike these internal TAM copies would ever appear in the final report;

(3) two pages of the District Attorney request for more informations from Aeronautics Final Report; and

(4) over sixty pages of four depositions at the Police Department in the very presence of the District Attorneys in charge of the case. They are: one, of an eye witness that the reverse did open at the take off; two, of the TAM Fokker 100 Commander who flied the airplane immediately before the fatal flight; three, of the Engineer who is the TAM Technical Director (see, on page 592: *the reverse was made by Grumman);* and four, of the TAM Fokker 100 Commander who flied the airplane immediately before the flight mentioned at the number "two" above. From my reading, as a layman, the four depositions are consistent with one another and I made many marks "#" by hand in the copies of each depositions right aside of their left margins of the topics I felt most important so it may facilitate the speed of your translation into English and of the due legal conclusions and your actions either in court or at least to try a deal. As for a translator with professional expertise in Brazilian Law I do recommend to you, as mentioned before to Arthur, the services of my dear and excellent former Assistant, and now a Master of Comparative Law, at the Notre Dame University, Carla Barbosa (phone 202-232-3300, fax 202-483-7726). Again:      phone            202-232-3300;            fax            202-483-7726.

As soon as you have comments mostly on the need for more documents, please let me know at once and I will try to obtain them this Thursday (se bellow) - but, of course, I can not guarantee I will have it either through the court or otherwise. Let me stress to you that *no* answer was received from you regarding my last *fax* sent last week to you where I asked your guidance on several key issues which are not clear at all to me about on how to handle the documents the Brazilian Authorities are supposed to deliver then at any time to the Federal Judge at the request of my lawsuit which was luck enough to have the merit for a prompt injunction from the court. This Thursday I will be with both the Federal and the State Judges in order to speed up the

release          of          the          Report          as          already          ordered.

Because the press will give a large coverage on the deliverance - at any time - of the documents to me at the courthouse, I must I have your reply to the questions I made to you in that fax last week. Please, answer me, giving me your guidance on those issues. In addition I may also ask Commander Millan Hayman to help me to understand these papers I am about to receive from the Judge so I could demand for more but for the right, specific ones - according to him and to your special request for legal                    purposes,                    ok                    ?

As Ana Beatriz may have told you already, the Chief of the Investigations - during their visit in Brasilia last week - told the widows' association that one relay of the reverse was made by AlliedSignal.

My correct account number is 1 202 2951 1940 - First National Bank Minnesota, P.O. Box 64799, Saint Paul, Minnesota 55164. Kindly add more US 69.63 (now 1.737,51) in the deposit since I forgot to include such a bill paid during my trip to Curitiba, Paraná State, two weeks ago, as I will show it to you soon. So, the amount as stated in my fax of June 24 is indeed, again, US$ 1.737,51. Just to make sure, the correct account number is 1 202 2951 1940 - First National Bank Minnesota, P.O. Box 64799, Saint Paul, Minnesota 55164. Thank you.

I look forward to having your guidance as soon as possible.

Very Sincerely Yours,

RG-00040

fax (703) 522-7905, phone (703) 522-7500 - Campaigns, Brazil, June, 24, 1997.

To: Speiser, Krause, Madole & Lear, Washington, D.C.

Dear Mr⁵ Gerald Lear, Arthur Ballen and Leigh Ballen:

**Great, great news !**

The best one, by far, we had up to now ! The Federal Judge **did accept** our request and issued yesterday an injunction to order the Aeronautics authority to give us (to release, but *in camera* and only to us) the Report produced by US NTSB.

If I may, I shall confess that I am very proud of this cause and of this very first decision ever made in Brazil in this kind of Aviation Law, and I would like to share this moment not only with all other dozens of lawyers who are together with us in this case but also with your firm as we all offer our very best to all the families whom we have the honor to represent and to serve in their pursuit to fair compensation.

Tomorrow we will take his order to Brasilia, our Capital. The government may appeal but the public *momentum* in the media to make our credibility stronger and to attract new clients is all done and there and it is irreversible. As you can read bellow, the Judge decided that those forty-five or so families still undecided must have access to the Report right away in order to decide to sign up, or not sign up, with your firm. So, either you may come to the Sao Paulo soon, maybe within two or three weeks, in order to pick up the Report in Court in a special hearing or, if you prefer, I can do it for you, pick it up myself and to take it to you in D.C. Anyhow, the whole press will there in this most unusual legal maneuver with the Judge and this means very large publicity and therefore more clients. Congratulations !

There is a chance that the meeting of this coming Tuesday between the Association of the widows and the Aeronautics authorities in Brasilia may result in a deal so the government would hand down the report *spontaneous* and immediately to them and in turn I would give up my injunction order due within next few days. Convincing that it will have to release the report sooner or later, the government could save his face as a *volunteer*. Of course, I would accept such a deal. And more publicity,                    more                    clients...

Several families who knew about your news to Ana Beatriz about the Northrop answer to you that the fault was of the rely, are now very insecure about the possibility of the American jurisdiction if the factory of the rely is not an American one. Could you please elaborate on this possibility so I will be able to explain the real situation                    to                    them                    ?

Were the copies I sent to you last Friday about parts of the Fokker 100 instructions by TAM enough or you and Gene Ileely still needs the whole brochure and/or to talk with Captain Milan Hayman ? How about if he could come here to assist me in case you decide not to come, so he could take a look in the coming Report and give his ok before it is taken to you or, if Gene does not approved the information

given, I refuse to receive it incomplete and demand for more, additional informations ?

The meetings in the State of Paraná in the last few days (you did receive my fax from there last Friday, don't you ?) were excellent on all accounts: we may have three new clients from there, one very good (the fellow from the Italian milk industry, Dairy Parmalat, whose attorney Arthur talked with for a long time alone, as I was left doing my first video with a family, remember ?) - plus the family of the man who had thousands of livestock in Amazons, over 1,000 employees. My expenses there were US$ 1,667.88, but included US$ 50.oo Arthur needed last time he was here. I either can send to you the receipts or to give them to you personally whenever we meet again. As I told Arthur, do not send or bring the money here, but rather deposit it in my account # 091000022 2022951194-0176, at the First Bank of Minneapolis, First Bank Place, Minneapolis, MN 55480. Thank you.

Tomorrow I will be away of Campinas, in the Sao Paulo Court, checking the declaratory lawsuit, the case for those who already made the US$ 145,000.oo deal but still want to sue in USA.

Leigh, in which day and hour our client, the family on the alligator case, will have their appointment with your office in New York next week or so, as I asked you last week?

Let's keep in touch. I hope see you soon again.

Very sincerely yours,

RG-00042

METROPOLITAN WASHINGTON, D.C. OFFICE

# SPEISER, KRAUSE, MADOLE & LEAR

NEW YORK OFFICE
SPEISER, KRAUSE, MADOLE & NOLAN
TWO GRAND CENTRAL TOWER
140 EAST 45TH STREET, 34TH FLOOR
NEW YORK, NEW YORK 10017
(212) 661-0011
FAX: (212) 953-6483

CALIFORNIA OFFICE
SPEISER, KRAUSE, MADOLE & COOK
ONE PARK PLAZA, SUITE 470
IRVINE, CALIFORNIA 92614
(714) 553-1421
FAX: (714) 553-1346

1900 NORTH SEVENTEENTH STREET
SUITE 330
ROSSLYN, VIRGINIA 22209-2900
(703) 522-7600
FAX: (703) 522-7605

DALLAS OFFICE
SPEISER, KRAUSE & MADOLE
THREE LINCOLN CENTER
5420 LBJ FREEWAY #1575
DALLAS, TEXAS 75240
(714) 404-1411
FAX: (214) 404-9797

MIAMI OFFICE
SPEISER, KRAUSE & MADOLE
MIAMI CENTER - 10TH FLOOR
201 S. BISCAYNE BOULEVARD
MIAMI, FLORIDA 33131
(305) 375-9400
FAX: (305) 375-0337

July 8, 1997

FACSIMILE TRANSMISSION

TO:        Renato Guimarães

COMPANY:

FAX #:     011 55 19 239 4315

FROM:      Leigh J. Balien

RE:        TAM Fokker air disaster of October 31, 1997

           There is 1 page including this cover sheet.

MESSAGE:  This memo is to remind you of our phone conversation today wherein you agreed to have Capt. Hayman meet with an experienced mechanic (preferably one who has worked on Fokker 100 aircraft), for the purpose of inspecting a Fokker 100 aircraft. Specifically, we ask that the mechanic determine the exact manufacturer of the relay which controls the deployment of the thrust reverser. Additionally, we would request the names of any and all manufacturers of components that are contained within the thrust reverser system (i.e. mechanisms that deploy the thrust reverser, switches that protect it from accidental deployment, wiring, etc.).

           We are willing to pay the reasonable expenses in obtaining this information and ask that you keep us up to date as to how soon this can be accomplished and how much it will cost. Thank you.

CONFIDENTIALITY NOTICE

"WARNING: Unauthorized interception of this telecopy transmission could be a violation of Federal and State laws."

The documents accompanying this telecopy transmission contain confidential information belonging to the sender which is legally privileged. The information is intended only for the intended recipients or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the content of this telecopied information is strictly prohibited. If you have received this telecopy in error, please notify us immediately by telephone to arrange for return of the original documents to us.

RG-00045

SEP-17-1997  17:16     S.K.M.&L.                                    703 522 7905    P.01/02

# SPEISER, KRAUSE, MADOLE & LEAR

**NEW YORK OFFICE**
SPEISER, KRAUSE, MADOLE & NOLAN
TWO GRAND CENTRAL TOWER
140 EAST 45TH STREET, 34TH FLOOR
NEW YORK, NEW YORK 10017
(212) 661-0011
FAX: (212) 953-8483

**1300 NORTH SEVENTEENTH STREET**
**SUITE 310**
**ROSSLYN, VIRGINIA 22209-3800**

(703) 522-7500
FAX: (703) 522-7905

**DALLAS OFFICE**
THREE LINCOLN CENTER
5430 LBJ FREEWAY # 1510
DALLAS, TEXAS 75240-2630
(972) 404-1401
FAX: (972) 404-8797

**CALIFORNIA OFFICE**
SPEISER, KRAUSE, MADOLE & COOK
ONE PARK PLAZA, SUITE 470
IRVINE, CALIFORNIA 92614
(714) 553-1421
FAX: (714) 553-1346

**MIAMI OFFICE**
SPEISER, KRAUSE & MADOLE
MIAMI CENTER - 16TH FLOOR
201 S. BISCAYNE BLVD.
MIAMI, FLORIDA 33131
(305) 379-8400
FAX: (305) 379-0337

## FACSIMILE TRANSMISSION

TO: _Renato Guimaraes_

COMPANY: _____

FAX #: _011 55 19 239 4315_

FROM: _Leigh J. Bitler_

DATE: _9/17/97_

RE: _TAM Fokker_

There is(are) _2_ page(s) including this cover sheet.

MESSAGE:   cc:  _Ana Beatriz Kopaciek (011 55 11 212 9577)_
_John J. Vecchi, Esq._
_Arthur F. Bitler, Esq._

**RG-00047**

**CONFIDENTIALITY NOTICE**

"WARNING: Unauthorized interception of this telecopy transmission could be a violation of Federal and State laws."

The document(s) accompanying this telecopy transmission contain confidential information belonging to the sender which is legally privileged. The information is intended only for the intended recipient or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited. If you have received this telecopy in error, please notify us immediately by telephone to arrange for return of the original document(s) to us.

SEP-17-1997  17:17    S.K.M.&L.    783 ․․․ ․․․    P.02/02

METROPOLITAN WASHINGTON, D.C. OFFICE

# SPEISER, KRAUSE, MADOLE & LEAR

| SPEISER, KRAUSE, MADOLE & NOLAN | 1300 NORTH SEVENTEENTH STREET, SUITE 310 | SPEISER, KRAUSE & MADOLE |
|---|---|---|
| 140 EAST 45TH STREET, 34TH FLOOR | ROSSLYN, VIRGINIA 22209-3800 | 5430 LBJ FREEWAY #1875 |
| NEW YORK, NEW YORK 10017 | | DALLAS, TEXAS 75240-2655 |
| (212) 861-0011  FAX: (212) 953-6682 | 703 522-7900 | (972) 404-1401  FAX: (972) 404-4787 |
| | FAX 703 522-7905 | |
| SPEISER, KRAUSE, MADOLE & COOK | | SPEISER, KRAUSE & MADOLE |
| ONE PARK PLAZA, SUITE 470 | | 201 SOUTH BISCAYNE BOULEVARD |
| IRVINE, CALIFORNIA 92614 | | MIAMI, FLORIDA 33131 |
| (714) 553-1421  FAX: (714) 553-1346 | | (305) 379-9400  FAX: (305) 379-0337 |

September 17, 1997

<u>**VIA FACSIMILE 011 55 19 239 4315**</u>

Renato Guimaraes
rua Francisco de Toledo, 501
Cidade Universitaria
13.083-470
Campinas, SP - Brazil

    RE:    **TAM Fokker disaster of October 31, 1996 in Sao Paulo, Brazil
           Our file #729.000**

Dear Renato:

    Please be advised that California Code of Civil Procedure § 340(3) provides a time limitation of one year from the date of the accident in which to initiate a lawsuit concerning the TAM disaster. Therefore, please note that we will be unable to accept new cases regarding this disaster after October 20, 1997.

    Please advise if any potential families would like to speak to us prior to that time.

    Thank you very much.

        Sincerely,

        SPEISER KRAUSE

        LEIGH J. BALLEN

/js

cc:   Ana Beatriz Kopacek (via facsimile 011 55 11 212 9577)
     John J. Veth, Esq.
     Arthur E. Ballen, Esq.

TOTAL P.02

**RG-00048**

*fax* (703) 522-7905, phone (703) 522-7500 - Campinas, Brazil, December 16, 1997.

To: Speiser, Krause, Madole & Lear, Washington, D.C.

Dear Mr° Arthur Ballen, Leigh Ballen, Gerald R. Lear and John J. Veth, Esq.:

Former Chief Supreme Court in Brazil, Sydney Sanches, agreed in receiving from you as soon as possible a formal *fax* confirming my invitation made yesterday to him be available in Santa Ana Courthouse on February 5 to show that in Brazil such a TAM case must last at least ten years and much more if foreign companies, including Fokker, are the defenders also. Within a few hours his secretary will provide me with his *fax* number in the Supreme Court, in Brasília, and then I will call you at once to discussion the terms of the invitation below as it looks like into English.

Thus, I urge you please to send him immediately - ( I am leaving Brazil tomorrow head to USA ) - after, of course, you receive from me his *fax* number and also agreed with the invitation as follows this *fax* bellow.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*

SDK ... and so on... ... 15, Dezembro, 1997.

Excelentíssimo Senhor
Ministro **Sydney Sanches**,
Supremo Tribunal Federal
Brasília, DF
Brasil.

Excelentíssimo Senhor Ministro:

Temos a honra de convidar Vossa Excelência para considerar a possibilidade de, no dia 5 de fevereiro próximo, poder comparecer em Los Angeles, na Califórnia, a fim de explicar as razões pela quais no Brasil, devido ao excesso de recursos disponíveis na legislação em vigor, uma ação indenizatória envolvendo empresas que não têm representantes para receber citações no Brasil, podem durante até mais de dez anos para ser a eventual condenação ser efetivamente paga por força de                                                                    execução judicial.

Claro que Vossa Excelência, se desejar, poderá nos esclarecer sobre quaisquer outros aspectos - sempre em tese - dessa matéria de Direito Comparado: a sobrecarga de serviços no Poder Judiciário do Brasil. Obviamente, nenhum ponto sobre qualquer caso concreto ou processo, atual ou futuro, será objeto de questionamento.

Se Vossa Excelência também desejar, poderemos, de preferência após o dia 22 de janeiro, comparecer em Brasília para ter a honra de pessoalmente explicar a Vossa Excelência os procedimentos da *Superior Court of the State of California*.

Agradecemos a consideração de Vossa Excelência para este pedido de fortalecimento da prática do Direito Internacional. Nosso colega no Brasil, Renato Guimarães Jr. (fone 019-239-2921), que embarca amanhã para os Estados Unidos, está à disposição de Vossa Excelência para esclarecer quaisquer outros detalhes que—

RG-00050

interessem.

Atenciosamente,
S & K

RG-00051

## PONTIFÍCI  UNIVERSIDADE CATÓLICA D  ÃO PAULO

### Affidavit of Dr. Nelson Nery

I, Nelson Nery Junior, a resident of São Paulo, Brazil, and over the age of eighteen, am fully competent to make this affidavit. I have personal knowledge of the facts and law stated herein, and they are all true and correct to the best of my knowledge. I hereby state the following under oath and in light of the penalties for perjury in Brazil and the United States of America:

### Curriculum Vitae

1. I am the Head Professor of Civil Procedure Law, and a Professor of Civil Law and Consumer Law, at the Law School of the Catholic University of São Paulo (PUC-SP). I have a Masters degree, a Doctorate degree (PhD), and a Doctorate of Law (PhD) at the Friedrich-University of Erlangen-Nürnberg, Germany.

2. I have been a Public Prosecutor since December 1, 1978, and became a High Procurator of Justice of the Public Ministry ("Ministério Público") of the State of São Paulo on August 13th, 1987. I serve as High Procurator of Justice in the section of Childhood and Youth of the Supreme Court of the State of São Paulo (the highest court of the state and the second of four levels of courts in Brazil).

3. I am a member of the São Paulo Law Academy, founder and director of the Brazilian Institute on Policy and Consumer Law (BRASILCON), active member of the Brazilian Institute of Procedural Law, active member of the Associación Ibero-Americana de Derecho Procesal (Ibero-American Association on Procedural Law), and an active member of the Wissenschaftliche Vereinigung für Internationales Verfahrensrecht EV (Munich, Germany). I am a member of the Managing Council

RG-00052

RUA MONTE ALEGRE, 984 - PERDIZES - CEP 05014-001 - TEL. (011) 263-0311 - SÃO PAULO
JUN-11-98 12:15 FROM:Speiser Krause Law Firm    ID:714 559 1948    PAGE   3/5

## PONTIFÍCIA UNIVERSIDADE CATÓLICA DE SÃO PAULO

of the Consumer Law Review (published by the Ed. Revista dos Tribunais, São Paulo).

4. In 1996, I was nominated both by the Public Ministry (among six candidates) and by the Superior Tribunal of Justice of Brazil (STJ) (among three candidates), for the position of Justice of the Federal Superior Court of Brazil.

5. I am a member of the Commission of Jurists, which authored a bill which was enacted as the Consumer Protection Code of 1990, Law # 8078 of September 12, 1990.

6. I have several books and papers published, notably the Brazilian Civil Procedure Code Commented (3rd Edition, Ed. Revista dos Tribunais, São Paulo, 1997), Brazilian Code of Defense of the Consumer - Commented by the Authors of the Anteprojeto (5th Edition, Ed. Forense Universitária, Rio de Janeiro, 1997), Appeals in the Civil Procedure Laws (4th Edition, Ed. RT, SP, 1997), Recent Developments in Civil Procedure (2nd Edition, Ed. RT, SP, 1996).

7. I provided a sworn affidavit on November 8, 1996, which was filed in the Superior Court of California, Los Angeles County, before Judge John H. Sandoz, (Dept. 6, Case No. BD-244326). The matter was entitled Alfred Harrison Dolder v. Marina Ludemann. The position I presented in the affidavit was adopted by the court.

8. I am a frequent lecturer on matters of law in Brazil.

## Misstatements In Northrop Grumman's Affidavit

9. Exhibit C of Defendant's Affidavit of José Theodoro Alves de Araujo cites to

RG-00053

JUN-11-98  12:18 FROM Speiser Krause Law Firm   ID:714 553 1348  CEP 05014-001 · TEL: (011) 263-0211 · SÃO PAULO · SP
PONTIFICA  NIVERSIDADE CATÓLICA DE  AO PAULO                           PAGE   4/8

outdated law in providing further reference to a section of the Brazilian code.

10. Footnote 4 of Article 159, attached as Exhibit C to Araújo's affidavit, cites for
authority to the *1966* Brazilian law concerning aviation law known as "Código
Brasileiro do Ar". This "Código Brasileiro do Ar" has long since been abolished.
The current Brazilian Code of Aeronautics was enacted on December 15, 1986,
expressly replacing the previous 1966 statute. (A true and correct copy of the
section of the current Brazilian Code of Aeronautics (1986), which replaced the
1966 statute, is attached hereto as Exhibit A.)

### Excessive Court Delay in Brazil

11. From the time that actions involving an air crash are first filed in Brazil, until final
resolution, is typically a **minimum of ten years**. I estimate that the time elapsed for
resolution of this case will be in excess of ten years.

### Jurisdiction of the Brazilian Courts Over Northrop Grumman

12. Article 88 of the Brazilian Code of Civil Procedure (CPC), as cited by Northrop
Grumman jurisdiction (a true and correct copy of which is attached hereto as
Exhibit B), grants the courts of Brazil only the *discretionary* right to adjudicate
matters concerning the liability of Northrop Grumman. Moreover, Article 88 is
intended to serve solely as an empowerment of the Plaintiff in choosing a proper
place to litigate, and does not act as a grant of jurisdiction over all matters

13. Contrarily, CPC Article 89 lists those categories where the court retains non-
discretionary, mandatory jurisdiction (a true and correct copy of which is attached

-3-

RG-00054

hereto as Exhibit C). An action against Northrop Grumman cannot be sustained under CPC Article 89.

14. I am a High Procurator of Justice of the Public Ministry (Attorney General's Office) for the São Paulo State Supreme Court (the highest court of the state and the second of four levels in Brazil), a position I have held for eleven years. A High Procurator is an officer of the Court, whose function is to protect the interests of the public, and specifically the interests of minors (those persons under the age of eighteen).

15. Article 82 of the CPC (a true and correct copy is attached as Exhibit D) states that "The Public Attorney is competent to participate in causes: I – in which there are interests of minors". The Federal Constitution of Brazil, Article 127 (a true and correct copy is attached as Exhibit E) states that "The Public Ministry (Attorney General's Office) is a permanent legal institution, essential to the Judiciary function of the country, responsible for the defense of the judicial order, for the defense of the democratic system and for the social and indispensable interests of the citizen".

16. Pursuant to Federal Constitution Article 127 and CPC 82, the High Procurator has the legal function and obligation to protect the interests of minors. These public officers appear before the Court, during all stages of the proceeding, so as to ensure that the interests of minors are being protected to the greatest extent possible in light of the facts of the case.

17. As a High Procurator, I can affirm that it is almost certain that an official objection will be filed by the Attorney General's Office to Northrop Grumman's submission to the Brazilian legal system.

RG-00055

PONTIFICIA UNIVERSIDADE CATOLICA DE SAO PAULO

18. There are several grounds for my expectation that a formal objection by the Attorney General's Office will be filed:

a) First is the concern, regardless of any affirmations made by Northrop Grumman, that any judgments rendered in this matter, after the appellate process has ended, may remain uncollectable. This is due to Northrop Grumman lacking any presence or assets in Brazil.

b) Second is the great trial delay which exists in the Brazilian Court system. In light of the minimal ten year process to reach a trial engendered by the Brazilian Court system (and additional delay concerning their right/ability to stay in the Brazilian Courts as addressed below), most of the minors who lost a parent will no longer be so at the outcome of any action maintained in Brazil. Allowing this great delay to hinder minors (who would otherwise have access to a greatly accelerated trial time in the United States) is a matter that would weigh very heavily with the Attorney General's Office, as well as the Brazilian trial court judge.

19. Further, any party to the action would have the same right to object to Northrop Grumman's submission to the Brazilian Court, on the grounds previously stated. It can be expected that many families will object to Northrop's submission to the Brazilian courts on these and other grounds.

20. Procedurally, the trial court will be obligated to hear argument on the issue of whether it should allow Northrop Grumman to remain in the case. Once raised, this issue will be appealable all the way to the Supreme Court of Brazil. It can be expected to take 4-5 years to obtain a determination from the first level of appeal (the Sao Paulo State Supreme Court). Once decided, if an appeal to the

RG-00056

next level is sought, a determination by the next appellate level (Federal Superior
Court) would take approximately 1-3 additional years beyond the 4–5 years
previously stated. Further appeal, to the Supreme Court of Brazil, would take
several additional years.

21. Per Section 496 of the CPC, it is discretionary as to whether the case would be
halted altogether while awaiting a determination as to Northrop Grumman's right to
be in the Brazilian case.

22. Ultimately, this particular jurisdictional issue might easily require as much as
seven or more years simply to determine whether Northrop Grumman is a
proper party to the lawsuit. This is in addition to the ten years or more which
a case of this complexity will last in the Brazilian Courts. This could extend the
minimal ten year process of receiving an ultimate determination to seventeen
years or more.

**Standard of Proof in Brazil is Gross Negligence or the Higher Standard of
"Dollus", and Strict Product Liability Does Not Exist for Aviation Disasters**

23. Strict Product Liability for aviation disasters does not exist in Brazil. The
Consumer Protection Code of 1990, which provides for strict product liability in
actions involving a product's manufacture, did not abolish the exclusive provisions
of the Brazilian Code of Aeronautics (1986).

24. Article 248 of the Brazilian Code of Aeronautics (1986) (a true and correct copy of
which is attached hereto as Exhibit F) requires Plaintiffs to prove gross negligence
against Northrop Grumman in order to recover greater than approximately

RG-00057

$15,000.00 USD (this limitation is per article 257 of the Brazilian Code of Aeronautics).

25. Per paragraphs 1 and 2 of Article 248 of the Brazilian Code of Aeronautics, if Northrop Grumman was found to be "an airline or it's agent", a standard higher than gross negligence would apply, and is known as "dollus". "Dollus" would require Plaintiffs to prove that the negligence of Northrop Grumman was intentional or the equivalent.

26. Though Article 159 of the Civil Code (Exhibit C to the Affidavit of Araújo) allows recovery based on normal negligence, it is doubtful that the courts will apply this standard in this case. The Brazilian Code of Aeronautics (1986) is most certainly an exclusive remedy in this case, and would require Plaintiffs to prove gross negligence or "dollus" by Northrop Grumman.

### No Discovery in Brazil

27. There exists no discovery process in Brazil. Were Northrop Grumman to submit to the Brazilian Court, there would be no practicable way to obtain information from them so as to prove their liability for the disaster. Parties are responsible for gathering evidence to prove their cases from third-parties, without the assistance of the Courts of Brazil or the Brazilian Code of Civil Procedure. Were Northrop Grumman allowed to litigate in Brazil, Plaintiffs would lack any process for obtaining documentation and other proofs essential to proving their case against them.

'98 12 19 FROM Speiser Krause Law Firm     ID 714 553 1346     PAGE 8/8

PONTIFÍCIA UNIVERSIDADE CATÓLICA DE SÃO PAULO

28. In Brazil, only non-party witnesses are subject to penalties for perjury. Party witnesses in a civil case (e.g. Northrop Grumman employees) would not be subject to criminal penalty for answering falsely any questions posed to them. Article 342 of the Brazilian Criminal Code lists those persons subject to criminal punishment for perjury, and party witnesses are exempted (a true and correct copy of Article 342 of the Brazilian Criminal Code is attached hereto as Exhibit G).

29. Any agreement by Northrop Grumman to provide necessary evidence in its possession would be unilateral, non-reviewable, and unenforceable. Where much of the proof exists solely in the hands of the product manufacturer, proving gross negligence (or especially "dollus") of a product manufacturer <u>not subject to any discovery obligations</u> would prove impossible.

The foregoing was rendered this 4th day of February, 1998, at São Paulo, Brazil. I declare under penalty of perjury before the laws of the State of California that the foregoing is true and correct.



Prof. Dr. NELSON NERY JUNIOR



Sinceramente,

SPEISER KRAUSE

APR-08 1998  10:03        S.K.M.B.                    703 522 7905   P.01/03

# SPEISER KRAUSE
### A PROFESSIONAL CORPORATION

| | | |
|---|---|---|
| 140 EAST 45TH ST., 34TH FLOOR<br>NEW YORK, NEW YORK 10017<br>(212) 661-0011<br>FAX: (212) 953-6483 | 3300 CLARENDON BLVD., SUITE 306<br>ARLINGTON, VIRGINIA 22201<br>(703) 522-7500<br>FAX: (703) 522-7905 | 5430 LBJ FREEWAY #1575<br>DALLAS, TEXAS 75240<br>(972) 404-1401<br>FAX: (972) 404-9797 |
| ONE PARK PLAZA, SUITE 470<br>IRVINE, CALIFORNIA 92614<br>(714) 553-1401<br>FAX: (714) 553-1346 | | 201 SOUTH BISCAYNE BOULEVARD<br>MIAMI, FLORIDA 33131<br>(305) 375-9400<br>FAX: (305) 375-0337 |

## FACSIMILE TRANSMISSION

TO:        Renata

COMPANY:

FAX #:     011 55 19 289 4315

FROM:      Julie

RE:

There is(are) 3 pages including this cover sheet.

MESSAGE:   Please check this final version

           Thanks!

CONFIDENTIALITY NOTICE

"WARNING: Unauthorized interception of this telephony transmission could be a violation of Federal and State laws."

The document(s) accompanying this facsimile transmission sheet contain confidential information belonging to the sender which is legally privileged. The information is intended only for the intended recipient or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this telephoned information is strictly prohibited. If you have received this facsimile in error, please immediately notify us by telephone to arrange for return of the documents.

RG-00060

APR-09 1998  15:03    S.K.M.GL.    703 522 7905    P.02/03

Rosalyn, 13 de Abril de 1998

Aos Membros das Famílias de Vôo-402 TAM

REF:  Fokker 100 TAM - Desastre Aéreo Ocorrido em
31 de Outubro de 1996 em São Paulo, Brasil

Caros Familiares:

Gostaríamos de atualizá-los sobre a situação de seu caso.

Como é de seu conhecimento, nós estamos nos empenhando em procurar estabelecer propostas amigáveis para um acordo entre as várias empresas envolvidas no acidente. Os progressos têm ocorrido mais lentamente do que o esperado, mas os negociadores das seguradoras em Londres, avisaram que estão tentando trazer todas as partes envolvidas à mesa de negociação. Até agora, não recebemos ofertas para os casos. O processo foi complicado em parte pelo relacionamento entre a TAM e a Fokker e pela presença de um acordo de indenização entre eles, pelo qual a TAM pode ser responsabilizada a pagar parte da indenização da responsabilidade da Fokker, além de qualquer outra indenização pela qual a TAM seja responsável independentemente.

Qualquer que seja o resultado dessas negociações, em 27 de Maio de 1998, a Corte Superior de Estado da Califórnia, no Condado de Orange, ouvirá, de nossa empresa, e dos advogados da Northrop Grumman, os argumentos referentes à questão de *forum non conveniens* (jurisdição da corte para reter os casos nos USA). A decisão da corte é esperada para o final daquela audiência (em 27 de Maio de 1998), ou no prazo de 5 (cinco) dias após esta audiência.

Nós continuamos confiantes em nossas chances de ganharmos este caso, e de mantê-lo na corte da Califórnia. Embora tenhamos outros recursos legais para continuarmos com os processos caso a corte da Califórnia não os aceite (inclusive processarmos as mesmas empresas em New York), isto não os impedirá de iniciarem seus processos contra a TAM no Brasil.

Por favor, fiquem seguros de que nós estamos cientes dos prazos de prescrições no Brasil, e da necessidade de vocês iniciarem suas ações contra a TAM até 30 de outubro deste ano. Assim que recebermos a decisão da corte da Califórnia, nós imediatamente nos reuniremos com todas as famílias para discutir, pessoalmente, o futuro do processo nos Estados Unidos. Entretanto, independentemente dos resultados, todas as famílias estarão livres para iniciar suas ações contra a TAM após a publicação da decisão da Corte da Califórnia.

Como sempre, nós os manteremos informados do desenvolvimento do caso. Por favor não exitem em nos contatar através do Renato Guimarães, Beatriz Kopacek, ou diretamente nos Estados Unidos, pelos telefones (703) 522 75 00, ou fax (703) 522 79 05.

Obrigado pela contínua confiança depositada em nossa empresa.

09

APR-09-1998  15:04    S.K.M.GL.    703 522 7905    P.03/03

RG-00061

To: **Speiser Krause** - *fax* (703) 522-7905 and (714) 523-1346 - Feb. 7, 1998. RE: *TAM*

Dear Mr$^{s}$ Leigh Ballen, Arthur Ballen, Gerald R. Lear, John J. Veth and J. Cook, Esq.:

Regarding the call Leigh gave me last night, the most efficient way to explain to our clients the current phase we are in now, is by far this: (1) I will hold the meeting this Friday by myself alone and, at the end of my presentation, I will give them, for the first time, the good news - (2) yes, the Ballens will come here *ASAP* to explain to all of you the whole negotiation process now under way with the insurers. And I will not, of course, elaborate anything on the matter simply because *"it did come up after I left US and you are entitled to have, as always, all reliable informations directly from our experts on it."*

Compelling reasons for this two-steps (two well connected meetings) approach: (a) all our clients and/or attorneys are very enthusiastic about my work in USA and on the *"coming"* hearing of Feb. 18; (b) they are anxious to know from me everything I learned and did on the FNC motion - an issue which will be always in their mind throughout and after the negotiation process; and (c) they asked for and I did promise them, among other things: the showing of the very copies of all cases Northrop presented to the Judge, plus those I found out under J. Veth's guidance, plus the pictures I took in Irvine office, outside and inside the Court, and of Northrop; the official profile of the Judge, my positive impression on how he handles the parties and attorneys (something very sensitive for the windows and attorneys in Brazil), my long night hours of research at the libraries after the office closed, my trip to Eugene, Oregon, and San Diego, to discuss with my Varig clients the two affidavits to J. Vert *(did you already received them, John ?- do not forget: my review can check any mistake they may have done regarding the Varig case and the US Ambassador's situation on it)*, the contacts with the American Nun and Attorney Michael Nolan, the Prof. Nery's and other scholars affidavits; how the Northrop motion mistakes were discovered; the J. Cook's saying that eventually I can help SK in a future accident in all Latin America and - to make a long story short - all what their Brazilian attorney made for them under SK guidance and as far as *their* law are related to the FNC motion.

You see, it is not an *ego* question: it is a key opportunity to keep our clients and attorneys still tier, even though they never were more united around SK and myself. There is not the slightest sign they would dare to fire us, mostly at this time: they are happier and more confident with us than ever before. And just let me tell you that, according to the Brazilian Law, which, besides the US one, also does govern our retainer letters (they were signed here, my name is there, the accident was here, they live here, and so on) no client can fire (a very extreme step and very rare in Civil Law countries) his/her attorney without breaking such a contract - except if an extremely serious malpractice is shown.

Also, they are understandably demanding my personal impression on the SK fellows in Irvine, particularly on J. Veth - questions, among other, they would not pose to the Ballens, neither to me in front of them because they would be intimidated or surely will suspect that my answers would then be less than candid, if given in front of you.

So, if the Ballens come here this Friday, all the values they may get from the hard and beautiful works resumed at "c", above, will be zero. And the Ballens can not

describe them at all (1) in details or (2) with the genuine, local, native feelings. On the other hand, my introduction this Friday to their near trip will stress its importance. If, on the contrary on what I have done many times before, I have no space to speak with them alone (of course I can not compete if the Ballens are here), our ability to hold the group together here if we lose the FNC motion will be largely eroded: they will wonder why I did not tell them before about the deal. They may well even speculate why you did not thrust me the simple duty to announce - as a *grand finale* of my presentation - something so simple like this: *"and now, dear clients and fellow attorneys, I am please to announce to all of you - but it is imperative to your own interest that we all keep absolute silence to anybody else on the following announcement - that SK just requested me that they will be here soon to explain to you all why and how the Feb. 4 hearing on FNC has being, with the approval of the very Judge McDonald, postponed for 90 conditional days because of - and this is the beautiful opportunity we all have looked for so long time - an agreement SK was able to reach with Northrop's insures in order to open a discussion, already under way, for a possible deal, assuming you would agree afterward with its terms. I am sorry but I can not go any further in this new, turning-point phase, but they will be here ASAP to give you full and detailed information on your rights whatsoever. Before that, if you have any urgent question which can not wait for them, please refer it to Leigh Ballen directly or through Ana Beatriz or me. But do not press them: they will be* here *soon."*

With all these in mind, it would the precipitate the Ballens coming this Friday for this would exclude our clients of the great legal experience they could otherwise share with me, an lasting accomplished which in the near future can be proven very important to us, let alone a court order I may have blocking Northrop to come here, my *fax* of Jan 30. Also to strength you in the deal talks, the TAM-American-Miami agreement, bellow.

In short, my strong suggestion on the need of two meetings are a balancing, sound strategic which cover most of the delicate angles of this cross-cultural communication task, sometimes hidden, or camouflaged by clues hard to be detected by those who still lack deep insights on how a Brazilian reacts in such emotional and legal new strange situation - what, of course, as you know much better, it is all typical of each society.

Thus, while I will report them on what we have done in those 35 days I expended with you - looking back to the past - the Ballens instead will make them looking forward on what the future alternatives are waiting for them in the settlement process. Neither the Ballens' afterward, exclusive meeting must be immediate: take your time, if you so wish, so that when you came you would have, say, some solid numbers to offer to them. Of course I will reassume them that no deal will be made without their written permission.

J. Cook: would you please advance me if California law would permit recover for suffering (spiritual damage), in addition to material loss of the 12 homes ? In Brazil they would be entitled to in the theory that the space where a family lives is its special place in the university, where happy and sad moments were experimented along the decades. Also different of the Americans, most Brazilians, and particularly these people, leave the whole life under on single roof, and sometimes for more than one generations - big values.

J. Veth: after we made a good use (like showing it to the Judge) of the Prof. Nery's book sent to you, please return it to me with another nice words from all of

RG-00063

you from Irvine with both his and my names on it: we both are proud to have worked
with                                                                                          SK.

Thank you for your understanding. I look forward to hearing from you.

Very Sincerely Yours,

RG-00064

# RENATO GUIMARÃES JR.

Doctor by USP, Professor of UNICAMP
*Master of Comparative Law, GWU,* IASP
Phones (19) 289-2921, 289-8989 - 289-8990 fax 289-4315 - rua Francisco de Toledo, 511
Cidade Universitária - 13.083-470, Campinas, SP, BRAZIL

Dear Mrs Leigh Ballen, Arthur Ballen, Gerald R. Lear, John J. Veth and Juanita, Esq.:

On May 27 I will be some *two or three seconds away* of the following phones:

(019) 289-2921 – 289-8989 and 289-8990, plus

*fax* (019) 289-8990 and 289-4345, and

Cellular (019) 994-2588

Please, make sure to explain to me the outcome and SK position afterward *before* you transmit it to Ana Beatriz (Duda) or any of our clients, even if they or their attorneys call you directly, from anywhere – except, of course, the family of David Andrews, of San Jose, CA. This order of calls will **prevent a lot of misunderstandings** on the legal consequences, as wrong or unwise informations may spread around – in minutes - with potential risk of departure among such a large group under strong emotional stress and expectations. Thank you very much.

Leigh: you letter for the impeachment is great. Your answer on the Commander 690 crash was sent to the lawyers of the family. Yes, they want your information on this model aircraft. The final copy of the Plaintiff's Opposition to Defendant's FNC Motion was *not* received "attached" to your fax. Did you send it by mail to me?

Kindly find bellow the expenses I had to pay to *DHL* and other services to copy and to send on May 20 new documentation and the video for possible use of it in court by J. Veth - the new package of 200 pages and the video cassette taped with the Aeronautics animation of the crash, handed down by the government to the Court in one of my lawsuits. They are: xerox R$ 43,35. Video cassete R$ 100,oo; lab copies of the video, R$ 100,oo, and DHL, R$ 88,oo: **total R$ 331,35**. The lab and DHL receipts were not given to me yet, the lab one because the editing will take sometime yet. The two others are bellow and all originals will be send to you by mail.

Please, ask Julie to deposit this total together with the last expenses still pending, I guess, because I had no information about it from the bank yet.

From now on SK must be available to possible calls from the Brazilian press.

Let's be united, as we say in Brazil, because many, many will be together with J. Veth and Judge McDonald, praying to the Lord for justice. Give them a hell !

Very Sincerely Yours,

*On May 25, 1998.*

RG-00066

Dear Joseph Cook:

Leigh Ballen told me last Friday that you too will be here this week to meet with the families, their attorneys and others concerned people about the TAM case.

Welcome to Brazil, but kindly take with you one copy of both the full text of our Response to the FNC motion and of Judge McDonald's decision on this case

Thank you very much. Have a nice trip.

Very Sincerely Yours,

Renato Guimarães Jr.

Camp.,
Brazil, June First, '98.

EXHIBIT
77- ID
10/12/05   CA

JUN-05-1998  17:29          SPEISER KRAUSE               703 522 7500    P.04/05

# SPEISER KRAUSE
A PROFESSIONAL CORPORATION

140 EAST 45TH STREET, 34TH FLOOR
NEW YORK, NEW YORK 10017
(212) 661-0011
FAX (212) 661-0442

ONE PARK PLAZA, SUITE 470
IRVINE, CALIFORNIA 92614
(714) 955-1167
FAX (714) 955-1046

2300 CLARENDON BOULEVARD
SUITE 306
ARLINGTON, VIRGINIA 22201

(703) 522-7500
Fax: (703) 522-7905

9400 LBJ FREEWAY, SUITE 1575
DALLAS, TEXAS 75240
(972) 404-1401
FAX (972) 404-9797

201 SOUTH BISCAYNE BOULEVARD
MIAMI, FLORIDA 33131
(305) 373-8400
FAX (305) 373-6937

469
91

June 5, 1998

Family Members of TAM Flight 402

RE:   TAM - Fokker 100 Disaster of October 31, 1996 in
      Sao Paulo, Brazil

Dear Family Members:

We are writing to explain to you the outcome of the May 27, 1998 hearing in the California Court. The defendants, Northrop Grumman and Teleflex, had asked the Court to dismiss all of the cases brought by Brazilian claimants, claiming that those cases should be heard in Brazil. The Court refused the requests made by Northrop Grumman and Teleflex and instead retained jurisdiction over the cases. However, the Court ordered that proceedings against the defendants Northrop and Teleflex be stayed[1] and ordered the plaintiffs to commence lawsuits against these two defendants in the Brazilian courts.

The Court further ordered a review of the progress in Brazil in 120 days. Our expectation is that if there has been inadequate progress in Brazil, the California judge will lift the Stay, and permit the litigation to proceed in the United States.

We will be working with Brazilian lawyers to initiate proceedings in Brazil. Based upon what we have been advised, we expect the proceedings in Brazil to be too slow and too limited to satisfy the expectations of the California judge. We are optimistic that ultimately the cases will proceed against the American defendants in California.

Arthur Ballen and Joseph T. Cook, of our California office, will be in Sao Paulo this Friday, June 5, 1998 to meet with families. They will also seek to meet with Brazilian lawyers who represent each family, so as to ensure that the lawsuits filed in Brazil properly include the United States defendants. If you are unable to attend the Sao Paulo meeting, we will make other arrangements in order to provide everyone with information regarding our plan for the coordination of the Brazilian and U.S. court filings.

---

[1] In the American court system, a Stay is an action by a Court to suspend or discontinue proceedings for a fixed period of time, with the potential that once the fixed period of time has ended, the proceedings may re-commence. It is a temporary measure, and during the time of the Stay, the parties are not permitted to conduct normal court procedures.

RG-00068

FROM : Guimaraes Jr          PHONE NO. : 55 019 2594315          JUL. 20 1998 10:54AM P2
JUN-05-1998  17:30          SPEISER KRAUSE                      703 522 7905   P.02/02

June 5, 1998
Page 2

   As always, we will keep you informed of all developments in the case. Please
do not hesitate to contact us through Renato Guimaraes, Beatriz Kopacek, or directly to the
United States at (703) 522-7500, or by fax to (703) 522-7905.

   Thank you for your continuing confidence in our firm.

                    Sincerely,

                    SPEISER KRAUSE

                    GERARD R. LEAR

/js

                                                            TOTAL P.05

RG-00069

July 17, 1998.

*To:*    *Seiser Krause - Attention to:* Joseph Cook, Arthur Ballen and associates.
*Re:*    Update of Northrop case in Brazil and coming *TAM* case in Brazil.

Now that the Northrop case in Brazil is under control, there is another pressing question to be solved together with *SK* and all the families. As I wrote to the families and their attorneys back in January, when I was in Irvine, *SK* would remain working with them in Brazil, against *TAM* in case the FNC motion were granted.

At that time T. Cook (or John Veth, I do not recall well whom exactly, because we discussed the issue several times) told me that it was at that point a little too premature to *SK* to propose its fee over the award to be recovered against *TAM* in Brazil for its job as a consultant specialist. In this past June, during the next to the last trip of Arthur to Brazil, I returned to the same issue before *SK*, but he just answered me that he had no idea either on how to handle it.

Now that we are with danger getting closer to the two-year statute of limitation in Brazil, and families and their attorneys are increasingly demanding me for a proposal, I must ask your decision on your coming contingency fee for *SK* job here in the lawsuit against *TAM*. Kindly ready a news from today about the another ex-wife of our family client Gasparian against *TAM*. Her attorney (Dr$^a$ Mansur, her name is on the newspaper bellow) also just called on the coming lawsuit against *TAM* here. We shall protect our clients against this kind of cheap competitors. Our client Elizabeth Janstein just asked me for a personal meeting tomorrow in São Paulo on this same issue. And President Sandra Assalli and the attorney for the people on the ground who lost their homes, Dr$^a$ Isabel, will both appear today in the most influential TV-Morning Show in the country saying that they, yes, are prepared to sue *TAM* here soon and together. Ms. Assalli just asked me how the families shall re-negotiate those old fee contracts they signed up with their attorneys well before knowing us. She too wants to hold soon a large meeting with the families first and latter with their attorneys to discuss this issue. They would love having some of you in one of this opportunity updating everyone about the news developments in LA and London.

Anyway, I must offer them very, very soon our conditions in order to keep the whole group together here too against *TAM* and with us, before other lawyer's approaches and attitudes.

Let me give you a brief picture on the attorneys' fees in our case here, against *TAM*. As you recall, it was, as always, a very hot issue present in two key opportunities with us: (1) when *SK* had to give to about half of all lawyers 10% of our fee, and now (2) when we had a hard time to put them all in the Strenger's action. Of course, the never expressed real fear of those lawyers who strongly resisted the Strenger action was, behind the so-called *ethic* excuses, their concern on the fees.

Thus, please consider the several situations: there are many lawyers, both entitled and *not* entitled to the 10% of our fee, whom already have been paid, or will be paid, by the families for the *TAM* case here, on different amounts and criteria, no-matter what they will do or have been done. About half our clients do not have other lawyers, for recovery in Brazil, but me. Some of these fees cover also the work for the estate. And a few do have other American law firms, besides you and me. And so on. Each case is one case. As we say here it is a real "bag of cats" – by the way, don't you have such an expression for a real *confusion*, a caos situation?

RG-00082

I have told them that each family and its attorneys must solve their own problem, so we can continue with *SK*. I am also prepared to write them that my work for the coming lawsuit for recovery from *TAM* here will be included in my contract with *SK* – as it has already been included as far as my seven preparatory lawsuits for the final report, against *TAM*, Aeronautic, UNIBANCO, *Lloyd's*, etc, are related.

Please, be aware that the percentage fee in Brazil varies grandly. In a hard and unique case 33,3% or 25% are reasonable. But in a litigation of many parties together, the amount are much lower, say, 10% or even less, if there are lots of plaintiffs. In this specific case, I am aware of several contracted on 10%, but remember that many families are already commited to their own lawyers.

Also, as I have stressed before, you and I shall reach a new, fair, reasonable division for each other out of our fee from the *TAM* case here because, of course, this lawsuit will be on my shoulders for years to come around the courts in Brazil and since you may not even be called to help us with your aeronautics skills at all, since we all in Brazil do expect that the Brazilian Court we will not require from us the burden of proof of any wrongdoing, either on the part of *TAM*, Faker, Northrop or anybody else, since that in these four individual, previous cases here the court already found *TAM* guilt without fault, once the Courts have continuously decided for the Consumer, strict, no-fault Liability.

To make the whole matter simpler, I am ask you, if I may, two numbers only: (1) how much to you want for your work as a consultant firm here against *TAM*; and (2) out of the above (1) percentage, how much to you deem would be a fair share for my work here as the attorney responsible for the said lawsuit against *TAM* in Brazil.

If you and I can agree on these two numbers then I will write to the families saying that my fee will be zero for them, since my fee will be, also in the *TAM* case in Brazil, out of *SK's* fee as a consultant. If this arrangement is *ok* with you, this delicate matter of fees in Brazil will be clear to help us to keep our clients together.

Today I will go to São Paulo. Yesterday D^a Isabel presented her opposition on behalf of our potential clients from the ground and told me that Judge Russo will be the one who will render down the decision this Monday. She also confirmed that he looks nice but said something about a sovereignty issue. I do not know why he came up with such an idea, so I will have a short, routine hearing with him today and, with the excuse of showing him a few more retainer-letters, try to check and explore accordingly his views on the matter in a last-minute oral arguments. Kindly find bellow the news from our two leading newspapers on the opinion of the Curator.

T. Cook: did you receive my *fax* with the translation into English of the Curator's opinion, as you asked me ? Anything from London ? How about the hearing last Monday on Linda Andrews' case ?

Leigh and Julie: kindly find bellow the bills I paid last week when I had to stay in the same Hotel for logistic facilities (computers all night long, *fax*, phone numbers with Ana Beatriz, Prof. Strenger, other lawyers, families, and so on). I did not receive your remittances to my MN account since the expenses made on March 3.

I look forward to having your answers assp.

Very Sincerely Yours,

RG-00083

*TAM* case in Brazil

*August First, 1998.*

*To:*  *Speiser Krause,* Attention to: Joseph Cook, Arthur Ballen and Frank Granito III.
*Re:*  Again, *TAM* case in Brazil and, now, death in *Times Square.*

### *TAM* case in Brazil

Next Saturday 8, there shall be a meeting with the families and their attorneys to discuss mostly the coming case in Brazil against *TAM.* A four pages long draft of a letter to be sent to all them is under review by Ana Beatriz, Sandra Assalli, Dr᷃ Isabel, the attorney for the people from the ground, and a few lawyers of our close circle. The goal is to keep the whole group together and with *SK* as our consultant. As my long letter of July 17 urged, your decision – on our fee to be shared according (1) to the role *SK* may play in assisting us as our consultant and (2) to the role I must play as the leading attorney for such a case in Brazil - is deeply needed ASAP.

In order to keep as many families as possible as our clients here against *TAM* too it would be very good if at least one person from *SK* could come to the meeting.

In fact, last January T. Cook and I discussed the participation of *SK* here as a consultant only in the case we have had lost the FNC motion. Now that the FNC is only less than two months away (let's pray for it), I am not certain if you are still interested at all in playing a role as a consultant firm here as you will have to work there very hard at the same time against Northrop and Teleflex. The case here will last years and at the end you may not have even a role at all to be played here, if the Court says that we do not have to show any *TAM* fault at all, and that we shall rely only in the no fault, product liability theory, since there are already two decisions on two other families from the same *TAM* crash under this easier law. I would like to have this case in court here on the day after the 120 days period of the FNC, September 27.

Any way, if *SK* and I can not make a decision at all on our fee and shares until the time of the meeting, I will have to respond to the families that I will charge 10% contingency and let *SK* own decision to a latter opportunity. If I do not respond to them with some number, I may loose lots of them as clients here because their attorneys of course are eager to take each of their case apart and do it on their own.

According to Ana Beatriz, it is becoming harder and harder to keep the whole group as an only unity here against *TAM.* I predict that if *SK* and I act well and fast, we will retain some 40 families, maybe a little more. If I have to be alone, this number may drop down to 30. Both estimations are only a guess; of course. If I could say something to *SK*, I would suggest that, even if *SK* is not interested in eventually

assist us here as a consultant, *SK* should take this opportunity in order to keep the families there in Orange Country too: many are already exhausted, including Ana Beatriz, and if I am not luck here against *TAM* very soon, they may accept the $ 145,000.oo deal and may also give up in California too. So *SK* presence here will keep their moral up both in US and in Brazil.

T. Cook: Northrop/Teleflex case here is going as I have predicated. Today I will present the third petition after the original, the Prof. Irineu's one, trying to keep Judge Russo's order still idle. I guess it will not move out of the ground up to the clerk preparation of the rogatory letter before three weeks from now. When you or John Veth have a chance, kindly send me a copy of the affidavits of Irina and Sieta Cleveland, from San Diego, to Judge McDonald. These copies will help me in two of the appeals I am preparing against Judge Russo's order for the next few weeks.

Leigh: did somebody, during the time of your vacation, deposit my expenses since your last remittance to my MN account of March 3 ? The translation of the two letters from T. Cook to Judge Russo and of the transcript of the FNC hearing will cost some $ 500,oo and shall be ready this Friday. And as I told Arthur I have had sent good money to two families to prevent them to accept the $ 145,000.oo deal with *TAM* and to avoid more danger to the unity of our group there too. So, please:

## Death in *Times Square*

Frank Granito III – Hope you have received my *fax* last week. I have no answer from you yet. Now the family of victim wants know if the law in New York is the same as it is in Brazil. Here, the brother of Teresa Feliconio, who was window with no parents neither children, and the four nephews, who are the survives of the four other Teresa's brothers and sisters, would divide among themselves the recovery in five equal parts – one to the brother and the other four parts to each of the nephews. Any difference in the New York Law ?

Thank you very much for the attention of you all. I look forward to hearing from you soon.

Very Sincerely Yours,

RG-00086

# SPEISER KRAUSE
A PROFESSIONAL CORPORATION

140 EAST 42TH STREET, 34TH FLOOR
NEW YORK, NEW YORK 10017
(212) 661-0011
FAX: (212) 953-6883

ONE PARK PLAZA, SUITE 470
IRVINE  CALIFORNIA 92614
(714) 851-1477
FAX (714) 221-1444

2300 CLARENDON BOULEVARD
SUITE 306
ARLINGTON, VIRGINIA 22201

(703) 522-7500
FAX: (703) 522-7905

5400 LBJ FREEWAY, SUITE 1275
DALLAS, TEXAS 75240
(972) 404-1401
FAX, (972) 404-9797

201 SOUTH BISCAYNE BOULEVARD
MIAMI, FLORIDA 33131
(305) 373-9400
FAX (305) 379-0287

August 7, 1998

VIA FACSIMILE

ABRAPAVAA
c/o Beatriz Kopacek
Rua Guaraiuva, 899
Sao Paulo-SP-Brazil
04570-002

RE:  TAM Fokker disaster of October 31, 1996 in Sao Paulo, Brazil
     Our file #729.000

Dear Sandra Assali and concerned TAM crash family members:

I hope this letter finds you doing well.

We would like to make clear to you our firm's intentions regarding our continuing involvement in the TAM cases. As you are aware, a lawsuit has been filed on behalf of all families against Northrop Grumman and Teleflex in Brazil. This was done pursuant to the California court's order. After filing suit, the Brazilian Court apparently ruled that jurisdiction over the cases might be proper in Brazil.

We continue to work on obtaining a settlement offer which would provide compensation from all negligent parties: TAM, Northrop Grumman, Teleflex, and any others. In many "international" cases, we have been able to do so despite the complexities of where the cases are filed and the status of those litigations. Further, it is important to note that the cases against Northrop Grumman and Teleflex have not been dismissed in California, and a settlement with all parties remains a reasonable prospect.

Nonetheless, we are fully aware that a lawsuit must be started against TAM in Brazil before the two-year anniversary of the crash. Further, many families have private attorneys who intend on filing lawsuits on their behalf. We believe it is important to coordinate such lawsuits to the extent possible. This belief is supported by our years of experience in dealing with aviation insurance adjusters – the more unified the plaintiffs, the more they are able to force a successful and *faster* result.

RG-00088

X

      We would like to discuss with you the potential for having a experienced Brazilian lawyer file suit on behalf of all families who have not hired their own Brazilian counsel. This attorney would seek to coordinate the lawsuits with those to be filed by other family lawyers. Speiser Krause would coordinate with these attorneys while continuing to seek settlement from the insurance adjusters.

      Accordingly, Arthur Ballen, Esq. will be in Sao Paulo during the week of August 17 to coordinate with Brazilian counsel in the filing of the lawsuits against TAM. He will also meet with families as the need arises.

      As always, we will keep you informed of all developments in the case. Thank you.

              Sincerely,

              SPEISER KRAUSE

              GERARD R. LEAR

/js
Enclosure

Presidenta Sandra e
PS:- Duda: apesar de eu poder ser "a pessoa subentendida" para fazer e tocar o processo como "experiente advogado brasileiro" (carta do Leigh explicativa da carta à Presidente, a seus cuidados), vou escrever a SK, após a reunião de Vocês, que também sou contra essa idéia "made in Washington", como me disseram, de contratar, outra vez, outro escritório de fora de nosso grupo de colegas: a idéia de Comissão eleita ou escolhida tem a preferência de todos com quem converso. O que Vocês acham?
R.

RG-00089



CONFIDENTIALITY NOTICE

**WARNING** Unauthorized interception of this telecopy transmission, portion consideration of the telecopy transmission could be a violation of Federal and State laws. The documents accompanying this telecopy transmission contain confidential information belonging to the sender which is legally privileged. The information is intended only for the intended recipient or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited. If you have received this telecopy in error, please notify us immediately by telephone to arrange for return of the original documents to us.

*nota abaixo*

AUG-07-1998  15:20        SPEISER KRAUSE                            703 522 7900  P.05/05

# SPEISER KRAUSE
### A PROFESSIONAL CORPORATION

140 EAST 40TH STREET, 24TH FLOOR
NEW YORK, NEW YORK 10017
(212) 661-0011
FAX: (212) 953-0493

ONE PARK PLAZA, SUITE 470
IRVINE, CALIFORNIA 92614
(714) 553-1421
FAX: (714) 553-1946

2300 CLARENDON BOULEVARD
SUITE 306
ARLINGTON, VIRGINIA 22201

(703) 522-7500
FAX: (703) 522-7905

August 7, 1998

5430 LBJ FREEWAY, SUITE 1575
DALLAS, TEXAS 75240
(972) 404-1601
FAX: (972) 404-0797

201 SOUTH BISCAYNE BOULEVARD
MIAMI, FLORIDA 33131
(305) 376-8400
FAX: (305) 376-8337

<u>VIA FACSIMILE 011 55 19 289 4315</u>

Renato Guimaraes
rua Francisco de Toledo, 501
Cidade Universitaria
13.083-470
Campinas, SP - Brazil

RE:    TAM Fokker disaster of October 31, 1996 in Sao Paulo, Brazil
Our file #729.000

Dear Renato:

RG-00090

Ex. 78, 29

*Aqui há um parágrafo confidencial de advocacia (nota acima)*

Gerard Lear has asked me to relate an area of particular concern regarding our firm's involvement in these cases. It is <u>urgent</u> that you not discuss with Brazilian attorneys Speiser Krause's potential "consulting" agreement. It is simply not the proper moment to begin discussions of our firm's role as consultants on the cause of the crash. This is not our primary focus at this point - we still intend on obtaining settlement offers on behalf of the family members.

We trust that you will do nothing further in terms of trying to solidify a consulting agreement and any sort of fee which our firm might charge for such service. Though we certainly could be interested in providing such a service, we believe that now is <u>not</u> the time for us to discuss such matters.

Additionally, attached please find a status letter which has been sent to Beatriz Kopacek, to be given to the widow's association at their non-lawyer meeting tomorrow. Please note that although the letter contemplates hiring a "experienced Brazilian lawyer" to file suit on behalf of all families who have not hired their own Brazilian counsel; this letter implies of course

Renato Guimarães
August 7, 1998
Page 2

that should a family member wish for you to represent them, obviously you would be the person to do so, including filing the complaint and prosecuting the matter on their behalf. However, a certain amount of families may wish to hire an independent attorney, and I am sure you understand that at this point our greatest interest is in keeping the families together.

Thank you for your understanding and please do not hesitate to call.

Sincerely,

SPEISER KRAUSE

LEIGH J. BALLEN

/js

cc:  Gerard R. Lear, Esq.
     Joseph T. Cook, Esq.
     Arthur E. Ballen, Esq.

RG-00091

August 10, 1998.

*To:*     *Speiser Krause* - to: Gerard Lear, Joseph Cook, Arthur Ballen and associates.
*Re:*     The real case in Brazil against *TAM*

The non-lawyer meeting yesterday was good: according to Ana Beatriz and President Sandra, about half of the families may want me as their attorney for the case against *TAM* and another half are either undecided or want their own lawyers for this case. They are still united on the idea to present the cases against *TAM* all on September 28, the day after the 120 days period of Judge McDonald. Is it *ok* with you, T. Cook ? It will be new meetings: *one* only for the attorneys on Thursday, 13, at 8 PM, and another one for all families-and-attorneys on Saturday, 15, at 4 PM. Arthur Ballen, who shell meet with Prof. Strenger, will be again the key participant in both meetings. Needless to say there will be questions on California and London.

The potential *SK* involvement as a possible consultant for us against the *TAM* has being around here as early as January when I spread the word from Irvine. Since then I do understand your particular concern regarding the effect this story may have upon the families who could see it, as you believe, a weakness of our case against Northrop there. Let's me tell you that this effect has always been very much on the contrary: the families and their attorneys are happy with your interest in being along with us even in the worse circumstances in our case there. So the families and their lawyers alike have felt this idea as a good one. It has, indeed, being a good key for *SK* toward "our greatest interest", serving their spirits high in keeping the families together and on obtaining settlement offers. But, of course, you can thrust me that I will not even discuss any more the possible "consulting agreement" and much less your fee, never even mentioned by me by the way, regardless the letter of T. Cook.

The references to "the potential for having an *(or a ?)* experienced Brazilian lawyer file suit on behalf of all families... to coordinate the lawsuits" were no good, if I may. It would hurt again not only many families and, as Arthur and T. Cook already felt, mostly the professional pride of many attorneys who are assisting their families for almost two years but also, and much worse, their own pocket. I understand and sincerely share their disappointment. I do not want to repeat my terrible past omission, one which I will have to regret the rest of my life for not having tried a little more to convince you that in fact we were already at that time the only store in town when our fees went down from 33% to 25%. So, I must suggest to you that, even though I did accept, again without liking it at all, the idea of an experienced lawyer, for the Northrop/Teleflex case here, it has being very hard to me to defend it: besides all Arthur's, Cook's and my patiences paid for it, such an idea did not worked out well and is still giving unnecessary confusion to all of us.

Since then I have received heavy criticism from what I call the resented — "silent majority" of attorneys who are not so active in these meetings but are those who delegate to us, many times from far way, good judgements: *"Why, Renato, we had to spend more money with another firm, an expensive one and which has doing nothing in this complex case, when we have (for families, or we are, for their attorneys) already so many lawyers ? Are we incapable to do the job, or don't we deserve it at the eyes of SK ? So, why they don't thrust us ? These kind of decisions come from the top to the bottom down here. Renato, you must resist these "made in USA" ideas here in Brazil. They are good there, in America, in another society, not*

RG-00092

*in our way to practices law which they ignore. You get to explain this to them, Renato. They are smart guys. They will understand you"* - and so for.

And I just can not imagine now their reactions when, at any moment, I will have to tell them about Prof. Strenger's resignation. A fiasco. So, please, try also to be sensitive to our understandable feelings and our... fees in Brazil. Very much for these financial reasons I could not stand to Prof. Strenger's implied determination to prosecuting Northrop here. Of course, I know your suggestion, as that one about *that* Dr. Arruda Sampaio, was made for the best of our difficulties, but kindly forget it was you put away his crazy *scheme* to quash or to "fix" the Northrop/Teleflex case here...

There is not an "experiment" attorney in Brazil in Aviation Law, except the well done one who represents *Lloyd's,* of London. On the other hand we have in our group many well "experiment" lawyers with decades of practices on general law, former Judges and Law Professors. And the only international air crash case involving many Brazilians is in my very hands.

My "American" proposal to all them - one which has been naturally accepted by all families and their attorneys alike - is simply that so many times described in the book Lawsuit: a kind of *steering committee* or *Commission* of attorneys - 3 or 5 I have suggested - chosen or elected among those already working with the families, to lead all the lawsuits as one single case, with the voluntary cooperation from all others and giving then reports from time to time. If, down in the road, we fell the need for the additional work from a great legal specialist then we, the Commission itself, will have to decide whose Brazilian scholar – as we did with Prof. Nery's opinion - will have to be hidden for that special legal service: *"Yes, not only SK and Renato alone, again, to pick up the best name"*, they have said to me more than once. And the Professors we may need in the future would not those in International Law, but on Civil Procedure and they speaks Italian, French, Spanish or Germany – like Prof. Nery – but not English, a language which has nothing to do with the Civil Law system and or Code of Civil Procedure.

This solution, I submit to you, will cost nothing to you or to them, and it will give some prestigious to their reputation for such a case in Brazil. The Commission can do the job. It is not that hard. It is much easier than some of those cases I already have, with good results, against the Minister of Aeronautics and even against the President of Brazil at the Supreme Court. Their results are in Irvine long time ago. It will not buddy me if - as it has happened so many times early - I have to do almost all the work by myself on the behalf of the Commission. More than that, other attorneys already have get some money and good decisions from their *TAM* cases. And – it counts in results - no one, believe it or not, can even be near of my experience with all these cases against *TAM* and no one can try better than me to get all the *TAM* cases here well fitting our both Northrop/Teleflex cases – that real one in California and this not so real one down here.

The Commission would be a pionner experience in our legal community, one of which everybody will be proud of; even educating the people to face future tragedies. This is something you could help us with your experience in teaching us on how to organize and to operate such a Commission, so sort of rules, etc. If you could put your energy in this endeavor, not only your communication with my fellow attorneys and their families down here will improve very much) but also the offers for a settlement latter on would be also more attractive. In short, the credibility so needed for "our primary focus at this point" – to obtaining settlement offers and to keep the families together – will be better served with this modest but realistic approach, instead of an abrupt new big contract with a big shot who at the end may proof not to

be so worth at all, leaving alone the time and energy lost with his impressive name: they are not prepared to work for families – they are big business attorneys. Great law firms here do not work for people: they are corporations's lawyers. Attorneys, who hardly speak English around here, work all for international transactions. They get great fees as a routine and are not so much popular among the sole practitioners like us - the little guys who are trying to become the Brazilian *equalizers*...

For the benefit of the continuing unity of our families in the future I do hope that you will reconsider and give up the tendency to hire an outside lawyer.

Today I will present a new petition to Judge Russo with more reasons on why he shall change his decision, indeed to keep him busy and the case idle.

On August 19 I shall undergo to a knee surgery, a minor meniscus (?) problem, from my old days of soccer, now hurting in my cooper exercises. I must run well after *TAM* and alikes. So I may not be available in Sao Paulo in those days.

Arthur: my family kindly invites you to come to our home on Sunday, 16, for the lunch when will we celebrate my birthday. Just a small, family meeting. My son Gustavo, who was with me in your home in Miami, will come too.

J. Cook: we need your help once more. Would please ask somebody to send me by *DIIL* a few studies (not court decisions) on (1) punitive damages, (2) potential damages and (3) a kind of Forensic Economics to calculate the award with mathematics formulas and theories ? We don't have these rights in our books but we will try to introduce them in our case against *TAM*.

Leigh: once again - did you have an opportunity to send the deposit to cover my expenses ? Excuse me, Leigh, but I can not understand why this matter is taking so long this time, or what is wrong with my bills.

Thank you very much. I look forward to hearing from you and to working with Arthur again.

Very Sincerely Yours,

RG-00094

February 8, 2000.

To *Speiser Krause*
Dear Leigh and Arthur Ballen, Juanita, Gerard Lear and Frank Granito III.
Re: <u>Decision against Northrop and Teleflex</u>

Judge Russo told me yesterday that he will decide our case with Northrop and Teleflex soon - say within one month. Of course, he did not tell me that he will decide *against* them, but it was not necessary: it was all so clear. For example, he asked me if they had made the R$ 300.000,00 deposit due long time ago. When I confirmed that they had not, he asked me what he could do against a foreign company that does not obey the Brazilian court and has no proprieties here either. He asked me to present my final arguments ASAP. When I replied that I had no need for any further statements, he said to me: "excellent, so I will decide ASAP the Curator for Minors give his final opinion", and send immediately the case to the Curator's opinion. The Curator – the same one who asked for the deposits in the first place and who had agreed with me when I asked to elevate the then R$ 500.000,00 to times more – has said that his opinion will be for large awards, and fast.

Judge Russo told me that in his decision he will make a clear difference between those 65 families who are in the case and those who are not yet, or who had given up out of the case in Brazil. It was a direct message to us. Believe or not, however, I have not been successful in getting those many families into the case or in returning them back to the case. My letters to them and to their lawyers, including the strong T. Cook's warnings to them, have been fruitless, except in one single case so for. President Sandra's and Ana Beatriz's (Duda) explanations to them also had not produced any better.

It is President Sandra's, Ana Beatriz's and mine the strong opinion that Arthur or another fellow attorney from *SK* should come down here and tell these families that <u>now it is final</u>: those outside the case in Judge Russo's coming decision shall be excluded by Judge MacDonald. We all believe that this trip to Brazil will be worthwhile to *SK* to keep its clients in US. Latter on, as a result, we may have almost the original 65 families in California. It is a so simple matter, but the families are so confused by the obscure reasons for Leigh's demands for copies of the avoid, null settlements with TAM, and this is the mean reason to them to remain hesitant toward a positive position against Northrop and Teleflex in Brazil. Thus, it is not only a question to put more pressure on Northrop and Teleflex in Brazil. It is the number of clients.

To achieve this goal, however, it will be important that you explain in a meeting with the families, as much possible, those "delicate" matters Juanita stressed to me in her fax (of course I made what she asked me to do).

Leigh, I did call you back Friday, but you were in a meeting and, as I wrote, I was in Sao Paulo yesterday. I will call you latter today, or you may call me anytime today. Tomorrow I will be in Sao Paulo, again with Judge Russo.

Thank you very much for your cooperation. Very Sincerely Yours,

February 14, 2000.

To *Speiser Krause*
Dear Juanita or T. Cook, Leigh and Arthur Ballen, Gerard Lear and Frank
Granito III.

Re: <u>Appeal to put more pressure – higher deposits - on *Northrop* and *Teleflex*</u>

Today I shall be with Judge Russo again: the *Official Gazette*
published last Friday that the period - for *Northrop*, *Teleflex* and the 65
families to appeal against the Court decision that diminished the deposit from
R$ 500.000,00 down to only R$ 300.000,00 – **already started**.

Thus I must act within <u>five days</u>.

T. Cook, or Juanita: kindly send me ASAP a formal letter ( so I can
translate it into Portuguese and add it as an evidence in my appeal to the
Superior Court, in Brasilia, our National Capital ) stating what and when it
would be Judge MacDonald's next steps ( conference hearings, decisions or
whatever ) in regard the Brazilian families, the relationship with the case
against *Northrop* and *Teleflex* in Brazil, and the relationship with the
behavior of the Brazilian families and of *Northrop* and *Teleflex* in court here.

Please, after your immediate *fax*, send the original by express mail.

Thank your very much.

Leigh: hope you have convinced both attorneys Eduardo Tess and
Fernando Lottenberg. The phones of the latter are (11) 283-0344 or 284-2258.
Best regards to them. I will be more than glad to discuss with them again
about the **<u>urgent need</u>** of having **<u>all 65 families</u>** against *Northrop* and
*Teleflex* in Brazil – according to T. Cook.

And day after tomorrow, give a hell to the insurance negotiators from
London: tell them that they may have a surprise very soon (1) from Judge
Russo, regarding the awards against the US factories; and (2) not too soon
but, say, within two months, from the Superior Court from Brasilia, about the
amount of the deposit due by *Northrop* and *Teleflex* here.

President Sandra and I discussed your request and she authorized me
to tell you that she has a felling, after so many conversations with many
*average* families, that most of them would accept a deal for the entire case,
including those against *TAM* in Brazil, for R$ 3 ( three ) millions *net*, say,
after the payment of our fees, but less the amounts already received as
"anticipatory" and "agreements" with *TAM*-Unibanco in Brazil.

Thank for your assistance.

Very Sincerely Yours,

RG-00178

ASSOCIATE INTERPRETERS, INC.
5845 SW 26TH ST.
Miami, FL 33155
(305) 663-3099

C E R T I F I C A T I O N

STATE OF FLORIDA    )
                    )    SS:
COUNTY OF DADE      )

BEFORE ME, the undersigned authority, personally appeared___Clarice Annes_____,who is personally known to me, for and on behalf of ASSOCIATE INTERPRETERS, INC., who being first duly sworn by me says that he/she is fully versed in the ___Portuguese_____and English languages and that the foregoing is a true and correct translation of an instrument consisting of ___56_____page/s and that this the ___57th___page of the attached.

_Clarice Annes_____
Translator

WITNESS my hand and official seal in Miami, State and County aforesaid,

this ___5th_____ day of___May_____, 2003 .

DARWIN E. PACE
MY COMMISSION # DD 016982
EXPIRES: August 10, 2005
Bonded Thru Budget Notary Services

_____
OFFICIAL NOTARY SEAL

_____
NOTARY PUBLIC,
State of Florida

The utmost care has been taken to ensure the accuracy of all translations. Associate Interpreters, Inc. and its employees shall not be liable for any damages due to omissions, typing, transcription or translation errors.

RG-00215

[coat of arms]

This Document Prepared By:
ASSOCIATE INTERPRETERS, INC.
5845 S.W. 26th Street
Miami, FL 33155

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Case No. 1,509/98

## ACKNOWLEDGMENTS

Report

SANDRA LUIZA SIGNORELLI ASSALI, SAMIR SIGNORELLI ASSALI, and RAFAELA SIGNORELLI ASSALI

— SUZANA GRECO DE FRANÇA KLEPETAR, ANA CARINA DE FRANÇA KLEPETAR, and DAVI DE FRANÇA KLEPETAR

HELOISA VAZ GUIMARÃES SAMPAIO GOUVÊA, ROBERTA VAZ GUIMARÃES SAMPAIO GOUVÊA, FERNANDO VAZ GUIMARÃES SAMPAIO GOUVÊA, and CAMILA VAZ GUIMARÃES SAMPAIO GOUVÊA

LÚCIA BORDA DE BELLO AQUINO, FELIPE DE BORDA AQUINO, and GABRIEL BORDA AQUINO

MARIA GUIOMAR AMBRA AMBRA FOURNIER VIEIRA, MARIANA AMBRA FOURNIER VIEIRA, and CASSIO SUPLICY VIEIRA NETO

RG-00216

[coat of arms]                                                    2

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2ⁿᵈ Civil Court of Regional Court III – Sao Paulo

MÔNICA KAUTZ BLEINAT, GISELA BLEINAT, PÁULA BLEINAT, and RODRIGO BLEINAT

TEREZINHA DE JESUS FERNANDES DUARTE, ERIC FERNANDES DUARTE, and ELLEN FERNANDES DUARTE

MÁRCIA GONÇALVES DIAS DE BARROS, EDUARDO GONÇALVES DIAS DE BARROS, and GABRIEL GONÇALVES DIAS DE BARROS

MARIA BIBIANA PINTO PIZARRO SÁ FORTES, CAMILLA PIZARRO SÁ FORTES, and BRUNO PIZARRO SÁ FORTES

VENERANDA APARECIDA SIMÕES DE ALMEIDA, OLIVIA MARIA SIMÕES DE ALMEIDA, and LUCAS SIMÕES DE ALMEIDA

DÉBORA REGINA GONÇALVES TAMIELLO, VITOR TAMIELLO, VANESSA TAMIELLO, and VIVIAN TAMIELLO

MARIA DO CARMO BRANDÃO FIGUEIREDO and ANA CLARA BRANDÃO DE FIGUEIREDO

KATIA COSTA DE ALBUQUERQUE ALECRIM, ROBERTA ALECRIM TRINDADE, and HENRIQUE ALECRIM TRINDADE

MIRIAM RAMOS GUTJAHR, EVA GUTJAHR, ISADORA GUTJAHR, and MELAINE GUTJAHR

WANDA MOREIRA VIEIRA, RODRIGO MOREIRA COIMBRA VIEIRA, and CAROLINA MOREIRA COIMBRA VIEIRA

CATHERINE FISHER and LEONARDO FISHER

SILVIA LÚCIA PEIXOTO ARJONA, SILVANA PEIXOTO ARJONA, DANIELA PEIXOTO ARJONA, and WILLIAN PEIXOTO ARJONA

RG-00217

[coat of arms]                                                    3

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd. Civil Court of Regional Court III – Sao Paulo

NEUSA MARIA VICENTINE AMANDO DE BARROS, JULIANA AMANDO DE BARROS, LUCIANA AMANDO DE BARROS RODRIGUES, and MARIANA AMANDO DE BARROS

MARIA ADELAIDE DECAT MANHÃES, WALTER LUIS DECAT MANHÃES, MARIA FABIANA DECAT MANHÃES DA COSTA, and MARCELA MARIA DECAT MANHÃES

IVIANA ZIZZA ROMERO, LEONARDO ZIZZA ROMERO, ADRIANO ZIZZA ROMERO, and ROBERTO ZIZZA ROMERO

MARISETE APARECIDA STRAPASSON SIMIONI, ALEXANDRO SIMIONI, LISMARY SIMIONI, and ELISANGELA SIMIONI

SHOGHIEH TAEED KASHANI SHAIKHZADEH, FOAD SHAIKHZADEH, FARIBA SHAIKHZADEH, and FAEZEH SHAIKHZADEH SANTOS

ROSA NHUCH BOIANOVSKY, MAURO BOIANOVSKY, DANIELA BOIANOVSKY, ANDRÉ BOIANOVSKY, and CELSO BOIANOVSKY

CIBELE MONTEIRO DA ROCHA FERRÃO

RENATA OLIVEIRA DA SILVA CASTRO

FERNANDO LOBO VAZ DE MELLO, MARIA DA CONCEIÇÃO MAGALHÃES VAZ DE MELLO, and LUCIANA MAGALHÃES VAZ DE MELLO

AIRTON FRANCISCO RODRIGUES and MARIA DAS GRAÇAS DE OLIVEIRA RODRIGUES

JOSÉ ORVAL PALMA, ZÉLIA DE ALMEIDA PALMA, MARCELLO DE ALMEIDA PALMA, MARCOS DE ALMEIDA PALMA, and RENATA DE ALMEIDA PALMA

RG-00218

[coat of arms]                                                                4

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

FATIMA APARECIDA VARGAS NOGUEIRA, CAMILA VARGAS NOGUEIRA, and VINICIUS VARGAS NOGUEIRA

ELIANA MESTRINELLI CREMASCO, EULER MESTRINELLI CREMASCO, ERIC MESTRINELLI CREMASCO, and EVANDRO MESTRINELLI CREMASCO

OLAVO AUGUSTO SOUZA CAMPOS DE SIQUEIRA FERREIRA and CECÍLIA MARIA DIAS CAMARGO, and

SIMONE PIRES FERREIRA have filed a legal action for damages against NORTHROP GRUMMAN CORPORATION and TELEFLEX CONTROL SYSTEMS, INCORPORATED, stating that they are immediate relatives (widows, children, parents, and siblings) of the victims JOSÉ RAHAL ABU ASSALI, GEORGE KLEPETAR, LUIS FERNANDO SAMPAIO GOUVÊA, GLIBERTO AQUINO, CARLOS MARIO FOURNIER VIEIRA, SÉRGIO APARECIDO BELINAT, JOSÉ PEREIRA DUARTE, GERALDO LUIS AREDE DE BARROS, MAURÍCIO F. SÁ FORTES, LUIS CARLOS SIMÕES DE ALMEIDA, LUIS CLAUDO TAMIELLO, AGUINALDO BARBOSA DE FIGUEIREDO, HENRIQUE MARQUES TRINDADE, IVO ROBERTO GUTJAHR, ALBERTO COIMBRA VIEIRA, ROBERTO FISHER, WILLIAN ARJONA CHONG, LUIS ANTÔNIO AMANDO DE BARROS, WALTER LUIS MANHÃES, LUIS LAURO ROMERO, AMILTON SEBASTIÃO SIMIONI, MOHAMAD SHAIKHZADEH, DAVI LUIZ BOIANOVSKY, MARCELO DO AMARAL FERRÃO, CHRISTIANO DE GUSMÃO NETO, ALEXANDRE MAGALHÃES VAZ DE MELLO, RILTON DE OLIVEIRA RODRIGUES, MARTA DE ALMEIDA PALMA, JOSÉ WILSON NOGUEIRA, LAÉRCIO CREMASCO, OLAVO RUY CAMARGO DE SIQUEIRA FERREIRA, and AMAURI PIMENTA DA VEIGA, in view of the plane crash occurred near the Congonhas Airport, in this city of Sao Paulo, the state Capital, on October 31, 1996, as a result of the crash of the TAM airplane Fokker-100, Flight 402, en route to Santos Dumont Airport, in the city of Rio de Janeiro, which caused the death of all passengers and flight crew, with a total loss of ninety-nine (99) lives.

RG-00219

[coat of arms]                                                                                    5

## THE JUDICIARY
### SAO PAULO STATE SUPREME COURT

**2nd Civil Court of Regional Court III – Sao Paulo**

The plaintiffs allege that the cause of such crash was determined to be a manufacturing defect in the airplane's *thrust reverser*, which opened during take-off, in conjunction with a failure in the *teleflex* cable, both parts designed and manufactured by the codefendants, respectively, and that a manufacturing defect occurred and was the cause of the crash.

They further allege that the investigation performed on the crashed airplane concluded that the aforementioned equipment did not operate properly, and that indeed the manufacturers have failed to warn the public of the dangers of possible exposure.

They emphasize that the defendants are undeniably responsible for the faulty design and manufacture of those parts, being this the only cause of this tragic event, since there was negligence in the manufacture of such equipment.

They seek compensation for damages, and pain and suffering resulting therefrom, and request that the suit be approved in its entirety.

The interlocutory decision on pages 474/477 of the records, involved by the temporal preclusion order, had evaluated the issue related to the competence of the Brazilian Courts to trial and adjudicate on this case, authorizing the amendment of the complaint, in order to include Transportes Aéreos Regionais S.A. (TAM), however in vain, following the decision in favor of summoning the defendants (page 645 – 3rd volume).

Motions for inclusion in this action as joint plaintiffs were filed in separate brief (pages 480/486, and 522 – 3rd volume).

The plaintiffs listed on pages 636, 647, 652, 656, 658, 661, and 677 (3rd volume) have decided not to pursue the claim, which was accepted and homologated by the Court.

RG-00220

[coat of arms]                    THE JUDICIARY                                    6
                         SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

       The interlocutory decision on pages 761/770 (4th volume) established a bond in the amount of R$ 500.000,00 per victim, and also summoned the parties for a conciliation hearing.

       New motions for joint plaintiff interventions have been made (pages 775/784; 848/852 – 4th volume; pages 2342/44 – 12th volume, pages 2749/50, 2761/62, 2678/80 – 14th volume, and pages 1918/20 – 15th volume).

       The defendants acknowledged having been served (pages 699 and 706 – 3rd and 4th volumes).

       The conciliatory effort produced no effect whatsoever (pages 873 – 4th volume), followed by a settlement offer, without any positive result.

       The codefendant Teleflex pleaded its defense (pages 882/903 – 5th volume), where it raised a preliminary argument of passive legal incapacity *ad causam*, by claiming that the final report on the accident, prepared by the Air Force Ministry, does not state that *the feedback cable* was found to be defective.

       Teleflex emphasized the inappropriate opening of the airplane's right engine reverser, designed and manufactured by codefendant Northrop, asserting that TAM pilots did not get any warning from the airplane's alarm system indicators, which has jeopardized such identification.

       Teleflex also pointed out that the pilots should have retracted the landing gear, what would increase the possibility of the airplane flying at more than 15° feet per minute, however, they did prefer to push the throttle sticks, resulting in the plane's loss of power and crash, which demonstrates that their product worked and did not contribute to the crash.

[coat of arms]                                    THE JUDICIARY                                    7
                            SAO PAULO STATE SUPREME COURT

2ⁿᵈ Civil Court of Regional Court III – Sao Paulo

Teleflex motioned for the impleader of the airplane manufacturer, the Netherlands company *Fokker Services B. V.*, and abatement of action.

Regarding the merit of the case, Teleflex claimed that *the feedback cable* broke down after the collision with the ground, and that it might have occurred breaking of other manufacturer's parts as well, since there was aggressive action of the pilots on the throttle, resulting in the split when the airplane crash was already inevitable.

Teleflex made a motion to dismiss the case, emphasizing that they have not at any time participated in that part's assembly and test process, and pointing out a third party at fault.

Codefendant Northrop, in its reply (pages 1078/1116 – 6ᵗʰ volume), emphasized Nair de Carvalho Jansein's lack of interest in acting, once he received the amount of R$ 150,000.00, which represented the settlement for his relative's death.

Northrop entered a motion to implead *Fokker Services B.B.* and Transportes Aéreos Regionais S/A, so that these companies would be part of the lawsuit as passive codefendant, thus avoiding an appeal.

In a separate brief (Case No. 1509/98 – Appendix C), they filed a motion for change of venue.

Regarding the grounds for the case, they emphasize that the engine reversion system is a complex system, and it is certain that "its relevant contribution to the reverser system lies in the hydraulic system, the operation of which has never been questioned by anyone" (sic – page 1097 – 6ᵗʰ volume).

Northrop does claim that the airplane crashed due to failure of the electric system erroneously designed and assembled by *Fokker*, which ended up engaging the reverser at the wrong time and inhibiting the failure warning to the pilots, who then took an unfortunate action, being those the two effective sources of the crash.

RG-00222

[coat of arms]

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Northrop requests application of the Brazilian Air Code and Article 159 of the Civil Code, emphasizing lack of requirements for its responsibility.

Northrop also made a motion to dismiss the case, arguing that the compensation demanded cannot be used to improve the life standard of the victims' relatives, and that undue advantages should be avoided, by deducting the amounts eventually received as life insurance, mandatory insurance, and INSS (social security benefits), in the event compensation is paid.

Codefendant Northrop entered a motion of suspicion of partiality, supervening the stay of the judicial proceedings (pages 2092 – 11th volume), followed by the rendering of the Court Decision (pages 314/317 – Appendix D), written by the Honorable Judge DJALMA LOFRANO, of the denying the aforementioned motion.

The Court Decision (pages 2442/2450 – 13th volume) written by the Honorable JORGE FARAH, Associate Judge of the Sixth Panel of Judges of the Civil Court of Appeals of the State of Sao Paulo, maintained the decision that has determined the bond, and reducing the same to the sum of R$ 300.000,00 per victim.

The court order on page 2487 determined compliance with the deadline established in the Court Decision for the deposit of said bond, following the codefendant Northrop's motion to summon its legal representatives, which was denied (pages 2500/2502 – 13th volume).

The plaintiffs responded and requested that trial take place in the state (pages 2503/22 – 13th volume).

[coat of arms]                                                                                    9

### THE JUDICIARY
### SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

The plaintiffs do claim that the codefendant is acting immorally, by not having deposited the bond ordered by the Court.

The defendants rejected the joint party interventions (pages 2800/2820, and 2812/28 14 – 15th volume).

The plea for change of venue was denied, the same occurring with the interlocutory appeal filed against the issue of summoning the legal representatives of codefendant Northrop (as per Judgments rendered by the Honorable Judge JORGE FARAH).

The Public Prosecution Office has opined in the Court records as required.

### RECITALS

The issue to be considered herein is a very special matter. The theme, in its most pure and exclusive concept, should not be judged by mankind. The hypothesis, above all, does invoke the search for the highest form of the Justice. Certainly not a formal, myopic, cold, almost inhuman justice. What has to be done here is to uncover the Spirit of the Law, referring to *Montesquieu* and all the philosophers of the world, such as Plato, Aristotle, Paul of Tarsus, Fustel de Coulanges, and many others.

The entire case does rest upon a tragedy experienced by all of the Brazilian people, in an episode broadcasted to the entire planet, about the tragic crash of the TAM airplane Fokker 100, which took off from Congonhas Airport, in this city of Sao Paulo, in its daily commute, well known as the "Sao Paulo — Rio de Janeiro air shuttle service", in that morning of October 31, 1996, by causing the death of ninety nine (99) people.

RG-00224

[coat of arms]                                                    10

## THE JUDICIARY
### SAO PAULO STATE SUPREME COURT

*2nd Civil Court of Regional Court III – Sao Paulo*

        To all people who come to read this sentence, I must confess this is a hard thing to deal with. The man, son, husband, father, brother, teacher, citizen, and a member that I am of this society of so many inconsistencies, feels at times powerless as a judge in face of so many the injustices, notwithstanding the fact that our country, Brazil, though very well-provided with Laws is not prodigal with Justice, in spite of the several serious and enlightened minds that compose the Judiciary of Sao Paulo, with whom I have had the honor of being familiar with during my thirteen (13) years on the bench.

        And also, it is very hard to say, even among the so-called first world countries, if there is any such country with a true concern for Justice. There are, of course, those countries that know how to produce consumption and individualism. The press, in all levels, already discloses plenty of such aspects to us all. We only have to be willing to see it.

        Therefore, it is very important to consider that Justice is not a task of consumption. It is a mission. A non-divine mission, taking into account that this Justice, the civil case Justice, might, at times not be representative of the *real* Justice (Article 3, I, of the Federal Constitution) that all of us, as a worthy and democratic society, wish to have. Man, however, in the capacity of Judge, has been entrusted by the society with a duty, because the State Judge is a free and fundamental arm of the democratic Rule of Law, of stating the written Law, without, however, losing sight that the citizens do expect the Judge to interpret, on their behalf *(citizenship rights,* Article 1, II of the Federal Constitution), the legislation, by making the letter of the Law rational, alive, proper, updated, human, positive, reliable, and specially Fair.

        So, it shall be understood by plaintiffs and defendants, by the honorable and hard working Counsels that so elegantly plea their cases in these records, by the Honorable Attorney General, by the dedicated employees of the 2nd Civil Office of this Court, and by society in general, that it seems to this Judge that there is no Justice to be made in this case, at least in this world of materialism and consumption.

RG-00225

[coat of arms]                                                                                    11

### THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

It is impossible to calculate on the loss of so many lives, moreover after with the disappearing of all those smiles by the sword of despair and the unavoidable fate.

At this stage of my life, I really do not know if society should not rethink whether man does exist for society to use him as an authentic product, or whether the *human being* is the true root of society? It is a reflection for the present, but aimed at the future.

Once these necessary observations have been established, such as the naked picture of this case: the plaintiffs state that the plane crashed and their loved ones are dead, due to failure of the *reverser* and the *feedback cable*, products manufactured by the defendants Northrop Grumman Corporation and Teleflex Control Systems, Incorporated (corporation that belongs to the same corporate group Northrop Grumman Corporation); while the defendants do maintain that they have no responsibility at all in the event, arguing that there was no failure of the equipment supplied, and that TAM's flight crew fail to act appropriately, and therefore the victims' families enrichment by means of alleged moral damages is not admissible.

In this context, the voice I heard is the one saying that there must be someone hiding in the depths of impunity, remaining inside this case, in spite of the crudity of the issue, to find its culprit. And it is true that this case has distinguished itself as the proper vehicle for this discovery, in view of the fact that its ultimate end is to restore *social harmony*, by removing the anguish and antinomy and resuming the course of the civilized life.

In this regard, we resort to the wise considerations and solid contribution of the eminent Professor **GALENO DE LACERDA**, Senior Professor of the Law School of Porto Alegre, University of Rio Grande do Sul (publication *Tribuna da Magistratura*, Doctrine Section, April/99, pages 57/65).

RG-00226

[coat of arms]

THE JUDICIARY                                                12
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Before anything, one must ask is it possible (at a time when we see an evolution in the Law as a science, when we discuss the significance of diffused rights, of consumer rights, of the global problem of drug traffic, of the laws that penalize corporations for crimes against nature (Law 9,605/98), of community rights, of the new rights (value) of the human personality, of discrimination, of the fetus generated *in vitro*, of the incredible evolution of the Especial Civil Courts, etc.) to admit a true defense shield based in the impurity of denial.

As always, it is easy to make up explanations for non-liability. Uncommon, otherwise, is *proving*, with the determination that the case requires, the coherence in acting and faithful diligence at all instances of the production process, together with a non-compromising with a possible fault, imperfection, or defect, hidden or otherwise.

Having said that, it is not difficult to understand that the passengers of TAM Flight 402, the final consumers, the ones who purchased the tickets and who, by boarding the airplane, marked the beginning of the transportation contract, a typical obligation based on results, are the starting point for the decision in this case.

They are indeed.

In fact, we cannot ever forget that it is not the product (seen in its entirety) that exists for mankind, but quite the opposite: mankind is the reason for the product to exist. This relationship must not be inverted. It is, therefore, necessary to clarify this rationale.

Therefore, it is clear, whether for society, citizens, taxpayers, men, women, children, and for the State, that the passengers of TAM Flight 402 are not responsible for this tragedy.

RG-00227

[coat of arms]                    THE JUDICIARY                    13
                          SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo


There is now the obligation of the State, represented herein by the judiciary branch, of finding the guilty party, whether it is the manufacturer of the airplane, the manufacturer of the reverser, the manufacturer of the other parts that make up this reverses, all of the aforementioned manufacturers, TAM, the pilot, the flight crew, ... fate?! Who or what?

In truth, we have no way of knowing how many can be held accountable for this.

Having considered all of the above, the crucial point of the case is based on the following: the product manufactured by the defendants, the so-called *"thrust reverser actuator,"* or the parts called *"feedback cable"* and *"turnbuckle,"* were found to be defective, especially in what concerns the fact that the failure in the reverser's electrical system could not be forecasted, as well as the consequences in its regular operation culminating in the inadvertent opening of the reverser, which compromised the thrust necessary for normal takeoff of TAM's Fokker 100 and resulted in a fatal 24-second flight and the subsequent tragic crash the aircraft, of which we do not need to be reminded.

The first step to resolve this sensitive issue is evaluating the entire investigation conducted by the Air Force Ministry, which can be found in the final report signed by Air Force Brigadier Lieutenant Ronald Eduardo Jaeckel and by Colonel Douglas Ferreira Machado (pages 905/952).

[coat of arms]                                                              14

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Therefore, it shall be noted that this investigation is more than enough basis to render judgment on the matter, not only because of its power of persuasion, but also because it is pointless to postpone the conclusion of this case since, logically speaking, there is no reason to believe that additional evidence can be found, in view of the fact that all possible and admissible evidence is or should be contained in the records, even more by verifying the point of support of the proceedings. It is, for this reason, imperative to render summary judgment in this case, pursuant to Article 330, Paragraph I, of the Code of Civil Procedure.

It shall be noted that the aforementioned investigation report has the power of evidence, since it was prepared by people acting as public agents, thus having, indirectly, a solid foundation, and is assumed to be accurate, not having been in any way contested even by the defendants, which grants it higher procedural value and efficacy.

Following this line of reasoning, we have to established, at this point, that said report is not vague. On the contrary: the report is highly unequivocal, since it was prepared in an academic, scientific, and objective way and its conclusions were derived from factual material collected from the crash site of TAM's Fokker 100.

In addition, this body of evidence was collected during a long and thorough fourteen-month research process conducted by the Office of Investigation and Prevention of Aircraft Accidents of the Air Force Ministry, which also includes the inspection of the aforementioned parts (reverser and other components) and describes their functional complexity, making it possible for this court to use these parts as a central focus for the resolution of this important and complex case.

Actually, the detailed analysis contained therein, without omitting, as caution and moderation direct us to do so, the deduction of a balance of its conclusions and revelations, by mobilizing its entirety, without loss of harmony and reasonability.

RG-00229

[coat of arms]                        THE JUDICIARY                        15
                        SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Therefore, the aforementioned report declares that although the inspection tests performed in the system revealed that the "actuators were fully operational" (page 908), the detailed analysis of the "reverser" points out that the failure of the product (the reverser manufactured by the codefendant Northrop) was real, to the extent that:

"the analysis report on the failure of the reverser issued by the manufacturer for the homologation process <u>did not</u> contain all possible *inadvertent positive* conditions, and <u>did not</u> consider the possibility of a *dormant failure...*" particularly in the event of a "highly unlikely failure" (page 910).

Without prejudice, one of the conclusions in the final report issued by the Air Force General Staff (page 941), without implied senses, clearly states that:

"the investigation concluded that there was an inadvertent opening of the right engine reverser as soon as the airplane left the runway," prior to any actions by the pilots, which arouses deep concerns in all who may come to evaluate the extent of this report prepared by the experienced and responsible people of the Air Force Ministry.

In this prospect, one must firstly consider that the equipment, systems, and assemblies of an aircraft cannot, under any circumstances, be considered separately. No. All components (considered as products under the Consumer Protection Code) shall, ordinarily and necessarily, function in strict cooperation, especially from the point of view of the special consumption relationship, which states that transportation (an obligation based on results) seen as a whole – particularly air transportation – is an activity of the highest importance involving numerous lives, from which a unique and significant moral and legal responsibility is created, without elaboration, unnecessary in this case, on the evident risk inherent therein.

RG-00230

[coat of arms]                                                                    16

### THE JUDICIARY
### SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

The Air Force Ministry also states that "the manufacturer has not considered the possibility that the contacts may adhere" and therefore "the case was not analyzed," which justifies the assertion that

there was "a dormant failure" in the reverser (a failure that can occur without being detected), according to important description contained in the aforementioned document (page 911).

In addition, the analysis diagram of the reverser's failure, recently prepared by the manufacturer, after the tragedy, indicates that:

"even without considering the possibility of a dormant failure, it states that the probability of an *inadvertent opening of the reversers* is *approximately 10-6*" (very high percentage), therefore not meeting the "requirements for airworthiness...", according to what has been pointed out by the public agents of the Air Force Ministry (page 911).

In this same context, the tests performed on the reversers, on the actuation of the secondary lock of the doors of the turbine thrust reversers, clearly showed:

"*inconsistencies in the response of the part and the consequent lack of reliability presented by the reversers. The components that should meet aeronautical quality standards when put into operation, did experience an abnormal degree of deterioration not explained by the manufacturers, who have been researching for some time ways to optimize such parts.*" (page 912, g.n.), which is cause for attention and much concern.

RG-00231

[coat of arms]                          THE JUDICIARY                          17
                        SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Upon deeper examination, one will find that the report was not more conclusive only because, foreign to its purposes, the conclusion was that TAM's Fokker 100 crashed because the

"*secondary lock actuator of the reversers must be reevaluated and its reliability must increased*, by the addition of final impedance and electric resistance tests, prior to delivery and after assembly of the aircraft" (page 949, g.n.), which is at the very least unacceptable in air transportation industry, in a responsible environment dictated by prudence.

In this light, after the investigation report concluded the all crew members had valid certificates of physical capacity and technical qualification and were rested, and that was the first takeoff of the day, and also that the pilot was experienced and the aircraft had undergone all required inspections and reviews, the investigators declared that the **aforementioned fault occurred during the first (1st) second of the takeoff, without any audible or visual warnings, reversing the reverser cycle (open reverser), causing a very serious drop in power for four (4) seconds,** which jeopardized the aircraft's performance (pages 941/942), resulting in the tragic events of which we do not need to be reminded.

In addition, the aeronautical experts pointed out that the "**reverser unlocked" procedure on takeoff**

"**was not practiced during the training of the company's crew members in the flight simulator,**" since the manufacturer stated that "*an opening of the reverser could not be actuated during flight due to the protection of the system's Switch Ground/Flight*" (page 942), a statement which was not accompanied by any reliable, adequate technical explanation capable of supporting the apparent assumption that a fault did not exist, and without the proof – so necessary in such cases – that the reverser was of the highest quality, as would have been required, what would then authorize an evaluation of the manufacturer's diligence, as established by the opinion of LUIZ GASTÃO PAES DE BARROS LEÃES (Manufacturer's Liability for the Product, Saraiva, 1987, pages 154/55).

RG-00232

[coat of arms]                                        THE JUDICIARY                          18
                          SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

> So, what one can clearly see is that the airplane crash was not caused only and exclusively by faulty design of the electrical system assembled by Fokker or by Dowty Aerospace Hydraulics, which actuated the reverser at an inopportune time and prevented the warning of such failure to the pilots, who according to codefendant Northrop took incorrect action (sic. page 1099).

> No.

> The airplane crash occurred because codefendant Northrop, the manufacturer of the vital part so called "reverser," was not zealous, competent, or humble enough to foresee the possibility of a failure in the electrical system connected to such part and attributed to the component a status of independence that it did not possess because it is an integral part of a whole.

> The aforementioned codefendant Northrop did not conduct itself as required and did not alert the manufacturers of the other reverser components of the importance of the electrical part, under penalty of having a product with faulty performance, according to its own position evidenced in its defense brief.

> Northrop, the manufacturer of the reverser (a complex and interconnected system), should have been cautious enough to objectively foresee – as it was perfectly capable of doing – the possibility of failure of the electrical system which could eventually compromise the operation of its product. These two things are inseparable, and represent omission bordering on malicious fraud.

RG-00233

[coat of arms]                      **THE JUDICIARY**                19
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

In fact, this omission is so grievous and so troubling that it affects us all.

What one can conclude, based on an unapologetic review of the report from the Air Force Ministry, and seeking to view this case as a portrait of mankind itself, is that in most cases, people do not accept their own faults. They would rather hide such faults even when their consciences urge them to correct them.

However, as in this case, when people lose their power and become dominated by the machines they build, they forget that the creation carries the virtues and faults of its creator, and that it is the responsibility of peaceful and humble men to duly research the foreseeable defects that may be hidden in the machine (its product of consumption), since it is certain that such defects are mankind's and not the machine's, even when we rationally accept mankind's limitations concerning technical and scientific knowledge at the moment of production.

It is therefore accepted as fact that there was failure in the reverser manufactured by codefendant Northrop, which inappropriately and inadvertently opened during the first second of the flight, without any intervention from the pilots and without audible or visual warning, and, on the other hand, the evidence did show the existence of defect or fault in the *feedback cable* manufactured by codefendant Teleflex Control Systems, Incorporated, which, consequently, exempts it from liability in this case.

Additionally, it is very important to state in writing that there is no reliable evidence that the flight crew acted improperly, especially the pilot and copilot, or even that such possible actions may have been the sole cause of the crash, even if one could admit some fault in the part of the command crew (page 1879).

RG-00234

[coat of arms]                        THE JUDICIARY                        20
                          SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

No.

The record does not show any evidence that could lead one to conclude with a clear conscience that the sole cause of the crash of TAM's Fokker 100 was flight crew error, especially none of such categorical nature as the evidences contained in the aeronautical report. It should be pointed out that the experts did not fail to notice that:

"the manner in which the unexpected fault was presented to the flight crew and the lack of warnings of such fault, made it uncertain that their actions were intentional..." (page 1879), a fact which deserves the attention and concern of the adjudicator, and clearly indicates that the conduct of the pilots is not in any way connected to the cause of the inappropriate and inadvertent actuation of the reverser, pointing out that

"the fact that the crew was unaware of the fault, due to a lack of warning and information, was a determining factor for them to abandon normal procedures..." (page 1879 – 10th volume), which necessarily negates Northrop's arguments that the crash was caused by pilot error (sic – page 1099 – 6th volume).

Having considered the points above, we cannot and shall not separate the primary cause from its secondary effect. According to the very competent evidence produced, the airplane crash was, therefore, caused by the inappropriate and inadvertent opening of the reverser, and it was not humanly possible for the pilots (in just a few seconds) to overcome such fault, especially when considering the lack of warnings and information, as has been pointed out in the Air Force Ministry report.

This argument, not being supported by or grounded on evidence, indirectly jeopardizes common sense and reason. This even flies in the face of a serene and resolute interpretation of facts based on honest observation.

[coat of arms]                                                                    21

### THE JUDICIARY
#### SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

This is, undoubtedly, the truth that emanates from the investigation conducted by the Air Force Ministry, in which the defendants have had ample participation, following all procedures without any hindrance, pursuant to Article 334, Paragraph III, of the Code of Civil Procedure.

One must remember at this moment, that uncontested facts do not require evidence, therefore there is no processing of such evidence (STJ, RTJ 93/162), and the evidentiary power of the aforementioned report must be stressed, since it was prepared immediately after the crash of the aircraft by public agents, being presumed as truth as are administrative acts in general, even if considered only in the realm of a simple circumstantial evidence.

Regarding this matter, PONTES DE MIRANDA, in his wisdom, explains the role of circumstantial evidence in the resolution of judicial proceedings, by teaching that:

"circumstantial evidence can bring more than presumption of fact — it can provide certainty or only constitute *hominis* assumption, it can provide the intimate element of proof. (Annotated Code of Civil Procedure, Paragraph III, page 419).

Similarly, Justice PEDRO CHAVES, in his opinion, explains that circumstantial evidence are of great importance to clarify a variety of issues (Evidence in Civil Court — Interpreted by the Courts, Records by Wilson Bussada. Ed. Sinteses, pages 177/78).

Absolutely nothing can be said to those that do not believe they make mistakes. For them, somebody else is always at fault. These people are left only with peace of mind — or torment — as consolation.

RG-00236

[coat of arms]                                                                22

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Having pondered the evidence collected, I can only to say to the families of the victims and plaintiffs in this case, to the attorneys, to the honorable District Attorney, and to society at large, that I can not see this case under any other light. I have been reflecting on this case for many months and within my human and intellectual limitations, I have to say that I feel it is just to acknowledge, as I do herein, that there was fault in the product manufactured by the aforementioned codefendant regarding information, conception, design, assembly, efficacy, and interconnection with hydraulic and electrical of the reverser, which **fundamentally** compromised its safety and reliability, and can be characterized as "product fault," which under Article 12, caption and fist paragraph, of the Consumer Protection Code, is unacceptable; therefore, it calls for compensation and invalidates the application of the old Article 159 of the Civil Code, which is inapplicable in this case.

In my understanding and by examining the evidence produced, which has not been contested by any of the parties, the codefendant did not even try to prove, as it was required to do, that their product (the reverser and its hydraulic components), is perfect, although claims of perfection would have damaged its credibility.

I shall also take the opportunity to state that such proof could have easily been produced by the defendants. They could have simply presented, along with their objection, as was their right (pursuant to Article 300 c/c Article 333, II, both from the Code of Civil Procedure – CPC), the evidence of how impeccable their product was, with the official disclosure of all tests and inspections performed on the operation (separately and within the reverser assembly) as a completely reliable part, component, or system (hydraulic) and immune to malfunctions, even dormant malfunctions as claimed in the Air Force Ministry report, and foreseeing (even after the exhaustive tests performed by the manufacturer) an occasional failure of the remaining systems of the aircraft, especially the electrical system and the system responsible for audible and visual warnings to the pilots and crew in the event of an irregularity, observing the principle of contingency (Article 300 of the Code of Civil Procedure).

RG-00237

[coat of arms]                                                                        23

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Without this evidence, and in order to provide a decision that guarantees the seriousness of this process, in order not to jeopardize the reliability of the legal system, and in a somewhat modern view of private law (particularly consumer law), one cannot, state that the defendant manufacturer of the *thrust reverser actuators* is not liable for the airplane crash. The defendant erred by omission when it did not consider a possible failure of the electrical system which could eventually compromise the normal performance of its product (reverser) and consequently result in this tragic event, especially when added to the lack of evidence of the reliability (perfection) of the aforementioned product.

Certainly, the words of attorney LUIZ CÉZAR RAMOS PEREIRA better describe this, in article written over than ten (10) years ago, but very appropriate to this case (06/13/2000 at 08:50 a.m.):

"Actually the manufacturer must prove that its product is perfect. In fact, it is easier for the manufacturer to produce this proof than it is to transfer this loss to the injured party. However, the manufacturer risks not being able to prove the injured party's claims, but this is a risk that cannot be transferred to the injured party, under any circumstance. The exculpatory proof must be firstly produced by the manufacturer, and then by the intermediary, if needed, but never by the injured party, since they have already suffered (or still suffers) the damage caused by the defect" (RI 654-54). The honorable attorney, an expert in International Private Law, also adds that

"The manufacturer must be punished, even when it places in the market a product that has no fault or defect, but that later comes to show fault or defect. The idea and philosophy here is that punishment is imposed for placing a product in the market that is not adequate for the use for which it was developed" (RT 654-55), especially when the manufacturer is certain, as one can

[coat of arms]                                                    24

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

plainly deduce from the record, of the perfect operation of its product, and that it is, at a certain moment of development, immune to faults, and, blinded by the lack of humility or more likely by the eagerness to produce something for consumption, without considering, the possibility of fault which may compromise the safety and reliability of its product.

Without a doubt we do admire the defendant's designers. However, we must endeavor at all costs never to forget that there was an unforeseen but humanly foreseeable fault in the reverser, which calls for prevalence of the guarantee principle, one of the main points of Law 8,078/90.

Following the same line of reasoning, one must understand that the manufacturer cannot be exempted from liability by arguing ignorance that the product was faulty. Otherwise, the entire humanistic and logical sense of the Consumer Protection Act would be negated.

In this sense, Professor ODETE NOVAIS CARNEIRO QUEIROZ, states that

"even ignoring such defects, the supplier is not exempt from liability..." (page 46, g.n.). The idealistic Professor ANTONIO HERMAN DE VASCONCELOS BENJAMIN also comments that the inadequacy of the defect generates a presumption of fault *jure et de jure* (page 112). Under the same argument, the illustrious Professor MARIA HELENA DIAZ states that the supplier's liability for defects in quantity or quality by lack of safety, related to the responsibility towards the physical safety of the consumer, is clear, pointing out that faults due to inadequacy or malfunctioning generate the aforementioned absolute presumption, even in cases of rendering of services (page 45).

RG-00239

[coat of arms]                                                          25

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

In addition, jurists GABRIEL A. STIGLITZ and RUBÉN S. STIGLITZ, in a deep examination of the defense of consumers rights, state that *"The United Nations Guidelines"* mark *"a series of mandates,"* among which we highlight the *"the effective prevention and protection against practices that can jeopardize the economical interests of the consumers"* (Derechos y Defesa de los Consumidores [The Rights and Defenses of the Consumer], Ediciones La Rocca, Buenos Aires, 1994, page).

Prevention. Yes, that is the word. Prevention with responsibility. Prevention as a principle. Prevention as a link of trust. Prevention as a guarantee. Prevention as a point of support. Lastly, prevention in order to protect the user of the product. This is the sole reason for a model law to exist. A law that serves as a guide to the entire world, such as our Consumer Protection Laws, without jeopardizing the light emanating from the United Nations mandate.

We shall never forget – not ever – that the manufacturer's pride in a good product does is not in the present, but in the future. To this end, whoever so desires may read the report that records the finding of benzene residue in the famous *"Perrier"* bottled water *(Food and Drug Administration – FDA)* and learn of the manufacturer's position, *its investments* in correcting the mistake, and mainly the fact that it recognized a defect in the product and later regained its share of the market. With all due respect, there is a certain wisdom in the way the manufacturer conducted itself. The future is not patented, as is the product. Only the future will teach us. Until then...

The reverser failed; it did not work as it was supposed to, in spite of the manufacturer's diligence. It failed, we shall say once more, maybe not in any significant way, but, to our horror, it failed to work at an important moment, which was enough to cause, by itself, without a serious and decisive contributing factor, the crash of TAM's Fokker 100 airplane.

RG-00240

[coat of arms]                    THE JUDICIARY                    26
                        SAO PAULO STATE SUPREME COURT

_____2nd Civil Court of Regional Court III – Sao Paulo_____

Had the reverser worked properly, what situation would we have today?!

This is a very delicate matter, but it should be said that we must not live under a system which always negates fault. All parts that should operate in conjunction with other parts impose joint liability of the manufacturers of all components (products), for the perfect harmony of the entire assembly. Using a simple analogy, the case of the reverser is not unlike a musician playing the tuba out of tune, compromising the entire orchestra and ruining the concert.

There is an objective, passive solidarity among all participants of the production process, and this creation is dictated by a unique legal model (articles 7, 18, 25, 28, and 34 of Law 8,078/90), an innovation worthy of praise as states the illustrious Doctor JOSÉ GERALDO BRITO FILOMENO (Brazilian Consumer Protection Code, annotated by the authors of the Bill, Forense Universitária, 2nd edition, page 75), accepting the right to a separate and independent appeal, as it is known.

So, the conclusion that reverser did not work is inescapable. Its efficacy and perfect operation were not proven. **It did not operate. That was the fault.** What comes out of that is not of interest to the consumer. No more, no less.

Regarding this matter, Doctor LUIZ ANTONIO RIZATTO NUÑES, an elite judge, a man who deals with the legal relationships in consumer matters every single day, a scholar and a specialist in this subject, states with a certain degree of subtlety that:

[coat of arms]                                                    27

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2ⁿᵈ Civil Court of Regional Court III – Sao Paulo

*"Failure, in turn, presumes the defect. There is defect without failure, but there is no failure without defect. The defect is* an inherent and intrinsic *characteristic of the product or service."* (Comments on the Consumer Protection Code — Substantive Rights, Ed. Saraiva, 2000, page 157).

The malfunction is, therefore, the failure originated from the defect of not foreseeing the foreseeable, as already stated. The failure, states the illustrious Professor,

**"is connected to the defect but, in terms of damage caused to the consumer, is much more devastating"** (mentioned work, page 158).

Thus, it shall be concluded that the term "failure" used in article 12, *caption,* of the Consumer Protection Code, deserves a flexible interpretation.

The true exegesis comes from the illustrious RIZZATO NUNES:

**"As a rule for consumer protection, it shall be understood that the list of hypotheses considered serves merely as an example. Any other possibility connected to the product, whether prior to, during, or after the manufacturing process, may imply the characterization of the defect — which always generates damages"** (aforementioned book, page 160).

[coat of arms]                    THE JUDICIARY                              28
                        SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

In addition, Doctor **CLÁUDIA LIMA MARQUES**, after quoting the Italian Professor **GUIDO ALPA**, states that:

"In regards to civil liability, the main value to be protected by the Law must be the effective and fast compensation to the victims. To that end, The CDC – Consumer Protection Code distances itself from the concept of guilt and, under article 12, evolves to an objective liability, of the type known in Europe as "non-culpable" liability.

"The tendency in comparative law is to attribute to the manufacturer the extra-contractual liability for damages caused by defective products. The CDC – Consumer Protection Code does adhere to such tendency, modifying the Brazilian system which requires guilt (failure in the sphere of activity) in order to generate liability." (Agreements on the Consumer Protection Code, Consumer Law Library, 3rd edition, 3rd printing, 1999, Ed. RT, page 620).

If there is proof of damage caused to the plaintiffs, as well as the causality relationship between the product and the damage (according to the findings object of the evidence produced), with clear indication of the failure of the reverser resulting from intrinsic defect, with clear indication of the party responsible for this product and absent the exculpatory circumstance foreseen under article 12, 3rd paragraph, of Law 8,078/90 (based on the idea that the manufacturer did not place the product in the market; or that even if it did place the product in the market, the defect does not exist, or that the guilt lies exclusively with consumer), the obligation to indemnify or compensate is inescapable, and we must verify the wisdom and reach of article 7 and its sole paragraph as well as articles 25, paragraphs 1 and 2, and article 34, all of them from the Consumer Protection Code, and it surely is unreasonable to transfer the sole liability to a third party, particularly without concrete evidence of its even more without the concrete proof that it is not connected to the production cycle.

RG-00243

[coat of arms]                                                                          29

### THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

---

Therefore, although the Consumer Protection Code is being used and applied very cautiously, even though it has been in effect for ten (10) years, and in spite of its enormous power, as states the illustrious professor versed in civil law GUSTAVO TEPEDINO (Civil Law Matters, Ed. Renovar, 1999, page 237), it is possible to understand that its point of view is of a society confused and affected by technological complexity, with many products and mass advertising, all of it creating a certain disassociation of the product with the individual, and de-personalization of the protagonists of the consumption relationship, which has allowed the civil law professor to consider that

"The defect that generates an accident, commonly named safety defect, is not really related to the intrinsic capacity of the product to cause an accident, but to its nonconformity with a reasonable consumer expectation, based in the nature of the product or the service..." (aforementioned book, page 240), which, in a decisive step forward, brings the author to conclude that this has the purpose of assuring "the safety of the consumer" with the "conceptual superposing content over form" (page 241).

It shall be pointed out that "such basis of liability of the manufacturer must be imposed, considering that the real phenomena of the damage products connected to the industrial development is always the same, which makes the normative differentiation or discrimination of an injured party, contractual creditor, or third party unjustified" according to the teachings of the Portuguese commentator JOÃO GALVÃO DA SILVA (Civil Liability of the Manufacturer, Ed. Coimbra, Almedina, 1990, page 478; and aforementioned book, page 239), which neutralizes any attenuating dynamic due to theoretical malfunctioning of another component of the product (seen as a whole), by generating – without forgetting that the systematic of the Consumer Protection Code is supported in the objective responsibility, and therefore it does not require proof of guilt of the party legally responsible – the pure and objective obligation of compensating, which, by the way, leads GUSTAVO TEPEDINO to state that

[coat of arms]                        THE JUDICIARY                        30
                         SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

---

"the party legally responsible cannot be exempted from the obligation to compensate based on the proof of the absence of guil" (aforementioned book, page 239), therefore, clarifying the fact that the consumers have a material and legitimate right to expect that the products they use are safe – a simple result of the so called

*"collective perception of a consumer society"* (JAMES J. MARINS DE SOUZA, (*Responsibility of the Manufacturer For Its Product*, Ed. RT, 1993, page 153).

In this context, the objective assignment of hidden defect can only be imputable to the manufacturer. Never to the product user.

Now, one should stop and remember that the consumer is vulnerable. It should be noted, a flare that emanates from the truth, that the vulnerability principle has a basic relevance in this world of consumption. This element should be rationally included and disclosed in this case. Then, taking the consumer into consideration, it should be added the need for an **actual equity** between the manufacturer and those listed under article 12, caption, of Law 8078/90. After all, it should be concluded that, without rationalizing this distance and without the manufacturer having to prove, **without delay**, as it can also be proven by reversal of the burden of proof (Article 6, VIII, Law 8078/90), the true past, present, and future efficacy of their product, there is no way, under the Law, to exempt the manufacturer from the obligation to remedy the damages suffered by the consumer, whatever they may be.

In this regard, the words of scholar MARIA TERESA Q. GONÇALVES have a special meaning:

RG-00245

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

"The rights of the consumer are a direct consequence of the claim for true equity, of the recognition of the right of participation by all citizens, and the model of the social Rule of Law". (Protection of Consumers and Users, and the Spanish Constitution of 1978, Madrid, 1986, page 20).

The objective responsibility stemming from the consumption relationship stipulates, by logic order, that the manufacturer should account for all assumptions and for all stages of the so called "product fact", especially because the activity risk from the product and its respective usefulness (Article 6, VI, of the CDC – Consumer Protection Code) cannot and should not serve as a shield against the consumer, except, with all due respect, under the seal of misusing such Law (8078/90), and the constitutional principles of citizenship, of consumer protection and defense, of public order, and of social interests (Article 1, II, and Articles 5, XXXII, and 170, V, all from the Brazilian Federal Constitution), particularly in the area of consumer safety (Article 6, section I of Law 8078/90).

The consumer safety protection, without impediment, deserves special attention, and PARRA LUCAN makes an appropriate comment regarding the case at issue, in that:

"The health and safety problems are among the most important ones proposed by consumer protection legislation", pointing out that

"The protection of consumer's health and safety is a corollary of the right of human beings to life (and to physical integrity), acknowledged in our international and constitutional laws" (Comments extracted from the study by Dr. VIVIANE COÊLHO DE SELLOS, *Revista de Direito do Consumidor*, issue 11/130).

[coat of arms]                                                                 32

## THE JUDICIARY
### SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

The distinguished professor and jurist NELSON NERY JUNIOR (RDC, RI, vol. III, page 58) teaches based on this view. Professor LUIZ GASTÃO PAES DE BARROS LEÃES equally clarifies this matter showing the widespread dissemination of damages deriving from the use of defective products (*Manufacturer's Responsibility for the Product Fact*, Saraiva, page 12). All this to draw the judge's attention to the change in focus in order to avoid giving priority to the production activity over the consumer, who is the main reason for the product to exist, except with proof of a competence as forgotten as history (particularly as from the industrial revolution), which taught us so much, but the facts keep repeating themselves, and so do the resulting damages.

At this time, in order to pause for a brief moment form the reading of this sentence, we should be eternally reminded of the writings of ALAIN FINKIELKRAUT, where he discusses the relationship between the man and History, and he comments that contemporary man no longer considers himself an heir of the past, and that

"true humanity is yet to come" *(The Ingratitude*, Ed. Objetiva, 2000, page 175), which takes us to the depths of our lives and our responsibilities.

Under this light, it is not inappropriate to point out that, without getting into the theory social solidarity by LEON DUGUIT, that a man cannot be granted honor and dignity, either material, spiritual, or even anthropological, without first distributing Justice as a means to enforce social strength, and achieve citizenship.

First of all, the Consumer Protection Code is a humanistic law. It rationalizes the truth, balances the disparity of forces between contracting parties, and showers the legal relationship between man and the product with a good dose of moral principles.

RG-00247

[coat of arms]                                                                33

### THE JUDICIARY
### SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

This can certainly illustrate numerous opinions. Before that, however, it should be noted that many centenarian Codes and Laws are not aware of, and do not want to deal with mass production industry, the technological revolution, the middlemen, the current social model, the 21-century family, and the children of tomorrow.

For some, it seems better to applaud the war, since for them the lives destroyed have no meaning. For those people, what matters is to produce weapons, bombs, communication systems for uninhabitable places, war planes, etc. **Boosting consumption and making profits.** The defendants' are not seen as having a living heart, but that's what man sees in society, as we have learned just in the past fifty (50) years: Hiroshima, Vietnam, Iraq and the Gulf War, Palestine, Bosnia, Kosovo, and other manufacturers are a proof of this.

Even as we are aware of this, there is still a lack of benevolence, and an abundance of consumption.

Therefore, it is appropriate to remember the words of Professor **RICHARD PHILLIPS FEYNMAN**, a physicist who worked for the well-known Manhattan Project, the U.S. program which developed the atomic bomb, as he declared, with the authority of a Physics Nobel Prize winner:

"**We, then, really need to take a look at theories that do not work, and at sciences that are not science**" *(You Must be Kidding Mr. Faynman*, translation of Cláudio Bentes David, Ed. UnB, Imprensa Official, 2000, page *377)*.

And what else should we say...

RG-00248

[coat of arms]                                                                                      34

**THE JUDICIARY**
SAO PAULO STATE SUPREME COURT

*2nd Civil Court of Regional Court III – Sao Paulo*

For all this, I believe, as teaches Professor Chiovenda, that to sentence is to feel that this is the only Justice to be attempted in this tragedy. What emanates from this, with all due respect, is the chorus of disappointment brought about by the discord.

For this reason, the codefendant must compensate for all damages claimed, with no exception whatever.

Seen under another light, some may claim as that this was the work of fatality.

It should, however, be taken into account that if a fatality occurred, it must be remedied by those who profited from an activity granted and supervised by the State. It is not appropriate to impute it to the negative scourge of the uncommitted omission, except to ratify the uneasiness, which shall not be done in this case.

It is simple, really quite simple, to lend our solidarity, sometimes merely a veiled solidarity, to the families affected by mourning and permanent grief.

Therefore, I feel that the claim is legal, appropriate, serious, well oriented, consistent with the modern law and its projection on society, particularly in the logic, consumption area, based on the equity, on the general principles of law and, most of all, FAIR.

RG-00249

[coat of arms]                            THE JUDICIARY                                35
                        SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

        Needless to say that the Civil Code – as established – and the Brazilian Air Code, as a natural nonidentity, are not applicable. As it is well known, this legislation is not applicable in instances such as in this case: Applicable, under penalty of denying the effect of a Law which has been drawing the world's attention (Mexico and Venezuela currently use our Consumer Protection Code as a model to reform their laws (according to **Antonio Herman Benjamin**, RT Informa, No. 7, May/June 2000, page 5)), is Law 8078/90, that is, the special Consumer Protection Code.

        In this regard, the Honorable Supreme Court, even though the situation is not evidently similar to that of this case, recognized that there is no room for previously established compensation fees in case of an airplane crash (RESP 6052/SP, by Minister **CLÁUDIO SANTOS**), which is enough to discard the mistake resulting from the intention of not compensating, since an insufficient compensation is the same as no compensation.

        **ARAKEN DE ASSIS**, a State of Minas Gerais Professor and Associate Justice, in an unparalleled vote (TJRS, Appeal 597.187.277), explains that the provisions of the Consumer Protection Code are applicable to the air transportation, which has been happening repeatedly (JTACSP, Lex, 152/173, reporting judge **JOAQUIM GARCIA**; Appeal 623.538/9, reporting judge **TORRES JUNIOR**, and Appeal 629.715/00, reporting judge **ANTONIO DE PÁDUA FERRAZ NOGUEIRA**), among others.

        With all due respect, it should not be forgotten that the Air Code, seems to be more concerned with goods (cargo, luggage) than with human beings.

        This is a sign of those times.

RG-00250

[coat of arms]                THE JUDICIARY                              36
                    SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

The distinguished RUI STOCO, in a well-known work, on a specific note, outlines that "most of the time, accidents happen not due to an omission, carelessness or incorrect performance of the air carrier, but due to an aircraft manufacturing or construction defect." (Civil Liability and its Jurisprudential Interpretation, RT, 4th edition, page 164), what is in keeping with the teachings of the Italian professor GUIDO ALPA (quoted by Prof. Cláudia Lima Marques, aforementioned work, page. 622), and of Professor and Public Prosecutor ANTÔNIO HERMAN BENJAMIN (Consumer Protection Code, Forense Universitária, 1991, page 55), all this being appropriate to the assumption discussed in these records.

Let it be known by the new generations, and the parents, children, wives, husbands, spouses, and siblings of these families reduced by the crash of TAM's Fokker 100, that they should rejoice in the fact that corrections are being made to gear to better judgments of such cases, which does not solve everything, but I believe that they contribute to reduce, perhaps even extinguish, conducts that focus on profit rather than the actual safety of human beings.

This, allow me to state, is the basis for democratic citizenship. Either the Law is implemented and applied with a humanistic and social mentality (Article 5 of LICC), even though this might imply criticism, without ever hurting common sense, or we shall have the frequent make-believe situation, which feeds disbelief and discredit.

It should be understood that this is not the victory of the weak over the economic superpower, as some may interpret this ruling. It is not. It is the command to allow for Law 8078/90, which emanated from the Federal Constitution, as previously indicated with great zeal, ethics, concern, comparison, legality, and vision, to flow into the arms of Justice.

RG-00251

[coat of arms]                                                                    37

### THE JUDICIARY
### SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

After reflecting a good deal about this case with conviction and certainty, I believe that the direct responsibility under Article 12 of Law 8078/90 (Consumer Protection Code) was not written by the legislators with a purpose other than safeguarding the consumer from the "pushing each other" or "assigning blame", seeking (as was already done in post-war Europe) to socialize the loss when such loss, as in this case, has a common cause and no responsibility on the part of the victims, or a specific third party; and I am sure that even the calamities can be forecasted, as professed by SERPA LOPES (Course of Civil Law, Ed. Freitas Bastos, 4th Edition, page 405).

In this particular instance, some insist in not seeing what the soul sees, and the rest of the people feel silently.

Therefore, very appropriate are the words of CARLOS MAXIMILIANO regarding interpretation of the Law. He reasons that in cases of this magnitude, the Judge should not perform a merely intellectual activity. In cases like this, "the Judge is a sociologist in action, a moralist in office, and he is responsible for making sure that the rules and regulations of human coexistence are complied, preventing and punishing violations". (Hermeneutics and the Application of the Law), Ed. Freitas Bastos, page), always concerned with the principles equity (LUIZ ANTONIO RIZZATTO NUNES, aforementioned work, page 21), and alert to the axioms; as ponders the distinguished CÂNDIDO RANGEL DINAMARCO, that

"the judge who is indifferent to society's axiological choices and who sticks to exaggerated literalism, tends to be unfair" (The Instrumentality of the Judicial Process, RT, 1987, page 274/75).

RG-00252

In view of all this, the claim is found with merit, being enough to establish a compensation, especially in the realm of pain and suffering, it is firm, humane, judicious, nondegrading, effective, and appropriate.

Prior to arbitration, it should be stressed that no amount at all is capable of restoring this very much serious mistreatment, an utter outrage.

As seen from a clear and open standpoint, there is no amount of money that can compensate for the premature death caused by a wrongful act so abrupt and violent, such as what occurred in this instance, in which the victims were reduced to unrecognizable corpses (pages 2157/2165).

Permanent suffering is inside us — it shakes the soul, disturbs awakening, floods the spirit, and generates anguish, disappointment, grief, loss of bearings, emptiness, suffering, pain, and is also causes an impotent and abysmal rage.

It has no price, however high it may be. It is irreparable.

Even though, compensation for pain and suffering has its purpose: to compensate for that which cannot be compensated, without losing track of its inherit punitive character.

Anyway, the Law has evolved. In the past, respectable opinions such as those of the distinguished GABBA LAFAIETE and LACERDA DE ALMEIDA, among others, represented the objectors to compensation for pain and suffering, as shown by CHRISTINO ALMEIDA DO VALLE (Pain and Suffering, AIDE Editora, 1999, page 18). Although, from the teachings of CARVALHO DE MENDONÇA, TEIXEIRA DE FREITAS, AGUIAR DIAS, CLÓVIS PONTES DE MIRANDA, PEDRO LESSA, and OROZIMBO NONATO (mentioned work, page 23), knowing that compensation for pain and suffering has never been denied by the Romans, raising the *actio injuriarum aestimatoria* (mentioned work, pages 31/32), and then compensation for damages began to be implemented at that time, thus repairing the mistake of those early arguments against compensation.

PEDRO LESSA said that money can compensate for pain and

[coat of arms]                           THE JUDICIARY                           39
                              SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

suffering. However, there is no complete compensation, as n ideal, "because life cannot be restored" (mentioned work, page 74), and "pain takes away life's normalcy, changing it for the worse," adds PONTES DE MIRANDA *(Tratado de Direito Privado* (Common Law Treaty), RT, 3rd Edition, 1984, 1, XXVI, page 32, no. 2).

With today's progress, the modern doctrine professing compensation is rich, especially after the Brazilian Federal Constitution of 1988, and Abstract 37 by the distinguished Federal Supreme Court.

Honorable jurists, among which are CARLOS ALBERTO BITTAR *(Reparação Civil Por Danos Morais,* 3rd Edition), ANTONIO JEOVA SANTOS *(Dano Moral Indenizável,* LEJUR, 2nd Edition, 1999, page 234), YUSSEF SAID CAHALI *(Dano Moral,* RT, 2nd Edition, 4th issue), HUMBERTO THEODORO JR. *(Dano Moral,* Ed. Juarez de Oliveira, 3rd edition, 2000), CLAYTON REIS *(Avaliação do Dano Moral,* Ed. Forense, 2nd Edition, 1999), and ARTUR OSCAR DE OLIVEIRA DEDA *(A Reparação dos Danos Morais,* Ed. Saraiva, 2000), expose the level and the importance of identifying extra-pecuniary damages.

CLAYTON REIS, Professor and Judge in the State of Paraná, on a sensible hermeneutic work, states that:

"It is an injury which affects the physical and spiritual values, the honor, our ideologies, intimate peace, life in its multiple aspects, a person's personality, anyway, that which deeply affects not the assets, but affects the human beings to the core, disturbing the peace we all need in order to behave in a balanced way in the winding paths of our existence" (mentioned work, page 205); the compensation being imperative for the victim affected by a non-pecuniary offense, which represents "a form of penalizing the offender to deter him or her from committing new acts harmful to the interests of the individual and society" (mentioned work, page 205).

RG-00254

[coat of arms]                                                                      40

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

However, in this reality, we have not yet reached a mature stage of compensation for pain and suffering with regards to accurately establish a fair compensatory value, which makes it extremely difficult to find an appropriate amount to attenuate the true holocaust caused by the crash of TAM's Fokker 100.

Such task needs to be completed. According to a nearly unanimous opinion, the *quantum* should serve as a discouragement to new offenses, and represents a serious warning to whomever commits a wrongful act, for it should reflect on its property and potentiality. It cannot be so high so as to cause a sudden enrichment, but cannot as well be merely symbolic in such a way that it serves as encouragement to foster mockery and discredit at court rulings.

This symbolism, with all due respect to authoritative opposing voices, contaminates the very objective and usefulness of the judicial proceeding and should be avoided with shrewdness and wisdom, even though it might be noticed, in other instances, that there is a so called pain and suffering industry (RT 757/298), with the disclosure of millionaire compensations such as that in the amount of US$ 34,000,000.00 (according to **WLADIMIR VALLER**, *Dano à Pessoa e Sua Indenização*, RT 1994, page 257).

At this point, it should be stressed that in Europe – particularly in Italy, France, Spain, and Portugal – there is a decisive concern with full protection of claims for pain and suffering. In Uruguay, the compensation for non-property damages have reached increasing values; bearing in mind that in the United States of America and England these compensations **"are very high; in such a way to deeply repress the action of the injuring parties"**, all this in keeping with the research by the Professor of the Federal University of Paraná (mentioned work, pages 206/207), which deserves careful attention of the judges.

RG-00255

[coat of arms]                                                    41

## THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

     Before going any further, it should be noticed that the lawsuit does not indicate that the plaintiffs are pursuing money just for the sake of money, nor that they seek revenge, retaliation or to get rich at the defendants' expense. They have already lost their riches. Nothing will compensate for that, and there is no immorality in pursuing that indemnification projected from the state of the human soul (RT 650/64, reporting Associate Justice WALTER MORAES), stressing that the moral injury without a fair compensation would perpetuate the social and legal imbalance (RT 631/29). This is even more serious and should be avoided, with the certainty that the judge is the interpreter of the values of his or her society, and should seek to interpret those values in search of social harmony, even unveiling them.

     This is his or her greatest legal and social commitment.

     The legal doctrine observes, based on a solid substantiation and translated into the compensatory and perhaps punitive nature of this indemnificatory mode, that the money, regarding pain and suffering, appears as an instrument capable of generating joy and this joy will be the fair price for the pain inflicted, as professed by WILSON MELO DA SILVA (*Dano Moral e sua Reparação*, pages 614/15), which, although bold, is undeniable.

     The plaintiffs on this lawsuit, with painstaking patience, seek a satisfaction that nobody can provide them. And they must still sleep hearing the sound of the old, outdated, almost abject voice of those who claim for dismissal, due to lack of evidence of their inefficacy... and that the guilt lies with others, with third parties...

     Would this be a crisis of mankind or a crisis of the Law, a crisis of man, of transition, of impunity. It is the crisis of civil procedure.

[coat of arms]

THE JUDICIARY

SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

42

Actually, we – judges, lawyers, members of the Public Prosecution Service, Attorneys, Professors, University Students – should make our best efforts towards a change in the legal procedure, so far marked by an individualist sign, overcoming the myths of the traditional judicial procedure.

According to the teachings of the professor and great conductor of civil procedures, the respected Doctor **ADA PELLEGRINI GRINOVER**, to seek the efficacy of the legal action and draw from it a conclusion more consistent with certain basic requirements by the social rule of law, in such a way to make it operative on a material level, restructuring it and adapting it to the social and political scopes of the jurisdiction and to the reality of the contemporary society (*O Processo em Evolução*, Ed. Forense Universitária, 1998, pages 10 and 15).

Regarding this matter, the distinguished **ORLANDO GOMES**, a truly important personality in the Brazilian civil rights, wrote forty-five (45) years ago with extraordinary accuracy, that the juridical order disagreements are revealing factors of the crisis in the Law, particularly in regards to common law, asserting that:

"*the whole law is about to be reconstructed and remade. From its philosophical matrixes to its technical notions. From its moral assumptions to the classification of its provisions.*

Broadly speaking, we could state that common law is undergoing the terrible crisis of a dual personality.

[coat of arms]                    THE JUDICIARY                    43
                      SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Rooted in indefensible philosophical postulates, stratified in decrepit codes, oriented by obsolete criteria, modeled according to old-fashioned standards, bowed by excrescent precepts, constantly mutilated by innocuous partial reforms, which do not follow a univocal thinking, common law is nothing but a spectrum which is supported on the strength of a staggering tradition.

No matter how we cherish these principles, we should still strive to renew and rejuvenate them". (*A Crise do Direito*, Max Limonad, 1955, page 22).

Having said that, and despite its delay, the young and ethical Consumer Protection Code (Law No. 8078/90) cannot be overlooked. It deals with a Federal Law which is reassuring, strong, philosophical, real, noncasuistic, positive, filled with view of the future. Only its concrete application can reveal a new legal, entrepreneurial, social, and even governmental mentality, by building the basis of a moral and ethical compensation system, under the constitutional, which should not be weakened by the tradition of symbolism. Otherwise, with no hesitation, the disagreements described by ORLANDO COMES will continue to make up the pieces of a vicious circle.

YUSSEF SAID CAHALI, in his very appropriate words, quotes a Decision of the Appellate Court (TARS) so as to consider that "compensation for pain and suffering is not solely indemnificatory, but also pedagogic, as it serves as a deterrent, so that culpable such as the defendant's shall not happen again". (mentioned work, page 177).

Due to all this, the arbitration of pain and suffering depends on the specifics of each concrete case, in such a way as to allow the judge to adopt a proper criteria, argues with authority the eminent Minister BARROS MONTEIRO (Interlocutory Appeal 208837/RJ).

RG-00258

[coat of arms]                                                    44

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

In this case, when it comes to the most significant moral wrongful act (violent death caused by wrongful act), committed by a quite diversified class of perpetrators (men, women, youngsters, fathers, mothers, individuals between twenty (20) and sixty (60) years of age, on average), and pointing out that the codefendant Northrop Grumman Corporation is one of the world's largest companies in the aerospace industry, it is reasonable and necessary to pay attention to some particulars.

The main characteristic of subjectivism, which sometimes leads to paradoxical comparisons is the mainline. However, judicial lottery should be avoided.

Therefore, a comparison should be made with some court decisions.

In fact, the honorable Superior Court of Sao Paulo, in a decision regarding damages for the discrimination of an HIV-positive young woman under 30 years of age by a corporation, ordered a compensation in the amount of 2,000 minimum salaries (currently approximately R$ 300,000.00 - Civil Court Appeal No. 85.534-4/3-00, 9th Panel of Common Law Judges, issued by reporting Associate Justice THYRSO SILVA).

The First Panel of Judges (Motion for Reconsideration No. 754.692/1, report by the Honorable Judge J. B. FRANCO DE GODOI), regarding the inclusion of the name of a Professor and Judge in the list of SERASA debtors, and in the list of BACEN for issuing bad check, and whose checkbook had been stolen at the premises of a bank branch, decided for compensation for pain and suffering in an amount equivalent to 1,000 minimum salaries.

The Higher Court of Rio de Janeiro (RT 693/198), in turn, in an exemplary Court Decision, reported by the honorable CARLOS ALBERTO MENEZES DIREITO, then an Associate Justice (currently serving as Minister of the Federal Supreme Court), in the famous case of a news report stating that singer NEY MATOGROSSO was suffering from a deadly disease, ordered compensation equivalent to 3,000 minimum salaries (currently approximately R$ 450,000.00).

RG-00259

[coat of arms]                                                                                    45

### THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Keeping these references in mind, the Honorable Superior Court maintained the amount of the compensation at R$ 2,250,000.00 owed the widow and seven (7) children of a man electrocuted on his way home from work, while riding his bicycle and touched a high-voltage wire laying across the road (RESP 246181, Report by Minister ARI PARGENDLER).

As those who practice law are aware, there are a number of interesting precedents, such as: (a) the sentence in the amount of R$ 20,000.00 due to a unlawful act which caused the left foot of a minor to be amputated (RT 748/385); (b) the death of a penitentiary inmate caused by another inmate (RT 753/157); (c) the interruption of a pregnancy (200 minimum salaries – RT 759/349); (d) the offense against honor deriving from an unfounded theft accusation (400 minimum salaries – RT 734/468); (e) the death of a mother victimized by a traffic accident (1,250 minimum salaries – RT 769/365); (f) the receipt of a credit card without request, which generated undue records at the Credit Protection Service – SPC (100 minimum salaries – RT 747/221); (g) the infection contracted by a patient in a hospital (compensation calculated at four times the amount of pecuniary damages – JTJ, Lex, 162/68) and many others; all of this to show, with no majority vote, how arid is the search for a fair and satisfactory amount.

After the above considerations, we have to bear in mind that human life is only one. The rich and the poor can not be rendered unequal, although they actually are.

The fact is, that almost the totality the victims *in casu* were human beings, differentiated by an intellectual, professional, and economical strength, and pointing out that the deceased youngsters had a history that indicated a promising future, being also plausible to value the social and economic status of the aggrieved parties (JTJ, Lex, 196/9 1; Reporting Associate Justice REBOUÇAS –DE CARVALHO).

[coat of arms]                                                    46
THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

This is relevant data. Therefore, it can not be relegated.

And being aware of this fact and also having demostrated the lack of uniformity in finding the right compensation amount, without losing track of the need to have **an exemplary judgment, but also pedagogic, and avoiding to demoralize such an advanced institution, by applying the punitive damage theory,** as professed by the Jurist, Professor and Judge **CARLOS ALBERTO BITTAR.**

This way, the compensation should be able to enhance life, translate credibility, support hope, and trigger the opportunity of a better tomorrow, trying not to translate into a greater shock to the soul, already impacted by the grief of unacceptable deaths.

Therefore, we shall attempt to find an mount which shall make the defendant feel the damage it caused – its economical and financial possibility being uncontroversial, as already indicated.

The famous Jurist and Professor **CAIO MÁRIO DA SILVA PEREIRA,** after stressing its punitive and compensatory nature, warns that this compensation should be adjusted to

**"an amount which provides pleasure as a compensation for the grief suffered,"**

**"in view of the offender's possessions and the personal situation of the offended party"** *(Responsabilidade Civil,* Ed. Forense, 1992, No. 42, page 55), bearing in mind the gravity of the offense.

[coat of arms]                                                        47

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III — Sao Paulo

By means of this educational process and referring the tragedy of
TAM'S Fokker 100 crash to the dehumanization of the consumption relationship and
the attachment to a materialistic consumption philosophy, and further seeking to
consecrate the importance of the moral value, "which should be protected as much
as, if not more, than property and interests protected under the Law" (RI
761/335), and counterbalancing all this, it should be noted that the victims of the fatal
crash had a stable family and social situation. They enjoyed good reputation and
dignity, in addition to a sound economic and financial situation, and since there is no
proof that the codefendant Northrop Grumman Corporation — we repeat, one of the
world's largest corporation in the aerospace industry — is unable to pay damages, I
believe I am not offending the logic of life by finding the aforementioned
manufacturer of the reverser guilty and ordering them to pay compensation for pain
and suffering in the amount of R$ 2,000,000.00 (two million reals), approximately
US$ 1,111,111.11 (one million, one hundred eleven thousand, one hundred eleven and
11/100 U.S. dollars) per victim's family. This amount will not make the victims rich,
and may not diminish the permanent disturbance inflicted by one of the greatest
disappointments a wrongful act can indeed cause to us all, avoiding this or that
distinction, without setting aside the news disseminated by the media in general, that,
for months, there have been attempts to reach a settlement for approximately US$
800,000.00.

At this point, it would not be inappropriate to go deeper and state that
at this time (June 2000) such amount would generate, if deposited on a savings
account, a monthly income of approximately R$ 12,000.00 (twelve thousand reals), or
US$ 6,666.67 (six thousand, six hundred sixty-six and 67/100 U.S. dollars), an
amount that is not exorbitant, and is equally not far from the high value of this case,
which deserves an extra thought, and that subsidizes the power of the premise that the
compensation should not simply disappear.

It is hereby adjudged extra-pecuniary damages for pain and
suffering.

RG-00262

[coat of arms]                                                              48

**THE JUDICIARY**
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

In regards to the material damage claim, it is convenient to bear in mind the feasibility of setting forth general parameters within the aphorism *ad midi factor, dabo tibi jus* (the judge applies the Law to the fact, even though the former has not been invoked – STJRJTJ 21/432, RTJ 105/1024, 115/392, RIJSP, 43/138, 50/281, 93/185, 115/119, among others), accepted by the civil procedure system (THEOTÔNIO NEGRÃO, CPC – Code of Civil Procedure, and Procedural Law In Effect, 28th edition, annotation 11 to article 282), solely discarding the possibility of refunding funeral expenses, as these were not expressly requested on the complaint brief.

Actually, if there is no doubt (and there is certainty) of the obligation of codefendant Northrop Grumman Corporation to compensate, in light of the Consumer Protection Code, a straight-forward instruction will follow regarding the calculation of the immediate property damages suffered by the victims, which are connected to the payment of 2/3 of the last monthly salary earned by each one of the victims, taking into consideration their respective legally defined occupations, with the possibility, in the settlement phase, and as an exception that the case calls for (within the already underlined lawsuit effectiveness) of evidencing each one of these issues, which is not difficult and requires only submission of a copy of the Employment Record Book of each one and proof of the last monthly salary received, or an equivalent document. The likely lifetime period of sixty-five (65) years should prevail, as shall be detailed further in the provisions of this sentence.

It is essential to stress that codefendant Northrop Grumman Corporation did not specifically oppose this detailed analysis, although their objection stated the recognition of the express request for property damages (pages 1112/1116 – 6th volume) and it is safe to verify that the plaintiffs requested the specific judgment for payment of alimony (page 12, No. 31 – 1st volume), also not opposed by the aforementioned codefendant. This calls for the application of article 334, section III, of the Code of Civil Procedure, being therefore an unchallenged and uncontroverted matter, which is a transparent result of the principle probability (article 300 of the Code of Civil Procedure).

RG-00263

[coat of arms]                                                        49

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

The impleader thesis and the connection deduced by codefendant Northrop need to be analyzed in another part of this lawsuit, in order to include as codefendants the companies Fokker Services BV and Transportes Aéreos Regionais S/A.; the numerous petitions to include joint defendants, after the rendering of the interlocutory judgment which determined that a bond should be provided (pages 761/770), are yet to be analyzed.

It should start by equating the impleader and its connecting link.

Although well written, this issue is not applicable, because the impleader

"is a procedural complicating factor by excellence, and is incompatible with the purpose prescribed by Law 8,078, of 1990, of providing a quick and effective protection for all individuals or companies which acquire or use the product or service as an end user, and nobody else" JTJ, Lex, 148/405, Reporting Associate Justice SOUZA LIMA, on the Consumer Protection Code and its Jurisprudential Interpretation, a work written by Professor and Judge LUIZ ANTONIO RIZZATTO NUNES, Ed. Saraiva, 2nd edition, 2000, page 413).

Likewise, one can also refer to the Superior Court Decision (JTJ, Lex, 183/175), Reporting Associate Justice MAURICIO VIDIGAL, and the Superior Court Decision reported by then Associate Justice, currently Honorable Minister FRANCIULLI NETTO (AI 32.628-4-SP, j. 02/18/97).

This contemporary, dynamic vision is the inescapable result of the wisdom of the provisions of Article 88 of the Consumer Protection Code, bearing in mind that the appeal is the natural recourse of the coplaintiffs before those against who they presume to have the right to redress. The path for these coplaintiffs is undoubtedly a separate recourse.

RG-00264

[coat of arms]                    THE JUDICIARY                    50
                        SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

RIZZATO NUNES further explains that:

"the required systematics of the regulatory text of the Consumer
Protection Code leads to the conclusion that the intent of the rule is to *always*
forbid impleaders in order to ensure the procedural speed in search of
compensating the injured consumer..." (mentioned work, page 417).

Based on these grounds, impleaders are firmly forbidden in lawsuits
supported by the Consumer Protection Code, and this is the opinion of ARRUDA
ALVIM, TERESA ALVIM, EDUARDO ARRUDA ALVIM, and JAMES
MARINS (Annotated Consumer Protection Code, Ed. RT, 2nd edition, page 413).

I therefore deny the impleader requested on pages 1086/1092 (6th
volume) and rule out the connection thesis due to the absolute lack of identity between
the cause of action and the **proximate cause**, pointing out that the latter is centered
around an extracontractual obligation, within the meaning of the Consumer Protection
Code, quite differently from those listed. It should be further stressed that the
connection is device created to speed up the lawsuit (MOACYR AMARAL
SANTOS, page 262) and its reason for being must not be corrupted, which would
happen if the argument were brought up in the defense.

Regarding the joint action filed after temporary preclusion of the
interlocutory judgment on page 817 (4th volume), it is important to consider that the
Consumer Protection Code contains a rule regarding compulsoriness of joint actions
associated with class actions involving the defense of equal individual interests,
pursuant to Article 94 of Law 8,078/91, which is not applicable in this case.

Therefore, the hypothesis is of a facultative joint action by
coplaintiffs, according to the Supreme Court Decision, stating that "on an
indemnificatory proceeding, joint action is always facultative (whether it involves
coplaintiffs or codefendants), and each one of the injured parties may, separately or
jointly, to seek compensation in court" (Resp. 35.496-0, Reporting Minister
DEMÓCRITO REINALDO – an appropriate quote from page 2801 – 15th volume).

RG-00265

[coat of arms]                                                          51
THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

In addition, in view of the particulars of these proceedings, all motions for joint action interventions filed after the rendering of the decision on pages 761/770 shall be denied, since they would – if granted – jeopardize the principle of independent and impartial judge, flying in the face of the provisions of Article 251 of the Code of Civil Procedure.

So it must be, in order not to oppose the seriousness of the aforementioned principle, which also seeks to prevent the party from choosing the judge in the case, a moral claim, as is well outlined by the illustrious Minister ARI PARGENDLER (Resp. 87641/RS – page 2802 – 15th volume).

Within this meaning, I dismiss all motions made after the rendering of the decision on page 817 (4th volume).

However, I grant the inclusion requested on pages 480/486 (3rd volume) of the following plaintiffs: MARIA TERESA CAIADO BALASSIANO, DIANA CAIADO BALASSIANO, BRUNO CAIADO BALASSIANO, ANDRE LUIZ BARCELLOS RODRIGUES, ALEXANDRE AUGUSTO BARCELLOS RODRIGUES, and ANA CRISTINA BARCELLOS RODRIGUES, widow and children of Félix Elias Ballassiano and Francisco José Rodrigues, respectively, who were victims in this tragedy, as well as NAIR DE CARVALHO JANSTEIN, MARIA CHRISTINA JANSTEIN, and ELISABETH JANSTEIN, widow and daughters of Wolfgang Hans Janstein.

At the closing of this sentence, it should be added that the Law is not dissociated from History insofar as it is a part of the social fact.

The history of humankind is its germ.

[coat of arms]                                                    52

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2ⁿᵈ Civil Court of Regional Court III – Sao Paulo

The Law is not a result of human fantasy and – very often – it gives rise to new ways of thinking in a society, in view of its educational purpose. The Law, without undermining the importance of other sciences, is the link and channel, essential to the betterment of mankind, even more so in a much desired democratic society governed by the rule of law.

It is not appropriate to mock society's patience. The arrogance so skillfully disguised as an antiquated view of empty legal concepts should be frustrated and have no consequences in social harmony. It is imperative to avoid flying blind, in order for future generations to be able to use the true legal arteries leading to Justice and to real progress in social coexistence. This is a change that should be attempted by everyone, especially those of us who deal with the Law on a daily basis. It is an inner change, which has been quietly announced by some scholars.

Having said that, we move on to the decision.

DECISION

In view of the aforementioned, it is my opinion that the suit has merit, and the defendant Northrop Grumman Corporation is hereby sentenced to pay the amount of two million reals (R$ 2,000,000.00), equivalent to approximately US$ 1,111,111.11 (according to the currency exchange rate on 06/30/2000), for pain and suffering, to each one of the families affected by the tragedy, an amount that shall be monetarily corrected starting on 10/31/1996.

I further order it to pay, starting from the day of the accident, compensation for property damages equivalent to two thirds (2/3) of the last monthly salary received by each victim, bearing in mind that 1/3 of that salary would correspond to the minimum amount of money needed to support each victim had they survived, as it has a recurring nature (RT 443/340, 303/271, 201/178; RJTJESP, 78/200, 81/57, and JTCASP 117/67, in addition to other Court Decisions).

RG-00267

[coat of arms]                                                                53

**THE JUDICIARY**
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

It is hereby stressed that the likely lifetime of the victims shall prevail, which is stipulated at sixty-five (65) years (RJTJSP, 62/101, 126/157, 129/203, just to mention a few Court Decisions).

Late payments are subject to interest, which shall not require a specific request (Abstract 254 of the Federal Supreme Court), counting from the payment due date, as set forth in Abstract 54, by the Supreme Court, an having the amount of the compulsory insurance deducted, as clearly stated in the jurisprudence (RUI STOCO, mentioned work, pages 812/13), with no bearing on social security benefits, by rule of its own legal nature.

In order to redeem the payable installments, the defendant shall gather funds capable of guaranteeing the full satisfaction of the obligation, pursuant to Article 602, caption, of the Code of Civil Procedure – CPC), and this obligation must be promptly met (Resp. 12.846-RJ, Reporting Judge **EDUARDO RIBEIRO**).

The Christmas Bonus (13th monthly salary) must be included, since it constitutes an integral part of the income that such a pension replaces (JTACSP, 113/310 and 117/67).

Monetary correction of the salary received by each victim shall, as applicable, comply with Abstract 490 by the Federal Supreme Court, to be calculated according to the provisions of Article 604 of the Code of Civil Procedure.

I finally acknowledge that the defendant Northrop Grumman shall be considered a litigant in bad faith, based on its noncompliance with the court-ordered bond, which was supported by the Superior Court Decision written by the Honorable Judge **JORGE FARAH**, since the deadline for said deposit has expired and no other decision exists which cancels this requirement.

RG-00268

[coat of arms]                                                                54

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Likewise, no explanation or justification can be found for such a bold procedural conduct, not as diplomatic as expected from a company of its size and respectability.

Compliance with court orders is important for the well being of the procedural process and ethically imperative, pursuant to Article 17, Section IV, of the CPC – Code of Civil Procedure. The defendant's actions do not deserve praise and demonstrate arrogance, also hurting the dignity of the Justice system (article 600, item III, of the CPC – Code of Civil Procedure – in similar application).

In this regard, the aforementioned defendant, a company existing under the laws of the State of Delaware, in the United States of America, known as a country which breathes democracy, failed to comply with a judicial order which was still in effect, believe it or not; an action that is not consistent with its own history and origins.

It is appropriate to point out this paradox: The United States of America, sometimes, sets an example of pride and open heart to the entire world. And here, it is discouraging to see the defendant, an American company, failing to comply with a court order issued by the 1st Civil Appellate Court, which was not suspended by the Federal Supreme Court, as per the denial decision issued by the Honorable Minister EDUARDO RIBEIRO.

As an example, we should mention a case judged in the American Justice System of *Chum Di*, a national of the People's Republic of China who left his country aboard a ship and on 6/6/1993, as it arrived in New York, jumped off the ship and was subsequently arrested.

However, he filed a petition with an Immigration Judge alleging that he was prevented from having another child in his homeland and that his wife, having been ordered to undergo sterilization at a Chinese hospital, escaped and refused to go through with the procedure. The couple had their house seized by the State and subsequently sought refuge in the United States.

RG-00269

[coat of arms]

### THE JUDICIARY
#### SAO PAULO STATE SUPREME COURT

55

*2nd* Civil Court of Regional Court III – Sao Paulo

He then applied for asylum, which was granted by the Board of Immigration Appeals, while a final judgment was not rendered, as reported by the idealist Professor and Judge of the Federal Regional Court, 4th Region (Porto Alegre – RS), Doctor **VALDIMIR PASSOS DE FREITAS**, in his Doctoral Thesis, considered today a very successful monograph *(A Constituição Federal e a Efetividade das Normas Ambientais [The Federal Constitution and the Effectiveness of Environmental Regulations]*, Ed. RT, 2000, pages 35/36), which is hereby used as a mere comparison between the aspiration which emanates from North America and the conduct shown in this proceeding.

Such an undemocratic discrepancy is not to be commended. The unwillingness to comply with the aforementioned court order cannot be seen as proper conduct for a litigant in good faith. It is a case of *improbus litigator*.

In view of all of these factors, I hereby order the defendant to pay each one of the families affected by this tragedy the amount equivalent to twenty per cent (20%) of the value of the matter in dispute, which I do based on Article 18, Second Paragraph of the CPC – Code of Civil Procedure).

By the burden of defeat principle, the defeated party shall be liable for all legal costs and attorneys fees, which I stipulate to be twenty per cent (20%) of the total amount still to be calculated.

This arbitration is a result of the efforts of the noble counsels for the plaintiffs, Doctor Irineu Strenger and Renato Guimarães Júnior, given the nature and significance of this case, its complexity, the degree of professional zeal shown, the amount of time required, and their unwavering diligence, which calls for the application of Article 20, Third Paragraph, Items "a," "b," "c," of the Code of Civil Procedure.

[coat of arms]

**THE JUDICIARY**
SAO PAULO STATE SUPREME COURT

56

2nd Civil Court of Regional Court III – Sao Paulo

I also declare this action ABATED without examining its merits (Article 267, VI, of the CPC – Code of Civil Procedure), in view of the fact that Teleflex Control Systems, Incorporated, who acknowledged its legal incapacity *ad causam*, being the plaintiffs responsible for costs and legal fees, which I establish at 15% of the value of the matter in dispute, with monetary correction applicable from the date of the filing of the action (Abstract 14 of the Honorable Federal Supreme Court – STJ).

The addition of new plaintiffs approved in this sentence (page 51) should be recorded annotated and reported to the distribution notary, without prejudice to the addition of joint parties on pages 775/776, a juridical-procedural resultant from the temporal preclusion of the interlocutory judgment of pages 817 (4th volume).

*P.R.I.*

Sao Paulo, June 30, 2000.

[signature]
RÓMULO RUSSO JÚNIOR
Court Judge

[stamp:  Acknowledged by the DA in Sao Paulo, on 07/04/00 [initials]
Nelson Luis Sampaio de Andrade – District Attorney]

[stamp:  I hereby certify that this Decision is filed with the Division of Records of this
Courthouse. Sao Paulo 07/04/00. [initials]. I, [initials] have transcribed it.]

RG-00271





PODER JUDICIÁRIO
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III — São Paulo

Processo nº 1.509/98

## VISTOS

### Relatório

SANDRA LUIZA SIGNORELLI ASSALI, SAMIR SIGNORELLI ASSALI e RAFAELA SIGNORELLI ASSALI SUZANA GRECO DE FRANÇA KLEPETAR, ANA CARINA DE FRANÇA KLEPETAR e DAVI DE FRANÇA KLEPETAR HELOISA VAZ GUIMARÃES SAMPAIO GOUVÊA, ROBERTA VAZ GUIMARÃES SAMPAIO GOUVÊA, FERNANDO VAZ GUIMARÃES SAMPAIO GOUVÊA e CAMILA VAZ GUIMARÃES SAMPAIO GOUVÊA. LÚCIA BORDA DE BELLO AQUINO, FELIPE DE BORDA AQUINO e GABRIEL BORDA AQUINO MARIA GUIOMAR AMBRA FOURNIER VIEIRA, MARIANA AMBRA FOURNIER VIEIRA e CASSIO SUPLICY VIEIRA NETO

RG-00272



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO



Juizo de Direito da 2ª Vara Civel do Foro Regional III – São Paulo

MÔNICA KAUTZ BLEINAT, GISELA BLEINAT, PAULA BLEINAT e RODRIGO BLEINAT

TEREZINHA DE JESUS FERNANDES DUARTE, ERIC FERNANDES DUARTE e ELLEN FERNANDES DUARTE

MÁRCIA GONÇALVES DIAS DE BARROS, EDUARDO GONÇALVES DIAS DE BARROS e GABRIEL GONÇALVES DIAS DE BARROS

MARIA BIBIANA PINTO PIZARRO SÁ FORTES, CAMILLA PIZARRO SÁ FORTES e BRUNO PIZARRO SÁ FORTES

VENERANDA APARECIDA SIMÕES DE ALMEIDA, OLIVIA MARIA SIMÕES DE ALMEIDA e LUCAS SIMÕES DE ALMEIDA

DÉBORA REGINA GONÇALVES TAMIELLO, VITOR TAMIELLO, VANESSA TAMIELLO e VIVIAN TAMIELLO

MARIA DO CARMO BRANDÃO FIGUEIREDO e ANA CLARA BRANDÃO DE FIGUEIREDO

KATIA COSTA DE ALBUQUERQUE ALECRIM, ROBERTA ALECRIM TRINDADE e HENRIQUE ALECRIM TRINDADE

MIRIAM RAMOS GUTJAHR, EVA GUTJAHR, ISADORA GUTJAHR e MELAINE GUTJAHR

WANDA MOREIRA VIEIRA, RODRIGO MOREIRA COIMBRA VIEIRA e CAROLINA MOREIRA COIMBRA VIEIRA

CATHERINE FISHER e LEONARDO FISHER

SILVIA LÚCIA PEIXOTO ARJONA, SILVANA PEIXOTO ARJONA, DANIELA PEIXOTO ARJONA e WILLIAN PEIXOTO ARJONA



PODER JUDICIÁRIO
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juizo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

NEUSA MARIA VICENTINE AMANDO DE BARROS, JULIANA AMANDO DE BARROS, LUCIANA AMANDO DE BARROS RODRIGUES e MARIANA AMANDO DE BARROS

MARIA ADELAIDE DECAT MANHÃES, WALTER LUIS DECAT MANHÃES, MARIA FABIANA DECAT MANHÃES DA COSTA e MARCELA MARIA DECAT MANHÃES

IVIANA ZIZZA ROMERO, LEONARDO ZIZZA ROMERO, ADRIANO ZIZZA ROMERO e ROBERTO ZIZZA ROMERO

MARISETE APARECIDA STRAPASSON SIMINONI, ALEXANDRO SIMIONI, LISMARY SIMIONI e ELISANGELA SIMIONI

SHOGHIEH TAEED KASHANI SHAIKHZADEH, FOAD SHAIKHZADEH, FARIBA SHAIKHZADEH e FAEZEH SHAIKHZADEH SANTOS

ROSA NHUCH BOIANOVSKY, MAURO BOIANOVSKY, DANIELA BOIANOVSKY, ANDRÉ BOIANOVSKY e CELSO BOIANOVSKY

CIBELE MONTEIRO DA ROCHA FERRÃO

RENATA OLIVEIRA DA SILVA CASTRO

FERNANDO LOBO VAZ DE MELLO, MARIA DA CONCEIÇÃO MAGALHÃES VAZ DE MELLO e LUCIANA MAGALHÃES VAZ DE MELLO

AIRTON FRANCISCO RODRIGUES e MARIA DAS GRAÇAS DE OLIVEIRA RODRIGUES

JOSÉ ORVAL PALMA, ZÉLIA DE ALMEIDA PALMA, MARCELLO DE ALMEIDA PALMA, MARCOS DE ALMEIDA PALMA e RENATA DE ALMEIDA PALMA

RG-00274



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

FATIMA APARECIDA VARGAS NOGUEIRA, CAMILA VARGAS NOGUEIRA e VINICIUS VARGAS NOGUEIRA

ELIANA MESTRINELLI CREMASCO, EULER MESTRINELLI CREMASCO, ERIC MESTRINELLI CREMASCO e EVANDRO MESTRINELLI CREMASCO

OLAVO AUGUSTO SOUZA CAMPOS DE SIQUEIRA FERREIRA e CECÍLIA MARIA DIAS CAMARGO e

SIMONE PIRES FERREIRA ajuizaram ação de indenização contra NORTHROP GRUMMAN CORPORATION e TELEFLEX CONTROL SYSTEMS, INCORPORATED, afirmando que são parentes diretos ( viúvas, filhos, pais, mães e irmãos ) das vítimas fatais JOSÉ RAHAL ABU ASSALI, GEORGE KLEPETAR, LUIS FERNANDO SAMPAIO GOUVÊA, GLIBERTO AQUINO, CARLOS MARIO FOURNIER VIEIRA, SÉRGIO APARECIDO BELINAT, JOSÉ PEREIRA DUARTE, GERALDO LUIS AREDE DE BARROS, MAURÍCIO F. SÁ FORTES, LUIS CARLOS SIMÕES DE ALMEIDA, LUIS CLÁUDIO TAMIELLO, AGUINALDO BARBOSA DE FIGUEIREDO, HENRIQUE MARQUES TRINDADE, IVO ROBERTO GUTJAHR, ALBERTO COIMBRA VIEIRA, ROBERTO FISHER, WILLIAN ARJONA CHONG, LUIS ANTÔNIO AMANDO DE BARROS, WALTER LUIS MANHÃES, LUIS LAURO ROMERO, AMILTON SEBASTIÃO SIMIONI, MOHAMAD SHAIKHZADEH, DAVI LUIZ BOIANOVSKY, MARCELO DO AMARAL FERRÃO, CHRISTIANO DE GUSMÃO NETO, ALEXANDRE MAGALHÃES VAZ DE MELLO, RILTON DE OLIVEIRA RODRIGUES, MARTA DE ALMEIDA PALMA, JOSÉ WILSON NOGUEIRA, LAÉRCIO CREMASCO, OLAVO RUY CAMARGO DE SIQUEIRA FERREIRA e AMAURI PIMENTA DA VEIGA, em razão do desastre aéreo ocorrido próximo ao aeroporto de Congonhas, nesta Capital, em 31 de Outubro de 1.996, decorrência da queda do avião Fokker-100, da TAM, vôo 402 com destino ao aeroporto Santos Dumont, na cidade do Rio de Janeiro, causando o óbito de todos os passageiros e tripulantes, no total de noventa e nove (99) vidas.



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo**

Asseveram que ficou apurado que a causa da referida queda deve-se a defeito de fabricação da peça da aeronave denominada " *thrust reverser* ", a qual abriu na hora de decolagem, além do defeito no cabo denominado " *teleflex* ", ambos projetados e fabricados pelas co-rés, respectivamente, tendo ocorrido defeito de fabricação, sendo esse o motivo do acidente.

Acrescentam que a perícia efetivada no avião acidentado concluiu que os aludidos equipamentos não funcionaram adequadamente, sendo certo que as fabricantes deixaram de alertar tecnicamente os perigos de sua eventual exposição.

Destacam que é incontestável a responsabilidade das rés por seu mau engenho, sendo essa a causa eficiente do triste episódio, ponderando que houve negligência na manufaturação dos mencionados equipamentos.

Requerem a reparação dos danos materiais e morais daí decorrentes e pedem a integral procedência da ação.

A decisão interlocutória de fls. 474/477, envolvida pela preclusão temporal, equacionara a questão alusiva à competência da Justiça brasileira para conhecer e decidir da causa, facultando-se a emenda da inicial, para a inclusão da pessoa jurídica Transportes Aéreos Regionais S. A. (TAM), mas, debalde, seguindo-se a determinação em favor da citação das rés (fls. 645 – 3º volume).

Por peça autônoma houve pedidos de admissão como litisconsortes ativos ( fls. 480/486 e 522 3º volume ).

Os co-autores de fls. 636, 647, 652, 656, 658, 661 e 677 (3º volume) desistiram da ação, o que foi homologado.

RG-00276



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juizo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

A decisão interlocutória de fls. 761/770 ( 4º volume ) arbitrou a caução na quantia de R$ 500.000,00 por vítima, convocando as partes para a audiência conciliatória, inclusive.

Novos pedidos de intervenção na qualidade de litisconsortes ativos foram formulados (fls. 775/784; 848/852 – 4º volume; fls. 2342/44 – 12º volume, fls. 2749/50, 2761/62, 2678/80 – 14º volume e fls. 1918/20 – 15º volume).

As rés deram-se por citadas (fls. 699 e 706 – 3º e 4º volumes ).

A tentativa conciliatória não produziu êxito (fls. 873 – 4º volume ), seguindo-se a proposta de acordo, sem resultado positivo.

A co-ré Teleflex deduziu sua defesa (fls. 882/903 – 5º volume ), onde levanta preliminar de ilegitimidade passiva *ad causam*, alegando que o relatório final sobre o acidente, elaborado pelo Ministério da Aeronáutica, não aponta que o *feedback cable* tenha apresentado defeito.

Destaca que ocorreu a abertura inoportuna do reversor do motor direito da aeronave, projetado e fabricado pela co-ré Northrop, sendo certo que os pilotos da TAM não receberam a indicação do sistema de alarme da aeronave, o que lhes prejudicou tal identificação.

Articula que os pilotos deveriam recolher o trem de pouso, o que aumentaria a possibilidade de subida da aeronave em mais 15º pés por minuto, mas preferiram avançar as manetes de potência dos motores, daí advindo a perda de desempenho e queda da aeronave, o que demonstra que seu produto funcionou e não contribuiu para o acidente.

RG-00277





P O D E R   J U D I C I Á R I O    7
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo**

Requer a denunciação da lide do fabricante do avião, a empresa holandesa *Fokker Services B.V.* e a extinção do feito.

No mérito, aponta que o *feedback cable* rompeu-se após o choque com o solo e que poderia ter ocorrido a ruptura de peças de outros fabricantes, tendo havido ação agressiva dos pilotos sobre a manete, daí ocorrendo a separação, quando a queda da aeronave já era inevitável.

Pede a improcedência da ação, destacando que não participou do processo de montagem e teste da peça, salientando a culpa de terceiro.

A co-ré Northrop, em sua resposta (fls. 1078/1116 – 6º volume ), destaca que falta interesse de agir de Nair de Carvalho Jansein, em face do recebimento da quantia de R$ 150.000,00, o que representara a quitação pelo óbito de seu parente.

Deduz denunciação da lide da *Fokker Services B.B.* e da Transportes Aéreos Regionais S/A, para que façam parte do pólo passivo da ação, evitando-se o regresso.

Articulam, em peça autônoma ( processo no. 1509/98 – apenso C ), exceção de incompetência do juízo.

No mérito, salientam que o sistema de reversão de motores é um sistema complexo, sendo certo que " sua contribuição relevante para o sistema do reservo é no sistema hidráulico, cujo funcionamento, impecável, não é questionado por quem quer que seja " (sic- fls. 1097 – 6º volume ).

Sustenta que a aeronave caiu por falha do sistema elétrico erroneamente projetado e montado pelo *Fokker*, que acabou acionando o reservo em momento inoportuno e inibindo o aviso do defeito aos pilotos, os quais tiveram atuação infeliz, sendo essas as duas fontes reais do acidente.



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Pede a aplicação do Código Brasileiro da Aeronáutica e do art. 159 do Código Civil, destacando a ausência dos requisitos para sua responsabilidade.

Requer a improcedência, acentuando que a indenização pedida não pode prestar-se para melhorar o padrão de vida dos familiares das vítimas, devendo evitar-se o locupletamento indevido, deduzindo-se os valores eventualmente recebidos a título de seguro de vida, seguro obrigatório e do INSS, em eventual compensação.

A co-ré Northrop deduziu exceção de suspeição, sobrevindo a suspensão do curso do feito (fls. 2092 – 11º volume), seguindo-se a prolação do V. Acórdão (fls. 314/317 – Apenso D), relatado pelo eminente Desembargador DJALMA LOFRANO, rejeitando-se a aludida exceção.

O V. Acórdão (fls. 2442/2450 – 13º volume), relatado pelo culto Juiz JORGE FARAH, da Colenda Sexta Câmara do Egrégio Primeiro Tribunal de Alçada Cível de São Paulo, manteve a decisão que arbitrara a caução, reduzindo-a para a importância de R$ 300.000,00, por vítima.

O despacho de fls. 2487 determinou a observância do prazo constante do V. Acórdão para o depósito referente a referida caução, seguindo-se o pedido da co-ré Northrop, no sentido de que a intimação fosse efetivada na pessoa de seus representantes legais, o que não foi acolhido (fls. 2500/2502 – 13º volume).

Os autores deduziram réplica e requereram o julgamento no estado (fls. 2503/22 – 13º volume).

RG-00279



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juizo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Os autores alegam que a co-ré age de forma imoral, posto que não efetuou o depósito da caução determinada.

As rés impugnaram as intervenções litisconsorciais (fls. 2800/2820 e 2812/2814 – 15º volume).

A exceção de incompetência foi desacolhida, o mesmo ocorrendo com o agravo de instrumento tirado contra a temática visando a intimação pessoal dos representantes legais da co-ré Northrop (cf. V. Arestos da lavra do culto Juiz JORGE FARAH.

O Ministério Público manifestou-se regularmente nos autos.

FUNDAMENTAÇÃO

Trata-se de julgar uma causa especialíssima. O tema, na sua mais pura acepção, não deveria ser entregue ao homem. A hipótese reclama, antes de tudo, a busca da mais ampla realização de Justiça. Não – é certo – uma justiça formal, míope, fria, quase desumana. Aqui tem-se que descortinar o espírito das Leis, lembrando-se *Montesquieu* e os pensadores de todo o planeta, entre eles Platão, Aristóteles, Paulo de Tarso, Fustel de Coulanges e tantos outros.

O processo repousa um drama vivido por toda a sociedade brasileira, um episódio transmitido para todo o planeta, em torno da trágica queda da aeronave denominada Fokker 100, da TAM, decolando do aeroporto de Congonhas, nesta Capital, dentro do serviço diário desenvolvido na conhecida "ponte aérea São Paulo - Rio de Janeiro", naquela manhã de 31 de outubro de 1.996, com a morte coletiva de noventa e nove (99) pessoas.

RG-00280



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

A todos que venham a ler esta sentença preciso confessar minha dificuldade. O homem, filho, marido, pai, irmão, professor, cidadão, enfim o partícipe desta sociedade de tantas incongruências, sente-se, enquanto magistrado, por vezes, impotente diante das injustiças que sobrevoam nossas cabeças, posto que nosso Brasil é rico em Leis, mas não esbanja Justiça, apesar de tantas mentes sérias e iluminadas que compõem o Judiciário Paulista, com as quais tenho a honra conviver nesses treze (13) anos na judicatura.

Aliás, difícil dizer, mesmo naqueles países ditos de primeiro mundo econômico, se há terra que se preocupe, de fato, com a Justiça ? Há, com certeza, aquelas que sabem fabricar o consumo e o individualismo. A imprensa, em todos os níveis, já nos mostra, com suficiência, isso. Basta querer ver.

Assim frisado, é importante considerar que a Justiça não é tarefa de consumo. É missão. Missão não divina, posto que esta Justiça, do processo civil, pode, em algumas vezes, não ser a Justiça real ( art. 3º, I, da Constituição Federal) que todos nós, enquanto sociedade digna e democrática, queremos. O homem, contudo, enquanto Juiz, tem o dever que lhe é confiado pela sociedade, porque o Juiz de Direito é um braço livre e fundamental do Estado democrático de Direito, de dizer o direito escrito na Lei, mas sem perder de vista que o cidadão espera que o Magistrado interprete, em seu nome (*pressuposto de cidadania*, art. 1º, II, da Constituição Federal)), o texto legal, tornando-o racional, vivo, adequado, atual, humano, positivo, confiável e especialmente Justo.

Entenda-se, assim, autores e réus, nobres e combativos advogados que funcionam tão elegantemente nestes autos, digno Promotor de Justiça, funcionários dedicados do 2º Ofício Cível deste Foro, sociedade em geral, que parece a este Juiz que não há nenhuma Justiça a ser feita neste caso, ao menos neste mundo da matéria e do consumo.



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Impossível avaliar a perda de tantas vidas, ainda mais com o desaparecimento desses sorrisos pela espada do desespero e do inevitável.

Não sei, a esta altura de minha vida, se a sociedade não deve repensar se o homem existe para a sociedade dele usufruir, como autêntico produto, ou se é o *ser* a verdadeira raiz da sociedade ? Trata-se de reflexão para o hoje, mas direcionada ao amanhã.

Cravadas essas necessárias observações, qual o retrato nú do processo: dizem os autores que a aeronave caiu e que faleceram seus entes queridos, por força da falha do *reverso* e do *feedback cable*, produto fabricado pelas rés Northrop Grumman Corporation e Teleflex Control Systems, Incorporated (pessoa jurídica pertencente ao mesmo grupo societário da Northrop Grumman Corporation); enquanto sustentam as rés que não têm culpa no evento, porque não houve falha do equipamento fornecido, tendo havido má atuação da tripulação da TAM, não cabendo o enriquecimento das famílias das vítimas à custo da alegação de dano moral.

Nesse horizonte, a voz que ouço é aquela de que há algum responsável escondido nas entranhas da impunidade, restando, dentro do processo, apesar da rudeza da causa, encontrar seu porto, sendo certo que o processo distingui-se por ser a instituição correta para essa descoberta, porquanto seu fim maior é o restabelecimento da *paz social*, afastando-se a angústia e a antinomia e retomando-se o curso da vida civilizada.

A esse respeito, confiram-se as lúcidas considerações e firme contribuição do eminente Professor **GALENO DE LACERDA**, Catedrático da Faculdade de Direito de Porte Alegre, Universidade do Rio Grande do Sul ( Tribuna da Magistratura, Caderno de Doutrina, abril/99, págs. 57/65).



PODER JUDICIÁRIO

TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

12

**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo**

Antes do mais, indague-se se será possível, em momento em que se verifica a evolução do direito enquanto ciência, já discutindo-se a profundidade dos direitos difusos, do direito do consumidor, da problemática internacional do narcotráfico, da Lei que penaliza a pessoa jurídica nos crimes ambientais ( Lei 9.605/98), dos direitos comunitários, dos novos direitos (valorização) da personalidade humana, da discriminação, do nascituro *in vitro*, da revolução de agilidade provocada dos Juizados Especiais Cíveis, etc., admitir-se o verdadeiro escudo defensivo baseado na impureza nevrálgica da negativa ?

Fácil, como sempre, montar explicações para a não responsabilidade. Pouco comum, ao revés, é **comprovar**, com a firmeza que o caso requer, a coerência no agir e sua fiel diligência em todos os momentos da marcha produtiva, no lado do verdadeiro não comprometimento com a eventual falha, vício ou defeito, escondido ou não.

Superados esses registros, não é difícil dizer que o passageiro do vôo 402 da TAM, o consumidor final, aquele que adquiriu o bilhete de passagem e ao ingressar na aeronave marcou o início do respectivo contrato de transporte, típica obrigação de resultado, é o ponto de partida do juízo dedutivo em torno desta causa.

Sim. Ele é.

Com efeito, não se pode perder de mente que não é o produto (visto em seu todo) que existe para o homem, mas sim o homem que dá motivo para o nascimento do produto. Não se deve inverter esse foco. Necessário, pois, clarear tal raciocínio.

Assim não há nenhuma dúvida, quer para a sociedade organizada, cidadãos, contribuintes, homens, mulheres, crianças e para o próprio Estado, que o passageiro do vôo 402 da TAM não é responsável pela referida tragédia.



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO



**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo**

Subsiste, agora, a obrigação do Estado, representado pelo Poder Judiciário, localizar quem é o artífice desse magistério: o fabricante do avião, o fabricante da peça *reverso*, o fabricante de parte de outros componentes que compõem a peça *reverso*, todos os fabricantes, a TAM, o piloto, a tripulação, ... a fatalidade ?! Quem ou o que ?

Não se sabe, dentro da verdade que vem do interior do ser, quantos podem ser incluídos nesse rol.

Feitas essas considerações, o ponto capital da causa está fincado na projeção da seguinte imagem: o produto fabricado pelas rés, o denominado " *thrust reverser actuators* –" (reverso ou sistema de reversão de motores) ou, ainda, as peças denominadas " *feedback cable e turnbuckle* ", apresentará defeito ou vício, em especial na parte referente à não previsão da eventual pane no sistema elétrico do reversor e seus reflexos em seu regular, pleno e perfeito funcionamento, com a abertura inadvertida do reverso, daí resultando comprometida a potência necessária para a normal decolagem do Fokker 100, da TAM, com a fatal seqüência de apenas vinte e quatro segundos (24s) totais de vôo e , ato contínuo, o trágico choque da referida aeronave que não exige lembrança ?

O primeiro passo, para equação dessa delicada questão, é avaliar-se o conjunto da tarefa probatória produzida no seio do Ministério da Aeronáutica, materializada no relatório final subscrito pelo Tenente Brigadeiro do Ar Ronald Eduardo Jaeckel e pelo Coronel Aviador Douglas Ferreira Machado (fls. 905/952).



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Averbe-se, pois, que esse elemento probatório é mais do que suficiente para o imediato julgamento da causa, não só por seu poder de convencimento, mas também porque é inútil retardar o desfecho da ação, posto que não há, à luz da lógica, razão objetiva para a produção de prova outra, posto que todas aquelas provas possíveis e admissíveis já estão ou deveriam estar nos autos, ainda mais verificando-se o ponto fulcral do feito. Imperativo, por isso, o julgamento antecipado da lide, como impõe o artigo 330, inciso I, do Código de Processo Civil.

Registre-se, a propósito, que o aludido trabalho pericial tem força probatória, em especial porque elaborado por homens que o traçaram com a responsabilidade de agentes públicos, tendo, por via oblíqua, base sólida, fluindo a presunção de seriedade, aliás, não maculada em nenhum momento do processo, nem mesmo pelas rés, o que lhe confere maior valor e eficácia processual.

Por essa trilha, fixe-se, neste instante, que o aludido relatório não é vago. Ao contrário. Tem ele fiel dose de convencimento, uma vez que realizado de modo pedagógico, científico, objetivo e cujas conclusões foram extraídas de todo o material fáctico recolhido no local da queda da aeronave Fokker 100, da TAM.

Ademais, este subsídio de prova foi extraído após longa e demorada pesquisa, a qual consumiu quatorze (14) meses do Sistema de Investigação e Prevenção de Acidentes Aeronáuticos, Departamento do Ministério da Aeronáutica, espelhando, ainda, o exame das aludidas peças ( reverso e demais componentes ) e sua complexidade funcional, tudo a viabilizar seu uso como ponto central para o deslinde deste importante e complexo processo.

De rigor, tanto por tanto, sua análise pormenorizada, sem deixar de prover, como manda a temperança e a cautela, a dedução de um balanço de suas conclusões e revelações, mobilizando-se seu todo, sem perda de harmonia e razoabilidade.

RG-00285





15

**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Assim sendo, o aludido relatório afirma que embora os testes de inspeção realizados no sistema tenham revelado que os "atuadores estavam plenamente operacionais" (fls. 908), a análise cuidadosa do "reverso" destaca que a falha do produto (reverso fabricado pela co-ré Northrop) era real, na medida em que:

" o relatório de análise de falha do reversor emitido pelo fabricante para o processo de homologação **não** apresentava todas as condições possíveis de *inadvertent positive* e **não** considerava a possibilidade de uma falha dormente (*dormant fail*)..." em especial no plano da superveniência de uma "falha extremamente improvável" (fls. 910).

Sem prejuízo, uma das conclusões extraídas no relatório final do Estado-Maior da Aeronáutica ( fls. 941 ), sem entrelinhas, positiva que:

" a investigação constatou ter ocorrido uma abertura inadvertida do reverso do motor direito     quando    a aeronave deixou a pista ", antes de qualquer ação dos pilotos,  o  que sobressalta e ativa a preocupação de todos quantos possam avaliar o grau desse registro emanado dos experientes e responsáveis homens do Ministério da Aeronáutica.

Nesse garimpo, antes do mais, crave-se que os equipamentos, sistemas e instalações de uma aeronave não podem, sob o respaldo de nenhuma escusa, ser considerados isoladamente. Não. Todos os componentes (produtos para o código do consumidor) devem, ordinária e necessariamente, estar em cooperação irrestrita, especialmente da ótica da relação especial de consumo, cravando-se que o transporte (obrigação de resultado) – visto como um todo – ainda mais o transporte aéreo, é tarefa de altíssima importância, a qual envolve inúmeras vidas humanas, daí partindo uma singular   e destacada responsabilidade moral  e jurídico-objetiva, sem aprofundar-se, até porque não necessário , acerca do evidente risco do inerente.

RG-00286



**P O D E R   J U D I C I Á R I O**    16   302

TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Linhas adiante, o relatório do Ministério da Aeronáutica considera que "o fabricante não considerou a possibilidade de um colamento dos contatos" e por conseguinte " o caso não foi analisado ", o que justifica a afirmação de que

houvera "uma falha dormente" no reverso (falha que pode se instalar sem, contudo, ser percebida), tudo consoante importante desdobramento marcado na referida peça (fls. 911).

Além disso, o diagrama de análise de falha do reversor, feito recentemente pelo fabricante, após a referida tragédia, ressalva que:

" mesmo não levando em conta uma falha dormente, indica que a probabilidade de uma abertura *inadvertida dos reversores*, a qual *é da ordem de 10-6 "* (percentual muito elevado), não satisfazendo, por isso, "os requisitos de aeronavegabilidade...", segundo o frisado pelos agentes públicos do Ministério da Aeronáutica (fls. 911).

Sem perder este contexto, os testes realizados envolvendo os reversores, em favor da atuação da trava secundária das portas dos reversores de empuxo das turbinas mostraram, sem rebuscar, a

" *inconsistência nas respostas dos mesmos e a consequente falta de confiabilidade por eles apresentadas. Os componentes, que deveriam apresentar um padrão de qualidade aeronáutica, colocados em operação, sofrem uma deterioração anormal, inexplicada pelos próprios fabricantes que vêm, há algum tempo, pesquisando formas de otimização"*. (fls. 912, g.n.), o que chama a atenção e alarma, alarma muito.



P O D E R   J U D I C I Á R I O
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

17

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Aprofunde-se, ainda mais, para encontrar no espírito do referido relatório, que só não foi mais contundente porque alheio a seus objetivos, o diagnóstico de que o avião Fokker 100 da TAM caiu porque o

*"secondary lock actuator dos reversores devem ser reanalisados e ter a sua confiabilidade aumentada*, incluindo-se testes finais de impedância e resistência elétrica, pré-delivery e pós-montagem na aeronave" (fls. 949, g.n.), o que, no mínimo, sob o governo da responsabilidade que pousa e repousa na asa da prudência, dentro do transporte aéreo, é inadmissível.

Por essa lente, após o relatório aeronáutico afirmar que os tripulantes estavam com seus certificados de capacidade física e de habilitação técnica válidos, descansados e que aquela era a primeira decolagem do dia, sendo o comandante experiente e a aeronave registrava a ordem e a atualização de suas revisões e inspeções, declararam os técnicos que a aludida anormalidade se pronunciou no primeiro (1°) segundo de vôo, não constatando-se a ocorrência de avisos sonoros e luminosos denunciadores dessa excepcionalidade, revertendo o ciclo do reverso (reverso aberto), produzindo na aeronave, por quatro (4) segundos uma grave queda de potência, deteriorando seu desempenho ( fls. 941/942 ), abrindo-se, então, a arquitetura que exige exercício de memória.

Além disso, pontuam os *experts* da aeronáutica que o procedimento de "reverser unlocked" na decolagem

"deixou de ser treinado no simulador de vôo pelos tripulantes da empresa" , posto que esclarecera o fabricante que " uma abertura do reverso em vôo através do seu acionamento não seria possível, devido à proteção do "Switch Ground/Flight" do sistema selecionado ( fls. 942 ), o que não veio apoiado dentro de nenhuma explicação técnica equilibrada, adequada ou capaz de salvaguardar o estigma dessa aparente certeza do não vício, sem a pronta demonstração, a qual deveria acompanhar a contestação, tão necessária em situações tais, de que o reverso era da melhor qualidade, como exigir-se-ia, o que autorizaria a avaliação da diligência do fabricante, como pondera a doutrina de LUIZ GASTÃO PAES DE BARROS LEÃES(Responsabilidade do Fabricante pelo fato do produto, Saraiva, 1987, pág. 154/55).



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo**

Assim, o que se vê, com claridade e senso de não escamotear, é que o avião não caiu apenas e tão somente pela má projeção do sistema elétrico montado pela Fokker ou pela Dowty Aerospace Hydraulics, o qual acionou o reverso em momento inoportuno e inibiu o aviso desse defeito aos pilotos, que, segundo a co-ré Northrop, tiveram atuação infeliz (sic-fls. 1099).

Não.

O avião caiu porque o fabricante de peça tão vital, a co-ré Northrop, como é o chamado "reverso", não teve o zelo ou a competência-humildade de prever a probabilidade de eventual mau funcionamento do sistema elétrico a ele interligado e conferiu a este componente um *status* de independência que dito produto não possuía, até porque parte de um todo simétrico e ordenado.

Não se conduzira a referida co-ré Northrop, como era exigível, no sentido de alertar os fabricantes dos demais competentes que interagem com o reverso, do quão substancial é o funcionamento da parte elétrica, sob pena do mau desempenho do seu produto, isto, diga-se, segundo a sua própria ótica, de acordo com sua tese de contestação.

Era necessário, sem exagero, que o fabricante do reverso (sistema complexo e enfeixado), a co-ré Northrop, tivesse a cautela de prever, mas prever com um espírito sereno, claro e limpo de nuvens, como lhe era de possível, a probabilidade da eventual falha do sistema elétrico e eventualmente comprometedor do perfeito funcionamento de seu produto. Um raciocínio é inseparável do outro, sob pena de tal representar omissão vizinha ao dolo eventual.





**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Aliás, a omissão desta providência é de tão elevada monta e de tal ordem preocupante que atormenta a todos.

O que é possível concluir, pela leitura do relatório do Ministério da Aeronáutica, não povoada pela desculpa, e procurando ver este processo como um retrato do próprio homem, é que este, na maioria das vezes, não aceita suas falhas. Prefere escondê-las dentro de si próprio, ainda que, dentro de seu "eu", seja alertado a corrigi-las.

Quando, no entanto, como aqui, o homem perde seu domínio e passa a ser dominado pela máquina que projeta, esquece-se que a criatura leva as virtudes e os defeitos do criador e cabe a ele, homem pacífico e humilde, pesquisar, diuturnamente, quais os defeitos previsíveis e talvez encobertos na máquina, seu produto de consumo, certo que esses defeitos são do homem e não da máquina, mesmo aceitando-se, até por racional, o limite e o nível humano de conhecimento técnico e científico compatível com o exato momento da produção.

Aceite-se, portanto, que houve falhas no reverso da co-ré Northrop, o qual abriu inoportuna e inadvertidamente no primeiro segundo de vôo, sem nenhum ato dos pilotos e sem a denúncia de avisos luminosos e sonoros, não transpirando da referida prova, de outra parte, a existência de vício ou defeito no *feedback cable*, produto da co-ré Teledyne Control Systemes, Incorporated, o que, por conseguinte, a isola na participação no evento danoso.

Além disso, é importante deixar escrito que não há nenhuma prova segura de que houvera a eventual ou episódica má atuação da tripulação, em especial do piloto e co-piloto, ou ainda de que essa possível conduta tenha desencadeado, **com exclusividade**, a queda do avião, ainda que se possa admitir alguma deficiência na aplicação de comando (fls. 1879).

RG-00290



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO                    20

Juizo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Não.

Não há nos autos, mormente com o mesmo perfil e caráter categórico do remanescente que brota do referido relatório aeronáutico, que permita, com tranquilidade, fixar-se que a causa única e exclusiva da malogro do Fokker 100 da TAM, foi a imperícia da tripulação, destacando-se que os *experts* não deixaram de perceber que:

"*a condição com que a inusitada anormalidade se apresentou à tripulação e a falta de avisos, indeterminou a intencionalidade da ação ...* " ( fls. 1879), o que merece registro e muita atenção do julgador, a indicar, com transparência, que a conduta dos pilotos está fora da linha de desdobramento causal provocado pelo inoportuno e inadvertido acionamento do reverso, pontuando-se que

"*o desconhecimento por parte dos tripulantes, por insuficiência de avisos e de informações sobre a anormalidade, foi determinante para que eles abandonassem a sequência normal de procedimentos ...* " (fls. 1.879 – 10° volume), o que, sem contraprova equivalente e na margem da vanglória, elimina, ordinária e necessariamente, a idéia da co-ré Northrop, no sentido de que a razão da queda da aeronave foi a atuação infeliz dos pilotos (sic – fls. 1099 - 6° volume).

Não se pode e não se deve, posto isto, distanciar a causa primária de seu efeito secundário. A queda da aeronave, portanto, foi provocada, segundo a abalizada prova produzida, pela inoportuna e inadvertida abertura do reverso, não sendo humanamente exigível dos pilotos ( em pouquíssimos segundos ), como asseveraram os técnicos do Ministério da Aeronáutica, superar essa anormalidade, máxime pela ausência de avisos e informações denunciadoras.

Essa temática, desprovida de elemento probatório que lhe conferisse base e razoabilidade, acaba, na via reflexa, maltratando o equilíbrio e a plausibilidade. Chega a causar sobressalto à gerência dos atributos da serenidade e da interpretação resoluta e comprometida com a franqueza.



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

21    3026

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Esta é, sem reparos, a verdade que emana do conjunto do resultado da inspeção realizada pelo Ministério da Aeronáutica, sobre o qual as rés tiveram ampla participação, acompanhando todos os seus procedimentos sem nenhuma impugnação, o que chama a incidência do art. 334, inciso III, do Código de Processo Civil.

Lembre-se, exatamente agora, que não dependem de prova os fatos incontroversos, não havendo trânsito, pois, para a prova de fato não controvertido (STJ, RTJ 93/162), destacando-se a força probante que resulta do mencionado relatório, posto que realizado logo após a queda da aeronave, por agentes públicos, tendo, assim, a presunção de verdade dos atos administrativos em geral, ainda que possa ser considerado na quadra de um simples indício.

PONTES DE MIRANDA, a esse respeito, com sua autoridade, explica a utilidade dos indícios para a solução das lides, lecionando que

" o indício pode dar mais do que presunção – pode dar certeza, ou só compor a presunção *hominis*, pode dar elemento íntimo da prova " (Comentários ao Código de Processo Civil, III, pág. 419).

No mesmo tom, com expressividade, o Ministro PEDRO CHAVES, em voto magistral, semeia que é de larga validade a função esclarecedora dos indícios no deslinde das mais várias questões (Prova no Civil – Interpretada pelos Tribunais, registros de Wilson Bussada, Ed. Sínteses, págs. 177/78).

Nada, mas nada mesmo, pode ser dito àqueles que não acreditam que erram. O erro, para estes, é sempre do outro. Para estes só a paz da consciência é consolo, ou tormento.

RG-00292



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juizo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Dentro do balanço dos elementos de convicção amealhados, fixe-se aos Senhores e Senhoras familiares das vitimas e autores desta ação, aos Senhores Doutores Advogados, ao Doutor Promotor de Justiça, à sociedade em geral, que não consigo enxergar de outro modo esta causa, sobre a qual venho refletindo há vários e vários meses e nos meus limites humanos e intelectuais lhes digo que sinto justo reconhecer, como nesta ato reconheço, que houve vício de informação, concepção, projeto, montagem, eficiência, interligação com a quadra hidráulica e elétrica do reverso, do produto fabricado pela mencionada co-ré, o que, na raiz, comprometeu sua segurança e confiabilidade, caracterizando-se, tanto por tanto, um autêntico "vício no produto", o qual o artigo 12, *caput* e parágrafo primeiro, do Código do Consumidor não admite, impondo-se, desse modo, o dever de indenizar, perdendo-se qualquer imagem de aplicação do antigo artigo 159 do Código Civil, o qual não guarda nenhuma sintonia com o universo desta causa.

Pelo que minha convicção me conduz e examinando-se a prova produzida, a qual não é impugnada por nenhuma das partes, tem-se que a co-demandada nem mesmo preocupou-se em tentar provar, como lhes cabia, que seu produto (o reverso e seus componentes hidráulico ), é perfeito, conquanto a perfeição tenha a foco autoflagelo e de ferir a credulidade.

Por oportuno, ademais, firme-se que tal prova era de simples produção às rés. Bastaria trazer, com a contestação, como era de império à co-ré (artigo 300 c/c artigo 333, II, ambos do CPC), a comprovação do quão impecável era seu produto, com a revelação oficial de todos os testes e verificações praticadas em torno do funcionamento isolado e em conjunto do reverso, enquanto peça, componente, ou sistema (hidráulico) plenamente confiável e imune ao mau funcionamento, ainda que dormente, como diz o laudo do Ministério da Aeronáutica e prevendo-se, como era fundamental (mesmo na fadiga investigatória do fabricante), uma eventual pane do remanescente do sistema da aeronave, em especial o elétrico e o de denúncia sonora ou luminosa de alguma irregularidade aos pilotos e tripulação, respeitando-se, ato único, o princípio processual da eventualidade (art. 300 do Cód. de Processo Civil).

23

302°
04



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Sem isso, não há, a bem de um juízo de salvaguarda da seriedade do processo, de não quebrantar a confiabilidade no sistema jurídico e dentro de uma visão moderna do direito privado, em especial o direito do consumidor, como dizer que a ré fabricante do *thrust reverser actuators* não tem responsabilidade pela queda do avião. Tem pela omissão de não rever a possível falha do sistema elétrico eventualmente comprometedor do regular, integral e pleno desempenho de seu produto (reverso) e, consequentemente, desencadeante de tudo o que assistimos, marcando-se a ausência de prova da eficiência – perfeição – do mencionado produto.

Melhores, por certo, são as palavras do advogado Doutor LUIZ CÉZAR RAMOS PEREIRA, em artigo escrito há mais de dez (dez) anos, mas atual como este sol de hoje (13.06.2000, 8,50 hs), no sentido de que:

" Na verdade o fabricante deverá provar que o seu produto é perfeito. Aliás, a prova produzida pelo fabricante é mais fácil de ser produzida, do que transferir este ônus ao lesado. Corre, porém, o risco de não conseguir provar o alegado pelo lesado, mas este é um risco que não pode ser transferido para o lesado, em hipótese alguma. A prova liberatória tem que ser fornecida primeiro pelo fabricante, depois pelo intermediário, se for o caso, mas nunca pelo lesado, pois, este já suportou ou suporta a lesão provocada pelo dano " (RT 654-54), acrescendo-se, ainda, nesse mergulho de coragem e verdade que emana das reflexões do ilustre advogado e especialista em Direito Internacional Privado, que

" O fabricante deve ser punido, mesmo quando põe no mercado produto que não apresenta vício ou defeito, mas posteriormente vem apresentá-los. A idéia e a filosofia que se aplica é que, se pune por um produto posto em circulação no mercado, que não é próprio para o uso a que foi desenvolvido " (RT 654-55), mormente quando

RG-00294



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

24

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo.

o fabricante crê, como se sente no caso dos autos, na certeza do perfeito funcionamento de seu produto, o qual é, em dado momento do projeto imune a vícios, sem dimensionar, talvez porque com os olhos vendados pelo não descortino da humildade, mas muito mais pelo afã do produzir para o consumo, a possibilidade de falha conjuntural comprometedora da segurança e da real confiabilidade de seu produto.

Homenageie-se, sem dúvida, os projetistas da ré. Não se deixe de reconhecer, custe o que custar, que houve vício não previsto, mas humanamente previsível, no reverso, o que impõe a prevalência do princípio da garantia, um dos vértices da Lei 8.078/90.

Entenda-se, por esse prisma, que o fabricante não se isenta de responsabilidade sob o argumento de desconhecer o vício do produto . Do contrário, cairia por terra todo o sentido humanístico e lógico do Código de Proteção ao Consumidor.

Nesse sentido, a Professora ODETE NOVAIS CARNEIRO QUEIROZ, leciona que

"mesmo desconhecendo tais vícios, o fornecedor não se isenta "" (pg. 46, g.n.), merecendo ressalva a prudente observação do idealista e Professor ANTONIO HERMAN DE VASCONCELLOS BENJAMIN, no tom de que a inadequação do vício de qualidade gera presunção *jure et de jure* de falha ( pg. 112), ditando a emérita Professora MARIA HELENA DINIZ, nesse perfil, que a responsabilidade do fornecedor por vício de quantidade e de qualidade por insegurança, relativo à tutela da incolumidade física do consumidor é objetiva, marcando-se que o vício de inadequação ou mau desempenho gera a referida presunção absoluta, mesmo em sede de prestação de serviços ( pág. 45 ).

RG-00295



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

25

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Além de tudo isto, os juristas **GABRIEL A. STIGLITZ** e **RUBÉN S. STIGLITZ**, em exame profundo sobre a defesa do direito dos consumidores, expressam que " *Las Directrices de las Naciones Unidas* ", marcam **"uma serie de mandatos"**, entre os quais destaca-se a *"prevención y proteción efectiva contras las prácticas que puedan perjudicar los interesses económicos de los consumidores"* (Derechos y Defesa de los Consumidores, Ediciones La Rocca, Buenos Aires, 1994, pág.

Prevenção, sin, esta é a palavra. Prevenção com responsabilidade. Prevenção como princípio. Prevenção com elo de confiança. Prevenção como garantia. Prevenção como ponto de apoio. Prevenção, enfim, para que haja proteção do usuário do produto. Essa é a única razão de ser de uma Lei modelar, para o mundo todo, como é a nossa **Lei de consumo**, sem prejuízo, por natural e intuitivo, da luz que se distribui do enunciado ditado pelas Nações Unidas.

Não se esqueça, jamais, que o orgulho do bom produto não está no hoje, mas no amanhã. A esse propósito, leia-se, quem quiser, o relatório que registrara a existência de resíduos de benzeno na famosa água " *Perrier* " (*Food and Drug Administration* FDA) e constate-se a postura do fabricante, seu investimento na correção e fundamentalmente seu reconhecimento na falha e posterior reconquista de mercado. Há, *data vênia*, certa educação nessa conduta. O futuro não é patenteado, como o produto. Dele virá o ensinamento. Até lá ...

O reverso falhou, não funcionou como previsto, apesar do empenho de seu fabricante. Falhou, repita-se, talvez em medida não expressiva, mas, **ao arrepio da alma**, deixou de funcionar em momento significativo e o suficiente para proporcionar - **sem a revelação de concausa outra, séria e decisiva** -, a queda da aeronave Fokker 100 da TAM.

RG-00296



PODER JUDICIÁRIO
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Tivesse, portanto, funcionado o reverso, qual a expressão que teríamos hoje ?!

Por isso, é delicado, mas deve ser dito, que não se deve viver o regime da profissionalização do não dano. Tudo que deve funcionar coligado impõe a responsabilidade de todos os fabricantes de todos os componentes (produtos), a bem da harmonia do conjunto, tal e qual, em simples analogia desafiadora, pelo reverso, a desarmonia da orquestra pelo episódico, aparentemente secundário e sazonal, desafino do músico que toca a "tuba" e compromete todo o espetáculo.

Há, sem mais, solidariedade passiva objetiva entre todos os partícipes do processo produtivo, criação essa ditada por um modelo legal extraordinário (artigos 7º, 18, 25, 28 e 34 da Lei 8.078/90), inovação merecedora de aplauso, como ensina o ilustre Doutor JOSÉ GERALDO BRITO FILOMENO (Código Brasileiro de Defesa do Consumidor, comentado pelos autores do Anteprojeto, Forense Universitária, 2ª ed., pág. 75), autorizando-se o direito de regresso autônomo e independente, como é sabido.

Assim, não há como não concluir que o reverso não funcionou. Não era e não comprovou sua eficácia, sua perfeição. Dormia. Esse foi seu defeito. O que daí desbordar não é assunto que interesse ao consumidor. Nem mais, nem menos.

Neste instante, o Doutor LUIZ ANTONIO RIZZATTO NUNES, magistrado de escol, homem que tem a relação jurídica de consumo presente no seu dia a dia, estudioso e excepcional especialista no tema, mostra, com sutileza que:





**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

" *O defeito, por sua vez, pressupõe o vício.*
Há vício sem defeito, *mas não há defeito sem vício. O vício é uma característica inerente,* intrínseca do produto *ou serviço em si* "
(Comentários ao Código de Defesa do Consumidor – Direito Material, Ed. Saraiva, 2000, pág. 157).

O não-funcionamento, pois, é o defeito originado do vício da imprevisão do previsível, como já marcado. O defeito, revela, o ilustre Professor, com sua autoridade,

" tem ligação com o vício, mas, em termos de dano causado ao consumidor, é mais devastador " ( ob. Cit., pág. 158).

Assim cravado, arremate-se que a expressão substantiva "defeito" escrita no art. 12, *caput*, do Código do Consumidor, merece interpretação elástica, expansiva mesmo.

Vem do eminente RIZZATTO NUNES a verdadeira exegese, no plano de que:

" Como norma protetora do consumidor deve-se entender que o elenco das hipóteses aventadas é meramente exemplificativo. Qualquer outra possibilidade ligada ao produto, quer antes, durante ou após o processo de fabricação, pode implicar a qualificação do defeito – que sempre gera dano " (ob. Cit., pág. 160).

RG-00298



28    3033

**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Além disso, em página criteriosa, a estudiosa e especialista Professora Doutora CLÁUDIA LIMA MARQUES, após citar o mestre italiano GUIDO ALPA, levanta que:

"Em matéria de responsabilidade civil, o principal valor a ser protegido pelo direito deve ser o efetivo e rápido ressarcimento das vítimas. O CDC para alcançar este fim afasta-se do conceito de culpa e evolui, no art. 12, para uma responsabilidade objetiva, do tipo conhecida na Europa como responsabilidade "não-culposa.

A tendência em direito comparado é atribuir ao *fabricante* a responsabilidade extracontratual pelos danos causados ao consumidor por produtos defeituosos. O CDC adere a essa tendência, modificando o sistema brasileiro que exige a culpa própria (falha na esfera de sua atividade) para a responsabilização " ( Contratos no Código de Defesa do Consumidor, Biblioteca do Direito do Consumidor, 3ª ed., 3ª tiragem, 1999, Ed. RT, pág. 620).

Se, tanto por tanto, existe a prova do dano causado aos autores, bem como o nexo de causalidade entre ele (dano) e o produto (consoante a revelação objeto da prova produzida), com a clara indicação do defeito do reverso, decorrente de vício intrínseco, sendo certa a indicação do responsável por esse produto e ausentes as excludentes de responsabilização previstas no art. 12, parágrafo 3º, da Lei 8.078/90 (no tom de que o fabricante não colocou o produto no mercado; que, embora haja colocado o produto no mercado, o defeito inexiste, ou que houve culpa exclusiva do consumidor), é inescapável o dever de indenizar, sem prejuízo de verificar-se a inteligência e o alcance do art. 7º e seu parágrafo único c/c os arts. 25, parágrafos 1º e 2º e 34, todos do Código de Proteção do Consumidor, certo que é incabível transferir-se a culpa exclusiva a terceiro, ainda mais sem a concreta demonstração de sua imunidade ao ciclo de produção.

RG-00299



PODER JUDICIÁRIO
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

29

*Juizo de Direito da 2ª Vara Civel do Foro Regional III – São Paulo*

Assim sendo, conquanto o Código de Defesa do Consumidor, mesmo após quase dez (10) anos de vigência, venha recebendo certa cerimônia em sua utilização e aplicação, apesar de sua enorme força normativa, como ensina o ilustre civilista GUSTAVO TEPEDINO ( Temas de Direito Civil, Ed. Renovar, 1999, pág. 237), é possível compreender sua ideologia é enxergar uma sociedade atarantada e afetada pela complexidade tecnológica, com produtos e produtos ao lado de propaganda em massa, tudo a criar certa desindividualização do produto e despersonalização dos protagonistas da relação de consumo, o que permitirá ao mencionado mestre considerar que

" O defeito que gera acidente, comumente chamado de vício de insegurança, relaciona-se não propriamente à capacidade intrínseca ao produto — de provocá-lo, senão à sua desconformidade com uma razoável expectativa do consumidor, baseada na natureza do bem ou serviço ... " (ob. cit., pág. 240), o que, em avanço decisivo, leva o aludido autor a dizer que isto visa tutelar " a incolumidade do consumidor ", com a " sobreposição conceitual do conteúdo sobre a forma " (pág. 241).

Sublinhe-se, ademais, que " essa unidade de fundamento da responsabilidade do produtor impõe-se, pois o fenômeno real dos danos dos produtos conexos ao desenvolvimento industrial é sempre o mesmo, o que torna injustificada a diferenciação ou discriminação normativa do lesado, credor contratual ou terceiro " consoante ensinamento do comentarista português JOÃO GALVÃO DA SILVA ( Responsabilidade Civil do Produtor, Coimbra, Ed. Almedina, 1990, pág. 478, ob. cit., pág. 239), o que neutraliza qualquer dinâmica atenuante pelo teórico mau funcionamento de componente outro do produto (visto como um todo), gerando       -    sem esquecer que a sistemática do Código de Defesa do Consumidor é apoiada na responsabilidade objetiva, prescindindo-se, por isso, da comprovação de culpa do responsável legal    -, assim, o puro e objetivo dever de indenizar, o que, a propósito, leva GUSTAVO TEPEDINO a afirmar que

50.FB.025



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

**Juízo de Direito da 2ª Vara Cível do Foro Regional III — São Paulo**

" não é dado ao responsável legal eximir-se do dever de indenizar com base na prova de ausência de culpa " (ob. cit., pág. 239), limpando-se os céus, portanto, em favor de que os consumidores têm o direito material e a legitimidade de esperar pela segurança dos produtos, simples somatória da chamada

" *concepção coletiva da sociedade de consumo* " (JAMES J. MARINS DE SOUZA, Responsabilidade da Empresa pelo Fato do Produto, Ed. RT, 1993, pág. 153).

Nessa quadra, a atribuição objetiva do vício oculto só pode ser debitada aos fabricantes. Jamais aos usuários do produto.

Pare-se, agora, para lembrar que o consumidor é vulnerável. Fixe-se, com ânimo que sobe da verdade, que o princípio da vulnerabilidade tem relevo basilar nesse mundo consumerista. Adite-se e difunda-se, com racionalidade, esse elemento ao caso dos autos. Em seguida, some-se a necessidade de uma **igualdade real** entre o fabricante e aqueles ciencados no artigo 12, *caput*, da Lei 8.078/90, em face do consumidor. Concluir-se-á, afinal, que sem racionalizar-se essa distância e sem que o fabricante prove, **sem delongas**, como pode, também pela inversão do ônus da prova (artigo 6°, VIII, da Lei 8.078/90 ), a verdadeira eficácia passada, presente e futura de seu produto, não há, no campo jurídico, como escusá-lo do dever de reparar os danos suportados pelos consumidores, sejam eles quais forem.

Especiais, nessa parte, as palavras da estudiosa MARIA TERESA Q. GONÇALVES, ao dizer que:

50.18.025

RG-00301



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

" Los derechos de los consumidores son una consecuencia directa de la reivindicación de una igualdad real, del reconocimiento del derecho a la participación de todos los cuidadanos y del modelo del Estado social del Derecho" ( La Protección de los consumidores y usudrios y la Constitución española de 1978, Madri, 1986, pág. 20).

A responsabilidade objetiva que nasce da relação de consumo impõe, por ordem lógica, que o fabricante deve responder por todas as hipóteses e por todas as etapas do chamado "fato do produto", máxime porquanto o risco da atividade que vem do produto e sua respectiva serventia (art. 6°, VI, do CDC), não pode e não deve servir de anteparo contra o consumidor, salvo, *data venia*, com a chancela do malversar a mencionada Lei ( 8.078/90) e os princípios constitucionais da cidadania, da proteção e defesa do consumidor, da ordem pública e do interesse social (art. 1° II c/c arts. 5°, XXXII e 170, V, todos da Constituição da República Federativa do Brasil), especialmente dentro do terreno da segurança do consumidor (artigo 6°, inciso I, da Lei 8.078/90).

A proteção da segurança do consumidor, sem óbice nenhum, merece especial atenção, articulando PARRA LUCAN, comentário adequado no caso em exame, no plano de que:

" Los problemas de salud y seguridad son de los más importantes que plantea la protección del consumidor ", averbando-se que

" La protección de la salud y la seguridad de los consumidores es un corolário del próprio derecho a la vida (y la integridad física) dela persona humana, reconocido en los textos internacionales y constitucionales de nuestro entorno " ( Comentários extraido do estudo da Dra. VIVIANE COÊLHO DE SÉLLOS, Revista de Direito do Consumidor, no. 11/130).

50.16.025



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juizo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

　　　　　　　　　　Por essa ótica, leciona o eminente catedrático e jurista NELSON NERY JÚNIOR (RDC, RT, vol. III, pág. 58). Em igualdade, desenlaça o Professor LUIZ GASTÃO PAES DE BARROS LEÃES, mostrando a incontrolável difusão de danos decorrentes do uso de produtos defeituosos ( A Responsabilidade do Fabricante pelo Fato do Produto, Saraiva, pág.12), tudo a chamar a atenção do julgador para a alteração do enfoque voltado para não privilegiar a atividade produtiva contra o consumidor, sua razão de ser, salvo com a prova da competência tão esquecida como a história (em especial a partir da revolução industrial), que ensina, ensina, mas os fatos repetem-se e com eles os danos.

　　　　　　　　　　Neste exato momento, anote-se, para o sempre, para descansar um pouco na leitura desta sentença, o escrito de ALAIN FINKIELKRAUT, onde discute a relação do homem de hoje com a História, comentando que o homem contemporâneo parece que já não se considera como herdeiro de um passado, e que

　　　　　　　　　　　　　　　" a verdadeira humanidade ainda está por vir " ( A Ingratidão, Ed. Objetiva, 2000, pág. 175), o que nos remete às profundezas de nossos dias e responsabilidades.

　　　　　　　　　　Com essas diretrizes, não é demais desatar, sem chegar-se na teoria da solidariedade social de LEON DUGUIT, que não se pode dar honra e dignidade ao homem, material, espiritual e até antropológica, sem, primeiro, necessariamente, distribuir a Justiça como meio de aplicação de força social e da conquista da cidadania.

　　　　　　　　　　O Código do Consumidor é, antes de tudo, uma lei humanista. Racionaliza a verdade, tempera a disparidade de forças entre os contratantes e banha a relação jurídica, o ser e a coisa (produto) , com uma boa dose de moral.

50.18.025

RG-00303



33



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo**

É claro que isto pode trazer a lume inúmeras opiniões. Antes, porém, viva-se que muitos códigos centenários e Leis casuístas não conhecem e não quiseram conhecer a indústria de massa, a revolução tecnológica, os intermediários, o modelo societário atual, a família do século 21 e a criança do amanhã.

Parece que é melhor, para alguns, aplaudir a guerra, porque as vidas ceifadas pouco importam. Relevante, para esses, é produzir armas, bombas, sistemas de comunicação para lugares inóspitos, aeronaves de combate, etc... **Ostentar o consumo e lucrar.** Não é, com um coração vivo, o ânimo das rés, mas é o que o homem vê na sociedade, consoante nos ensinam apenas os últimos cinquenta (50) anos: Hiroshima, Vietnã, Iraque e o Golfo, Palestina, Bósnia, Kosovo e outros fabricantes que o digam.

Falta benquerença, sobra consumismo, mesmo fazendo-se ciência.

Por isso, não é demais trazer à lume as palavras do Professor **RICHARD PHILLIPS FEYNMAN**, físico que trabalhou no conhecido Projeto *Manhattan*, o programa norte-americano que desenvolveu a bomba atômica, ao desabafar com a autoridade de um titular do Prêmio Nobel de Física, que :

" Então, realmente, precisamos dar uma olhada nas teorias que não funcionam e na ciência que não é ciência " ( Deve Ser Brincadeira Sr. Feynman, tradução Cláudio Bentes David, Editora UnB, Imprensa Oficial, 2000, pág. 377).

O que mais dizer ...

50.18.025

RG-00304



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III — São Paulo

Sinto, por tudo isto, como leciona o mestre Chiovenda, que sentença é sentir, que esta é a única Justiça que pode ser tentada nesta tragédia. O que daí desbordar, *data venia*, é o coro que o desencanto faz a discórdia.

A co-ré, por isso, deve reparar todos os danos postulados, sem uma única exceção.

Por outra ótica, podem alguns, como queiram, sustentar o arrepio da fatalidade.

Desarme-se, contudo, que se fatalidade tivesse havido, deve ser ela reparada perante quem tem o lucro de atividade concedida e supervisionada pelo Estado. Não cabe debitá-la ao flagelo negativo da omissão descompromissada, salvo homologando-se o mal estar, o que não se fará.

Simples, simples mesmo, é rendermos nossa solidariedade, as vezes meramente velada, às famílias atingidas pelo luto e pela permanente dor.

Por isso, sinto que a pretensão é jurídica, adequada, séria, bem dirigida, consentânea com o direito moderno e sua projeção na sociedade, mormente na área de consumo, lógica, baseada na equidade, nos princípios gerais de direito e marcadamente JUSTA.

RG-00305



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Nem é preciso dizer que não se aplica o Código Civil – como cravado – e, em natural não identidade, o Código Brasileiro do Ar. Essa legislação, como é sabido, não guarda incidência em hipóteses como a dos autos. Aplicável, sob pena de negativa de vigência de uma Lei que vem chamando a atenção do mundo (atualmente o México e a Venezuela utilizam o nosso Código do Consumidor como molde para a reforma de suas leis, ( cf. **Antonio Herman** Benjamim, RT Informa, no. 7., maio/junho 200, pág. 5), a Lei 8.078/90, ou seja, o especial Código do Consumidor.

Nesse sentido, o Egrégio Superior Tribunal de Justiça, ainda que em situação não idêntica àquela dos autos – até por evidente -, reconheceu que não há lugar nenhum para a indenização tarifada em caso de acidente aéreo (RESP 6052/SP, rel. Ministro **CLÁUDIO SANTOS**), o que já é bastante para afastar o engano que vem do ânimo do não indenizar, posto que indenização insuficiente é o mesmo que não reparar.

**ARAKEN   DE   ASSIS**, Professor e Desembargador Mineiro, em voto ímpar (TJRS, Ap. 597.187.277), explica que ao transporte aéreo se aplicam as disposições do Código do Consumidor, o que vem sendo repetido (JTACSP, Lex, 152/173, relator Juiz **JOAQUIM GARCIA**; Ap. 623.538/9, relator Juiz **TORRES JÚNIOR** e Ap. 629.715/00, relator Juiz **ANTONIO DE PÁDUA FERRAZ NOGUEIRA**), dentre outros.

Não se esqueça, com todo respeito, que o Código do Ar, *data venia*, parece mais preocupar-se com a mercadoria (carga, bagagem), do que com o homem.

Sinal daqueles tempos.



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Em outro momento, feche-se que o eminente RUI STOCO, em conhecida obra, em nota específica, desenha que no " mais das vezes, o acidente ocorre não por omissão, desídia ou má atuação do transportador aéreo, mas por defeito de construção ou fabricação da aeronave " (Responsabilidade Civil e sua Interpretação Jurisprudencial, RT, 4ª ed., pág. 164), o que se alinha às lições do mestre italiano GUIDO ALPA ( citação da Professora Cláudia Lima Marques, ob. cit., pág. 622) e do Professor e Promotor de Justiça ANTÔNIO HERMAN BENJAMIN ( Código de Defesa do Consumidor, Forense Universitária, 1991, pág. 55), tudo apropriado à hipótese discutida nestes autos.

Festeje-se, para as novas gerações, para os pais, filhos, mulheres, maridos, companheiros, irmãos dessas famílias reduzidas pela queda da Fokker 100 da TAM, que está havendo correção de rumo no julgamento de casos tais, o que se não resolve tudo, contribui, creio, para a diminuição, quiçá a extinção, de condutas mais assanhadas pelo lucro do que pela real segurança do homem.

Isto, permita-se escrever, é a estirpe de uma cidadania democrática. Ou a Lei sai do papel e é aplicada com espírito humanístico e social (artigo 5º da LICC), ainda que isto importe em críticas, sem espancar – nunca - a sensatez, ou ter-se-á o freqüente faz-de-conta, alimento da descrença e do descrédito.

Não é, compreenda-se, a vitória do fraco sobre a super-potência econômica, como talvez estes ou aqueles venham a criticar esta sentença. Não é. É o comando de deixar que a correnteza da Lei 8.078/90, com nascedouro na Constituição Federal, como apontado linhas atrás, escrita com tanto zelo, ética, preocupação, comparação, juridicidade, atualidade e visão de futuro, desemboque no mar da Justiça.



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO



Juizo de Direito da 2ª Vara Civel do Foro Regional III – São Paulo

Tenho, assim, de forma segura e convicta, após muito refletir sobre este caso, que a responsabilidade objetiva declarada no artigo 12 da Lei 8.078/90 (Código de Proteção ao Consumidor) não foi escrita pelo legislador com vocação outra que não fosse salvaguardar o consumidor do famoso "empurra-empurra", ou "eu não", buscando-se, como já se fez na Europa, no pós-guerra, a socialização do prejuízo, quando este, como neste caso, tem causa comum e nenhuma responsabilidade por parte das vítimas, ou de terceiro seguramente definido, certo que até as calamidades podem ser previstas, consoante leciona SERPA LOPES (Curso de Direito Civil, Ed. Freitas Bastos, 4ª ed., pág. 405).

No particular, alguns teimam, contudo, em não querer ver o que alma enxerga e a população sente silenciosa.

Oportunas, por isso, as palavras de CARLOS MAXIMILIANO, ligadas à interpretação da lei, no raciocínio de que em casos da envergadura deste, não deve o Juiz desenvolver atividade meramente intelectual. Nestes casos, " o juiz é um sociólogo em ação, um moralista em exercício, competindo-lhe vigiar pela observância das normas reguladoras da coexistência humana, prevenindo e punindo as transgressões " (Hermenêutica e Aplicação do Direito, Ed. Freitas Bastos, pág. ), mantendo-se sempre a preocupação com a equidade ( LUIZ ANTONIO RIZZATTO NUNES, ob. cit., pág.21) , alertando-se para a axiologia, ponderando o sábio CÂNDIDO RANGEL DINAMARCO, que

" o juiz indiferente às escolhas axiológicas da sociedade e que pretenda apegar-se a um exagerado literalismo exegético tende a ser injusto " (A instrumentalidade do Processo, RT, 1987, pág. 274/75).

RG-00308





**Juizo de Direito da 2ª Vara Civel do Foro Regional III – São Paulo**

Por tudo isto, é a justa a procedência da ação, bastando definir-se qual indenização, mormente na seara do dano moral, é firme, humana, ponderada, não aviltante, eficaz e adequada.

Antes do arbitramento, crave-se que nenhuma quantia é capaz de restaurar esse gravíssimo maltrato, fixo ultraje.

A morte antecipada por um ato ilícito, ainda mais tão abrupta e violenta, como aquela vivida neste caso, cujas vítimas fatais transformaram-se e ficaram reduzidas a cadáveres irreconhecíveis ( fls. 2157/2165 ), não tem, em visão clara e aberta, nenhuma compensação capaz de ser valorada em dinheiro.

O sofrimento – permanente - é interior, abala a alma, incomoda o acordar, deságua no espírito, gera angústia, decepção, aflição, perda do ponto de referência, vácuo, padecimento, dor e causa a cólera da impotência e do abismo.

**Não tem preço, por mais elevado que seja.**

**É irreparável.**

Mesmo assim, o reparo moral tem sua função: compensar o incompensável, sem perder de vista o caráter punitivo dele inerente.

De qualquer modo, o direito evoluiu. No passado, opiniões respeitáveis como as dos eminentes GABBA, LAFAIETE e LACERDA DE ALMEIDA, dentre outros, representavam a corrente dos opositores da reparação do dano moral, como mostra CHRISTINO ALMEIDA DO VALLE (Dano Moral, AIDE Editora, 1999, pág. 18), embora a partir dos ensinamentos de CARVALHO DE MENDONÇA, TEIXEIRA DE FREITAS, AGUIAR DIAS, CLÓVIS, PONTES DE MIRANDA, PEDRO LESSA e OROZIMBO NONATO (ob. cit., pág. 23), sabendo-se que a reparação dos danos morais nunca foi negada pelos romanos, levantando-se a *actio injuriarum aestimatoria* (ob. cit., págs. 31/32), começava-se a conquistar a possibilidade de indenizá-lo, restaurando-se o equivoco daquelas primeiras exegeses.



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

PEDRO LESSA, aliás, dizia que o dinheiro pode compensar o dano moral. Contudo, não há compensação completa, como seria ideal, "porque a vida não pode ser restituída" (ob. cit., pág. 74) e a " dor retira a normalidade da vida, para pior ", completa PONTES DE MIRANDA    (Tratado de Direito Privado, RT, 3ª ed., 1984, T. XXVI, pág. 32, n. 2).

Hoje, com o referido progresso, é rica a doutrina moderna em lecionar sua indenizabilidade, mormente a partir da Constituição Federal de 1.988 e do surgimento da Súmula 37 do Egrégio Superior Tribunal de Justiça.

Ilustres doutrinadores, entre os quais CARLOS ALBERTO BITTAR ( Reparação Civil por Danos Morais, 3ª ed., ), ANTONIO JEOVA SANTOS ( Dano moral Indenizável, LEJUR, 2ª ed., 1999, pág. 234) YUSSEF SAID CAHALI ( Dano Moral, RT, 2ª ed., 4ª tiragem), HUMBERTO THEODORO JR. (Dano Moral, Ed. Juarez de Oliveira, 3ª ed., 2000), CLAYTON REIS ( Avaliação do DanoMoral, Ed. Forense, 2ª ed., 1999) E ARTUR OSCAR DE OLIVEIRA DEDA ( A Rparação dos Danos Morais, Ed. Saraiva, 2000), descortinam o grau e a importância de indenizar o dano extrapatrimonial.

CLAYTON REIS, Professor e Magistrado no Paraná, em desenvolvimento hermenêutico sensato, ilumina que:

" Trata-se de uma lesão que atinge os valores físicos e espirituais, n honra, nossas ideologias, a paz íntima, a vida nos seus múltiplos aspectos, a personalidade da pessoa, enfim, aquela que afeta de forma profunda não os bens patrimoniais, mas que causa fissura no âmago do ser, perturbando-lhe a paz de que todos nós necessitamos para nos conduzir de forma equilibrada nos tortuosos caminhos da existência " ( ob. cit., pág. 205), impondo-se a compensação à vítima atingida pela ofensa não-patrimonial, a qual representa " uma maneira de penalizar o ofensor para o fim de dissuadi-lo ao cometimento de novas ações lesivas ao interesse individual e social " ( ob. cit., pág. 205).

RG-00310



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III — São Paulo

Nesse horizonte, no entanto, ainda não atingimos um estágio da madureza do reparo moral, na quadra pertinente à exata fixação do justo valor indenizatório , o que dificulta – sobremaneira – o encontro de uma soma adequada para atenuar o verdadeiro **holocausto** provocado pela queda do Fokker 100, da TAM.

Essa tarefa precisa ser vencida. O *quantum*, segundo a opinião quase unânime, deve servir como desestímulo a novas agressões, representando uma séria advertência ao autor do ilícito, devendo reflectir em seu patrimônio e potencialidade, não podendo ser tão elevado que possa gerar o descanso do enriquecimento repentino, mas também não pode ser simplesmente simbólico que seja estímulo e adubo da zombaria e do descrédito das decisões judiciais.

Esse simbolismo, *data venia* das autorizadas vozes em sentido contrário, contamina o próprio fim e utilidade do processo, devendo ser evitado com argúcia e sabedoria, ainda que se perceba - em casos outros -, a já denominada indústria do dano moral (RT 757/298), com o anúncio de indenizações milionárias, como aquela de US$ 34.000.000,00 (cf. **WLADIMIR VALLER**, Dano à pessoa e sua indenização, RT, 1994, pág. 257).

A esta altura, margeie-se que na Europa, em particular na Itália, França, Espanha e Portugal, constata-se a decisiva preocupação com a tutela ampla dos danos morais. No Uruguai as indenizações sobre danos não patrimoniais vêm atingindo valores crescentes, sem esquecer-se que nos Estados Unidos da América e na Inglaterra essas reparações " **são elevadíssimas, de forma a reprimir de forma profunda a ação dos lesionadores** ", tudo consoante o retrato da pesquisa do Mestre da Universidade Federal do Paraná (ob. cit., págs. 206/207), o que merece registro e cuidadosa atenção do julgador.



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

41

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Note-se, antes de prosseguir, que não salta do processo a imagem de que os autores perseguem dinheiro, por dinheiro, nem tampouco que almejam vingança, desforra, ou enriquecer-se à custa da ré. **Já perderam suas riquezas.** Nada lhes pagará, não havendo imoralidade na busca daquela indenização que se projeta dos estados d'alma humana (RT 650/64, relator Desembargador WALTER MORAES), adjetivando-se que a **lesão moral sem justa recomposição perpetuaria o desequilíbrio sócio jurídico** (RT 631/29), o que é mais grave e deve ser evitado, certo que o magistrado é o hermeneuta dos valores da sociedade na qual está inserido, devendo procurar interpretá-los na busca da paz social, desnudando-os, inclusive.

Este é, sem devastar, seu maior compromisso legal e social.

De uma forma ou de outra, observa a doutrina, com fundamentação sólida e traduzida no cunho compensatório e quiçá punitivo dessa modalidade indenizatória, que o dinheiro, no dano moral, aparece como um instrumento capaz de fazer gerar a alegria e esta alegria será o justo preço da dor causada, segundo dita o i. WILSON MELO DA SILVA (Dano Moral e sua Reparação, pags. 614/15), o que, ainda que seja ousado, não é de se negar.

Buscam os autores desta ação, com a paciência dos monges, uma satisfação, que ninguém lhes quer dar. São, ainda, obrigados a dormir com o som da voz antiga e desatualizada, meio abjeta, daqueles que clamam pela improcedência, por falta de provas de sua ineficiência ... e de que a culpa é de terceiro, do alheio ...

Será a crise da humanidade, ou a crise do direito, a crise do homem, a crise da transição, a crise da impunidade. É a crise do processo civil.

RG-00312



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

               Nós, de fato, magistrados, advogados, membros do Ministério Público, Procuradores, Professores, Universitários, devemos empenhar nossos esforços para a transformação do processo, até agora marcado por um signo individualista, superando mitos da processualística tradicional.

               Melhor, nas seguras lições da incansável Professora e condutora maior do processo civil na atualidade, a conhecida Doutora ADA PELLEGRINI GRINOVER, buscar a efetividade do processo, dele extraindo uma feição mais consentânea com certas exigências básicas do Estado social de direito, de modo a torná-lo operativo no plano substancial, reestruturando-o e adequando-o aos escopos sociais e políticos da jurisdição e à realidade da sociedade contemporânea ( O Processo em Evolução, Ed. Forense Universitária, 1998, págs. 10 e 15).

               Nessa especificidade , o festejado ORLANDO GOMES, verdadeiro vulto do direito civil brasileiro, escrevera, há mais de quarenta e cinco (45) anos, mas com a espantosa atualidade, que os desajustamentos da ordem jurídica são reveladores da crise do direito, em especial do direito privado, positivando que:

               " é todo um direito que está por se reconstituir e refazer. Desde as suas matrizes filosóficas às suas noções técnicas. Desde os seus pressupostos morais à nomenclatura dos seus institutos.

               Em largos traços, poder-se-ia afirmar que o direito privado vive o terrível drama da dupla personalidade.



P O D E R   J U D I C I Á R I O

TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

43

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Enraizado em postulados filosóficos indefensáveis, estratificado em códigos decrépitos, orientado por critério obsoletos, modelado por padrões antiquados, vergado ao peso de preceitos excrescentes, mutilado, a cada instante, por inócuas reformas parciais que não obedecem a um pensamento unívoco, o direito civil não passa de um espectro, que se sustenta na força de uma tradição vacilante.

Por mais carinhosa que seja a estima que devotemos ao seus preceitos codificados, maior ainda deve ser a nossa vontade de reanimá-los e rejuvenescê-los ". (A Crise do Direito, Max Limonad, 1955, pág. 22).

Com tudo isto, apesar da tardança, não se pode desprezar o jovem e ético Código do Consumidor (Lei 8.078/90). Cuida-se de Lei Federal reanimadora, forte, filosófica, real, não casuística, positiva e povoada por uma visão do amanhã. Só a sua concreta aplicação é que poderá descortinar uma nova mentalidade jurídica, empresarial, social e até estatal, afundando-se os pilares de uma indenização, vazada no dano moral, de feição constitucional, a qual não deve ficar fragilizada pela tradição do simbolismo. Do contrário, sem vacilações, os desajustamentos alinhados por ORLANDO GOMES continuarão e comporão as peças de um círculo vicioso.

YUSSEF SAID CAHALI, em palavras muito oportunas, traz a citação de um V. Acórdão do TARS, a bem de considerar que " a indenização por dano moral não tem caráter unicamente indenizatório, mas também possui caráter pedagógico, ao servir de freio para que atos culpáveis como o da ré não voltem a se repetir " (ob. cit., pág. 177).

O arbitramento do dano moral, por tudo isto, depende das particularidades de cada caso concreto, de modo a permitir a adoção de um critério próprio do julgador, pondera, com autoridade, o eminente Ministro BARROS MONTEIRO (Ag. 208837/RJ).

RG-00314



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Nessa espiral, tratando-se do mais expressivo ilícito moral (a morte violenta causada por ato ilícito), espalhado de forma tão heterogênea (homens, mulheres, jovens, pais, mães, pessoas entre vinte (20) e sessenta (60) anos de idade, em média) e destacado que a co-ré Northrop Grumman Corporation é uma das maiores empresas mundiais no cenário aeroespacial, é razoável e necessário dar atenção a algumas particularidades.

A marca do subjetivismo, que as vezes leva a comparações paradoxais, é a linha mestra. Deve ser evitada, contudo, a loteria jurídica.

Far-se-á, por isso, uma pequena comparação entre alguns V. Julgados.

Com efeito, o Egrégio Tribunal de Justiça de São Paulo, no julgamento de dano moral por discriminação de uma jovem, portadora de AIDS, por uma pessoa jurídica, com menos de trinta anos de idade, arbitrou indenização no valor de 2.000 salários mínimos ( hoje cerca de R$ 300.000,00 - Ap. cível 85.534-4/3-00, 9ª Câmara de Direito Privado, Relator Desembargador **THYRSO SILVA**).

Sem perder de conta, o Egrégio Primeiro Tribunal de Alçada (Emb. Infringentes nº 754.692/1, Relator o eminente Juiz **J.B. FRANCO DE GODOI**), na hipóteses da inclusão do nome de um Professor e Magistrado no rol dos devedores do SERASA e na lista do BACEN, pela emissão de cheque sem fundos, cuja talonário tinha sido objeto de furto nas dependências de uma agência bancária, arbitrara a indenização por dano moral na quantia que representar 1.000 salários mínimos.

Por sua vez, o Egrégio Tribunal de Justiça do Rio de Janeiro (RT 693/198), em V. Acórdão modelar, relatado pelo então Desembargador **CARLOS ALBERTO MENEZES DIREITO**, hoje nobre Ministro do Superior Tribunal de Justiça, no famoso caso da divulgação de noticia de que o cantor NEY MATOGROSSO era portador de enfermidade letal, arbitrara a indenização correspondente a 3.000 salários mínimos (hoje cerca de R$ 450.000,00).



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juizo de Direito da 2ª Vara Civel do Foro Regional III – São Paulo

Sem perder essas referências, o Egrégio Superior Tribunal de Justiça, manteve o valor da indenização de R$ 2.250.000,00, devida à viúva e sete (7) filhos de um homem eletrocutado na volta do trabalho, quando esbarrou com sua bicicleta no fio de alta tensão que estava atravessado no caminho (RESP 246181, Relator Ministro ARI PARGENDLER).

Tem-se, como os operadores do direito sabem, vários precedentes interessantes, por exemplo: a)- a condenação na quantia de R$ 20.000,00, por ato ilícito que gerou a amputação do pé esquerdo de um menor (RT 748/385);  b)- a morte de presidiário ocasionada por outro detento ( RT 753/157);  c)- a interrupção de uma gravidez (200 salários mínimos – RT 759/349);  d)- a ofensa injusta à honra, decorrente da acusação infundada de furto ( 400 salários mínimos – RT 734/468); e)- a morte de uma mãe vítima de acidente de trânsito ( 1.250 salários mínimos, RT 769/365);  f)- o envio de cartão de crédito sem solicitação, com o registro indevido no SPC (100 salários mínimos – RT 747/221);  g)- infecção contraída por paciente em hospital ( quatro vezes o valor do custo da indenização a título de danos patrimoniais – JTJ, Lex, 162/68) e tantos outros, tudo a mostrar, sem maioria, o quão árida é a busca de um justo e equânime montante satisfatório.

Após essas considerações, bata-se que a vida humana é uma só. O rico e o pobre não podem ser desigualados, embora o sejam.

Certo é, *in casu*, que as vítimas, em sua quase totalidade, eram seres humanos que se diferenciavam por uma solidez intelectual, profissional e econômica, marcando-se que os jovens falecidos pontuavam uma história que indicava um futuro promissor, havendo plausibilidade em aquilatar-se a posição socioeconômica dos ofendidos. ( JTJ, Lex, 196/91, Relator o Desembargador REBOUÇAS DE CARVALHO).

RG-00316



P O D E R   J U D I C I Á R I O
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

46  3054

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

É dado de relevo. Não deve, pois, ser relegado.

A par disso e já demonstrada a falta de uniformidade no encontro do correto valor, sem perder do fronte a necessidade de um julgamento **exemplar, mas também pedagógico e evitando-se desmoralizar um instituto de tamanha vanguarda, aplicando-se a teoria do "punitive damages"**, como lecionava o jurista, Professor e Magistrado CARLOS ALBERTO BITTAR.

A indenização, assim, deve ser capaz de aprimorar a vida, traduzir credibilidade, ancorar esperança e decolar a oportunidade de um amanhã melhor, procurando não se traduzir em choque maior à alma atingida pela dor das mortes tão inaceitáveis.

Procurar-se-á descobrir, pois, uma soma que faça a ré sentir o dano que causara, sendo incontroversa sua possibilidade econômico-financeira, como frisado.

Deve essa indenização, adverte o grande Jurista e Professor CAIO MÁRIO DA SILVA PEREIRA, após ressaltar seu caráter punitivo e compensatório, ajustar-se a

" uma soma que proporcione prazeres como contrapartida do mal sofrido ", tendo

" em vista as posses do ofensor e a situação pessoal do ofendido " ( Responsabilidade Civil, Ed. Forense, 1992, n. 45, pág. 55), não escapando da mente a gravidade da falta.

RG-00317



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

                    Por esse processo educativo e devotando-se, do verbo devotar, a tragédia da queda do Fokker 100, da TAM, à desumanização da relação de consumo e ao apego a um materialismo de filosofia consumista, procurando, ainda, consagrar a importância do valor moral, " que se deve **proteger tanto quanto, se não mais do que os bens materiais e interesses que a lei protege** " (RT 761/335) e .sopesando todo esse conjunto, guardando-se que as vítimas fatais possuíam situação familiar e social estável, gozando de boa reputação e honradez, ao lado de saudável condição econômico-financeira e não existindo a revelação de impossibilidade material da co-ré Northop Grumman Corporation, - repita-se uma das maiores empresas mundiais no céu do consumo aeroespacial –, penso não ofender a lógica da vida a condenação, por dano moral, da referida fabricante da peça reverso, no pagamento da quantia de R$ 2.000.000,00 (dois milhões de reais) por família enlutada, cerca de US$ 1.111.111,11, quantia que não enriquece as vítimas e é capaz de não malbaratar a perturbação permanente proporcionada por uma das maiores decepções que um ato ilícito pode causar a todos, todos mesmo, evitando-se esta ou aquela distinção, sem pôr de lado as notícias, veiculadas pela imprensa em geral, de que há tratativas de composição – há meses – pela quantia de cerca de US$ 800.000,00.

                    Nesse ponto, não é demais aprofundar-se que a referida importância produziria, nos dias de hoje (Junho de 2.000), se aplicada em caderneta de poupança, uma receita mensal de cerca de R$ 12.000,00 (doze mil reais) ou US$ 6.666,67, valor não anômalo e igualmente não distante da alta peculiaridade do processo, o que merece um instante a mais de reflexão e subsidia a pujança do primado de que a indenização não deve esvaziar-se por si mesma.

                    Arbitrado está, portanto, o dano moral, extrapatrimonial.

48 – 3053



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

No que concerne à pretensão de danos materiais, convém guardar-se a viabilidade da fixação de seus parâmetros gerais, dentro do aforisma *da mihi factum, dabo tibi jus* ( o juiz aplica o direito ao fato, ainda que aquele não tenha sido invocado – STJ- RJTJ 21/432, RTJ 105/1024, 115/392, RTJSP, 43/138, 50/281, 93/185, 115/119, dentre outros ) , acolhido pela sistemática processual civil ( THEOTÔNIO NEGRÃO, CPC e legislação processual em vigor, 28ª ed., nota 11 ao artigo 282), afastando-se apenas a possibilidade do reembolso das despesas com funeral, posto que não expressamente pedidas na inicial.

Com efeito, se dúvida não subsiste, portanto, de que havendo, como há, certeza no dever de indenizar da co-ré Northrop Grumman Corporation, à luz do Código do Consumidor, seguir-se-á a direção retilínea da composição dos imediatos danos patrimoniais experimentados pelas vítimas, os quais atrelam-se ao pagamento de 2/3 do último salário de cada um dos falecidos, enxergando-se suas respectivas ocupações laborais lícitas e definidas, abrindo-se, na fase de liquidação, em tom excepcional, como a causa merece (dentro da já sublinhada efetividade do processo), a possibilidade de se comprovarem cada um desses focos, o que não é complexo e depende da simples juntada da cópia carteira de trabalho de cada qual e da comprovação do último salário percebido, ou elemento equivalente, prevalecendo o período de vida provável de sessenta e cinco (65) anos, como adiante pormenorizar-se-á, na parte dispositiva desta sentença.

Frise-se, porque fundamental, que a co-ré Northrop Grumman Corporation não impugnou especificamente esse crivo, embora a contestação registre o reconhecimento do expresso pedido de danos patrimoniais (fls. 1112/1116 – 6º volume), sendo seguro verificar-se que os autores pediram a exata condenação no pagamento de pensão alimentar ( fls 12, n. 31 – 1º volume ), igualmente não contrariada pela referida co-ré, o que impõe a incidência do art. 334, inciso III, do Código de Processo Civil, tratando-se, assim, de matéria não impugnada e incontroversa, decorrência transparente do princípio da eventualidade (art. 300 do Código de Processo Civil).



Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Em outro ponto do processo, precisa ser apreciada a tese de denunciação da lide e conexão deduzida pela co-ré Northrop, em favor da inclusão no pólo passivo da lide das pessoas jurídicas **Fokker Services BV e Transportes Aéreos Regionais S/A**; carecendo de análise os inúmeros pedidos do ingresso de litisconsortes, após a prolação da decisão interlocutória que determinou a prestação de caução ( fls. 761/770 ).

Iniciar-se-á pela equação da denunciação da lide e elo conectivo.

Embora bem escrita, não é cabível essa temática ampliativa, posto que a denunciação da lide

" por ser um complicador processual por excelência, é incompatível com o objetivo traçado pela Lei 8.078, de 1.990, de fornecer proteção rápida e eficaz a toda pessoa física ou jurídica que adquire ou utiliza produto ou serviço como destinatário final, e a mais ninguém " JTJ, Lex, 148/405, Relator Desembargador SOUZA LIMA, *in* Código de Defesa do Consumidor e sua Interpretação Jurisprudencial, obra elaborada pelo Professor e Magistrado LUIZ ANTONIO RIZZATTO NUNES, Ed. Saraiva, 2ª ed., 2000, pág. 413).

No mesmo sentido, é o V. Acórdão (JTJ, Lex, 183/175), Relator o Desembargador MAURICIO VIDIGAL e aquele Relatado pelo então Desembargador, hoje ilustre Ministro FRANCIULLI NETTO (AI 32.628-4-SP, j. 18.2.97).

Essa dinâmica e visão moderna, tanto por tanto, é consequência inexorável da inteligência do artigo 88 do Código do Consumidor, lembrando-se que a ação de regresso é o caminho natural que os litisdenunciantes detém em face daquele (s) perante quem entendem possuir eventual direito regressivo. O caminho para estes, sem escape, é a ação autônoma regressiva.

RG-00320

 

**P O D E R    J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

RIZZATO NUNES, ademais, explica que a:

" sistemática necessária do texto normativo do Código de Defesa do Consumidor leva à conclusão de que o que norma pretende é proibir *sempre* a denunciação da lide, como forma de garantir a celeridade processual em busca do benefício do consumidor lesado ..." (ob. cit., pág. 417).

Por esses fundamentos, é firme a proibição de denúncia da lide nas ações lastreadas no Código do Consumidor, sendo esse o magistério de ARRUDA ALVIM, TERESA ALVIM, EDUARDO ARRUDA ALVIM e JAMES MARINS ( Código do Consumidor Comentado, Ed. RT, 2ª ed., pág. 413).

Rejeito, assim, a denunciação requerida a fls. 1086/1092 ( 6º volume) e afasto a tese de conexão, por absoluta falta de identidade entre a causa de pedir próxima, distinguindo-se que a malha desta centra-se em dever extracontratual, sob a ótica do Código do Consumidor, bem diferente daquelas apontadas. Aprofunde-se, ainda, que a conexão é instituto imaginado para dar celeridade ao processo (MOACYR AMARAL SANTOS, pág. 262), sendo primoroso que não se desnature sua *ratio*, o que dar-se-ia com a imagem trazida na contestação.

Quanto ao litisconsórcio postulado após a preclusão temporal da decisão interlocutória de fls. 817 ( 4º volume ), é importante considerar que o Código do Consumidor contém regra direcionada à obrigatoriedade do litisconsórcio ligado às ações coletivas envolvendo a defesa de interesses individuais homogêneos, consoante dispõe o art. 94 da Lei 8.078/90. Não é o caso dos autos.

A hipótese, pois, é de litisconsórcio ativo facultativo, consoante, ademais, o V. Acórdão do Egrégio Superior Tribunal de Justiça, no plano de que " em ação indenizatória, o litisconsórcio é sempre facultativo, seja ativo ou passivo, podendo cada um dos prejudicados, isoladamente (ou em conjunto) pleitear, em juízo, o ressarcimento " (Resp 35.496-0, Relator o Ministro DEMÓCRITO REINALDO – oportuna citação de fls. 2801 – 15º volume ).



51

**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juizo de Direito da 2ª Vara Cível do Foro Regional III — São Paulo

Além disso, na especialidade deste processo, não é de se acolher os pedidos de intervenção litisconsorcial deduzidos após a prolação do despacho de fls. 761/770, porquanto tal — se admitido — teria o condão de ferir o princípio do Juiz natural, atingindo o texto do artigo 251 do Código de Processo Civil.

Assim deve ser, a bem de não contrariar a seriedade do apontado princípio, o qual também busca evitar que a parte escolha o juiz da causa, postulado de ordem moral, como muito bem gizado pelo eminente Ministro **ARI PARGENDLER** ( Resp. 87641/RS — fls. 2802 - 15º volume ).

Nessa modelagem, indefiro todos os pedidos deduzidos a partir da preclusão do despacho de fls. 817 ( 4º volume ).

Defiro, contudo, a inclusão no pólo ativo da ação, requerida a fls. 480/486 ( 3º volume ) por **MARIA TERESA CAIADO BALASSIANO, DIANA CAIADO BALASSIANO, BRUNO CAIADO BALASSIANO, ANDRÉ LUIZ BARCELLOS RODRIGUES, ALEXANDRE AUGUSTO BARCELLOS RODRIGUES e ANA CRISTINA BARCELLOS RODRIGUES**, viúva e filhos de Félix Elias Ballassiano e Francisco José Rodrigues, respectivamente, falecidos na referida tragédia, assim como em favor de **NAIR DE CARVALHO JANSTEIN, MARIA CHRISTINA JANSTEIN e ELISABETH JANSTEIN**, viúva e filhas de Wolfgang Hans Janstein.

Para fechar esta sentença, cubra-se que Direito não perde sua relação com a História, na medida em que participe do fato social.

A história dos povos é seu germe.



52

**P·O·D·E·R   J·U·D·I·C·I·Á·R·I·O**

TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo**

Não é invenção da fantasia humana e – muitas vezes – é o direito que dá nascente a uma nova mentalidade à civilização, isto porque tem função educativa. É elo e canal – sem desprezo às funções das demais ciências -  indispensável ao aprimoramento do próprio homem, enquanto pessoa humana, ainda mais no almejado Estado Democrático de Direito.

Não cabe zombar da paciência da sociedade. Frustada deve ficar a arrogância tão habilmente disfarçada em nome de uma ultrapassada visão de conceitos jurídicos vazios e sem nenhum resultado na paz social. É imperioso evitar-se o vôo cego, inclusive para que as futuras gerações façam uso das verdadeiras artérias jurídicas que levam à Justiça e ao real progresso na convivência social. É uma reforma que cada um de nós deve tentar, mormente aqueles, como nós, que vivem diariamente o direito. É a reforma íntima, a qual alguns sábios vêm silenciosamente anunciando.

Com essas referências, encaminhar-se-á ao dispositivo.

## DISPOSITIVO

Em harmonia com o exposto, **JULGO PROCEDENTE** a ação e em consequência condeno a ré **Northrop Grumman Corporation** a pagar a quantia de R$ 2.000.0000,00 (dois milhões de reais), cerca de US$ 1.111.111,11 (na cotação de hoje, 30.06.2000), a título de dano moral a cada uma das famílias atingidas pelo luto, incidindo correção monetária a contar do dia 31.10.1996.

Condeno-a, ainda, a pagar, a partir do evento, a indenização, por danos materiais, correspondente a 2/3 (dois terços) do que cada vítima percebia em seu último salário, sabendo-se que 1/3 constituíria despesa mínima necessária para a sobrevivência do próprio finando, como é iterativo (RT 443/340, 303/271, 201/178; RJTJESP, 78/200, 81/57 e JTCASP 117/67, além de outros V. Julgados).

RG-00323



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

53

**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo**

Fica ressalvado que prevalecerá o período de vida provável dos falecidos, o qual é estipulado em sessenta e cinco anos (65) de idade ( RJTJSP. 62/101, 126/157, 129/203, apenas para citar alguns V. Arestos).

O pagamento das parcelas vencidas será acrescido de juros moratórios, os quais não dependem de pedido ( Súmula 254 do Colendo Supremo Tribunal Federal), fluindo a partir do evento danoso, conforme disciplina a Súmula 54 do Egrégio Superior Tribunal de Justiça, deduzindo-se a verba atinente ao seguro obrigatório, como é tranqüilo na jurisprudência (**RUI STOCO**, ob. cit., págs. 812/13), sem alcance sobre aquelas de cunho previdenciário, por força de sua própria natureza jurídica.

Para o resgate das parcelas vincendas a ré deverá formar capital capaz de assegurar a inteira satisfação da obrigação, na forma do art. 602, *caput*, do CPC), certo que esse encargo deve ser prontamente atendido ( REsp 12.846-RJ, Relator o insigne Ministro **EDUARDO RIBEIRO**).

Incluir-se-á o 13º salário, posto que integrante da remuneração que o pensionamento substitui ( JTACSP, 113/310 e 117/67).

A atualização monetária do salário percebido por cada vítima poderá observar, no que couber, o regime da Súmula 490 do Colendo Supremo Tribunal Federal, tudo a ser apurado nos termos do artigo 604 do Código de Processo Civil.

Reconheço, por último, que a ré Northrop Grumman Corporation deve ser reputada litigante de má-fé, litigância essa alicerçada no descumprimento da ordem judicial de caução, a qual restou mantida pelo V. Acórdão relatado pelo culto Juiz **JORGE FARAH**, escoando o prazo para a realização do depósito determinado, margeando-se, de mais a mais, que não há nenhuma outra decisão em vigor que tenha suspenso sua eficácia.

RG-00324

54    3059



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

**Juízo de Direito da 2ª Vara Cível do Foro Regional III — São Paulo**

Em igualdade, não se vê nenhuma explicação ou justificação para essa conduta processual tão corajosa, mas ao mesmo tempo muito pouco qualificada pela diplomacia que se esperava de uma empresa do porte e da respeitabilidade que dela naturalmente emana.

Trata-se, na claridade do bem estar processual e sua efetividade, de imperativo de natureza ética e decorrente do alcance do artigo 17, inciso IV, do CPC, aviltando-se que atos tais não merecem homenagem e traduzem ousadia, atentando, ainda, contra a dignidade da Justiça (artigo 600, III, do CPC — em aplicação analógica).

A esse propósito, a referida demandada, sociedade constituída segundo as Leis do Estado de *Delaware*, nos Estados Unidos da América, conhecido como um país que respira a democracia, deixa de cumprir, acredite-se, uma decisão judicial não suspensa, ato não adequado à sua própria história e origem.

Balanceie-se, porque oportuno, o paradoxo de ver que os Estados Unidos da América, - às vezes - dá exemplo de altivez e espírito aberto para toda a humanidade. Aqui, para desencorajar, a ré, empresa norte-americana, não cumpre decisão judicial mantida pelo Egrégio 1º Tribunal de Alçada Civil e não suspensa pelo Egrégio Superior Tribunal de Justiça, consoante despacho denegatório proferido pelo eminente Ministro EDUARDO RIBEIRO.

Para constar, cite-se, por exemplo, que na Justiça norte-americana há o interessante caso do cidadão *Chum Di*, da República Popular da China, que deixou seu país a bordo de um navio e em 06.06.1993, em Nova York, saltou ao mar para fugir nadando, sendo preso.

Peticionara, no entanto, ao Juiz de Imigração alegando que se viu impedido de ter mais do que um filho em sua pátria mãe, sendo que sua mulher foi procurada para ser encaminhada a um hospital para ser esterilizada, tendo ela fugido e se recusado a submeter-se à esterilização. Tiveram eles a casa confiscada pelo Estado, combinando, na sequência, a procura de abrigo nos Estados Unidos.



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo**

Pedira, então, o direito de asilo, acatado na *Board os Immigration Appeals*, conquanto ausente julgamento definitivo, segundo registra outro idealista, Magistrado Federal do Tribunal Regional Federal da 4ª Região ( Porto Alegre – RS) e Professor, o Doutor **VALDIMIR PASSOS DE FREITAS**, em sua tese de Doutorado, hoje monografia de largo sucesso (A Constituição Federal e a Efetividade das Normas Ambientais, Ed. RT, 2000, pág. 35/36), o que é anotado para um mero juízo de comparação entre a aspiração que vem da América do Norte e a prática encenada neste processo.

Não é de aplaudir-se, assim, esse descompasso de não democracia. O não desejo de cumprir a referida ordem judicial não pode ser visto como litigância adequada ou de boa-fé. É o *improbus litigator*.

Por tudo isto, condeno-a a pagar a cada uma das famílias afetadas pela tragédia, a quantia que representar 20% (vinte por cento) sobre o valor dado à causa, o que faço com amparo no art. 18, parágrafo segundo, do CPC.

Por força do princípio da sucumbência, arcará a vencida com as custas e verba honorária, a qual arbitro em 20% (vinte por cento) sobre o total que restar apurado.

Esse arbitramento deve-se ao empenho dos nobres patronos dos autores, os Professores Doutores Irineu Strenger e Renato Guimarães Júnior, marcada a natureza e a importância da causa, sua complexidade, o grau de zelo profissional, o tempo exigido e a clara diligência deduzida, o que chama a incidência do art. 20, parágrafo terceiro, alíenas "a", "b" e "c", do Código de Processo Civil.