# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

Case No. No. 05 CV 02210 (DC)

X==========================================================X

RENATO GUIMARAES, JR.,

Plaintiff,

-against-

SPEISER, KRAUSE, NOLAN & GRANITO
a professional corporation f/k/a SPEISER,
KRAUSE, MADOLE & LEAR,
a professional corporation,

Defendant.

X==========================================================X

*REPLY MEMORANDUM OF LAW*
*IN SUPPORT*
*OF DEFENDANT'S MOTION*
*FOR SUMMARY JUDGMENT*

Dated: New York, New York
     November 10,  2006

*Prepared by:*
Apuzzo & Chase
Attorneys for Defendant
800 Third Avenue - 8th Floor
New York, NY 10022

## TABLE OF CONTENTS

**Page**

Preliminary Statement .................................................................. 1

## ARGUMENT

I.    Choice of Law                                                          1

II.   The Lear Fax Does Not Pertain Solely to Plaintiff............................    4

    A.    The Lear Fax Is Unambiguous................................................    6

    B.    Guimaraes' Reliance on Extrinsic Evidence Lacks any Merit............    8

    C.    There Was No Meeting of the Minds......................................    9

III.  Even if the Court Elects to Consider Parol Evidence, Plaintiff has Failed
    to Demonstrate a Meeting of the Minds.................................    9

IV.   "Agreements to Agree" are Unenforceable Under the Laws of Both
    New York and Virginia.....................................................    11

V.    In the Absence of a Meeting of the Minds on Plaintiff's 25% Claim there is
    Still Not Meeting of the minds on Plaintiff's New 50% Claim.............    12

VI.   Plaintiff Failed to Raise a Material Question of Fact
    Regarding his Abandonment............................................    13

Conclusion ......................................................................    20

### Preliminary Statement

This is a *quantum meruit* case. Under the relevant decisional law, plaintiff raises no material issue of fact concerning a meeting of the minds between himself and defendant Speiser Krause. Plaintiff continues to contend that the Lear Fax created a valid enforceable written agreement containing all material terms. However, plaintiff's suggested reading of that document – a reading flatly contradicted by its unambiguous terms – is fatal to his contract claim.

## I.    Choice of Law.

Plaintiff asks this Court to undertake a choice of law analysis, arguing 1) that there is a "conflict" between the relevant substantive laws of New York and Virginia, and 2) that Virginia contract either a) does not require a meeting of the minds as to all material terms, b) admits parol evidence to vary or contradict an unambiguous writing, or c) will rewrite contracts based on an interested party's unfounded allegation of unfairness. As shown below, no such conflict exists. Both New York and Virginia contract law require a meeting of the minds to form a contract.

Before the Court undertakes a choice of law analysis, it should first determine whether there is, in fact, a conflict on the issue of contract formation between the law of New York and the law of Virginia. In the absence of an "actual conflict" between the applicable laws of the relevant jurisdictions, the Court is not obligated to undertake a choice of law analysis. *See, e.g. Comm'l Union Ins. Co. v. Flagship Marine Svcs., Inc.* 190 F.3d 26, 30 (2d Cir. 1999). Where the court determines that the result would be the same under either candidate jurisdictions' law, it need not decide which to apply. *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998).

Guimaraes candidly acknowledges that Virginia law also requires a meeting of the minds in order for a contract to be formed. Plaintiff's Memorandum of Law in Opposition to Summary

Judgment ("Pl. Mem") at 15, *citing, Montagna v. Holidy Inns, Inc.*, 221 Va. 336, 269 S.E.2d 838, 884-45 (Va. 1980). Plaintiff is also compelled to admit that the parties' objectively-manifested intent governs the issue of contract formation. *See Id., citing*, *Lucy v. Zehmer*, 196 Va. 493, 84 S.E.2d 516, 521-22 (Va. 1954). Notwithstanding his apparent candor with regard to these legal principles, plaintiff has misstated or obscured a number of important rules of construction and decision. As Speiser Krause demonstrates below, both New York and Virginia law require a "meeting of the minds" to form a contract. In the evident absence of a meeting of the minds, courts applying both New York and Virginia law grant summary judgment dismissing such claims.

Chief among the standards plaintiff chose to obscure is the notion that under Virginia law, "where the parties' representations are in dispute, the issue of contract formation is a question of fact." Pl. Mem. 16, *citing Jessee v. Smith*, 222 Va. 115, 278 S.E.2d 793, 794-95 (1981); *Mullins v. Mingo Lime*, 176 Va. 44, 10 S.E.2d 492, 492 (Va. 1940). When the terms of a writing are at issue, these cases are not the law. Both cases plaintiff relies upon concern oral contracts [1], where the parties had factual dispute concerning the words used. Both courts took care to distinguish Virginia's rule (very much the same as New York's) concerning writings, i.e. cases where the words are before the court: "'Where ... the material facts concerning the formation of an alleged contract are not in dispute, the issue of contract *vel non* is a question of law' to be decided by the court." *Jessee v. Smith, supra* 222 Va. at 17, *citing Valjar, Inc. v. Maritime Terminals*, 220 Va. 1015, 1018, 265 S.E.2d 734, 736 (1980); *See also, Mullins v. Mingo Lime, supra*, 176 Va. 44, 48, 10 S.E.2d 492, 493 ("The pivotal question is whether any enforceable contract was made between the [parties]. A

---

[1] *Jessee* involved a claim for $2,673.26 for carpenter's work performed under an alleged oral proposal for the same on a "cost plus 25%" basis. Plaintiff claimed the contemplated labor charge was 125% of the material cost, while the defendant claimed the proposal was for 25% of the material cost. No writing existed between those parties. *Mullins*, decided 66 years ago concerned an allegedly verbal agreement for sales commissions, also unsupported by any writing.

negative answer to this question completely disposes of the case.") Here, the exact written words used are before the Court, and factual issues of pre-contractual negotiation are irrelevant.

Plaintiff also elected to cite irrelevant law in an effort to obfuscate when courts – applying either Virginia or New York law – will clarify alleged ambiguities in a writing. The threshold determination is universally one of law: whether the words at issue are reasonably capable of being understood to refer to two or more things at the same time. The law of both states is clear: absent a patent ambiguity, courts are not to rewrite contract terms.

Plaintiff also unjustifiably attempts to transform the summary judgment standard as applicable to this case into a pure question of fact. Pl. Mem at 13. Even if it were, "when no rational jury could find in favor of the nonmoving party because the evidence is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Services, Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994). In this undertaking, plaintiff relies on two cases considering essentially "form" contracts, and whether those contracts included agreements to arbitrate.[2] However, summary judgment in this case is a question of law. "[I]f a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." *Postlewaite v. McGraw-Hill, Inc.* 411 F.3d 63, 67 (2d Cir. 2005).

There is no conflict between the New York and Virginia laws of contract formation or interpretation. Both states: 1) require a meeting of the minds on all material terms; 2) bar

---

[2]*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping*, 241 F.3d 135 (2d Cir. 2001); *Ronan Associates Inc. v. Local 94-94A-94B, Intern. Un. of Op. Eng., AFL-CIO*, 24 F.3d 447, 449 (2d Cir. 1994). In *U.S. Titan*, the Second Circuit was concerned with whether the parties had entered into a "charter party" or standard form contract which included an arbitration clause. In *Ronan*, the court also inquired into the incorporation of an arbitration provision in a labor agreement. Both cases were decided under Federal Common law, construing the Federal Arbitration Act.

introduction of parol evidence to vary the plain meaning of words used; 3) hold that intent must be gleaned from within the four corners of an unambiguous writing; and 4) read contracts as a whole, giving effect to all words present, but not construing the document to render any word meaningless.

**II.    The Lear Fax Does Not Pertain Solely to Plaintiff**

Because a meeting of the minds is essential to the formation of a contract, to overcome defendant's motion for summary judgment, Guimaraes must raise a genuine issue of material fact. *Marefield Meadows, Inc. v. Lorenz*, 245 Va. 255, 427 S.E.2d 363, 365 (1993); *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). Guimaraes' only contract claim seeks redress for Speiser Krause's alleged breach of the 25% term contained in the Lear Fax of February 5, 1997. *See* plaintiff's First Amended Complaint at ¶18, 33 ("Guimaraes was at all times entitled to receive 25% of [Speiser Krause's fees]," "The damages suffered by Guimaraes representing his 25% share of the attorneys fees. . ."); Guimaraes 11/2/05 Dep. pp.64-66)(only agreement was in writing, entitled plaintiff to 25% of the fees Speiser Krause earned); Plaintiff's Interrogatory Response #6 ("Guimaraes was to receive 25% of the attorneys fee collected by Speiser Krause in the TAM case"), and #11 (Asked to identify all breaches: "Guimaraes asserts that Speiser Krause breached its obligation under the fee-sharing agreement between Guimaraes and Speiser Krause by failing and refusing to pay Guimaraes his 25% share of the attorneys fees received by Speiser Krause in connection with the TAM case."). At bottom, however, Guimaraes' contract claim rests entirely upon his (unfounded) charge that the "Brazilian counsel" referred to in the Lear Fax pertains solely to "Renato Guimaraes."

By its terms the Lear Fax pertains to a class of "Brazilian counsel." Plaintiff asks this Court to find that term ambiguous, as capable of simultaneously supporting two meanings: "Renato Guimaraes," or "Guimaraes, together with local or referring Brazilian attorneys." The allegedly

4

unclear term "Brazilian counsel" is disambiguated however, by the succeeding pronoun "their" which establishes, under the rules of English, New York and Virginia that "Brazilian counsel" meant "Guimaraes, together with local or referring Brazilian attorneys." Plaintiff admits this is the only possible conclusion when giving effect to the words used, but also argues that use of the "singular their" is a common grammatical mistake, "making it reasonable for Guimaraes to construe the term as referencing him." Pl. 56.1 # 13. Plaintiff's subjective construction is not relevant.

According to Guimaraes' interpretation, however, "their services" really meant "you." It is undisputed that Speiser Krause worked with numerous Brazilian counsel in connection with the TAM case. Moreover, although Guimaraes (in an equally unfounded manner) alleges that the local and referring attorneys were supposed to be paid 10% of the net attorney fee from Speiser Krause's 75% share of the alleged fee-sharing agreement, he does not dispute that Speiser Krause has paid hundreds of thousands of dollars to local and referring Brazilian counsel. Thus, Guimaraes' breach of contract claim depends entirely upon whether he can establish a meeting of the minds between himself and Speiser Krause concerning his interpretation of the alleged 25% term of the Lear Fax pertaining exclusively to him.

As discussed below, none of the arguments plaintiff raises in opposition preclude the finding that there was no meeting of the minds as a matter of law. The plain language of the Lear Fax, plaintiff's introduction of irrelevant extrinsic evidence, and principles of public policy support only one conclusion – that the minds of Guimaraes and Speiser Krause did not meet. Accordingly, partial summary judgment should be entered in favor of Speiser Krause on plaintiff's contract claim.

### A.    The Lear Fax Is Unambiguous

Faced with the plain language of the Lear Fax, Guimaraes purports to oppose the instant motion with extrinsic evidence. That evidence, however, is both legally and factually incapable of raising a material issue of fact. The general rule, not just in Virginia, but in virtually all American courts, is that where, as plaintiff alleges here, parties to a contract have reduced their agreement to a writing, if that writing, construed as a whole, is plain and unambiguous in its meaning, evidence of prior or contemporaneous agreements or negotiations is inadmissible to vary or contradict that meaning. See 29A AM. JUR. 2D Evidence §§ 1092, 1100 (1994); Restatement (Second) of Contracts § 215 (1981); *Eure v. Norfolk Shipbuilding & Drydock Corp. Inc.*, 263 Va. 624, 561 S.E.2d 663, 667 (2002)(Court will not look for meaning beyond face of plain and unambiguous agreement); *Renner Plumbing, Heating & Air Conditioning, Inc. v. Renner*, 225 Va. 508, 303 S.E.2d 894, 898 (1983)(same). New York law is substantially similar. *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 566 N.E.2d 639, 565 N.Y.S.2d 440 (1990) (Extrinsic or parol evidence inadmissible to create ambiguity); *Slamow v. Del Col*, 174 A.D.2d 725, 726, 571 N.Y.S.2d 335 (2d Dept. 1991)(where writing is unambiguous, intent is only to be found within four corners of instrument).

Plaintiff asks the Court to disregard this rule, (*See* Pl. Mem. at 19-21) as if the instant motion was the first time a court applied a rule of grammar. Courts applying Virginia law frequently apply the rules of grammar to determine the existence of an ambiguity. *See, e.g., Hilfiger v. Transamerica Life*, 256 Va. 265, 505 S.E.2d 190 (1998)(citing, John C. Hodges et al., Harbrace College Handbook 249 (12th ed. 1994))("Fundamental rules of grammar require the placement of a phrase so as to indicate clearly what the phrase modifies.") New York is again the same. *See, e.g. Jeffrey v. Allcity Ins. Co.*, 26 A.D.3d 355, 809 N.Y.S.2d 174 (2d Dept. 2006).

6

Under Virginia contract law, language is ambiguous when "it may be understood in more than one way or when it refers to two or more things at the same time."[3] *Granite State Ins. Co. v. Bottoms*, 243 Va. 228, 234, 415 S.E.2d 131, 134 (1992). However, "[a] contract is not ambiguous merely because the parties disagree as to the meaning of the terms used." *TM Delmarva Power, L.L.C. v. NCP of Virginia, L.L.C.*, 263 Va. 116, 119, 557 S.E.2d 199, 200 (2002).

Contract terms in a writing are not ambiguous merely because the parties to a lawsuit disagree about their meaning. *See Eure v. Norfolk Shipbuilding, supra, 263 Va. 624, 561 S.E.2d at 668; Wilson v. Holyfield*, 227 Va. 184, 313 S.E.2d 396, 398 (1984). Were this not the case, the ambiguity exception would swallow the parol evidence rule, for it would be a rare case that lawyers would not "find" an ambiguity in the clearest language. This is precisely what plaintiff attempts to do in the case at bar.[4] To avoid having the ambiguity exception swallow the general rule, the law considers that a writing is not ambiguous under the parol evidence rule unless settled rules of interpretation, applied to the writing as a whole, leave a genuine uncertainty as to which of two or more possible meanings represents the contracting parties' true intent.[5] See 29A AM. JUR. 2D Evidence § 1138 (1994). None is present here.

Contrary to Plaintiff's argument (Pl. Mem at p. 16), Virginia law, like that of New York provides that "the question [of] whether a writing is ambiguous is not one of fact but of law." *Pyramid Dev., L.L.C. v. D&J Assocs.*, 262 Va. 750, 754, 553 S.E.2d 725, 727 (2001) (*quoting Langman v. Alumni Ass'n of the Univ. of Virginia*, 247 Va. 491, 498, 442 S.E.2d 669, 674 (1994));

---

[3] When testifying under oath, plaintiff attempted to explain his strained construction of the Lear fax by speculating that Mr. Lear may have been under the mistaken impression that he (Mr. Guimaraes) was not a sole practitioner. Plaintiff stated that this was his attempt to "accommodate" the words contained in the Lear Fax. Plaintiff also testified that no one at Speiser Krause would ever have had a basis for such a belief. Plaintiff has apparently abandoned this argument in opposing summary judgment.

[4] See, Pl. Mem at 22-23. Like his Complaint in this action, the Pl. Mem. refers the Lear Fax as the "final" "complete" "fee sharing agreement." *See Complaint*, Exhibit 1, ¶11 ("signed, written fee sharing agreement."). Plaintiff's memorandum variously characterizes the Lear fax as "definite," "clear," and "unambiguous." Undeterred, plaintiff attempts to re-write that same document, arguing that a "frighteningly picayune" "grammatical mistake" somehow creates an ambiguity.

[5] Under Virginia law a party to a contract may introduce parol evidence to establish a <u>defense</u> based on such doctrines as partial integration, collateral contract, fraudulent procurement, mutual mistake, or condition precedent. *Price v. Taylor*, 251 Va. 82, 86-87, 466 S.E.2d 87, 89 (1996)(citation omitted). Plaintiff however, makes no such claim here. *See Pl. Mem.* at 16, 27 ("*The Agreement Was Definite and Contained All Material Terms*"), ("Guimaraes considered [the Lear Fax] . . *definitive*").

*Ruttenberg v. Davidge Data Sys. Corp.*, 215 A.D.2d 191, 192-193, 626 N.Y.S.2d 174, 178 (1ˢᵗ Dept. 1995). To determine contract ambiguity, courts applying Virginia law look at the words at issue within the four corners of the agreement itself. *Wilson v. Holyfield, supra,* 227 Va. 184, 187-88, 313 S.E.2d 396, 398 (1984).

### B.    *Guimaraes' Reliance on Extrinsic Evidence Lacks any Merit.*

Just as Virginia "courts cannot read into contracts language which will add to or take away from the meaning of the words already contained therein," *Henderlite v. Henderlite*, 3 Va. App. 539, 541, 351 S.E.2d 913, 914 (1986) (*quoting Wilson v. Holyfield supra,* 227 Va. at 187, 313 S.E.2d at 398), this Court should not accept plaintiff's argument that the terms "Brazilian counsel" and "their services" actually refer to "Renato Guimaraes" and "you." "Where there is no ambiguity in the terms of a contract, [courts applying Virginia law] construe it as written, . . .and [] are not at liberty to search for the meaning of the provisions beyond the pertinent instrument itself." *Smith v. Farrell*, 199 Va. 121, 128, 98 S.E.2d 3, 7 (1957).

Under Virginia law, "extrinsic evidence can be admitted to explain an ambiguity in a document. However, the ambiguity must be apparent on the face of the instrument." *Cohan v. Thurston*, 223 Va. 523, 525, 292 S.E.2d 45, 46 (1982). New York law is much the same. *W.W.W. Assocs. v. Giancontieri, supra* 77 N.Y.2d 157 (1990)("extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face.") Plaintiff, in a rhetorically-charged attempt to circumvent these rules, asks the Court to apply the force of law to the "contract" without regard to the words employed therein. However, Virginia courts will not use parol evidence to vary or contradict the terms of an agreement. *See Tuomala v. Regent University,* 252 Va. 368, 374, 477 S.E.2d 501, 505 (1996). *See also Lansdowne Dev. Co. v. Xerox Realty Corp.*, 257 Va. 392, 400, 514 S.E.2d 157, 161 (1999) ("[W]e will not insert by construction, for the benefit of a party, a term not express in the contract."). This is precisely what plaintiff's contract claim requires, and what the Court should refrain from doing.

8

### C.    *There Was No Meeting of the Minds*

Under Virginia law, contracts presuppose an obligation arising from mutual agreement and intent to promise, and require a meeting of the minds. "A meeting of the minds," in turn, "requires a manifestation of mutual assent." *Wells v. Weston*, 229 Va. 72, 79, 326 S.E.2d 672, 676 (1985) (citation omitted). 4A *Michie's Jurisprudence of Virginia and West Virginia, Contracts* §99 at 561 (footnotes omitted), *quoted* in *Com. Biotechnologies, Inc. v. Va. Com. Univ.*, 2002 WL 1426143, *4 (Va. Cir. Ct. 2002). This is wholly in accord with the law of New York. "In order for a breach of contract to exist, there must be a meeting of the minds on the agreement said to have been breached." *Miranco Contracting, Inc. v. Perel* 29 A.D.3d 873, 816 N.Y.S.2d 516 (2d Dept. 2006)(upholding grant of summary judgment), *quoting*, *Gomez v Bicknell*, 302 AD2d 107, 115, 756 N.Y.S.2d 209 (2d Dept. 2002); *see Platt v Portnoy*, 220 A.D.2d 652, 653, 632 N.Y.S.2d 659 (1995). "Mutual assent evincing the intention of the parties to form a contract is essential" and "[a]n agreement to agree, which leaves material terms of a proposed contract for future negotiation, is unenforceable." *Id.*, *quoting Gomez, supra* at 115-116, *Maffea v Ippolito*, 247 A.D.2d 366, 367, 668 N.Y.S.2d 653 (2d Dept. 1998); *see Joseph Martin, Jr., Delicatessen v Schumacher*, 52 N.Y.2d 105, 109, 417 N.E.2d 541, 436 N.Y.S.2d 247 (1981).

Given the lack of textual support in the Lear Fax for plaintiff's suggested interpretation, as well as the absence of any material factual dispute concerning the meaning of "Brazilian counsel" used in that communication, plaintiff's contract claim must fail as a matter of law.

### III.    Even if the Court Elects to Consider Parol Evidence, Plaintiff has Failed to Demonstrate a Meeting of the Minds.

Plaintiff offers an interpretation of the Lear fax that obligated Speiser Krause to pay him 25% of its fees. Pl. Mem. at 16-21. To show that there was a meeting of the minds, Guimaraes argues: "Lear's letter memorialized our agreement that I would receive 25% of Speiser Krause's fee."

9

Guimaraes decl. at ¶14. This conclusory assertion is insufficient to raise a triable issue of fact regarding the meaning of the words used. Under Virginia law, the acceptance of an offer must correspond exactly to the terms of the offer; if it does not, any purported acceptance is a rejection. *Arnold v. Amoco Oil Co.*, 872 F.Supp. 1493 (WD Va. 1995). Thus, even if the Court were to accept that Guimaraes' "offer" of a sole entitlement to the 25% portion of the fee split, Lear's alleged "acceptance" would be nothing more than a counteroffer.[6]

Guimaraes' advice that Lear's alleged acceptance had been circulated "among at least the families *and their attorneys* of about 25 (twenty five) victims[.]" should remove any residual doubt. Berman Aff. Exh. 8 (Doc. No. RG-00026). Accordingly, Guimaraes cannot now allege that the Lear Fax (and its purported 25% fee split) applied to anything other than "Brazilian counsel" and "their services." "Brazilian counsel" meaning, of course Guimaraes "together with the local and referring attorneys." Having admitted this retransmission to the prospective clients and their lawyers, plaintiff mystifyingly asks this court to overlook his own, equally unambiguous words:

> *The attorneys of the families and I* are firm in repeating what Gerard R. Lear Wrote to *us* on February 5: ".we look forward to once again working actively with your office" - and also hearing so at 12 noon today.

Berman Aff. Exh. 8 (Doc No. RG-00028)(emphasis supplied). With no evidence (parol or otherwise) to alter this publication, Plaintiff has failed to demonstrate how a reasonable finder of fact could find ambiguity concerning the universe of local counsel to which the Lear fax refers. Without more, Guimaraes has failed to sustain his burden of providing sufficient evidence of a triable issue of fact on his claim that there was a meeting of the minds between he and Speiser Krause.

---

[6] Specifically, a counteroffer similarly too indefinite to form a contract, as no division of the 25% between plaintiff and "local Brazilian counsel" was provided for.

10

IV.   **"Agreements to Agree" are Unenforceable Under the Laws of Both New York and Virginia.**

Inasmuch as plaintiff fits in to the category of lawyers described in the Lear fax of February 5, 1997, he may be entitled to a claim for a portion of 25% to be split among Brazilian counsel under his *quantum meruit* and unjust enrichment claims.[7] Much like courts applying New York law, (see Defendant's Memorandum in Support of Motion for Summary Judgment ("Def. Mem") at 11 (citing, *inter alia, Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d at 109-10, 417 N.E.2d 541, 436 N.Y.S.2d 247 (1981))), courts applying Virginia law do not enforce "agreements to negotiate." *See W. J. Schafer Assocs. v. Cordant, Inc.*, 254 Va. 514, 520, 493 S. E. 2d 512, 515 (1997). Under Virginia law, alleged "contracts" which fail to specify the scope of work, price, or duration are unenforceable. *Id.* Plaintiff was *one of* the "Brazilian counsel" eligible to earn a portion of Speiser Krause's fee, as his circulation of the very same fax among its intended recipients, (Berman Aff. Exh. 8 (Doc. No. RG-00026-28)) demonstrates. However, plaintiff offers no way of dividing the 25% available among "Brazilian counsel," as a result, no contract may be found, *see, Weldon v. Innovative Mgmt. Concepts, Inc.* 113 Fed.Appx. 517, 2004 WL 2423693 (4th Cir. 2004)(agreement calling for cooperation in pursuit of business opportunities was merely an agreement to negotiate and its indefiniteness precluded a successful breach of contract claim under Virginia law), and any recovery must be limited to *quantum meruit.*

---

[7] Speiser Krause is in no way admitting liability under plaintiff's quasi-contractual claims. Instead, it is simply recognizing that it has not sought summary judgment on these claims in the instant motion. While plaintiff may have been entitled to recovery under this theory at some point, he outrageously asserted that the long-suffering TAM victims' families were not entitled to accept the negotiated settlements, and did everything in his power to thwart recovery thereunder. Absent his contract claim, the value of his services, if any, may still be determined by the trier of fact.

11

**V.    In the Absence of a Meeting of the Minds on Plaintiff's 25% Claim there is still not Meeting of the minds on Plaintiff's New 50%Claim.**

Plaintiff offers an interpretation of the written client retainers under which he now claims entitlement to 50% of Speiser Krause's fees. Like his prior theories, this one finds no support in the evidence. First, Guimaraes testified that there was only one "contract" between the parties – the alleged written "fee sharing agreement." *See* Guimaraes 11/2/05 Dep. pp.64-66)(only agreement was in writing, entitled plaintiff to 25% of the fees Speiser Krause earned). Second, any contract claim other than one based upon the alleged 25% "fee sharing agreement" is not a claim before this Court. *See* plaintiff's First Amended Complaint at ¶18, 33 ("Guimaraes was at all times entitled to receive 25% of [Speiser Krause's fees]" "The damages suffered by Guimaraes representing his 25% share of the attorneys fees. . ."). Third, plaintiff has asserted no breach by Speiser Krause under anything other than the alleged "fee sharing agreement." Plaintiff's Interrogatory Response #6 ("Guimaraes was to receive 25% of the attorneys fee collected by Speiser Krause in the TAM case"), and 11),("Guimaraes asserts that Speiser Krause breached its obligation under the fee-sharing agreement between Guimaraes and Speiser Krause by failing and refusing to pay Guimaraes his 25% share of the attorneys fees received by Speiser Krause in connection with the TAM case.") Fourth, Speiser Krause's clients in the TAM actions would be necessary parties to any proceeding concerning the retainer agreements, and are not parties to this action. Fifth, as plaintiff has admitted, his refusal to contribute to the prosecution of the case by processing the settlements caused his discharge by between 17 and 20 of the TAM clients . Plaintiff's Interrogatory Response #8 (Contained in Apuzzo Aff., Exh. E)(detailing termination by 20 clients due to refusal his refusal in regard to settlements), Guimaraes Decl. ¶50 (stating termination by 17 clients). Sixth, plaintiff has sued at least two of

12

Speiser Krause's TAM clients for fees in Brazil (Apuzzo Aff., Exh. E (Interrogatory Response #15); and finally, Guimaraes has previously, unsuccessfully sought to enforce his claimed "right" to fees awarded in United States domestic courts at least four times. *See*, 1) *In re: Letter Rogatory Issued by Second Part of the III Civil Regional Court of Jabaquara/Saude Sao Paulo, Brazil* (No. M13-72 (RO)) (reported at 2001 WL 1033611 (SDNY)) (Sept. 7, 2001); 2) *In re: Letter Rogatory Issued By the Second Part of the III Civil Regional Court of Jabaquara/Saude, Sao Paulo, Brazil* No. 01-MC-212(JG)(reported at 2002 WL 257822 (EDNY)) (Feb. 6, 2002); 3) *Klepetar v. Northrup [sic] Grumman Corp. et. al*, (No. 01-13502CA (23)) 11th Circuit Court of the Eleventh Judicial Circuit (Miami-Dade County, FL)(Donner, J.) (Jan. 13, 2003)(adjudging claim *inter alia* (at Guimaraes' direction) to be "blatant, transparent forum shopping"); and 4) *Renato Guimaraes v. Northrop Grumman Corp.*, (No. BC345356(Aguirre, Jr.) (Sustaining demurrer in favor of defendant, without leave to amend) (Jul. 20, 2006))(California Superior Court, Los Angeles County). The client retainer agreements do not create a contract between the plaintiff and defendant to share a specific percentage of the fees earned. The absence of a meeting of the minds on the alleged 75% - 25% fee-split, does not require a finding of a 50% - 50%, 40% - 60%, 10% - 90% or under a contract theory.

**VI.    Plaintiff Failed to Raise a Material Question of Fact Regarding his Abandonment.**

Plaintiff's abandonment presents the Court with a second independently-sufficient ground for dismissing his contract claim. By way of expert affidavit, plaintiff attempts to alter his prior admission of actions contradicting the known, expressed wishes of TAM clients and their desire to accept the settlements. As will be shown below, this is a fundamental violation of the attorney-client relationship, rather than, as plaintiff now argues, the harmless expression of professional opinion. There is little doubt that under domestic U.S. law, plaintiff would be unentitled to any fee in a

13

situation such as this because the decision of whether to accept or reject a proposed settlement is universally reserved to the client, not the attorney. However, plaintiff now seeks to alter the standard governing his conduct under the dubious proposition that attorneys in Brazil, who are in breach of their fiduciary duties remain entitled to a fee. Plaintiff, as the proponent of the purported application of foreign law, bears the burden of establishing that law as a question of fact. Fed. R. Civ. Pro. 44.1. Plaintiff's claim in this regard is not only unconscionable, it is also incorrect.

The "contract" alleged to exist between the parties concerned domestic (U.S.) performance, only. Plaintiff admits that his goal in regard of the TAM cases was to provide the TAM clients with access to "the comparative efficiency of the United States legal system," by "filing [] a lawsuit in the United States." Guimaraes Decl. ¶¶6, 7. There is no dispute that Speiser Krause maintained actions against the TAM defendants in Orange County California, and New York State Supreme Court. *See,* Guimaraes Decl. ¶30, Granito Aff. ¶¶2-5. Plaintiff alleges that his own performance under the alleged contract occurred in part, in the United States. Guimaraes Decl. ¶34. Despite the claimed "definitiveness" of the contract plaintiff alleges, "he indicated that it was necessary to discuss a separate fee-sharing arrangement concerning th[e] independent action against TAM Airlines because it was contemplated from the outset that Guimaraes (and not Speiser Krause) would be primarily responsible for handling this piece of litigation in Brazil." *Id.* at ¶ 38[8]. The plaintiff states that the defendants had nothing to do with any Brazilian litigation. Guimaraes Decl. ¶37-38. Plaintiff clearly declares that the alleged "fee sharing agreement" only concerned the domestic (U.S.) prosecution of the cases, and did not pertain to the actions he instituted in Brazil. Id. Plaintiff admits that the

---

[8]As established in defendant's moving brief, the ostensible need for such further negotiation in view of plaintiff's allegation of a "definitive," "final" and "complete" agreement as reflected in the Lear Fax is dubious. The issue is only revisited here to further evidence that any alleged contract between the parties could only have been for the performance of services in the United States of America - as opposed to in Brazil.

14

"consulting" arrangement he contemplated in July 1998 never materialized, *Id.* at ¶39, and that the fees he seeks to recover here, were derived from Speiser Krause's domestic (U.S.) actions. Plaintiff admits that the Brazilian action concerned a separate 10% retainer fee, *Id.* at 40, of which he claims Speiser Krause is unentitled to participate in. Guimaraes Decl. ¶40. In all events, plaintiff claims he referred TAM clients to Speiser Krause in order to prosecute a U.S. litigation. Apuzzo Aff., Exhibit G (Plaintiff's Supplemental Interrogatory Response #6).

Speiser Krause filed TAM-related actions in New York State Supreme Court, including an action Westchester County, (Sup. Ct. Westchester County Index No. 00215/99), and in New York County (Sup. Ct. Index No. 119544/98). These actions continued until 2001. Granito Aff. ¶¶4-8 Depositions and discovery were conducted in New York. *Id.* at ¶6. Stipulations of discontinuance, without prejudice, were filed in New York. *Id.* at ¶6. These cases remain in suspense in the Supreme Court of the State of New York. The claimants who have not settled have the right to re-file the claims and the TAM defendants agreed to waive any defense based on the statute of limitations. *Id.* at ¶8.

Speiser Krause also instituted and litigated 64 separately filed TAM cases in California Superior Court. Those cases were dismissed on *forum non conveniens* grounds, but the order of dismissal has been stayed. *Id.* at ¶8, *see also*, Guimaraes Decl. ¶35. As the cases settled, they were closed in California. There still remain unsettled cases in California Superior Court. See Berman Aff. Exh. 8 (Doc No. RG-00212).

Plaintiff traveled to both New York and California as part of the performance he alleges. He alleges to have worked over a month in Speiser Krause's California office, on the clients' cases. *See* Guimaraes Decl. ¶34. Multiple conferences and meetings with the insurance carriers for the TAM

15

defendants occurred in New York and Washington, D.C. Granito Aff. ¶7. In 2000, Speiser Krause negotiated the settlements with the TAM defendants in New York and Washington, DC. The settlements were funded in American dollars, and paid to Speiser Krause's American trust account. Id. ¶9.

Most significantly, plaintiff himself requested, and continues to request, that Speiser Krause pay him in U.S. dollars. Berman Aff. Exh. 8, (Doc. Nos. RG 00039-41; 00065-66; 00083-86; 00092-94. Granito Aff. ¶9. Mr. Guimaraes maintained a U.S. bank account, and whenever he requested that Speiser Krause pay his disbursements, he requested payment to his U.S. Bank account. *Id.* Under Florida choice of law rules, this *alone* is enough to apply American law to the issues at hand. *See Pan-American Life Insurance Co. v. Recio*, 154 So.2d 197 (Fla. App. 1963)(provision for payment in U.S. dollars sufficient to apply American, rather than foreign law). Therefore, the subject matter of the contract is U.S. dollars, which were paid to Speiser Krause's American bank account. Plaintiff is not suing in New York for Brazilian Reals. He wants U.S. Dollars for his domestic bank account.

The performance of the contract to represent TAM clients in the United States is still being performed and was substantially completed in New York and California. Plaintiff chose to bring suit in the United States of America for U.S. Dollars. Brazilian law should not supply the rule of decision to allow an attorney to earn a fee after acting against his clients' known interests.

Under American law, ultimate settlement authority is reserved to the client. *See ABA Model Rules of Professional Conduct*, Rule 1.2(a)(1983)("A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter"). New York's law is in substantial accord. *New*

16

*York Lawyer's Code of Professional Responsibility*, EC 7-7.[9]  California is no different.  *See United States v. Beebe*, 180 U.S. 343, 21 S.Ct. 371, 45 L.Ed. 563 (1901)(settlement authority reserved to client); *Linsk v. Linsk*, 70 Cal.2d 272, 449 P.2d 760 (1969)(same), *Estate of Falco* 188 Cal.App.3d 1004, 233 Cal.Rptr. 807 (2d Dist. 1987)(client's right to accept or reject a settlement is absolute and implicit in contract between client and attorney).

Plaintiff's view of entitlement to attorneys fees sharply contrasts the fundamental American rule concerning the decisions to settle.  Under American law, this decision is reserved to the client.  The New York Code of Professional Responsibility provides at EC 7-7:

> In certain areas of legal representation not affecting the merits of the cause or substantially prejudicing the rights of a client, a lawyer is entitled to make decisions. But otherwise the authority to make decisions is exclusively that of the client and, if made within the framework of the law, such decisions are binding on the lawyer. As typical examples in civil cases, it is for the client to decide whether to accept a settlement offer or whether to waive the right to plead an affirmative defense.

In civil matters, California law is also "settled" on this point: the general rule is that a client makes the decision whether and on what terms to settle a claim. *See United States v. Beebe* 180 U.S. 343, 45 L.Ed. 563, 21 S.Ct. 371 (1901); Linsk *v. Linsk* 70 Cal.2d 272, 74 Cal.Rptr. 544, 449 P.2d 760 (1969); *Hall v. Orloff*, 49 CalApp. 745, 748-749, 194 P. 296 (1920)(decision to accept or reject settlement remains with client).  *See generally, Estate of Falco,* 188 Cal.App.3d 1004, 233 Cal.Rptr. 807 (2nd Dist. 1987)(client's right to reject a settlement is absolute and is implicit in the contract between a client and an attorney).  On American rule being in substantial accord, *see generally*, Restatement (Third) of the Law Governing Lawyers § 22 (listing whether and on what terms to settle

---

[9]"In certain areas of legal representation not affecting the merits of the cause or substantially prejudicing the rights of a client, a lawyer is entitled to make decisions. But otherwise the authority to make decisions is exclusively that of the client and, if made within the framework of the law, such decisions are binding on the lawyer. As typical examples in civil cases, it is for the client to decide whether to accept a settlement offer or whether to waive the right to plead an affirmative defense."

a claim under list of decisions under"Authority Reserved to Client"); *see also ABA Model Rules of Professional Conduct*, Rule 1.2(a)(1983) ("A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter").

In support of his shocking argument that Brazilian law requires the payment of attorney's fees even where the requesting attorney has breached his fiduciary duties, plaintiff offers the Declaration of Professor Keith Rosenn. Professor Rosenn expresses a view that under Brazilian law, clients typically pay their attorneys 1/3 of the agreed fee when the representation commences, another 1/3 upon the issuance of a decision in the court of the first instance, and the final third at the "end" of the case. Rosenn. Decl. ¶9. Rosenn only touches lightly on contingent fees, except to say that Brazilian courts typically include a loser-pays attorney fee award in the types of verdicts at bar.

Rosenn also opines that under Brazilian law, even attorneys who were discharged "for cause" remain entitled to fees. Rosenn Decl. ¶16. Under plaintiff's analysis, because the attorneys fee protection statute does not distinguish between termination and justified termination, that must mean that the Brazilian legislature requires payment of attorneys, even where, as here, an attorney is in breach of his or her fiduciary responsibilities. Professor Rosenn does <u>not</u> state, however, that Brazilian attorneys who oppose and attempt to undermine the expressed wishes of a client, such as a client's expressed request to settle, retain the right to be compensated. In addition, the Court should give professor Rosenn's opinion no weight because U.S. law, and not Brazilian law applies to the issues at bar. Even if the Court were to consider Professor Rosenn's declaration, it should note that he has not opined on whether a Brazilian attorney is entitled to a fee even if, as here, that attorney admits acting against his client's interest. In view of the foregoing, Professor Rosenn's opinion about Brazilian law must be disregarded.

18

American courts are nearly universal in striking down attorney fee arrangements by which clients purport to cede settlement-making authority to their attorneys. Typically, this is done on public policy grounds. *See, e.g., In re Marriage of Hasso,* 229 Cal. App.3d 1174, 1185, 280 Cal.Rptr. 919 (1991)(rejecting as against public policy an argument for a rule forbidding parties from settling without their attorney's consent)[10];

Plaintiff's insistence on an entitlement to a fee, despite his actions attempting to thwart the settlements from which those fees were derived also contradicts another important precept of American law: lawyers entering into contingent-fee arrangements are only entitled to receive the specified fees when, and to the extent that the client receives payment. *See,* Restatement (Third) of the Law Governing Lawyers §35. Plaintiff's grave and admittedly-willful failure to follow the clients known wishes constitutes a serious breach of any purported "contract" he had with Speiser Krause, and with the clients. He admitted so much, and should not now be heard to complain.

Public policy also militates against applying the purported Brazilian standard plaintiff argues for, as it rewards an attorney for his own misconduct in regard to settlement. Plaintiff is attempting to collect fees earned under the same settlement he refused to contribute his assistance toward achieving, against the known wishes of the clients.

---

[10]California goes even further, criminalizing such conduct: "Every attorney is guilty of a misdemeanor who . . . [w]illfully delays the client's suit with a view to his own gain." Cal. Business and Professions Code 6128(b). This directly contravenes plaintiff's contention that his actions caused no damage. (*see* Guimaraes Decl. at ¶53)("Eventually, all clients who chose not to follow my advice were able to receive the full amount of the settlements they agreed to")(emphasis supplied).

**Conclusion**

Absent a meeting of the minds, there cannot be a contract entitling plaintiff to 25% of the fees Speiser Krause earned. Although Mr. Guimaraes may be entitled to a share of the fees as was paid to other Brazilian counsel, he must establish his entitlement thereto solely on a *quantum meruit* basis. If it is found that plaintiff's conduct constituted a breach of his fiduciary duties as a matter of law, he should not recover any compensation.


Dated:    New York, New York
          November 10, 2006                    Respectfully submitted,


                                      By:    _William J. Apuzzo_
                                             William J. Apuzzo (WA 1312)
                                             Apuzzo & Chase
                                             Attorneys for Defendant
                                             Speiser Krause
                                             800 Third Avenue - 8th Floor
                                             New York, NY 10022
                                             (212) 297-0885

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
RENATO GUIMARAES, JR.,

                            Plaintiff,

          -against-

SPEISER, KRAUSE, NOLAN & GRANITO a
professional corporation f/k/a SPEISER,
KRAUSE, MADOLE & LEAR, a professional
corporation,

                          Defendant.
------------------------------------------------------------X

**ECF Case**

No. 05 CV 02210 (DC)

### *Attorney's Certificate of Service*

    This is to certify that a copy of the foregoing has been sent by FedEx Overnight Delivery on this date to each of the following:

        Richard E. Berman, Esq.
        Berman, Kean & Riguera, P.A.
        2101 West Commercial Blvd., Ste. 2800
        Ft. Lauderdale, FL 33309
        (954)735-0000

    and that the foregoing was left with said overnight courier prior to the time for which that courier stops accepting overnight deliveries.

Dated: New York, New York
       November 10, 2006

                                William J. Apuzzo (WA-1340)
                                Attorneys for Defendant
                                800 Third Avenue -8th Floor
                                New York, NY 10022
                                Tel.: (212) 297-0885

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
RENATO GUIMARAES, JR.,

                              Plaintiff,                    No. 05 CV 2210 (DC)(RLE)

                                                           DEFENDANT'S REPLY TO
            -against-                                      PLAINTIFF'S STATEMENT
                                                           OF PURPORTED
SPEISER, KRAUSE, NOLAN & GRANITO a                         MATERIAL DISPUTED FACTS
professional corporation f/k/a SPEISER,
KRAUSE, MADOLE & LEAR, a professional
corporation,

                              Defendant
-------------------------------------------------------------X

      Defendant Speiser, Krause, Nolan & Granito, PC ("Speiser Krause" or "Defendant"), by

its attorneys, Apuzzo & Chase, pursuant to Local Civil Rule 56.1, hereby submits this statement

in response to the statement of purported material facts submitted by plaintiff Renato Guimaraes,

Jr. ("Plaintiff" or "Guimaraes"):

1.     Denied because there was no "fee sharing agreement" by which defendant agreed to pay

     plaintiff 25% of its fees. Plaintiff has failed to cite evidence which establishes that

     Speiser Krause intended to be bound by the "fee sharing agreement." Fed. R. Civ. Pro.

     56(e), Local Civil Rule 56.1(d). The alleged "fee sharing agreement" in plaintiff's

     statements of purported material fact refer to Exhibit 1 to Plaintiff's Amended Complaint,

     (the "Lear Fax" dated February 5, 1997). Plaintiff's continued mischaracterization of

     Amended Complaint Exhibit 1 as the "fee sharing agreement" is a conclusion of law,

     rather than a statement of fact, and is flatly contradicted by plaintiff's own purported

1

"response" to that document, Berman Aff. Exh. 8, (Doc. No. RG-00026-00028), wherein

plaintiff purports to "accept" the alleged offer on behalf of "The attorneys for the families

and I." Moreover, Speiser Krause avers that intent, to the extent the same is reflected

outside of the purported "fee sharing agreement" is not material because the Lear fax is

unambiguous, and the term plaintiff seeks to introduce patently contradicts the plain

meaning of the Lear fax. ("Brazilian counsel" and "their services" refer to <u>plural</u> counsel).

2.    Denied because there was no fee sharing agreement.  Plaintiff has failed to cite evidence

which establishes that Guimaraes intended to be bound by "the fee sharing agreement."

Fed. R. Civ. Pro. 56(e), Local Civil Rule 56.1(d). See response to Statement 1, Amended

Compl. Exhibit 1, and Berman Aff., Exh 8, (Doc. No RG-00026-28)(the Lear fax "have

been copied and circulated (distributed) along with the translations into Portuguese,

among at least the families and their attorneys. . . . "The attorneys of the families and I . . .

look forward to once again working actively with your office").

3.    Denied because there was no fee sharing agreement.  Plaintiff has failed to cite evidence

which establishes that there were no open material terms in "the fee sharing agreement."

Fed. R. Civ. Pro. 56(e), Local Civil Rule 56.1(d). See response to Statements 1, 2 above,

Amended Compl. Exhibit 1, and Berman Aff., Exh 8. (Doc. No RG-00026-28).

Moreover, plaintiff offers no means by which the alleged 25% portion of the attorneys'

fee split among "Brazilian counsel" would be divided between himself and  "attorneys of

the families."  Compensation is a material term, which remained open after the Lear fax.

2

4.      Denied because there was no "fee sharing agreement." Plaintiff has failed to cite

evidence which establishes that "[t]he fee sharing agreement was not preliminary." Fed.

R. Civ. Pro. 56(e), Local Civil Rule 56.1(d). See response to Statement 1, Amended

Compl. Exhibit 1, and Exhibit 8 to Berman Aff. (Doc. No RG-00026-28). To the extent

that the Lear fax was not preliminary, that is because there was no "agreement" as

plaintiff alleges.


5.      Denied because there was no "fee sharing agreement." Plaintiff has failed to cite

evidence which establishes that "[t]he fee sharing agreement was not an agreement to

agree." Fed. R. Civ. Pro. 56(e), Local Civil Rule 56.1(d). See response to Statement 1,

Amended Compl. Exhibit 1, and Exhibit 8 to Berman Aff. (Doc. No RG-00026-28). To

the contrary, if anything it could only have been one to negotiate further, i.e. "agree" in

the future as to fees payable to "Brazilian counsel" out of a total 25% Speiser Krause was

willing to make available. Apuzzo Reply Aff., Exh A (Deposition of Gerard R. Lear at

pp. 65-69).


6.      Denied because there was no "fee sharing agreement." Plaintiff has failed to cite

evidence which establishes that "[t]he fee sharing agreement did not contemplate future

negotiations." Fed. R. Civ. Pro. 56(e), Local Civil Rule 56.1(d). See response to

Statements 1, 5, above. See also plaintiff's inconsistent argument that future negotiations

were necessary as reflected in his declaration in opposition to Summary Judgment at ¶38

3

("I indicated that it was necessary to discuss a separate fee-sharing arrangement concerning that independent action against TAM airlines because it was contemplated from the outset that Guimaraes (and not Speiser Krause) would be primarily responsible for handling this piece of the litigation in Brazil.").

7.    Denied because there was no "fee sharing agreement."  Plaintiff has failed to cite evidence which establishes that "[t]he fee sharing agreement did not contemplate a further writing between Speiser Krause and Guimaraes."  Fed. R. Civ. Pro. 56(e), Local Civil Rule 56.1(d).  The Lear fax is unambiguous. Amended Compl. Exhibit 1. Therefore, any "contemplation" of that writing must be gleaned from within the four corners of the instrument.  By its terms, the Lear fax pertains to "Brazilian counsel," and "their services" which can only mean more than one Brazilian counsel, rather than plaintiff, alone.  Amended Compl., Exh. 1. This statement is also contradicted by plaintiff's declaration that "it was necessary to discuss a separate fee-sharing arrangement" in July 1998.  Guimaraes Decl. ¶38.

8.    Denied because plaintiff has failed to cite evidence which establishes that "Guimaraes told A[rthur] Ballen that unless Speiser Krause was willing to pay him 25% of the contingency fee, he would find other United States counsel to represent the clients.    Fed. R. Civ. Pro. 56(e), Local Civil Rule 56.1(d).  In fact, as Mr. Ballen testified, the only fee discussed was "in reference to Brazilian counsel," rather than to Mr. Guimaraes.  Apuzzo Reply Aff., Exh. B (Arthur Ballen Dep., p. 59-60; 171, 173-174).  Answering further,

Speiser Krause denies that any alleged prior conversation is material, because parol evidence is inadmissible to alter the plain words contained in the Lear fax.

9.  Denied because there was no "fee sharing agreement."  See, Deposition of Arthur Ballen at 59-60, 171-174.  Plaintiff has failed to cite admissible evidence that any telephone conversation took place.  Answering further, Speiser Krause denies that any conversation which is alleged to precede the Lear is material, as the Lear fax is unambiguous.

10.  Denied because there was no "fee sharing agreement."  Denied because plaintiff failed to cite evidence which shows that the Lear fax memorialized or constituted an agreement. Further, defendant denies this statement because it is a conclusion of law, rather than a statement of fact. See Amended Compl. Exh. 1; Apuzzo Reply Aff., Exh. B (Deposition of Arthur Ballen at 59-60, 171-174; Deposition of Gerard Lear at 65-69).  To the contrary, the Lear fax refers to "Brazilian counsel" as Guimaraes recognized in further communications, and his attempt to "accommodate" the language.  Berman Aff. Exh. 8 (Doc. No. RG-00026-28); Apuzzo Aff., Exh. "H" (Guimaraes 11/2/05 Dep., p. 164, l. 14 - p. 165 l. 22).  Furthermore, Plaintiff has admitted his awareness that the terms term "Brazilian counsel," and "their services" refer to more than one person. *Id., see also* plaintiff's response to defendants rule 56.1 statement at response #13 (admitting that "their" is a plural possessive pronoun, but denying that it was unreasonable for plaintiff to understand it as such).

11.    Denied because there was no "fee sharing agreement."  Further denied to the extent that

the cited evidence (Guimaraes Decl. ¶18) contains conclusions of law, rather than

statements of fact.  *See,* Fed. R. Civ. Pro. 56(e), Local Civil Rule 56.1(d).  *See also*

response to Statement 1, above.  Answering further, Speiser Krause states that plaintiff

treated the alleged "fee sharing agreement" as preliminary, non-binding or viewed

himself as otherwise un-obliged thereby.  Plaintiff's assertion is belied by his going into

business for himself (and to Speiser Krause's exclusion).  Examples of his acts

inconsistent with a "fee sharing agreement" include: 1) entering into retainer agreements

with TAM clients for Brazilian litigation; (Apuzzo Aff., Exh. H, (Plaintiff 11/2/05 Dep.

p. 90, l. 24 - p.92, l. 12.)); 2) being paid "between $150,000 or $200,000, probably, less

or more," and not paying Speiser Krause 75% of those fees (*Id.*, at Plaintiff's 10/7/05

Dep. at p. 121, l. 22 -p. 122, l.8.); 3) hiring, authorizing, and otherwise encouraging Dr.

Wanderley Minitti to prosecute letters rogatory for the enforcement of the Jabaquara

judgment in the United States so he could recover the 20% loser-pays attorneys fee

awarded by the Jabaquara judgment (again to the exclusion of Speiser Krause)(See

Response to Interrogatory # 9); 4) Asking the Jabaquara court to dismiss that case;

(Apuzzo Aff. Exh. H (Guimaraes 10/7/05 Dep. at p. 160)); 5) writing to the Brazilian bar

association and attorney general, complaining about Speiser Krause's representation of

the TAM clients (Apuzzo Reply Aff., Exh. E);(Apuzzo Aff., Exh. H (Plaintiff's 11/2/05

Dep. at p. 98))(Interrogatory Response # 6 (plaintiff complained to Sao Paolo Attorney

General about Speiser Krause)); 6) refusing to process the TAM client settlement awards

despite clear instruction to do so made by a number of the clients (Apuzzo Aff. Exh.

6

H)(Plaintiff's 11/2/05 Dep. at 101-102)); 7) in the same way, acting against Speiser

Krause's expressed interest (*Id.*(Plaintiff's 11/2/05 Dep. at 103-105)); 8) treating his

"proposed contingency fee" as being outside of the alleged fee-sharing agreement

(Guimaraes Decl. ¶38); 9) admitting that the fee discussions between himself and Speiser

Krause were still ongoing as late as the year 2000. Apuzzo Aff. Exh. H (Guimaraes Dep.

10/7/05, p. 82, l.16 - p.83, l. 7), 10) seeking to obtain substitute U.S. counsel to replace

Speiser Krause in regard to the TAM clients. (Plaintiff's Interrogatory Response #3); and

11) Mr. Guimaraes aired his contempt for the settlement offers obtained by Speiser

Krause. Apuzzo Aff. Exh H (Guimaraes 11/2/05 Dep. at pp. 103-104. ("Q: Were your

actions in refusing to assist the clients in accepting these settlements, were these actions

contrary to the objectives that were made known to you by the TAM clients?  A: Yes,

they want the money, I want the rule."  "Q. [W]ere your actions also contrary to the

objectives of Speiser Krause?  A. Yes."))  Guimaraes was aware that Speiser Krause's

receipt of attorneys fees was contingent upon recovery, yet acted to the contrary as

detailed above.

12.    Denied because there was no "fee sharing agreement."  Speiser Krause hereby

incorporates by reference its responses to Statements 1, 6, 7, 10, and 11.  Answering

further, as Mr. Lear testified, the purpose of that communication was to "make sure that

this thing did not get out of hand, that everyone understood that our firm was not going to

pay more than a total of 25 per cent to all Brazilian counsel. . . " Apuzzo Reply Aff., Exh.

A (Lear Dep., p. 65). Furthermore, there were continuing discussions in regards to TAM-

related attorneys fees in 1998 (Guimaraes Decl. ¶38); and as plaintiff testified the parties were discussing fees as late as the year 2000 (Apuzzo Aff., Exh. H (Guimaraes Dep. 10/7/05, p. 82, l.16 - p.83, l. 7)).

13.   Denied because there was no "fee sharing agreement."  Further denied because Guimaraes Decl. ¶18, stated conclusions of law, not facts.  *See*   Fed. R. Civ. Pro. 56(e), Local Civil Rule 56.1(d).  See responses to statements 1, 11 above. Answering further, as plaintiff testified: the parties were discussing his "fees" up to two and a half year <u>after</u> he alleges entry into an agreement: "Well, that was 1998, we start to have a difference around 2000.  Around two years, roughly, because not like its, it was a kind of strange talk, you know, Renato, you have to cooperate, you know, you don't have to worry about everything, things like that.  So it's not one day, it was a kind of ongoing game, say, I don't believe what they are going to, and so forth." Apuzzo Aff., Exh. H (Guimaraes Dep. 10/7/05, p. 82, l.16 - p.83, l. 7).  Furthermore, as plaintiff testified, he made it known to the clients that he would strongly oppose their attempts to accept the settlements, despite their expressed interests to the contrary.  Guimaraes Decl. ¶¶49, 51, 52.  Plaintiff's Interrogatory Response No. 8 (detailing clients who found it necessary to terminate plaintiff by virtue of his intransigence with regard to their known desire to accept the individually-negotiated settlements as proposed by Speiser Krause).  Plaintiff's Interrogatory Response No. 9 (he authorized Dr. Wanderley Minitti to prosecute a letters rogatory proceeding in the US, without consulting with Speiser Krause concerning the same).

14.     Denied because there was no "fee sharing agreement."  See responses to Statements 1 &

        13, above.  Absent agreement, there could be neither a  repudiation, nor "any indication

        that the parties were not bound by it."  Further, the Court is referred to plaintiff's letter of

        February 19, 1997.  Berman Aff. Exh. 8, Doc. Nos. RG-00026-28.  (Expressing surprise

        at Speiser Krause's repudiation of the alleged offer to pay 25% to Guimaraes and counsel

        for the families).


15.     Denied because there was no "fee sharing agreement."  See responses to Statements 1, &

        7. above, except that Speiser Krause admits that plaintiff worked on behalf of some of its'

        TAM clients, and that Speiser Krause was aware of some of plaintiff's actions.  However,

        Guimaraes testified that any attorneys fees he was to earn by virtue of Brazilian

        proceedings were to be "all his" and not split with Speiser Krause. Apuzzo Aff., Exh. H

        (Plaintiff 11/2/05 Dep. p. 90, l. 24 - p.92, l. 12).  Accordingly, plaintiff's conduct in

        regard to the "separate" litigations is equivocal, and not solely referable to the "fee

        sharing" agreement he alleges existed between himself and Speiser Krause, the terms of

        which, in any event were too indefinite to form a contract.


16.     Deny "Speiser Krause revised the first page of the retainer agreement to remove

        Guimaraes' name as co-counsel without his knowledge or consent."  Plaintiff has

        admitted having a contract on "26 [TAM clients]." Apuzzo Aff., Exh. H (Guimaraes

        11/2/05 Dep., p. 79, l. 20 - p.81, l.22).  Answering further, as Arthur Ballen testified: "Q:

        Were any of the original retainer agreements executed by the Brazilian clients altered

                                                9

after the time that they were executed? A: No." Apuzzo Reply Aff., Exh B (Arthur

Ballen 10/11/05 Dep., P. 70). Speiser Krause avers that plaintiff's name does not appear

on those client retainers for which he was not involved in signing up the given client.

17. Denied. See response to Statement 16, above. Answering further, Speiser Krause admits

that it collected and maintained retainer agreements, but denies that plaintiff relied on

defendant because plaintiff does not cite to admissible evidence to support this statement.

Answering further, the date of plaintiff's "discovery" of the alleged omission of his name

is not material to the issues herein.

18. Denied because there was no "fee sharing agreement." Answering further, Speiser

Krause denies that the term "originated" is defined, or clarified by citation to admissible

evidence. Admit that plaintiff introduced Speiser Krause to a number of its TAM clients,

but deny that plaintiff was a referring counsel, as many of Speiser Krause's TAM clients

had local and/or referring attorneys. Speiser Krause admits that plaintiff performed some

work for Speiser Krause's TAM clients, but denies that the said work was solely referable

to the alleged fee-sharing agreement. Guimaraes testified that any attorneys fees he was

to earn by virtue of Brazilian proceedings were to be "all his" and not split with Speiser

Krause. Apuzzo Aff., Exh H (Plaintiff 11/2/05 Dep. p. 90, l. 24 - p.92, l. 12). In fact,

plaintiff admitted prosecuting litigation against some of Speiser Krause's TAM clients to

recover this separate fee. Plaintiff's Interrogatory Response #15. Accordingly, plaintiff's

conduct in regard to the "separate" litigations is equivocal, and not solely referable to the

"fee sharing" agreement he alleges existed between himself and Speiser Krause.

19.     Deny that Speiser Krause negotiated a "global settlement" with the insurance carriers of

the various defendants for the total sum of approximately $37,000,000.00 and then

unilaterally allocated the total amount of settlement among the settling families, without

prior discussion or communication with Guimaraes or the clients.  With regard to the

allegation of global settlement, there was none, as evidenced by plaintiff's own

continuing representation of TAM clients who refused to settle.  Arthur Ballen 10/11/05

Dep. at pp. 131-132 ("Q: Were these settlements [plural] negotiated on a global basis? A:

No."); Lear 10/12/05 Dep. at pp. 138-139 ("Q: When did you first make a global offer to

settle for $50 million? A: We did not, we didn't make a global offer.  We made

individual demands." ) L. Ballen 10/10/05 Dep. at pp. 154 ("Q: Did you negotiate a

global settlement with the TAM defendants?  A: No.").  Apuzzo Reply Aff. Exh. C.  As

concerns discussing the settlement offers with plaintiff or plaintiff's clients, Mr.

Guimaraes made his contempt for the concept of the individual settlement offers being

accepted known, obviating any discussion with him on that matter.  Apuzzo Aff., Exh. H

(Guimaraes 11/2/05 Dep. at pp. 103-104).  ("Q: Were your actions in refusing to assist

the clients in accepting these settlements, , Ewere these actions contrary to the objectives

that were made known to you by the TAM clients?  A: Yes, they want the money, I want

the rule."  "Q. [W]ere your actions also contrary to the objectives of Speiser Krause? A.

Yes."

11

20.    Denied. Speiser Krause advised its TAM clients of the status of the New York and

California litigations. As Leigh Ballen testified at pp. 185-186: "Q:  In the settlement

meetings themselves, what did you tell the clients about the status of the litigation in the

United States?  A:  We went through specifically where the case is standing, California

and in New York, to the extent of the court's unwillingness to retain  jurisdiction for the

Brazilian families absent something happening in Brazil to cause the court to revisit that

issue, and that matters were not proceeding well in New York.  Q: Why?  What was

happening in New York? A. I believe at the time that the settlements occurred the New

York court, we felt, was either leaning towards FNC dismissal or had actually entered an

order.  I don't recall.  Q: Did you, at any time during these meetings, tell the clients that

the cases in the  United States had been lost and that if they didn't take the settlements

that were on the table they would not get any money?  A: No." Apuzzo Reply Aff., Exh

C.  Further, plaintiff's declaration ¶44, which purports to speak to this issue is not based

upon personal knowledge, nor does it purport to be. See, Berman Aff., Exh. 2 (Guimaraes

11/2/05 Dep. at pp. 78-79)(allegation of statement concerning status of U.S. proceedings

as "lost" based on rank hearsay).

21.    Admit that Speiser Krause's Answer to Amended Complaint ¶25 "denies knowledge or

information sufficient to form a belief as to the existence, status, enforceability, or

validity of the 'Brazilian judgment.'" Deny that Speiser Krause failed to competently

advise the clients regarding a fair and accurate assessment of the value of their claims,

12

including intentionally to take into account the value of the claims asserted in the

Jabaquara Action." Denied because plaintiff has failed to cite admissible evidence

supporting the balance of his assertions in this statement of purported material fact. Fed.

R. Civ. Pro. 56(e), Local Civil Rule 56.1(d). See response to Statement #20, above. As

an initial matter, the settlement conferences Speiser Krause had with its clients occurred

in April, 2000, (see Guimaraes Decl. at ¶44), while the Brazilian (Jabaquara) "judgment"

was not rendered until June 30, 2000 (see Id. at ¶47). Therefore, it was impossible to

advise the TAM clients regarding the impact of a "judgment" that did not exist.

However, Speiser Krause is aware of at least four attempts to domesticate the Jabaquara

judgment, each of which has been unsuccessful. These attempts are reflected in the

following decisions: 1) *In re: Letter Rogatory Issued by Second Part of the III Civil*

*Regional Court of Jabaquara/Saude Sao Paulo, Brazil* (No. M13-72 (RO)) (reported at

2001 WL 1033611 (SDNY)) (Sept. 7, 2001); 2) *In re: Letter Rogatory Issued By the*

*Second Part of the III Civil Regional Court of Jabaquara/Saude, Sao Paulo, Brazil* No.

01-MC-212(JC)(reported at 2002 WL 257822 (EDNY)) (Feb. 6, 2002).; 3) *Klepetar v.*

*Northrup [sic] Grumman Corp. et. al*, (No. 01-13502CA (23)) 11th Circuit Court of the

Eleventh Judicial Circuit (Miami-Dade County, FL)(Donner, J.) (Jan. 13,

2003)(adjudging *inter alia* (Guimaraes' direction) to be "blatant, transparent forum

shopping"); and 4) *Renato Guimaraes v. Northrop Grumman Corp.*, (No.

BC345356(Aguirre, Jr.) (Sustaining demurrer in favor of defendant, without leave to

amend) (Jul. 20, 2006))(California Superior Court, Los Angeles County). Apuzzo Reply

13

Aff., Exh. D. Based on the foregoing, the Jabaquara judgment appears to be unenforceable in the United States at this time.

22.    Denied because plaintiff has not cited admissible evidence "that many of the clients were surprised and angered by the settlement offers presented by Speiser Krause because they were far lower than what the families had anticipated." Fed. R. Civ. Pro. 56(e), Local Civil Rule 56.1(d). This statement is inadmissible hearsay.

23.    Denied because plaintiff has not cited admissible evidence "that the clients were shocked to hear for the first time that the case in the United States had been 'lost' and that they had no further opportunity to negotiate the amounts being offered." Fed. R. Civ. Pro. 56(e), Local Civil Rule 56.1(d). Subject to the foregoing, as Leigh Ballen testified at pp. 185-186: "Q: In the settlement meetings themselves, what did you tell the clients about the status of the litigation in the United States? A: We went through specifically where the case is standing, California and in New York, to the extent of the court's unwillingness to retain jurisdiction for the Brazilian families absent something happening in Brazil to cause the court to revisit that issue, and that matters were not proceeding well in New York. Q: Why? What was happening in New York? A. I believe at the time that the settlements occurred the New York court, we felt, was either leaning towards FNC dismissal or had actually entered an order. I don't recall. Q: Did you, at any time during these meetings, tell the clients that the cases in the United States had been lost and that if they didn't take the settlements that were on the table they would not

14

get any money? A: No." Apuzzo Reply Aff., Exh. C.  Further, plaintiff's declaration ¶44, which purports to speak to this issue is not based upon personal knowledge, nor does it purport to be. See, Berman Aff., Exh. 2 (Guimaraes 11/2/05 Dep. at pp. 78-79) (allegation of statement concerning status of U.S. proceedings as "lost" based on rank hearsay).

24.    Denied because plaintiff has failed to cite admissible evidence which supports the proposition that many of the clients agreed with Guimaraes' opinion that the settlement offers were too low, but decided to accept the settlement offers because they needed the money. Fed. R. Civ. Pro. 56(e), Local Civil Rule 56.1(d).  Plaintiff's statement is based on hearsay.

25.    Deny that plaintiff explained to the clients that he was only opposed to settlements he felt were unfair to them.  In fact, as plaintiff testified, he was aware of the TAM clients' decisions to accept the proposed settlements, but he was more interested in "the rule," i.e. the Jabaquara judgment, (Apuzzo Aff., Exh. H (Plaintiff's 11/2/05 Dep. at pp. 103)), than he was in accepting the money, or in permitting the TAM clients to accept the settlement offers as they wanted to do. Id. at 11/2/05 Dep., pp. 103-105.  Furthermore, this statement is not material to the issue of contract formation. Fed. R. Civ. Pro. 56(e), Local Civil Rule 56.1(d).

26.    Admit that Guimaraes refused to assist the TAM clients in processing settlements, and

admit that plaintiff was opposed to the settlement offers.  Deny that plaintiff has cited

admissible evidence establishing the remainder of the statement.  Fed. R. Civ. Pro. 56(e),

Local Civil Rule 56.1(d).

27.    Denied because plaintiff has failed to cite admissible evidence establishing that all of

Guimaraes' efforts to oppose the settlement offers were made in good faith in attempting

to fulfill his duty as an attorney to carry out the client's wishes and interests, and were not

motivated by any malice or intent to harm the clients in any way.  Furthermore, as

plaintiff testified, "he wanted the rule" without regard to the client's known interests in

accepting the settlements.  Apuzzo Aff., Exh. H (Guimaraes 11/2/05 Dep. at pp. 103-104)

("Q: Were your actions in refusing to assist the clients in accepting these settlements,

were these actions contrary to the objectives that were made known to you by the TAM

clients?  A: Yes, they want the money, I want the rule." In addition, plaintiff wrote to the

Brazilian bar association and attorney general, complaining about the settlements

(Plaintiff's 11/2/05 Dep. at p. 98)(Interrogatory Response # 6 (plaintiff complained to Sao

Paolo Attorney General about settlements), which had the effect of delaying the funding

of the settlements, depriving the clients of the use of the settlement funds.  Apuzzo Reply

Aff., Exh E (Guimaraes 10/16/00 letter to OAB (Brazilian Bar Association)); see also

Apuzzo Aff., Exh. S (revogas).

16

28.   Denied because plaintiff has failed to cite admissible evidence to support the conclusion

that he never abandoned the TAM clients. Abandonment is a question of law for the

Court. As plaintiff testified, "he wanted the rule" without regard to the client's known

interests in accepting the settlements. Apuzzo Aff., Exh. H (Guimaraes 11/2/05 Dep. at

pp. 103-104) ("Q: Were your actions in refusing to assist the clients in accepting these

settlements, were these actions contrary to the objectives that were made known to you by

the TAM clients? A: Yes, they want the money, I want the rule."). In addition, plaintiff

wrote to the Brazilian bar association and attorney general, complaining about the

settlements, (Apuzzo Reply Aff., Exh. E (letter to OAB)); (Apuzzo Aff., Exh. H

(Plaintiff's 11/2/05 Dep. at p. 98)); (Interrogatory Response # 6 (plaintiff complained to

Sao Paolo Attorney General about settlements), which had the effect of delaying the

funding of the settlements, depriving the clients of the use of the settlement funds. See

also Apuzzo Aff., Exh. S (revogas).

29.   Denied because plaintiff has failed to cite to admissible evidence to support his

conclusion that he was not terminated for cause. Guimaraes Decl. ¶51 is a conclusion of

law, not a statement of fact.   Fed. R. Civ. Pro. 56(e), Local Civil Rule 56.1(d).  As

plaintiff testified, "he wanted the rule" without regard to the client's known interests in

accepting the settlements. Apuzzo Aff., Exh. H (Guimaraes 11/2/05 Dep. at pp. 103-104)

("Q: Were your actions in refusing to assist the clients in accepting these settlements,

were these actions contrary to the objectives that were made known to you by the TAM

clients? A: Yes, they want the money, I want the rule."). In addition, plaintiff wrote to

17

the Brazilian bar association and attorney general, complaining about the settlements (Id.

Plaintiff's 11/2/05 Dep. at p. 98); (Interrogatory Response # 6 (plaintiff complained to

Sao Paolo Attorney General about settlements); (Apuzzo Reply Aff., Exh E (Guimaraes

letter to OAB), which had the effect of delaying the funding of the settlements, depriving

the clients of the use of the settlement funds.  See also Apuzzo Aff., Exh. S (revogas).

30.    Denied.  As plaintiff testified, "he wanted the rule" without regard to the client's known

interests in accepting the settlements.  Apuzzo Aff. Exh. H (Guimaraes 11/2/05 Dep. at

pp. 103-104)  ("Q: Were your actions in refusing to assist the clients in accepting these

settlements, were these actions contrary to the objectives that were made known to you by

the TAM clients?  A: Yes, they want the money, I want the rule.")  In addition, plaintiff

wrote to the Brazilian bar association and attorney general, complaining about the

settlements (Apuzzo Reply Aff., Exh E (letter to OAB), (Apuzzo Aff. Exh. H (Plaintiff's

11/2/05 Dep. at p. 98)), (Interrogatory Response # 6 (plaintiff complained to Sao Paolo

Attorney General about settlements), which had the effect of delaying the funding of the

settlements, depriving the clients of the use of the settlement funds.  See also Apuzzo

Aff., Exh. S (revogas).

Dated:  New York, New York
      November 10, 2006

                                            Respectfully submitted,
                                            Apuzzo & Chase

                      By:

                                      William J. Apuzzo
                                      (WA-1312)
                                      *Attorneys for Defendant*
                                      800 Third Avenue - 8th Fl.
                                      New York, NY 10022
                                      (212) 297-0885