UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
RENATO GUIMARAES, JR.,

                                          Plaintiff,


        -against-                                    No. 05 CV 02210 (DC)

SPEISER, KRAUSE, NOLAN & GRANITO a                   **Attorney's Reply Affidavit**
professional corporation f/k/a SPEISER,
KRAUSE, MADOLE & LEAR, a professional
corporation,

                                          Defendant.
-------------------------------------------------------------X
State of New York      )
County of New York  )        ss.:


        William J. Apuzzo, being duly sworn, deposes and says:


1.      I am an attorney duly admitted to practice law before the United States District Court for

        the Southern District of New York.  I am a partner at Apuzzo & Chase, attorneys for the

        defendant Speiser, Krause, Nolan & Granito, PC ("Speiser Krause"), in this matter.  I

        submit this affidavit in Reply to plaintiff's opposition to Speiser Krause's motion for

        summary judgment in this matter.


2.      Annexed hereto as Exhibit "A" is a true and accurate copy of pages 65-69 of Gerard R.

        Lear's deposition.

3.     Annexed hereto as Exhibit "B" is a true and accurate copy of pages 59-60, 70, and 171-174 of Arthur E. Ballen's deposition.

4.     Annexed hereto as Exhibit "C" is a true and accurate copy of pages 138-139, 154, and 184-186 of the October 10, 2005 deposition of Leigh Ballen.

5.     Annexed hereto as Exhibit "D" are copies of four decisions of American courts which concern plaintiff's attempts to domesticate the Jabaquara judgment.

6.     Annexed hereto as Exhibit "E" is a letter and translation of that letter written by plaintiff to the OAB (Brazilian bar) dated October 16, 2000.

7.     Citations to exhibits annexed hereto are denoted "Apuzzo Reply Aff., Exh. __."  With __ representing the letter of the exhibit. This is to be distinguished from citations to exhibits accompanying defendant's moving papers, which are denoted "Apuzzo Aff. Exh.__."

WHEREFORE, your deponent respectfully prays that for an order dismissing plaintiff's first cause of action herein, and for such other, further and different relief as to this Court may seem just, proper or equitable.

William J. Apuzzo

Sworn to before me this 10th
day of November 2006.

Notary Public

BETTY MORALES
Notary Public, State of New York
No. 01MO6024761
Qualified in New York County
Commission Expires May 17, 20__

# EXHIBIT "A"

🖥 **COPY**

57

1

2

3 UNITED STATES DISTRICT COURT
  SOUTHERN DISTRICT OF NEW YORK
4 ------------------------------------------x
  DR. WANDERLEY MINITTI,
5
                              Plaintiff,
6
                   - against -   No. 04 CV 07976 (DC)
7
  SPEISER, KRAUSE, NOLAN & GRANITO, PC,
8
                              Defendant.
9 ------------------------------------------x
  RENATO GUIMARAES, JR.,
10                            Plaintiff,
11                 - against -   No. 05 CV 02210 (DC)
12 SPEISER, KRAUSE, NOLAN & GRANITO, a
   professional corporation f/k/a SPEISER,
13 KRAUSE, MADOLE & LEAR, a professional
   corporation,
14
                            . Defendant.
15 ------------------------------------------x

16                    Wednesday, October 12, 2005
                      10:10 a.m.
17                    Held at the Offices of
                      Apuzzo & Chase, LLC
18                    800 Third Avenue
                      New York, New York 10022
19

20                         CONTINUED
21
           EXAMINATION BEFORE TRIAL of
22
                      GERARD LEAR,
23
   Witness for Defendant, held as above noted,
24 pursuant to Notice, before Catherine Armentano,
   C.S.R., a Notary Public of the State of New York.
25

1                           Gerard Lear

2      conversations with anybody about how Dr. Guimaraes

3      would be compensated for clients he brought to

4      Speiser Krause, if at all?

5           A.      I don't remember specifically about

6      Mr. Guimaraes being compensated. Obviously, I

7      wrote a letter, I think it's in the record here,

8      sometime in February of '97, a 25 per cent letter

9      to Brazilian counsel, but whether that was -- and

10     it was to Renato. So, I assume Leigh had brought

11     it to my attention that Renato was asking questions

12     about something.

13                  And I was making sure that this thing

14     didn't get out of hand, that everyone understood

15     that our firm was not going to pay more than a

16     total of 25 per cent to all Brazilian counsel

17     because I yet hadn't really decided how far we were

18     going to go on in this case, but I knew that would

19     be an issue.

20          Q.      Let me show you, sir, what has

21     previously been marked as Exhibit 72, which

22     purports to be a letter from you dated February

23     5th, 1997 to Renato Guimaraes, which refers to the

24     25 per cent to Brazilian counsel, and ask if you

25     can identify that document.

1                         Gerard Lear

2                    (The witness examines document.)

3          A.       Right, that's my letter.

4          Q.       What information did you have prior

5     to writing that letter relative to any discussions

6     that had occurred with Dr. Guimaraes relative to

7     the fees --

8          A.       I don't believe --

9          MR. APUZZO:   Let him finish his

10         question.

11         Q.       -- for bringing cases to Speiser

12    Krause?

13         A.       I don't know if I had seen the

14    letters I've seen in the last couple of months that

15    Renato wrote about fees.

16              My recollection is that Leigh and I

17    had a conversation about it, and I, of course, was

18    concerned that we didn't start getting into a case

19    and then I found that people expected they were

20    going to be paid more than I was willing to pay for

21    services by all Brazilian counsel, or by whatever

22    Brazilian counsel were involved.  And I was going

23    to put a cap on it right off, and if people thought

24    they wanted to get a higher fee than that, then I

25    was going to reconsider whether or not we were even

1                    Gerard Lear

2    going to go any further.

3            Q.      Did you choose the words for this

4    letter?

5            A.      I can't tell you, I don't know

6    whether Leigh gave me a draft.  I may very well

7    have -- I mean, I usually edit pretty heavily

8    anything I'm given.

9            Q.      Looking at the lower left-hand side,

10   there's --

11           A.      JS, Julie Stromick, that would be

12   Leigh's secretary who typed it.  That wasn't my

13   secretary.  That indicates to me Leigh may have

14   given me something and I edited it.

15           Q.      It says, "Our firm will charge the

16   sum of 33 1/3 per cent  for the handling of each

17   such case."

18                   That was your intention at the time?

19           A.      That was my intention at that time.

20           Q.      Then it says, "Of this fee,"

21   presumably, that means of the 33 1/3 per cent for

22   handling the case?

23           A.      Seems logical.

24           Q.      "A total of 25 per cent will be paid

25   to Brazilian counsel for their services."

Gerard Lear

1

2          Is that what you wrote?

3    A.    A total of, a maximum of 25 per cent.

4    Q.    Where does it say that?

5    A.    It says a total, that's what I

6    meant.  I knew we were going to have more than one

7    counsel in each case, that's generally the way it

8    works in this part of the world.  A lot of times

9    you will have, not on wives, but mistresses,

10   families split, brothers, sisters, with a lawyer,

11   or a widower with a lawyer, so that's what I was

12   making sure of, that everyone was clear on this.

13          I was not going to get caught in that

14   type of runaround.  We were going to make sure that

15   we weren't going to be in a position and we didn't

16   pay more than 25 per cent total to whatever

17   Brazilian counsel were involved.

18   Q.    So, you anticipated paying 25 per

19   cent of your 33 1/3 per cent to Brazilian counsel?

20   A.    No, I wasn't going to pay more than

21   that.  If I can pay 10 or 15 and that was all that

22   was involved, that's fine.

23   Q.    This says, "a total of 25 per cent

24   will be paid to Brazilian counsel."

25   A.    That was my intention as I just

1                              Gerard Lear

2    stated.

3              Q.       Did you ever write any other letter

4    modifying your February 5th, '97 letter?

5              A.       I know there were letters written

6    that talked about it, but I don't know whether I

7    signed them or Arthur or Leigh signed them, you'd

8    have to show them to me.

9              Q.       Did Arthur Ballen review this

10   February 5th, 1997 letter, Exhibit 72?

11             A.       I doubt he reviewed it.  I don't

12   think Arthur would presume to review my letters,

13   but Leigh might have talked to him or sent him a

14   copy, I don't know.

15             Q.       Did you ever talk to Dr. Guimaraes

16   about this letter?

17             A.       No, not that I recall.

18             Q.       Did anyone else have any input into

19   this letter?

20             A.       Other than Leigh and Arthur, I can't

21   think of anybody that would have.

22             Q.       Is it a fair statement that you're in

23   charge of the firm and that it was your decision?

24             A.       That's correct.

25             Q.       Did Speiser Krause sign any retainer

Gerard Lear

COURT REPORTER'S CERTIFICATION

I, Catherine Armentano, Certified Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That the witness whose deposition is hereinbefore set forth, was duly sworn by me and that the within transcript is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

CATHERINE ARMENTANO, C.S.R.

ASA REPORTING SERVICE, INC.
(914) 588-3358

# EXHIBIT "B"

1                    📁 **COPY**

2

3      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
4      - - - - - - - - - - - - - - - - - - - - - - - - - - -x
       DR. WANDERLEY MINITTI,
5
                                    Plaintiff,
6
                      - against -   No. 04 CV 07976 (DC)
7
       SPEISER, KRAUSE, NOLAN & GRANITO, PC,
8
                                    Defendant.
9      - - - - - - - - - - - - - - - - - - - - - - - - - - -x
       RENATO GUIMARAES, JR.,
10                                  Plaintiff,

11                    - against -   No. 05 CV 02210 (DC)

12     SPEISER, KRAUSE, NOLAN & GRANITO, a
       professional corporation f/k/a SPEISER,
13     KRAUSE, MADOLE & LEAR, a professional
       corporation,
14
                                    Defendant.
15     - - - - - - - - - - - - - - - - - - - - - - - - - - -x

16                         Tuesday, October 11, 2005
                           10:15 a.m.
17                         Held at the Offices of
                           Apuzzo & Chase, LLC
18                         800 Third Avenue
                           New York, New York 10022
19

20            EXAMINATION BEFORE TRIAL of

21                ARTHUR BALLEN,

22
       Witness for Defendant, held as above noted,
23     pursuant to Notice, before Catherine Armentano,
       C.S.R., a Notary Public of the State of New York.
24

25

                   ASA REPORTING SERVICE, INC.
                        (914) 588-3358

59

1                         Arthur Ballen

2        the retainer agreement was done by Renato?

3              A.       Could have been.

4              Q.       During your first trip to Brazil that

5        we've just been discussing, did you have any

6        conversations or communications with Renato as to

7        how he would be compensated for the clients that he

8        originated for Speiser Krause?

9              A.       No.

10             Q.       The topic wasn't discussed at all?

11             A.       The topic was not discussed at all.

12             Q.       Was his role in the TAM disaster

13       litigation discussed?

14             A.       Yes.

15             Q.       With whom?

16             A.       Me.

17             Q.       Just you, who else was present?

18             A.       I don't recall.  Could have been my

19       son, maybe not.

20             Q.       And where did this take place?

21             A.       At the Maksoud Hotel.

22             Q.       How far into your two-week trip did

23       the discussion take place?

24             A.       No way of telling.

25             Q.       First day, last day, somewhere in the

1                           Arthur Ballen

2       middle?

3               A.      Sir, there is just no way of telling.

4               Q.      And, as best as you can recall, tell

5       me what you discussed with Renato concerning his

6       role in the TAM air disaster in conjunction with

7       Speiser Krause.

8               A.      He was to serve as our local attorney

9       for services if and when we needed them.   Inasmuch

10      it was going to be American litigation there was no

11      need for him -- Period.

12                      That was his role and I think it was

13      just generally understood that if he referred the

14      case, he would be getting, as the other lawyers

15      did, he would be getting a referral fee.

16              Q.      It was generally understood?

17              A.      Yes.

18              Q.      Or was it discussed?

19              A.      I don't understand the difference.

20              Q.      Well, generally understood means you

21      didn't have a verbal discussion about it and some-

22      how or another it was that there was an under-

23      standing that was in the air.

24                      What do you mean by generally

25      understood?

                        Arthur Ballen

1

2          A.      Yes.

3          Q.      So, pages were substituted taking his

4    name out, is that what you're saying?

5                  MR. APUZZO:  Objection.

6          A.      No, that's not what I'm saying.

7                  MR. APUZZO:  Wait for me to raise

8          an objection.

9          Q.      How do you remove someone's name from

10   an original agreement without --

11                 MR. APUZZO:  That was not his

12         testimony.

13         A.      That was neither your question or my

14   testimony.

15         Q.      I do not testify, you do.

16         A.      It was neither --

17         Q.      Let me make my question more precise.

18                 Were any of the original retainer

19   agreements executed by the Brazilian clients

20   altered after the time that they were executed?

21         A.      No.

22         Q.      Did Mr. Guimaraes' name get taken out

23   of new retainer agreements that the clients

24   executed sometime after you had begun and agreed

25   upon settlement numbers with the carriers for the

1                        Arthur Ballen

2          Q.     Did you see it at or about the time

3    it was written?

4          A.     No.

5          Q.     Did you see it before it went out?

6          A.     No.

7          Q.     Who had the initial conversation with

8    Dr. Guimaraes concerning fees for Brazilian

9    attorneys?

10         A.     Well, that's a compound question.  I

11   did not have any conversation with him in reference

12   to fees.  I did have conversations in reference to

13   Brazilian counsel.

14         Q.     Did you ever have any conversation

15   with Renato Guimaraes prior to February 5th, 1997

16   where the subject matter related or pertained to

17   fees to be paid to Brazilian counsel?

18         A.     I would have to refer to my letter to

19   Dr. Guimaraes saying that 10 per cent will be

20   paid --

21               MR. APUZZO:  No, no, please,

22          listen to the question, all right.

23          You're going off.

24               MR. BERMAN:  We'll have the

25          question read back.

172

1                          Arthur Ballen

2                          (The question referred to was read

3                          back by the Court Reporter.)

4          A.       I do not know.

5          Q.       You don't recall, or you don't?

6          A.       I do not know or recall.

7          Q.       Did you have a conversation with Mr.

8    Lear on or prior to February 5th, 1997 as to fees

9    to be paid to Brazilian counsel for their services?

10         A.       I conveyed to Mr. Lear that a letter

11   should be drafted and sent down explaining the fee

12   situation before February 5th.

13         Q.       Did you tell Mr. Lear that as of

14   February 5th, 1997 that you proposed the Speiser

15   Krause firm would charge the sum of 33-and-a-third

16   per cent for the handling of each case from the TAM

17   air disaster?

18         A.       That was our retainer.

19         Q.       Is that a yes?

20         A.       Yes, it was our retainer.

21         Q.       The question was, did you propose to

22   Mr. Lear that the fee to be charged to the victims

23   of the TAM air disaster of October 31st, 1996 would

24   be the sum of 33-and-a-third per cent?

25         A.       It was determined that would be the

173

1                    Arthur Ballen

2    sum before we went to Brazil.

3           Q.      Determined by whom?

4           A.      Myself and Mr. Lear, that we would

5    charge a third.

6           Q.      Now, you said you've seen this letter

7    before?

8           A.      Yes.

9           Q.      This letter also contains another

10   sentence written in fine English which says, "Of

11   this fee a total of 25 per cent will be paid to

12   Brazilian counsel for their services," do you see

13   that?

14          A.      Yes.

15          Q.      Did you discuss with Mr. Lear prior

16   to him sending this letter to Dr. Guimaraes that a

17   total fee of 25 per cent will be paid to Brazilian

18   counsel for their services?

19          A.      No.

20          Q.      Do you know where he received that

21   number from?

22          A.      You must ask him, I don't.

23          Q.      I understand that, and I will.  I

24   want to know what you know about it.

25          A.      I just told you, we did not have a

1                    Arthur Ballen

2    discussion referencing paying fees to Brazilian

3    counsel.

4            Q.    I note, it says, "We look forward to

5    once again working actively with your office."

6            A.    Yes.

7            Q.    And that was conveyed to Mr. Lear by

8    Dr. Guimaraes?

9            A.    Yes.

10           Q.    How many other letters were written

11    to Brazilian counsel that said that a total of 25

12    per cent would be paid to Brazilian counsel for

13    their services, to your knowledge, sir?

14           A.    None.

15           Q.    So, the only one who was communicated

16    that 25 per cent figure was Dr. Guimaraes; is that

17    correct?

18           A.    Yes.

19                 MR. BERMAN:   Let's mark this as

20           Exhibit 73.

21                 (Speiser Krause Letter to Dr.

22           Renato Guimaraes Dated 5/23/97, marked

23           for identification, Exhibit 73.)

24           Q.    I'd like to show you, sir, what has

25    been marked for identification as Exhibit Number

ASA REPORTING SERVICE, INC.
(914) 588-3358

1                          Arthur Ballen

2

3            COURT REPORTER'S CERTIFICATION

4

5                    I, Catherine Armentano, Certified

6        Shorthand Reporter and Notary Public

7        within and for the State of New York, do

8        hereby certify:

9                    That the witness whose

10       deposition is hereinbefore set forth,

11       was duly sworn by me and that the within

12       transcript is a true record of the

13       testimony given by such witness.

14                   I further certify that I am

15       not related to any of the parties to this

16       action by blood or marriage and that I am

17       in no way interested in the outcome of

18       this matter.

19

20       _____
         CATHERINE ARMENTANO, C.S.R.

21

22

23

24

25

# EXHIBIT "C"

**COPY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------x
DR. WANDERLEY MINITTI,

                  Plaintiff,

      -against-

                        No. 04 CV 07976 (DC)

Speiser Krause, NOLAN & GRANITO, PC,

                  Defendant.
-------------------------------------------x
RENATO GUIMARAES, JR.,

                  Plaintiff,

      -against-

                        No. 05 CV 02210 (DC)

Speiser Krause, NOLAN & GRANITO, a
professional corporation f/k/a SPEISER,
KRAUSE, MADOLE & LEAR, a professional
corporation,

                  Defendant.
-------------------------------------------x
                800 Third Avenue
                New York, New York 10022
                October 10, 2005
                10:11 A.M.

     EXAMINATION BEFORE TRIAL of LEIGH BALLEN,

a witness on behalf of the Defendant herein, held at

the above time and place, taken before Jayne

McGinley, a Court Reporter and Notary Public within

and for the State of New York, pursuant to a Notice.

         All County Reporters, Inc.
           487 East Main Street
       Mount Kisco, New York 10549
            (914) 763-6546

- Leigh Ballen -

138

MR. BERMAN:  No.

MR. APUZZO:  All right.

Q        Now, there were two actions filed in
Brazil, as we noted earlier; correct?  You said you
wanted to treat them separately; do you recall that
testimony?

A        I do.

Q        Is this the Jabaquara action against
Northrop Grumman and Teleflex; correct?

A        I don't know.  I can't read this
document.

Q        On page 74, do you see the names of
anyone else other than Northrop Grumman and Teleflex?

A        And certain plaintiffs, no.

Q        Are there any other defendants -- is
TAM anyplace in here that you see?

A        I don't see their name mentioned in
this item.

Q        Okay.  For the record, I count 65
plaintiffs in here and you said you recognized the
names.  Did you represent 65 --

MR. APUZZO:  I'm going to
    object.

MR. BERMAN:  He can count
    them.

- Leigh Ballen -

139

MR. APUZZO:  No.  I'm going to object to the characterization of this as plaintiffs, defendants.  The document is in Portuguese language.  No translation was furnished to us and the witness has already said that he does not understand the Portuguese language.  But, can he count the names of people who are -- that he recognizes as names, yes, you can answer that.

MR. BERMAN:  Recognizes as names of clients of Speiser Krause?

MR. APUZZO:  Yes, you can answer that.

Q      Are all these clients listed -- these names listed -- clients of Speiser Krause?

A      Yes.

Q      Or were they at the time?

A      They were at the time.

Q      Are these the clients who were dismissed from the action in California?

MR. APUZZO:  Asked and answered, but go ahead.

A      Yes.

Q      What is your understanding of why a

- Leigh Ballen -

154

the defendants' willingness to pay anything.

Q       Did you negotiate a global settlement
with the TAM defendants?

A       No.

Q       How many different settlement
discussions did you have?

A       Multiple discussions that I was a
party to.  At least three or four with each of the
two groups that I referred to earlier and then other
discussions that were had outside of my purview.

Q       Did you employ an actuary?

A       No.

Q       How did you divide up the pain and
suffering portion of the demand?  Did you just divide
it by the number of plaintiffs?

A       I don't know what you're referring to
-- dividing up.

Q       Okay.  How did you determine the pain
and suffering portion of the demand made on behalf of
the individual plaintiffs?

A       It was addressed, in part, based on
the number of survivors.  When we had a case of what
we call a single non-dependency, meaning a
non-married person of adult age without children or a
spouse, we assign less of a value to the pain and

- Leigh Ballen -

local attorney they might have, and oftentimes Renato

Guimaraes.

Q      Now, was Mr. Guimaraes present at any

of these meetings with you, your father and the

families when there was no local attorney present?

A      Yes.

Q      So, Mr. Guimaraes, as of May 2000,

was still working with Speiser Krause; is that

correct?

A      Yes.

Q      Do you remember the order in which

you conducted the meetings?

A      Which family went first?

Q      Yes.

A      I only remember that we started with

some of Renato's closest family contacts.

Q      Why do you remember that?

A      Because we got a very negative

initial reaction when they entered the room.  They

had an obvious predisposition to news that they were

not yet supposed to have.

Q      What do you mean by that?

A      Arms crossed, look of frustration.

It was a new sentiment that we were not expecting.

Q      Did you tell the clients at these

- Leigh Ballen -

1    meetings or at that first meeting that the case had

2    been lost in America?

3            A       Way prior to that.

4            Q       What did you tell them about losing

5    the case in America?

6            A       We never said that we lost the case

7    in America.

8            Q       You said way prior, what did you mean

9    by that?

10           A       The correspondence speaks for itself

11   as to the extent that we put them on notice in

12   writing about the specific status of the California,

13   New York action.

14           Q       I'm not talking about that.

15                   In the settlement meetings

16   themselves, what did you tell the clients about the

17   status of the litigation in the United States?

18           A       We went through specifically where

19   the case is standing, California and in New York, to

20   the extent of the court's unwillingness to retain

21   jurisdiction for the Brazilian families absent

22   something happening in Brazil to cause the court to

23   revisit that issue, and that matters were not

24   proceeding well in New York.

25           Q       Why?  What was happening in New York?

- Leigh Ballen -

1    A    I believe at the time that the

2  settlements occurred the New York court, we felt, was

3  either leaning towards FNC dismissal or had actually

4  entered an order.  I don't recall.

5    Q    Did you, at any time during these

6  meetings, tell the clients that the cases in the

7  United States had been lost and that if they didn't

8  take the settlements that were on the table they

9  would not get any money?

10    A    No.

11    Q    What precisely did you tell them in

12  that regard, if anything?

13    A    As I said before, the status of the

14  cases in California and New York, and that due to the

15  status of the cases in those places, that the

16  settlements, by enlarge, we thought were favorable in

17  light of the remaining venues which, in Brazil, is a

18  never-ending litigation process.

19    Q    So, you told them that the

20  proceedings in Brazil could go on for maybe many,

21  many years?

22    A    Usually local counsel -- we would ask

23  them if there was local counsel in the room.  We

24  would ask them their own opinion on that issue.  But,

25  after a while, it became quite clear that the

- Leigh Ballen -

275

W
O
R
D

I
N
D
E
X

# C E R T I F I C A T I O N

I, JAYNE MCGINLEY, a Court Reporter and Notary Public within and for the County of Westchester, State of New York, do hereby certify:

That I reported the proceedings that are hereinbefore set forth, and that such transcript is a true and accurate record of said proceedings.

AND, I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand.

JAYNE MCGINLEY
Court Reporter

# EXHIBIT "D"

2001 WL 1033611 (S.D.N.Y.)
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
In re: LETTER ROGATORY ISSUED BY SECOND PART OF THE III CIVIL REGIONAL
COURT OF
JABAQUARA/SAUDE SAO PAULO, BRAZIL
No. M13-72 (RO).
Sept. 7, 2001.

*MEMORANDUM AND ORDER*

OWEN, J.
***1*** Before this Court is an application for an order requiring Northrop Grumman
Corporation to deposit approximately $8.6 million either with a Brazilian court or with
this Court, in compliance with an order from the Second Part of the Third Civil Regional
Court of Jabaquara/Saude, Sao Paulo, Brazil issued as a letter rogatory. The underlying
action in this case arises from a fatal airplane crash in Brazil in 1996, since which
settlement negotiations have been taking place. Seemingly unaware of the ongoing
settlement negotiations here in the United States, a trial was held in Brazil and the court
there rendered a judgment against the only defendant before it, Northrop Grumman.
[FN1] The instant application seeks enforcement of that judgment.

> FN1. The standards of this trial differed greatly from a trial in the United
> States. For example, the "trial" was based on paper submissions, the
> court did not agree to hear any testimony from Northrop Grumman's
> experts, and the court placed the burden on defendant to show that it
> was not responsible (this is one of many issues on appeal in Brazil).

The application is denied because venue is improper in this Court. Northrop Grumman
has no facilities in the Southern District of New York and service on it was effected in
Bethpage, Long Island, which is in the Eastern District of New York. Therefore the
appropriate venue for this action is the Eastern District, and although this is just a short
trip over the Brooklyn Bridge, any action in this Court beyond denying the application
based on improper venue and possibly transferring it to the Eastern District could be
declared invalid. The governing statute states that "the district court of a district in
which is filed a case laying venue in the wrong division or district shall dismiss, or if it be
in the interest of justice, transfer such case to any district or division in which it could
have been brought." 28 U.S.C. § 1406(a). Whether dismissal or transfer is appropriate
"lies within the sound discretion of the district court." *Minette v. Time Warner,* 997 F.2d
1023 (2d Cir.1993). In this instance, transfer is not appropriate. To exercise my
discretion in an informed manner, I have examined the merits and conclude this
application does not merit the order it seeks, and the interests of justice would not be
served by transferring it to another district.
However, since this application might be made anew in the Eastern District and this
Court became familiar with the issues through briefing and argument, it is worth
discussing three highly troubling aspects of this application. First, the foreign judgment
in question is not a final judgment but is on appeal in Brazil. At the time the appeal was
filed, the judgment was stayed by the trial court, and given this, it remains unclear why
the trial part signed a letter rogatory order.
Second, even absent a stay, this application amounts to an attempt to enforce a foreign
judgment through a letter rogatory, and the law is clear that a letter rogatory may not
be used for this purpose. Plaintiffs contend that they are not seeking enforcement or

recognition of a foreign judgment, but rather merely requesting that this Court execute a procedural act incapable of being implemented in Brazil. This contention reflects either confusion about what plaintiffs seeks or an attempt to mislead this Court about what it would be granting. Applying to this Court for an order requiring Northrop Grumman to deposit with a court the amount of the Brazilian judgment is applying for enforcement or recognition of a foreign judgment. The relevant statutory provision for a letter rogatory states that "the district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a). By its plain language, the provision only authorizes the use of letters rogatory for the production of testimony and evidence, *not* for enforcement of a foreign judgment. *See Osario v. Harza Engineering Co.,* 890 F.Supp 750, 753 (N.D.Ill.1995)("[T]here is no federal statute that authorizes a federal court to enforce a foreign judgment pursuant to a letter rogatory"); *In re Civil Rogatory Letters Filed by the Consulate of the U.S. of Mexico,* 640 F.Supp. 243, 244 (S.D.Tex.1986); *Tacul, S.A. v. Hartford Nat'l Bank & Trust Co.,* 693 F.Supp. 1399, 1400 (D.Conn.1988). [FN2]

> FN2. Similarly, no treaty authorizes the use of letters rogatory to enforce foreign judgments.

**\*2** Third, there is a serious question regarding the authority of Richard Peskin, Esq., the attorney making this application, to act on behalf of the families affected by the crash. The very same families who Peskin and Dr. Minitti, a Brazilian attorney with whom Peskin works, purport to represent also have earlier signed retainer agreements with the firm of Speiser, Krause, Nolan & Granito. Acting on behalf of these families, Speiser, Krause reached a settlement agreement in April 2000 of the claims against Northrop Grumman and other defendants (Tam Airlines, Fokker Aircraft, the manufacturers of the aircraft, and Teleflex, the company that made the cables). In addition, the purported lead petitioner in Peskin's application to this Court has signed and put before me an affidavit rejecting any attempt by Peskin, et al., to act on her behalf. (*See* Exhibit A, annexed hereto.)

At oral argument on this application, attorneys for Northrop Grumman and from Speiser, Krause explained the confusion as follows: this is a protracted and complicated international air crash litigation involving Brazilian decedents, a Brazilian airline, a foreign airframe manufacturer, and an American component part manufacturer. The earlier Speiser, Krause retainer agreements are with the families of 65 of the decedents to prosecute actions in the United States with Brazilian attorney Renato Guimaraes acting as local counsel on 26 of the retainers. A total settlement package in excess of $40 million was reached in April 2000; since then the multi-national, multi-lingual parties to the settlement have been working on approximately 10 different release drafts. Speiser, Krause remains the counsel of record for the families. The local counsel in Brazil, however, not satisfied with the settlement (it is unclear whether his dissatisfaction stemmed from his fee or from some other aspect of the settlement), asked a new set of lawyers, among them Peskin and Dr. Minitti, to pursue the action in Brazil. Peskin, applying to this Court claiming to represent plaintiffs, answered this contention by saying that the retainer agreements have both U.S. and local counsel on them, and that this application is a separate divergent action from the underlying case that Speiser, Krause is handling. However, Peskin offers no useful explanation of the latter contention and it appears these actions cannot be other than intimately related. The question of who is accredited here and who is not remains open.

Given the flawed and highly troubling aspects of this application, a court where venue is proper would likely deny this application for an order requiring Northrop Grumman to deposit $8.6 million with such court. Accordingly, venue being improper, the application

is denied and the action is dismissed.
So ordered.
S.D.N.Y.,2001.
In re Letter Rogatory Issued By Second Part of the III Civil Regional Court of
Jabaquara/Saude Sao Paulo, Brazil
2001 WL 1033611 (S.D.N.Y.)
END OF DOCUMENT

2002 WL 257822 (E.D.N.Y.)
Motions, Pleadings and Filings
Only the Westlaw citation is currently available.

United States District Court, E.D. New York.
In re: Letter Rogatory Issued By the Second Part of the III Civil Regional
Court of Jabaquara/Saude, Sao Paulo, Brazil
No. 01-MC-212(JC).
Feb. 6, 2002.
Richard S. Peskin, New York, for Petitioners.
Frederick C. Schafrick, Shea & Gardner, Washington, DC, James P. Connors, Jones
Hirsch Connors & Bull P.C., New York, for Respondent Northrop Grumman Corporation.

MEMORANDUM AND ORDER

GLEESON, District J.
*1 This case arises out of a plane crash in Brazil on October 31, 1996, in which 99
people were killed, and the resulting litigation in Brazil against, among others, Northrop
Grumman Corporation ("Northrop Grumman"), which made the airplane's "thrust
reverser." That litigation resulted, after trial, in a judgment rendered on June 30, 2000,
in the Second Part of the III Civil Regional Court of Jabaquara/Saude, in Sao Paulo. That
judgment established, in part, a schedule of "financial support payments" for the
families who lost relatives in the accident.
The financial support payments portion of the June 30, 2000, judgment is the subject of
a separate action in the Brazilian courts. According to Northrop Grumman's Brazilian
counsel, the separate action in Brazil is an attempt to "obtain provisional enforcement"
of the financial support payments. The letter rogatory that is the subject of this action
relates to this attempt at enforcement.
The letter rogatory was originally filed in the Southern District of New York. [FN1] In a
memorandum and order dated September 7, 2001, Judge Richard Owen denied this
application on the ground of improper venue. *In Re: Letter Rogatory Issued by Second
Part of the III Civil Regional Court of Jabaquara/Saude, Sao Paulo, Brazil,* No. M13-72
(RO), 2001 U.S. Dist. LEXIS 13753 (S.D.N.Y. Sept. 7, 2001). Anticipating that the letter
would be filed in this court, Judge Owen also addressed the merits of petitioners'
application, discussing three aspects that he found "highly troubling": (1) the foreign
judgment in question is on appeal and therefore not final; (2) a letter rogatory may not
be used to enforce a foreign judgment; (3) the attorney making the application may not
have the authority to act on behalf of the families affected by the crash. *Id.*

> FN1. Though the letter rogatory is addressed to the Southern District, its
> terms state that it can be applied to other United States courts as well.

In this court, Northrop Grumman was ordered to show cause why I should not enter an
order (a) requiring it to deposit $8,642,802.94 into an account with either this court or
the Brazilian court; (b) restraining any bank accounts necessary to secure such amount;
and (c) sequestering any assets necessary to secure such amount.
A. *The Deposit of Funds by Northrop Grumman*
It is well-established that letters rogatory are an impermissible method for enforcing a
foreign judgment in United States courts. *See, e.g., Osario v. Harza Engineering Co.,
890 F.Supp. 750, 753 (N.D.Ill.1995)* ("There is no federal statute that authorizes a
federal court to enforce a foreign judgment pursuant to a letter rogatory"); *In re Civil
Rogatory Letters Filed by the Consulate of the U.S. of Mexico,* 640 F.Supp. 243, 244
(S.D.Tex.1986); *Tacul, S.A. v. Hartford Nat'l Bank & Trust Co.,* 693 F.Supp. 1399, 1400

(D.Conn.1988). Petitioners agree that a letter rogatory may not be used to enforce a foreign judgment, but insist that they are not attempting to enforce their Brazilian judgment. [FN2] Rather, they claim that they are asking only for performance of "the procedural act... requested by the foreign jurisdiction...of citing Northrop Grumman Corporation and further depositing or freezing the amount requested by the Brazilian court...." (Peskin Aff. ¶ 23.) I am not persuaded that, in substance, there is any difference between the relief petitioners seek and the relief they agree is unavailable to them. The $8,642,802.94 they want Northrop Grumman to deposit with a court will undoubtedly go to the petitioners in Brazil. Indeed, despite petitioners' careful phrasing of their request for relief, the letter rogatory itself asks for an "order of execution" requiring the deposit by the respondent. Accordingly, to the extent that the letter rogatory asks this court to order Northrop Grumman to deposit funds with this court or the court in Brazil, the request is denied.

> FN2. Therefore, I need not address whether petitioners may enforce the Brazilian judgment through an Article 53 proceeding pursuant to the New York Uniform Foreign Money-Judgments Recognition Act and brought under the jurisdiction of the diversity statute. See *Seetransport v. Navimpex Cent Navala*, 29 F.3d 79, 82 (2d Cir.1994) (French arbitration award enforceable as foreign money judgment under Article 53); *In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India, in Dec. 1984,* 809 F.2d 195, 204 (2d Cir.1987) (final Indian judgment enforceable under Article 53); *Island*

> *Territory of Curacao v. Solitron Devices, Inc.,* 489 F.2d 1313, 1323 (2d Cir.1973) (Curacao arbitration award enforceable pursuant to Article 53).

**\*2** Similarly, to the extent that the petitioners seek provisional relief, such as "freezing" or "sequestering" respondent's assets, this request is also denied. The only authority cited in support of such relief is a Florida case, *de Pacanins v. Pacanins*, 650 So.2d 1028 (Fla.Ct.App.1995), in which an injunction was entered pursuant to the Uniform Foreign Money-Judgments Act as enacted in Florida. *See also* George A. Bermann, *Provisional Relief in Transnational Litigation*, 35 Colum. J. Transnat'l L. 553, 598 (1997) (discussing *de Pacanins*, and pointing out that the situations generally arise when "a foreign court issues an order of provisional relief in aid of its own proceedings, and the litigant in whose favor the order was issued then asks a U.S. court to enforce it"). But, as respondent points out, in *de Pacanins*, 650 So.2d at 1030, there was concern that the assets would be dissipated and unavailable to fulfill a judgment; petitioners have made no showing of such a danger here.

B. *Service of the Provisional Enforcement Order on Northrop Grumman*

In emphasizing that their application does not include enforcement of a judgment, petitioners point out that they merely want this court to "cite" the respondent, presumably referring to service on the respondent of the Brazilian provisional enforcement order. Indeed, the affidavit accompanying the Order to Show Cause describes the letter rogatory as "requested by a foreign jurisdiction... to serve respondent Northrop Grumman Corp. with notice that it is required to deposit...," and indicates that the letter rogatory mechanism was necessary in part due to Brazilian counsel's "refusal of acceptance of service in this proceeding in Brazil." (Peskin Affidavit, ¶ 24.) The Brazilian judge who issued the request also clearly contemplated that service of process was part of the request. *See* Tab 6 in the letter rogatory ("I favor the issue of a rogatory letter, for service.") (J. Russo, dated August 2, 2000). Finally, respondent clearly interpreted the application as encompassing such a request, as it argues that such a request is improper in its Memorandum of Law. (Respondent's Memorandum of

Law, at 19.)

Notwithstanding respondent's arguments to the contrary, this application seems proper. 28 U.S.C. § 1696 provides for service of documents in foreign and international litigation. It reads, in relevant part:

The district court of the district in which a person resides or is found may order service upon him of any document issued in connection with a proceeding in a foreign or international tribunal. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon application of any interested person and shall direct the manner of service. 28 U.S.C. § 1696(a).

Respondent makes two arguments in favor of denying the request insofar as it seeks service on Northrop Grumman of the order of provisional enforcement from the Brazilian court. First, it asserts that service would be improper because the letter rogatory "has not been transmitted through the Central Authority of the United States," and movants have not complied with "other technical requirements of the Convention and its Additional Protocol," referring to the Inter-American Convention on Letters Rogatory. (Respondent's Memorandum of Law, at 19.)

*3 I find this argument unpersuasive. Article 4 of the Convention, "Transmission of Letters Rogatory," says that letters rogatory may be transmitted to "the authority to which they are addressed by the interested parties, through judicial channels, diplomatic or consular agents, or the Central Authority of the State of origin or of the State of destination, as the case may be." Inter-American Convention on Letters Rogatory, Jan. 30, 1975, 14 I.L.M. 339 (entered into force Jan. 16, 1976) (reprinted following 28 U.S.C. § 1781). Cf. Kreimerman v. Casa Veerkamp, S.A. de C.V., 22 F.3d 634, 644 (5th Cir.1994) (letter rogatory mechanism provided for in the Inter-American Convention does not preclude other methods of service); Ackermann v. Levine, 788 F.2d 830, 838 (2d Cir.1986) (service of process by registered mail, without a letter rogatory transmitted through the Central Authority, did not violate the Hague Service Convention).

The Additional Protocol applies "only to those procedural acts set forth in Article 2(a)," which does include service of process. Additional Protocol to the Inter-American Convention on Letters Rogatory, art. 1, May 8, 1979, 18 I.L.M. 1238 (entered into force June 14, 1980) (reprinted following 28 U.S.C. § 1781). But the Protocol is also defined as encompassing requests that are "made by a judicial or other adjudicatory authority of a State Party to a judicial or administrative authority of another State Party" and "are transmitted by a letter rogatory from the Central Authority of the State of origin to the Central Authority of the State of destination." Id. Since the request in this matter was not transmitted through the Central Authorities, as permitted by Article 4 of the convention, 28 U.S.C. § 1696, and 28 U.S.C. § 1781(b)(1) ("This section does not preclude... the transmittal of a letter rogatory or request directly from a foreign or international tribunal to the tribunal, officer, or agency in the United States to whom it is addressed and its return in the same manner"), the Additional Protocol does not apply.

Respondent's argument is also undercut by the plain language of 28 U.S.C. § 1696, which specifically authorizes this court to order service "pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal" or "upon application of any interested person." In this case, we have both a letter rogatory and an application of an interested person. See also Service By United States Courts at the Request of Foreign Countries, 28 Fed. Proc. L.Ed. 65:220 (1996) ("There has traditionally been a reluctance on the part of American courts to comply with letters rogatory... [28 U.S.C. § 1696] is intended to overcome this reluctance of United States courts by making clear that the courts' inherent authority to grant international judicial assistance includes the power to comply with letters rogatory.").

Second, respondent asserts that "Brazilian counsel has informed us that Article 210 of the Brazilian Code of Civil Procedure requires that letters rogatory be transmitted 'through the diplomatic service,' ' and therefore the letter rogatory has not been validly transmitted under Brazilian law. (Respondent's Memorandum of Law at 19; Giusti Decl.

¶ 17.) [FN3] If respondent wants to oppose the provisional enforcement order on grounds based in Brazilian law, I assume it is free to do so in the Brazilian court. *See* Hans Smit, *Recent Developments in International Litigation,* 35 S. Tex. L.Rev. 215, 231 (1994) ("It is for the Swiss courts to decide the consequences of the service.") (discussing an analogous case). Moreover, because the language of 28 U.S.C. § 1696 clearly states that "[s]ervice pursuant to this subsection does not, of itself, require the recognition or enforcement in the United States of a judgment, decree, or order rendered by a foreign or international tribunal," respondent is not unfairly prejudiced by such service. *See also Sprague & Rhodes Commodity Corp. v. Instituto Mexicano Del Cafe,* 566 F.2d 861 (2d Cir.1977) (service of Mexican letters rogatory pursuant to 28 U.S.C. § 1696 does not require recognition or enforcement of the Mexican judgment).

> FN3. According to the English translation provided by Northrop Grumman, Article 210 of the Brazilian Code of Civil Procedure reads: "Letter rogatory shall comply with the provisions of the international convention as to admissibility and method of performance, in the absence thereof, it shall be sent to the foreign judicial authority, by diplomatic means, after it has been translated into the language of the country in which the requested act is to be performed." (Respondent's Memorandum of Law, Exhibit I .) The language of this Article does not appear to preclude transmittal of the letter rogatory as it has occurred in this proceeding, and Northrop Grumman's counsel has not provided authority to demonstrate otherwise.

> In the absence of such authority, I reject Northrop Grumman's argument as contrary to the clearly contemplated procedure--in the Inter-American Convention, 28 U.S.C. § 1696 and 28 U.S.C. § 1781(b)--of courts in different countries communicating directly with each other, and providing assistance of precisely this nature. *Cf. Chemical Waste Management v. Hernandez,* 1997 WL 47811, at *2 (S.D.N.Y. Feb. 5, 1997) (upholding service as proper where court in Southern District of New York issued letters

> rogatory directly to a court in Mexico authorizing service on the respondent, and Mexican attorney indicated that under Mexican law, courts have the discretion to channel letters rogatory through the parties rather than the Central Authority); *Commodity Futures Trading Commission v. Nahas,* 738 F.2d 487, 494 (D.C.Cir.1984) (noting, in a case involving an administrative subpoena served on a Brazilian, that "Brazilian law requires that service of process by foreign nations be made pursuant to a letter rogatory *or* a letter of request transmitted through diplomatic channels.") (emphasis added).

**\*4** In exercising my discretion on this aspect of petitioners' application, I am influenced by respondent's insistence that it has not been properly served with the order of provisional enforcement. [FN4] In their brief, respondent's counsel emphasize that this order of provisional enforcement cannot be enforced or recognized in any way by this court because "*Northrop Grumman was never served in the proceeding.*" (Respondent's Memorandum of Law, at 15; emphasis in original). Brazilian counsel relies on this lack of service as well in arguing that the order cannot be enforced. (Giusti Declaration, ¶ 12.)

FN4. By my count, Northrop Grumman has already received, directly or

indirectly, the order of provisional enforcement at least three times: (1) the attempted service on Brazilian counsel on July 12, 2000, which was refused; (2) service of the letter rogatory, which includes the "writ of summons and attachment" at Tab 20, on Northrop Grumman in Bethpage, New York, on November 28, 2001; (3) the order to show cause itself, which included the enforcement order as Exhibit K to the Peskin Affidavit.

To eliminate any ambiguity and in accordance with the letter rogatory, I direct the Clerk of this Court to serve process of the attached order of provisional enforcement from the Brazilian court on respondent's counsel and Northrop Grumman itself in Bethpage, New York. To the extent there is any question about the identity of the petitioners, it is answered by the attachments to the letter rogatory, as conceded by respondent's counsel at oral argument.

Finally, I emphasize that this order--and the resulting service of process on the respondent--does not constitute "recognition or enforcement in the United States of a judgment, decree, or order rendered" by the Brazilian court, in accordance with 28 U.S.C. § 1696. I draw no conclusions about any obligations that the respondent might have in Brazil as a result of being served with the order of provisional enforcement, and the respondent has no obligation to deposit any money with this court.

For the reasons stated, petitioners' application is granted in part, and denied in part.

So Ordered.

E.D.N.Y.,2002.

In re Letter Rogatory

2002 WL 257822 (E.D.N.Y.)

Motions, Pleadings and Filings (Back to top)

• 1:01MC00212 (Docket) (Nov. 28, 2001)

END OF DOCUMENT

856 - 435 - 4062                          3155 - 3502

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO: 01-13502 CA (23)
Consolidated Cases

Suzana Greco de Franca KLEPETAR, *et al.*,

    Plaintiffs,

vs.

NORTHRUP GRUMMAN CORP., *et al.*,

    Defendants.

_____/



**DEFENDANT'S EXHIBIT**

### ORDER GRANTING DEFENDANTS MOTION TO DISMISS
### PLAINTIFFS' CONSOLIDATED COMPLAINT

    THIS CAUSE came before this Court on October 17, 2002, on Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint on the basis of forum non conveniens. The Court having reviewed the motions, considered the arguments of counsel, reviewed the court file, and having been otherwise fully advised in the premises, the Court finds as follows:

1.    In this case, Plaintiffs are Brazilian nationals who reside in Sao Paulo, Brazil. On or about October 31, 1996, an airplane (owned by TAM-Transportes Aereos Meridionais, S.A., d/b/a TAM Airlines ("TAM")) crashed during takeoff into a residential neighborhood in Sao Paulo, Brazil. TAM Flight 402 ("Flight 402") crashed and burned resulting in the loss of 99 passengers, crew, and innocent bystanders on the ground. Flight 402 was scheduled to fly from Sao Paulo, Brazil to Rio de Janeiro, Brazil. Plaintiffs allege that a thrust reverser failed and engaged during the ascent causing Flight 402 to descend rather than ascend. Plaintiffs either owned property on the ground destroyed in the crash; or are part of the estate of bystanders; or passengers who died as a result of the crash.

2.    The seminal case as to forum non conveniens is *Kinney Sys., Inc. v. Continental Ins. Co.*, 674 So. 2d 86 (Fla. 1996). In that case, the Florida Supreme Court stated:

        Forum non conveniens is a common law doctrine addressing the problem that arises when a local court technically has jurisdiction over a suit but the cause of action may be fairly and more conveniently litigated elsewhere. Forum non conveniens also serves as a brake on the tendency of some plaintiffs to shop for the "best" jurisdiction in which to bring suit—a concern of special importance in the international context. Commentators generally have noted a growing trend in private international law of attempting to file suit in an

Page 1 of 4

American state even for injuries or breaches that occurred on foreign soil. There already is evidence the practice is growing to abusive levels in Florida.

\* \* \*

Nothing in our law establishes a policy that Florida must be a courthouse for the world, nor that the taxpayers of the state must pay to resolve disputes utterly unconnected with the state's interests.

*Id.*, 674 So. 2d at 88.

3.  *Kinney* requires the following:

[1]  As a prerequisite, the court must establish whether an adequate alternative forum exists which possesses jurisdiction over the whole case.

[2]  Next, the trial judge must consider all relevant factors of *private* interest, weighing in the balance a strong presumption against disturbing plaintiffs' initial forum choice.

[3]  If the trial judge finds this balance of private interests in equipoise or near equipoise, he must then determine whether or not factors of *public* interest tip the balance in favor of a trial in [another] forum.

[4]  If he decides that the balance favors such a ... forum, the trial judge must finally ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice.

*Id.*, 674 So. 2d at 90.

4.  The Florida Supreme Court went on to note the following salient points:

Based on the foregoing discussion, we are persuaded that the time has come for Florida to adopt the federal doctrine of forum non conveniens. The use of Florida courts to police activities even in the remotest parts of the globe is not a purpose for which our judiciary was created. Florida courts exist to judge matters with significant impact upon Florida's interests, especially in light of the fact that the taxpayers of this state pay for the operation of its judiciary. Nothing in our Constitution compels the taxpayers to spend their money even for the rankest forum shopping by out-of-state interests.

\* \* \*

We address two final points relevant to this case. First, under our holding today it now is immaterial how "corporate residency" is determined, because a corporation's various connections with Florida–if any–will only be factors to be weighed in the balance of conveniences, as outlined above. Therefore we answer all three parts of the certified question in the negative as qualified in this opinion. Even the fact that a corporation has its principal place of business in Florida does not necessarily preclude application of the doctrine of forum non conveniens. Instead, the trial court should gauge the situation using the "balance of conveniences" approach.

*Id.*, 674 So. 2d at 93.

5.  Applying *Kinney* here: Brazil is, and was previously held by the California court–which first considered this matter–to be, an adequate alternative forum which possesses jurisdiction over the whole case. Next, a consideration of the Plaintiffs' private interests indicates that the case belongs in Brazil. For example, the Plaintiffs had adequate access to evidence and

relevant sites in Brazil because the accident occurred in Brazil; the Plaintiffs had adequate access to witnesses in Brazil as most of the witnesses [investigators, police, Plaintiffs, etc.] live in Brazil; adequate enforcement of judgments exists in Brazil [if necessary, Plaintiffs can domesticate the Brazilian judgment, *see infra*]; and the practicalities and expenses associated with the litigation in Florida would entail the expensive translation of documents from Portuguese to English, the use of translators, travel to and from Brazil of the witnesses, attempting to serve subpoenas upon foreign nationals, etc. There exists a strong presumption against disturbing a plaintiff's initial forum choice. Given the travel of this case, Florida was not the Plaintiffs' initial forum choice–at best it was the third choice. California and New York were both considered and tried by the Plaintiffs before landing in Florida.

6.  Next, the trial court considers the public interest of a trial in another forum. In broad terms, the inquiry focuses on whether the case has a general nexus with the forum sufficient to justify the forum's commitment of judicial time and resources to it. At best, this case has a tenuous nexus to Florida. There exists no reason to commit judicial resources to this case.

7.  Finally, the trial court must ensure that Plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice. Defendant Northrup Grumman Corp. agreed to submit to the jurisdiction of the Brazilian courts and waive the statute of limitations for a lawsuit arising out of this accident. There is no reason for these consolidated cases to visit Florida any longer.

8.  Domesticating the foreign judgment. Forum non conveniens usually applies where a plaintiff attempts to litigate a matter for the first time. Such is not the case here. Many of the Plaintiffs previously filed suit in California where the case was dismissed due to *forum non conveniens*.[1] The Plaintiffs then filed suit and prevailed in Brazil or participated in a settlement of their claims in Brazil. To date, the Plaintiffs were unsuccessful in collecting their judgment against Northrop Grumman in Brazil. Therefore, the Plaintiffs next traveled to New York where they attempted to enforce a letter rogatory against Northrop Grumman in the Southern District of New York. The Southern District of New York dismissed the action as it was filed in the wrong district court. The case then crossed the bridge to the Eastern District of New York where the case was dismissed.

9.  This case is about enforcing the Brazilian judgment. The Plaintiffs, through their counsel, are at a loss as to how to go about domesticating a foreign judgment in the United States.[2] In Florida, the correct procedure for domesticating a foreign money judgment does not require a judgment creditor to file a new lawsuit. See e.g., *Cutler v. Harrison*, 792 So. 2d 574, 575 (Fla. 3d DCA 2001) (discussing a similar statute, §§ 55.501, *et seq.*, "The statute contemplates that … [a] judgment creditor would file the judgment in Florida, without the necessity of filing a lawsuit, …, and any litigation over the validity of the judgment would be initiated by Cutler as judgment debtor."). The correct procedure is found in §§ 55.601, *et seq.*, which provides for domesticating out-of-country foreign money-judgment. See e.g., *Nadd v. Le Credit Lyonnais, S.A.*, 804 So. 2d 1226 (Fla. 2001).

10. Teleflex claims that the Plaintiffs are barred from bringing a new claim in Florida where the very same claim was adjudicated in Brazil and Teleflex was cleared of any liability. *See*

---

[1] The Plaintiffs did not specify which of their number filed suit in California.

[2] The Eastern District of New York, in footnote two of its decision, gave the Plaintiffs a broad hint as to the use of the New York Uniform Foreign Money-Judgments Recognition Act. The Plaintiffs did not take the hint. Moreover, California has its own version of the Uniform Foreign Money-Judgments Recognition Act codified as West's Ann.Cal.C.C.P. §§ 1713-1713.8.

*Barbado v. Green & Murphy, P.A.*, 758 So. 2d 1173 (Fla. 4th DCA 2000). Teleflex should file a motion for summary judgment and reassert this claim. Similarly, the Defendants' claims that the Plaintiffs' Complaints exceed the statute of limitations will not be considered here, but in a motion for summary judgment.

WHEREFORE, it is **ORDERED** and **ADJUDGED**:

1. The Plaintiffs are engaged in blatant, transparent forum shopping. The Consolidated Complaint has no reason to stay in Florida. Moreover, the Plaintiffs could simply domesticate the Brazilian money judgment they previously received.

2. The Defendants stipulated that they would submit to the jurisdiction of the adequate alternative forum of the Brazilian courts.

3. Defendants' Motion to Dismiss is hereby **GRANTED** and the action is dismissed on the basis of forum non conveniens conditioned upon the Defendants' stipulation to submit to jurisdiction of the adequate alternative forum of the Brazilian courts.

DONE and ORDERED in chambers this January 15, 2003, at Miami-Dade County, Florida.

AMY STEELE DONNER
CIRCUIT COURT JUDGE

JAN 1 5 2003

AMY STEELE DONNER
Circuit Court Judge

Copies furnished to:
Francis A. Anania, Esq.
Richard M. Dunn, Esq.
Raquel M. Gonzalez, Esq.
Jeffrey M. Herman, Esq.
Christopher E. Knight, Esq.
Allison E. Salsbury, Esq.

TOTAL P.05

CODDINGTON
HICKS & DANFORTH

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 07/17/06

JUL 20 2006          DEPT. 30

HONORABLE  ELIZABETH A. GRIMES          JUDGE

J. GALCON _____ DEPUTY CLERK
INIT _____

HONORABLE
#3                                    JUDGE PRO TEM

_____ ELECTRONIC RECORDING MONITOR

C. AGUIRRE   CA          Deputy Sheriff

B. NAGATA, CSR #12268          Reporter

| | | | |
|---|---|---|---|
| 8:35 am | BC345356 | Plaintiff<br>Counsel | STEVEN C. SHUMAN [X] |
| | RENATO GUIMARES JR<br>VS<br>NORTHROP GRUMMAN CORPORATION | Defendant<br>Counsel | RANDOLPH HICKS [X]<br>A. KRISTINE FLOYD [X]<br>ROBERT C. SHAIA [X] |

**NATURE OF PROCEEDINGS:**

DEMURRER OF DEFENDANT, NORTHROP GRUMMAN CORPORATION,
TO PLAINTIFF'S FIRST AMENDED COMPLAINT;

Matter is called for hearing:

The court states its tentative is to sustain the
demurrer without leave to amend as time is barred by
the statute of limitations.  The court further states
that the First Cause of Action is the only cause of
action against defendant Northrop Grumman Corporation.

Cause is argued extensively as reflected in the
notes of the court reporter, which are incorporated
herein by reference.

At the request of plaintiff's counsel, the court
TAKES THE DEMURRER UNDER SUBMISSION to further
review authority re statute of limitations.

The Clerk will notice counsel of the court's ruling.

Later, the court rules as follows:

The court sustains the objections of defendant to
the request for judicial notice and to the Guimares
declaration for purposes of the demurrer.  The court
overrules the objections of defendant to paragraphs

Page   1 of   4   DEPT. 30

MINUTES ENTERED
07/17/06
COUNTY CLERK

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 07/17/06                                                                    DEPT. 30

HONORABLE  ELIZABETH A. GRIMES          JUDGE   J. BACON              DEPUTY CLERK

HONORABLE                          JUDGE PRO TEM                      ELECTRONIC RECORDING MONITOR
#3
           C. AGUIRRE   CA        Deputy Sheriff   B. NAGATA, CSR #12268      Reporter

| 8:35 am | BC345356 | | |
|---|---|---|---|
| | RENATO GUIMARES JR | Plaintiff Counsel | STEVEN C. SHUMAN [X] |
| | VS NORTHROP GRUMMAN CORPORATION | Defendant Counsel | RANDOLPH HICKS [X] A. KRISTINE FLOYD [X] ROBERT C. SHAIA [X] |

**NATURE OF PROCEEDINGS:**

3, 4 and 5 of the Guimares declaration for purposes
of the motion to dismiss for failure to join an
indispensable party.

The Demurrer to the first cause of action is
SUSTAINED WITHOUT LEAVE TO AMEND. The action is
time-barred by the four-year statute of limitations
that applies to an action to recognize and enforce a
foreign money judgment.  In the alternative, the
court dismisses this action without prejudice for
failure to join an indispensable party, Dr. Irineu
Strenger.

Defense counsel is ordered to submit a proposed form
of judgment.

Defendant's counsel to notice any interested party
not listed below.

            CLERK'S CERTIFICATE OF MAILING/
              NOTICE OF ENTRY OF ORDER

I, the below named Executive Officer/Clerk of the
above-entitled court, do hereby certify that I am
not a party to the cause herein, and that this date
I served Notice of Entry of the above minute order
of 7-17-06 upon each party or counsel named below by
depositing in the United States mail at the
courthouse in Los Angeles, California, one copy of
the original entered herein in a separate sealed
envelope for each, addressed as shown below with the

                    Page   2 of   4   DEPT. 30

```
MINUTES ENTERED
07/17/06
COUNTY CLERK
```

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| DATE: 07/17/06 | | | DEPT. 30 |
|---|---|---|---|
| HONORABLE ELIZABETH A. GRIMES | JUDGE | J. BACON | DEPUTY CLERK |
| HONORABLE #3 | JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| C. AGUIRRE  CA | Deputy Sheriff | B. NAGATA, CSR #12268 | Reporter |

| 8:35 am | BC345356 | Plaintiff Counsel | STEVEN C. SHUMAN [X] |
|---|---|---|---|
| | RENATO GUIMARES JR VS NORTHROP GRUMMAN CORPORATION | Defendant Counsel | RANDOLPH HICKS [X] A. KRISTINE FLOYD [X] ROBERT C. SHAIA [X] |

**NATURE OF PROCEEDINGS:**

postage thereon fully prepaid.

Date: 7-17-06

John A. Clarke, Executive Officer/Clerk

By: _J. Bacon_____
          Jennifer Bacon


Steven C. Shuman
10100 Santa Monica Blvd.,
16th Floor
Los Angeles, CA 90067-4107


Randolph Hicks
555 Twon Dolphin Drive,
Suite 300
Redwood City, CA 94065


A. Kristine Floyd
1900 Main Street,
5th Floor
Irvine, CA 92614-7321


Page   3 of   4   DEPT. 30

MINUTES ENTERED
07/17/06
COUNTY CLERK

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | |
|---|---|
| DATE: 07/17/06 | DEPT. 30 |
| HONORABLE ELIZABETH A. GRIMES                 JUDGE | J. BACON                    DEPUTY CLERK |
| HONORABLE #3                                        JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR |
| C. AGUIRRE   CA                           Deputy Sheriff | B. NAGATA, CSR #12268          Reporter |

| | | |
|---|---|---|
| 8:35 am | BC345356 | Plaintiff Counsel    STEVEN C. SHUMAN [X] |
| | RENATO GUIMARES JR VS NORTHROP GRUMMAN CORPORATION | Defendant Counsel    RANDOLPH HICKS [X] A. KRISTINE FLOYD [X] ROBERT C. SHAIA [X] |

**NATURE OF PROCEEDINGS:**

Robert C. Shaia
1900 Main Street,
5th Floor
Irvine, CA 92614-7321

Page   4 of   4   DEPT. 30

# EXHIBIT "E"

### RENATO GUIMARÃES JR.

Doutor pela USP, Professor da UNICAMP
*Master of Comparative Law*, GWU, IASP
Fone (019) 3259-8989, 3289-3990-fax-3289-4315, 3289-2921, rua Francisco de Toledo, 511
Cidade Universitária - 13.083-470, Campinas, SP

Em 16, outubro, 2000.

Excelentíssimo Senhor
Doutor Rubens Approbato Machado,
DD. Presidente da Ordem dos Advogados do Brasil,
Seção de São Paulo

Senhor Presidente:

A OAB, como toda cidadania, apoia as famílias dos 99 mortos na tragédia da *TAM*, desde quando a *Comissão de Direitos Humanos* aprovou forte moção contra a Aeronáutica que negava à Justiça o Laudo do Acidente, até quando, agora, sua CAAP acolhe aquelas famílias de fora de São Paulo.

Atitude específica da OAB, porém, deve ser tomada com urgência: advogados americanos - contratados junto com o signatário, por 65 famílias que acionam a *Northrop et al* nos Estados Unidos - em abril p.p. obtiveram de grande maioria das famílias, em necessidades, meras "autorizações" para, em 20 dias, fecharem acordo em valores medíocres e em condições incertas.

O MM. Juiz da 2ª Vara Cível do Jabaquara condenou a *Northrop Grumman Corporation*, a maior fábrica de aviões de guerra do mundo, e que fabricou o "reverso" cujo defeito ajudou a derrubar o avião, a indenizar cada família em R$ 2.000.000,00 só por danos morais, além dos materiais. E porque desobedece ao E. 1º Tribunal de Alçada, a *Northrop* foi condenada por má-fé. Como já era junho, os acordos vis tinham de ser renegociados.

Mas os advogados estrangeiros não só insistem em não aumentar os valores das propostas que, para os danos morais, pagam zero, não só insistem nas condições brutalmente ilegais, como ainda pressionam ilegalmente muitas famílias a destituírem este advogado brasileiro, porque o aconselhamento deste, adverso aos acordos, como consta dos autos, é "obstáculo". Exemplos dos termos: (a) pagamento, 20 dias *depois* do trânsito em julgado da extinção das ações, a ser efetuado... no Texas, USA, e a *terceiros*; (b) as famílias pagam a sucumbência de 20% da *Northrop*, etc.

O Júri Indenizatório na Califórnia está marcado para abril p.f. e, pelo que se saiba, até hoje a condenação do Jabaquara não está naqueles autos em que está suspensa a admissão dos brasileiros ao Júri que, assim, só arbitrará a indenização da família americana. O acordo seria outra tragédia. Há pedido, suspenso, para intervenção do Procurador-Geral da Justiça.

Os americanos em Português só falam a palavra "money". A redação do acordo, confirmou-se, é do advogado da *TAM* que, como denunciado pelas viúvas em audiência com dois Ministros da Justiça, Dias e Caleiros, comete tergiversação a defender também o IRB, fiscal, e a fiscalizada Unibanco. Eles estão, hoje, no Hotel Maksoud Plaza: Arthur e Leigh Ballen.

O ilustre Professor Irineu Strenger, da USP, e o signatário, na condenação da *Northrop*, mereceram honorários máximos por todos os itens do art. 20 do CPC. É preciso proteger a advocacia do Brasil, as famílias e cerca de 100 órfãos, contra a coação e interesse de advogados estrangeiros que até sonegam a prova. Renovo, Sr. Presidente, a estima e a consideração.

# RENATO GUIMARÃES JR.

Doutor pela USP, Professor da UNICAMP

*Master of Comparative Law, GWU, IASP*

Fone (019) 3289-8789, 3289-8990-fax-3289-4315, 3289-2921, rua Francisco de Toledo, 511

Cidade Universitária - 13.083-470, Campinas, SP

### Termo de Declarações da Primeira Vítima

*a ser ratificado e, eventualmente, atualizado em Juízo*

O declarante, desde 5 de fevereiro de 1997, é o responsável, junto com o escritório *Speiser Krause*, especializado em indenizatórias por tragédias aéreas, pelas ações, nos Estados Unidos, de 65 famílias das vítimas do *Fokker 100*, da TAM, que há quatro anos, no Jabaquara, deixou 99 mortos; as relações profissionais do declarante com a *Speiser Krause* foram excelentes e produtivas até janeiro de 2000, quando o declarante obteve na Holanda o relatório dos síndicos da falência da *Fokker*, com o que provou a má-fé da *TAM*, da *Northrop* e outras co-rés porque, enquanto nos Juízes do Brasil, uma tentava jogar a culpa na outra, já perante o Juiz holandês, compunham um consórcio para pagar as famílias dos mortos; a partir daí surgiram, pela primeira vez, propostas de acordos e crescentes divergências; o Professor de Engenharia, Fernando Lobo Vaz de Mello, que perdeu o filho no acidente, tentou obter detalhes do colega, da Fokker, que se prolificara ao declarante, naquele janeiro, a fornecer detalhes de uma carta em que o Presidente Rolim inseriu - e a Aeronáutica adotou em seu Laudo oficial – o falso ideológico de que a *Fokker* havia dispensado o treinamento dos pilotos para a emergência de o "reverso" abrir na ar; a *Speiser Krause*, estranhamente – sabendo pela falida da consulta - pediu ao Prof. Vaz para *"não mexer no assunto"* porque poderia prejudicar as propostas iniciais de acordo; o Prof. Vaz consultou o declarante sobre esse empecilho e este o aconselhou a adiar um pouco sua pesquisa, para não prejudicar muitas famílias que precisavam - e hoje desesperadamente mais – do dinheiro do acordo; após intensas consultas com o signatário, sobre detalhes de cada família e suas expectativas para ofertas viáveis, a *Speiser Krause*, em abril, chegou com as propostas, cujos valores foram decepcionantes, não só em relação aos valores admitidos pela Justiça do Brasil, como principalmente em comparação às vultosas avaliações que Arthur Ballen, daquela firma, calculara para cada família, quando elas assinaram os 65 contratos com a *Speiser Krause* e o declarante; contrariando as sugestões do declarante à *Speiser Krause*, os métodos para apresentar as propostas às famílias, foram ultrajantes; ao invés de se realizarem numa sala no *Business Center*, do *Hotel Maksoud Plaza*, em São Paulo, como foram realizadas as reuniões para as assinaturas dos 65 contratos com as famílias, as reuniões agora, "por economia", passaram a ser realizadas no próprio quarto de dormir de Arthur, numa constrangedora saleta anexa privada; outro exemplo desses métodos constrangedores: Arthur e seu filho Leigh Ballen, os advogados que mais freqüentam o Brasil para tratar do caso em nome da *Speiser Krause*, insistiam para que uma família não contasse para outra o valor da proposta de cada uma, o que violentava o espírito de amizade que há anos as unia, pela dor comum e batalhas por seus direitos; outro exemplo era que os cálculos de cada proposta não eram exibidos para a família, que só recebia de Leigh o valor

do possível acordo; profissionalmente, que mais chocou o declarante, nesse ambiente de sigilo, foi a informação inicial, dada a cada famílias, de que os brasileiros estavam a iminência de perder a causa nos Estados Unidos, o que surpreendeu o declarante que sempre fora informado que as chances de ganharmos a admissão na Justiça dos USA era de 75%; também inaceitável foi a afirmação de que todas as 65 famílias teriam de aceitar o acordo, sob pena de todas as propostas ficarem prejudicadas e os *"brasileiros perderem a oferta e terem de esperar anos para receber na Justiça do Brasil"*; essa unanimidade logo foi amenizada para a exigência de *"quase todas"*; mas os atritos mais sérios começaram a ocorrer quando, conforme o declarante havia, desde fevereiro, advertido, por *fax*, várias vezes, que as propostas teriam de ser claras sobre quem pagaria os honorários dos colegas brasileiros que trabalhavam há mais de três anos, com diferentes contratos, nas 65 causas no Brasil contra a *TAM*; toda vez que o declarante, a família ou seu advogado de confiança, levantava a questão, Arthur afirmava que aquele não era problema dele, e que era só entre a família e seu advogado, e não admitia discussão; para piorar a situação, também começou a ficar incerta a situação de todos advogados brasileiros que haviam recomendado às respectivas famílias-clientes tentar a Justiça dos Estados Unidos, pois tinham, e têm, direito a 10% sobre os honorários da *Speiser Krause* - pagos exclusivamente pela parte dessa firma, e não pela do declarante – direito esse que o declarante fora por ela autorizado a confirmar, logo no início dos contratos e a todos colegas brasileiros, que fariam eles jus a essa parcela de 10%; essa confirmação foi celebrada numa enorme reunião de Arthur e o declarante com dezenas de ilustres advogados brasileiros de confiança de cada família, geralmente os que cuidavam do inventário, entre eles renomados Professores de Direito; assim, a cada reunião o clima entre os Ballen e o declarante degradava principalmente quando este considerava os valores vis; Arthur passou a permitir que o declarante só participasse das reuniões com as 26 famílias clientes do declarante contra a *TAM* no Brasil, o que tornou o ambiente miserável entre as demais das 65 famílias cujos advogados muitas vezes pediam para o declarante, mais afeito ao que ocorria nos USA, participasse também da reunião, expondo seu ponto de vista; as famílias também reagiam com indignação mas, por causa da necessidade de dinheiro, acabavam, com relutância, a autorizar que as propostas fossem formalizadas para serem aceitas, homologadas e pagas em, no máximo, dois meses, se as empresas estrangeiras, inclusive a *Llody's*, de Londres, seguradora da *TAM*, confirmassem; ficou evidente às famílias que surgia então, pela primeira vez, forte divergência entre a *Speiser Krause* e o declarante, que relutava em concordar com os valores ofertados e os modos forçados como as famílias tinham de aceitar a propostas; não havia possibilidade de contrapropostas; essas confusões cresciam com a resistência das famílias de ter de pagar, da medíocre proposta, dois ou até três advogados, principalmente quando o colega, de confiança da família, tinha direito aos 10% e não era o advogado encarregado da indenizatória, contra a *TAM* no Brasil, e que, com o acordo, teria de ser extinta também; após muito choro, no sentido literal, e desavenças muito tristes, Arthur teve de ceder aos argumentos das famílias que, vítimas da falta de transparência nas informações, conseguiam "sub-acordos" praticamente "de acordo com a cara do freguês"; assim, se a família era de um viúvo ou pai que não fora dependente do morto, a resistência era maior, e *Speiser Krause* tinha de assumir que pagaria os honorários dos outros advogados; se a resistência fosse menor, pagaria, digamos 70% ou 30%; se fosse nenhuma, a viúva pagaria 100%, numa falta de uniformidade desumana; essas discrepâncias logo eram do conhecimento geral; as viúvas ficaram arrasadas, algumas ofendiam, com razão, Arthur e o filho, na presença deles, ou por detrás;

Arthur ficava muito nervoso e acusava algumas viúvas de terem assinado, logo após a tragédia, o acordo então oferecido pela *TAM* e Unibanco, de US$ 145,000.oo, reconhecido Tribunal de Alçada como anulável e por todos cinco Procuradores de Justiça, que deram parecer sobre esses acordos, como "nulos", tendo a ré de pagar *de novo*; algumas choravam, tentando justificar o acordo nulo aceito por US$ 145,000.oo com o desespero na hora na morte, ao que Arthur então respondia que a nova oferta era um "presente", um "milagre"; uma viúva (Vanessa), ao saber da proposta, chegou a perguntar "*vocês são os meus advogados nos USA ou são advogados das empresas ?*", ao que Leigh respondeu: "*você não precisa nos insultar, basta aceitar a proposta*" que, eles insistiam, era "excelente", ante a iminência de perderem nos USA; até hoje, mais de seis meses depois, nada foi perdido nos USA; perturbava o declarante o fato de a *Northrop* querem pagar as famílias se ela fosse ganhar a ação nos USA, ao que Leigh respondia que eram "*diferentes perspectivas*"; outro dado impressionante: a própria *Speiser Krause* informara, e o declarante divulgou pela Imprensa na época, que uma viúva, sem filhos, fizera um acordo, no mesmo processo em que as famílias brasileiras estão em Nova York, por mais de US$ 3,000,000.oo e só com a Fokker, continuando a ação, até hoje, contra a *Northrop*; assim, o que deveria ser um final feliz ou razoável para a longa batalha judicial sobre enorme trauma, acabava sendo outra tormenta; o declarante, tentando conciliar o que parecia ser as incompreensões dos Ballen e a injustiça às famílias, que tanto precisavam e precisam de dinheiro, ficou sob *stress* - do que, em seus 62 anos de idade, nunca sofrera, tendo de ser atendido no ambulatório médico do Hotel e, depois, com exames clínicos e tratamento; Arthur falava como o dito americano: "*Renato, não balance o barco*", ao que o declarante respondia: "*esse barco vai virar, e como um Titanic*"; quando o declarante explicou que a Arthur que muitas viúvas preferiam as águas remansosas de receber, mensalmente, as tutelas antecipadas, já concedidas, como "direitos alimentares" e em até 80% do valor dos vencimentos do respectivo marido morto, retroativas essas pensões à data da tragédia, ao invés de uma só "bolada" no final, pois tinham medo de acabarem perdendo nas aplicações, Arthur se afundou gritando: "*elas têm medo de dinheiro ? então dêem para mim*"; o ponto máximo desses atritos foi quando, incapaz de convencer o declarante – que tentava lhe explicar que na vida real, perto prática dos gritos dos órfãos e longe da teoria dos gritos dos investidores econômicos, as viúvas não eram versadas em Economia Internacional, e que a maioria delas era apenas donas de casas que, embora diplomadas, dependiam de outras pessoas para decisões financeiras – convencer de que as propostas eram "excelentes" para as famílias, Leigh abandonou sua argumentação com índices da Bolsa de Nova York e a demora da Justiça no Brasil, argumento que Leigh então prometeu provar ao declarante com um parecer econômico, mas que jamais, como outros documentos prometidos, lhe deu, passou então a "interrogar" o declarante que, exigia ele, tinha de responder "sim" ou "não" a perguntas como esta: "*Você aconselhou a família "x" a não aceitar o acordo - sim ou não ?*"; houve duas sessões desses "interrogatórios", uma na presença da viúva Sandra Assali, presidenta da *Associação da Famílias* e que o declarante acredita, mas não tem certeza, acabou saindo do quarto no meio daquele espetáculo de pressão, e a outra sessão, na presença, com certeza, da Ana Beatriz, a Duda, cunhada da Sandra, Administradora de Empresas e Física Nuclear que a *Speiser Krause* contratou, para assessorar todas as famílias, logo a partir de uma das primeiras viagens do Arthur ao Brasil, e por indicação do declarante, que já não estava dando conta de atender a todas famílias que, cada vez em maior número e por recomendações públicas do declarante, o procuravam interessadas também em tentar o ingresso na Justiça dos USA

através do declarante e da *Speiser Krause*; o declarante preparou-se para colocar as coisas no devido lugar, num terceiro interrogatório que, devido a deterioração das relações, nunca ocorreu, o que foi bom para não precipitar um rompimento de vez e impedir mais descobertas; as suspeitas do declarante de que os Ballen estavam passando a trabalhar mais nos interesses das empresas, abandonando o das famílias, praticamente se confirmaram quando ele viu o advogado da *TAM*, Luís Eduardo Arena Alvarez, saindo pelo *hall* do *Hotel Maksoud Plaza* exatamente nos dias em que se realizam, no apartamento de Arthur, as reuniões com as famílias; assim, quando a minuta do acordo chegou, em julho, ao conhecimento do declarante, este, de pronto e sem surpresas, não teve dúvidas – e isso ficou comprovado, com o silêncio dele, em vários processos e na audiência, em outubro, na 28ª Vara Cível da Capital - de que o Dr. Arena, da *TAM*, fora muito provavelmente, com a ajuda de outro defensor da *TAM*, Dr. Lino Pereira da Silva, réu nesta causa, numa exibitória da Justiça Federal, quem redigira a proposta de acordo, como se vê adiante na denúncia feita pelo declarante ao Procurador-Geral da Justiça, para evitar danos às famílias; gradativamente, e isso foi muito triste, as famílias, unidas há mais de três anos em torno da *Associação* que fundaram, já iam se dividindo radicalmente: a maioria aceitando o acordo para *"acabar com toda essa confusão, que ninguém mais agüenta, porque no Brasil não vai dar em nada mesmo"*, e a minoria, rejeitando o acordo *"porque é muito pouco em vista do que os próprios Ballen prometeram"*, e dispostos a esperar mais, na Justiça, ou tentar obter um acordo maior; passou-se muito mais do que 20 dias prometidos, e nada de vir ao Brasil o dinheiro do acordo de abril, muito divulgado, para limpar a imagem da *TAM*, pela Imprensa, com valores de até US$ 800,000.00, como divulgado na *Folha de S. Paulo* e o *Estadão de S. Paulo*; o declarante teve de ajuizar medida cautelar responsabilizando a *TAM* em caso de seqüestro, em especial dos órfãos, vez que as viúvas ficaram entre apreensivas e em pânico; aí, sem dúvida estimulada pela *TAM*, começaram as entrevistas de algumas viúvas admiradas ( sic ) com *"a rapidez da Justiça dos USA"*, conforme fita gravada e requisitada pelo declarante à TV-Globo, matéria da abertura do *Jornal (Nacional) da Globo*, das 23 hs., logo em maio, e à disposição da Justiça; o nome de Arthur Ballen – para enorme surpresa do declarante, sem contestação por ele que, que sempre pedia sigilo – apareceu no jornal e ele elogiou a notícia; a mudança de seu comportamento, do segredo para a divulgação, só se explicava pela crescente oposição do declarante ao acordo, resistência que a *Speiser Krause* tentava minar através da pressão pública junto às famílias necessitadas, jogando contra elas a posição cautelosa e cogente do declarante; quase convicto de que a *Speiser Krause* estava trabalhando para as empresas mesmo, e não mais defendendo os interesses das famílias, assim traídas, o declarante foi com seu filho Gustavo Orlando a Nova York e fez uma visita de surpresa ao escritório da *Speiser Krause*; o declarante acredita que foi uma benção de Deus o chefe do escritório, que cuida do processo das famílias brasileiras, o advogado Frank Granito, III, estar ausente naquele manhã, e terem sido, o declarante e seu filho, atendidos pelo advogado Thomas Frizzell, que foi o responsável pela produção das provas contra a *Northrop*, para o Júri Indenizatório da Califórnia, que já está marcado para abril próximo; como quase todos os advogados da *Speiser Krause*, que são também diplomados em Aviação, geralmente Pilotos ou Engenheiros - exceto os Ballen que não são nem Pilotos ou Engenheiros – Thomas ficou muito feliz em conhecer o declarante e seu filho e começou a descrever, com muito orgulho e riqueza de detalhes técnicos, que o declarante e seu filho, como leigos, só entendiam superficialmente, como ele, Thomas, tinha conseguido provar, através de interrogatórios e laudos

técnicos, para os direitos indenizatórios das famílias brasileiras, a culpa da *Northrop*; em síntese, Thomas explicou que a falha da *Northrop* - que é a maior fábrica de aviões de guerra do mundo, com US$ 9,000,000,000.oo (bilhões) de lucros anuais - não gerava responsabilidade objetiva, ou defeito de fabricação, como se pensava, pelo Código de Defesa do Consumidor, mas de própria culpa subjetiva, negligência, imprudência e imperícia, consistente no fato de "alguém", dentro da *Northrop*, talvez até com "dolo eventual", ter despacho para a *Fokker*, na Holanda, um tipo de "reverso" - que ajudou a derrubar o avião – tipo esse que seria mais moderno, para um modelo de Fokker-100 mais avançado, mas que não estava ainda em fabricação; precipitaram a remessa, aparentemente sem advertências, à Fokker, sobre essa precocidade fatal; o valor das indenizações nos USA, como no Brasil, às evidências, aumenta muito de acordo com o grau de culpa do responsável; exatamente a essa mesma conclusão, três meses depois, chegaria o Juiz da Primeira Vara Criminal do Jabaquara, ao remeter o Inquérito Policial sobre as 99 mortes, para o Procurador-Geral da Justiça: "alguém", de dentro da *Northrop* e com elevado conhecimento técnico, agiu com até eventual dolo; o Promotor de Justiça, designado para o mesmo Inquérito Policial, também entendeu que "alguém" da *Northrop* é, sem dúvida, co-responsável pela tragédia, mas a prova, concluiu o Ministério Público, era e ainda é - quanto à fixação do indivíduo ou dos indivíduos penalmente responsáveis - "nebulosa"; perguntado, Thomas afirmou ao declarante e seu filho que era ele o responsável apenas pela produção da prova judicial, e que, quem cuidava da partes dos acordos eram os Ballen e Granito; o declarante pediu então que Thomas passasse a Granito algumas indagações para, depois, responder ao declarante ao telefone; Thomas anotou os vários itens das perguntas numa lista e prometeu entregar a Granito assim que ele chegasse; depois, o declarante, por telefone, teria a respostas de Granito através de Thomas; agradecendo, o declarante saiu do escritório com seu filho e pasmo com a revelação dessa prova definitiva da responsabilidade civil da *Northrop*, e penal·de algum ou alguns indivíduos de dentro dela, prova essa que a *Speiser Krause*, sem dúvida dolosamente, jamais contou para o declarante, embora mais do que ciente de que os Juízes do Jabaquara estavam para decidir, a qualquer momento, tanto a indenizatória como o Inquérito Policial; descoberta essa ocultação de prova criminal e civil, o declarante resolveu contratar no mesmo dia um advogado americano para si próprio para, protegendo seus direitos nos Estados Unidos, orientá-lo - para o trato do que era e é prioritário – orientá-lo em como melhor continuar aumentar as propostas de acordos para as famílias, diante dessa flagrante <u>sonegação de prova judicial</u>, a dano das famílias na Justiça do Brasil; o declarante contratou para si, então, os trabalhos do escritório *Richard S. Peskin*, com o qual trabalham dois advogados brasileiros, Dr. Anselmo Martini, que fica em Nova York, e Dr. Wanderley Minitti, renomado advogado que defende, por exemplo, os garotos atropelados pela escolta do Michael Jackson num *show* em São Paulo; quando, depois, o declarante telefonou para Thomas, para saber as respostas da *Speiser Krause* para as questões das famílias que o declarante deixara com ele, Thomas, para nova enorme surpresa do declarante foi Granito quem atendeu ao telefone e, para maior surpresa ainda, Granito passou a tentar desmoralizar, para o declarante, seu próprio colega na *Speiser Krause*, afirmando que o declarante "fizera mal" de ter conversado com Thomas porque ele era *"muito jovem ( júnior )"*; o declarante, tinha assim, a confirmação insofismável de que as <u>famílias brasileiras</u> e ele próprio estavam sendo vítimas de uma grande <u>traição profissional</u>, com enormes prejuízos para as indenizações que cerca de <u>100 órfãos</u> tinham direito sagrado; Granito pediu, ainda, para o declarante telefonar para

Leigh, provavelmente porque este tem muito mais contado com o declarante do que ele, Granito, que talvez nunca tenha vindo ao Brasil; quando o declarante telefonou para Leigh, cujo escritório fica em Washington, D.C., este demorou alguns minutos para atender, o que o declarante achou estranho, pois a secretária - que sempre ou o colocava logo na ligação, ou então pegava o recado para Leigh – pediu, espaçadamente, umas duas ou três vezes, para o declarante não desligar e esperar mais um pouco; essa situação já ocorrera várias vezes, quando a conversa seria importante e mais de uma pessoa participaria da "conversa em conferência", às vezes entre três cidades de países diferentes, mas então a secretária ou o interlocutor avisava o declarante para esperar a "montagem" da triangulação telefônica; conhecendo assim os procedimentos da *Speiser Krause*, o declarante percebeu que sua conversa ou seria gravada ou seria escutada por outra pessoa, além de Leigh, muito provavelmente pelo chefe do escritório em Washington, pessoa, Gerald Lear, sempre mencionado como a autoridade máxima da *Speiser Krause* para este caso; logo que Leigh começou a falar, o declarante percebeu que a conversa ou estava sendo gravada mesmo e/ou estava escutada, pois voz de Leigh estava com certo eco e distante, como ao fundo, e em tom mais metálico; nos diálogos, havia demora muito grande para as frases Leigh serem pronunciadas e num ritmo diferente de seu natural, muito veloz, parecendo, agora, que obedecia à outra pessoa, tornando muito pausada a fluência das palavras, exigindo mais tempo para as respostas, dando a impressão de que consultava terceira pessoa; e a entonação enérgica e o discurso violento, dos tempos dos "interrogatórios" tornaram-se amenos e delicados; Leigh disse que o declarante não precisava ter sido tão agressivo, procurando outro advogado e insistiu num convite para ir a Washington, D.C., com despesas pagas, para conversar, pessoalmente, com Lear, que gostaria de trocar idéias com o declarante; Leigh estava muito interessado em saber onde e com quem o declarante estava; convite não aceito e, voltando ao Brasil, junho passou, e nada, ainda, de o dinheiro, como até hoje, chegar; e nada, também, de cópia da prova da culpa, ou talvez dolo eventual, de alguém de dentro da *Northrop*; como a *Speiser Krause* tinha plena consciência de que essa prova, que eles tinham produzido, seria inestimável tanto para a indenizatória como para o Inquérito Policial, ainda com o Promotor de Justiça designado, a sonegação dela à Justiça do Brasil constitui o crime tipificado no art. 356 do Código Penal, eis comete esse delito o advogado que torna inútil – por ocultação e omissão do seu uso devido, por exemplo - um documento de valor probatório, total e dolosamente omitido do Poder Judiciário Brasileiro, eis que em nosso território o resultado danoso; e mais uma vez a *Speiser Krause* utilizava seu poder de advogado para praticar o patrocínio infiel, "traindo", como advogado, seu dever profissional de ofertar em Juízo a que tinha prova a favor das famílias, prejudicando, difusamente, uma centena de órfãos das 65 famílias que, conjuntamente com o declarante, a *Speiser Krause* representa, assim incidindo eles no delito descrito no art. 355 do Código Penal; Granito ameaçou o declarante, através de *Peskin*, com uma indenizatória, nos USA, se o acordo falhasse; sem dúvida essa ameaça tipifica o art. 344 do Código Penal; em julho o Juiz da Segunda Vara Cível do Jabaquara condenou a *Northrop* a pagar R$ 2.000.000,oo só pelos danos morais, e mais 2/3 dos vencimentos das respectivas vítimas, até a idade em que ela completaria 65 anos de idade; a *Northrop* também foi condenada por <u>má-fé</u>, porque até hoje desobedece a v. acórdão do Egrégio Primeiro Tribunal de Alçada Civil do Estado de São Paulo e se recusa a depositar a caução de R$ 300.000,oo por família, questão que o Egrégio Superior Tribunal de Justiça, em medida cautelar interposta pelo declarante, de ofício mandou subir, em sede de recurso especial; só a

indenização de US$ 1,111,111,11, pelos danos morais, é maior do que todas as propostas de acordo, e mais que o dobro de mais da metade delas; a histórica sentença, aclamada por jurisconsultos, disputada por autores e suas editoras, estudada na Faculdades e uma das pouquíssimas, na íntegra da *Internet*, no *site* especializado em Responsabilidade Civil, com 100.000 v. acórdãos, *www.jurinforma.com.br*, a *Speiser Krause*, ao invés de levar, imediatamente, essa condenação no Brasil ao juízes da Califórnia e de Nova York, onde as ações das famílias brasileiras até hoje estão suspensas, aguardando essa decisão do Brasil contra a *Northrop*, ou pelo menos postular algum aumento das propostas de acordo no Brasil, inacreditavelmente, passou a atacar a condenação no Jabaquara, fornecendo um parecer apócrifo que afirma que o Juiz do Brasil violou garantias a que a *Northrop*, por ser estrangeira "não residente" no País, art. 5º da Constituição Federal, não tem direito, e passando, às viúvas, a versão sórdida de que a condenação "atrapalhou" os acordos e a sórdida afirmação – com escreveu a *Speiser Krause* ao ilustre Prof. Irineu Strenger, da USP, que assinou a petição inicial junto com o declarante – de que os acordos de abril <u>não</u> seriam aumentados em razão da condenação ! ; noutras, os R$ 2.000.000,oo, pelos danos morais, na armação da *Speiser Krause*, para as famílias, valem <u>zero</u> mas, para ela e à *Northrop*, às claras, muitíssimo; o crime de tergiversação, aí, **art. 355, § único,** da Lei Penal, outra vez aparece às evidências; o declarante protocolou, em 26 de julho, na <u>Procuradoria-Geral da Justiça</u>, sob número MP 57993/00, pedido para instauração de Inquérito Civil para <u>impedir</u> que os acordos – de cujo texto acabara de tomar conhecimento e já com assinatura de clientes seus - prejudiquem cerca de uma <u>centena de órfãos</u> e, *difusamente,* todos os familiares dos consumidores mortos, em razão de cláusulas absolutamente ilegais e leoninas da minuta que alguns clientes do declarante, sem o conhecimento dele, como descrito, e por certo muitas outras famílias, acabavam assinando sob as capciosas informações dos Ballen; nenhum dos ilustres advogados, que assistem as demais famílias, têm conhecimento, por falta de informação da *Speiser Krause,* das complexas ações nos USA, para poder avaliar, criteriosamente, seu veloz potencial indenizatório, inclusive para acordo razoável, e assim poder aconselhar seus clientes, que tanto precisam do dinheiro logo, decidirem com segurança - além das conhecidas delongas das ações no Brasil que, no caso do Jabaquara porém, já se encontra em fase de execução provisória dos "alimentos" devidos desde a tragédia, e além das tutelas antecipadas concedidas e já atrasadas de há muito; essa falta de transparência atinge, na composição dessa tragédias de 100 órfãos, às raias do inadmissível quando esse esquema da *Speiser Krause* impossibilita que o declarante, como advogado brasileiro responsável, oferte os dados e seu aconselhamento, como é seu dever legal e pelas 65 procurações que, em conjunto com o *Speiser Krause,* recebeu das 65 famílias, tanto que o declarante já tem sido acusado por várias viúvas, e inclusive por escrito e por eminente <u>Procurador da República</u> de Brasília, genro de uma viúva, de não dar a todas 65 famílias as informações e o aconselhamento essenciais, quedando-se, nas primeiras reuniões para o acordo, e mal o sabem porquê, em quase em silêncio e omisso, atitude que - não fosse a conflitante coação de força-maior, caracterizada pela inexigibilidade de conduta diversa - poderia gerar responsabilidades civis e criminais, que são na verdade, exclusiva, e maliciosamente escondidas, da *Speiser Krause;* um ou dois dias depois do protocolamento no Ministério Público, numa reunião no escritório, da rua Benjamin Constant, do Dr. Luiz Roberto Arruda Sampaio, amigo do Arthur, advogado, na época, de uma família, e que serviu de intérprete e intermediário, o declarante, acompanhado do Dr. Minitti, entregou ao Dr. Sampaio, que <u>a leu</u> e a

através do declarante e da *Speiser Krause*; o declarante preparou-se para colocar as coisas no devido lugar, num terceiro interrogatório que, devido a deterioração das relações, nunca ocorreu, o que foi bom para não precipitar um rompimento de vez e impedir mais descobertas; as suspeitas do declarante de que os Ballen estavam passando a trabalhar mais nos interesses das empresas, abandonando o das famílias, praticamente se confirmaram quando ele viu o advogado da *TAM*, Luís Eduardo Arena Alvarez, saindo pelo *hall* do *Hotel Maksoud Plaza* exatamente nos dias em que se realizam, no apartamento de Arthur, as reuniões com as famílias; assim, quando a minuta do acordo chegou, em julho, ao conhecimento do declarante, este, de pronto e sem surpresas, não teve dúvidas – e isso ficou comprovado, com o silêncio dele, em vários processos e na audiência, em outubro, na 28ª Vara Cível da Capital - de que o Dr. Arena, da *TAM*, fora muito provavelmente, com a ajuda de outro defensor da *TAM*, Dr. Lino Pereira da Silva, réu nesta causa, numa exibitória da Justiça Federal, quem redigira a proposta de acordo, como se vê adiante na denúncia feita pelo declarante ao Procurador-Geral da Justiça, para evitar danos às famílias; gradativamente, e isso foi muito triste, as famílias, unidas há mais de três anos em torno da *Associação* que fundaram, já iam se dividindo radicalmente: a maioria aceitando o acordo para *"acabar com toda essa confusão, que ninguém mais agüenta, porque no Brasil não vai dar em nada mesmo"*, e a minoria, rejeitando o acordo *"porque é muito pouco em vista do que os próprios Ballen prometeram"*, e dispostos a esperar mais, na Justiça, ou tentar obter um acordo maior; passou-se muito mais do que 20 dias prometidos, e nada de vir ao Brasil o dinheiro do acordo de abril, muito divulgado, para limpar a imagem da *TAM*, pela Imprensa, com valores de até US$ 800,000.oo, como divulgado na *Folha de S. Paulo* e o *Estadão de S. Paulo*; o declarante teve de ajuizar medida cautelar responsabilizando a *TAM* em caso de seqüestro, em especial dos órfãos, vez que as viúvas ficaram entre apreensivas e em pânico; aí, sem dúvida estimulada pela *TAM*, começaram as entrevistas de algumas viúvas admiradas ( sic ) com "a rapidez da Justiça dos USA", conforme fita gravada e requisitada pelo declarante à TV-Globo, matéria da abertura do *Jornal (Nacional) da Globo*, das 23 hs., logo em maio, e à disposição da Justiça; o nome de Arthur Ballen – para enorme surpresa do declarante, sem contestação por ele que, que sempre pedia sigilo – apareceu no jornal e ele elogiou a notícia; a mudança de seu comportamento, do segredo para a divulgação, só se explicava pela crescente oposição do declarante ao acordo, resistência que a *Speiser Krause* tentava minar através da pressão pública junto às famílias necessitadas, jogando contra elas a posição cautelosa e cogente do declarante; quase convicto de que a *Speiser Krause* estava trabalhando para as empresas mesmo, e não mais defendendo os interesses das famílias, assim traídas, o declarante foi com seu filho Gustavo Orlando a Nova York e fez uma visita de surpresa ao escritório da *Speiser Krause*; o declarante acredita que foi uma benção de Deus o chefe do escritório, que cuida do processo das famílias brasileiras, o advogado Frank Granito, III, estar ausente naquele manhã, e terem sido, o declarante e seu filho, atendidos pelo advogado Thomas Frizzell, que foi o responsável pela produção das provas contra a *Northrop*, para o Júri Indenizatório da Califórnia, que já está marcado para abril próximo; como quase todos os advogados da *Speiser Krause*, que são também diplomados em Aviação, geralmente Pilotos ou Engenheiros - exceto os Ballen que não são nem Pilotos ou Engenheiros – Thomas ficou muito feliz em conhecer o declarante e seu filho e começou a descrever, com muito orgulho e riqueza de detalhes técnicos, que o declarante e seu filho, como leigos, só entendiam superficialmente, como ele, Thomas, tinha conseguido provar, através de interrogatórios e laudos

técnicos, para os direitos indenizatórios das famílias brasileiras, a culpa da *Northrop*; em síntese, Thomas explicou que a falha da *Northrop* - que é a maior fábrica de aviões de guerra do mundo, com US$ 9,000,000,000.oo (bilhões) de lucros anuais - não gerava responsabilidade objetiva, de defeito de fabricação, como se pensava, pelo Código de Defesa do Consumidor, mas de própria culpa subjetiva, negligência, imprudência e imperícia, consistente no fato de "alguém", dentro da *Northrop*, talvez até com "dolo eventual", ter despacho para a *Fokker*, na Holanda, um tipo de "reverso" - que ajudou a derrubar o avião – tipo esse que seria mais moderno, para um modelo de Fokker-100 mais avançado, mas que não estava ainda em fabricação; precipitarrm a remessa, aparentemente sem advertências, à Fokker, sobre essa precocidade fatal; o valor das indenizações nos USA, como no Brasil, às evidências, aumenta muito de acordo com o grau de culpa do responsável; exatamente a essa mesma conclusão, três meses depois, chegaria o Juiz da Primeira Vara Criminal do Jabaquara, ao remeter o Inquérito Policial sobre as 99 mortes, para o Procurador-Geral da Justiça: "alguém", de dentro da *Northrop* e com elevado conhecimento técnico, agiu com até eventual dolo; o Promotor de Justiça, designado para o mesmo Inquérito Policial, também entendeu que "alguém" da *Northrop* é, sem dúvida, co-responsável pela tragédia, mas a prova, concluiu o Ministério Público, era e ainda é - quanto à fixação do indivíduo ou dos indivíduos penalmente responsáveis - "nebulosa"; perguntado, Thomas afirmou ao declarante e seu filho que era ele o responsável apenas pela produção da prova judicial, e que, quem cuidava da partes dos acordos eram os Ballen e Granito; o declarante pediu então que Thomas passasse a Granito algumas indagações para, depois, responder ao declarante ao telefone; Thomas anotou os vários itens das perguntas numa lista e prometeu entregar a Granito assim que ele chegasse; depois, o declarante, por telefone, teria a respostas de Granito através de Thomas; agradecendo, o declarante saiu do escritório com seu filho e pasmo com a revelação dessa prova definitiva da responsabilidade civil da *Northrop*, e penal de algum ou alguns indivíduos de dentro dela, prova essa que a *Speiser Krause*, sem dúvida dolosamente, jamais contou para o declarante, embora mais do que ciente de que os Juízes do Jabaquara estavam para decidir, a qualquer momento, tanto a indenizatória como o Inquérito Policial; descoberta essa ocultação de prova criminal e civil, o declarante resolveu contratar no mesmo dia um advogado americano para si próprio para, protegendo seus direitos nos Estados Unidos, orientá-lo – para o trato do que era e é prioritário – orientá-lo em como melhor continuar tentando aumentar as propostas de acordos para as famílias, diante dessa flagrante <u>sonegação de prova judicial</u>, a dano das famílias na Justiça do Brasil; o declarante contratou para si, então, os trabalhos do escritório *Richard S. Peskin*, com o qual trabalham dois advogados brasileiros, Dr. Anselmo Martini, que fica em Nova York, e Dr. Wanderley Minitti, renomado advogado que defende, por exemplo, os garotos atropelados pela escolta do Michael Jackson num *show* em São Paulo; quando, depois, o declarante telefonou para Thomas, para saber as respostas da *Speiser Krause* para as questões das famílias que o declarante deixara com ele, Thomas, para nova enorme surpresa do declarante foi Granito quem atendeu ao telefone e, para maior surpresa ainda, Granito passou a tentar desmoralizar, para o declarante, seu próprio colega na *Speiser Krause*, afirmando que o declarante "fizera mal" de ter conversado com Thomas porque ele era *"muito jovem ( júnior )";* o declarante, tinha assim, a confirmação insofismável de que as <u>famílias brasileiras</u> e ele próprio estavam sendo vítimas de uma grande <u>traição profissional</u>, com enormes prejuízos para as indenizações que cerca de <u>100 órfãos</u> tinham direito sagrado; Granito pediu, ainda, para o declarante telefonar para

Leigh, provavelmente porque este tem muito mais contado com o declarante do que ele, Granito, que talvez nunca tenha vindo ao Brasil; quando o declarante telefonou para Leigh, cujo escritório fica em Washington, D.C., este demorou alguns minutos para atender, o que o declarante achou estranho, pois a secretária - que sempre ou o colocava logo na ligação, ou então pegava o recado para Leigh – pediu, espaçadamente, umas duas ou três vezes, para o declarante não desligar e esperar mais um pouco; essa situação já ocorrera várias vezes, quando a conversa seria importante e mais de uma pessoa participaria da "conversa em conferência", às vezes entre três cidades de países diferentes, mas então a secretária ou o interlocutor avisava o declarante para esperar a "montagem" da triangulação telefônica; conhecendo assim os procedimentos da *Speiser Krause*, o declarante percebeu que sua conversa ou seria gravada ou seria escutada por outra pessoa, além de Leigh, muito provavelmente pelo chefe do escritório em Washington, Gerald Lear, sempre mencionado como a autoridade máxima da *Speiser Krause* para este caso; logo que Leigh começou a falar, o declarante percebeu que a conversa ou estava sendo gravada mesmo e/ou estava escutada, pois voz de Leigh estava com certo eco e distante, como ao fundo, e em tom mais metálico; nos diálogos, havia demora muito grande para as frases Leigh serem pronunciadas e num ritmo diferente de seu natural, muito veloz, parecendo, agora, que obedecia à outra pessoa, tornando muito pausada a fluência das palavras, exigindo mais tempo para as respostas, dando a impressão de que consultava terceira pessoa; e a entonação enérgica e o discurso violento, dos tempos dos "interrogatórios" tornaram-se amenos e delicados; Leigh disse que o declarante não precisava ter sido tão agressivo, procurando outro advogado e insistiu num convite para ir a Washington, D.C., com despesas pagas, para conversar, pessoalmente, com Lear, que gostaria de trocar idéias com o declarante; Leigh estava muito interessado em saber onde e com quem o declarante estava; convite não aceito e, voltando ao Brasil, junho passou, e nada, ainda, de o dinheiro, como até hoje, chegar; e nada, também, de cópia da prova da culpa, ou talvez dolo eventual, de alguém de dentro da *Northrop*; como a *Speiser Krause* tinha plena consciência de que essa prova, que eles tinham produzido, seria inestimável tanto para a indenizatória como para o Inquérito Policial, ainda com o Promotor de Justiça designado, a sonegação dela à Justiça do Brasil constitui o crime tipificado no art. 356 do Código Penal, eis comete esse delito o advogado que torna inútil – por ocultação e omissão de seu uso devido, por exemplo - um documento de valor probatório, total e dolosamente omitido do Poder Judiciário Brasileiro, eis que em nosso território o resultado danoso; e mais uma vez a *Speiser Krause* utilizava seu poder de advogado para praticar o patrocínio infiel, "traindo", como advogado, seu dever profissional de ofertar em Juízo a que tinha prova a favor das famílias, prejudicando, difusamente, uma centena de órfãos das 65 famílias que, conjuntamente com o declarante, a *Speiser Krause* representa, assim incidindo eles no delito descrito no art. 355 do Código Penal; Granito ameaçou o declarante, através de *Peskin*, com uma indenizatória, nos USA, se o acordo falhasse; sem dúvida essa ameaça tipifica o art. 344 do Código Penal; em julho o Juiz da Segunda Vara Cível do Jabaquara condenou a *Northrop* a pagar R$ 2.000.000,oo só pelos danos morais, e mais 2/3 dos vencimentos das respectivas vítimas, até a idade em que ela completaria 65 anos de idade; a *Northrop* também foi condenada por má-fé, porque até hoje desobedece a v. acórdão do Egrégio Primeiro Tribunal de Alçada Civil do Estado de São Paulo e se recusa a depositar a caução de R$ 300.000,oo por família, questão que o Egrégio Superior Tribunal de Justiça, em medida cautelar interposta pelo declarante, de ofício mandou subir, em sede de recurso especial; só a

indenização de US$ 1.111.111,11, pelos danos morais, é maior do que todas as propostas de acordo, e mais que o dobro de mais da metade delas; a histórica sentença, aclamada por jurisconsultos, disputada por autores e suas editoras, estudada na Faculdades e uma das pouquíssimas, na íntegra da *Internet*, no *site* especializado em Responsabilidade Civil, com 100.000 v. acórdãos, *www.jurinforma.com.br*, a *Speiser Krause*, ao invés de levar, imediatamente, essa condenação no Brasil ao juízes da Califórnia e de Nova York, onde as ações das famílias brasileiras até hoje estão suspensas, aguardando essa decisão do Brasil contra a *Northrop*, ou pelo menos postular algum aumento das propostas de acordo no Brasil, inacreditavelmente, passou a atacar a condenação no Jabaquara, fornecendo um parecer apócrifo que afirma que o Juiz do Brasil violou garantias a que a *Northrop*, por ser estrangeira "não residente" no País, art. 5º da Constituição Federal, não tem direito, e passando, às viúvas, a versão sórdida de que a condenação "atrapalhou" os acordos e a sórdida afirmação – com escreveu a *Speiser Krause* ao ilustre Prof. Irineu Strenger, da USP, que assinou a petição inicial junto com o declarante – de que os acordos de abril <u>não</u> seriam aumentados em razão da condenação ! ; noutras, os R$ 2.000.000,oo, pelos danos morais, na armação da *Speiser Krause*, para as famílias, valem <u>zero</u> mas, para ela e à *Northrop*, às claras, muitíssimo; o crime de tergiversação, aí, **art. 355, § único**, da Lei Penal, outra vez aparece às evidências; o declarante protocolou, em 26 de julho, na <u>Procuradoria-Geral da Justiça</u>, sob número MP 57993/00, pedido para instauração de Inquérito Civil para <u>impedir</u> que os acordos – de cujo texto acabara de tomar conhecimento e já com assinatura de clientes seus - prejudiquem cerca de uma <u>centena de órfãos</u> e, <u>difusamente</u>, todos os familiares dos consumidores mortos, em razão de cláusulas absolutamente ilegais e leoninas da minuta que alguns clientes do declarante, sem o conhecimento dele, como descrito, e por certo muitas outras famílias, acabavam assinando sob as capciosas informações dos Ballen; nenhum dos ilustres advogados, que assistem as demais famílias, têm conhecimento, por falta de informação da *Speiser Krause*, das complexas ações nos USA, para poder avaliar, criteriosamente, seu veloz potencial indenizatório, inclusive para acordo razoável, e assim poder aconselhar seus clientes, que tanto precisam do dinheiro logo, decidirem com segurança - além das conhecidas delongas das ações no Brasil que, no caso do Jabaquara porém, já se encontra em fase de execução provisória dos "alimentos" devidos desde a tragédia, e além das tutelas antecipadas concedidas e já atrasadas de há muito; essa falta de transparência atinge, na composição dessa tragédias de 100 órfãos, às raias do inadmissível quando esse esquema da *Speiser Krause* impossibilita o declarante, como advogado brasileiro responsável, oferte os dados e seu aconselhamento, como é seu dever legal e pelas 65 procurações que, em conjunto com o *Speiser Krause*, recebeu das 65 famílias, tanto que o declarante já tem sido acusado por várias viúvas, e inclusive por escrito e por eminente <u>Procurador da República</u> de Brasília, genro de uma viúva, de não dar a todas 65 famílias as informações e o aconselhamento essenciais, quedando-se, nas primeiras reuniões para o acordo, e mal o sabem porquê, em quase em silêncio e omisso, atitude que não fosse a conflitante coação de força-maior, caracterizada pela inexigibilidade de conduta diversa - poderia gerar responsabilidades civis e criminais, que são na verdade, exclusiva, e maliciosamente escondidas, da *Speiser Krause*; um ou dois dias depois do protocolamento no Ministério Público, numa reunião no escritório, da rua Benjamin Constant, do Dr. Luiz Roberto Arruda Sampaio, amigo do Arthur, advogado, na época, de uma família, e que serviu de intérprete e intermediário, o declarante, acompanhado do Dr. Minitti, entregou ao Dr. Sampaio, que <u>a leu</u> e a

traduziu para os Ballen, uma cópia do protocolado ao Procurador-Geral da Justiça para impedir o acordo que resultaria ou resultará em enormes e evidentes danos nos órfãos e famílias; à noite do mesmo dia, ou do dia seguinte, chegando em seu escritório, em Campinas, desse encontro em São Paulo, o declarante encontrou em sua *secretária eletrônica* duas mensagens gravadas por Leigh ao declarante, avisando que ele e o pai tinham a *"incomum notícia"* de que eles estavam fazendo uma exigência para a *Northrop* aumentar os valores da propostas de acordo *"por causa da condenação que você obteve no Jabaquara"* e que teriam a resposta da *Northrop* na semana seguinte, quando voltariam ao Brasil para trabalhar com o declarante, avisando-o da chegada; essa <u>gravação está à disposição da Justiça</u>; imediatamente, em 31 de julho, o declarante pediu a suspensão desse pedido ao Ministério Público ante a possibilidade de consenso com os Ballen para modificar as cláusulas, possibilidade essa depois abortada; os Ballen voltaram ao Brasil mais umas três ou quatro vezes, mas sempre tentando obter o aceite das famílias à proposta de abril, que ainda rejeitavam e, cada vez mais, e eles já se afastando do declarante cada vez mais, e vice-versa; uma vez, a *Speiser Krause* chegou a "se esquecer" de avisar o declarante que a *Speiser Krause* estava tentando se reunir, como têm se reunido, deliberadamente sem disso informar o declarante, com as próprias famílias que eram e são as 26 clientes do declarante no Brasil nas ações contra a *TAM*; o declarante tem a convicção e provas de que nenhuma das famílias sequer duvida que ele pugna para aumentar os valores das indenizações em acordos lícitos, rápidos e exequíveis, mas ele também não duvida que a maioria delas prefere receber menos - sem avaliar no certo o quanto é esse "menos" - do que contar só com as delongas da Justiça do Brasil, que tampouco avaliam, neste caso, corretamente; acabam, assim, vítimas conscientes do poderoso ardil de monólogo da *Speiser Krause*, que acena com o dinheiro, desde abril, em "vinte dias", o que esmaga possível diálogo *declarante-65 clientes comuns* - a firma impedindo, com a imagem falsa do declarante, sem ter esse como contestar, como "complicador" dos acordos; o Dr. Minitti, então, começou a tratar, com os advogados da *Northrop* no Brasil, *Pinheiro Neto*, que se disse autorizado pela própria *Northrop* a receber contraproposta, e que apresentou ao declarante os valores para o acordo com todas as 65 famílias, informação essa que a *Speiser Krause* sempre sonegou do declarante, exceto das 26 famílias que ele representa no Brasil contra a *TAM*; o Dr. Minitti, então, fez uma contraproposta para aumentar em 50% o valor do acordo, exceto em casos especiais em que foram pedidos aumentos maiores; logo depois a *Speiser Krause* distribuiu às famílias uma carta da <u>seguradora</u> da *Northrop* – não da ré condenada, *Northrop* – afirmando que aquela só tratava do acordo com as famílias, através da *Speiser Krause*, não autorizado nenhuma outra pessoa a cuidar desse assunto com o declarante ou com qualquer outra pessoa; a *Speiser Krause*, por sua vez, informou às famílias que não comungava da posição do declarante para tratar do aumento do acordo; mais uma vez, pois, estava claro que a *Speiser Krause* defendia a posição da *Northrop* contra os interesses das famílias que comungam da atitude do declarante de tentar o acordo com a *Pinheiro Neto* através do Dr. Minitti; no dia 21 último, durante o *I Congresso Mundial do Ministério Público*, o declarante, apresentado pelo Delegado de Polícia para Assuntos Internacionais, Dr. Mauro Marcelo Lima e Silva, ao *Deputy Director* da *FBI*, Thomas J. Pickard, entregou em público o pedido para que a *FBI* fizesse o que a *Speiser Krause* tinha o dever profissional de ter feito de há muito tempo: entregar à Justiça do Brasil uma cópia da prova da culpa da *Northrop* produzida por seu advogado Thomas Frizzell; essa prova é essencial não só para que a condenação do Jabaquara, sob ataque da

apelação da *Northrop*, seja mantida, ou aumentada no Egrégio Primeiro Tribunal de Alçada Civil do Estado de São Paulo, mas principalmente para que o Procurador-Geral da Justiça, que está com o Inquérito Policial sobre as 99 mortes, possa decidir, pelo art. 28 do Código de Processo Penal e quanto aos fatos, com as provas disponíveis; finalmente, várias reuniões foram feitas com os Ballen, o assessor deles para a América Central, Pedro Luís Marroquin, da Guatemala, Dr. Minitti, Marcelo Augusto, filho do declarante e ele próprio e às vezes entre apenas dois membros de cada lado, a última delas sendo entre os dois filhos, Leigh e Marcelo, quando este teve de repetir várias vezes que o pai era mais motivado pela reputação e menos pelo dinheiro; os Ballen passaram a manifestar muita preocupação em negociar a sucumbência que a *Northrop* tem de pagar ao Prof. Irineu Strenger e ao declarante; numa dessas reuniões, Arthur, após discutir sobre a sucumbência, telefonou, em tom bastante servil, para os Estados Unidos, e (após muito mais ouvir, do que falar, com um tal de "Professor", da *Northrop*, informou, com ar aliviado, que a *Northrop* autorizara o *Pinheiro Neto* a negociar com o Dr. Minitti a sucumbência do Jabaquara, para facilitar o acordo e que, pelo texto do Dr. Arena-Lino, ficaria - "monstruosamente", como o declarante tem colocado nos autos e a elas - a cargo das famílias; outro ponto que ficou insolúvel foi o do local e época dos pagamentos às famílias: pela inacreditável cláusula 1 da minuta Dr. Arena-Lino, o pagamento seria "efetuado", vinte dias após o trânsito em julgado da extinção de todas as ações, com um depósito no... Texas, USA, onde as famílias não têm ação alguma, e na conta de uma firma ligada aos Ballen, com poderes ilimitados para renúncia, transigir, etc.; ao ouvir que no Brasil assina-se com a mão direita e recebe-se com a esquerda - ou então o acordo fica em juízo, digamos, esperando, em "vinte dias", o dinheiro de Londres chegar ou, como é mais comum, as prestações a prazo de uma transação válida ser honradas, etc. - Arthur ainda teve o humor de sugerir que o dinheiro, como alternativa, então ficasse com a *TAM*, porque a *Northrop* acha, disse ele, que na América Latina o dinheiro depositado "desaparece"; nessas derradeiras reuniões, os Ballen prometiam, sempre, altas somas - que subiam à medida que recusadas; não pelo valor, mas por princípio moral e pelo contrato que assegurava o direito à parcela do declarante — para que este induzisse, com seu aconselhamento profissional favorável, seus clientes a aceitarem o acordo – o que, às evidências, caracteriza a figura do art. 171 do Diploma Penal e, por outro lado, enfatizavam o quanto o declarante iria perder se o acordo falhasse, ameaçando com a versão de que muitos clientes, que queriam fazer o acordo, poderiam entender atitude do declarante, de mero aconselhamento contrário aos acordos, como "obstáculo" a esses acordos e, assim, o destituiriam como advogados dessas famílias; essa ameaça - depois concretizada e consumada seis vezes, graças à informação dolosa da *Speiser Krause* às famílias mais desejosas de dinheiro rápido - também tipifica o delito do art. 344 do Código Penal; o Dr. Minitti e Marcelo intensamente, e o declarante, na única vez em que participou dessas reuniões finais, focalizavam apenas no aumento das propostas para as famílias, deixando claro que os honorários, sendo objeto de contrato, nem poderiam ser discutidos, nem para mais, nem para menos; aí os Ballen, além das ameaças desses graves prejuízos materiais e morais, com a perda de seus 26 clientes acima, revelaram - como último expediente para obter a adesão do declarante às propostas de abril, desprezando, inclusive, a condenação que obtivera no Jabaquara – a falsidade de que, dos 65 contratos que a *Speiser Krause* e o declarante têm com as 65 famílias, o nome do declarante constaria de apenas em metade deles, uns trinta e pouco contratos e, pois, o declarante faria jus a mais ou menos à metade do que tem direito pela sua participação profissional, como é até pública e notória nestes três anos e

meio, na totalidade das 65 indenizações das famílias do Brasil que representa, junto com a *Speiser Krause*, nos Estados Unidos; esse crime está tipificado no art. 298 do texto Penal; exaurindo essas ameaças, combinadas com a consumada falsificação dos contratos, a *Speiser Krause* conseguiu que, até agora, seis - mas mais desesperadas 26 famílias suas clientes, exaustas pelas necessidades econômicas e informações desencontradas sobre o prometido acordo, para receberem o dinheiro em 20 dias, a partir de abril - enviassem ao declarante sua destituição como advogado pela explícita razão de que ele seria o "obstáculo" para os acordos, acordos que, já passados 25 dias da destituição, ainda não foram pagos nem sequer homologados, isto é, quase uma semana a mais dos prometidos 20 dias, o que demonstra que o "obstáculo" não era mesmo o declarante; conforme o documento anexo, o modelo é expresso para fazer as famílias cumprirem a anunciada destituição do declarante, como *Speiser Krause* ameaçara - trechos: *"fazer por Cartório ou telegrama com cópia e comprovação da entrega... tomando conhecimento... de sua opinião ( sic ) no sentido de não serem assinadas as propostas e acordo... justifica-se face aos inúmeros obstáculos opostos por V. Sa. para formalização do acordo proposto pelos advogados americanos, contratados para propositura de ação de indenização perante Cortes Americanas... este é o advogado indicado pelos Americanos para que assinem o Acordo portanto, não haverá ônus para o Cliente"*; o nome do advogado que aparece no documento como *"indicado pelos Americanos para que assinem o Acordo"* é o mesmo que leu e traduziu nos Ballen, como descrito acima, a cópia do protocolado no Procurador-Geral da Justiça para tentar evitar, com os acordos, danos aos menores e famílias; o declarante foi assim destituído por causa de sua *"opinião"* profissional para "não serem assinadas as propostas e acordo" ! ; e foi substituído, *"sem ônus para o Cliente"*, por *"advogado ( gratuito ) indicado pelos Americanos"*; o declarante, nesta data, encaminha ao digno Presidente da *Ordem dos Advogados do Brasil*, Seção de São Paulo, denúncia a respeito dessa violação de estrangeiros na intocabilidade da advocacia pátria, indispensável à administração da Justiça, *"sendo inviolável por seus atos e manifestações no exercício da profissão"*, art. 133 da Constituição da República; muito desse sofrimento judicial às famílias só ocorre por causa da corrupção que as famílias denunciaram, em audiências, a dois Ministros da Justiça: Renan Calheiros e José Carlos Dias, amplamente fotografadas e publicadas pela Imprensa - mas em vão; é que o fiscal do governo, o IRB, o antigo *Instituto de Resseguros do Brasil*, que tem a função pública, legal e constitucional de fiscalizar, para proteção dos segurados ou, se mortos, de suas famílias, a liquidação judicial dos grandes sinistros, tem, o fiscal IRB, repita-se, na mesma causa e em processos diferentes, simultaneamente, como advogado, o mesmo advogado da Unibanco Seguradora e da TAM, o que tipifica o crime do art. 355, § único, do Código Penal; o ilustre Ministro do Egrégio Superior Tribunal de Justiça, Sálvio de Figueiredo, enviou, *de ofício*, expediente para o Procurador-Geral da Justiça de São Paulo tomar as providências cabíveis sobre essa tergiversação que tanto prejudica, como se vê por suas ramificações internacionais, tantas famílias de vítimas, mas o Promotor de Justiça pediu o arquivamento do Inquérito Policial porque, alegando que consultara não citados civilistas *(sic)*, fiscal e fiscalizadas não são partes "contrárias" nos processos, todas tendo o mesmo intuito de protelar ao máximo ( sic ) as indenizatórias, o que "parece imoral", mas não é tipificado; renomado Professor de Direito Penal das Arcadas, porém, está pronto para entregar ao declarante parecer no sentido de que a tipificação é perfeita e que as "partes contrárias" não precisam ser, necessariamente autor e réu, podendo, embora no mesmo polo processual, ter interesses

contrários, como é rica a jurisprudência dessas claríssimas hipóteses
análogas nos conflitos de interesses muitíssimo menos frontal do que o
necessariamente constante entre fiscal e fiscalizadas, com o agravante de
que o fiscal tem aí específica função pública essencial, em prol dos segurados
hipossuficientes, por expresso princípio, traído, da Constituição da
República; e não finalidade de lucros, como o conflitante fiscalizada, a dano
concreto e difuso, como se constata aqui; o declarante confirma que a
*Speiser Krause* é muito competente em direito aeronáutico indenizatório e
só começou a desconfiar de seu lado podre quando, após três anos de
intenso trabalho judicial em conjunto e freqüentemente acompanhado pela
Imprensa, para processar a *Northrop*, a *TAM*  e outras empresas
estrangeiras, os Ballen começaram a ter certas conversas esquisitas; como,
por exemplo, a insinuação feita numa praia no Rio de que o declarante, se
apoiasse o acordo tal como ele viesse, então em breve, dos USA, poderia
ganhar dinheiro para nunca mais se preocupar com a aposentadoria, ao que
o declarante respondeu que, sendo Promotor de Justiça aposentado, não
tinha preocupações com a aposentadoria; Arthur não gostou da resposta;
mas a primeira e grande decepção ocorreu logo no início dos trabalhos
quando Arthur fazia os depoimentos das viúvas para *"demonstrar aos
jurados da Califórnia* – que irá julgar agora em abril o caso - *o sofrimento
das famílias, para o arbitramento das indenizações"*; ele afirmava que, se
não houvesse acordo com a *Northrop*, as famílias talvez tivessem de ir à
Califórnia, com todas as despesas pagas pela *Speiser Krause*, para os
depoimentos ao Júri; mas, para efeitos de tentativa de acordo, talvez
bastassem depoimentos gravados em vídeos; as gravações começaram numa
sala do *Hotel Maksoud Plaza* e com profissionais de câmara de televisão,
mas, depois de aceita a idéia pelas famílias, logo continuaram, para maior
"realismo" aos jurados da Califórnia, nos próprios lares das famílias já
dilaceradas; o declarante e a Duda, serviam como intérpretes; a longa
gravação era extremamente dolorosa: a viúva ia respondendo às perguntas
de Arthur, descrevendo os detalhes íntimos desde sua juventude, aspirações
e planos familiares, até o instante da tragédia e, quase sempre chorando,
detalhando os prejuízos materiais que as famílias sofriam; a pior parte era
do sofrimento moral  dela e dos órfãos, as incertezas do futuro, e demora
dos processos, tudo para, dizia Arthur, transmitir os jurados da Califórnia a
veracidade dos  sofrimentos; muitas colocavam os órfãos no colo e
conversavam com eles; depois de umas 15 dessas sessões emocionalmente
muito desgastantes, Arthur delegou ao declarante a tarefa, o que facilitava
tudo porque toda a entrevista passou a ser feita diretamente em Português
para, depois, a *Speiser Krause* mandar legendar em Inglês, para os jurados;
após umas seis dessas gravações só com o declarante, Arthur terminou com
elas dizendo que aqui tudo era *"bullshit"* - porcaria que se joga fora – *"mas
elas* (as viúvas) *gostam disso"*; o declarante sentiu asco daquele inominável
sadismo apenas para, cruelmente, captar clientes com ilusões desumanas
mas, como na fase atual de divergências sobre os acordos, tentou, para
benefício das famílias, e já que semelhante encenação abjeta não se repetiria
mais, equilibrar os interesses – às vezes ocultos e em conflito - para a
prioritária indenização final razoável; o declarante se prontifica a se
submeter à máquina de detectar mentiras; de modo que o declarante
compreende, como várias famílias, por intuição, de há muito desconfiavam:
que as 65 famílias suas clientes são hoje as primeiras vítimas dessas
armadilhas da *Speiser Krause*  que permitem a todos apenas uma parte do
que  têm  direito, sendo tudo, com a impunidade da tergiversação,
criminosamente controlado por essa firma de advocacia, capaz mas capaz de
trair as famílias brasileiras para vantagem indevida das empresas e dela
própria; parcela de contribuição para esse estado de coisa pode ser atribuída



a certas inexplicáveis delongas judiciais no cumprimento, por exemplo, da execução, contra a *TAM* e Unibanco, das tutelas antecipadas, concedidas pelo Egrégio Primeiro Tribunal de Alçada Civil do Estado de São Paulo, como "direitos alimentares" e, como já dito, em até 80% do valor dos vencimentos do respectivo morto, e retroativas - essas pensões mensais já acumuladas há quatro anos - à data da tragédia, sendo que há mais de ano e dois meses, um Curador pediu que Rolim Amaro depositasse em cinco dias o devido ou teria de responder pelo crime de desobediência, e até hoje nada, apesar de mais de 20 ( vinte ) pedidos para o depósito e levantamento a favor de nove famílias; nos Estados Unidos, na última semana, soou como grande surpresa que as famílias ainda não tenham recebido o dinheiro, porque a notícia que circula nos meios forenses americanos é de que o acordo, com as famílias brasileiras, fora fechado de há muito, o que leva confirma que a *Speiser Krause*, primeiro, fechou, sem qualquer consulta às famílias, sobre os valores e suas condições, um acordo com a *Northrop, TAM* e outras empresas – *Deus ou o diabo sabe lá como* – e depois tem de "encaixar" as famílias no pacote que chega ao Brasil, pelo que se calcula – e nunca relevado pela *Speiser Krause*, em torno de US$ 40,000,000.oo para ser dividido entre as 65 famílias; tanto que nos Estados Unidos, ao se saber do impasse no Brasil, imediatamente pensou-se, muito contra os valores dos brasileiros, que as famílias estavam se degradando entre si, cada uma tentando obter uma fatia maior do todo, o que foi prontamente desmentido; conhecendo o extenso *curriculum* de tragédias aéreas "resolvidas" pela firma em países em desenvolvido e subdesenvolvidos – que o declarante exibia aos clientes e nos autos – este não pode imaginar quantos outros escândalos como esse não floresceram, por falta de uma boa denúncia comprovada, ao redor do mundo sobre os cadáveres das vítimas, famílias e órfãos vítimas de uma segunda tragédia, a indenizatória, enganados por quadrilhas que em Português ou noutras línguas só falam a palavra "money"; improvisadas com coadjuvantes locais, igualmente tergiversadores em meio à corrupção administrativa e quebra das regras éticas e de deveres expressos do Estatuto da *Ordem dos Advogados do Brasil* e do Código Penal, todos de colarinho branco e beca preta num esquema de cultura não escrita, exceto com o sangue dos mortos: seguradoras e empresas multinacionais contra famílias, Judiciários e leis fragilizados pela impunidade, e contra advogado honesto; uma *gang* de bacharéis competentes e mal intencionados, sobressaindo deste *complô* a exceção de muitos, como o inocente Thomas Frizzell; o declarante pensa que *estourar um aparelho desse* - que gira em torno da *Lloyd's*, de Londres, e, aqui, do poder da *Northrop* - com a ajuda da *FBI*, que tanto nos acabou de ilustrar sobre a cooperação internacional contra o ilícito transfronteiras, e juízes dignos dos Estados Unidos, seria, pensa, profilático muito além do Brasil e da América; a profilaxia começou quando, após ser notificado pelo Cartório, documento anexo, Arthur retornou ao USA e, consta, encontra-se em Londres; em abril, na Califórnia, começa o Júri; se as famílias estiverem lá, e Arthur, não, a profilaxia da lei terá imperado.

*"Aos grandes não dêem o dos pequenos"* (Camões).

De Campinas para São Paulo, 12, outubro, 2000.

*Dia das Crianças* - mais, porque órfãos.

*Renato Guimarães Jr.*

LEGAL TRANSLATION SYSTEMS
P.O. Box 15, New York, NY 10044 USA (212) 629-4541 academictranslations.com
e-mail: carlosdepaula@mindspring.com

# RENATO GUIMARAES JR

J.D. (USP), UNICAMP Professor
Master of Comparative Law, GWU, IASP

October 16, 2000

Hon. Rubens Approbato Machado
President of the Brazilian Bar Association

Sao Paulo Chapter

Hon. President

OAB, like all citizenry, supports the families of the 99 persons deceased in the TAM tragedy, since the Human Rights Commission approved a strong motion against the Air Force, which denied the Judiciary access to the Accident Report, until now that the CAAP supports families out of Sao Paulo.

The OAB should, however, take urgent action: American attorneys, who were retained with the signatory hereof by the 65 families that sued Northrop et al in the United States, under a power of attorney dated April, have obtained from the vast majority of the needy families, mere authorizations to make mediocre settlements for payment within 20 days thereof, under uncertain conditions.

The Hon. Judge of the 2nd Civil Court of Jabaquara sentenced Northrop Grumman Corporation, the world's largest war plane manufacturer, that manufactured the reverse which helped bring the plane down, to indemnify each family to the tune of RS2,000,000, for moral damages alone, in addition to material damages. And Northrop was held in contempt of court, because it failed to comply with the requirements of the First Court of Appeals. In June the settlements have yet to be renegotiated.

However, not only did the foreign attorneys insist in not raising the amounts of the proposed settlements, whereunder zero is being paid for moral damages, but they also insist, under brutally illegal conditions, to illegally pressure several families to fire this Brazilian attorney, alleging that his legal advice, contrary to the settlement, is considered an "obstacle". Examples of terms: (a) payment, 20 days after the dismissal of the legal actions, to be made... in Texas, USA, and to third parties; b) the parties pay Northrop's 20% attorney retainers, etc.

The Trial by Jury handling the damages in California is scheduled for April, next year, and as far as I know, to this date the Jabaquara sentence has not been filed with these proceedings, which suspended the Brazilian's admission to Trial by Jury, which therefore, would only deliberate upon the damages for the American family. The settlement would be another tragedy. There is a suspended request of intervention by the Brazilian Attorney General's office.

**LEGAL TRANSLATION SYSTEMS**
P.O. Box 15, New York, NY 10044 USA (212) 629-4541 academictranslations.com
e-mail: carlosdepaula@mindspring.com

The only word the Americans speak in Portuguese is "money". The text of the settlement, we have confirmed, was prepared by TAM's attorney, who has been accused by the widows, during a hearing with two Ministers, Dias and Caleiros, of prevarication, as he also defends the regulatory authority IRB and the inspected company, Unibanco, at the same time. Arthur and Leigh Ballen are at the Maksoud Hotel today.

The illustrious professor Irineu Strenger, from USP, and the signatory, were entitled to maximum fees, under the Northrop judgment, according to article 20 of the CPC. The legal profession, the families and about 100 orphans must be protected in Brazil against coercion and the interest of foreign attorneys, who deny evidence. Again, mr. President, accept my regards and consideration

## FIRST VICTIM'S STATEMENT
To be ratified and updated in Court

The writer has been, since February 5, 1997, in charge before the law firm Speiser Krause, specialized in airline crash damages, for legal actions brought in the USA by 65 families of victims of the crash involving the TAM Fokker 100, that crashed in Jabaquara, killing 99 people. The professional relationship between the writer and Speiser Krause were excellent and productive until January of 2000, when the writer obtained in Holland a report from the Fokker bankruptcy receivers, which proved TAM's, Northrop and other co-defendants' bad faith, because, while, before the Brazilian judges they tried to blame one another, before the Dutch judge they were forming a pool to pay the deceaseds' families. Thus emerged, for the first time, settlement proposals and growing divergences. The engineering professor Fernando Lobo Vaz de Mello, who lost a child in the accident, tried to obtain details from a colleague at Fokker, who had promised to the writer, in January, to provide details about a letter whereby President Rolim included - and the Air Force adopted in its official report - the lie that Fokker had waived pilot training for any eventual failure of the "reverse" in open air. Speiser Krause, strangely, having been informed by (Fokker) about the query - asked Prof. Vaz to "stop messing with the subject", because these could harm the settlement negotiations. Prof Vaz contacted the writer about this hindrance, and the latter advised him to postpone his research, in order not to harm several families that need - today, more than ever - the settlement money. After intensive consultations with the signatory, concerning details about each family and their expectations of feasible settlement offers, Speiser Krause, in April, came with proposals, which were disappointing, not only in regards to the amounts admitted by the Brazilian Judiciary, but also in comparison to the high amounts that Arthur Ballen, from that firm, had calculated for each family when they signed the retainer agreement with Speiser Krause, and the informant. Speiser Krause's method of presenting the settlement offers to the families, contrary to the writer's advice, were offensive. Instead of doing it at Hotel Maksoud Plaza's Business Center, in Sao Paulo, where the meetings for signing the retainer agreements with the 65 families had been held, the new meetings were held, "to save money", in Arthur's private room, in a very embarrassing room connected to the bedroom. Another embarrassing method: Arthur and

**LEGAL TRANSLATION SYSTEMS**
P.O. Box 15, New York, NY 10044 USA (212) 629-4541 academictranslations.com
e-mail: carlosdepaula@mindspring.com

his son Leigh Ballen, the attorneys who went to Brazil more frequently to handle the case in Speiser Krause's name, insisted that each family should not tell the others about the settlement offered, which violated the spirit of comradery that united the families, the common pain and battle for their rights. Another example: the calculations of each proposal were not shown to the family, who only received from Leigh the amount of a possible settlement. However, what shocked the writer the most, from a professional point of view, under this environment of secrecy, was the initial information provided to each family that the Brazilians were about to lose the USA case, which took the writer by surprise, as he had always been informed that our chances to prevail in the USA were 75%. Also unacceptable was the statement that all 65 families had to accept the settlement, subject to harming all proposals and "the Brazilians would miss out on the offer and have to wait years to receive the indemnification in Brazil". This unanimity was soon changed to "almost all". But the most serious disputes began when the writer had warned several times by fax, since February that the proposals had to be clear as to who would pay the retainer of the Brazilian colleagues who had been working on the case for over three years, in different contracts, in the 65 cases brought against TAM in Brazil. Anytime the writer, the family or the attorney he trusted mentioned the issue, Arthur stated that that was not his problem, this was a problem between the family and its attorney, and that he would not discuss the matter. To make matters worse, the situation of all Brazilian attorneys that had recommended to the families to try the U.S. Courts became uncertain, as were, and still are, entitled to 10% of Speiser Krause's fees paid exclusively by that firm, rather than the writer - a right that the writer had been authorized to confirm to all Brazilian colleagues, in the early stages of contract signing. This confirmation was celebrated in a large meeting between Arthur, the writer and dozens of illustrious Brazilian attorneys representing each individual family, generally those handling the probate proceedings, including several law professors. Thus, after every meeting the relationship between the writer and the Ballens deteriorated, especially when considering the amounts. Arthur determined the writer would take part only in meetings with 26 families that were clients of the writer in the case against TAM in Brazil, which soured the relations with the other 65 families, whose attorneys often requested the presence of the writer, who was better informed about what was occurring in the USA. The families also reacted with indignation, but because of their financial needed, ended up, reluctantly, authorizing the proposals, to be accepted, homologated and paid within at most 2 months if the foreign companies, including Lloyd's of London, TAM's insurer, confirmed. It became evident to the families, for the first time, that there was a strong divergence between Speiser Krause and the writer, who refused to agree with the offered amounts and the way in which the families were being forced to accept the proposals. There was no possibility of counterproposals. Such confusion grew, when the families resisted having to pay from mediocre settlements, two or even three attorneys, especially when the colleague, trusted by the family, was entitled to 10% and was not the attorney in charge of the damages case brought against TAM in Brazil, which under the settlement would need to be withdrawn. After much crying, literally, and sad disagreements, Arthur had to give in to the families' arguments, who were victimized by the lack of transparency of information. Thus there were "sub-agreements", practically "agreements made according to client's situation", for instance, if the family comprise a widower or parent that was not a dependant of the deceased, there was greater resistance,

**LEGAL TRANSLATION SYSTEMS**
P.O. Box 15, New York, NY 10044 USA (212) 629-4541 academictranslations.com
e-mail: carlosdepaula@mindspring.com

and Speiser Krause had to take upon itself to pay other attorneys' retainers. If there was less resistance, the payment would be split 70% to 30%. If there was no resistance, for instance, a widow, would pay 100%, a great lack of uniformity, and inhuman. These discrepancies would soon become common knowledge. Widows were destroyed, some rightfully offended Arthur and his son, some on their faces, some in the back. Arthur was very nervous and accused some widows of having signed, right after the tragedy, the settlement offer made by TAM and Unibanco, in the amount of US$145,000.00, which was recognized by the Higher Court as subject to annulment. Five Federal Prosecutors considered these settlements to be void, and that the defendant would need to pay damages again. Some cried, trying to justify the voided US$145,000.00 settlement, due to desperation at the time of death. Arthur then answered that the new offer was a "gift", a "miracle". One widow (Vanessa), upon being informed of the proposal, asked "are you my attorneys in the USA or do you represent the companies?", to which Leigh replied "you don't need to offend us, simply accept the proposal", which, they insisted, was "excellent", in light of the possibility of losing the case in the USA. To this day, more than 6 months later, nothing was lost in the USA. The writer was troubled as to why Northrop wanted to pay the families, if indeed it had great chances of prevailing in the USA, to which Leigh replied that these were "different perspectives". Another impressive information: Speiser Krause itself had reported, and the writer informed the press at the time, that a childless widow had made an agreement, under the same case filed by the Brazilian families in New York, for over US$3 million, with Fokker alone. The action against Northrop continues to this day. Therefore, what was supposed to be a happy or reasonable end for this long judicial battle, caused by a highly traumatic event, ended up being another problem: the writer, trying to reconcile what seemed to be the lack of understanding of the Ballens and the injustice to the families, who needed the money so much, ended up with stress - a condition he had never suffered in 62 years of life, having to be checked by the hotel's medical service, followed by tests and treatment. Arthur said "Renato, don't rock the boat", to which the writer replied "this boat is going to overturn, like a Titanic". When the writer explained to Arthur that several widows preferred a more laid-back approach, receiving monthly "maintenance" payments corresponding to almost 80% of the deceased husband, retroactive to the date of the tragedy, rather than a lump sum, as they feared they would end up losing money if this lump sum were invested, Arthur shouted, giving away his intentions "are they afraid of money? Then give it to me". The peak of the disagreements was when Leigh failed to convince the writer with his argument, rather using the New York stock market indexes and the slow Brazilian judiciary as arguments - while the writer tried to explain that in real life, these widows had to contend with the orphans' crying, far from investment theory, and that the widows were not specialized in international business, most of them were housewives who relied on others for their financial decisions, although they might hold college degrees. Leigh promised to prove his point of view with an expert economic report, which, like several other promised documents, he never did produce. Then he began to interrogate the writer, forcing him to answer yes or no to questions such as these: "Did you advise family "x" to refuse the settlement -yes or no?. There were two such interrogation sessions, one before the widow Sandra Assali, president of the Family Association, which the writer believes, but is not sure, left the room in the midst of that high pressure spectacle, and another session, I am sure, in the presence of Ana Beatriz,

**LEGAL TRANSLATION SYSTEMS**
P.O. Box 15, New York, NY 10044 USA (212) 629-4541 academictranslations.com
e-mail: carlosdepaula@mindspring.com

Duda, sister in law. She is a business administrator and nuclear physicist, whom Speiser Krause hired to assist all families, in one of Arthur's first trips to Brazil, at the advice of the writer, who was having problems in handling all families, who sought him in greater numbers, based on public recommendations made by the writer. These families were interested in trying to file a case in the USA, through the writer and Speiser Krause. The writer prepared to clarify the matters once and for all, on a third interrogation that ended up not taking place, due to the deterioration of relations. This was good, because it did not result in a breach of relations, allowing the writer to discover more things. The writer suspected the Ballens began to work on behalf of the interests of the companies, rather than the families, which was confirmed when he saw TAM's attorney, Luis Eduardo Arena Alvarez, leaving the hall of the Maksoud Plaza hotel, on the very same day in which meetings would be held in Arthur's room. Thus, when the draft of the settlement was submitted to the writer, in July, I had no doubt that the settlement had been written by TAM's Dr. Arena, assisted by another TAM defense attorney, Lino Pereira da Silva, defendant in this case. I was sure of this, due to his silence in several cases and in the hearing held in October, in the 28th Civil Court of the Capital. This has been stated in the accusation made by the writer to the Federal Prosecutor's Office, to avoid harm to the families. Gradually, the families that had been working together for more than 3 years in the Association they founded, began to divide radically: most accepted the settlement "to end all of this confusion, we can't stand it anymore, because nothing will happen in Brazil", and the minority rejected the settlement "because it is too little, in light of what the Ballens promised". The latter were determined to wait a little more, in Court cases, or would try to get a larger settlement. More than 20 days passed, and the money from April's settlement did not come to Brazil, widely disclosed to clean TAM's image in the press, involving amounts of up to $800,000.00, as reported in Folha de S.Paulo and Estadao de S.Paulo. The writer filed an injunction, which hold TAM responsible in case there were kidnappings, especially of orphans, as some of the widows were apprehensive and in panic. No doubt stimulated by TAM, some interviews with widows were broadcast, who claimed to be positively surprised with the "speed of the U.S. Judiciary", according to a TV Globo Jornal Nacional 11 P.M. broadcast, during May, a tape of which was requested by the writer and placed at the disposal of the Judiciary. The name of Arthur Ballen appeared on the newspaper - to the writer's surprise, as Ballen always requested confidentiality. In fact he praised the report. This change of behavior, from requiring confidentiality to praising reports could only be explained through the writer's growing opposition of the settlement, which Speiser Krause attempted to undermine through public pressure against the needy families, downplaying the writer's cogent and careful position. The writer was almost convinced that Speiser Krause was working on behalf of the companies, rather than the families, and went to New York with his son Gustavo Orlando, making a surprise visit to Speiser Krause. The writer believes it was a blessing from God that the attorney who heads the Brazilian families case, Frank Granito III, was absent that morning and that he and his son were seen by attorney Thomas Frizzell, who was responsible for gathering evidence against Northrop, for submission to the California Jury scheduled for next April. Like almost all at Speiser Krause, who are also Aviation graduates, generally pilots or engineers - except the Ballens, who are neither Pilots or Engineers - Thomas was very happy to meet the writer and his son, and began to describe, with pride and in great technical detail, something the writer and his

**LEGAL TRANSLATION SYSTEMS**
P.O. Box 15, New York, NY 10044 USA (212) 629-4541  academictranslations.com
e-mail: carlosdepaula@mindspring.com

son understood superficially. He, Thomas, had managed to prove Northrop's fault, through interrogations and technical reports, for purposes of damages. In short, Thomas explained that Northrop's fault - the largest warplane manufacturer of the world, with an annual profit of US$ 9 billion - did not generated an objective liability, from a manufacturing defect, as originally thought, under the Consumer Defense Code, but rather, subjective blame, negligence, imprudence and ineptitude, consistent with the fact that "somebody" at Northrop, maybe with "eventual willful misconduct" had shipped to Fokker, in Holland, a "reverse" type which helped to bring the plane down - a type that would be more modern, for a more advanced Fokker 100, but was not yet being manufactured. They shipped the device without any warning to Fokker of this fatal precocity. The value of damages in the USA, as in Brazil, increases according to the liable party's degree of fault. This was the same conclusion reached, three months later, by the First Criminal Court of Jabaquara, who sent the police investigation on the 99 deaths to the Brazilian Attorney General's office: "somebody" at Northrop, with high technical knowledge, acted with criminal malice. The federal prosecutor designated in the same Police Inquiry also understood that somebody at Northrop was jointly responsible for the tragedy, but the evidence according to the Prosecutor's Office, was and still is that assigning individual fault is a gray area. When asked, Thomas stated to the writer and his son that he was responsible for the production of the evidence, and the Baliens and Granito dealt with the settlements. The writer then asked Thomas to ask some questions to Granito, which would be answered on the phone later. The writer and his son thanked him, left the office astonished with the revelation of a final evidence of civil liability in Northrop's part, and criminal liability of one or some individuals within the company. This evidence was never shared by Speiser Krause with the writer, no doubt a malicious omission, although Speiser Krause knew that the Jabaquara judges were about to decided, at any time, both the damages and Police Inquiry. Having discovered this omission, the writer decided to hire, on the same day, an attorney in the USA, to protect his rights in the USA and to advise him - a priority - as to how to attempt to increase the settlement amounts, in light of this clear refusal of evidence, which would be harmful to the families in Brazil. The writer then retained the law firm of Richard S. Peskin, where two Brazilian attorneys work: Dr. Anselmo Martini, who is New York based, and Dr. Wanderley Minitti, a well known attorney who defends the interests of the boys who were run over by Michael Jackson in a show in Sao Paulo. When the writer called Thomas later, to find out the Speiser Krause answers to questions posed by the families, the writer was enormously surprised when Granito answered the phone, and even more surprised when he went on to demoralize his Speiser Krause colleague, stating that the writer did "not do any good" by talking to Thomas, who was very "junior". Thus the writer had the confirmation, beyond a reasonable doubt, that the Brazilian families and himself were being victims of a major professional betrayal, with enormous harms to the damages that about 100 orphans were entitled to. Granito also asked the writer call Leigh, with whom he had more contact, as Granito had possibly not even been to Brazil. When the writer called Leigh, whose office is located in Washington DC, he took some time to answer, which the writer found strange as the secretary - who always put his calls through or then took a message for Leigh - asked the writer, some two or three times, to stay on the line and wait a bit more. This situation had already occurred a few times, when the conversation was important and more than one person was to participate in the

**LEGAL TRANSLATION SYSTEMS**
P.O. Box 15, New York, NY 10044 USA (212) 629-4541 academictranslations.com
e-mail: carlosdepaula@mindspring.com

"conference call", which sometimes involved three cities in three different countries. Then the secretary or the recipient asked the writer to wait a few more moments to set up the call. Knowledgeable of Speiser Krause's procedures, the writer realized his call would be recorded or heard by another person besides Leigh, probably the Washington office head, Gerald Lear, always mentioned as Speiser Krause's highest authority for this case. As soon as Leigh began to talk, the writer realized the conversation was actually being recorded and/or being heard by somebody else, as Leigh's voice had an echo and sounded very distant, as if he were far, and there was a metal sound to it. In the dialogues, Leigh was taking a long time to pronounce his words, at a different pace than his usual (which was normally fast), taking a long time to give answers, giving the impression that he was taking orders from somebody else, speaking slowly, requiring more time to give answers and giving the impression that a third person was being consulted. The powerful tone and violent discourse of the "interrogations" had been replaced by delicate and soft talk. Leigh said that he did not need to be so aggressive, seeking another attorney, and insisted on inviting him to come to Washington DC, with all expenses paid, to personally talk to Lear, who would like to share some thoughts with him. Leigh was very much interested in knowing where the writer was and in whose company he was. The invitation was not accepted, and upon returning to Brazil, June passed, and no money was sent (which has not been done to this date). No copy of the evidence of Northrop's fault was sent, or even evidence of eventual criminal malice of somebody inside Northrop. As Speiser Krause was fully aware that this evidence, which they had produced, would be of extreme value both for the action for damages as well as the Police Inquiry, which had already been designated to a Prosecutor, and the refusal to submit it to the Brazilian Judiciary constitutes a crime, provided in article 356 of the Criminal Code - attorneys that render an evidence useless - due to hiding or omission of use from the Brazilian Judiciary - commit this crime, as the evidence was required in Brazil. Speiser Krause used the company's power as an attorney to violate its fiduciary duty as an attorney, violating its professional obligation of submitting to the Court evidence that favored the families, thus harming about one hundred orphans from 65 families that Speiser Krause, and the writer, represent, a violation of article 355 of the Criminal Code. Granito threatened the writer, through Peskin, saying he would file an action for damages, should the settlement fail. This action is a violation of article 344 of the Criminal Code. In July, the Judge of the Second Civil Court of Jabaquara sentenced Northrop to pay RS2,000.000 for moral damages alone, plus 2/3 of each respective victims' earnings, up to the age in which the victim were to reach 65; Northrop was also held in contempt of Court, because it has, to this day, failed to comply with the ruling by the First Higher Civil Court of the State of Sao Paulo, failing to deposit the R$300,000.00 bond per family, an amount which the Superior Court of Justice ordered to be raised, under an injunction filed by the writer, in a special motion. The moral damages in the amount of US$1,111,111.11 are greater than all settlements proposed, and more than double one half of it. The historical judgment is highly acclaimed by lawyers, sought by authors and publishing companies, studied in law schools and one of the few found in full on the internet, on the civil liability site www.jurinforma.com.br, that features over 100,000 court rulings. Speiser Krause, rather than taking this Brazilian judgment to the Courts in California and new York, where the Brazilian family actions are suspended to this day, awaiting a decision in Brazil against Northrop, or at least increasing some settlement proposals in Brazil,

LEGAL TRANSLATION SYSTEMS
P.O. Box 15, New York, NY 10044 USA (212) 629-4541 academictranslations.com
e-mail: carlosdepaula@mindspring.com

unbelievably began to attack the Jabaquara judgment, providing an apocryphal opinion stating that the Brazilian Judge violated guarantees to which Northrop, as a foreign entity, non-resident in Brazil, article 5 of the Federal Constitution, was not entitled to, and telling the widows the sordid version to the effect that the judgment "harmed" the settlements and the sordid statement - written by Speiser Krause to illustrious USP Prof Irineu Strenger, who signed the petition with the writer - to the effect that the April settlements would not be increased due to the judgment! On the one hand, for the families Speiser Krause tells the RS2,000,000.00 moral damage judgment is worth zero, however, for it and Northrop it clearly means a lot: the crime of prevarication, according to article 335, sole paragraph of the Criminal Code, which again emerges! The writer filed, on July 26, in the Brazilian Attorney General's Office, under MP-57993/00, a request for Civil Inquiry, to prevent settlements - which text he had just become aware of, and which had already been signed by his clients - harm about one hundred orphans, and diffusely, all family members of the deceased consumers, due to absolutely illegal and unfair clauses of the document, wherein some writer clients, without the latter's knowledge, as mentioned, and certainly several other families, ended up signing off on the Ballen's untrue information. None of the illustrious attorneys who advise the other families are aware of the complex legal actions in the USA, due to lack of information by Speiser Krause, so they are unable to discerningly analyze the indemnification potential, and thus advise their clients properly, clients that do need money soon. In addition to that, the Brazilian judiciary is known for being very slow, although the Jabaquara court was already executing the provisional maintenance order, owed since the tragedy, in addition to some other remedies, which are already late. This lack of transparency towards the 100 orphans that suffered such tragedy is almost inadmissible, when the Speiser Krause prevents the writer, as Brazilian attorney in charge, to convey the information and provide advice to the families, which is his legal duty, according to the 65 powers of attorney that were granted by these families, jointly, to the writer and Speiser Krause. The writer is being accused by several widows, including in writing by an eminent Federal Prosecutor from Brasilia, who is a widow's son in law, of failing to provide essential information and advice to all 65 families. The writer was having to remain almost quiet and ommissive during the settlement meetings. The families do not know the reason for such behavior: an attitude that, were it not caused by conflicting major coercion, characterized by opposing conduct, could generate both civil and criminal liabilities, in fact, exclusively and maliciously hidden by Speiser Krause. One or two days after the filing in the Prosecutor's Office, in a meeting held in the office of Dr. Luiz Roberto Arruda Sampaio, a friend of Arthur's, at Rua Benjamin Constant, who at the time was attorney for one of the families, who served as interpreter and intermediary, the writer, in the company of Dr. Minitti, gave Dr. Sampaio a copy of the Federal Attorney's General filing, which was translated to the Ballens, with the purpose of preventing the settlement which would cause enormous harm to the orphans and families. At night, on the same day, or the following day, upon arriving in my office in Campinas after attending this meeting in Sao Paulo, the writer found two messages in his answering machine, left by Leigh to the writer, claiming that he and his father had "unusual news", saying that they required that Northrop increase the settlement amounts due to the "judgment you obtained in Jabaquara" and that they would have Northrop's answer on the following week, at which time they would return to Brazil to work with the writer,

**LEGAL TRANSLATION SYSTEMS**
P.O. Box 15, New York, NY 10044 USA (212) 629-4541 academictranslations.com
e-mail: carlosdepaula@mindspring.com

their arrival date yet to be notified. <u>This recording is at the disposal of the Judiciary.</u> Immediately, on July 31, the writer requested the suspension of this request before the Prosecutor's office, due to the possibility of consensus with the Ballens to modify the clauses (of the settlement), a possibility that was aborted later. The Ballens would return to Brazil another three or four times, always trying to obtain the acceptance of the April settlement from all families, who continued to reject it, and getting farther and farther from the writer. Once more Speiser Krause "forgot" to notify it was trying to meet, as it had been deliberately doing, with the families that were and are 26 clients of the writer in Brazil, in the legal actions against TAM. The writer has the conviction and evidence that none of the families doubts that he has been fighting to increase the value of damages, in licit, quick and enforceable settlements, but also believes that they prefer to receive less - how much less is questionable - rather than relying on the Brazilian's judiciary delays (they are correct in believing the Judiciary is slow). Thus, they end up being victims of powerful and shrewd Speiser Krause, who has being flaunting quick money, payable in "twenty days" since April, which hinders the possibility of dialogue between the writer and 65 common clients. The firm also conveys a false image of the writer, calling him a "troublemaker", without allowing him to defend himself. Dr. Minitti began to negotiate with Northrop's attorneys in Brazil, Pinheiro Neto, who claimed to be authorized by Northrop to receive any counterproposals, who presented to the writer the settlement values for all 65 families. Speiser Krause always refused to give this information to the writer, except that concerning the 26 families who are represented by the writer in Brazil against TAM. Dr. Minitti made a counterproposal, to increase the settlement's amount by 50%, except in certain special cases, when greater amounts were required. Soon after Speiser Krause distributed to the families a letter from Northrop's insurer - not from the defendant, Northrop, which had a judgment against it - stating that the matter would only be handled through Speiser Krause, and that no one else would be authorized to discuss this matter with the writer or any other person. Speiser Krause, on the other hand, reported to the families that it dot share the writer's position, which called for increasing the amount of the settlement. Once more, it became clear that Speiser Krause defended Northrop's position against the interests of the families, who shared the writer's attitude, to wit, trying an agreement with Pinheiro Neto, through Dr. Minitti. On the 21st of the last month, during the I World Prosecutors Conference, the writer, introduced by the International Affairs Police Sheriff Mauro Marcelo Lima e Silva to the FBI's Deputy Director, Thomas J. Pickard publicly asked the FBI to cause Speiser Krause to do what it had a professional obligation to do a long time ago: deliver to the Brazilian Judiciary a copy of evidence of fault of Northrop, produced by its attorney Thomas Frizzell. This piece of evidence is essential not only in connection to the final judgment in Jabaquara, under appeal by Northrop, to stand, or be increased in the Court of Appeals of Sao Paulo, but also to enable the Prosecutor, who is handling the Police Inquiry concerning the 99 deaths, to decide whether article 28 of the Criminal Procedure Code should be applied to this case, concerning the facts and available evidence. Finally, several meetings were held with the Ballens, their advisor for Central America, Pedro Luis Marroquim, from Guatemala, Dr. Minitti, Marcelo Augusto, who is the writer's son and by the writer himself, and sometimes, involving two parties, the last such meeting involving Leigh and Marcelo, when the latter stated several times that his father was more motivated by reputation than money. The Ballens began to voice concern about attorneys fees payable

**LEGAL TRANSLATION SYSTEMS**
P.O. Box 15, New York, NY 10044 USA (212) 629-4541 academictranslations.com
e-mail: carlosdepaula@mindspring.com

to prof Irineu Strenger and the writer. In one of these meetings, Arthur, after discussing the fees, called the U.S., in a very docile tone, and in a conversation in which he was more of a hearer than speaker, with a so-called "Professor" from Northrop, he stated, with relief, that Northrop authorized Pinheiro Neto to negotiate the Jabaquara attorney's fees with Dr. Minitti, to facilitate an agreement. According to Dr. Arena Lino's text, the families would bear such burden - a "monstrosity", according to the writer. Another issue that was not solved was the location and time of payment to the families. Under the unbelievable clause 1 of the Dr. Arena-Lino text, the payment would be "made" twenty days after all actions were terminated, through a deposit in Texas, USA, where the families do not have any pending legal actions, in an account of a firm affiliated with the Ballens, with unlimited powers of waiver, transaction etc. Upon hearing that in Brazil one signs (agreements) with the right hand, and receives the money with the left - otherwise the agreement remains in Court, thus, waiting the arrival of the London money for "twenty days", or, more common, installments of a valid transaction etc - Arthur had enough sense of humor to suggest, as an alternative, that the money should stay with TAM, because Northrop believes that the deposited money "disappears" in Latin America. In our latter meetings, the Ballens always promised high sums - which were increased as they were refused, not due to their value, but rather, moral principles and the contract that ensured the payment of the writer's fees - to convince the writer to induce his clients, with favorable professional advice, to accept the settlement - which, according to the evidence, is a violation of article 171 of the Criminal Code. On the other hand, they emphasized how much the writer would lose if the settlement failed, threatening that several clients would be told to consider the writer's attitude as an "obstacle" for agreement, and would end up firing the writer as their attorney, a fact that did end up happening six times, as a result of malicious information provided by Speiser Krause, to families that desired quicker money. This is a violation of Article 344 of the Criminal Code. Dr. Minitti and Marcelo, and the writer, participating in one of these meetings one last time, intensely focused on increasing the proposals for the families, letting it clear that the fees object of the contract could not be adjusted, higher or lower. The Ballens, in addition to the threatening the material and moral loss of the above mentioned 26 clients, revealed - as a last resort to force the writer to accept the April proposals, disregarding the Jabaquara judgment - a lie that the writer's name appeared in only one half of the 65 contracts, with the 65 families, thirty something contracts, therefore, the writer would be entitled to about half of his fees, for his work in this case - publicly notorious in three and one half years - of the 65 indemnifications payable to the families in Brazil whom he represents with Speiser Krause in the USA. This crime is a violation of article 298 of the Criminal Code. Having used all possible threats, and the consummated falsification of the contracts - Speiser Krause managed to cause that 6 of the more desperate 26 families fire the writer as their attorney - exhausted by their economic needs and conflicting information about possible settlements, with the promise of receiving their money in 20 days, after April. The reason was that the writer was allegedly an "obstacle" for the settlements. 25 days after the firing, such settlements have not been paid nor recorded in Court, that is, almost one week after the promised 20 days. This shows that indeed the writer was not the "obstacle". According to the enclosed document, a standard letter used by the families to fire the writer, as threatened by Speiser Krause - I quote "proof of delivery through a Notary or telegram with copy...becoming aware...of his opinion

**LEGAL TRANSLATION SYSTEMS**
P.O. Box 15, New York, NY 10044 USA (212) 629-4541  academictranslations.com
e-mail: carlosdepaula@mindspring.com

(sic) that the proposals and settlement should not be signed...justified in light of the several obstacles presented by you that prevent the formalization of a settlement proposed by the American attorneys hired to file the damages action in American Courts....this is the attorney indicated by the Americans, to sign off on the settlement, therefore, there will be no burden to the Client." The name of the attorney that appears in the document as "the attorney indicated by the Americans to sign-off on the settlement" is the same that read and translated for the Ballens, as described above, the copy of the filing to the Federal Prosecutor's office, to avoid harm to the minors and the families. Therefore, the writer was fired due to his professional "opinion", "against signing the proposals and agreement" and was replaced, "without burden to the Client" by an "attorney (free) indicated by the Americans". The writer hereby submits to the President of the Brazilian Bar Association, Sao Paulo Chapter, an accusation of this violation of the Brazilian profession by foreigners, which is indispensable for the dispensation of Justice, " whose acts and professional practice are inviolable" , according to Article 133 of the Brazilian Constitution. Much of this legal suffering occurred due to corruption, which was reported in hearings, to two Justices, Renan Calheiros and Jose Carlos Dias, amply photographed an reported in the press, but in vain. The reason is that a governmental regulatory agency, the IRB, the former Brazilian Reinsurance Institute, which has the public, legal and constitutional function of overseeing the legal liquidation of insurance claims, to protect insureds, or in case of death, their families, is simultaneously represented, in this case, and other cases, by the same attorney as Unibanco Seguradora and TAM, a violation of article 355, sole paragraph of the Criminal Code. The Hon. Justice of the Higher Court of Justice, Salvio de Figueiredo, sent a memo to the Sao Paulo State Prosecutor to take applicable action concerning this prevarication, which harms several victim families, as we can see by their international implications. However, the Prosecutor closed the police Inquiry, alleging that he had contacted unmentioned civil attorneys (sic), who claimed that a regulatory agency and a party subject to it are not conflicting parties in litigations, as both have the aim of postponing as much as possible the payment of claims, which "seems immoral" but in fact is not so. A well known Criminal Law professor is ready to provide a legal opinion to the effect that such is not true, and that "opposite parties" in civil proceedings are not necessarily only a plaintiff and a defendant, and several other parties may have opposing interests in a case, and that jurisprudence has clear precedents of conflicts of interest which are even less clear than that between a regulatory agency and those the agency regulates. Much more serious is the fact that the agency has an essential public function, in favor of the needy insured, according to a constitutional principle, and it does not have a profit motive, like the regulated party, a concrete and diffused damage. The writer confirms that Speiser Krause is very competent in aviation crash damages, but began to suspect it had a dark side when, after three years of intensive joint legal work - often reported in the press - suing Northrop and TAM and other companies, the Ballens began to have unusual conversations (with the writer). For instance, they insinuated at a beach in Rio, that if the writer supported the settlement in the form soon to be provided from the USA, (he) would make so much money that he would not need to worry about retirement. The writer answered that as a retired Prosecutor, he did not worry about retirement. Arthur did not like the answer. The first and major disappointment happened in the early phase of work, when Arthur was taking the widows' depositions to "show the California jury - who will hear in the case in April -

**LEGAL TRANSLATION SYSTEMS**
P.O. Box 15, New York, NY 10044 USA (212) 629-4541 academictranslations.com
e-mail: carlosdepaula@mindspring.com

the suffering of the families, to establish the damages". He said that if no settlement was reached with Northrop the families might have to go to California, with all expenses paid by Speiser Krause, to make depositions to the Jury; however, for settlement attempts, the video taped depositions might suffice. The recordings were done at a room at Maksoud Plaza, with TV professionals, but after acceptance by the families, they would continued to be done at the families' homes, to enhance their "realism" for the California jury. The writer and Duda would serve as interpreters. The long recordings were painful. The widows answered questions made by Arthur, describing intimate details since youth, aspirations and family plans until the tragedy, and almost always crying, giving details of the material losses suffered by the families. The worse part was the moral suffering of the widows and children, uncertainties about the future, the lawsuit delays. All that, according to Arthur, to enable him to show the California jury the families suffering. Several widows had the orphans on their laps, talking to them. After 15 of these emotionally draining sessions, Arthur delegated this task to the writer, which facilitated things as the interviews were conducted directly in Portuguese, and English subtitles would be produced later, by Speiser Krause. After six of such sessions with the writer, Arthur ended them saying that everything was "bullshit", adding that "the widows liked it". The writer felt great disgust for such ignoble sadism, used to inhumanly deceive the clients. However, in the current phase, where there was great dispute about the settlements, the writer tried to use it to the benefit of the families, balancing the interests with the purpose of reaching a reasonable final settlement, as such vile display would no longer take place. The writer has made himself available to go through a lie detector test. The writer believes, as do many of the 65 families, that they are the first victims of Speiser Krause's trap, whereby all involved are receiving only a part of what they are entitled to. The whole thing is an unpunished prevarication, controlled by this capable law firm, who is indeed capable of betraying the Brazilian families, to favor the companies and itself. This situation can be partially explained by unexplainable legal delays in the execution of retroactive maintenance payments, against TAM and Unibanco, granted by the First Civil Court of Appeals of Sao Paulo, of up to 80% of the earnings of the deceased. These monthly pensions have been accruing for four years. Over one year and two months ago, a Court Attorney asked Rolim Amaro deposit the amount due in five days, otherwise he would be held in contempt of Court. Nothing happened, in spite of over 20 (twenty) deposit requests, in favor of nine families. In the United States, last week, there was great surprise that the families had not yet received the money, as in American legal circles the settlement had been made with the Brazilian families a long time ago. This confirms the suspicion that Speiser Krause first made a settlement with Northrop, TAM and other companies, without consultation to the families in regards to amounts and conditions - God or the devil only know how - and now try to "fit in" the families in the package offered in Brazil. This, one calculates (as Speiser Krause never disclosed the amount) amounts to US$40 million, to be divided by the 65 families. In the USA, upon hearing of the Brazilian impasse, many thought that the families were fighting each other, trying to get a larger slice. This was immediately denied. Given the extensive list of airline crashes "resolved" by the firm, in developed and underdeveloped countries, one can only imagine how many scandals such as this have given rise during the years, which have not been unveiled due to the lack of proper accusation. The victims, families and orphans suffered two tragedies, the crashes and

Translation Prepared by Carlos de Paula - 12 - 11/21/2005 - 3:25 PM
C:\tradcorp\RENATO GUIMARAES JUNIOR.doc

**LEGAL TRANSLATION SYSTEMS**
P.O. Box 15, New York, NY 10044 USA (212) 629-4541 academictranslations.com
e-mail: carlosdepaula@mindspring.com

then the damages, fooled by a gang whose only word, in Portuguese or any other language, is "money". They are helped by local assistants who are equally prevaricators, acting in the midst of administrative corruption and violation of the ethical and obligation clauses set forth in the Brazilian Bar Association's Status and Criminal Code. They are all white collar and black robed individuals, playing to an unwritten script, soiled by the blood of the victims: insurance companies and multinational companies against families, judicial systems and laws that are weakened by impunity, against an honest lawyer. A gang of competent, however ill intentioned, attorneys. In this conspiracy emerges an exception, the innocent Thomas Frizzell. The writer believes that destroying such machine - that stretches from Lloyd's of London to Northrop's power here - with the help of the FBI, illustrates how international cooperation against cross-border illegal activities and (the actions of) honorable Judges in the USA, would be highly prophylactic, beyond Brazil and America. This began when Arthur was summoned by a Notary, returned to the USA, and allegedly, is in London now. The Trial by Jury begins in April, in California. If the families are there, but Arthur isn't, then the law shall have prevailed.

"The greats should not give away what belongs to the poor" (Camoes)

From Campinas to Sao Paulo, October 12, 2000

Children's Day - especially the orphans