UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

DR. WANDERLEY MINITTI,                    :

              Plaintiff,     :

      - against -                      :          04 Civ. 7976 (DC)

SPEISER, KRAUSE, NOLAN & GRANITO,  :
P.C.,
                      :
             Defendant.
                      :
- - - - - - - - - - - - - - - - - -x          **MEMORANDUM DECISION**

RENATO GUIMARAES,                         :

              Plaintiff,     :

      - against -                      :
                          05 Civ. 2210 (DC)
SPEISER, KRAUSE, NOLAN & GRANITO,  :
P.C.,
                      :
             Defendant.
                      :
- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/19/2006

**APPEARANCES:**   (See last page)

**CHIN, D.J.**

      These related cases arise from a 1996 plane crash in
Sao Paolo, Brazil.  All ninety-nine passengers and crew members
on board were killed.  Defendant Speiser, Krause, Nolan &
Granito, P.C. ("Speiser Krause") was retained by sixty-five of
the victims' families to bring wrongful death cases in the United
States against the companies implicated in the crash.
Eventually, Speiser Krause negotiated conditional settlements for
sixty-three of the families, totaling more than forty million
dollars.

Plaintiffs Wanderley Minitti and Renato Guimaraes Jr. are Brazilian attorneys who bring these actions claiming an entitlement to a portion of any fees earned by Speiser Krause in connection with the settlements. Speiser Krause moves for summary judgment dismissing the complaints.

Speiser Krause's motion is granted as to Minitti's claims, for Minitti admittedly has no contractual arrangement with Speiser Krause and no recovery can be awarded on a quantum meruit basis. The motion is denied, however, as to Guimaraes's claims, for Guimaraes had a contract with Speiser Krause, and genuine issues of fact exist for trial as to whether he is entitled to a portion of Speiser Krause's fees. Speiser Krause also moves for leave to amend its answer to add a counterclaim against Guimaraes for tortious interference with prospective business advantage. This motion is granted.

<u>**BACKGROUND**</u>

**A.**  <u>**Facts**</u>

Construed in the light most favorable to the nonmoving parties, the facts are as follows:

**1.**  <u>**The Crash**</u>

On October 31, 1996, an aircraft operated by Transportes Aereos Regionais, S.A. Airlines ("TAM") crashed in Sao Paolo, Brazil, killing the ninety-nine passengers and crew members on board. (Guimaraes Am. Compl. ("GAC") ¶ 6; Minitti Am. Compl. ("MAC") ¶ 6).

- 2 -

### 2.  Guimaraes Contracts with Speiser Krause

Immediately following the crash, Guimaraes contacted Speiser Krause in hopes of associating with the firm in pursuing litigation in the United States.  (Id. ¶ 8).  In December 1996 Guimaraes attended a two-day meeting in Florida at the home of Speiser Krause attorney Arthur E. Ballen.  (Id. ¶ 9).  Guimaraes and Ballen discussed representing the victims' families and entering into a fee-sharing arrangement.  (Id.).  According to Guimaraes, he and Ballen "reached an understanding" during the meeting with respect to fee-sharing and the parties' respective responsibilities.  (Id.).

On February 5, 1997, Guimaraes spoke with Ballen by phone from Brazil and, pursuant to their earlier discussions, the two agreed that Guimaraes would receive twenty-five percent of any attorneys' fees collected by Speiser Krause.  (11/2/2005 Guimaraes Dep., at 23:9-24:20, 162:13-14; 164:8-13 ("I talk to [Arthur Ballen], you take 25 percent or good luck, I go to [another law firm].  He said okay, he accept.")).  To memorialize this agreement Ballen offered to send Guimaraes a fax.  (Id. at 24:10-20).  The fax Guimaraes received from Speiser Krause was signed, however, by Gerard R. Lear, another Speiser Krause attorney working in the firm's Virginia office.  (Berman Aff. Ex. 8, at RG4).  The fax stated

> I would like to confirm the proposed arrangement
> between our firm and the families of the victims of the
> TAM Fokker disaster of October 31, 1996.  Our firm will
> charge the sum of 33 1/3% for the handling of each such

- 3 -

```
case.  Of this fee, a total of 25% will be paid to
Brazilian counsel for their services.
     We look forward to once again working actively
with your office.
```

(Berman Aff. Ex. 8, at RG4; 11/2/2005 Guimaraes Dep., at 24:18-

20).  According to Guimaraes, this fax memorialized the agreement

he had reached with Ballen on behalf of Speiser Krause:

> Guimaraes's responsibilities were to include acting as
> a liaison with the families of the victims in Brazil,
> translating legal documents, explaining legal
> strategies to the families and their direct, individual
> and referral attorneys in Brazil, assisting in
> gathering any facts or documents in Brazil necessary
> for the litigation, interfacing with Brazilian press on
> legal matters relating to the crash, and handling any
> collateral legal proceedings in Brazil required to
> support the United States litigation that Speiser
> Krause would prosecute.

(GAC ¶ 13).  On February 19, 1997, however, Guimaraes faxed a

letter to Speiser Krause attorneys Lear, Ballen, and Leigh

Ballen, reacting to a communication from Speiser Krause

indicating that it would, in Guimaraes's words, "retreat from

[the] definitive letter" confirming the fee-sharing arrangement.

(Apuzzo Aff. Ex. M, at RG26).[1]  In his letter, Guimaraes urged

Speiser Krause to continue its relationship with him.  (Id. at

RG28).

### 3.  __Retainer Agreements with the Families__

     In March 1997, Guimaraes and Ballen began obtaining

retainer agreements from some of the victims' families in Brazil.

(GAC ¶ 15).  Initially, the retainers named both Speiser Krause

---

[1]     The communication from Speiser Krause is not in the
record before the Court.

- 4 -

and Guimaraes as counsel, and in total twenty-nine retainer
agreements name both Speiser Krause and Guimaraes.  (Apuzzo Aff.
Ex. S).  Starting in late September 1997, however, the majority
of the agreements signed by the families named only Speiser
Krause as counsel, and of the sixty-four retainer agreements,
thirty-five do not name Guimaraes.  (Id.).  None of these
agreements is signed by, or has a signature line for, Guimaraes.
(Id.).  Guimaraes contends, however, that all of the Brazilian
families who signed the retainer agreements understood that he
and Speiser Krause were jointly representing them and were to
share in any attorneys' fees.  (Guimaraes Aff. ¶¶ 24-25, 27).  A
sixty-fifth retainer agreement with Speiser Krause, which did not
name Guimaraes, was signed by an American family.  (GAC ¶ 15;
Granito Aff. ¶ 3).

   **4. Speiser Krause Files Suit in California**

   On September 9, 1997, Speiser Krause filed suit in
California on behalf of its American client against the following
defendants:  Fokker Aircraft, both its U.S. subsidiary and its
Dutch parent corporation; TAM Airlines, both its U.S. subsidiary
and its Brazilian parent corporation; Safe Flight Instrument
Corporation, a New York entity; Northrop Grumman Corporation
("Northrop"), a New York entity; and Teleflex Control Systems,
Incorporated, a California entity.  (Granito Aff. Ex. A).  On
September 28, 1997, Speiser Krause filed notice of the related
cases of the Brazilian families, and subsequently filed actions
on their behalf in California on October 20, 1997.  (Id.).  All

- 5 -

the actions excepting the American client's were dismissed on
<u>forum non conveniens</u> grounds, but the dismissal was stayed
pending litigation in Brazil.  (GAC ¶ 20).

     5.   **<u>Guimaraes Files Suit in Brazil</u>**

       Following the stay in California, Guimaraes executed
separate retainer agreements with twenty-six (the "Brazilian
Court Clients") of the sixty-four Brazilian families, pursuant to
a Brazilian court action Guimaraes subsequently filed against
Northrop only.  (11/2/2005 Guimaraes Dep., at 62:24-63:5).
Guimaraes litigated the case in the Brazilian court without the
assistance of Speiser Krause.  (<u>Id.</u> ¶ 21).

     6.   **<u>Speiser Krause Negotiates Settlements & the Brazilian
Court Issues Judgment</u>**

       In or about January 2000, Speiser Krause negotiated
settlements for sixty-three of the sixty-five families with all
the defendants named in the California action.  (<u>Id.</u> ¶ 22).
Speiser Krause later negotiated settlements of approximately six
million and three million dollars for the two remaining families.
(<u>Id.</u> ¶ 23).  The total exceeded forty million dollars, but the
settlements were subject to each family signing a formal
settlement agreement and,  where minor children were involved,
approval by the Brazilian court.  (<u>Id.</u> ¶ 22).  For his part,
Guimaraes thought the Speiser Krause-negotiated settlements to be
a miscarriage of justice because he believed that:  (1) The
amounts were too low; (2) Speiser Krause attorneys improperly
communicated with the defendants resulting in a "treason" against

- 6 -

the clients under Brazilian law; and (3) Speiser Krause lied to the clients about the status of the lawsuit in California. (11/2/2005 Guimaraes Dep., at 77:12-79:6).  On this basis Guimaraes took action against Speiser Krause in Brazil by filing complaints with, inter alia, the President of the Brazilian Bar Association and the Brazilian Attorney General.  (Apuzzo Rep. Aff. Ex. E; 11/2/2005 Guimaraes Dep., at 104:10-105:5).

On June 30, 2000, the Brazilian court issued its judgment in the case Guimaraes had litigated for the Brazilian Court Clients, awarding each of the twenty-six families approximately one million dollars, plus (1) two-thirds of the last annual salary earned by each decedent from the date of the accident until that decedent would have reached age sixty-five; (2) a twenty percent contempt of court penalty against Northrop; and (3) twenty percent of the judgment in attorneys' fees.  (GAC ¶ 24).

Of the Brazilian Court Clients who had entered into retainer agreements with both Speiser Krause and Guimaraes, some elected to accept the settlement reached by Speiser Krause rather than to take part in the Brazilian judgment.  (Id. ¶ 25). Speiser Krause informed them that they had to discharge Guimaraes to do so (Apuzzo Aff. Ex. K (2/6/2001 Guimaraes Aff. ¶ 3)), and at least seventeen families discharged Guimaraes as their attorney.  (11/2/2005 Guimaraes Dep., at 92:15-17). Additionally, at least seven families Guimaraes consulted with discharged Speiser Krause as their attorneys and hired other counsel recommended to them by Guimaraes.  (Id. at 66:7-16).

7.    **Minitti Becomes Involved**

After issuing the judgment on June 30, 2000, the
Brazilian court authorized Minitti to bring to the United States
a letter rogatory applying for an order requiring Northrop to
deposit approximately $8.6 million, either with the Brazilian
court or with a U.S. court.  In re Letter Rogatory Issued by
Second Part of the III Civil Regional Court of Jabaquara/Saude
Sao Paulo, Brazil (Letter Rogatory SDNY), No. M13-72 (RO), 2001
WL 1033611, at *1 (Sept. 7, 2001 S.D.N.Y.); (MAC ¶ 14 & Ex. A).
Guimaraes engaged Minitti to assist with the letter rogatory, and
executed a retainer agreement and a power of attorney for that
purpose.  (Id. ¶ 16 & Ex. B).  In their retainer agreement, dated
October 16, 2000, Guimaraes subrogated to Minitti -- while also
retaining -- the powers granted to him through the retainer
agreements executed between Guimaraes and the Brazilian Court
Clients.  Guimaraes also granted Minitti the powers he
purportedly had with respect to the families he jointly
represented with Speiser Krause, although approximately two-
thirds of these clients had not taken part in Guimaraes's
Brazilian court action and thus had no part in the proceeding
generating the letter rogatory from the Brazilian court.  (MAC
Ex. B).

On December 22, 2000, Guimaraes authorized Minitti, in
writing, to retain a law firm in the United States not only to
assist with the letter rogatory but also to "replace the law firm
Speiser [] Krause," because Speiser Krause had, according to

Guimaraes, "failed to represent [the families] for almost one year being limited to intermediate agreements with Northrop . . . and [its] insurance compan[y], said agreements being null and void before the Brazilian laws."  (Id. Ex. C).  Guimaraes further wrote that the fees shared with Minitti and any U.S. law firm he retained "shall be in the same form, but inferior to those signed by Speiser [] Krause."  (Id.).

On January 5, 2001, Minitti executed an agreement in the name of Guimaraes with Richard S. Peskin, a New York attorney.  (MAC Ex. D ¶¶ 1-2).  This agreement represented that Speiser Krause "did not participate in any way" in the action in Brazil, and stated that any fees received in connection with filing of the letter rogatory in the United States would be shared among Guimaraes, Minitti, and Peskin, and not with Speiser Krause.  (Id. ¶¶ 3-4).

Minitti first filed the letter rogatory in this Court. Letter Rogatory SDNY, 2001 WL 1033611, at *1.  Judge Richard Owen dismissed the application for the order on the grounds that venue was improper.  Id.  Judge Owen did, however, discuss the merits of the application, and noted that it amounted to an attempt to enforce a foreign judgment, which could not be accomplished with a letter rogatory.[2]  Id.  Next, Minitti filed the letter rogatory

---

[2]    By statute, a letter rogatory may not be used to enforce a foreign judgment.  28 U.S.C. § 1782; see In re Letter Rogatory Issued by the Second Part of the III Civil Regional Court of Jabaquara/Saude, Sao Paolo, Brazil (Letter Rogatory EDNY), No. 01-MC-212 (JG), 2002 WL 257822, at *1 (E.D.N.Y. Feb. 6, 2002) ("It is well-established that letters rogatory are an impermissible method for enforcing a foreign judgment in the

in the U.S. District Court for the Eastern District of New York. Letter Rogatory EDNY, 2002 WL 257822, at *1.  Judge John Gleeson denied the application for the order, also on the grounds that the letter rogatory amounted to an attempt to enforce a foreign judgment.  Id.  Judge Gleeson did direct the Clerk of the Court to serve Northrop with the Brazilian judgment and the Brazilian court-issued order of attachment.  Id. at *4.

At both proceedings Speiser Krause appeared in opposition to Minitti and the application on the letter rogatory. (See MAC ¶¶ 18-19).

B.   **Prior Proceedings**

Minitti filed his original complaint with this Court on October 8, 2004.  Minitti filed an amended complaint on January 7, 2005.  Minitti concedes that he has no contract with Speiser Krause but alleges that, because of his work in New York filing the letter rogatory, he is entitled to a share of Speiser Krause's attorneys' fees on theories of quantum meruit, unjust enrichment, and conversion.

Guimaraes filed his original complaint in the Southern District of Florida on November 19, 2004.  In December 2004 Guimaraes filed an amended complaint.  On January 10, 2005, Speiser Krause filed a motion to transfer the case to this Court, and on January 28, 2005, the case was transferred.  Guimaraes

---

United States courts."); Letter Rogatory SDNY, 2001 WL 1033611, at *1 (stating that "the law is clear that a letter rogatory" may not be used to enforce a foreign judgment).

alleges that he fulfilled all of his obligations relating to the fee-sharing agreement with Speiser Krause, in that he "provided liaison services as necessary during the process of procuring Retainer Agreements from the families and prosecution of the case in the United States," and that he prosecuted the case in Brazil, a litigation that "enabled Speiser Krause to reach" the settlements.  (GAC ¶ 29).  Accordingly, he contends that he is entitled to his share of the attorneys' fees collected by Speiser Krause.  Speiser Krause has not remitted any fees to Guimaraes.[3]

Additionally, Guimaraes claims damages under a theory of quantum meruit, asserting that "Speiser Krause requested that Guimaraes assist it in representing the families . . . by acting as a liaison . . . , translating legal documents, explaining legal strategies to the families and their . . . attorneys in Brazil, assisting in gathering any facts or documents in Brazil," and providing other services.  (Id. ¶ 35).  Guimaraes contends that while he did perform these services -- which both Speiser Krause and the families requested of him and benefitted from -- he has never been paid for them, resulting in Speiser Krause's unjust enrichment.

On April 1, 2005, Speiser Krause filed an answer to Guimaraes's amended complaint, asserting a counterclaim against Guimaraes seeking indemnification if it is found liable to Minitti.  On August 11, 2006, Speiser Krause filed a motion to

---

[3]    Guimaraes has been reimbursed by Speiser Krause for his expenses.  (Lear Aff. ¶ 7).

amend or correct its answer, seeking to add a counterclaim against Guimaraes for tortious interference with prospective business advantage.  On October 5, 2006, Guimaraes filed a motion to strike Speiser Krause's reply papers in support of the motion to amend the answer, alleging that the reply was untimely.

Speiser Krause filed its motion for summary judgment in both cases on September 22, 2006.  Speiser Krause contends that Minitti fails to state a claim for quasi-contractual restitution, and fails to state a claim for conversion.  With respect to Guimaraes, Speiser Krause contends that:  (1) There was no contract between the parties; and (2) Guimaraes's refusal to assist the families in concluding the settlements negotiated by Speiser Krause constitutes abandonment of the clients and consequently he is not entitled to any fee.[4]

## DISCUSSION

### I.    Motions for Summary Judgment

#### A.    Summary Judgment Standard

The standards governing motions for summary judgment are well-settled.  A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law.  See Fed R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

---

[4]    In his Memorandum of Law in Opposition to the Motion to Dismiss, Guimaraes voluntarily dismisses his claims for imposition of a constructive trust and for conversion or an accounting.  (Guimaraes's Mem. of Law in Opp'n, at 38).  Accordingly, these claims are dismissed.

475 U.S. 574, 585-87 (1986).  Accordingly, the court's task is
not to "weigh the evidence and determine the truth of the matter
but to determine whether there is a genuine issue for trial."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  To
create an issue for trial, there must be sufficient evidence in
the record to support a jury verdict in the nonmoving party's
favor.  See id.

  To defeat a motion for summary judgment, the nonmoving
party "must do more than simply show that there is some
metaphysical doubt as to the material facts."  Matsushita, 475
U.S. at 586.  As the Supreme Court stated in Anderson, "[i]f the
evidence is merely colorable, or is not significantly probative,
summary judgment may be granted."  Anderson, 477 U.S. at 249-50
(citations omitted).  The nonmoving party may not rest upon mere
conclusory allegations or denials, but must set forth "concrete
particulars" showing that a trial is needed.  Nat'l Union Fire
Ins. Co. v. Deloach, 708 F. Supp. 1371, 1379 (S.D.N.Y. 1989)
(quoting R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77
(2d Cir. 1984) (internal quotations omitted)).  Accordingly, it
is insufficient for a party opposing summary judgment "merely to
assert a conclusion without supplying supporting arguments or
facts."  BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d
603, 615 (2d Cir. 1996) (internal quotations omitted).

  **B.** **Choice of Law**

  As an initial matter, I must determine what substantive
law to apply to these actions, which originate from a plane crash

in Brazil, involve two Brazilian lawyers and an American law firm with offices in several states, and concern litigation in New York, California, and Brazil.

A federal court sitting in diversity applies the choice-of-law rules of the forum state.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  Where a change of venue is granted pursuant to 28 U.S.C. § 1404, however, the transferee court must apply the choice-of-law rules of the transferor court.  Ferens v. John Deere Co., 494 U.S. 516, 532 (1990); Van Dusen v. Barrack, 376 U.S. 612, 639 (1964). Accordingly, with respect to Minitti's claims I apply New York's choice-of-law rules, while with respect to Guimaraes's claims I must apply Florida choice-of-law rules.

### 1.   Choice of Law for Minitti

For contract claims such as Minitti's, New York provides a "'center of gravity' or 'grouping of contacts approach.'"  Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1539 (2d Cir. 1997).  The relevant contacts include: "the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or the place of business of the contracting parties."  Id.

Minitti negotiated his contract with Guimaraes in Brazil.  The place of performance, however (filing the letter rogatory), was New York.  Because Minitti and Guimaraes contracted for work to be performed in New York, and because Minitti brought his claim in New York against a New York law

firm, claiming the firm benefitted from his work with respect to the letter rogatory in New York, under the New York "grouping of contacts" approach I apply New York law.  See Lazard Freres & Co., 108 F.3d at 1539.

### 2.    Choice of Law for Guimaraes

Guimaraes's lawsuit was transferred from Florida; therefore I apply Florida's choice-of-law rules.  I consider the law governing first the existence of a contract and second the performance of the contract.  See State-Wide Ins. Co. v. Flaks, 233 So. 2d 400, 402 (Fla. Dist. Ct. App. 1970) ("[M]atters bearing upon the execution, interpretation, and validity of a contract are determined by the law of the place where it is made. . . . [M]atters connected with performance are regulated by the law of the place where the contract by its terms may have been provided to be performed." (internal quotations omitted)).

### a.    Law Governing Existence of a Contract

Florida does not follow the "center of gravity" or "contacts" analysis for choice-of-law for contract existence, but instead adheres to the traditional rule of lex loci contractus: In absence of a contractual provision specifying the governing law, the existence of a contract is governed by the law of the state in which the contract was made.  Fioretti v. Mass. Gen. Life Ins. Co., 53 F.3d 1228, 1235 (11th Cir. 1995).  "The basic assumption behind the lex loci contractus doctrine is that when a contract is executed in a particular state, the parties can be

assumed to have intended to have that state's laws govern their
contractual relationship." Id. at 1236 n.27.

Guimaraes contends that I should apply Virginia law to
his claim that a contract exists with Speiser Krause because Lear
sent the fax confirming Guimaraes's agreement with Ballen from
the firm's Virginia office.  Even assuming Guimaraes's recitation
of the facts is true, Lear's fax merely memorialized the
agreement between Guimaraes and Ballen, a convenient but
unnecessary act, because the contract does not fall within the
Statute of Frauds.  See 9 Williston on Contracts § 21:4 (4th ed.)
(stating the "classes of informal contracts . . . generally
within the Statutes of Frauds in the United States"); see also
N.Y. Gen. Oblig. Law § 5-701 (codifying the Statute of Frauds in
New York); Va. Code Ann. § 11-2 (Virginia's codification of the
Statute of Frauds).  Yet neither party presented information to
this Court regarding Ballen's location when he and Guimaraes
reached the agreement about sharing attorneys' fees.  Guimaraes
was in Brazil, while Ballen, presumably, was somewhere in the
United States.

Here, the most basic principles of contract law resolve
the question of whether a contract existed or not, and there is
no conflict amongst the law of the states Ballen might have been
in when he spoke with Guimaraes.  Accordingly, I need look only
to the most basic principles of contract law adopted by all these
states.

### b.    Law Governing Performance of a Contract

Under Florida choice-of-law rules "a court addressing a contract performance issue must apply the rule of law where the contract was to be performed." Pezold Air Charters v. Phoenix Corp., 192 F.R.D. 721, 724 (M.D. Fla. 2000); see Hammett v. Am. Bankers Ins. Co., 203 F.R.D. 690, 700 (S.D. Fla. 2001).  On this analysis, I conclude that I must apply Brazilian law for issues of contract performance.  Speiser Krause engaged Guimaraes for services he would perform in Brazil, and the Brazilian families retained him for the same purpose.  Accordingly, the place of performance for both the contract with Speiser Krause and the retainer agreements is Brazil, and Brazilian law applies.

### C.    Minitti's Claims

Minitti asserts essentially two claims:  quantum meruit and conversion.  Although he includes both unjust enrichment and quantum meruit claims, these are not separate causes of action. Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005).  To recover under quantum meruit in New York a party "must establish performance of [its duties] in good faith, acceptance of the services by persons to whom such services were rendered, expectation of compensation, and the reasonable value of such services."  Id.; Fluor Daniel Carribean, Inc. v. Humphreys (Cayman) Ltd., No. 04 Civ. 686 (DC), 2005 WL 1214278, at *5 (citing Weinrich v. Sandhaus, 805 F. Supp. 1169, 1183 (S.D.N.Y. 1994)); Guggenheimer v. Bernstein Litowitz Berger & Grossman LLP, 810 N.Y.S.2d 880, 888 (Sup. Ct. 2006).

"To state a claim for unjust enrichment in New York, a plaintiff must allege that (1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendants to make restitution." Kidz Cloz, Inc. v. Officially for Kids, Inc., 320 F. Supp. 2d 164, 177 (S.D.N.Y. 2004) (internal quotations omitted).

"Conversion is the 'unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'" Wechsler v. Hunt Health Sys. Ltd., 330 F. Supp. 2d 383, 431 (S.D.N.Y. 2004) (quoting Vigilant Ins. Co. of Am. v. Hous. Auth. of El Paso, 660 N.E.2d 1121, 1126 (1995) (internal quotations omitted)). To prevail on a conversion claim, plaintiff must show that (1) he had a legal ownership interest in the property and (2) defendant exercised unauthorized interference with plaintiff's ownership or possession of that property. Id.

As for the quantum meruit/unjust enrichment claim, Minitti implies that his work on the letter rogatory led to the Speiser Krause-negotiated settlements, and thus he demands a share of the resulting attorneys' fees. (MAC ¶ 23). Minitti has produced no evidence, however, to show that Speiser Krause accepted the services he rendered, see Fluor Daniel Carribean, Inc., 2005 WL 1214278, at *5, or that the circumstances were such that equity and good conscience require Speiser Krause to make restitution. See Kidz Cloz, Inc., 320 F. Supp. 2d at 177.

Indeed, that Speiser Krause appeared at the letter rogatory proceedings in New York in opposition to Minitti demonstrates that it did not accept the services he rendered, and that equity and good conscience do not require that Speiser Krause make restitution.  (See MAC ¶¶ 18-19).  Furthermore, because the letter rogatory could not be used to enforce the Brazilian judgment against Northrop in the United States, see 28 U.S.C. § 1782, Minitti's claim that his work led to the settlements is specious.  Indeed, both Judge Gleeson and Judge Owen dismissed Minitti's petitions.  See Letter Rogatory EDNY, 2002 WL 257822, at *1; Letter Rogatory SDNY, 2001 WL 1033611, at *1.  On the evidence presented, a reasonable jury could only find that under New York law Minitti is not entitled to any part of Speiser Krause's attorneys' fees generated by the settlements.

As none of the attorneys' fees collected by Speiser Krause are Minitti's property, he cannot state a claim for conversion.  See Wechsler, 330 F. Supp. 2d at 431.

Minitti argues that Brazilian law governs his claims. (Minitti's Mem. of Law in Opp'n, at 1-2).  Under Brazilian law as Minitti states it, the retainer agreement executed between Guimaraes and Minitti for filing of the letter rogatory binds all of Guimaraes's clients to Minitti, allowing Minitti to step into the shoes of Guimaraes with respect to Speiser Krause and all of the represented families.  (Id. at 2-3).  Minitti's claims, however, are governed by New York, not Brazilian, law.  Moreover, even assuming Brazilian law gives Minitti contractual rights as

- 19 -

against Guimaraes, those rights do not extend to Speiser Krause, as Minitti was not in privity with Speiser Krause.

For the above reasons, Speiser Krause's motion for summary judgment is granted with respect to Minitti.

D.    **Guimaraes's Claims**

1.    **The Fee-Sharing Agreement with Speiser Krause**

"The most basic principle of contract law is that when one party makes an offer that is clear, definite, and explicit, and leaves nothing open for negotiation, acceptance of that offer by the other party will complete the contract." Judicial Inquiry & Review Comm'n of Va. v. Elliott, 272 Va. 97, 119 (2006); see Restatement (Second) of Contracts §§ 22, 24, 50. Guimaraes testified at his deposition that he and Ballen had a conversation via telephone during which, pursuant to their previous discussions, Guimaraes offered to work with Speiser Krause in exchange for twenty-five percent of the attorneys' fees it collected, and that Ballen accepted Guimaraes's offer and confirmed the acceptance in writing. (11/2/2005 Guimaraes Dep., at 23:9-24:20, 162:13-14; 164:8-13; Berman Aff. Ex. 8, at RG4). Thereafter, they had a contract.

Additionally, some of the retainer agreements with the families name both Speiser Krause and Guimaraes as the retained attorneys, and Guimaraes contends that all sixty-four Brazilian families understood that both he and Speiser Krause would be representing them -- and consequently sharing any attorneys' fee

-- when they signed the retainer agreements.[5]  (Apuzzo Aff. Ex. S; Guimaraes Aff. ¶¶ 24-25, 27).  Regardless of the exact details of the fee-sharing arrangement Guimaraes alleges to have had with Speiser Krause, a reasonable jury could find that Guimaraes is entitled to some share of the attorneys' fees generated by representation of the families per the retainer agreements.

Accepting Guimaraes's statements as true and drawing all reasonable inferences in his favor from the evidence presented, he has produced sufficient evidence to overcome Speiser Krause's contention that no contract existed between it and Guimaraes, and to raise genuine issues of material fact for trial.

## 2.  <u>The Retainer Agreements with the Families</u>

Speiser Krause contends that, even conceding that Guimaraes did have a contract for attorneys' fees with both it and some or all of the sixty-four Brazilian families, when Guimaraes urged the families not to accept the proposed settlements he abandoned them as clients and, equating this with an attorney being discharged for cause, consequently Guimaraes is not entitled to any fee.

Pursuant to Federal Rule of Civil Procedure 44.1, Guimaraes gave timely notice of his contention that Brazilian law applies, and he provides the affidavit of Professor Keith S.

---

[5]    These retainer agreements are on Speiser Krause letterhead and are signed by Ballen, a Speiser Krause attorney. (Apuzzo Aff. Ex. S).

Rosenn on the subject of payment of attorneys' fees under
Brazilian law.  Above, I concluded that for purposes of this
motion Brazilian law applies to the performance of any contract
between Guiamaraes and Speiser Krause or between Guimaraes and
the Brazilian families.  Although Speiser Krause disputes the
application of Brazilian law, it does not argue that Professor
Rosen's recitation of Brazilian law is incorrect.  Accordingly, I
conclude that he has accurately stated Brazilian law.

Under Brazilian law, an attorney may quit or be
discharged by his client at any time.  (Rosenn Aff. ¶ 12).
Discharge even for cause, however, does not negate a client's
duty to pay the agreed-upon attorneys' fees, although the amount
owed may be affected by services actually performed prior to
discharge.  (Id. ¶¶ 12-14).  Pursuant to Brazilian law, then,
Guimaraes may be entitled to recover some amount of attorneys'
fees even from those families who discharged him as their
attorney, and even if they discharged him for cause.  But see
Campagnola v. Mullholland, Minion & Roe, 76 N.Y.2d 38, 44 (1990)
(holding under New York law that "[w]here the discharge is for
cause, the attorney has no right to compensation or a retaining
lien, notwithstanding a specific retainer agreement"); see also
Gurry v. Glaxo Wellcome, No. 98 Civ. 6243 (DC), 2000 WL 1702028,
at *1 (Nov. 14, 2000 S.D.N.Y.) (same).  Because Speiser Krause
has collected a fee for each family accepting the Speiser Krause-
negotiated settlement, the firm may be liable to Guimaraes for
some amount of fees.

For the above reasons, I conclude that Guimaraes has produced sufficient evidence to generate a genuine issue of material fact requiring trial with respect to whether he is owed attorneys' fees. Accordingly, Speiser Krause's motion for summary judgment with respect to Guimaraes is denied.

## II.   **Speiser Krause's Motion to Amend its Answer**

Rule 13(f) of the Federal Rules of Civil Procedure provides that a court may allow a party to amend its pleading to assert a counterclaim if the pleader failed originally to assert the counterclaim through oversight, inadvertence, or excusable neglect, or when justice so requires. Courts must read Rule 13(f) together with Federal Rule of Civil Procedure 15, which provides that leave to amend a pleading shall be freely given when justice so requires. See Fagan v. Deutsche Bank, 438 F. Supp. 2d 376, 391 (S.D.N.Y. 2006); Zubulake v. UBS Warburg LLC, 231 F.R.D. 159, 161 (S.D.N.Y. 2005). In assessing a motion to add a counterclaim, a court should consider whether (1) the counterclaim is compulsory; (2) the pleader has acted in good faith and has not unduly delayed filing the counterclaim; (3) undue prejudice would result to plaintiff; and (4) the counterclaim raises meritorious claims. See Zubulake, 231 F.R.D. at 161. Here, there is no question that the proposed counterclaim is compulsory, as Speiser Krause's claim arises from the same transaction or occurrence as Guimaraes's claim. See Fed. R. Civ. P. 13(a).

In considering whether a proposed claim is meritorious, the court should apply standards applicable under Federal Rule of Civil Procedure 12(b)(6). Thus, if the claim would be subject to dismissal under Rule 12(b)(6), the court should refuse to grant leave to amend. <u>Dupree v. Pough</u>, 454 F. Supp. 2d 166, 173 (S.D.N.Y. 2006). The proposed counterclaim should be construed in the light most favorable to the moving party, <u>see</u> <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974), and leave to add the counterclaim should be denied if the moving party can prove no set of facts supporting the proposed claim that would entitle it to relief. <u>Dahlberg v. Becker</u>, 748 F.2d 85, 88 (2d Cir. 1984).

To state a claim for tortious interference with prospective business advantage, Speiser Krause must prove that: (1) It had a business relationship with a third party; (2) Guimaraes knew of that relationship and intentionally interfered with it; (3) Guimaraes acted solely out of malice, or used dishonest, unfair, or improper means; and (4) Guimaraes's interference caused injury to the business relationship. <u>PKG Group, LLC v. Gamma Croma, S.p.A</u>, 446 F. Supp. 2d 249, 251 (S.D.N.Y. 2006).

Accepting Speiser Krause's allegations as true for purposes of this motion, Speiser Krause has met its burden. Speiser Krause had an ongoing business relationship which Guimaraes knew of. (Proposed Am. Ans. ¶¶ 6, 9). To induce Speiser Krause's clients to discharge the firm, Guimaraes made statements to them "unlawfully and improperly attack[ing] the

character and credibility of Speiser Krause." (Id. ¶ 17).  As a result, several of Speiser Krause's clients discharged the firm, resulting in loss of some attorneys' fees Speiser Krause would have gained had these families taken part in the Speiser Krause-negotiated settlements.  (Id. ¶¶ 7-8, 23).  Speiser Krause has shown that the proposed counterclaim is meritorious.

Guimaraes's other argument is that Speiser Krause unduly delayed in seeking leave to add this counterclaim, and that this delay will cause undue prejudice to him.  It is true that Speiser Krause's excuses for its delay in moving to add a counterclaim are less than compelling.  Still, the amended pleading will not substantially delay the suit, as it involves the same transaction or occurrence at issue in the claims already presented.  Moreover, it appears that Speiser Krause was unaware of the extent of Guimaraes's contacts with other attorneys regarding Speiser Krause's clients until after depositions were taken in this case.  (Def.'s Rep. in Supp. of Mot. to Am. Ans., at 1-3).[6]  While Guimaraes contends that additional discovery

---

[6]    On October 5, 2006, Guimaraes filed a motion to strike Speiser Krause's reply in support of its motion to amend the answer, alleging that Speiser Krause had violated Local Rule 6.1 in filing the reply sixteen days after Guimaraes filed his opposition, instead of the five days required by the Rule. Speiser Krause contends that it understood the Court to set alternative deadlines for the motion to amend, in line with the deadlines set for the motion for summary judgment.  In any event, Guimaraes does not claim any prejudice as a result of the delay, and it is unclear why any would result from the late filing of reply papers to which Guimaraes had no right of rejoinder.  See also Somlyo v. J. Lu-Rob Enters., Inc., 932 F.2d 1043, 1048-49 (2d Cir. 1991) (finding departure from the Local Rules appropriate where "application of the letter of the Local Rules to a particular case would cause an unjust result").  Accordingly, Guimaraes's motion to strike Speiser Krause's reply is denied.

would be necessary if Speiser Krause is permitted to add this counterclaim, he does not identify what this additional discovery might be.  Speiser Krause, the party seeking to add the claim, does not believe additional substantial discovery will be necessary, and the Court agrees.  Accordingly, Speiser Krause's delay does not warrant denial of its motion to add this meritorious counterclaim.  The answer is deemed amended to add a counterclaim for tortious interference with prospective business advantage.

## CONCLUSION

For the reasons set forth above I grant summary judgment dismissing Minitti's claims.  These claims are dismissed.  With respect to Guimaraes, Speiser Krause's motion for summary judgment is denied.  Finally, I grant Speiser Krause leave to amend its answer to add a counterclaim against Guimaraes for tortious interference with prospective business advantage.

SO ORDERED.

Dated:    New York, New York
          December 19, 2006

_____
DENNY CHIN
United States District Judge

- 26 -

**APPEARANCES:**

For Wanderley Minitti:

                DURST LAW FIRM
                   By:  John E. Durst, Esq.
                319 Broadway
                New York, New York  10007

For Renato Guimaraes, Jr.:

                BERMAN, KEAN & RIGUERA, P.A.
                   By:  Richard E. Berman, Esq.
                     Jose R. Riguera, Esq.
                2101 West Commercial Boulevard, Ste. 2800
                Fort Lauderdale, Florida  33309

For Speiser Krause Nolan & Granito, P.C.:

                APUZZO & CHASE
                   By:  William J. Apuzzo, Esq.
                800 Third Avenue, 8th Floor
                New York, New York  10022