UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 05-CV-2210(DC)
THE HONORABLE DENNY CHIN

RENATO GUIMARAES, JR.,

       Plaintiff,

vs.

SPEISER, KRAUSE, NOLAN & GRANITO, a
professional corporation f/k/a SPEISER,
KRAUSE, MADOLE & LEAR, a professional
corporation,

       Defendant.

_____/

### AFFIDAVIT OF JOSE R. RIGUERA

**STATE OF FLORIDA**      )
**COUNTY OF BROWARD**    )   **ss.:**

Jose R. Riguera, being duly sworn, deposes and says:

1.     I am an attorney duly admitted to practice law in the State of Florida, and authorized to appear *pro hac vice* in this action by Order of this Court. I am a partner at Berman, Kean & Riguera, P.A., attorneys for the Plaintiff, Renato Guimaraes ("Guimaraes"), in this matter. I submit this affidavit in support of the Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment.

2.     Annexed hereto as Exhibit "1" is the sworn Declaration of Renato Guimaraes, Jr. dated May 25, 2007 (with attached exhibit).

3.     Annexed hereto as Exhibit "2" is the sworn Declaration of Maria Das Gracas de Oliveira Rodrigues dated May 30, 2007 (in English and Portuguese).[1]

4.     Annexed hereto as Exhibit "3" is the sworn Declaration of Airton Francisco Rodrigues dated

---

[1] The attached Declarations are fax copies. Originals of each translation will be filed with the Court once they are received from the respective declarants.

Guimaraes v. Speiser Krause
Case No.: 05-CV-2210(DC)

May 30, 2007 (in English and Portuguese).

5.      Annexed hereto as Exhibit "4" is the sworn Declaration of Suzana Klepetar dated May 28, 2007 (in English and Portuguese).

6.      Annexed hereto as Exhibit "5" is the sworn Declaration of Terezinha de Jesus Fernandes Duarte dated May 28, 2007 (in English and Portuguese).

7.      Annexed hereto as Exhibit "6" is the sworn Declaration of Jaime Menin dated May 28, 2007 (in English and Portuguese).

8.      Annexed hereto as Exhibit "7" is the sworn Declaration of Zeila de Oliveira Matos  dated May 29, 2007 (in English and Portuguese).

9.      Annexed hereto as Exhibit "8" is the sworn Declaration of Vanessa Pereira Ramos  (in English and Portuguese).

10.     Annexed hereto as Exhibit "9" is the sworn Declaration of Fernando Lobo Vaz de Mello dated May 26, 2007 (in English and Portuguese).

11.     Annexed hereto as Exhibit "10" is the sworn Declaration of Maria Da Conceicao Magalhaes Vaz de Mello dated May 26, 2007 (in English and Portuguese).

12.     Annexed hereto as Exhibit "11" is the sworn Declaration of Maria Christina Janstein dated May 31, 2007 (in English and Portuguese).

13.     Annexed hereto as Exhibit "12" is the sworn Declaration of Daniela Peixoto Arjona dated May 30, 2007 (in English and Portuguese).

14.     Annexed hereto as Exhibit "13" are relevant excerpts from the transcript of the deposition of Gerard Lear taken October 11, 2005.

15.     Annexed hereto as Exhibit "14" are relevant excerpts from the transcript of the deposition

2

of Gerard Lear taken October 12, 2005.

16.    Annexed hereto as Exhibit "15" are relevant excerpts from the transcript of the deposition of Gerard Lear taken April 23, 2007.

17.    Annexed hereto as Exhibit "16" are relevant excerpts from the transcript of the deposition of Arthur Ballen taken on October 11, 2005.

18.    Annexed hereto as Exhibit "17" are relevant excerpts from the transcript of the deposition of Leigh Ballen taken on October 10, 2005.

19.    Annexed hereto as Exhibit "18" are relevant excerpts from the transcript of the deposition of Renato Guimaraes taken on October 7, 2005.

20.    Annexed hereto as Exhibit "19" are relevant excerpts from the transcript of the deposition of Renato Guimaraes taken on November 2, 2005.

21.    Annexed hereto as Exhibit "20" are relevant excerpts from the transcript of the deposition of Renato Guimaraes taken on November 17, 2005.

22.    Annexed hereto as Exhibit "21" is the Affidavit of Gerard Lear dated September 22, 2006, submitted by Defendant in support of Defendant's Motion for Summary Judgment.

23.    Annexed hereto as Exhibit "22" are Speiser Krause's Answers to Plaintiff's Interrogatories, sworn April 10, 2007.

24.    Annexed hereto as Exhibit "23" is the Amended Complaint (with Exhibits) filed by Dr. Wanderly Minitti in a lawsuit styled Dr. Wanderly Minitti v. Speiser, Krause, Nolan & Granito, P.C., Case No. 04 CV 07976 (DC)(RLE).

25.    Annexed hereto as Exhibit "24" are the relevant documents produced by Renato Guimaraes in response to discovery requests in this action bearing production numbers RG-00004,

Guimaraes v. Speiser Krause
Case No.: 05-CV-2210(DC)

RG00178, and RG00215-RG00326.

26.    Submitted along with the Memorandum of Law in Support of Plaintiff's Motion for

Summary Judgment is Plaintiff's Local Civil Rule 56.1 Statement.

WHEREFORE, your deponent respectfully requests an order granting Plaintiff's Motion for

Summary Judgment, and for such other and further relief as this Court deems just and proper.

**_FURTHER AFFIANT SAYETH NOT._**

Jose R. Riguera
(Fla. Bar No. 860905 - admitted _pro hac vice_)

SWORN TO BEFORE ME, this 31 day of May, 2007.

Notary Public - State of Florida

Print Name of Notary

DEANNE L. FERRESE
MY COMMISSION # DD 444265
EXPIRES: July 8, 2009
Bonded Thru Notary Public Underwriters

Seal:

Personally Known ___X___ or Produced Identification _____
Type of Identification Produced _____

4

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 05-CV-2210(DC)
THE HONORABLE DENNY CHIN

RENATO GUIMARAES, JR.,

      Plaintiff,

vs.

SPEISER, KRAUSE, NOLAN &
GRANITO, a professional corporation f/k/a
SPEISER, KRAUSE, MADOLE & LEAR, a
professional corporation,

      Defendant.

_____/

### DECLARATION OF RENATO GUIMARAES, JR.

Pursuant to 28 U.S.C. 1746, Renato Guimaraes, Jr. attests:

1.    My name is Renato Guimaraes, Jr.  I am an attorney in Brazil and the Plaintiff in this action.

2.    I am over the age of 18 and make this declaration based upon my personal knowledge.

3.    After the Jabaquara judgment was entered, I granted Wanderly Minitti, a fellow Brazilian attorney, a power of attorney authorizing him to seek to enforce the execution of the Jabaquara judgment in the United States through a letters rogatory procedure.

4.    In compensation for his services, Mr. Minitti was to receive a certain percentage of any amounts collected from the TAM defendants through his efforts to enforce the Jabaquara judgment.

5.    Mr. Minitti was ultimately unsuccessful in enforcing the Jabaquara judgment in the United States, as he failed to recover any money on behalf of the TAM clients.

Guimaraes v. Speiser Krause
Case No.: 05-CV-2210(DC)

6.    Because Mr. Minitti's fee was contingent upon such recovery, he did not earn any

attorneys' fee in connection with the enforcement of the Jabaquara judgment.

7.    In November 2004, I learned for the first time that Mr. Minitti had filed a lawsuit in New

York against Speiser Krause, styled <u>Dr. Wanderly Minitti v. Speiser, Krause, Nolan &</u>

<u>Granito, P.C.</u>, Case No. 04 CV 07976 (DC)(RLE), in which he sought a judgment for

50% of the attorney's fees collected by Speiser Krause in connection with the TAM

litigation.

8.    I never authorized, encouraged or in any way caused Mr. Minitti to file a lawsuit against

Speiser Krause.

9.    On the contrary, I have consistently opposed Mr. Minitti's claim that he is entitled to a

share of Speiser Krause's attorneys' fees from the TAM litigation, since I am the one who

had the fee-sharing agreement with Speiser Krause.

10.    During the course of my discussions and negotiations with Speiser Krause concerning our

fee-sharing agreement, we never agreed that I would indemnify Speiser Krause in the

event of any lawsuits or claims arising from the TAM litigation.

11.    Annexed hereto as Exhibit "A" is the published decision of the Ordem Dos Advogados

Do Brasil, Secçâo de Sâo Paulo - the Brazil bar association - which unanimously

exonerated me of any wrongdoing concerning a bar complaint filed against me as a result

of my opposition to the TAM settlements.

Guimaraes v. Speiser Krause
Case No.: 05-CV-2210(DC)

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Renato Guimaraes, Jr.

Date: 5/25/2007

# EXHIBIT A

# OAB SP

**ORDEM DOS ADVOGADOS DO BRASIL**
**SECÇÃO DE SÃO PAULO**
**2003 ANO DA SOLIDARIEDADE**



procs. 2281/02, 1525/01 e proc. 4113/01
representantes: Luiz Roberto de Arruda Sampaio, Sandra Assali e Lino Pereira da Silva.
representados: Renato Guimarães Júnior

O cenário mostra-se decerto desafiador.    Inegáveis a amplidão, responsabilidade e complexidade envoltas.    Antagonizam-se advogados de nomeada. Reputações e dignidades são trazidas à calva.    Como pano de fundo, debilidades do Judiciário.    Extremeadas com lamentáveis laivos de indesejável mercancia, ante quantias que muitas espicaçaram a ganância, tudo aliado a ditas tramas das mais pérfidas.

De um lado advogado assaz conhecido.    Seu pai, bem conhecido por sua combatividade e denodo marcante em nossos Pretórios, a quem sempre muito admirei, vivenciou agruras da tristemente lembrada OBAN.    Vivências, experiências que certamente levam à evolução, a considerações acuradas.    Mostra-se, ladeado por filho de conhecido Desembargador, ao qual também sempre devotei apreço.

Do outro lado, egresso do Ministério Público, alguém dotado de combatividade, inteligência e cultura ímpares, I. Professor da UNICAMP, com passado impoluto, ao que sei.    Observo que ao revés daquilo que aqui se buscou sustentar, quanto a não mais representar ninguém na questão em foco, mas sim a si próprio, na verdade, constam, dentre outras, por recentes, petições em prol de órfãos e viúva, ao STJ e ao 1º TAC-SP, às fls. 1019 e seg., do PD 4113/01.

De entremeio a tudo, referências até a Insigne Professor Catedrático, hoje aposentado, de Direito Internacional em nossas Arcadas.

Ex-surge dos alentados volumes nos quais se confrontam, conquanto algo esquálida, uma sugerida debilidade "tupiniquim".    Insta por aí, se veja este parecer preambulado por legítimo ufanismo quanto ao conduzir-se deste E. Pretório, bem como da Nobre Classe dos Advogados em nosso País, detentora de Código Ético a causar inveja pelo Mundo, notadamente em relação à poderosa Nação norte-americana. De há muito em congressos mundiais se destacam os Princípios Éticos que regem os Advogados em nosso País, inadmitidas aqui a propaganda e mercantilização, lá, em regra, grassantes.    Culturas e modo de ser, bem diferenciados sem dúvida.

Acusa-se o qdo. de sobrepor sua ambição pessoal ou desmedida ganância ao interesse de clientes, de sorte a obstar acordos.

Este se defende à exaustão, apontando fatos da mais suma gravidade, tramas das mais torpes, urdidas além fronteiras, por grupos poderosíssimos.    Acresce em sua defesa, engodos a torpedeá-lo junto aos clientes, buscando levá-lo a descrédito, qual verdadeiro Don Quixote contra moinhos de vento, sentindo-se um Golias a duelar com gigantes.

De permeio ainda e a tudo isto, dezenas de vítimas por infausto e clamoroso desastre aéreo com proporções jamais vistas em nosso País.    Dentre estas há



RUA SENADOR FEIJÓ, 143 - 01006.901 - SÃO PAULO - SP - PABX. 3116.1025 - http://www.oabsp.org.br

RG-12190
CONFIDENTIAL



# OAB SP

### ORDEM DOS ADVOGADOS DO BRASIL
### SECÇÃO DE SÃO PAULO
**2003 ANO DA SOLIDARIEDADE**

aquelas que se mostram revoltadas, como v.g. I. membro do M. Público Federal Trabalhista, hora apresentado. Mostra-se extremamente revoltado, irado mesmo, ao achar que a morte de seu filho, está a propiciar a sanha de mercadores infames. Não quer receber nada, por entender, a tanto se permitindo, dada sua inegável qualificação jurídica, não traduzível em cifrões a tragédia ocorrida. Poderá haver também quem esteja passando por extrema necessidade, v.g. as muitas viúvas envolvidas, se dispondo a receber desde logo, quantia ainda que irrisória. Como também poderá existir quem se disponha a ir "até o fim" em busca de justiçamento o mais pleno e intenso possível.

Quanto ao qdo., trabalhou e por aí entende lhe serem devidos honorários, a teor do art. 23 do EA. Não se olvidará que o mesmo é patrocinado, por Nobre Advogado que já presidiu nossa AASP, o qual aliás também advoga para o antes aqui nomeado Professor de Direito Internacional, em ações de cobrança de honorários relativos à mesma causa. No seu ver acordos, mormente canhestros, por justo não poderão resultar em prejuízo daquilo que lhe pertenceria por Direito. Abomina aquilo que tem por trama torpe, a implantar divisões, intrigas, malquerenças e infâmias dentre as sofridas vítimas, de sorte a antagonizá-lo com as mesmas. Se mostra inconformado ante o uso de publicações em revistas de grande influência e circulação, com o apoio de quem tem por uma vendilhona, a liderar associação de vítimas, a qual teria sido subornada, para induzir estas, qual verdadeira boiada, a desastroso e ínfimo ressarcimento. Mostra sentir enxovalhadas, conspurcadas, sua honra e dignidade. Execra advogados de afamado escritório estadunidense, Speiser Krause, dizendo-os incursos em patrocínio infiel, notadamente Arthur E. Ballen, o qual além de se apresentar bêbado, desdenhando ou desfazendo de nosso País, utilizava até meretrizes em sua companhia, deixando triste memória por onde andou.

De se ver que diligenciando, através da *Internet*, localizei, com efeito, conteúdo preocupante, no *site* desse escritório, a conter liames merecedores de consideração, quiçá melhor apuração, quais sejam;

"Speiser Krause
Attorney Profiles
John J. "Jack" Veth

Following military service, <u>Mr. Veth joined Northrop</u> Corporation's Development and Production Team for the Advanced Technology (Stealth) Bomber, the B-2, at Northrop's Advanced Systems Division in Pico Rivera, California.

He has handled product liability cases against Boeing Corporation, McDonnell Douglas Helicopters, Inc., Robinson Helicopters Inc., Cessna Aircraft, Inc., and is currently lead plaintiffs' <u>counsel in the on-going litigation stemming from the Brazilian TAM FOKKER 100 crash in San Paulo, Brazil which occurred in October of 1996.</u>"

(grifei)

Também aponta diversos delitos, inclusive patrocínio infiel, em relação ao qte. Luiz Roberto de Arruda Sampaio e sua colega de escritório, Rosana Malatesta Pereira.



RUA SENADOR FEIJÓ, 143 - 01006.901 - SÃO PAULO - SP - PABX. 3116.1025 - http://www.oabsp.org.br

RG-12191
CONFIDENTIAL



# OAB SP

**ORDEM DOS ADVOGADOS DO BRASIL**
**SECÇÃO DE SÃO PAULO**
**2003  ANO DA SOLIDARIEDADE**

Dito ainda de mal conduzir-se do advogado carioca que representa a "máfia", advogando pela VARIG, como também pela TAM, Lino Pereira da Silva e seu "Arena".

Gravíssimas imputações pois, trazidas aos alentados volumes dos feitos disciplinares em que contendem.

No tocante ao aqui qdo., resta ver se agiu dentro de sua consciência profissional, em ato de foro íntimo, na efetiva defesa, sob justa e compreensíveis revolta e indignação, inconformado, ante o aviltamento das indenizações pespegadas, ou se mostra movido por egoística, bem como ganânciosa ambição e proveito meramente pessoal, conquanto injurídico ou imoral.  Só regular instrução e dilação probatória mais atilada, não se confundindo isto com meras reiterações inócuas que adviriam em desrespeito à preciosidade do tempo desta C. Corte, permitirá, como já assentado pela Exma. Presidência do E. TED III às fls. 981 do PD 4113/01, venha a ser apurado o quanto insta, até pela dignidade e devida preservação de Nossa Classe.  Por aí se deverá aferir a qual dos lados assiste razão, consagrando-se assim sua lisura e honorabilidade.

Insta ainda, restar consignado que as posições do qdo. em relação ao I. Professor Irineu Strenger ostentam alguma diferença, qual seja a de que o qdo. através do advogado comum a ambos, postula honorários seja junto a seus clientes, seja junto à parte vencida mercê de sucumbência sem trânsito em julgado.  Já o Professor move ação de cobrança de honorários contra a Northrop, por constituído pela mesma e não pelas vítimas.  De se ver por sinal, no nosso entender, deverá ver-se, infelizmente, reformada a sentença de primeiro grau na ação cível do F. Jabaquara Saúde, pelo menos em parte.  Tal acredito por inobstante judiciosa a decisão, mercê da sabida debilidade de recursos e tempo, deu-se uma, creio descabida, tábula rasa em que se nivelou, se tratou por igual partes distintas, aquinhoou-se a todos igualmente, quando, sabidamente, havia que se distinguir cada qual das vítimas, seja pela idade, seja pelo nível social, psique próprio, ou ganhos individuais.  Assim, por interessar aqui, demorando hoje a distribuição do 1º Alçada cerca de 4 anos, muito há que se esperar ainda no âmbito judicial, pelo que com mais brevidade aqui, confio, restará apurado o que de Direito, até porque, relembre-se que a mera tramitação de feito disciplinar já se erige em suplício, em punição contra o advogado que com isto, sabidamente, sofre muito.

Cabe observar que conquanto não vedada, mostra-se desrecomendada a advocacia *ad exitum*, por consorciar o advogado ao cliente, retirando-lhe a necessária

RUA SENADOR FEIJÓ, 143 - 01006.901 - SÃO PAULO - SP - PABX. 3116.1025 - http://www.oabsp.org.br

RG-12192
CONFIDENTIAL



# OAB SP

ORDEM DOS ADVOGADOS DO BRASIL
SECÇÃO DE SÃO PAULO
2003 ANO DA SOLIDARIEDADE

frieza ou isenção, toldando sua melhor visão, comprometendo-a, podendo vir a prejudicar o cliente e a si próprio. Cria ademais óbices a uma recomendável eventual renúncia, quando vislumbrada perda da confiabilidade p. e., tornando cinzenta a zona delimitória quanto a qual percentual terá feito jus até então.

Difícil, sabe-se, resistir à tentação, mormente nestas épocas difíceis para a proletarizada classe de pegar aquela causa vultuosa com valores a fazerem consagrarem pelo menos financeiramente o advogado. Mais tentador ainda uma causa de valor alto, com vários clientes. Daí à cooptação, curto interstício haverá. A mercancia também estará rondando. Não se olvide que a advocacia se apóia na *fides*, advinda do "olho no olho"(Art.16 do CE). Mais que isso, conquanto possa angariar possível maior atenção do Judiciário pelo vulto agigantado, não será menos certo que fundirem-se num mesmo cadinho interesses pessoais diferenciados, se mostrará não cômodo. Um poderá querer acordo logo, contrapondo-se a outro, demandista e que gosta de brigar, de "ir até o fim".

Ouso, outrossim, discordar do Nobre Colega Relator em seu diligente parecer de fls. 880/883 no PD 4113/01, ao incluir a transgressão descrita pelo inc. VIII do art. 34 do EA. Isto porque a tenho como destipificada *ex-vi* da menção "entendimento com a parte adversa". Dá-se que a inaugural deste e falas posteriores referem-se a queixumes de qte. por comunicações a ex-clientes e que só vieram a se constituir em parte adversa posteriormente, após ajuizada ação contra os mesmos, visando cobrar honorário. Pela mesma sorte, a incursão na falta descrita no inc. XXV, do mesmo preceito, me parece um tanto desapegada, eis que a teor da jurisprudência desta E. Corte, seu enquadramento se dá ante hipóteses como "a má-fama e reprovável reputação profissional", embriaguez habitual, ante, como segue ...

> "...prova inculpadora estreme de dúvida, como caracterização da habitualidade. Assim, não se tipifica tal conduta quando eventual embriaguez se constitui em ato isolado e acidental na vida do profissional do Direito. Ademais, tal conduta incompatível tem que se exteriorizar em ações concretas capazes de denegrir a boa imagem e reputação de que deve gozar na comunidade dos operadores do Direito."

(Recurso nº 1.982/99/SCA-SP. Relator: Conselheiro Nereu Lima -RS. Data de julgamento: 14.06.99. DJ 22.08.99, p. 69, 51)

Caberia sim ante a prática contumaz de delitos graves como "a invasão, portando arma de fogo, do domicílio de um colega" (Recurso nº 2.130/2000/SCA, orígem OAB/MS - Processo 129/97 - CED de 05.05.97, por maioria. (DJ 24.05.2000, p. 141, 51e), e outros tais (Ementa nº 089/2000/SCA).



RUA SENADOR FEIJÓ, 143 - 01006.901 - SÃO PAULO - SP - PABX. 3116.1025 - http://www.oabsp.org.br

RG-12193
CONFIDENTIAL



# OAB SP

**ORDEM DOS ADVOGADOS DO BRASIL**
**SECÇÃO DE SÃO PAULO**
**2003 ANO DA SOLIDARIEDADE**

Entendo assim, *venia concessa* e sempre *sub censuram*, descabida a admissibilidade quanto às mesmas, quais sejam, os incs. VIII e XXV mencionados.

Também ouso dissentir, *venia permissa*, do não menos Nobre Colega Instrutor Relator que se pronunciou às fls. 914/918 no PD 1525/01, opinando pelo arquivamento do feito, conquanto acolhendo e tendo por bem lançadas suas fundamentações com razões muito bem esposadas. Vejo, contudo, como bem determinado por essa Exma. Presidência, dado o fragor e relevância envoltos, até para que se permita ao qdo., bem se defendendo, vir a extremar de dúvida seu conduzir-se, mediante atremada instrução que se espera, em restando absolvido. Também entendo por bem consignar, no meu ver, mostrar-se compreensível a amplidão dos processados, dada a complexidade e suma delicadeza daquilo que neles se mostra contido.

Por derradeiro e ainda, *data maximissima venia*, ao revés do sustentado no parecer de fls. 198/200 do PD 1525/01, por D. Colega Assessor da E. Presidência Geral, não se me mostram tipificadas as infrações por ele vislumbradas, quais sejam as descritas pelos incs. VII e IX do art. 34 do EA, mercê da excludente "justa causa" ali contida. Isto porque, os fatos ou circunstâncias afloradas pelo qte. na liça, a meu ver encontram devida justificativa. Em outras palavras, para defesa dos interesses pelos quais terçou armas, impunha-se viessem a lume. Não vejo excessos nem violações nesse conduzir-se, pois além do mais buscava resguardar sua honra e dignidade. Tampouco se dirá ocorrido prejuízo ao cliente uma vez que implicaria isto em violentar-se a consciência, a convicção do advogado, área estritamente de foro íntimo, à qual resta vedado ingressar-se. Havia, ou há ainda e ademais, a contraposição dos interesses de outras vítimas que seguem por ele defendidas com tenacidade, além dos a ele inerentes, quanto à pretendida percepção de honorários por sucumbência.

Entendo assim, *venia concessa* e sempre *sub censuram*, descabida a admissibilidade e seguimento quanto aos incs. VIII e XXV mencionados, tanto quanto aos incs. VII e IX.

Por outro lado, como antes referido e já bem determinado pela Exma. Presidência do TED III às fls. 981 do PD 4113/01 e às fls. 919 do PD 1525/01, se deverá apurar, através do regular seguimento, com supedâneo na Ementa 527 do E. Conselho Federal de nossa Colenda Corte, quanto à "irrelevância do enquadramento em outro dispositivo pelo TED" (Ementário do Conselho Federal da OAB, ed. 1997/1998, p. 99, DJ 31.10.97, p. 56151/152, com referência a decisão similar anterior, DJ 25.9.97, p. 47472), secundando o parecer de fls. 798/799 do PD 2281/02, com ressalva apenas quanto à incursão no inc. VIII como aqui antes já sustentado,



RUA SENADOR FEIJÓ, 143 - 01006.901 - SÃO PAULO - SP - PABX. 3116.1025 - http://www.oabsp.org.br

RG-12194
CONFIDENTIAL



# OAB SP

**ORDEM DOS ADVOGADOS DO BRASIL**
**SECÇÃO DE SÃO PAULO**
2003 ANO DA SOLIDARIEDADE

entendo *sub censuram*, cumprir-me opinar pela continuidade deste, mantida
honrabilidade, mas por passível em tese o representado de incursão somente
transgressões descritas pelo nosso Código de Ética, em seus...

Art. 2º - Parágrafo único - São deveres do advogado:
... atuar com destemor, independência, honestidade, decoro, veracidade, leal
dignidade e boa fé;

Art. ... O exercício da advocacia é incompatível com qualquer procediment
mercantilização.

Art. 7º - É vedado o oferecimento de serviços profissionais que impliquem, diret
indiretamente, inculcação ou captação de clientela.
c.c. o inc IV do art. 34 do EA "angariar ou captar causas, com ou sem a intervençã
terceiros;"
...

Art. 44  Deve o advogado tratar o público, os colegas as autoridades e os funcionári
Juízo com respeito discrição e independência, exigindo igual tratamento e zelando
prerrogativas a que tem direito.

Art. 45  Impõe se ao advogado lhaneza, emprego de linguagem escorreita e polida, es
e disciplina na execução dos serviços.

Isto sem perder de vista tocar ao advogado, *ex-vi* do art. 2º supra,
velar por sua reputação pessoal e profissional;", se mostrando certo ainda que pelo me
texto, em seu "Art. 14  A revogação do mandato judicial por vontade do cliente não o desot
do pagamento das verbas honorárias contratadas, bem como não retira o direito do advogad
receber o quanto lhe seja devido em eventual verba honorária de sucumbência, calcu
proporcionalmente, em face do serviço efetivamente prestado."

Enfeixando, no tocante à questão da reunião dos feitos, atent
requerida pelo qdo. para "facilitar sua defesa", haveria por óbice acharem-se os fe
em fases diferenciadas além da questão do sigilo, não em prol do qdo., ressalte-se,
sabidamente da figura do Advogado, eis que aparentemente há qtes. distin
Contrapondo-se, ou por melhor, sopesando-se isto, todavia, às benesses a advirem
reunião requerida, vendo imperar no substrato inequívoca conexão instrumental, p
economia do sabidamente custoso aparato desta E. Corte, mas sobretudo no rece
decisões conflitórias, *ex-vi* do art. 82 do CPP subsidiariamente aplicável, tambér
sempre *sub censuram*, entendo caber-me opinar se vejam reunidos os feitos, seguir
se a regular instrução no PD 1525/01, por *anterius*, onde às fls 871, inclusive V.I
honrou-me "Para análise da matéria", observando já nomeado instrutor as fls. 1C
do PD 4113/01, crendo porém, ao reverso do pelo mesmo exarado, *data max.*
*venia*, descaber a esta altura novo rol de testemunhas, eis que apenas com a inaugu
e defesa prévia isto cabia (§ 2º do art. 52, do CE), observando-se ademais já ofereci
rois de testemunhas nos autos, v.g. fls. 953 do PD 1525/01, fls. 568 do PD 2281

RUA SENADOR FEIJÓ, 143 - 01006.901 - SÃO PAULO - SP - PABX. 3116.1025 - http://www.oabsp.org.br

RG-12195
CONFIDENTIAL



# OAB SP

ORDEM DOS ADVOGADOS DO BRASIL
SECÇÃO DE SÃO PAULO
2003  ANO DA SOLIDARIEDADE

ou fls. 210 do PD 143/01, vendo no mais como desnecessárias novas manifestações das partes, por já exaurido o quanto lhes cabia falar, descabendo cogitar-se da letra "a" do inc. IV do art. 50, dadas as circunstâncias, nas extensões dos processados, sendo de se encerrar o contraditório, resguardada que se viu ao qdo., como instava, derradeira manifestação após juntada de documentos, cumprirá, s.m.j., ver-se designada audiência para produção a coleta de provas orais, conforme aposto pelo I. Instrutor Relator, às fls. 903 do PD 1525/01.

São Paulo, 8 de setembro de 2003.

Benedicto Sérgio de Almeida Santiago
OAB-SP 22 337
**Assessor da Presidência Geral do Tribunal de Ética e Disciplina**

RG-12196
CONFIDENTIAL

# EXHIBIT 2

VARA FEDERAL DE PRIMEIRA INSTÂNCIA
DISTRITO SUL DE NOVA YORK

PROCESSO N.: 05-CV-2210(DC)
ILUSTRÍSSIMO SENHOR JUIZ DENNY CHIN

RENATO GUIMARÃES, JR.,

     Autor,

contra

SPEISER, KRAUSE, NOLAN &
GRANITO, uma empresa profissional
anteriormente conhecida por
SPEISER, KRAUSE, MADOLE
& LEAR, uma empresa profissional,

     Ré.

_____/

### DECLARAÇÃO DE MARIA DAS GRAÇAS DE OLIVEIRA RODRIGUES

De acordo com o U.S.C. 28 (Código Federal dos EUA) 1746, **MARIA DAS GRAÇAS DE OLIVEIRA RODRIGUES** declara:

1.    Meu nome é **MARIA DAS GRAÇAS DE OLIVEIRA RODRIGUES**. Sou cidadã brasileira e resido no Brasil. A presente declaração baseia-se no que eu pessoalmente tenho conhecimento.

2.    Minha família contratou Speiser, Krause, Nolan & Granito ("Speiser, Krause") e Renato Guimarães Jr. para representarem minha família num processo judicial nos Estados Unidos referente a um acidente aéreo ocorrido em 31 de outubro de 1996, com avião operado pela Transportes Aéreos Regionais, S.A., Linhas Aéreas ("TAM Airlines"), que decolou de São Paulo, Brasil.

3.    Em abril, ou por volta de abril, 2000, representantes da Speiser, Krause vieram ao Brasil e apresentaram á minha família uma proposta de acordo. Eu não aceitei a oferta de acordo naquele momento nem posteriormente porque não creio que seja em quantia suficiente de dinheiro.

4.    Além de rejeitar a oferta de acordo, minha família tomou a decisão de não mais ser representada pela Speiser, Krause. Por esse motivo, contratamos com outro advogado.

Guimarães contra Speiser Krause
Processo N.: 05-CV-2210(DC)

5.  Minha decisão de rejeitar a oferta de acordo e deixar de usar os serviços da Speiser, Krause foi uma decisão financeira e não foi influenciada ou causada por nenhum conflito ou quaisquer eventos relacionados a nenhum conflito entre o advogado Renato Guimarães Jr. a Speiser, Krause.   Tomei essa decisão com base no que senti ser mais interessante financeiramente para minha família.

6.  Fui informado que agora a Speiser, Krause sustenta que o Dr. Guimarães disse ou fez alguma coisa para me influenciar a rejeitar o acordo ou não mais utilizar os serviços da Speiser, Krause, mas isso não está correto.

7.  Declaro sob pena de perjúrio segundo as leis dos Estados Unidos da América e do Brasil que o exposto acima é verdadeiro e está correto.

MARIA DAS GRAÇAS DE OLIVEIRA RODRIGUES
Data: 30/05/07

Página 2 de 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 05-CV-2210(DC)
THE HONORABLE DENNY CHIN

RENATO GUIMARAES, JR.,

     Plaintiff,

vs.

SPEISER, KRAUSE, NOLAN &
GRANITO, a professional corporation f/k/a
SPEISER, KRAUSE, MADOLE & LEAR, a
professional corporation,

     Defendant.

_____/

## DECLARATION OF MARIA DAS GRACAS DE OLIVEIRA RODRIGUEZ

Pursuant to 28 U.S.C. 1746, **MARIA DAS GRACAS DE OLIVEIRA RODRIGUEZ** attests:

1.     My name is **MARIA DAS GRACAS DE OLIVEIRA RODRIGUEZ**. I am a citizen and resident of Brazil. This declaration is based upon my personal knowledge.

2.     My family retained Speiser, Krause, Nolan & Granito ("Speiser, Krause") and Renato Guimaraes to represent my family in a lawsuit in the United States concerning an airplane crash that occurred on October 31, 1996 in a plane operated by Transportes Arcos Regionais, S.A. Airlines ("TAM Airlines") departing from Sao Paulo, Brazil.

3.     On or about April 2000, representatives of Speiser, Krause came to Brazil and presented my family with a settlement offer. I did not, and have not, accepted that settlement offer because I do not believe it is for a sufficient sum of money.

4.     In addition to rejecting the settlement offer, my family made a decision that we do not wish to be represented by Speiser, Krause. For this reason we retained different counsel.

5.    My decision to reject the settlement offer and to cease using the services of Speiser, Krause

was a financial decision and it was not influenced or caused by any dispute, or any events

related to any dispute, between attorney Renato Guimaraes and Speiser, Krause. I made this

decision based upon what I felt was in my family's financial best interests.

6.    I have been informed that Speiser, Krause now contends that Mr. Guimaraes said or did

something which influenced me to reject the settlement or to stop using the services of

Speiser, Krause, but that is not accurate.

7.    I declare under penalty of perjury under the laws of the United States of America and the

laws of Brazil that the foregoing is true and correct.


_____
MARIA DAS GRACAS DE OLIVEIRA RODRIGUEZ

Date: 30 / 05 / 07


Page 2 of 2

# EXHIBIT 3

VARA FEDERAL DE PRIMEIRA INSTÂNCIA
DISTRITO SUL DE NOVA YORK

PROCESSO N.: 05-CV-2210(DC)
ILUSTRÍSSIMO SENHOR JUIZ DENNY CHIN

RENATO GUIMARÃES, JR.,

    Autor,

contra

SPEISER, KRAUSE, NOLAN &
GRANITO, uma empresa profissional
anteriormente conhecida por
SPEISER, KRAUSE, MADOLE
& LEAR, uma empresa profissional,

    Ré.

_____/

## DECLARAÇÃO DE AIRTON FRANCISCO RODRIGUES

De acordo com o U.S.C. 28 (Código Federal dos EUA) 1746, AIRTON FRANCISCO RODRIGUES declara:

1.     Meu nome é **AIRTON FRANCISCO RODRIGUES.** Sou cidadão brasileiro e resido no Brasil. A presente declaração baseia-se no que eu pessoalmente tenho conhecimento.

2.     Minha família contratou Speiser, Krause, Nolan & Granito ("Speiser, Krause") e Renato Guimarães Jr. para representarem minha família num processo judicial nos Estados Unidos referente a um acidente aéreo ocorrido em 31 de outubro de 1996, com avião operado pela Transportes Aéreos Regionais, S.A., Linhas Aéreas ("TAM Airlines"), que decolou de São Paulo, Brasil.

3.     Em abril, ou por volta de abril, 2000, representantes da Speiser, Krause vieram ao Brasil e apresentaram á minha família uma proposta de acordo. Eu não aceitei a oferta de acordo naquele momento nem posteriormente porque não creio que seja em quantia suficiente de dinheiro.

4.     Além de rejeitar a oferta de acordo, minha família tomou a decisão de não mais ser representada pela Speiser, Krause. Por esse motivo, contratamos com outro advogado.

Guimarães contra Speiser Krause
Processo N.: 05-CV-2210(DC)

5.     Minha decisão de rejeitar a oferta de acordo e deixar de usar os serviços da
Speiser, Krause foi uma decisão financeira e não foi influenciada ou causada
por nenhum conflito ou quaisquer eventos relacionados a nenhum conflito
entre o advogado Renato Guimarães Jr. a Speiser, Krause.   Tomei essa
decisão com base no que senti ser mais interessante financeiramente para
minha família.

6.     Fui informado que agora a Speiser, Krause sustenta que o Dr. Guimarães disse
ou fez alguma coisa para me influenciar a rejeitar o acordo ou não mais
utilizar os serviços da Speiser, Krause, mas isso não está correto.

7.     Declaro sob pena de perjúrio segundo as leis dos Estados Unidos da América
e do Brasil que o exposto acima é verdadeiro e está correto.

_Rodrigues_
AIRTON FRANCISCO RODRIGUES
Data: _30/05/07_

Página 2 de 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 05-CV-2210(DC)
THE HONORABLE DENNY CHIN

RENATO GUIMARAES, JR.,

     Plaintiff,

vs.

SPEISER, KRAUSE, NOLAN &
GRANITO, a professional corporation f/k/a
SPEISER, KRAUSE, MADOLE & LEAK, a
professional corporation,

     Defendant.

_____/

## DECLARATION OF AIRTON FRANCISCO RODRIGUES

Pursuant to 28 U.S.C. 1746, **AIRTON FRANCISCO RODRIGUES** attests:

1.   My name is **AIRTON FRANCISCO RODRIGUES**. I am a citizen and resident of Brazil. This declaration is based upon my personal knowledge.

2.   My family retained Speiser, Krause, Nolan & Granito ("Speiser, Krause") and Renato Guimaraes to represent my family in a lawsuit in the United States concerning an airplane crash that occurred on October 31, 1996 in a plane operated by Transportes Areos Regionais, S.A. Airlines ("TAM Airlines") departing from Sao Paulo, Brazil.

3.   On or about April 2000, representatives of Speiser, Krause came to Brazil and presented my family with a settlement offer. I did not, and have not, accepted that settlement offer because I do not believe it is for a sufficient sum of money.

4.   In addition to rejecting the settlement offer, my family made a decision that we do not wish to be represented by Speiser, Krause. For this reason we retained different counsel.

Guimaraes v. Speiser Krause
Case No.: 05-CV-2210(DC)

5.  My decision to reject the settlement offer and to cease using the services of Speiser, Krause was a financial decision and it was not influenced or caused by any dispute, or any events related to any dispute, between attorney Renato Guimaraes and Speiser, Krause. I made this decision based upon what I felt was in my family's financial best interests.

6.  I have been informed that Speiser, Krause now contends that Mr. Guimaraes said or did something which influenced me to reject the settlement or to stop using the services of Speiser, Krause, but that is not accurate.

7.  I declare under penalty of perjury under the laws of the United States of America and the laws of Brazil that the foregoing is true and correct.

*Rodrigues*

**AIRTON FRANCISCO RODRIGUES**

Date: 30/05/07

Page 2 of 2

# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 05-CV-2210(DC)
THE HONORABLE DENNY CHIN

RENATO GUIMARAES, JR.,

      Plaintiff,

vs.

SPEISER, KRAUSE, NOLAN &
GRANITO, a professional corporation f/k/a
SPEISER, KRAUSE, MADOLE & LEAR, a
professional corporation,

      Defendant.

———————————————————/

## DECLARATION OF SUZANA KLEPETAR

Pursuant to 28 U.S.C. 1746, SUZANA KLEPETAR attests:

1.   My name is SUZANA KLEPETAR. I am a citizen and resident of Brazil. This declaration is based upon my personal knowledge.

2.   My family retained Speiser, Krause, Nolan & Granito ("Speiser, Krause") and Renato Guimaraes to represent my family in a lawsuit in the United States concerning an airplane crash that occurred on October 31, 1996 in a plane operated by Transportes Areos Regionais, S.A. Airlines ("TAM Airlines") departing from Sao Paulo, Brazil.

3.   On or about April 2000, representatives of Speiser, Krause came to Brazil and presented my family with a settlement offer. I did not, and have not, accepted that settlement offer because I do not believe it is for a sufficient sum of money.

4.   In addition to rejecting the settlement offer, my family made a decision that we do not wish to be represented by Speiser, Krause. For this reason we retained different counsel.

2E-01-2000 19:05  FROM:                                              TO:                    P:02

Guimaraes v. Speiser Krause
Case No.: 05-CV-2210(DC)

5.    My decision to reject the settlement offer and to cease using the services of Speiser, Krause
      was a financial decision and it was not influenced or caused by any dispute, or any events
      related to any dispute, between attorney Renato Guimaraes and Speiser, Krause. I made this
      decision based upon what I felt was in my family's financial best interests.

6.    I have been informed that Speiser, Krause now contends that Mr. Guimaraes said or did
      something which influenced me to reject the settlement or to stop using the services of
      Speiser, Krause, but that is not accurate.

7.    I declare under penalty of perjury under the laws of the United States of America and the
      laws of Brazil that the foregoing is true and correct.

                                        _____
                                        SUZANA KLEPETAR

                                   Date: 05/28/2007

Page 2 of 2

VARA FEDERAL DE PRIMEIRA INSTÂNCIA
DISTRITO SUL DE NOVA YORK

PROCESSO N.: 05-CV-2210(DC)
ILUSTRÍSSIMO SENHOR JUIZ DENNY CHIN

RENATO GUIMARÃES, JR.,

     Autor,

contra

SPEISER, KRAUSE, NOLAN &
GRANITO, uma empresa profissional
anteriormente conhecida por
SPEISER, KRAUSE, MADOLE
& LEAR, uma empresa profissional,

     Ré.

---

## DECLARAÇÃO DE SUZANA KLEPETAR

De acordo com o U.S.C. 28 (Código Federal dos EUA) 1746, **SUZANA KLEPETAR**
declara:

1. Meu nome é **SUZANA KLEPETAR**.  Sou cidadã brasileira e resido no
Brasil.  A presente declaração baseia-se no que eu pessoalmente tenho
conhecimento.

2. Minha família contratou Speiser, Krause, Nolan & Granito ("Speiser,
Krause") e Renato Guimarães Jr. para representarem minha família num
processo judicial nos Estados Unidos referente a um acidente aéreo ocorrido
em 31 de outubro de 1996, com avião operado pela Transportes Aéreos
Regionais, S.A., Linhas Aéreas ("TAM Airlines"), que decolou de São Paulo,
Brasil.

3. Em abril, ou por volta de abril, 2000, representantes da Speiser, Krause
vieram ao Brasil e apresentaram á minha família uma proposta de acordo. Eu
não aceitei a oferta de acordo naquele momento nem posteriormente porque
não creio que seja em quantia suficiente de dinheiro.

4. Além de rejeitar a oferta de acordo, minha família tomou a decisão de não
mais ser representada pela Speiser, Krause.  Por esse motivo, contratamos
com outro advogado.

Guimarães contra Speiser Krause
Processo N.: 05-CV-2210(DC)

5.    Minha decisão de rejeitar a oferta de acordo e deixar de usar os serviços da
      Speiser, Krause foi uma decisão financeira e não foi influenciada ou causada
      por nenhum conflito ou quaisquer eventos relacionados a nenhum conflito
      entre o advogado Renato Guimarães Jr. a Speiser, Krause.    Tomei essa
      decisão com base no que senti ser mais interessante financeiramente para
      minha família.

6.    Fui informado que agora a Speiser, Krause sustenta que o Dr. Guimarães disse
      ou fez alguma coisa para me influenciar a rejeitar o acordo ou não mais
      utilizar os serviços da Speiser, Krause, mas isso não está correto.

7.    Declaro sob pena de perjúrio segundo as leis dos Estados Unidos da América
      e do Brasil que o exposto acima é verdadeiro e está correto.


                        SUZANA KLEPETAR
                        Data: 28/05/2007




                        Página 2 de 2

# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 05-CV-2210(DC)
THE HONORABLE DENNY CHIN

RENATO GUIMARAES, JR.,

     Plaintiff,

vs.

SPEISER, KRAUSE, NOLAN &
GRANITO, a professional corporation f/k/a
SPEISER, KRAUSE, MADOLE & LEAR, a
professional corporation,

     Defendant.

_____/

## DECLARATION OF TEREZINHA DE JESUS FERNANDES DUARTE

Pursuant to 28 U.S.C. 1746, **TEREZINHA DE JESUS FERNANDES DUARTE** attests:

1. My name is **TEREZINHA DE JESUS FERNANDES DUARTE**. I am a citizen and resident of Brazil. This declaration is based upon my personal knowledge.

2. My family retained Speiser, Krause, Nolan & Granito ("Speiser, Krause") and Renato Guimaraes to represent my family in a lawsuit in the United States concerning an airplane crash that occurred on October 31, 1996 in a plane operated by Transportes Areos Regionais, S.A. Airlines ("TAM Airlines") departing from Sao Paulo, Brazil.

3. On or about April 2000, representatives of Speiser, Krause came to Brazil and presented my family with a settlement offer. I did not, and have not, accepted that settlement offer because I do not believe it is for a sufficient sum of money.

4. In addition to rejecting the settlement offer, my family made a decision that we do not wish to be represented by Speiser, Krause. For this reason we retained different counsel.

Guimaraes v. Speiser Krause
Case No.: 05-CV-2210(DC)

5.  My decision to reject the settlement offer and to cease using the services of Speiser, Krause was a financial decision and it was not influenced or caused by any dispute, or any events related to any dispute, between attorney Renato Guimaraes and Speiser, Krause. I made this decision based upon what I felt was in my family's financial best interests.

6.  I have been informed that Speiser, Krause now contends that Mr. Guimaraes said or did something which influenced me to reject the settlement or to stop using the services of Speiser, Krause, but that is not accurate.

7.  I declare under penalty of perjury under the laws of the United States of America and the laws of Brazil that the foregoing is true and correct.


_____
TEREZINHA DE JESUS FERNANDES DUARTE

Date: 28/05/2007

VARA FEDERAL DE PRIMEIRA INSTÂNCIA
DISTRITO SUL DE NOVA YORK

PROCESSO N.: 05-CV-2210(DC)
ILUSTRÍSSIMO SENHOR JUIZ DENNY CHIN

RENATO GUIMARÃES, JR.,

    Autor,

contra

SPEISER, KRAUSE, NOLAN &
GRANITO, uma empresa profissional
anteriormente conhecida por
SPEISER, KRAUSE, MADOLE
& LEAR, uma empresa profissional,

    Ré.

———————————— ——————————/

## DECLARAÇÃO DE TEREZINHA DE JESUS FERNANDES DUARTE

De acordo com o U.S.C. 28 (Código Federal dos EUA) 1746, **TEREZINHA DE JESUS FERNANDES DUARTE** declara:

1.    Meu nome é **TEREZINHA DE JESUS FERNANDES DUARTE**. Sou cidadã brasileira e resido no Brasil. A presente declaração baseia-se no que eu pessoalmente tenho conhecimento.

2.    Minha família contratou Speiser, Krause, Nolan & Granito ("Speiser, Krause") e Renato Guimarães Jr. para representarem minha família num processo judicial nos Estados Unidos referente a um acidente aéreo ocorrido em 31 de outubro de 1996, com avião operado pela Transportes Aéreos Regionais, S.A., Linhas Aéreas ("TAM Airlines"), que decolou de São Paulo, Brasil.

3.    Em abril, ou por volta de abril, 2000, representantes da Speiser, Krause vieram ao Brasil e apresentaram á minha família uma proposta de acordo. Eu não aceitei a oferta de acordo naquele momento nem posteriormente porque não creio que seja em quantia suficiente de dinheiro.

4.    Além de rejeitar a oferta de acordo, minha família tomou a decisão de não mais ser representada pela Speiser, Krause. Por esse motivo, contratamos com outro advogado.



5.  Minha decisão de rejeitar a oferta de acordo e deixar de usar os serviços da Speiser, Krause foi uma decisão financeira e não foi influenciada ou causada por nenhum conflito ou quaisquer eventos relacionados a nenhum conflito entre o advogado Renato Guimarães Jr. a Speiser, Krause.   Tomei essa decisão com base no que senti ser mais interessante financeiramente para minha família.

6.  Fui informado que agora a Speiser, Krause sustenta que o Dr. Guimarães disse ou fez alguma coisa para me influenciar a rejeitar o acordo ou não mais utilizar os serviços da Speiser, Krause, mas isso não está correto.

7.  Declaro sob pena de perjúrio segundo as leis dos Estados Unidos da América e do Brasil que o exposto acima é verdadeiro e está correto.

**TEREZINHA DE JESUS FERNANDES DUARTE**
Data: 28/05/2007

# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 05-CV-2210(DC)
THE HONORABLE DENNY CHIN

RENATO GUIMARAES, JR.,

        Plaintiff,

vs.

SPEISER, KRAUSE, NOLAN &
GRANITO, a professional corporation f/k/a
SPEISER, KRAUSE, MADOLE & LEAR, a
professional corporation,

        Defendant.

## DECLARATION OF JAIME MENIN

Pursuant to 28 U.S.C. 1746, JAIME MENIN attests:

1.     My name is JAIME MENIN. I am a citizen and resident of Brazil. This declaration is based upon my personal knowledge.

2.     My family retained Speiser, Krause, Nolan & Granito ("Speiser, Krause") and Renato Guimaraes to represent my family in a lawsuit in the United States concerning an airplane crash that occurred on October 31, 1996 in a plane operated by Transportes Areos Regionais, S.A. Airlines ("TAM Airlines") departing from Sao Paulo, Brazil.

3.     On or about April 2000, representatives of Speiser, Krause came to Brazil and presented my family with a settlement offer. I did not, and have not, accepted that settlement offer because I do not believe it is for a sufficient sum of money.

4.     In addition to rejecting the settlement offer, my family made a decision that we do not wish to be represented by Speiser, Krause. For this reason we retained different counsel.

Guimaraes v. Speiser Krause
Case No.: 05-CV-2210(DC)

5.   My decision to reject the settlement offer and to cease using the services of Speiser, Krause
     was a financial decision and it was not influenced or caused by any dispute, or any events
     related to any dispute, between attorney Renato Guimaraes and Speiser, Krause. I made this
     decision based upon what I felt was in my family's financial best interests.

6.   I have been informed that Speiser, Krause now contends that Mr. Guimaraes said or did
     something which influenced me to reject the settlement or to stop using the services of
     Speiser, Krause, but that is not accurate.

7.   I declare under penalty of perjury under the laws of the United States of America and the
     laws of Brazil that the foregoing is true and correct.


                                   JAIME MENIN

                                   Date: 28 MAY 07



                              Page 2 of 2



                    VARA FEDERAL DE PRIMEIRA INSTÂNCIA
                       DISTRITO SUL DE NOVA YORK

                    PROCESSO N.: 05-CV-2210(DC)

RENATO GUIMARÃES, JR.,

     Autor,

contra

SPEISER, KRAUSE, NOLAN &
GRANITO, uma empresa profissional
anteriormente conhecida por
SPEISER, KRAUSE, MADOLE
& LEAR, uma empresa profissional,

     Ré.

_____/

### DECLARAÇÃO DE JAIME MENIN

De acordo com o U.S.C. 28 (Código Federal dos EUA) 1746, **JAIME MENIN** declara:

1.     Meu nome é **JAIME MENIN**. Sou cidadão brasileiro e resido no Brasil. A presente declaração baseia-se no que eu pessoalmente tenho conhecimento.

2.     Minha família contratou Speiser, Krause, Nolan & Granito ("Speiser, Krause") e Renato Guimarães Jr. para representarem minha família num processo judicial nos Estados Unidos referente a um acidente aéreo ocorrido em 31 de outubro de 1996, com avião operado pela Transportes Aéreos Regionais, S.A., Linhas Aéreas ("TAM Airlines"), que decolou de São Paulo, Brasil.

3.     Em abril, ou por volta de abril, 2000, representantes da Speiser, Krause vieram ao Brasil e apresentaram á minha família uma proposta de acordo. Eu não aceitei a oferta de acordo naquele momento nem posteriormente porque não creio que seja em quantia suficiente de dinheiro.

4.     Além de rejeitar a oferta de acordo, minha família tomou a decisão de não mais ser representada pela Speiser, Krause. Por esse motivo, contratamos com outro advogado.

Guimarães contra Speiser Krause
Processo N.: 05-CV-2210(DC)

5. Minha decisão de rejeitar a oferta de acordo e deixar de usar os serviços da Speiser, Krause foi uma decisão financeira e não foi influenciada ou causada por nenhum conflito ou quaisquer eventos relacionados a nenhum conflito entre o advogado Renato Guimarães Jr. a Speiser, Krause. Tomei essa decisão com base no que senti ser mais interessante financeiramente para minha família.

6. Fui informado que agora a Speiser, Krause sustenta que o Dr. Guimarães disse ou fez alguma coisa para me influenciar a rejeitar o acordo ou não mais utilizar os serviços da Speiser, Krause, mas isso não está correto.

7. Declaro sob pena de perjúrio segundo as leis dos Estados Unidos da América e do Brasil que o exposto acima é verdadeiro e está correto.

JAIME MENIN
Data: 28 MAY 07

Página 2 de 2

# EXHIBIT 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 05-CV-2210(DC)
THE HONORABLE DENNY CHIN

RENATO GUIMARAES, JR.,

     Plaintiff,

vs.

SPEISER, KRAUSE, NOLAN &
GRANITO, a professional corporation f/k/a
SPEISER, KRAUSE, MADOLE & LEAR, a
professional corporation,

     Defendant.

_____/

## DECLARATION OF ZEILA DE OLIVEIRA MATOS

Pursuant to 28 U.S.C. 1746, ZEILA DE OLIVEIRA MATOS attests:

1.     My name is ZEILA DE OLIVEIRA MATOS. I am a citizen and resident of Brazil. This declaration is based upon my personal knowledge.

2.     My family retained Speiser, Krause, Nolan & Granito ("Speiser, Krause") and Renato Guimaraes to represent my family in a lawsuit in the United States concerning an airplane crash that occurred on October 31, 1996 in a plane operated by Transportes Areos Regionais, S.A. Airlines ("TAM Airlines") departing from Sao Paulo, Brazil.

3.     On or about April 2000, representatives of Speiser, Krause came to Brazil and presented my family with a settlement offer. I did not, and have not, accepted that settlement offer because I do not believe it is for a sufficient sum of money.

4.     In addition to rejecting the settlement offer, my family made a decision that we do not wish to be represented by Speiser, Krause. For this reason we retained different counsel.

Guimaraes v. Speiser Krause
Case No.: 05-CV-2210(DC)

5.  My decision to reject the settlement offer and to cease using the services of Speiser, Krause
    was a financial decision and it was not influenced or caused by any dispute, or any events
    related to any dispute, between attorney Renato Guimaraes and Speiser, Krause. I made this
    decision based upon what I felt was in my family's financial best interests.

6.  I have been informed that Speiser, Krause now contends that Mr. Guimaraes said or did
    something which influenced me to reject the settlement or to stop using the services of
    Speiser, Krause, but that is not accurate.

7.  I declare under penalty of perjury under the laws of the United States of America and the
    laws of Brazil that the foregoing is true and correct.

ZEILA DE OLIVEIRA MATOS

Date: 29.05.2007

Page 2 of 2

VARA FEDERAL DE PRIMEIRA INSTÂNCIA
DISTRITO SUL DE NOVA YORK

PROCESSO N.: 05-CV-2210(DC)
ILUSTRÍSSIMO SENHOR JUIZ DENNY CHIN

RENATO GUIMARÃES, JR.,

    Autor,

contra

SPEISER, KRAUSE, NOLAN &
GRANITO, uma empresa profissional
anteriormente conhecida por
SPEISER, KRAUSE, MADOLE
& LEAR, uma empresa profissional,

    Ré.

_____/

### DECLARAÇÃO DE ZEILA DE OLIVEIRA MATOS

De acordo com o U.S.C. 28 (Código Federal dos EUA) 1746, **ZEILA DE OLIVEIRA MATOS** declara:

1.    Meu nome é **ZEILA DE OLIVEIRA MATOS**. Sou cidadã brasileira e resido no Brasil. A presente declaração baseia-se no que eu pessoalmente tenho conhecimento.

2.    Minha família contratou Speiser, Krause, Nolan & Granito ("Speiser, Krause") e Renato Guimarães Jr. para representarem minha família num processo judicial nos Estados Unidos referente a um acidente aéreo ocorrido em 31 de outubro de 1996, com avião operado pela Transportes Aéreos Regionais, S.A., Linhas Aéreas ("TAM Airlines"), que decolou de São Paulo, Brasil.

3.    Em abril, ou por volta de abril, 2000, representantes da Speiser, Krause vieram ao Brasil e apresentaram á minha família uma proposta de acordo. Eu não aceitei a oferta de acordo naquele momento nem posteriormente porque não creio que seja em quantia suficiente de dinheiro.

4.    Além de rejeitar a oferta de acordo, minha família tomou a decisão de não mais ser representada pela Speiser, Krause. Por esse motivo, contratamos com outro advogado.

5. Minha decisão de rejeitar a oferta de acordo e deixar de usar os serviços da Speiser, Krause foi uma decisão financeira e não foi influenciada ou causada por nenhum conflito ou quaisquer eventos relacionados a nenhum conflito entre o advogado Renato Guimarães Jr. a Speiser, Krause.   Tomei essa decisão com base no que senti ser mais interessante financeiramente para minha família.

6. Fui informado que agora a Speiser, Krause sustenta que o Dr. Guimarães disse ou fez alguma coisa para me influenciar a rejeitar o acordo ou não mais utilizar os serviços da Speiser, Krause, mas isso não está correto.

7. Declaro sob pena de perjúrio segundo as leis dos Estados Unidos da América e do Brasil que o exposto acima é verdadeiro e está correto.

ZEILA DE OLIVEIRA MATOS
Data: 29.05.2007

Página 2 de 2

# EXHIBIT 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 05-CV-2210(DC)
THE HONORABLE DENNY CHIN

RENATO GUIMARAES, JR.,

      Plaintiff,

vs.

SPEISER, KRAUSE, NOLAN &
GRANITO, a professional corporation f/k/a
SPEISER, KRAUSE, MADOLE & LEAR, a
professional corporation,

      Defendant.

_____/

### DECLARATION OF VANESSA PEREIRA RAMOS

Pursuant to 28 U.S.C. 1746, **VANESSA PEREIRA RAMOS** attests:

1.    My name is **VANESSA PEREIRA RAMOS**. I am a citizen and resident of Brazil. This declaration is based upon my personal knowledge.

2.    My family retained Speiser, Krause, Nolan & Granito ("Speiser, Krause") and Renato Guimaraes to represent my family in a lawsuit in the United States concerning an airplane crash that occurred on October 31, 1996 in a plane operated by Transportes Areos Regionais, S.A. Airlines ("TAM Airlines") departing from Sao Paulo, Brazil.

3.    On or about April 2000, representatives of Speiser, Krause came to Brazil and presented my family with a settlement offer. I did not, and have not, accepted that settlement offer because I do not believe it is for a sufficient sum of money.

4.    In addition to rejecting the settlement offer, my family made a decision that we do not wish to be represented by Speiser, Krause. For this reason we retained different counsel.



Guimaraes v. Speiser Krause
Case No.: 05-CV-2210(DC)

5.  My decision to reject the settlement offer and to cease using the services of Speiser, Krause
    was a financial decision and it was not influenced or caused by any dispute, or any events
    related to any dispute, between attorney Renato Guimaraes and Speiser, Krause. I made this
    decision based upon what I felt was in my family's financial best interests.

6.  I have been informed that Speiser, Krause now contends that Mr. Guimaraes said or did
    something which influenced me to reject the settlement or to stop using the services of
    Speiser, Krause, but that is not accurate.

7.  I declare under penalty of perjury under the laws of the United States of America and the
    laws of Brazil that the foregoing is true and correct.


                                    VANESSA PEREIRA RAMOS

                            Date:

VARA FEDERAL DE PRIMEIRA INSTÂNCIA
DISTRITO SUL DE NOVA YORK

PROCESSO N.: 05-CV-2210(DC)
ILUSTRÍSSIMO SENHOR JUIZ DENNY CHIN

RENATO GUIMARÃES, JR.,

     Autor,

contra

SPEISER, KRAUSE, NOLAN &
GRANITO, uma empresa profissional
anteriormente conhecida por
SPEISER, KRAUSE, MADOLE
& LEAR, uma empresa profissional,

     Ré.

_____ /

### DECLARAÇÃO DE VANESSA PEREIRA RAMOS

De acordo com o U.S.C. 28 (Código Federal dos EUA) 1746, **VANESSA PEREIRA RAMOS** declara:

1.    Meu nome é **VANESSA PEREIRA RAMOS**. Sou cidadã brasileira e resido no Brasil. A presente declaração baseia-se no que eu pessoalmente tenho conhecimento.

2.    Minha família contratou Speiser, Krause, Nolan & Granito ("Speiser, Krause") e Renato Guimarães Jr. para representarem minha família num processo judicial nos Estados Unidos referente a um acidente aéreo ocorrido em 31 de outubro de 1996, com avião operado pela Transportes Aéreos Regionais, S.A., Linhas Aéreas ("TAM Airlines"), que decolou de São Paulo, Brasil.

3.    Em abril, ou por volta de abril, 2000, representantes da Speiser, Krause vieram ao Brasil e apresentaram á minha família uma proposta de acordo. Eu não aceitei a oferta de acordo naquele momento nem posteriormente porque não creio que seja em quantia suficiente de dinheiro.

4.    Além de rejeitar a oferta de acordo, minha família tomou a decisão de não mais ser representada pela Speiser, Krause. Por esse motivo, contratamos com outro advogado.



Guimarães contra Speiser Krause
Processo N.: 05-CV-2210(DC)

5.  Minha decisão de rejeitar a oferta de acordo e deixar de usar os serviços da Speiser, Krause foi uma decisão financeira e não foi influenciada ou causada por nenhum conflito ou quaisquer eventos relacionados a nenhum conflito entre o advogado Renato Guimarães Jr. a Speiser, Krause.  Tomei essa decisão com base no que senti ser mais interessante financeiramente para minha família.

6.  Fui informado que agora a Speiser, Krause sustenta que o Dr. Guimarães disse ou fez alguma coisa para me influenciar a rejeitar o acordo ou não mais utilizar os serviços da Speiser, Krause, mas isso não está correto.

7.  Declaro sob pena de perjúrio segundo as leis dos Estados Unidos da América e do Brasil que o exposto acima é verdadeiro e está correto.

VANESSA PEREIRA RAMOS
Data:

Página 2 de 2

# EXHIBIT 9

VARA FEDERAL DE PRIMEIRA INSTÂNCIA
DISTRITO SUL DE NOVA YORK

PROCESSO N.: 05-CV-2210(DC)
ILUSTRÍSSIMO SENHOR JUIZ DENNY CHIN

RENATO GUIMARÃES, JR.,

     Autor,

contra

SPEISER, KRAUSE, NOLAN &
GRANITO, uma empresa profissional
anteriormente conhecida por
SPEISER, KRAUSE, MADOLE
& LEAR, uma empresa profissional,

     Ré.

_____/

### DECLARAÇÃO DE FERNANDO LOBO VAZ DE MELLO

De acordo com o U.S.C. 28 (Código Federal dos EUA) 1746, **FERNANDO LOBO
VAZ DE MELLO** declara:

1.     Meu nome é **FERNANDO LOBO VAZ DE MELLO**.  Sou cidadão brasileiro e resido no Brasil.  A presente declaração baseia-se no que eu pessoalmente tenho conhecimento.

2.     Minha família contratou Speiser, Krause, Nolan & Granito ("Speiser, Krause") e Renato Guimarães Jr. para representarem minha família num processo judicial nos Estados Unidos referente a um acidente aéreo ocorrido em 31 de outubro de 1996, com avião operado pela Transportes Aéreos Regionais, S.A., Linhas Aéreas ("TAM Airlines"), que decolou de São Paulo, Brasil.

3.     Em abril, ou por volta de abril, 2000, representantes da Speiser, Krause vieram ao Brasil e apresentaram á minha família uma proposta de acordo. Eu não aceitei a oferta de acordo naquele momento nem posteriormente porque não creio que seja em quantia suficiente de dinheiro.

4.     Além de rejeitar a oferta de acordo, minha família tomou a decisão de não mais ser representada pela Speiser, Krause. Por esse motivo, contratamos com outro advogado.



Guimarães contra Speiser Krause
Processo N.: 05-CV-2210(DC)

5.    Minha decisão de rejeitar a oferta de acordo e deixar de usar os serviços da
      Speiser, Krause foi uma decisão financeira e não foi influenciada ou causada
      por nenhum conflito ou quaisquer eventos relacionados a nenhum conflito
      entre o advogado Renato Guimarães Jr. a Speiser, Krause.    Tomei essa
      decisão com base no que senti ser mais interessante financeiramente para
      minha família.

6.    Fui informado que agora a Speiser, Krause sustenta que o Dr. Guimarães disse
      ou fez alguma coisa para me influenciar a rejeitar o acordo ou não mais
      utilizar os serviços da Speiser, Krause, mas isso não está correto.

7.    Declaro sob pena de perjúrio segundo as leis dos Estados Unidos da América
      e do Brasil que o exposto acima é verdadeiro e está correto.

FERNANDO LOBO VAZ DE MELLO
Data:   26/05/2007

Página 2 de 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 05-CV-2210(DC)
THE HONORABLE DENNY CHIN

RENATO GUIMARAES, JR.,

       Plaintiff,

vs.

SPEISER, KRAUSE, NOLAN &
GRANITO, a professional corporation f/k/a
SPEISER, KRAUSE, MADOLE & LEAR, a
professional corporation,

       Defendant.

_____/

### DECLARATION OF FERNANDO LOBO VAS DE MELLO

Pursuant to 28 U.S.C. 1746, **FERNANDO LOBO VAS DE MELLO** attests:

1.     My name is **FERNANDO LOBO VAS DE MELLO**. I am a citizen and resident of Brazil.
This declaration is based upon my personal knowledge.

2.     My family retained Speiser, Krause, Nolan & Granito ("Speiser, Krause") and Renato
Guimaraes to represent my family in a lawsuit in the United States concerning an airplane
crash that occurred on October 31, 1996 in a plane operated by Transportes Areos Regionais,
S.A. Airlines ("TAM Airlines") departing from Sao Paulo, Brazil.

3.     On or about April 2000, representatives of Speiser, Krause came to Brazil and presented my
family with a settlement offer. I did not, and have not, accepted that settlement offer because
I do not believe it is for a sufficient sum of money.

4.     In addition to rejecting the settlement offer, my family made a decision that we do not wish
to be represented by Speiser, Krause. For this reason we retained different counsel.

Guimaraes v. Speiser Krause
Case No.: 05-CV-2210(DC)

5.     My decision to reject the settlement offer and to cease using the services of Speiser, Krause
       was a financial decision and it was not influenced or caused by any dispute, or any events
       related to any dispute, between attorney Renato Guimaraes and Speiser, Krause. I made this
       decision based upon what I felt was in my family's financial best interests.

6.     I have been informed that Speiser, Krause now contends that Mr. Guimaraes said or did
       something which influenced me to reject the settlement or to stop using the services of
       Speiser, Krause, but that is not accurate.

7.     I declare under penalty of perjury under the laws of the United States of America and the
       laws of Brazil that the foregoing is true and correct.

FERNANDO LOBO VAS DE MELLO

Date: 26/05/2007

Page 2 of 2

# EXHIBIT 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 05-CV-2210(DC)
THE HONORABLE DENNY CHIN

RENATO GUIMARAES, JR.,

       Plaintiff,

vs.

SPEISER, KRAUSE, NOLAN &
GRANITO, a professional corporation f/k/a
SPEISER, KRAUSE, MADOLE & LEAR, a
professional corporation,

       Defendant.

_____/

### DECLARATION OF MARIA DA CONCEIÇÃO MAGALHÃES VAZ DE MELLO

Pursuant to 28 U.S.C. 1746, **MARIA DA CONCEIÇÃO MAGALHÃES VAZ DE MELLO**
attests:

1.    My name is **MARIA DA CONCEIÇÃO MAGALHÃES VAZ DE MELLO.** I am a
citizen and resident of Brazil. This declaration is based upon my personal knowledge.

2.    My family retained Speiser, Krause, Nolan & Granito ("Speiser, Krause") and Renato
Guimaraes to represent my family in a lawsuit in the United States concerning an airplane
crash that occurred on October 31, 1996 in a plane operated by Transportes Areos Regionais,
S.A. Airlines ("TAM Airlines") departing from Sao Paulo, Brazil.

3.    On or about April 2000, representatives of Speiser, Krause came to Brazil and presented my
family with a settlement offer. I did not, and have not, accepted that settlement offer because
I do not believe it is for a sufficient sum of money.

4.    In addition to rejecting the settlement offer, my family made a decision that we do not wish

Guimaraes v. Speiser Krause
Case No.: 05-CV-2210(DC)

to be represented by Speiser, Krause. For this reason we retained different counsel.

5.   My decision to reject the settlement offer and to cease using the services of Speiser, Krause
     was a financial decision and it was not influenced or caused by any dispute, or any events
     related to any dispute, between attorney Renato Guimaraes and Speiser, Krause. I made this
     decision based upon what I felt was in my family's financial best interests.

6.   I have been informed that Speiser, Krause now contends that Mr. Guimaraes said or did
     something which influenced me to reject the settlement or to stop using the services of
     Speiser, Krause, but that is not accurate.

7.   I declare under penalty of perjury under the laws of the United States of America and the
     laws of Brazil that the foregoing is true and correct.

MARIA DA CONCEIÇÃO MAGALHÃES VAZ DE MELLO

Date: 26/05/2007

Page 2 of 2

VARA FEDERAL DE PRIMEIRA INSTÂNCIA
DISTRITO SUL DE NOVA YORK

PROCESSO N.: 05-CV-2210(DC)
ILUSTRÍSSIMO SENHOR JUIZ DENNY CHIN

RENATO GUIMARÃES, JR.,

     Autor,

contra

SPEISER, KRAUSE, NOLAN &
GRANITO, uma empresa profissional
anteriormente conhecida por
SPEISER, KRAUSE, MADOLE
& LEAR, uma empresa profissional,

     Ré.

_____/

### DECLARAÇÃO DE MARIA DA CONCEIÇÃO MAGALHÃES VAZ DE MELLO

De acordo com o U.S.C. 28 (Código Federal dos EUA) 1746, **MARIA DA
CONCEIÇÃO MAGALHÃES VAZ DE MELLO** declara:

1.     Meu nome é **MARIA DA CONCEIÇÃO MAGALHÃES VAZ DE
MELLO.** Sou cidadã brasileira e resido no Brasil. A presente declaração
baseia-se no que eu pessoalmente tenho conhecimento.

2.     Minha família contratou Speiser, Krause, Nolan & Granito ("Speiser,
Krause") e Renato Guimarães Jr. para representarem minha família num
processo judicial nos Estados Unidos referente a um acidente aéreo ocorrido
em 31 de outubro de 1996, com avião operado pela Transportes Aéreos
Regionais, S.A., Linhas Aéreas ("TAM Airlines"), que decolou de São Paulo,
Brasil.

3.     Em abril, ou por volta de abril, 2000, representantes da Speiser, Krause
vieram ao Brasil e apresentaram á minha família uma proposta de acordo. Eu
não aceitei a oferta de acordo naquele momento nem posteriormente porque
não creio que seja em quantia suficiente de dinheiro.

4.     Além de rejeitar a oferta de acordo, minha família tomou a decisão de não
mais ser representada pela Speiser, Krause. Por esse motivo, contratamos
com outro advogado.

Guimarães contra Speiser Krause
Processo N.: 05-CV-2210(DC)

5.      Minha decisão de rejeitar a oferta de acordo e deixar de usar os serviços da Speiser, Krause foi uma decisão financeira e não foi influenciada ou causada por nenhum conflito ou quaisquer eventos relacionados a nenhum conflito entre o advogado Renato Guimarães Jr. a Speiser, Krause.    Tomei essa decisão com base no que senti ser mais interessante financeiramente para minha família.

6.      Fui informado que agora a Speiser, Krause sustenta que o Dr. Guimarães disse ou fez alguma coisa para me influenciar a rejeitar o acordo ou não mais utilizar os serviços da Speiser, Krause, mas isso não está correto.

7.      Declaro sob pena de perjúrio segundo as leis dos Estados Unidos da América e do Brasil que o exposto acima é verdadeiro e está correto.

_____
MARIA DA CONCEIÇÃO MAGALHÃES VAZ DE MELLO
Data: *26 de maio de 2007*

Página 2 de 2

# EXHIBIT 11

UNITED STATES DISTRICT COURT SOUTHERN
DISTRICT OF NEW YORK
CASE NO.: 05-CV-2210 (DC)
THE HONORABLE DENNY CHIN

RENATO GUIMARAES, JR.,

      Plaintiff,

vs.

SPEISER, KRAUSE, NOLAN & GRANITO,
a professional corporation f/k/a
SPEISER, KRAUSE, MADOLE & LEAR,
a professional corporation,

      Defendant.

_____/

## DECLARATION OF MARIA CHRISTINA JANSTEIN

Pursuant to 28 U.S.C. 1746, MARIA CHRISTINA JANSTEIN attests:

1.    My name is MARIA CHRISTINA JANSTEIN. I am a citizen and resident of Brazil. This declaration is based upon my personal knowledge.

2.    My family retained Speiser, Krause, Nolan & Granito ("Speiser, Krause") and Renato Guimaraes to represent my family in a lawsuit in the United States concerning an airplane crash that occurred on October 31, 1996 in a plane operated by Transportes Aeros Regionais, S.A. Airlines ("TAM Airlines") departing from Sao Paulo, Brazil.

3.    On or about April 2000, representatives of Speiser, Krause came to Brazil and presented my family with a settlement offer. I did not, and have not, accepted that settlement offer because I do not believe it is for a sufficient sum of money.

4.    In addition to rejecting the settlement offer, my family made a decision that we do not wish to be represented by Speiser, Krause. For this reason we retained different counsel.

Guimaraes v. Speiser Krause

Case No.: 05-CV-2210(DC)

5.    My decision to reject the settlement offer, and to cease using the services of Speiser, Krause was a financial decision and it was not influenced or caused by any dispute, or any events related to any dispute, between attorney Renato Guimaraes and Speiser, Krause. I made this decision based upon what I felt was in my family's financial best interests.

6.    I have been informed that Speiser, Krause now contends that Mr. Guimaraes said or did something which influenced me to reject the settlement or to stop using the services of Speiser, Krause, but that is not accurate.

7.    I declare under penalty of perjury under the laws of the United States of America and the laws of Brazil that the foregoing is true and correct.

MARIA CHRISTINA JANSTEIN

Date: 31. 05. 2007

Page 2 of 2

VARA FEDERAL DE PRIMEIRA INSTANCIA
DISTRITO SUL DE NOVA YORK

PROCESSO N.: 05-CV-2210 (DC)
JUIZ DENNY CHIN

RENATO GUIMARÂES, JR.,
    Autor,

contra
SPEISER, KRAUSE, NOLAN & GRANITO,
uma empresa profissional anteriormente conhecida
por
SPEISER, KRAUSE, MADOLE
& LEAR, uma empresa profissional,

    Ré.

_____/

### DECLARAÇAO DE MARIA CHRISTINA JANSTEIN

De acordo com o U.S.C. 28 (Codigo Federal dos EUA) 1746, **MARIA CHRISTINA JANSTEIN** declara:

1.    Meu nome é **MARIA CHRISTINA JANSTEIN.** Sou cidadao brasileiro e resido no Brasil. A presente declaraçao baseia-se no que eu pessoalmente tenho conhecimento.

2.    Minha familia contratou Speiser, Krause, Nolan & Granito ("Speiser, Krause") e Renato Guimaraes Jr. para representarem minha familia num processo judicial nos Estados Unidos referente a um acidente aéreo ocorrido em 31 de outubro de 1996, corn aviao operado pela Transportes Aéreos Regionais, S.A., Linhas Aéreas ("TAM Airlines"), que decolou de Sao Paulo, Brasil.

2.    Em abril, ou por volta de abril, 2000, representantes da Speiser, Krause vieram ao Brasil e apresentaram a minha familia uma proposta de acordo. Eu nao aceitei a oferta de acordo naquele momento nem posteriormente porque nao creio que seja em quantia suficiente de dinheiro.

4.    Além de rejeitar a oferta de acordo, minha familia tomou a decisao de nao mais ser representada pela Speiser, Krause. Por esse motivo, contratamos corn outro advogado.

Guimaraes contra Speiser Krause
Processo N.: 05-CV-2210(DC)

5.  Minha decisão de rejeitar a oferta de acordo e deixar de usar os serviços da Speiser, Krause foi uma decisao financeira e nao foi intluenciada ou causada por nenhum conflito ou quaisquer eventos relacionados a nenhum conflito entre o advogado Renato Guimarães Jr. e a Speiser, Krause. Tomei essa decisao com base no que senti ser mais interessante financeiramente para minha família.

6.  Fui informado que agora a Speiser, Krause sustenta que o Dr. Guimaraes disse ou fez alguma coisa para me influenciar a rejeitar. o acordo ou nao mais utilizar os serviços da Speiser, Krause, mas isso nao esta correto.

7.  Declaro sob pena de perjurio segundo as leis dos Estados Unidos da América e do Brasil que o exposto acima é verdadeiro e esta correto.

**MARIA CHRISTINA JANSTEIN**
Data: 31.05.2007

Pagina 2 de 2

# EXHIBIT 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 05-CV-2210(DC)
THE HONORABLE DENNY CHIN

RENATO GUIMARAES, JR.,

     Plaintiff,

vs.

SPEISER, KRAUSE, NOLAN &
GRANITO, a professional corporation f/k/a
SPEISER, KRAUSE, MADOLE & LEAR, a
professional corporation,

     Defendant.

_____/

### DECLARATION OF DANIELA PEIXOTO ARJONA

Pursuant to 28 U.S.C. 1746, DANIELA PEIXOTO ARJONA attests:

1.    My name is DANIELA PEIXOTO ARJONA. I am a citizen and resident of Brazil. This declaration is based upon my personal knowledge.

2.    My family retained Speiser, Krause, Nolan & Granito ("Speiser, Krause") and Renato Guimaraes to represent my family in a lawsuit in the United States concerning an airplane crash that occurred on October 31, 1996 in a plane operated by Transportes Areos Regionais, S.A. Airlines ("TAM Airlines") departing from Sao Paulo, Brazil.

3.    On or about April 2000, representatives of Speiser, Krause came to Brazil and presented my family with a settlement offer. I did not, and have not, accepted that settlement offer because I do not believe it is for a sufficient sum of money.

4.    In addition to rejecting the settlement offer, my family made a decision that we do not wish to be represented by Speiser, Krause. For this reason we retained different counsel.

Guimarães contra Speiser Krause
Processo N.: 05-CV-2210(DC)

5.    Minha decisão de rejeitar a oferta de acordo e deixar de usar os serviços da
Speiser, Krause foi uma decisão financeira e não foi influenciada ou causada
por nenhum conflito ou quaisquer eventos relacionados a nenhum conflito
entre o advogado Renato Guimarães Jr. a Speiser, Krause.    Tomei essa
decisão com base no que senti ser mais interessante financeiramente para
minha família.

6.    Fui informado que agora a Speiser, Krause sustenta que o Dr. Guimarães disse
ou fez alguma coisa para me influenciar a rejeitar o acordo ou não mais
utilizar os serviços da Speiser, Krause, mas isso não está correto.

7.    Declaro sob pena de perjúrio segundo as leis dos Estados Unidos da América
e do Brasil que o exposto acima é verdadeiro e está correto.

**DANIELA PEIXOTO ARJONA**
Data: 30.05.07

Página 2 de 2

VARA FEDERAL DE PRIMEIRA INSTÂNCIA
DISTRITO SUL DE NOVA YORK

PROCESSO N.: 05-CV-2210(DC)
ILUSTRÍSSIMO SENHOR JUIZ DENNY CHIN

RENATO GUIMARÃES, JR.,

     Autor,

contra

SPEISER, KRAUSE, NOLAN &
GRANITO, uma empresa profissional
anteriormente conhecida por
SPEISER, KRAUSE, MADOLE
& LEAR, uma empresa profissional,

     Ré.

_____/

### DECLARAÇÃO DE DANIELA PEIXOTO ARJONA

De acordo com o U.S.C. 28 (Código Federal dos EUA) 1746, **DANIELA PEIXOTO ARJONA** declara:

1.     Meu nome é **DANIELA PEIXOTO ARJONA**. Sou cidadã brasileira e resido no Brasil. A presente declaração baseia-se no que eu pessoalmente tenho conhecimento.

2.     Minha família contratou Speiser, Krause, Nolan & Granito ("Speiser, Krause") e Renato Guimarães Jr. para representarem minha família num processo judicial nos Estados Unidos referente a um acidente aéreo ocorrido em 31 de outubro de 1996, com avião operado pela Transportes Aéreos Regionais, S.A., Linhas Aéreas ("TAM Airlines"), que decolou de São Paulo, Brasil.

3.     Em abril, ou por volta de abril, 2000, representantes da Speiser, Krause vieram ao Brasil e apresentaram á minha família uma proposta de acordo. Eu não aceitei a oferta de acordo naquele momento nem posteriormente porque não creio que seja em quantia suficiente de dinheiro.

4.     Além de rejeitar a oferta de acordo, minha família tomou a decisão de não mais ser representada pela Speiser, Krause. Por esse motivo, contratamos com outro advogado.

Guimaraes v. Speiser Krause
Case No.: 05-CV-2210(DC)

5.  My decision to reject the settlement offer and to cease using the services of Speiser, Krause
was a financial decision and it was not influenced or caused by any dispute, or any events
related to any dispute, between attorney Renato Guimaraes and Speiser, Krause. I made this
decision based upon what I felt was in my family's financial best interests.

6.  I have been informed that Speiser, Krause now contends that Mr. Guimaraes said or did
something which influenced me to reject the settlement or to stop using the services of
Speiser, Krause, but that is not accurate.

7.  I declare under penalty of perjury under the laws of the United States of America and the
laws of Brazil that the foregoing is true and correct.

DANIELA PEIXOTO ARJONA

Date: 30.05.07

Page 2 of 2

# EXHIBIT 13

28

1                          Gerard Lear

2     to that, whether it was early 2000, early 2001, I

3     just don't remember.  I remember being there,

4     that's it.

5              Q.     What did you do when you were there?

6              A.     There was a family meeting, excuse

7     me, a group meeting, a big meeting.  Everyone was

8     there, a lot of lawyers were there, I think Renato

9     was there, I'm sure he was because that must have

10    been the other time I met him.  A lot of family

11    members.  I spoke.  I listened to them, and that

12    was, basically, it.

13             Q.     What did you speak about?

14             A.     I assume I talked to them about the

15    crash itself, the thrust reversers.  Generally, I

16    might get into the technical parts of it because of

17    my pilot background, giving them an idea of what

18    happened, I believe.

19             Q.     You said you were only there one

20    time?

21             A.     Yes.

22             Q.     Only in conjunction with the TAM

23    litigation?

24             A.     Yes.

25             Q.     And you went to Sao Paulo?

ASA REPORTING SERVICE, INC.
(914) 588-3358

<pre>
 1                    Gerard Lear
 2   writing, though; is that correct?
 3         A.     Well, the letters, whatever the
 4   correspondence is that you have, if I sent it to
 5   Renato and I signed it, it's there.
 6              MR. BERMAN:  We'll pull all those
 7          and discuss those tomorrow morning.
 8         Q.     You told me you were in charge of the
 9   settlement negotiations; correct?
10         A.     Yes.
11         Q.     When did you first get involved in
12   the settlement negotiation process?
13         A.     Well, it was a long process and I
14   guess you would have to -- I'll take it that you're
15   using the word process in a generic long-standing
16   sense.  I probably talked to Neil McGilchrist about
17   it probably as early as '97 to see whether there
18   was any interest in settlement.
19              I remember Renato and other families,
20   they were interested, that's why people were in the
21   United States, could we settle the cases in what we
22   would call mid Atlantic numbers.
23              And, so, I would have had some
24   conversations with Neil, but I can't be specific.
25   I may have been in London, met with him, tested the
</pre>

1                          Gerard Lear

2     water to see whether or not he had any interest,

3     whether he knew anyone else who had interest.

4          Q.      What are mid Atlantic numbers?

5          A.      Well, in our practice, if there are

6     cases that are in Europe that may have a thread of

7     connection to the United States in a jurisdictional

8     sense, but it is tenuous or we anticipate it may be

9     tenuous, you may try to get a defendant to settle

10    the case for greater than or maybe not exactly

11    United States numbers, something in between, so you

12    can get the families more money than they would get

13    if they litigated in their own country.

14         Q.      Is there a quantification of the term

15    mid Atlantic numbers?

16         A.      No, it's just a term in my firm, when

17    we use mid Atlantic, we all know what we're talking

18    about.

19         Q.      Is what you're saying, so I can

20    understand it, it would be something that would be

21    a number that would typically be more than one

22    would anticipate as a recovery in Europe or South

23    America and less than one would anticipate if you

24    had no jurisdictional issues in the United States?

25         A.      Well, if you made a recovery in the

# EXHIBIT 14

1                      Gerard Lear

2    cases where substitutions of counsel were signed by

3    Walter Lack?

4         A.    I remember thinking about it.  I'm

5    sorry, with Lack did you say?

6         Q.    In any of the cases that are still

7    pending that are now being handled by Mr. Lack?

8         A.    I don't believe so, no, we haven't

9    filed anything with Mr. Lack other than

10   substitution of counsel.  And that, again, was done

11   by Jack.  Jack will be better able to answer your

12   questions in that regard.

13        Q.    Prior to November 9th, 2000, did the

14   Speiser Krause firm recognize that there were valid

15   claims for payment of attorney fees by Renato

16   Guimaraes?

17             MR. APUZZO:  I'm sorry, could we

18        read that question back, please?

19             (The question referred to was read

20             back by the Court Reporter.)

21        A.    Not necessarily, no, I didn't.  I was

22   ready to discuss with Renato if he felt he was

23   entitled and we could get him back to doing what we

24   were trying to do, which was give the clients the

25   choice to settle or not, but absent that, I was not

1                    Gerard Lear

2    they decided they do not wish to accept the

3    settlement, or they discharged us, or whatever

4    other reasons are out there.

5         Q.    Such as fighting amongst themselves

6    as Arthur Ballen testified?

7         A.    I think most of that's overcome,

8    there may be a couple.  I'll accept what Arthur

9    Ballen said in that regard.

10        Q.    Would you have any different opinion

11   on that subject?

12        A.    I would not.

13        Q.    Would he be the best source of

14   information with respect to the intra-family

15   disputes that are ongoing?

16        A.    He and Leigh, yes.  I think Arthur

17   probably first and Leigh second in the priority of

18   people that would know.

19        Q.    Did you ever get involved in any of

20   those intra-family disputes?

21        A.    I didn't get involved in the

22   disputes, thank God, but I was involved in

23   discussions with the insurers about trying to do

24   what we would do to make them understand if there

25   were disputes and whether additional funds were

144

1                    Gerard Lear

2          A.      It was apparently in the documents

3    that were in the New York office.

4          Q.      What recent developments had occurred

5    in December of 1999 to compel you to withdraw the

6    $50 million offer?

7          A.      I just went over that.

8          Q.      Did something good happen?

9          A.      Good for us in the sense TAM was a

10   third party.  They had resisted being included in

11   the California action, but the appellate decision,

12   I believe, at that point had come down, or that

13   indicated they were now a third party.

14              And they had previously indicated to

15   me, Neil and Steven, for TAM, had indicated to me

16   that they wanted to settle but they wanted to do it

17   in conjunction with Northrop Grumman and Teleflex.

18   And Northrop Grumman and Teleflex were resisting

19   that.

20              So, I couldn't get settlement talks

21   going, nothing serious.  I was trying to, clients

22   wanted us to make some lead way there, but I wasn't

23   getting it done.

24         Q.      Who at Speiser Krause were the people

25   who were most involved in putting together the

1                    Gerard Lear

2        A.      I already told you.

3        Q.      That was Mrs. Assali.

4        A.      I'm sorry, with Beatrice, probably, I

5   don't know if I ever talked to her on the

6   telephone, maybe I did.  She wouldn't have talked

7   to me directly but I might have been put on a call,

8   I might have said hello if I passed by Leigh's

9   office when she was talking to him, that could of

10  happened.  I met her in Brazil, I met her in

11  Georgetown.  Other than that, I don't recall.

12       Q.      Do you remember what you discussed

13  with her?

14       A.      Where?

15       Q.      At any time.

16       MR. APUZZO:  He doesn't even

17       recall speaking to her.

18       MR. BERMAN:  Beatrice, he said he

19       spoke to her.

20       A.      Yes, Beatrice.  I doubt it was

21  anything substantive.

22       Q.      Nothing specific you can recall?

23       A.      No.

24       Q.      Did you receive any short settlement

25  authority from any of the TAM plaintiffs prior to

1                      Gerard Lear

2     inaugurating settlement discussions?

3          A.     Only the information about earnings

4     and things of that.  No, we didn't go to them

5     specifically for authority in ranges or anything

6     like that, no.

7          Q.     Did you discuss with them the

8     American defendant had recovered $6,000,000?

9          A.     I don't think I did.  I didn't.

10         Q.     Did you advise them that the recovery

11    for the American plaintiff would exceed by some six

12    times the highest recovery for any of the

13    Brazilians?

14         A.     No.

15         Q.     Had you a range of authority that you

16    had perceived in advance from any of the plaintiffs

17    from your inaugurated settlement discussions?

18         A.     I don't think so.

19         Q.     Had you discussed in advance the

20    expectations of recovery with any of the Brazilian

21    plaintiffs prior to inaugurating settlement

22    schedules?

23         A.     I did not.  Arthur or Leigh may have.

24         Q.     Just you.

25         A.     I did not.

1                          Gerard Lear

2              Q.      At any point?

3              A.      I'm not sure we needed to.  There

4       wasn't a requirement to get an actuary, we knew the

5       ages, income.

6              Q.      Did you know the medical --

7              A.      We did, Leigh would discuss with me

8       any special medical conditions, yes.

9              Q.      Were their family means discussed

10      with you?

11             A.      Yes.  We were aware a lot of families

12      were in desperate straits and that was the reason

13      we were pushing so hard, because of the inflation

14      in Brazil, we were doing our best to see if we

15      could help them.

16             Q.      Are there any other communications or

17      conversations that you had with any of the

18      Brazilian families that you haven't told us about

19      as best you can recall?

20             A.      If there are, I can't think of them.

21             Q.      Are there any other conversations or

22      communications that you had with Mr. Guimaraes that

23      you haven't told us about?

24             MR. APUZZO:  Asked and answered, but

25             answer again.

# EXHIBIT 15

1                          Gerard Lear

2     Apuzzo.  I read the depositions of all the partners

3     that were previously taken.  And I went through

4     certain documents that Mr. Apuzzo had, he and I had

5     discussed over the last several months.

6              Q.     So, are you the person from Speiser

7     Krause who knows the most about the matters set

8     forth in the counterclaim?

9              A.     Well, I don't know if I know the

10    most, but certainly I have read materials that

11    appear to be pertinent to that.

12             Q.     If not you, who would be that person?

13             A.     Don't know, don't know what the

14    others know or don't know.

15             Q.     What is your contention in the

16    counterclaim as to those relationships that were

17    purportedly interfered with by Mr. Guimaraes?

18             MR. APUZZO:  Note my objection,

19             but answer the question.

20             A.     After the settlement was reached,

21    obviously, there was a lot of documentation that

22    needed to be accomplished in order to get the

23    families their money.  And Mr. Guimaraes didn't

24    agree that the settlement was appropriate,

25    especially after the Jabaquara decision came down,

```
 1                         Gerard Lear
 2    so he not only refused to take part in the
 3    preparation of any of the documentation for the
 4    families that he represented, as well as anyone
 5    else that perhaps would have liked him to do it,
 6    but actively wrote letters to the clients, to the
 7    Bar Association of Sao Paulo, I believe, in Brazil,
 8    apparently, also to the FBI, to the State
 9    Department of the United States, the Attorney
10    General of Brazil, three judges that were on the
11    matter in the United States in one fashion or
12    another, four or five law firms, and numerous other
13    correspondence that not only vehemently opposed the
14    settlement but referred to Speiser Krause in terms
15    of criminal activity.
16              Q.      Is there an ongoing criminal
17    investigation of Speiser Krause in Brazil?
18              A.      Not to my knowledge, to my knowledge,
19    there never was.
20              Q.      Which clients do you contend that he
21    interfered with?
22              A.      My understanding is that he wrote the
23    letters to all the clients.
24              Q.      There were 65 clients; is that
25    correct?
```

9

1                     Gerard Lear

2    original group of 64, 65?

3         A.    Other than Lack?

4         Q.    Yes, sir.

5         A.    Well, we probably still represent

6    several more, but how many of those are torn

7    between the Jabaquara decision, it's the same

8    issues we discussed in my first deposition, some of

9    that balance are waiting to see what happens with

10   Jabaquara, some of them for various reasons related

11   to issues that are unknown to me simply for one

12   reason or another are not interested in receiving

13   their money.

14                Others may be interested in receiving

15   their money but have been stopped because either

16   they can't get the documentation through the

17   Brazilian system or the defendants are unwilling to

18   pay notwithstanding whatever has happened to the

19   documentation.

20        Q.    Some of that could be inter-family

21   squabbles?

22        A.    Could be.  I think some of this is

23   that type of thing, again Arthur Ballen and Leigh

24   Ballen are more able to discuss that than I am.

25        Q.    As a result of these actions you say

10

1                        Gerard Lear

2    Mr. Lack is engaged in, how many of the 64 or 65

3    clients did you no longer continue to represent?

4         A.    The ones I'm certain of are the eight

5    or nine now that certainly Walter Lack's firm

6    represents.  Are there others out there, there very

7    well may be, I am not satisfied in my own mind that

8    I know exactly why each and every one of them is

9    not proceeding forward, it could be a combination

10   of things.

11        Q.    You'd be speculating --

12        A.    As to other than the nine right now,

13   I would be speculating.  Our intention is to try to

14   get a handle on that.

15             MR. APUZZO:  Can I just interject?

16             We're not making a claim, we're

17        only making a claim for those clients who

18        have substituted, that's my understanding,

19        and this additional new one which we

20        didn't know about which Walter Lack is

21        representing, so the clients that Walter

22        Lack is representing, that's the basis of

23        our claim.

24             We spelled it out in the

25        interrogatory responses, counselor, name,

11

1                          Gerard Lear

2              amount, it's all in writing.

3                      MR. BERMAN:  I've seen those, but

4              I've also seen some reference to a more

5              fixed group of perhaps others.

6              Q.      But you'd be speculating to anything

7      other than the ones represented by Walter Lack?

8              A.      There are others but I cannot sit

9      here and tell you what position every one of those

10     is in because they're not represented by Mr. Lack,

11     they nominally are still represented by us but, for

12     one reason or another, either don't want to take

13     the settlement, some of them still rely on

14     Jabaquara, on Mr. Guimaraes, and the potential for

15     Jabaquara, and others of them, as you say, have

16     family squabbles.  And the fact that the defendants

17     have at least implied to me, if not said, they're

18     not paying anymore money until all this becomes

19     clear, whatever that all is.

20             Q.      By the defendants, you mean?

21             A.      Mr. Bouscaren.

22             Q.      The insurers?

23             A.      Correct, right.  Grumman, for the

24     most part.  I haven't had many conversations with

25     London because they have pulled the plug on the

12

1                      Gerard Lear

2    most part.

3           Q.      I just want to, if I could,

4    understand the relationship interfered with, was it

5    the retainer agreement that you're claiming was

6    interfered with?

7           A.      No, the retainers we already had.

8           Q.      Was it the settlement?

9           A.      The settlement, no, the settlement

10   wasn't interfered with.  The time of the settlement

11   was April 2000, and Mr. Guimaraes at that time was

12   being helpful.

13          Q.      Was it the relationship with the

14   client in general?

15          A.      After the Jabaquara, yes.

16          Q.      After the Jabaquara judgment came

17   down?

18          A.      Yes, then it was the relationship

19   with the client, by us with the client, and there

20   was an active role by Mr. Guimaraes in attempting

21   to stop those people from accepting the settlement

22   and also the allegations of criminal activity by us

23   and having to negotiate the settlement.

24          Q.      Thank you.

25                  Have you met with each one of these

```
1                         Gerard Lear
2    clients?
3            A.      Me, personally?
4            Q.      Yes, sir.
5            A.      No.  I may have met some of them when
6    I was down in Sao Paulo, but I haven't met each and
7    every one of them, no.
8            Q.      Have you met with the clients that
9    are listed as clients of Mr. Lack?
10           A.      I wouldn't know if I have or not, I
11   don't believe I have, not by name.  If I, again,
12   met them at a general meeting in Brazil, it's
13   possible, they may, if you ask them the question,
14   they might say they met me down there, but I
15   certainly haven't met them individually in years.
16           Q.      Wolfgang Hans Janstein,
17   J-A-N-S-T-E-I-N, have you met him?
18           A.      Not that I know of.
19           Q.      Could you describe him to us?
20           A.      How could I describe him if I never
21   met him?
22           Q.      George Klepetar, K-L-E-P-E-T-A-R?
23           A.      I don't recall meeting him.
24           Q.      William Chong?
25           A.      Same answer.
```

1                          Gerard Lear

2          Q.    Jose Duarte?

3          A.    Same answer.

4          Q.    You don't recall meeting him?

5          A.    I don't recall meeting them.

6          Q.    So, if you walked in a room and met

7    them --

8          A.    I wouldn't know them.

9          Q.    Alexandre M. Vaz de Mello?

10         A.    Never met the person.

11         Q.    Rilton DeOiveira Rodrigues?

12         A.    I have not met that person.  If I

13   have met them in a group, I don't recall.

14         Q.    Zelia Menin?

15         A.    Same.

16         Q.    Mario Rodrigues de Matos?

17         A.    Same.

18         Q.    Have any of those people spoken to

19   you and told you the reason that they switched to

20   Mr. Lack?

21         A.    No, I don't believe they have, no.

22         Q.    To your knowledge, have any of those

23   people that I just listed spoken to any members of

24   your firm and told them the reason they switched to

25   Mr. Lack?

```
 1                      Gerard Lear
 2           just asking him about the counterclaim
 3           and about these people that are listed in
 4           the interrogatories.
 5               MR. APUZZO:  That's correct
 6      EXAMINATION CONTINUING BY MR. BERMAN:
 7           Q.    Did you ever receive any written
 8      communications from any of the parties I just
 9      enumerated explaining why they chose to change law
10      firms?
11           A.    I only received communications from
12      their lawyer.  There's been several lawyers, Herman
13      & Mermelstein, Mr. Mermelstein telling us that he
14      was now representing the cases at that time, and
15      Jack Veth received communications, I believe
16      similar in nature from Mr. Lack.
17           Q.    Did you ever receive communications
18      from any of these clients where they said why they
19      wanted to change law firms?
20           A.    Not to my knowledge.  If it's in the
21      file it's in the file.
22           Q.    I have not seen anything, that's why
23      I'm asking you, sir.
24           A.    I haven't seen anything.
25               MR. APUZZO:  Counselor, I can't
```

```
 1                         Gerard Lear
 2      they said we're not going to pay you.
 3            Q.      So, is that a no?
 4            A.      That's my answer.
 5            Q.      So, either orally or in writing, did
 6      you ever receive any communications from any of
 7      these clients indicating that they were not going
 8      to pay Speiser Krause?
 9            A.      I haven't seen anything.
10            Q.      Did you ever send any invoices to any
11      of those clients for work that you did?
12            A.      No, I did not.
13            Q.      When I say you, I'm speaking of your
14      firm.
15            A.      To my knowledge, the firm did not.
16            Q.      Did you ever bring any legal action
17      to any of those former clients for the work you
18      did?
19                    MR. APUZZO:  Define legal.
20            Q.      Filed a lawsuit?
21            A.      No, we never filed a lawsuit.
22            Q.      You did file claims of liens?
23            A.      Correct.
24            Q.      Did you actually file them in the
25      California courts?
```

Gerard Lear

2      A.     I don't know if Mr. Lack has ever

3    acknowledged that as you frame it.

4      Q.     Did he ever say you wouldn't be paid?

5      A.     No.

6      Q.     So, in terms of your discussions,

7    there was some kind of payment acknowledged?

8      A.     I think he'd like to work it out in

9    some way, but we haven't gotten to the settlement

10   discussions of May 4th which are being calendared

11   right now, but Mr. Lack is a good lawyer, he's not

12   going to make any proposals that he's not certain

13   can be undertaken.

14      Q.     Would you say Mr. Lack is competent

15   to handle these matters?

16      A.     Absolutely.

17      Q.     Do you have time records reflecting

18   your time that you spent on each one of these

19   client files?

20      A.     No, we don't keep time records.

21      Q.     So, if you had to pursue a quantum

22   meruit claim, how would you support your claim in

23   the absence of time records?

24      A.     I'd have to get the Ballens together

25   and see, but we don't have time records.

23

1                          Gerard Lear

2          Q.      Have you made any effort to recreate

3    or construct time records for each one of these

4    matters?

5          A.      Not at this time.

6          Q.      Now, is it your position that when

7    the clients were presented with settlement offers

8    that they had the right to accept or reject those

9    offers?

10          A.      Absolutely.

11          Q.      For any reason that they chose to

12    accept or reject the offers; correct?

13          A.      I don't understand the question.

14                 MR. BERMAN:  Strike that.

15          Q.      Whose decision was it, yours or the

16    clients, whether or not to accept the offers?

17          A.      Certainly wasn't our decision.

18          Q.      So, it was the client's decision?

19          A.      Of course, it always is.

20          Q.      Are the settlement offers, to your

21    knowledge, still open to the clients who did not

22    accept them?

23          A.      Probably a good question.  I'm

24    assuming they are but we asked that question to

25    each of the defendant insurers, I'm not sure the

1                          Gerard Lear

2      answer.

3                Q.      Are you having ongoing discussions?

4                A.      Not on those cases, I don't represent

5      them anymore.

6                Q.      You still represent other clients of

7      that original 64 or 65 who have not accepted

8      settlement offers; is that correct?

9                A.      To the extent that I believe so, yes.

10               Q.      Are the settlement offers open as to

11     them?

12               A.      I don't know the answer to that.  I'm

13     assuming they are for purposes if someone came to

14     me, one of those clients chose to go ahead and say

15     I want the money, what do I have to do, I'd do my

16     best to get it, but right now, that's uncertain.

17               Q.      Could a client who previously

18     rejected a settlement still settle for the amount

19     of the settlement?

20               A.      A couple of them have accepted and

21     then changed their minds, some of them have

22     rejected and then changed their minds.  My

23     impression is that the insurers would like to

24     settle the cases but, again, how many of those

25     defendant insurers are willing to do that, I just

42

1                          Gerard Lear

2    until --

3              A.     Of course.  And I think it's already

4    been produced to you because I remember last year

5    going through the file, again, it's been produced.

6              Q.     Do you know if there's any

7    correspondence that the clients established that

8    they understood the category they were being placed

9    into for settlement discussions?

10                    MR. APUZZO:  Objection.

11                    It was asked and answered.

12             A.     We already went over that.

13             Q.     You don't know?

14             A.     There's no reason we would have

15   discussed that with them, but I don't know.

16             Q.     Do you know whether Mr. Guimaraes was

17   present at meetings with clients other than the

18   ones that his name appears opposite on Exhibit

19   Number 1?

20             A.     I don't know.

21             Q.     Now, were the Brazilian lawyers

22   permitted to offer their perspective on the

23   settlements?

24             A.     I'm sure they were, I don't see a

25   reason why they were not.

1                          Gerard Lear

2      that the number was there, the settlement

3      conversations and negotiations, I forget the word

4      he used, were of no consequence.

5                  It was, you know Mr. Guimaraes'

6      language which tends to be flowery and that they

7      were of no consequence and that it wasn't going to

8      happen, there were various ways he phrased it, and

9      again the letters have been produced by us to you

10     recently, I believe.

11             Q.      Understand.

12                 Was Mr. Guimaraes in your opinion not

13     committed to be critical of the settlement --

14             A.      I have no problem of him being

15     critical of it.  If he came to me and says, Gerry,,

16     here's where we want to look at, we talk about it.

17     Maybe he had a point, we go back and get more

18     money.

19                 But that wasn't it, we were guilty of

20     malicious conduct, treason, I think one letter

21     there's even a reference to the Ballens and a

22     potential murder charge and years in prison.  I

23     mean, it got totally out of hand.  I mean, it was,

24     I've never read anything like that, I never read

25     anything like that from any lawyer I ever worked

                              Gerard Lear

1

2    Jabaquara, or the alleged criminal activity, and

3    all the investigations that he had initiated

4    against our firm with various Brazilian and United

5    States legal authorities.

6         Q.    Let's look at the settlement offers

7    themselves, could a client be offended by the

8    number they were offered?

9         A.    Some of them might have been, I don't

10   know.  No client is ever satisfied with a

11   settlement, they always think that the value of the

12   settlement should be more, and rightfully so, I

13   always think so, too.  But settlements are just

14   that, they are compromised settlements between the

15   parties and in some cases may mean one party or the

16   other losing totally.

17        Q.    Could the clients be unhappy because

18   one family was offered more than another?

19        A.    I guess they could be.

20              It is my procedure based upon my

21   years of doing it that you keep the settlements

22   confidential between families because of the fact

23   that once they become public you can have problems

24   outside of just the settlement itself.  There are

25   people who if they read so and so got so much

```
 1                    Gerard Lear

 2   division of the settlement was discussed by any of

 3   the clients?

 4              MR. APUZZO:  Objection.  I object

 5         to the form of the question.

 6              MR. BERMAN:  I'll rephrase it.

 7         Q.    Was an explanation given to the

 8   clients as to how their settlement sum was

 9   determined?

10         A.    I don't know, I can't think of what

11   the explanation would be.

12         Q.    Could the clients, including these

13   eight clients, have different expectations of what

14   they would receive?

15         A.    I'm sure they did.

16         Q.    Is it possible that the clients that

17   didn't accept the offer could have been influenced

18   by other third parties?

19         A.    Anything is possible.

20         Q.    Maybe by family members?

21         A.    Sure.

22         Q.    Other lawyers?

23         A.    I don't know.  I don't know what

24   conversation took place with those eight clients.

25         Q.    Could emotion and grief over the loss
```

53

```
 1                        Gerard Lear
 2    of their loved one impact their reaction to the
 3    settlements, whether to accept or not accept?
 4                    MR. APUZZO:  Objection.
 5                    Answer it.
 6         A.     I don't know.
 7         Q.     And I think you already indicated the
 8    family members amongst themselves could disagree on
 9    what was appropriate?
10         A.     Sure they could.
11         Q.     And you believe that's happened?
12         A.     I'm sure they could.
13         Q.     Do you know whether any of these
14    clients felt that the settlement offers were
15    inadequate because they wanted to punish the
16    defendants for the loss of their loved ones?
17                    MR. APUZZO:  Objection.
18         A.     These eight?
19         Q.     Yes.
20         A.     I don't know.
21         Q.     Do you know any reason that you can
22    articulate why any of these eight did not accept
23    the settlements?
24         A.     Specifically for each family, no, I
25    don't know what reasons they had for not accepting.
```

54

1                    Gerard Lear

2          Q.       And they might have all had different

3    reasons; is that correct?

4          A.       It's possible, sure.

5          Q.       Is it possible they could have

6    believed or did believe that they would receive

7    more if they kept litigating?

8          A.       Possible.

9          Q.       Or they could have received more from

10   the Jabaquara judgement?

11         A.       Possible.

12         Q.       Does Speiser Krause know the answer

13   to any of those questions, as to why these eight

14   turned down the settlement?

15              MR. APUZZO:  Objection.

16              You asked the same question, I

17         don't know how many times, Mr. Berman.

18         He's not going to change his answer.

19              You can answer the question.

20              MR. BERMAN:  I'll withdraw it and

21         ask it a different way.

22              MR. APUZZO:  That's what I meant.

23         Q.       Did any of these clients articulate

24   to Speiser Krause why they didn't want the

25   settlement that was being proposed to them?

55

1                          Gerard Lear

2          A.      They never -- No family member came

3     to me and articulated that.

4          Q.      Did any family member come to Speiser

5     Krause and articulate that?

6          A.      Whether they had the discussions with

7     Arthur or Leigh Ballen, I don't know.

8          Q.      Have you ever discussed with Mr.

9     Ballen these eight clients?

10         A.      We've discussed those clients in

11    terms of what the makeup was of the family, and

12    things of that nature.  I can't remember

13    specifically discussing why, in answer to the

14    questions you're asking, why they didn't accept the

15    settlement.  I'm assuming they didn't for

16    different -- I just don't know, I just don't know

17    why they didn't, but I never had that discussion

18    with him.

19         Q.      Did either of the Ballens ever tell

20    you why these eight didn't accept the settlement?

21         A.      No.

22         Q.      Do you know if they knew why these

23    eight didn't accept the settlement?

24         A.      I don't know.

25                 MR. APUZZO:  Objection.

57

Gerard Lear

2      A.      Well, I wasn't there, but that wasn't

3  true.

4      Q.      Have you made an effort to educate

5  yourself to find out what happened during these

6  settlement discussions with these eight clients?

7      A.      I was told what I was told about

8  them, whether the person accepted or rejected, I

9  didn't go into the reasons and that was the bottom

10  line.

11      Q.      You weren't given a reason for their

12  acceptance or rejection?

13      A.      No.

14      Q.      Did you go into any of the reasons

15  for the acceptances or rejections?

16      A.      I didn't go into the reasons why any

17  family accepted or rejected.

18      Q.      Sir, are you familiar with the

19  California action where there was a forum non

20  conveniens motion to dismiss that had been made, a

21  motion to transfer?

22      A.      You mean back early on?

23      Q.      Yes.

24      A.      Yes, I am, well, to the extent that I

25  am, I am.

76

```
 1                    Gerard Lear
 2    a meeting, wouldn't you?
 3         A.    Not necessarily.
 4         Q.    My understanding of your responses
 5    previously provided in the interrogatories were
 6    that you made the determination based on your
 7    experience as to what would be an appropriate
 8    amount to settle these cases for; is that correct?
 9         A.    Well, I'm not sure about to settle, I
10    certainly made a determination what I thought the
11    range was.  I was trying to get the negotiations
12    going and see what the defendants were willing to
13    offer, which so far at that point had been zero.
14         Q.    Were the clients advised prior to
15    your requests to the insurers as to specific sums
16    and different categories on each of their behalfs
17    as to the range that you were going to be asking
18    for on their behalf from the defendants?
19              MR. APUZZO:  Objection to form.
20         A.    Not by me.
21         Q.    Do you know whether anybody at
22    Speiser Krause did that?
23         A.    Whether or not the Ballens had that
24    conversation, I don't know.
25         Q.    In your response to interrogatory
```

```
 1                        Gerard Lear
 2        Q.     How could it not go down?
 3               MR. APUZZO:  Objection.
 4               If you're asking him for a legal
 5        conclusion --
 6               MR. BERMAN:  He's a lawyer.
 7               MR. APUZZO:  It doesn't matter, he
 8        already says he doesn't want to say
 9        respectively what the California courts
10        may or may not do with that claim.  This
11        is basically a legal matter that's going
12        to be resolved by the courts and a judge
13        in some future proceeding.
14               MR. BERMAN:  In California.
15               MR. APUZZO:  Most probably in
16        California.
17        Q.     Has there been a resolution of the
18        claims that you've filed in California?
19        A.     No.
20        Q.     And you don't know if you'll get zero
21        dollars or the full amount of your lien; is that
22        correct?
23        A.     I don't know.
24        Q.     The range is between zero and the
25        full amount of your lien, is that a fair statement?
```

83

1                    Gerard Lear

2           A.      I guess it's a fair statement,

3    whether or not it's accurate, I don't know.

4           Q.      At this point, nobody knows what

5    you're going to get on those liens; correct?

6           A.      Absolutely.

7           Q.      If you recover money on these liens,

8    would that not reduce the amount of damages that

9    you suffered as you set forth in your counterclaim?

10                  MR. APUZZO:  Objection.  It calls

11               for a judicial conclusion, not an opinion

12               by the witness sitting here at this

13               point.

14                  MR. BERMAN:  I disagree, counsel.

15               And this is not time for speaking

16               objections, he can answer the question.

17          A.      I'm not a California lawyer, I don't

18    know.

19          Q.      I understand, but you're a lawyer.

20          A.      I don't know the answer, counselor.

21          Q.      So, you think it's possible that you

22    could recover the full amount of your lien yet you

23    could still recover the full amount of your

24    counterclaim, is that right?

25                  MR. APUZZO:  Objection.

84

1                          Gerard Lear

2         A.      I don't know.

3         Q.      Can you get double recovery?

4         A.      Under California law, I don't know, I

5    am not a specialist in lien law, I don't know.

6         Q.      Do you believe that you can recover

7    more than the amount that you agreed to accept in

8    your retainer agreement?

9                 MR. APUZZO:  Objection.

10                Answer it.

11        A.      Counselor, I do not know the answer

12   to the question, what affect the lien would have.

13        Q.      And until that is resolved by the

14   California court, you won't know what affect that

15   will have; is that correct?

16        A.      Correct.

17        Q.      Who's responsible at Speiser Krause

18   for keeping the clients informed as to the progress

19   of settlement discussions?

20        A.      Well, the Ballens would have answered

21   any questions that came in on that.  I know that

22   Mr. Guimaraes was pressing for settlement

23   negotiations so I know that he had conversations

24   with the Ballens.  Anybody else, any other client

25   that asked about it, we certainly respond.

```
 1                      Gerard Lear

 2        Q.     Do you know whether it was an effort

 3   made by Speiser Krause to keep their clients

 4   informed as to settlement discussions?

 5        A.     I know that there were status letters

 6   and conversations telling them that we were

 7   attempting to have settlement negotiations underway

 8   and what the problems were attending to that.

 9        Q.     Were there individual letters written

10   to each of these eight clients telling them what

11   the status of their settlement discussions were?

12        A.     If there were status letters that

13   went out that talked about it, I believe there

14   were, I'm assuming they would have gotten a copy.

15        Q.     So, there were general letters that

16   went to everyone as opposed to specific ones to

17   these eight?

18        A.     We've already been over this, I never

19   had conversations with clients about a specific sum

20   until I had a sum to talk about.

21        Q.     Did you have or did anyone from

22   Speiser Krause have authority from the clients to

23   negotiate within a certain range a settlement that

24   would be acceptable to them in this litigation?

25        A.     We never had that conversation with a
```

1                        Gerard Lear

2      client about specific sums and arrangements.

3            Q.      The forum non conveniens ruling was

4      made in 1998; is that right?

5            A.      I accept that.

6            Q.      What action did Speiser Krause take

7      to inform the families of that ruling between 1998

8      and 2000?

9            A.      I'm assuming it was status letters

10     that went out, and conversations.  I don't recall

11     anything specific but I know I've read about it,

12     I've read letters and I've read in the status

13     conferences we would have told them about the stay

14     and the form non conveniens, it was a subject that

15     was well discussed in that time period.

16           Q.      Between '98 and 2000, or just in 2000

17     when settlement offers were discussed, sir?

18           A.      The record speaks for itself in that,

19     I don't know the dates.

20           Q.      I have not seen any letters in that

21     time frame, that's why I'm asking you.

22                   MR. APUZZO:  We've produced them,

23           counselor.

24                   MR. BERMAN:  Between 1998 and

25           2000?

98

1                          Gerard Lear

2    generally knowing what was going on, but you really

3    got involved when it came to dealing with dollars

4    and settlements and proposals and negotiations; is

5    that right?

6              A.      Correct.

7                      MR. APUZZO:  Objection.

8              Q.      That was your job?

9              A.      That's probably correct.

10             Q.      Now, do you know, sir, how many

11   families rejected the settlement at the meeting

12   that took place in Brazil?

13             A.      I only know that when I wrote the

14   affidavit, I guess in February of the following

15   year, that I said 55 had accepted, so I assume

16   that's what I knew.

17             Q.      Do you know how many families

18   rejected it at the settlement meeting in Brazil?

19             A.      My answer stands, what I knew.

20             Q.      That was months later?

21             A.      Correct.

22             Q.      But do you know how many when they

23   heard it said no thank you?

24             A.      I don't know what the time line was.

25             Q.      Do you know how many rejected it

                ASA REPORTING SERVICE, INC.
                      (914) 588-3358

1                         Gerard Lear

2    within a week?

3           A.      I don't know.

4           Q.      How about within two weeks or a

5    month?

6           A.      I don't know.

7           Q.      Do you have any records that would

8    reflect when the clients rejected it?

9           A.      I would assume Leigh or Arthur might,

10   but I don't know.

11          Q.      Do you know if you have any records

12   reflecting the reasons that the clients rejected

13   it?

14                  MR. APUZZO:  Objection.

15          A.      I don't know.

16                  MR. APUZZO:  Objection.

17          Q.      Do you have any records reflecting

18   the families that may have been upset by the amount

19   that was tendered to them?

20                  MR. APUZZO:  Objection.

21          A.      I don't.

22          Q.      Do you have any records reflecting or

23   do you have any knowledge as to how many complained

24   about the amount?

25                  MR. APUZZO:  Objection.

1                         Gerard Lear

2           Q.      My question is, can you identify any

3     client who told Speiser Krause in substance that we

4     will not take the settlement because of something

5     that Dr. Guimaraes said or did?

6           A.      Certainly no one told me, and it

7     hadn't been reported to me by anyone else.

8           Q.      Is there any client that you can

9     identify that ever told Speiser Krause in substance

10    that we will not use Speiser Krause anymore because

11    of something that Dr. Guimaraes said or did?

12              MR. APUZZO:  You're referring to

13          the eight clients?

14              MR. BERMAN:  Yes, sir.

15          A.      Nobody told me that, no.

16          Q.      And you've not seen anything like

17    that?

18          A.      I have not seen anything, I don't

19    believe.

20          Q.      So, is there anything that you can

21    show us where a client said or wrote to Speiser

22    Krause that said their, these eight people's,

23    decision not to continue with Speiser Krause was

24    influenced by Dr. Guimaraes?

25              MR. APUZZO:  Objection.

1                          Gerard Lear

2            Q.      The eight.

3            A.      I just have no knowledge of that.

4            Q.      Did Dr. Guimaraes ever tell you that

5      the families' decision, those eight families'

6      decision, to not continue with Speiser Krause was

7      based on what Dr. Guimaraes said or did?

8            A.      Well, certainly he recommended to

9      them that they not accept the settlement.

10           Q.      Well, he can do that as their lawyer,

11     could he not?

12           A.      He can do whatever he wants, it's

13     none of my business.

14           Q.      He can, lawyers give clients advice,

15     right?

16           A.      Whether -- and certainly in his

17     letters to the clients he related to them the

18     alleged criminal conduct by Speiser Krause, so what

19     influence that had on the clients, I guess is

20     between him and the clients.

21           Q.      But you don't know?

22           A.      I only know what I read.

23           Q.      They could have been influenced by

24     many other things as you pointed out earlier;

25     correct?

1                          Gerard Lear

2      as to whether they wanted to settle?

3              A.      I know some changed their minds.

4              Q.      But they stayed with Speiser Krause?

5              A.      Well, that, I guess I'm not certain

6      that all of them did or did not, I just don't know

7      the answer to that.  Some did, some left, some

8      wanted to come back and retain us again.

9              Q.      And that did happen?

10             A.      I'm sorry?

11             Q.      That did happen where a client left

12     and came back?

13             A.      Yes, it did.

14             Q.      And you took them back?

15             A.      I guess we did, I'm not sure we took

16     them all.

17                     MR. APUZZO:  Don't guess, don't

18             speculate, please.

19             Q.      Can you name any clients?

20             A.      I can't, no.

21                     MR. BERMAN:  Let's mark this as

22             Exhibit 3.

23                     (Nazareth Client Letter to Speiser

24             Krause Dated 4/9/03, marked for

25             identification,  Lear's Exhibit 3.)

1                              Gerard Lear

2    communications, when did you learn that they had

3    occurred?

4                     MR. APUZZO:  Objection, asked and

5              answered, but go ahead.

6         A.     I would have become aware of them

7    when I saw the letters or the communications.

8         Q.     Did you contact the media and demand

9    retractions?

10        A.     I didn't, no.

11        Q.     Did anyone on behalf of Speiser

12   Krause do that?

13        A.     No.

14        Q.     Did you call any of the clients on

15   the phone to explain that you hadn't done anything

16   wrong?

17        A.     I didn't.

18        Q.     Do you know if anybody did?

19        A.     I don't know whether or not either of

20   the Ballens did or not.

21        Q.     Did you meet with the clients and

22   explain that you hadn't done anything wrong?

23        A.     I didn't personally.

24        Q.     Do you know if anybody did?

25        A.     I don't know the answer to that.

Gerard Lear

1   
2        MR. APUZZO:  Each one?

3        MR. BERMAN:  Each one.

4        Q.    Did you wait a period of time before

5   doing anything or did you do it contemporaneously?

6        A.    If you're talking about the status

7   letter, I don't know when it went out.

8        Q.    I think in your letters you say up

9   until now you've been ignoring what Mr. Guimaraes

10  was saying, why did you ignore it if you were being

11  harmed by it?

12       A.    Well, my personal view is when you

13  get involved in something like that, there's no

14  winner, and to make a bigger issue out of it than

15  it already is doesn't help, so me writing letters

16  would not have accomplished anything in that

17  regard.

18       Q.    How about demanding media

19  retractions, would that have accomplished anything?

20       A.    To me, that's a fruitless act.

21       Q.    Did you try to have Mr. Guimaraes

22  removed as counsel after receiving these various

23  communications?

24       MR. APUZZO:  Objection.

25       Removed as counsel on what?

129

1                          Gerard Lear

2              MR. BERMAN:  Strike that.

3         Q.     Mr. Guimaraes was serving as co-

4    counsel on some of these cases, was he not?

5         A.     He had cases he had brought.

6         Q.     Did you seek to have him removed --

7         A.     I didn't, of course not.

8         Q.     Did your firm?

9         A.     He had his own cases.

10        Q.     But he had cases with you, as well?

11        A.     He was on some of the retainers and

12   he had the Jabaquara cases, but we made no effort

13   to have him removed from anything.  We didn't use,

14   obviously, we weren't going to use his services

15   after that in connection with it because he refused

16   to cooperate in any way.

17        Q.     He refused to endorse the

18   settlements; is that correct?

19        A.     Once your co-counsel starts calling

20   you a criminal, it kind of breaks up the

21   relationship.

22        Q.     So, did you try to have him taken off

23   any of the cases in which you were co-counsel with

24   him?

25        A.     I didn't, no.

130

1                          Gerard Lear

2          Q.      Did anyone on behalf of your firm?

3          A.      I don't know, I don't believe so.

4          Q.      Did you ever file a grievance, a bar

5    grievance, against Mr. Guimaraes?

6          A.      I did not.

7          Q.      Did anyone?

8          A.      I don't know if anyone did, but I did

9    not.  Nobody did it on behalf of Speiser Krause.

10         Q.      Do you know if anybody filed a

11   grievance?

12         A.      I had heard that some of the clients

13   may have filed a broad grievance against him, but I

14   don't know.

15         Q.      Do you know the results of one bar

16   grievance that was filed against him --

17         A.      Not really, I saw something --

18         Q.      Did you know he was exonerated 27 to

19   zero?

20         A.      No, I didn't know that.

21         Q.      And found to have engaged in nothing

22   wrong, did you know that?

23         A.      I didn't know that.

24         Q.      Did you seek to withdraw from any of

25   the cases that you had with Mr. Guimaraes because

131

1                    Gerard Lear

2    you could not any longer cooperate with co-counsel?

3              MR. APUZZO:  Objection, but answer

4         it if you can.

5         A.      I don't think so.

6         Q.      Did you ever seek an injunction

7    against Mr. Guimaraes to stop him from engaging in

8    any of these actions?

9         A.      I don't believe we did, no.

10        Q.      Prior to initiating this counterclaim

11   which came, I guess in 2007, had you taken any

12   action against him for these activities that he

13   engaged in many many years earlier?

14        A.      I never had any intention of taking

15   action against Mr. Guimaraes until he filed a

16   lawsuit against us and it became known that he left

17   us with no options.

18        Q.      Did you ever file a complaint with

19   the authorities alleging that Mr. Guimaraes'

20   complaint that he made against you was false?

21        A.      Are you talking about the complaint

22   in this lawsuit?

23        Q.      No.

24        A.      What are you referring to?

25        Q.      You indicated earlier that he said

ASA REPORTING SERVICE, INC.
(914) 588-3358

1                    Gerard Lear

2    you engaged in criminal actions, and maybe he did

3    that in Brazil, but did you ever file a complaint

4    with the criminal authorities alleging that Dr.

5    Guimaraes' complaint against you was false?

6        A.      No, I didn't.

7        Q.      Other than the letters that Mr.

8    Guimaraes wrote to the clients, do you have any

9    evidence to show that the clients were even aware

10   of the things that you claim the client did to

11   interfere with the client relationship?

12              MR. APUZZO:  Objection to form.

13              Answer if you can understand it.

14       A.      I don't understand it.

15       Q.      Dr. Guimaraes wrote letters to

16   clients; correct?  Other than the letters, there

17   are other things that you complain of that Mr.

18   Guimaraes did.  Do you have any evidence that the

19   clients were aware of any of these other actions

20   undertaken by Dr. Guimaraes?

21       A.      Several of the letters to the clients

22   list what he did.

23       Q.      Do they list everything?

24       A.      I don't know if it's everything, but

25   it's certainly enough.

```
1                        Gerard Lear
2    defendants on June 23rd, 2000 that you represented
3    in 1998, did you not?
4            A.    It would appear we did, yes.
5            Q.    So, there was no action taken by Dr.
6    Guimaraes that resulted in your loss of any clients
7    as of June 23rd, 2000?
8            A.    I doubt there was at that time, I
9    don't remember.  The record will speak for itself,
10   but I don't think there was.
11           Q.    Now, do you have any idea why Speiser
12   Krause does not have all of the retainer agreements
13   for all 64 clients?
14               MR. APUZZO:  Again, this was
15               asked, answered.  Not only that, but I
16               wrote a letter to your partner Jose
17               describing exactly those retainer
18               agreements.
19               MR. BERMAN:  That are missing?
20               MR. APUZZO:  That are missing.
21               Two of them was to Hiram Montero firm in
22               Florida, one was with the Podhurst firm,
23               they signed up these clients.
24               MR. BERMAN:  So, they were never
25               Speiser Krause clients?
```

189

1                              Gerard Lear

2     their claims?

3              A.        It would appear that way.

4              Q.        And that is how many years after the

5     settlement proposal was originally presented to

6     these parties?

7              A.        Well, it was '00, so it's, you know,

8     five, six years.

9              Q.        So, it's like six years later these

10    clients still hadn't agreed upon a settlement with

11    you, or you hadn't been able to finalize a

12    settlement, in any event?

13             A.        Right.

14             Q.        And it looks like you still haven't

15    been able to effect a settlement for the ones that

16    you still represent that are contained in Exhibit

17    9; correct?

18             A.        That's right.

19             Q.        Can you understand the client being

20    ready to change counsel after six years of not

21    being able to effect a settlement to perhaps try

22    again with somebody else?

23             A.        If they want to change counsel,

24    they're free to do so, I don't have a problem with

25    that.

                        Gerard Lear

1

2          A.     I don't know.

3          Q.     To your knowledge, was any action

4    taken as a result of this letter?

5          A.     I have no idea.

6          Q.     Were you asked to indemnify any of

7    the insurance carriers or any of the defendants as

8    a result of this letter?

9          A.     No.

10          Q.     I asked you this question earlier and

11    I'm going to show you something to try to refresh

12    your recollection, so that's why I'm going to ask

13    the question again.  Do you know whether Dr.

14    Guimaraes was told by anyone representing your

15    office prior to the settlement discussion trip to

16    Brazil of the settlement numbers either in whole or

17    in part before the trip to Brazil?

18              MR. APUZZO:  Objection.

19              I'm sorry, I didn't understand the

20          question.

21          Q.     Before Mr. Ballen, junior and senior,

22    went to Brazil, I want to know if you know whether

23    or not they talked to Mr. Guimaraes and told him

24    what the anticipated presentations were going to be

25    to all or any of the plaintiffs.

209

1                        Gerard Lear

2          A.      I have no direct knowledge.

3                  MR. BERMAN:  We'll mark this next

4          as Exhibit 13.

5                  (Handwritten Renato Guimaraes

6          Letter to Speiser Krause, marked for

7          identification, Lear's Exhibit 13.)

8                  MR. BERMAN:  I'll let you read

9          that sir, before I ask any questions.

10                 (The witness examines document.)

11                 THE WITNESS:  Okay, I've read it.

12         Q.      Have you seen this letter before,

13    sir?

14         A.      I guess I must have, I crossed it

15    off.

16         Q.      So, on the upper right-hand corner

17    that designates the initials of those people who

18    received copies of it?

19         A.      Well, who, apparently, read it, yes.

20         Q.      So, the top one is yours?

21         A.      Right.

22         Q.      Does this letter refresh your

23    recollection that there were conversations or

24    discussions with Dr. Guimaraes prior to the trip to

25    Brazil to discuss the settlements?

1                    Gerard Lear

2       information you may deem as appropriate for the

3       approval of the settlements in court with my

4       signature."  Do you see?

5              A.     Yes.

6              Q.     Does this letter sound like Mr.

7       Guimaraes is cooperating with Speiser Krause?

8              A.     It would appear that he is, yes.  It

9       also refers to May 9th, 22nd and 23rd in Sao Paulo,

10      so I don't know if the meetings had already taken

11      place or not, or some meetings.

12             Q.     It makes reference to six dates when

13      he was promised some information and he makes

14      reference that as of this date, he still hasn't

15      received it; correct?

16             A.     Well, that's, apparently, what he

17      says.

18             Q.     Then it says "I shall take what I

19      have been told it is my duty to do to protect the

20      deal offers, the families and myself according to

21      the law against any charge of malpractice, lackness

22      of action in favor of minors or suspicion of not

23      doing my best to their interests - nothing to say

24      to protect my shares common fees.  Thank you for

25      your attention."

220

1                        Gerard Lear

2          A.      By the defendants to then present to

3     the court, was my understanding.

4          Q.      So, you're saying it is TAM's delay?

5          A.      That was what I was being told.

6          Q.      Because it doesn't say from whom you

7     cannot get the release documentation, it could have

8     been your clients, it could have been their

9     counsel, and it could have been TAM?

10         A.      I doubt it would be our clients, they

11    would want the money.  I had been preconditioned

12    over many years to expect that TAM's counsel was

13    very much a problem in this area.

14         Q.      Problem --

15         A.      Getting documents signed, for some

16    reason or another he would delay.

17         Q.      So, the insurer would agree and then

18    TAM's counsel would not follow through?

19         A.      That has sort of been my

20    understanding, or what I've been told.

21         Q.      So, this had nothing to do with Dr.

22    Guimaraes?

23         A.      I don't think so, no, Dr. Guimaraes

24    was not involved in this.

25         Q.      This is 2006?


                 ASA REPORTING SERVICE, INC.
                      (914) 588-3358

```
 1                      Gerard Lear

 2           A.    Right.  I don't think he was involved

 3      in this at all.

 4           Q.    Did this ever get resolved, did you

 5      ever get the release documentation in order to

 6      finalize this settlement that the cases refer to in

 7      their letter of February 7th, 2006?

 8           A.    I don't think so, that was one of the

 9      things that led me to believe they were pulling

10      back, there was a great deal of uncertainty and a

11      lack of cooperativeness between them.

12           Q.    You're talking about TAM, or you're

13      talking about the insurers?

14           A.    They're all insurers, this is TAM's

15      insurer, not the airline.

16           Q.    Right, but you're writing to the

17      insurers saying you can't get the documentation

18      from TAM?

19           A.    Correct, Steven Matthews represents

20      TAM.

21           Q.    So, it's sort of you guy's clients

22      are delaying this, not us?

23           A.    That's basically it.

24           Q.    And whatever happened as a result of

25      this letter?
```

227

1                    Gerard Lear

2    forth but the facts speak for themselves, he did

3    not cooperate.  Why not, I don't know, if I'm wrong

4    about Jabaquara, or something, I don't know.

5            Q.    Did Dr. Guimaraes indicate that he

6    was concerned that the widows and orphans were not

7    getting enough money?

8            A.    I got -- Relative to what?

9            Q.    Relative to how much money he thought

10   they should get, did he express that?

11           A.    I'm sure he did.

12           Q.    Is there anything wrong with him

13   expressing it?

14           A.    Not at all.

15           Q.    Did Dr. Guimaraes indicate that

16   expectations had been set higher based on earlier

17   communications from Arthur Ballen with the

18   plaintiffs thereby creating the belief in the

19   plaintiffs that they would receive more than the

20   settlement offers?

21           A.    Well, 45 people accepted it and got

22   their money, in fact, 54 accepted it and they

23   didn't seem to have any problem with expectations,

24   so I don't know.  These are all just things you're

25   throwing out, but I don't know the answer.

1                           Gerard Lear

2           A.      We have no idea what any recovery

3    will be to the lien, if any.

4           Q.      But if you were to recover 100 per

5    cent of your lien, isn't it true you wouldn't be

6    damaged?

7                   MR. APUZZO:  Objection.

8                   MR. BERMAN:  Please, no speaking

9               objections, counsel.

10                  MR. APUZZO:  We went over this,

11              counselor, this morning and you're not

12              going to get a different answer at the

13              end of the day.

14                  MR. CHASE:  It's a conclusion.

15                  MR. BERMAN:  If you don't have any

16              damage, or you don't know --

17                  MR. APUZZO:  Richard, the fact

18              that if he collects on the charging lien,

19              we'll withdraw the claim against Mr.

20              Guimaraes today, but we haven't seen a

21              check yet from anybody and it's because

22              of your client's problems that this whole

23              thing arose, he brought this upon

24              himself.

25                  MR. BERMAN:  Counsel, he indicated

1                      Gerard Lear

2         Krause.

3                 MR. BERMAN:  But we don't know if

4         there's been any damage, that's my only

5         point.

6                 MR. APUZZO:  If we get paid on the

7         charging liens --

8                 MR. BERMAN:  Then there's no

9         damage.

10                 MR. APUZZO:  That's right.

11         Q.      If Mr. Guimaraes was a signatory to

12    the same retainer agreements that you were a

13    signatory to with clients, was he permitted to

14    express to those clients his view on the

15    settlement?

16         A.      Whether or not he signed the retainer

17    since he was acting as our local counsel, you know,

18    in '97 or '98, of course I would have listened to

19    what he said.  I think Renato is a bright man, I

20    would listen to him, but he never came to me and

21    said let's sit down and talk about this case, this

22    case, and this case, that didn't happen.

23                 All that happened was we had this

24    period of time after Jabaquara, things were

25    unsettled and then suddenly I'm a member of an

# EXHIBIT 16

72

1                    Arthur Ballen

2          Q.     Didn't Renato attend by your

3   invitation many of the settlement conferences with

4   clients in Brazil to advise them of the result of

5   your negotiations with the TAM defendants?

6          A.     When you say at our invitation, sir,

7   you're implying a more formal structure than

8   existed.

9                  Renato accompanied -- Let me put it

10  this way:  We had arranged a room in Brazil and

11  arranged several days of meetings, each family

12  being designated a certain hour for them to come so

13  we could discuss the settlement.

14                 That was in the area of April 2000.

15  Renato showed up, spoke to the families, and he got

16  up there.  We spoke to them and most of them agreed

17  to the settlement.  He was not there at our

18  invitation.

19         Q.     Was he included?

20         A.     I don't think he was in the room, to

21  my recollection, when the clients were there.

22  There might have been some clients that wanted him

23  in there, so I guess he was there at that time.

24         Q.     Did you tell the clients in Brazil

25  when you were recommending settlements to them that

125

1                    Arthur Ballen

2    States.

3         Q.    Explaining the U.S. System?

4         A.    Yes.  And there were intra-family

5    problems there.  I'm sorry, problems that were

6    popping up.

7         Q.    What kind of intra-family problems?

8         A.    Disputes amongst the families, who

9    gets the money.  Many of these cases had split

10   families, the decedent was divorced, children from

11   the first marriage, the wife from the second.  A

12   lot of those situations.  They also have a mistress

13   problem there we don't have here.

14        Q.    Tell me about that.

15        A.    The mistress, under some

16   circumstances, we're told the mistress has a right

17   to collect.

18        Q.    So, a mistress has a legal status in

19   Brazil?

20        A.    I've been told that.

21        Q.    So, were some of the mistresses your

22   clients?

23        A.    No, the mistresses ended up in other

24   lawyers' hands, other local lawyers.

25        Q.    Did you represent the interests of

1                    Arthur Ballen

2    the mistress through other referring counsel?

3         A.    Didn't happen that way.  No, the

4    answer is no.

5         Q.    I'm just trying to understand, how

6    did it happen?

7         A.    Once we got the award, the mistress

8    pops up asking for a percentage of the award, and

9    the insurance company is reluctant to settle up

10   unless everyone signs off.

11        Q.    Do you have an understanding of the

12   Brazilian law as to the status the mistress has to

13   make a claim?

14        A.    Depends who you ask.

15        Q.    I'm asking you.

16        A.    In Brazil, the general consensus, as

17   I understand it, and I may be wrong, is that if

18   there is a real situation where the trial at fact

19   would believe the decedent promised to take care of

20   this woman for the rest of her life, et cetera,

21   then there's a claim.

22        Q.    Were these issues that were discussed

23   in some of the meetings that you were at in Brazil?

24        A.    No, that would only be a private

25   meeting with the client.

129

1                        Arthur Ballen

2            A.      No, he was not the referring

3      attorney.  I don't know.  Not on all, but a small

4      number of cases.

5            Q.      Wasn't he in any of these settlement

6      meetings?

7            A.      I must have had 50-some settlement

8      meetings, I don't think he was in near -- I don't

9      think he was there in 10 per cent of them.

10           Q.      So, you don't think he was in more

11     than five settlement meetings?

12           A.      I can't indicate --

13           Q.      That's 10 per cent.

14           A.      I understand.  I can't say the number

15     of meetings he was at but, generally, he was not

16     there with the family.

17           Q.      Did you pay for Mr. Guimaraes' bill

18     every time he was at the hotel that you were at the

19     hotel?

20           A.      Probably yes.  Probably, yes.

21           Q.      Now, Mr. Sampaio got more involved as

22     time went on, yes?

23           A.      Yes.

24           Q.      Do you have any idea of how much time

25     Mr. Sampaio spent on these matters?

# EXHIBIT 17

- Leigh Ballen -

184

1    local attorney they might have, and oftentimes Renato

2    Guimaraes.

3           Q     Now, was Mr. Guimaraes present at any

4    of these meetings with you, your father and the

5    families when there was no local attorney present?

6           A     Yes.

7           Q     So, Mr. Guimaraes, as of May 2000,

8    was still working with Speiser Krause; is that

9    correct?

10          A     Yes.

11          Q     Do you remember the order in which

12    you conducted the meetings?

13          A     Which family went first?

14          Q     Yes.

15          A     I only remember that we started with

16    some of Renato's closest family contacts.

17          Q     Why do you remember that?

18          A     Because we got a very negative

19    initial reaction when they entered the room.  They

20    had an obvious predisposition to news that they were

21    not yet supposed to have.

22          Q     What do you mean by that?

23          A     Arms crossed, look of frustration.

24    It was a new sentiment that we were not expecting.

25          Q     Did you tell the clients at these

- Leigh Ballen -

187

1    expectation that the families had, either from local

2    counsel or from their own experiences in life, in

3    other litigation and other matters in Brazilian cases

4    in Brazil, would go on for a long time.

5            Q       Did you recommend all of these

6    settlements?

7            A       I believe we did.

8            Q       You hesitated.  Are there some that

9    you may not have recommended?

10           A       There were cases where the families

11   had signed releases in Brazil and we felt that the

12   money we obtained on top of that, without hesitation,

13   we could recommend.

14                   Other families we gave

15   qualifications.  Some families had huge wage earners

16   with very young children.  And with regret or

17   sadness, we had to recommend in light of what we felt

18   were their prospects overall.  In some, I believe, we

19   recommended all settlements.

20           Q       In how many of these settlement

21   meetings did Mr. Guimaraes sit in on?

22           A       10 or 15, at least.

23           Q       Maybe more?

24           A       Maybe more, yeah.

25           Q       Over how many days did these

- Leigh Ballen -

188

1    settlement meetings occur or was it just one day or

2    was it more than one day?

3              A       Several days.

4              Q       And after you concluded the

5    settlement meetings, were the clients presented with

6    documents to sign accepting the settlement?

7              A       Yes --

8              Q       And --

9              A       -- if they wished to settle.

10             Q       Okay.  And did some of them sign at

11   the meetings?

12             A       Yes.

13             Q       Did some of them sign after the

14   meetings?

15             A       I don't recall.  Some of them had to

16   have a couple of meetings.

17             Q       Some took more than one meeting?

18             A       Correct.

19             Q       Okay.  And after you concluded the

20   settlement meetings, before leaving Brazil, what did

21   you do?

22             A       I don't know.  There were several --

23   I don't know the answer to your question.

24             Q       Did you take depositions, after you

25   concluded the settlement meetings with the Brazilian

- Leigh Ballen -

192

1    were filed in Brazil, were you still working with

2    Mr. Guimaraes?

3         A    Yes.

4         Q    And it was your recommendation,

5    because of the Brazilian statute of limitations, to

6    file the TAM lawsuits to your clients?

7         A    Yes.

8         Q    And many of them chose to file with

9    Mr. Guimaraes; is that also correct?

10        A    Yes.

11        Q    And you were still working with

12   Mr. Guimaraes; were you not?

13        A    Yes.

14        Q    Okay.  Did you get reports from

15   Mr. Guimaraes on a regular basis as to the status of

16   the litigation in Brazil?

17        A    We may have gotten some, yes.

18        Q    Now, there were 65 cases that your

19   firm had at one time; is that correct?

20        A    Yes.

21        Q    Were the records for those cases

22   maintained centrally or were they maintained at

23   different locations?

24        A    Three of our offices worked on the

25   TAM case and they all maintained their own records.

- Leigh Ballen -

226

1      discusses settlement authority,

2      negotiations, results of negotiations.

3                    MR. CHASE:  Communications

4      with the clients which discuss these?

5                    MR. BERMAN:  Yes.  Yes.

6                    MR. CHASE:  Okay.

7                    MR. BERMAN:  And/or

8      communications with counsel for the clients.

9      I represent to you we have nothing.  Maybe

10     it's out there somewhere, but we don't have

11     it.

12     DOCUMENT/DATA REQUESTED _____

13        Q      Okay.  Do you recall writing any

14     letters to the clients to obtain from them settlement

15     authority?

16                    MR. APUZZO:  That's a

17     different --

18                    MR. BERMAN:  It's a different

19     question.

20                    MR. APUZZO:  Settlement

21     authority as opposed to discussions about

22     it?

23                    MR. BERMAN:  Absolutely.  It

24     all begins with settlement authority.

25        Q      When is the first time that, to your

- Leigh Ballen -                                    227

1    knowledge, you or anyone at Speiser Krause spoke to

2    any of your clients to obtain authority to negotiate

3    within a range of sums to settle their respective

4    cases?

5              A    From the very beginning.

6              Q    So, there should be letters, from the

7    very beginning, talking about how much you valued the

8    case at and responses from the client as to what

9    authority they gave you with respect to settlement of

10   the cases; is that right?

11             A    No.

12             Q    Okay.  Did you ever receive a letter

13   from any of the clients, or any of their attorneys,

14   where the subject matter related or pertained to the

15   settlement authority that Speiser Krause had to act

16   on their behalf in inaugurating and continuing

17   settlement discussions?

18             A    I don't agree with the premise.

19             Q    What premise?

20             A    The premise of settlement authority.

21             Q    In other words, you can -- well, what

22   don't you agree with?  I'm not going to argue with

23   you.  Why don't you agree with the premise?

24                  MR. APUZZO:  It's in the

25        retainer.

- Leigh Ballen -

228

1        A       We have retainers.

2        Q       Which allow you to do what, in your

3    opinion, whatever you want?

4        A       They speak for themselves.  I'm not

5    going to recite the terms of the retainer.

6        Q       Why didn't you get settlement

7    authority from the clients before discussing

8    settlement with the insurers?

9        A       Because every family advised --

10   authorized us to negotiate on their behalf.

11       Q       Sure.  I understand that.

12               The parameters of the negotiation is

13   what I'm asking you about.

14               When did you get authority from the

15   families to negotiate the numbers that are contained

16   in the exhibits that we just discussed?

17       A       We had authority vis-a-vis our

18   retainers and other verbal discussions with every

19   family to seek or demand settlement offers to be

20   made.

21                        MR. APUZZO:  Richard, it's

22               5:00 o'clock.  We have to advise the court

23               reporter if we're going overtime and how

24               long she could stay.

25                        MR. BERMAN:  I just want to

- Leigh Ballen -

229

1         finish this area and then I will be done.

2                       MR. APUZZO:  Okay.

3                       MR. BERMAN:  I mean, how long

4         do we have?

5                       MR. RIGUERA:  I don't know.

6         Do you want to take a quick minute?

7                       MR. BERMAN:  I mean, let's

8         finish this area and then I'll see where we

9         are.

10                      MR. APUZZO:  You got it.

11        Q       Go back to Exhibit 63.  I'm just

12   trying to make it as easy as I can.

13                   There's a bunch of numbers set forth

14   in Exhibit 63 which says that Speiser Krause,

15   Mr. Lear, is asking for settlement confirmation that

16   Fokker and TAM are willing to finalize the offers

17   discussed and set forth in the next two pages; do you

18   see that?

19        A       Yes.

20        Q       What documentation is there to

21   indicate that the clients of Speiser Krause knew that

22   you were negotiating in this range or authorized you

23   to negotiate in this range?

24        A       I don't know.

25        Q       Okay.  Is a possible answer none?

- Leigh Ballen -

230

1          A      I don't know.

2          Q      Can you identify for me any client

3  that you talked to before negotiations began with the

4  insurers where you discussed specific settlement

5  range numbers?

6          A      No.

7          Q      Has anyone at Speiser Krause ever

8  told you that that person at Speiser Krause had a

9  conversation or communication in writing with any of

10  your clients prior to inaugurating settlement

11  discussions to discuss with your client the

12  parameters within which settlement discussion should

13  be had?

14          A      Yes.

15          Q      Who was that?

16          A      My father.

17          Q      What did he tell you?

18          A      That demands would be made based on

19  the potential for settling the cases prior to trial.

20                  MR. BERMAN:  Move to strike as

21          not responsive.

22                  Would you read back my

23          question, please?

24                  (Whereupon, the record was

25          read back by the court reporter.)

- Leigh Ballen -

241

1       that that's what was best.

2               Q       And didn't he think he was acting in

3       the best interest of the families?

4               A       I believe he thought that.

5               Q       I would like you to take a look at

6       number 68, please, which is SK-192 and 193.

7               A       68?

8               Q       Yes, sir.  It purports to be a fax

9       transmission to Mr. Lear from Mr. McGilchrist dated

10      June 20, 2000.  Have you seen this document before?

11              A       Yes.

12              Q       What was the purpose of this

13      document, as you understood it, if you did?

14              A       That defendants were willing, as we

15      had thought, to settle on less than an all or none

16      basis.

17              Q       At what point in time was

18      Mr. Guimaraes removed as counsel?  Was it before or

19      after the settlement numbers were recommended by your

20      firm?

21              A       It was -- as to the families who

22      terminated his representation?

23              Q       Yes, sir.

24              A       It was after the settlement offers

25      were obtained by us, Speiser Krause.

- Leigh Ballen -

240

1    exactly.

2           Q      And that's what you told the clients?

3           A      That they would need counsel that

4    would represent them and agree to sign the dismissal.

5           Q      Do you have any reason to believe

6    that Mr. Guimaraes opposed the settlement, on any

7    basis, other than what he wrote to you which is he

8    thought that you should get more?

9           A      Yes.

10          Q      What reason is that?

11          A      General continuation of litigation,

12   generally.

13          Q      For which he was not going to get

14   paid unless the litigation was over?  I don't

15   understand.  Could you please explain?

16          A      Well, that's it.  That's it.  That --

17   the glory of being an aviation attorney on an ongoing

18   basis, as we were told he had done in other cases.

19          Q      So, you believe that Mr. Guimaraes

20   valued the glory of continuing the litigation over

21   the benefit to the widows and orphans?

22          A      Wholeheartedly.

23          Q      That's your belief?

24          A      Generally, although I don't believe

25   he intends to harm anyone.  I believe that he felt

# EXHIBIT 18

134

1              Renato Guimaraes, Jr.

2    Minitti's work, because I have to replace Speiser

3    Krause by somebody with the expertise in rogatory

4    letters, and I found Minitti to do so.

5          Q.      I'll go into some detail in later

6    questions in reference to the enforcement, but, in

7    your opinion, is the legal system in Brazil very

8    slow?

9          A.      Yes, I think there is a national

10   demand to speed up the proceedings.  Too much

11   appeal, and so forth, yes.

12         Q.      And is the system in Brazil

13   unreliable, do you know the word, not to be relied

14   upon, for justice?

15              MR. BERMAN:  Object to the form.

16         A.      Northrop said it is a beautiful

17   system, Northrop wrote that.  Accepted the case to

18   Brazil, it's a beautiful country, they have new

19   constitution, all rights and we will obey the

20   system of Brazil.  That's in the proceeding in

21   California.  They are exaggerating, but it's good,

22   it's not perfect.

23              On the other hand, we don't have the

24   things in Brazil like we have here in this case,

25   never.

139

1                    Renato Guimaraes, Jr.

2          Q.      Yes, on page 50.

3                  MR. BERMAN:  Read it to yourself.

4          Q.      Are you familiar with this?

5          A.      Yes, former Chief Supreme Court in

6    Brazil, and so forth.

7          Q.      Did you write this letter?

8          A.      Yes, I did.

9          Q.      And where you state that "In Brazil

10   such a TAM case must last at least 10 years and

11   much more if foreign companies including Fokker are

12   the defenders," is that a correct statement?

13         A.      At that point, yes, very reasonable.

14         Q.      Were there any efforts to enforce

15   this judgement in the United States?

16         A.      Yes, very much so, yes.

17         Q.      What did you do to try to enforce the

18   judgement in the United States?

19         A.      Well, my first resource, my first

20   project was hire somebody reliable to replace

21   Speiser Krause which was Minitti, in this case.

22   Then kind of international law firm contact some

23   families, and, then, very quickly, we say we have a

24   new theory to enforce there.

25                 And, then, attorney in Miami called

ASA REPORTING SERVICE, INC.
(914) 588-3358

140

1              Renato Guimaraes, Jr.

2    Herman, Jeffrey Herman, also help us.  So, all of

3    those failed and no money was received yet.  Now we

4    have a new opportunity next week or so in LA.

5              Q.    You say you have an opportunity, you

6    have a proceeding pending next week in Los Angeles?

7              A.    October 20, next Monday, if I am not

8    wrong.

9              Q.    What is that proceeding?

10             A.    Well, the enforcement of the monthly

11   conditional monthly payment for the losses of early

12   wages.

13             Q.    And these were for the 10 clients

14   that you're representing?

15             A.    Seven, three are scared, they are

16   awaiting the results.

17             Q.    What attorneys are representing the

18   seven clients in California next week?

19             A.    Walter and Steve.

20             Q.    Walter Lack?

21             A.    Lack, yes.

22             Q.    And Steve, what is his last name?

23             A.    Schuman, S-C-H-U-M-A-N.

24             Q.    And are Walter Lack and Steve Schuman

25   in the same office?

# EXHIBIT 19

23

1                        Renato Guimaraes

2      trust when you were dealing in the beginning with

3      Speiser Krause?

4           A.      Yes, yes, but more than that we made

5      a written statement as you recall, 25 over 25,

6      written letter from Jerry Lear to me after

7      conversation with Arthur Ballen, you accept or go

8      to Kreindler & Kreindler.  He say okay, I accept.

9           Q.      Could you explain that; in other

10     words, you gave him the choice that either he

11     accept it or you would go to Kreindler & Kreindler,

12     another firm?

13          A.      Yes, because I was scared to lose the

14     families in Brazil, our clients.  It was a kind of

15     speed, I was on a public telephone in Sao Paulo and

16     I think he want to give me 15, then 20.  Well, 25

17     is the minimum Kreindler & Kreindler gave me, so I

18     have to decide, you accept or not.

19                  He took the wire and said okay, I

20     accept 25 five, so please send a letter to me.  And

21     I was surprised, it was not his signature that was

22     there, it was Jerry Lear, never had talked with him

23     before.

24          Q.      So, the conversation you had was with

25     Leigh Ballen?

```
1                    Renato Guimaraes
2         A.      No, Arthur Ballen.  That's well after
3    my stay at his home in Key Largo.
4         Q.      It had to be after the visit to Key
5    Largo and before you saw this writing, that's the
6    period of time?
7         A.      Before what?
8         Q.      Before the writing was sent to you;
9    correct?
10        A.      Yes.  In 30 minutes I send it.  I
11   have a fax number here, public fax here in town,
12   Sao Paulo, I was not in Campinas, sending letter
13   confirming our talk.
14                So, the level of confidence was much
15   shorter than I have with Clito, I know him 40
16   years, or Professor Strager who was my teacher.
17   You know, it was a foreigner.  I trust Speiser
18   Krause, but let's put on paper.  He said okay, I
19   send letter to this, and he did.  But who signed
20   it, Jerry Lear, that's the letter here, 25 over 25.
21        Q.      Do you remember the name of the
22   attorney at Kreindler & Kreindler who made you an
23   offer of 25 per cent?
24        A.      No, I never talked with Kreindler &
25   Kreindler regarding TAM case at that point.  I knew
```

```
 1                   Renato Guimaraes
 2    their letterhead dated February 5th of 1997
 3    designated RG00006.  Can you identify this letter?
 4                   (The witness examines document.)
 5         A.     Sure.
 6         Q.     And this is a letter that was sent to
 7    you by Gerard Lear?
 8         A.     Somebody in his office.
 9         Q.     Do you know when you received this
10    letter?
11         A.     When?
12         Q.     Yes.
13         A.     Half-an-hour after I discussed
14    verbally with Arthur Ballen for the 25 per cent.
15         Q.     And you were working in your office
16    at the time you received this?
17         A.     No, I was in town, Sao Paulo, so I
18    gave a public fax number on the phone, I went.
19         Q.     What was your understanding when you
20    received this, what did this mean to you?
21         A.     Just like today, it was a
22    complimentary written evidence of our understanding
23    which was left open in Key Largo, you know, well,
24    depend, Renato, how many clients, let's see, we'll
25    discuss this later, and then it's time to fix it.
```

```
 1                  Renato Guimaraes
 2         answer.  If you know what Arthur or
 3         Gerard Lear were thinking when he wrote
 4         that, go ahead.
 5              MR. APUZZO:  Please.
 6         A.     In retrospect --
 7         Q.     No, at the time you received this.
 8         A.     I have no question, I talk to the
 9    guy, you take 25 five per cent or good luck, I go
10    to Kreindler & Kreindler.  He said okay, he
11    accept.  And I receive this, my fee.  You know the
12    trick they put in I recognize later on, but I was
13    sure it was referred to me.
14         Q.     And when he uses the words "their
15    services," did you have any question of the English
16    use of the words their services?
17         A.     Much later, much later professor in
18    America told me counsel is a word is used singular
19    and plural.  I was not aware of that, so I said
20    they think I have other employees in my office, but
21    I have a suspicion right from the beginning he was
22    making a trap.
23              MR. CHASE:  Can we go off the
24         record.
25              (Off the record at 4:30 p.m.)
```

# EXHIBIT 20

Page 77

Guimaraes

1

2      A.    I contacted Dr. Minitti first on the

3   forum non convenient situation.

4      Q.    What lead to you contacting Dr.

5   Wanderley Minitti with regard to forum non

6   convenience?

7      A.    When I talked with a judge the chief

8   of justice of Brazilian about Judge Russo

9   approach he said, look for Michael Jackson case

10  and I went there I found the Minitti name and

11  then I called him and at his home and he called

12  me back from New York.

13     Q.    And basically did he help you with

14  the forum non convenience?

15     A.    Yes, he said oh, yes, I have a case

16  like that, look at the court number and so and

17  so, I did, I saw his name and I make a big noise

18  on Michael case forum non convenience decision

19  Brazil.

20     Q.    Now, did there ever come a time that

21  you hired him to represent the 65 families in

22  connection with the Tam case?

23     A.    I don't think the name, the verb

24  hired was proper but I asked him to take,

25  replace, so to speak, Speiser and Krause because

ce88f693-1406-495f-b956-3ceca5607f09

1                  Guimaraes

2    I need somebody for rogatory letters.

3         Q.    I'm going to show you what has been

4    marked yesterday as Minitti Exhibit 18.  Now

5    that has both the Portuguese version as well as

6    the American version.

7              Do you recognize that document?

8         A.    Yes, the Portuguese is original.

9         Q.    Can you describe that document?

10        A.    Yes, I delegate according to the

11   Brazilian law department I received from the

12   families to Dr. Minitti to replace Speiser and

13   Krause according to the sharing duties I have

14   with the Speiser and Krause before Judge

15   McDonald and the Judge Solomon here in New York.

16        Q.    Now, at the time that you signed this

17   document, is that your signature below?  Is that

18   your signature?

19        A.    Yes, sure, my signature.

20        Q.    Did you have authority to sign that

21   agreement, to delegate your duties to Mr.

22   Minitti?

23        A.    No, it's my power.  I don't have to

24   ask anybody permission to sign my name.

25        Q.    I'm asking did you have the authority

ce88f693-1406-495f-b956-3ceca5607f09

1                    Guimaraes

2              MR. CHASE:  That was Minitti 1 for

3      ID, I believe.

4              MR. PELLEGRINI:  That was marked as

5      Minitti 1.  I don't want to confuse the

6      documents here.

7         Q.    Now, I have what has been marked as

8   Minitti Exhibit 2.

9              Do you recognize this?

10        A.    Yes, I do, sir.

11        Q.    Now, did there ever come a time that

12   you saw this document?

13        A.    Yes, sure, I saw it.  Yesterday.

14        Q.    And could you describe the document?

15        A.    Yes, Minitti was here in New York and

16   he produced along with Peskin his understanding

17   about our sharing if we succeed to have the

18   money for Northrop it will be a little below 25

19   percent for Speiser and Krause agreement would

20   be 24 to make it more, more convincing to the

21   family economically.

22        Q.    Now, was Dr. Minitti successful with

23   regard to letters of rogatory?

24        A.    Half and half.  He did not get the

25   money but he serve, he succeed in the second try

ce88f693-1406-495f-b956-3ceca5607f09

1                    Guimaraes

2    across the river in Brooklyn or something,

3    Queens and he did serve Northrop.  So we, he

4    went back there, pick up little factory with --

5        Q.    After he came back to Brazil, after

6    becoming successful with or partially successful

7    with the letters of rogatory basically in the

8    sense that Northrop was served with this

9    enforcement of the judgment he went back to

10   Brazil and he continued to do more work on this

11   case?

12       A.    He did for a long time then he gave

13   up.

14       Q.    What kind of work did he do?

15       A.    He found it, Litton.  Nobody knew

16   Litton belong, subsidiary for Northrop so it's

17   all there, our city, Campinas.

18       Q.    Was he able to seize those assets?

19       A.    Twice on the court of appeal.  It

20   disqualify the judge.

21       Q.    Besides that did Dr. Minitti do any

22   other work on behalf of the 65?

23       A.    He did his best.  He did not collect,

24   he gave up but he made the best, his best.

25                    MR. PELLEGRINI:  I don't have anymore

ce88f693-1406-495f-b956-3ceca5607f09

# EXHIBIT 21

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

RENATO GUIMARAES, JR.,                                      Case No. 05-CV-2210(DC)

                                        Plaintiff,

                -against-                                   **AFFIDAVIT OF GERARD LEAR**

SPEISER, KRAUSE, NOLAN & GRANITO,
a professional corporation, f/k/a SPEISER,
KRAUSE, MADOLE & LEAR, a professional
corporation,

                                        Defendant.
-------------------------------------------------------------X

State of Virginia      )
County of Arlington    ) ss.:

        Gerard Lear, being duly sworn, deposes and says:

1.      I am the managing attorney of Speiser, Krause, Nolan & Granito ("Speiser Krause"),

        defendant in this action, and I have personal knowledge of the facts herein stated.  I

        submit this affidavit in support of Speiser Krause's motion for summary judgment.

2.      Speiser Krause is a law firm specializing in aviation-related tort matters.

3.      In 1996, our firm was contacted by Renato Guimaraes, Jr., a Brazilian attorney, for

        purposes of representing potential clients resulting from the crash of TAM flight 402, a

        Brazilian passenger jet in Brazil on October 31, 1996.

4.      After some discussion between Mr. Guimaraes and other representatives of Speiser

        Krause, I was asked to prepare a document on the firm's letterhead so that Mr. Guimaraes

        could circulate it among potential clients and their local counsel.  On February 5, 1997, I

faxed such a letter to Mr. Guimaraes. The letter described a 33⅓% contingent fee that Speiser Krause would be willing to receive from clients for providing legal services in connection with the crash of TAM flight 402, and also stated that Speiser Krause would pay up to 25% of our fee to Brazilian counsel for these potential clients.

5.  It has been my experience in foreign mass tort litigation, that a single tort victim can generate several surviving family claimants, each of these having their own separate counsel. That is specifically why I used the words "their" and "counsel" in my February 5, 1997 fax.

6.  I did not send this fax to Mr. Guimaraes to "ratify" any fee-sharing discussions as has been alleged in the Complaint. At the time the fax was sent, we had no idea how many clients would ultimately decide to retain our firm, nor did we know the amount of work, if any, that would be required of Brazilian counsel. By necessity, our discussions with Mr. Guimaraes concerning his role, responsibilities, and fees were in flux. Speiser Krause never agreed to pay 25% of our legal fees in the TAM cases to plaintiff.

7.  We did pay Mr. Guimaraes' expenses when he requested reimbursement. Early on, we considered coming to some agreement with Mr. Guimaraes concerning compensation, especially in cases where Mr. Guimaraes acted as local counsel. However, when Mr. Guimaraes stopped cooperating with our TAM clients, it became necessary to compensate other Brazilian counsel for their work.

8.    In 2000, when many of Speiser Krause's TAM clients accepted the settlement offers

proposed by the defendants, their local counsel were required to apply to the Brazilian

courts to obtain approval of the settlements.  Mr. Guimaraes not only refused to assist

these clients in processing the settlements, he also tried to convince the clients to reject

the settlements.  As a result, 17 TAM clients expressly discharged him and retained other

counsel to complete the settlement process.

9.    As of today, Mr. Guimaraes has convinced at least eight of Speiser Krause's TAM clients

to discharge us, and to retain other U.S. law firms.  These firms include Engstrom,

Lipscomb & Lack.  Those TAM clients have still not resolved their claims on this near 10

year anniversary of their losses.

10.    I am also informed that plaintiff has claimed the existence of a fiduciary relationship

between our firm and himself.  Speiser Krause never represented Mr. Guimaraes in a

legal capacity, and I am aware of no other fiduciary relationship being alleged or existing

between Mr. Guimaraes and my firm.

WHEREFORE your deponent respectfully prays that the defendant's motion be granted in

all respects, and for such other, further or different relief as to this court may seem just, proper or

equitable.

Gerard Lear

Sworn to before me this 21st
day of September 2006

Notary Public

My Commission Expires May 31, 2009

# EXHIBIT 22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
RENATO GUIMARAES, JR.,

        Plaintiff,

   -against-

SPEISER, KRAUSE, NOLAN & GRANITO a
professional corporation f/k/a SPEISER,
KRAUSE, MADOLE & LEAR, a professional
corporation,

        Defendant.
-------------------------------------------------------------X

**ECF Case**

No. 05 CV 02210 (DC)

## DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S INTERROGATORIES TO DEFENDANT RE: DEFENDANT'S SECOND COUNTERCLAIM DATED FEBRUARY 26, 2007

Responding party objects to the "Definitions and Instructions"A through P preceding the Interrogatories to the extent that any definition or instruction purports to broaden the meaning or obligations established by the Federal Rules of Civil Procedure and/or Local Civil Rule 26.3, which in any event are incorporated by reference to all discovery demands within the District.

1. Responding party objects to this interrogatory to the extent it is compound, overly broad and/or unduly burdensome. Defendant further objects to this Interrogatory to the extent that it seeks information within the possession, custody, or control of Plaintiff. Without limiting Responding Party's response, the requesting party is referred to responding party's objections and responses to requesting party's demand for the production of documents re: second counterclaim dated March 28, 2007, more specifically documents responsive to requests numbered 3, 6, 7, 8, 9, 14, 15, 16, 23, 24, 25, 26, 27, 28, and 42.

Answering further, and subject to the foregoing:

a) George Klepetar, William Arjona Chong, Jose Periera Duarte, Alexandrea M. Vaz De Mello, Rilton de Oliveira Rodrigues, Zelia Menin and Mauro Rodrigues de Matos. Requesting party is also referred to the five clients identified by responding party in response to request 15 herein for additional identities of clients.

b) Please refer to response 1, above.

c) Documents in responding party's possession, custody, or control indicate that the communications were written. Specific evidence of oral communication between requesting party and any given TAM client is unknown but presumed at this time.

d) Please refer to responses 1 and 1c), above.

e) Please refer to responses 1 and 1c), above.

f) From the documents produced by the requesting party in this action, from the documents produced by Wanderley Minitti in the companion action; from TAM clients and their local Brazilian attorneys; from public records and court filings.

g) Please refer to response 1, above.

h) Upon information and belief, all of the TAM clients and their local counsel who are not included in 1(a), above; recipients of all written communications referred to in 1, above; see also response to 1c), above.

i) The retainer contracts for the TAM clients listed in 1a), above have been produced and identified in response 1, above. The advantage was the negotiated settlement amounts identified therein.

2

    j)      The acts took place in New York and California USA and Brazil.  See responses
to 1 and 1c), above.

2.    Requesting party's acts consisted of authoring and publishing unfair, unlawful, and
injurious falsehoods about the responding party which attempted and which tended to
expose the responding party to public hatred, shame, aversion, disgrace, damage to
reputation in the legal profession, induced an evil or negative opinion about the
responding party in the minds of its clients, and cast responding party in a false light.  The
falsehoods aforestated are contained in the communications identified in responding
party's responses to interrogatory 1, above and in responding party's responses and
objections to requesting party's demand for the production of documents re: second
counterclaim, specifically responses numbered 1, 3, 4, 5, 6, 7, 8, 14, 15, and 16.  See also
response to 1 c), above.

3.    The acts, statements, and misrepresentations made by requesting party are contained in
the communications identified in responding party's response to interrogatory #1, above,
and in responding party's responses and objections to requesting party's demand for the
production of documents re: second counterclaim, specifically responses numbered 1, 3,
4, 5, 6, 7, 8, 14, 15 and 16.  See also response to 1 c), above.

4.    Objection to the extent this interrogatory calls for a legal conclusion, seeks the mental
impressions of responding party's counsel, or calls for the production and/or identification

3

of documents within requesting party's possession, custody, or control. Without limiting responding party's response, the unlawful actions include, but are not limited to the requesting party's falsely reporting to law enforcement and disciplinary authorities that the responding party was guilty of criminal acts. These actions are identified in the communications identified in response to interrogatory 1, above. See also response to 1 c), above. With regard to the laws violated, the Court, at trial, will take judicial notice of all statutes and laws in effect at the time of the actions. Answering further, requesting party is also referred to responding party's response to requesting party's demand for the production of documents re: second counterclaim, response numbers 1 and 26.

5. Responding party objects to this interrogatory to the extent it is compound, overly broad and/or unduly burdensome. Objection to the extent this interrogatory calls for the production and/or identification of documents within requesting party's possession, custody, or control. The statements made by the requesting party were reported and published in the news and magazine articles identified in responding party's response to interrogatory 1, above, as well as in responding party's response to requesting party's demand for the production of documents re: second counterclaim, response numbers 1, 14, 15 and 16.

6. The 8 TAM clients who have substituted the services of responding party with those of Herman & Mermelstein, and/or Engstrom, Lipscomb & Lack, and the reasons therefore are identified in responding party's response to interrogatory #1, above, and further in

4

responding party's response to requesting party's demand for the production of documents

re: second counterclaim, responses numbered 1, 4, 8, and so much of response 3 that

refers to documents concerning the termination of responding party and retainers for

Herman & Mermelstein.  The dates and reasons are set forth in the those documents.

7.      The monetary damages are computed for each client based upon the negotiated settlement

amounts, as follows:

| Client | Northrop | TAM | Total |
|--------|----------|-----|-------|
| Wolfgang Hans Janstein | $80,000.00 | $215,000.00 | $295,000.00 |
| George Klepetar | $140,000.00 | $429,879.02 | $569,879.02 |
| William Arjona Chong | $230,000.00 | $673,371.79 | $903,371.79 |
| Jose Pereira Duarte | $105,000.00 | $322,927.30 | $427,927.30 |
| Alexandre M. Vaz de Mello | $100,000.00 | $297,567.72 | $397,567.72 |
| Rilton De Oiveira Rodrigues | $105,000.00 | $297,026.05 | $402,026.05 |
| Zelia Menin | $100,000.00 | $195,000.00 | $295,000.00 |
| Mauro Rodrigues de Matos | $105,000.00 | $195,000.00 | $300,000.00 |
| Total: | | | $3,590,771.88 |

The retainer contract with each client consisted of a fee calculated at 25% of the

settlement amounts, and client reimbursement for costs advanced calculated at 2% of the

settlement amounts, for a total of 27%.  The damage is thus calculated as follows:

$3,590,771.88 x 27% = $969,508.40.  In addition to the foregoing, defendant anticipates

legal expenses to enforce its charging liens and fees, and expenses caused in defending

claims asserted by requesting party's agent, Wanderley Minitti, in an amount to be

5

determined at trial. Further, there are five additional clients identified later (in response to interrogatory 15) who have not yet discharged or substituted responding party, so the damages ensuing therefrom cannot be calculated. Documents evidencing these damages are identified in the schedule contained in responding party's response to requesting party's demand for the production of documents re: second counterclaim, numbers 1 and 20.

8.    Objection to this interrogatory to the extent the term "the settlement" is ambiguous, undefined and/or argumentative, and to the extent it has a predicate unestablished assumption, particularly that there was a single "settlement." There were independently negotiated settlements. Without limiting the foregoing responding party refers requesting party to the response to interrogatory 1, including 1 c), above. Requesting party is also referred to responding party's response to requesting party's demand for the production of documents re: second counterclaim, particularly response number 1, and more particularly response numbers 4 and 9 therein.

9.    Objection to this interrogatory to the extent the term "the settlement" is ambiguous, undefined and/or argumentative, and to the extent it has a predicate unestablished assumption, particularly that there was a single "settlement." There were independently negotiated settlements. Objection to this interrogatory to the extent it is overly broad and unduly burdensome. Responding party objects to this interrogatory on the ground that it asks responding party to "identify any and all client communications. . . where any TAM

6

client questioned or expressed concerns or reservations..." and is, therefore, overly broad with language requiring a search for information that far exceeds the scope of relevant information. Without limiting the foregoing, upon information and belief, all communications from the 8 clients who substituted Speiser Krause with other counsel, concerning the amount of each offer of settlement to the respective client, are contained in responding party's response to requesting party's demand for the production of documents re: second counterclaim, number 1, and, more particularly #4. See also response to interrogatory 1 c), above.

10.    Objection to this interrogatory to the extent it seeks the mental impressions of responding party's counsel and/or any third party. Objection to this interrogatory to the extent it seeks information within the possession, custody or control of requesting party. Requesting party is also referred to interrogatory response number 1, above (including 1 c), above), and the documents referred to in responding party's response to requesting party's demand for the production of documents re: second counterclaim, number 1 with respect to the different settlement offers made to each client.

11.    Objection to this interrogatory to the extent the term "the settlement" is ambiguous, undefined and/or argumentative, and to the extent it has a predicate unestablished assumption, particularly that there was a single "settlement." There were independently negotiated settlements. Objection to this interrogatory to the extent it seeks information within the possession, custody or control of requesting party or any third party. Without

7

limiting the foregoing, see doc. nos. SK-4232, 4244, and 4260.  Concerning oral

communications, refer to 1 c), above.


12.     Objection to this interrogatory to the extent the term "the settlement" is ambiguous,

undefined and/or argumentative, and to the extent it has a predicate unestablished

assumption, particularly that there was a single "settlement."   There were independently

negotiated settlement<u>s</u>.  Requesting party is also referred to interrogatory response

number 1, above (including 1 c), above), and the documents referred to in responding

party's response to requesting party's demand for the production of documents re: second

counterclaim, number 1 with respect to the different settlement offers made to each client.

13.     Please refer to responses and objections to interrogatories 1(a), and 1(i), above.


14.     Objection to this interrogatory to the extent the term "co-counsel" is ambiguous,

undefined and/or argumentative, and to the extent it has a predicate unestablished

assumption, particularly that there was a definable "co-counsel" relationship.  Defendant

further objects to this Interrogatory on the grounds that it is vague and ambiguous, and

therefore, does not adequately inform the responding party as to the scope of the answer

requested to the extent that it asks Defendant to identify "the reason why that relationship

ended."  Without limiting the foregoing, as concerns the second counterclaim, the

contractual, or quasi-contractual relationship between the parties, if any, was terminated

by the acts of the plaintiff as identified in response to interrogatory number 1, above, and

8

documents identified by responding party in response to requesting party's demand for the production of documents re: second counterclaim, number 1.

15. The clients who suspect Speiser Krause of wrongdoing are the claimants for the decedents Marlene Haddad and Ariovaldo Ricioli, Flavio de Araujo Filho, Ricardo Alan Calonico Maciel and Paulo Marcelo Caiuby de Araujo. The foregoing five TAM clients have not yet discharged the responding party, and substituted other counsel.

16. Responding party's authority to negotiate settlements offers on behalf of its clients derives from its retainer agreements with those clients, and with the cooperation of the clients in developing their respective damage brochures.

I have read the foregoing answers to interrogatories and do hereby swear that they are true and correct to the best of my knowledge, information, and belief.

SPEISER, KRAUSE, NOLAN & GRANITO a
professional corporation f/k/a SPEISER,
KRAUSE, MADOLE & LEAR, a professional
corporation,

By

Gerard R. Lear

State of Virginia    )
County of Arlington) ss.:

Sworn to before me this 10 day of April 2007

Notary Public                    My Comm. Exp. 1/31/2008

*As to objections*:

Apuzzo & Chase
*Attorneys for Defendant & Counter-claimant*

By:

William J. Apuzzo (WA-1312)
800 Third Avenue – 8th Floor
New York, NY 10022
(212) 297-0885

9

# EXHIBIT 23

ECF Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
DR. WANDERLEY MINITTI,

                              Plaintiff,                 04 CV 07976 (DC)(RLE)

                                                         **AMENDED COMPLAINT**
      - against -

SPEISER, KRAUSE, NOLAN & GRANITO, PC,                    Jury Trial Demanded

                              Defendants.
-----------------------------------------------------------x

Plaintiff, DR. WANDERLEY MINITTI (hereinafter "MINITTI"), through his
attorneys, PELLEGRINI & ASSOCIATES, LLC, respectfully alleges upon knowledge
with respect to himself and his own actions and upon information and belief as to all
other matters as and for his complaint against defendant, SPEISER, KRAUSE, NOLAN
& GRANITO, PC, ("hereinafter SPEISER, KRAUSE"), as follows:

## NATURE OF THE ACTION

1.      This is a collection action for unpaid attorneys fees owed to a foreign
attorney arising from an international plane crash that took place in Brazil. Plaintiff
seeks declaratory relief to 28 U.S.C. §2201 and compensatory and punitive damages
pursuant to quantum meruit as well as various state common law causes of action.

## JURISDICTION

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §
1332(a)(2). Plaintiff asserts jurisdiction over defendant per 28 U.S.C. §1367. Plaintiff
requests that this Court exercise pendant jurisdiction over those state law claims
arising out of the same common nucleus of operative facts as plaintiff's federal claims.

1

## VENUE

3.      Venue is proper in the Southern District pursuant to 28 U.S.C. §1391(a) because defendant maintains a business office in the Southern District and a substantial part of the events or omissions giving rise to the claims occurred and a substantial part of the property that is the subject of the action is situated in the Southern District.

## PARTIES

4.      Plaintiff, MINITTI, is a Brazilian attorney duly admitted to practice law before the courts of Brazil and a member of the Brazilian Bar Association. He was the attorney appointed by a Brazilian court to pursue Financial Support payments from an American corporation by enforcing the terms of a Letter Rogatory.

5.      Defendant, SPEISER, KRAUSE, is an American based law firm that was jointly retained by most of the families of the subject aviation crash to pursue judgments against the various defendants in the United States.

## FACTS

6.      This action arises from the October 31, 1996 crash of TAM Fokker flight 402, in Sao Paolo, Brazil, which killed ninety-nine passengers and crew members. Shortly after the accident, sixty-five retainer agreements were signed jointly, where Renato Guimaraes, Jr. (a Brazilian lawyer) and Defendant SPEISER, KRAUSE (a New York-based law firm) agreed to represent the victims' families in return for a contingent fee, to be split jointly, of 25 percent of any monies collected with an additional 2% reimbursement allowance for costs.

7.      Shortly thereafter, an action was commenced in Brazil against Northrop Grumman and other defendants on behalf of 65 families of the victims. This action

was brought in the Second Part of the III Civil Regional Court of Jabaquara/Saude, ("Jabaquara Court"), Sao Paolo, Brazil, Action # 1509/98.  The action alleged negligence due to a defective thrust reverser that was designed and manufactured by solely by Northrop Grumman.

8.      Northrop Grumman appeared in the Jabaquara Court through its counsel the law firm of Pinheiro Neto and defended itself in that proceeding.  After lengthy trial brought and prosecuted only by Renato Guimares, Jr., without the participation or aid of Defendant SPEISER, KRAUSE, a final judgment was rendered by the Jabaquara Court on June 30, 2000.  The judgment was then served on Northrop Grumman and duly published in the State of San Paulo Law Journal, as required under Brazilian Law.

9.      That Brazilian judgment required that Northrop Grumman pay for the pain and suffering of the victims' in the amount of two million Brazilian Reals (approximately $1,111,111.11) per family.  The judgment also required that Northrop Grumman pays as follows:

i.      an additional 20% of the amount assigned as "formal value of the matter." This payment is due since Northrop was deemed in contempt of court for failure to deposit a bond prior to the litigation, as directed by judicial decision;

ii.     an additional 20% of the amount of the judgment as attorneys' fees; and

iii.    2/3 of the amount of the last salary of each victim through the age of 65.

10.     The Jabaquara Court, based on paragraph 9(iii) above, in an ancillary action similar to a child-support or alimony collection action under New York State Laws, directed Northrop Grumman to pay immediately to the families two-thirds of the amount of the last salary of each victim through the age of 65, as financial support payments for what is known in Brazilian Law as food relief ("Financial Support

3

Payments") Following an independent calculation ordered by the Jabaquara Court, the amount of the Financial Support Payments payable and overdue to 26 of the victims' families was determined to be US $8,642,802.94, corresponding to the period between October, 1996 through November, 2000.

11.     This proceeding for the enforcement of Financial Support Payments was assigned the Index Number 1509/98-E. This proceeding was also brought and prosecuted by Renato Guimares, Jr. and Plaintiff MINITTI without any help and/or participation by defendant SPEISER, KRAUSE. The food relief granted, and to be satisfied by Northrop Grumman through Financial Support Payments to the victims' families is final.

12.     The Jabaquara Court ordered the service of Northrop Grumman for payment of the Financial Support Payments in 24 hours, or be subject to seizure and attachment of its assets. The Counsel for Northrop Grumman in Brazil refused to accept service for payment of the Financial Support Payments.

13.     Northrop Grumman did not comply with the Jabaquara Court's orders; rather it chose to make itself unavailable for service in Brazil, having closed its Brazilian office shortly after the accident. The victims' families did not receive any Financial Support Payments.

14.     The Jabaquara Court, in an effort to compel Northrop Grumman to meet its obligations to the victims' families, requested through a Letter Rogatory, that the United States Courts serve Northrop Grumman in connection to the Financial Support Payments or be subjected to seizure and attachment of its assets. The Letters Rogatory was assigned to Plaintiff MINITTI to be filed in the United States Court and to follow the pertinent proceedings for its accomplishment. Annexed hereto as **Exhibit "A"** are

4

copies of the Certificates from the Brazilian Court, dated February 1, 2001 and February 2, 2001, stating that Plaintiff MINITTI is defending the rights of the victims and that there have been no settlement proposal from Northrop Grumman.

15.    Defendant SPEISER, KRAUSE, as attorneys for the victims' families, jointly with Renato Guimaraes, Jr., did not pursue in any manner the enforcement of the Letters Rogatory in the United States.

16.    Renato Guimaraes, Jr. then retained Plaintiff MINITTI to follow and prosecute the enforcement of the Financial Support Payments and the Letters Rogatory by executing a power of attorney and retainer agreement assigning his powers in the Financial Support Payments proceedings to Plaintiff MINITTI, including rights to retain other United States counsel to assist in the prosecution of the Letters Rogatory. Annexed hereto as **Exhibits "B" and "C"** are copies of the Retainer Agreement, dated October 16, 2000, between Renato Guimaraes, Jr. and Plaintiff MINITTI and Power of Attorney, dated December 22, 2000, between Renato Guimaraes, Jr. and Plaintiff MINITTI respectively.

17.    Plaintiff MINITTI then engaged the services of, through a retainer agreement, Richard Peskin, a New York State Attorney, to bring the Letters Rogatory to the attention of the appropriate court in the United States. Together Plaintiff MINITTI and Richard Peskin, Esq. filed the Letters Rogatory in the Southern District of New York on January 9, 2001 and later in the Eastern District of New York. Annexed hereto as **Exhibit "D"** is a copy of the Retainer Agreement, dated January 5, 2001, between Richard S. Peskin, Esq., Plaintiff MINITTI and Renato Guimaraes, Jr.

18.    The Southern District Court declined to decide on the request contained in the Letters Rogatory, and indicated that the Eastern District court was the venue

with jurisdiction over the matter, since Northrop Grumman's New York office is located in Bethpage, New York. Curiously, co-counsel for the victims' families, Defendant SPEISER, KRAUSE appeared at the Letters Rogatory proceeding in the unusual role of opposing the Jabaquara Court's request that Northrop Grumman be served for the payment of Financial Support Payments in 24 hours or be subjected to seizure and attachment of its assets, in direct violation of its promise in the retainer agreements with the victims' families to zealously represent their interests. Its appearance opposing the motion to act on the Letter Oratory posed difficulties for the 26 victims' families, who had retained Defendant SPEISER, KRAUSE to pursue the owed food relief in the form of Financial Support Payments, which without the proper service on Northrop Grumman would prevent any future Financial Support Payment proceedings in Brazil.

19.    The Eastern District Court granted in part of the Jabaquara Court's request contained in the Letters Rogatory, having ordered the service of Northrop Grumman to the extent that Northrop Grumman was to be deemed served of the Brazilian court order to pay the victims' families the amount of Financial Support Payments. Mr. Granito, a partner of Defendant SPEISER, KRAUSE, was present at the Letters Rogatory hearings at the Eastern District Court, and, consistently with Defendant SPEISER, KRAUSE previous behavior at the Southern District hearing, was hostile and non-cooperative when interacting with Plaintiff MINITTI and Richard Peskin, Esq. while they pursued the enforcement of the Letters Rogatory. Northrop Grumman and its New York attorneys were served of the Eastern District decision by the U.S. Marshall as determined by the United States Federal Judge.

6

20.    Defendant SPEISER, KRAUSE acted solely in its own interest by pursuing settlement only, and opposing the Letters Rogatory proceedings which would have allowed the flow of the proceedings for enforcement of Financial Support Payments to the victims' families.

21.    Defendant SPEISER, KRAUSE aggressively pursued settlements in detriment of actually working for the attachment of Northrop Grumman assets in Brasil. In addition, Defendant SPEISER, KRAUSE retained the services of another Brazilian attorney, Mr. Luis Roberto de Arruda Sampaio ("Sampaio"), for the sole purpose of directly contacting the victims' families and convincing them to settle their cases. All this was done without the knowledge of Renato Guimaraes, Jr., who gradually started to receive notices from the victims' families canceling their retainer agreements with him, as Sampaio succeeded in his efforts on behalf of Defendant SPEISER, KRAUSE

22.    Defendant SPEISER, KRAUSE paid a percentage to Sampaio of each settlement he was able to reach. In fact, as a tool of persuasion to get victims' families to cancel the retainer agreement to Renato Guimaraes, Jr., Sampaio mailed to some of the victims' families a copy of a judgment in another unrelated air crash case in which Mr. Guimaraes had worked, and which outcome was not favorable to the clients of Renato Guimaraes, Jr.

23.    In spite of Defendant SPEISER, KRAUSE's lack of interest in serving Northrop Grumman in the United States to pay the Financial Support Payments to the victims' families, Defendant SPEISER, KRAUSE benefited from the service of Northrop Grumman to further their intent to rush victims' families into settlements. At least 14 of the 26 families of the victims' families named as plaintiffs in the Letters Rogatory

7

entered into settlements, and ALL such settlements occurred AFTER the filing of the Letters Rogatory on January 9, 2001 with the Southern District Court in New York. (See, Exhibit "A").

24.    As a result of these settlements, Defendant SPEISER, KRAUSE collected US $ 8,412,538.03 on behalf of the 14 families with attorney's fees and costs of $2,271,385.20. None of this amount had been or has been shared with Plaintiff MINITTI in any way. Plaintiff MINITTI has been forced to, after having done all the work prosecuting the Financial Support Payments and Letters Rogatory proceedings in Brazil and in the United States, to now hire additional United states counsel to pursue fees and costs that Plaintiff MINITTI is owed by Defendant SPEISER, KRAUSE. Plaintiff MINITTI has sustained out-of-pocket expenses over $144,000.00. Defendant SPEISER, KRAUSE, on the other hand, has done nothing beyond agreeing to a quick settlement and then attempted to frustrate all attempts to follow and prosecute the Financial Support Payments and Letters Rogatory proceedings.

25.    Plaintiff now seeks recovery of fifty (50%) percent of the attorney fees that were generated as a result of the fourteen settlements described above on the basis he did most of the work but received no money for his efforts. Plaintiff in this case has done nearly all of the work that led to these settlements and therefore asks the court to use its power in equity to award the plaintiff a just proportion of the fees.

### FIRST CAUSE OF ACTION FOR RECOVERY OF ATTORNEY FEES BASED ON QUANTUM MERUIT

26.    Plaintiff repeats and re-alleges the allegations contained in paragraphs "1" through "25" above as if fully set forth herein.

27.    As a result of the above-described actions, the defendant individually and/or vicariously by and through their agents, servants and/or employees, deprived

8

plaintiff of the equitable share of the attorneys fees resulting from the settlement of the claims of the fourteen families involved in the underlying Brazilian suit.

28.     As a result of the foregoing, plaintiff suffered damages.

### SECOND CAUSE OF ACTION FOR UNJUST ENRICHMENT

29.     Plaintiff repeats and re-alleges the allegations contained in paragraphs "1" through "28" above as if fully set forth herein.

30.     By not meaningfully contributing to the recovery of monies on behalf of the victims' families, defendant enjoyed attorney fees in gross excess to what it actually deserved at plaintiff's direct expense.

31.     As a result of the foregoing, plaintiff suffered damages.

### THIRD CAUSE OF ACTION FOR CONVERSION

32.     Plaintiff repeats and re-alleges the allegations contained in paragraphs "1" through "31" above as if fully set forth herein.

33.     Defendant's refusal to share its fees by maintaining sole possession of the funds unlawfully excluded plaintiff from its share of the fee proceeds.

34.     As a result of the foregoing, plaintiff suffered damages.

### FOURTH CAUSE OF ACTION FOR PUNITIVE DAMAGES

35.     Plaintiff repeats and re-alleges the allegations contained in paragraphs "1" through "34" above as if fully set forth herein.

36.     The aforesaid deprivation and resulting injuries to plaintiff were due to the willful, wanton, reckless and/or malicious conduct of the defendant, individually and/or vicariously by and through its agents, servants and/or employees.

37.     As a result of the foregoing, plaintiff suffered damages.

9

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered as follows

### A.    Declaratory relief as follows

1.    A declaration that plaintiff had a property interest in the attorney fees available from the settlement proceeds taken by the defendant.

2.    A declaration that plaintiff performed valuable legal services that materially contributed to the ultimate settlement that was obtained.

3.    A declaration that the reasonable value of the work plaintiff performed in pursuing the Letter of Rogatory in the United States was at least ONE MILLION DOLLARS ($1,000,000.00).

### B.    Compensatory Damages

1.    Compensatory damages in an amount to be fixed at trial but not less than ONE MILLION DOLLARS ($1,000,000) for the third cause of action.

2.    Punitive damages in an amount to be fixed at trial but not less than ONE MILLION DOLLARS ($1,000,000) by reason of the wanton, willful and malicious character of the conduct complained of on the first through fourth causes of action.

3.    An award of costs and disbursements to plaintiff.

4.    An award of attorney fees.

5.    Such other and further relief as this Court may deem just, proper and equitable.

Dated: New York, New York
January 6, 2005

Yours, etc.,

PELLEGRINI & ASSOCIATES, LLC
Attorneys for Plaintiff

By: _____
     Frank L. Pellegrini (FP-0876)
     330 Broadway, 10th Floor
     New York, New York 10013
     Phone: (212) 219-8312
     Facsimile:  (212) 226-3224

TO:    William Joseph Apuzzo, Esq.
       685 Third Avenue – Suite 2700
       New York, New York 10017

11



*MANOEL ANTONIO SCHIMIDT*

Tradutor Público Juramentado e Intérprete Comercial

Matrícula Nº 490 da Junta Comercial do Estado de São Paulo

Praça da Sé, 21 - 14º Andar - Conj. 1.489 - Tel.: (0xx11) 239-1077 - Fax: (0xx11) 3105-8603 - São Paulo - SP

LIVRO Nº    C251    FOLHA Nº    TRADUÇÃO Nº    T-53.361/001

I, the undersigned Sworn Translator and Commercial
Interpreter, hereby CERTIFY this is the description and
faithful translation of a DOCUMENT written in Portuguese,
which I translate as follows:

### Renato Guimarães Jr.

#### P.H.D. by USP, Professor at UNICAMP

##### Member of Comparative Law, GWU, IASP

Phone Nº  (019) 3289-8983, 3289-8990   Fax No. 3289-4515
Rua Francisco de Toledo, 511
University - 13.083-470, Campinas SP

### RETAINER AGREEMENT
### TAM BRAZILIAN FOKKER 100
### October 31, 1996

#### Subrogation

I hereby subrogate, to Dr. WANDERLEY MINITTI, Lawyer,
enrolled before the Brazilian Bar Association, Section of
São Paulo, telephone number (011) 3051-6965, with office at
Largo São Francisco, No. 181 - 7ª floor, Centro, Capital
and reserve the same to me, the powers granted - by the 65
(sixty five) families of the tragedy occurred to the
aircraft - Fokker 100 of TAM, in which 99 persons were
killed and 16 houses were destroyed in Jabaquara on the
date stated above, due to the "reverse" supplied by
Northrop Grumman Corporation and Teleflex plus the pilots
lack of training - through the 65 Power of Attorneys -
RETAINER AGREEMENTS, granted to me and jointly with the Law
Firm called Speiser Krause and/or Speiser, Krause, Madole &
Lear or any other firm associated to the same group of
American lawyers, according to the sole and uniform model
attached, for the 65 Brazilian families which were
addressed to said firm by me and through the processes sent
by the Honorable Judge William McDonald, of the Superior
Court of the State of California, County of Orange, Case
No. 783990, Linda Andrews et al, v. Northrop Grumman
Corporation, for which I am responsible before the
Brazilian Justice, and also according to the processes Index
No. 120256/1997, Celia Berliner et al, v. Northrop Grumman
Corporation, TAM et al, Supreme Court of the State of New
York, County of New York, Honorable Judge Jane S. Solomon,

INSCRIÇÃO RG 1,441,259  ·  CPF 346.107.328-53  ·  FMESP (ISS) 8.546.237-8  ·  IAPAS 110.591.008-74



## MANOEL ANTONIO SCHMIDT

Tradutor Público Juramentado e Intérprete Comercial
Matrícula Nº 490 da Junta Comercial do Estado de São Paulo

Praça da Sé, 21 - 14º Andar · Conj. 1.409 · Tel.: (0xx11) 239-1077 · Fax: (0xx11) 3105-8693 · São Paulo - SP

LIVRO Nº  0251   FOLHA Nº     2 TRADUÇÃO Nº  I-53.361/001

United States of America, and in special to dispatch the
documents of 12 pages, signed by me.

Campinas, SP, Brazil, October 16, 2000.

(a) illegible
    Renato Guimarães Junior.



NOTHING ELSE was contained in said original, which I return with
this faithful translation. In WITNESS WHEREOF, I have hereunto
set my hand and seal of office, this February 16, 2001.

                                                          vb
                                    Manoel Antonio Schmidt
                                        Sworn Translator

INSCRIÇÃO: RG 3.441.239  ·  CPF 346.307.328-55   ·   PMSP (ISS) 8.545.237-5   ·   IAPAS 110.591.000-74

RENATO GUIMARÃES JR.
Doutor pela USP, Professor da UNICAMP
Master of Comparative Law, GWU, IASP
Fone (019) 3289-8680, 3289-8990 fax: 3289-4315, 3289-2931, rua Francisco de Toledo, 531
Cidade Universitária – 13.083-070, Campinas, São Paulo, Brasil

RETAINER AGREEMENT
*TAM BRAZILIAN FOKKER 100*
October 31, 1996

### Substabelecimento

Substabeleço, na pessoa do Dr. WANDERLEY MINITTI, advogado, *Ordem dos Advogados do Brasil*, de São Paulo, fone ( 011 ) 3051-6965, com escritório no Largo de São Francisco, nº 181, 7º andar, Centro, Capital, reservando os mesmos para mim, os poderes outorgados - por todas as 65 ( sessenta e cinco ) famílias da tragédia do avião Fokker 100, da *TAM*, que matou, por causa do "reverso" da *Northrop Grumman Corporation* e da Teleflex, e com a falta de treinamento dos pilotos, 99 pessoas, destruindo 10 casas, no Jabaquara, na data acima – através das 65 procurações-*RETAINER AGREEMENTS*, a mim e em conjunto com a firma *Speiser Krause* e/ou *Speiser, Krause, Madole & Lear* ou outra qualquer firma coligada ao mesmo grupo de advogados americanos, conforme o modelo anexo único e uniforme para as 65 famílias brasileiras que encaminhei àquela firma e por cujos processos, enviados pelo **Honorable Judge William McDonald**, *Superior Court of the State of California, County of Orange, Case No. 783990, Linda Andrews et al, v. Northrop Grumman Corporation*, sou responsável perante a Justiça do Brasil, e em harmonia, também, com os processos Index No. 120256/1997, Celia Berliner et al, v. Northrop Grumman Corporation, TAM et al, Supreme Court of the State of New York, County of New York, **Honorable Judge Jane S. Solomon**, *United States of America*, e especialmente para despachar a documentação de 12 p.p. por mim assinada.

Campinas, SP, Brazil, October 16, 2000.



**MANOEL ANTONIO SCHMIDT**
Tradutor Público Juramentado e Intérprete Comercial
Matrícula N° 490 da Junta Comercial do Estado de São Paulo

Praça de Sé, 21 - 14° Andar - Conj. 1,406 - Tel.: (0xx11) 239-1077 - Fax: (0xx11) 3105-8603 - São Paulo - SP

LIVRO N°   0251   FOLHA N°        TRADUÇÃO N°   T-53.359/001

I, the undersigned Sworn Translator and Commercial
Interpreter, hereby CERTIFY this is the description and
faithful translation of a DOCUMENT written in Portuguese,
which I translate as follows:

ANEXO "A"

**Renato Guimarães Jr.**
P.H.D. by USP, Professor at PUC-CAMP
Master of Comparative Law, GWU, IASP
Phone No. (019) 3289-8585, 3289-8990   Fax No. 3289-4315
Rua Francisco de Toledo, 511
University - 13.083-470, Campinas SP

December 22, 2000.

Dr. Wanderley Minitti Esq.
Advocate at the Court of Law
of São Paulo, Capital

Dear Dr. Minitti

Confirming our deal, I hereby authorize you to retain a law
firm in the United States not just to prosecute the
Rogatory Letter, but also, upon acceptance by the families,
to replace the law firm Speiser & Krause, with which
represent sixty five (65) Brazilian Families in the actions
filed in California and New York and they failed to
represent them for almost one year being limited to
intermediate agreements with Northrop, Teleflex, TAM et al
and their insurance companies, said agreements being null
and void before the Brazilian laws, as I have stated in all
litigations I acted before the Brazilian Justice Court and
have communicated to the Honorable American Judges.

The legal fees to be established shall be in the same form,
but inferior to those signed by Speiser & Krause, provided
the same share be established to me.

Sincerely,

(s.) illegible
Renato Guimarães Jr.

NOTHING ELSE was contained in said original, which I return with
this faithful translation. IN WITNESS WHEREOF, I have hereunto
set my hand and seal of office, this February 19, 200..

Manoel Antonio Schmidt
Sworn Translator

INSCRIÇÃO: RG 3.441.239   CPF 346.307.328-53   FMSP (ISS) 8.545.237-8   IAPAS 110.591.000-76

0192394315          RENATO GUIMARÃES                    041 P01   DEC 22 '00  13:1

## Renato Guimarães Jr.

*Doutor pela USP, Professor da UNICAMP*
*Master of Comparative Law, GWU, IASP*

Fone (019) 3289-3959, 3289-8990-fax-5289-4315, 3289-3921, rua Francisco de Toledo, 511
Cidade Universitária - 13.083-410, Campinas, SP

Em 22, dezembro, 2000.-

Ilmo. Sr.
Dr. Wanderley Minitti,
DD. Advogado no Foro de
São Paulo, Capital

Prezado Dr. Minitti,

Confirmando nossos entendimentos, autorizo o senhor a contratar Escritório de Advocacia nos Estados Unidos não só para o cumprimento da Carta Rogatória mas também, aceitando as famílias, substituir o Escritório *Speiser Krause*, com o qual represento 65 famílias brasileiras, nas ações na California e Nova York, e que há quase um ano deixaram de defendê-las, limitando-se a intermediar acordos com a *Northrop, Teleflex, TAM et al* e suas seguradoras, acordos esses vis e nulos de acordo com as Leis do Brasil, conforme tenho denunciado em todas as ações em que atuo na Justiça Brasileira - e comunicado aos dignos Juízes americanos.

Os honorários a ser estabelecidos deverão ser nos moldes, mas inferiores, aos firmados pela *Speiser Krause*, preservada a mesma participação minha.

Cordialmente,

Renato Guimarães Jr.

4

**RICHARD S. PESKIN**
ATTORNEY AT LAW
301 MADISON AVENUE
4ᵗʰ FLOOR
NEW YORK, NEW YORK 10017

ADMITTED IN NEW YORK & FLORIDA

(212) 953-5868 x100
Fax (212) 953-6022
Eskyre@aol.com

## RETAINER AGREEMENT
### LETTER ROGATORY DATED DECEMBER 20, 2000 RELATING TO THE
### TAM FOKKER 100 ACCIDENT IN SAO PAULO, BRAZIL OCTOBER 31, 1996

1  This agreement confirms the terms upon which you Renato Guimaraes, Jr. have retained me Richard S. Peskin, to represent you in connection with the above-referenced matter. In exchange for my fee set forth below I will take all legal steps necessary to transmit Letters Rogatory to the United States District for the Southern District of New York and to enforce such a proceeding via litigation.

2.  This agreement is executed by Wanderley Minitti pursuant to an authorization of Renato Guimaraes, Jr. dated December 22ⁿᵈ, 2000 that becomes part of this retainer as Exhibit A.

3.  Renato Guimaraes, Jr. represents that the law firm of Speiser & Krause did not participate in any way by filing a notice of appearance or otherwise in the action filed in Brazil, which precipitated the issuance of the above-mentioned Letter Rogatory.

4.  The total legal fees in this matter will be twenty-four (24%) percent handled as set forth below at such time as Northtrop Grumman shall comply with the instructions contained in the Letters Rogatory.

    a)  Four (4%) percent (equivalent to ~~twenty-five~~ *sixteen point sixty seven* (16.67%) percent of Twenty-Four (24%)) of any sums so deposited shall be deemed earned, due and owing after its release by the judge in Brazil or in the United States.

    b)  Six (6%) percent to Renato Guimaraes. Jr. (equivalent to twenty-five (25%) percent of Twenty-Four (24%)) of any sums so deposited shall be deemed earned, due and owing after its release by the judge in Brazil or in the United States.

    c)  Fourteen (14%) percent (equivalent to ~~twenty-five~~ *fifty eight point thirty three* (58.33%) percent of Twenty-Four (24%)) to Wanderley Minitti. of any sums so deposited shall be deemed earned, due and owing after its release by the judge in Brazil or in the United States.

1

5. The legal fees for this Letters Rogatory shall be deemed earned, due and owing despite any settlement or agreement that may occur in the future.

6. In the event such a deposit regarding this matter is made in the United States, Richard S. Peskin is authorized to retain his share of legal fees and to hold the shares of Wanderley Minitti and Renato Guimaraes, Jr. in his escrow account for their benefit.

7. If the said sum is deposited in the United States, Richard S. Peskin will release the shares of Wanderley Minitti and Renato Guimaraes, Jr. according to their directions.

8. In the event a deposit regarding this matter is made in Brazil, Wanderley Minitti is authorized to retain his share of legal fees and to hold the shares of Richard S. Peskin and Renato Guimaraes, Jr. for their benefit.

9. If deposited in Brazil, Wanderley Minitti will release the shares of Richard S. Peskin and Renato Guimaraes, Jr. according to their directions.

10. No other services other than those itemized in this agreement are included.

11. You hereby grant to Richard S. Peskin power of attorney to execute all complaints, claims, contracts, settlements, drafts, releases, verifications, dismissals, and orders regarding this matter as you yourself could execute. You also authorize me to release from escrow, funds to pay the legal fees.

12. All the expenses regarding the prosecution of this rogatory letter are being paid by Wanderley Minitti i.e. travel, costs, filing fees, copies, certified translator and others.

13. In the event of a filing of new Letters Rogatory this retainer will apply.

ACCEPTED AND AGREED:          ACCEPTED AND AGREED:          ACCEPTED AND AGREED:

RICHARD S. PESKIN, ESQ.       WANDERLEY MINITTI, ESQ.       WANDERLEY MINITTI, ESQ.
                                                           On behalf of
                                                           RENATO GUIMARAES, JR.
Date: January 5, 2001         Date: January 5, 2001         Date: January 5, 2001

2

## CERTIFICATION OF SERVICE

I, undersigned, an attorney at law in the State of New York, hereby certify that

the foregoing Plaintiff's Amended Complaint was served upon:

William Joseph Apuzzo, Esq.
685 Third Avenue – Ste. 2700
New York, New York 10017-4024

by causing a true copy of same, enclosed in a properly addressed wrapper, to be

deposited on January 6, 2005 with the United States Postal Service for delivery via first

class mail at the address designated above.

FRANK L. PELLEGRINI

Dated: January 6, 2005

155411.1

# EXHIBIT 24

FROM : Guimarães Jr          PHONE NO. : 55 019 2394315      OCT. 20 2004 12:24AM P2

NOV-19-1996  15:58        S.K.M.&L.                    703 522 7905   P.02/02

METROPOLITAN WASHINGTON, D.C. OFFICE

# SPEISER, KRAUSE, MADOLE & LEAR

SPEISER, KRAUSE, MADOLE & NOLAN
140 EAST 45TH STREET, 34TH FLOOR
NEW YORK, NEW YORK 10017
(212) 661-0011  FAX: (212) 953-6483

SPEISER, KRAUSE, MADOLE & COOK
TWO PARK PLAZA SUITE 1050
IRVINE, CALIFORNIA 92714
(714) 553-1421  FAX: (714) 553-1548

1300 NORTH SEVENTEENTH STREET, SUITE 310
ROSSLYN, VIRGINIA 22209-3800
703 522-7800
FAX 703 522-7905

5430 LBJ FREEWAY #1575
DALLAS, TEXAS 75240-2455
(972) 404-1401  FAX: (972) 404-9797

SPEISER, KRAUSE & MADOLE
201 SOUTH BISCAYNE BOULEVARD
MIAMI, FLORIDA 33131
(305) 375-9400  FAX: (305) 375-0397

November 19, 1996

<u>VIA FACSIMILE 011 55 019 239 4315</u>

Renato Guimarães, Esq.
Campinas, Brazil

RE:    Fokker 100 accident in Sao Paulo, Brazil

Dear Mr. Guimarães:

Please note that we have new information concerning the possibility of a connection between the Fokker 100 crash and potential United States jurisdiction. I would like to speak to you on the telephone regarding a potential effort to represent the victims and their families in this accident. Please contact me at your earliest convenience.

Sincerely,

SPEISER, KRAUSE, MADOLE & LEAR

LEIGH J. BALLEN

/js

RG-00004

February 14, 2000.

To *Speiser Krause*
Dear Juanita or T. Cook, Leigh and Arthur Ballen, Gerard Lear and Frank Granito III.

Re: Appeal to put more pressure – higher deposits – on *Northrop* and *Teleflex*

Today I shall be with Judge Russo again: the *Official Gazette* published last Friday that the period - for *Northrop, Teleflex* and the 65 families to appeal against the Court decision that diminished the deposit from R$ 500.000,00 down to only RS 300.000,00 – **already started**.

Thus I must act within five days.

T. Cook, or Juanita: kindly send me ASAP a formal letter ( so I can translate it into Portuguese and add it as an evidence in my appeal to the Superior Court, in Brasilia, our National Capital ) stating what and when it would be Judge MacDonald's next steps ( conference hearings, decisions or whatever ) in regard the Brazilian families, the relationship with the case against *Northrop* and *Teleflex* in Brazil, and the relationship with the behavior of the Brazilian families and of *Northrop* and *Teleflex* in court here.

Please, after your immediate *fax*, send the original by express mail.

Thank your very much.

Leigh: hope you have convinced both attorneys Eduardo Tess and Fernando Lottenberg. The phones of the latter are (11) 283-0344 or 284-2258. Best regards to them. I will be more than glad to discuss with them again about the **urgent need** of having **all 65 families** against *Northrop* and *Teleflex* in Brazil – according to T. Cook.

And day after tomorrow, give a hell to the insurance negotiators from London: tell them that they may have a surprise very soon (1) from Judge Russo, regarding the awards against the US factories; and (2) not too soon but, say, within two months, from the Superior Court from Brasilia, about the amount of the deposit due by *Northrop* and *Teleflex* here.

President Sandra and I discussed your request and she authorized me to tell you that she has a felling, after so many conversations with many *average* families, that most of them would accept a deal for the entire case, including those against *TAM* in Brazil, for R$ 3 ( three ) millions *net*, say after the payment of our fees, but less the amounts already received as "anticipatory" and "agreements" with *TAM*-Unibanco in Brazil.

Thank for your assistance.

Very Sincerely Yours,

RG-00178

Associate Interpreters, Inc.
5845 SW 26TH ST.
Miami, FL 33155
(305) 663-3009

CERTIFICATION

STATE OF FLORIDA        )
                        )    SS:
COUNTY OF DADE          )

BEFORE ME, the undersigned authority, personally appeared_____Clarice Annes_____,who is personally known to me, for and on behalf of ASSOCIATE INTERPRETERS, INC., who being first duly sworn by me says that he/she is fully versed in the ___Portuguese_____ and English languages and that the foregoing is a true and correct translation of an instrument consisting of ____56_____ page/s and that this the ___57th____ page of the attached.

_____Clarice Annes_____
Translator

WITNESS my hand and official seal in Miami, State and County aforesaid, this __5th___ day of___May_____, 200_3___.

DARWIN E. PACE
MY COMMISSION # DD 016982
EXPIRES: August 10, 2005
Bonded Thru Budget Notary Services

_____        _____
OFFICIAL NOTARY SEAL                 NOTARY PUBLIC,
                                     State of Florida

The utmost care has been taken to ensure the accuracy of all translations. Associate Interpreters, Inc. and its employees shall not be liable for any damages due to omissions, typing, transcription or translation errors.

RG-00215

[coat of arms]

This Document Prepared By:
ASSOCIATE INTERPRETERS, INC.
5845 S.W. 26th Street
Miami, FL 33155

### THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Case No. 1,509/98

### ACKNOWLEDGMENTS

Report

SANDRA LUIZA SIGNORELLI ASSALI, SAMIR SIGNORELLI ASSALI, and RAFAELA SIGNORELLI ASSALI

— SUZANA GRECO DE FRANÇA KLEPETAR, ANA CARINA DE FRANÇA KLEPETAR, and DAVI DE FRANÇA KLEPETAR

HELOISA VAZ GUIMARÃES SAMPAIO GOUVÊA, ROBERTA VAZ GUIMARÃES SAMPAIO GOUVÊA, FERNANDO VAZ GUIMARÃES SAMPAIO GOUVÊA, and CAMILA VAZ GUIMARÃES SAMPAIO GOUVÊA

LÚCIA BORDA DE BELLO AQUINO, FELIPE DE BORDA AQUINO, and GABRIEL BORDA AQUINO

MARIA GUIOMAR AMBRA FOURNIER VIEIRA, MARIANA AMBRA FOURNIER VIEIRA, and CASSIO SUPLICY VIEIRA NETO

RG-00216

[coat of arms]                                                                2

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

MÔNICA KAUTZ BLEINAT, GISELA BLEINAT, PAULA BLEINAT, and RODRIGO BLEINAT

TEREZINHA DE JESUS FERNANDES DUARTE, ERIC FERNANDES DUARTE, and ELLEN FERNANDES DUARTE

MÁRCIA GONÇALVES DIAS DE BARROS, EDUARDO GONÇALVES DIAS DE BARROS, and GABRIEL GONÇALVES DIAS DE BARROS

MARIA BIBIANA PINTO PIZARRO SÁ FORTES, CAMILLA PIZARRO SÁ FORTES, and BRUNO PIZARRO SÁ FORTES

VENERANDA APARECIDA SIMÕES DE ALMEIDA, OLIVIA MARIA SIMÕES DE ALMEIDA, and LUCAS SIMÕES DE ALMEIDA

DÉBORA REGINA GONÇALVES TAMIELLO, VITOR TAMIELLO, VANESSA TAMIELLO, and VIVIAN TAMIELLO

MARIA DO CARMO BRANDÃO FIGUEIREDO and ANA CLARA BRANDÃO DE FIGUEIREDO

KATIA COSTA DE ALBUQUERQUE ALECRIM, ROBERTA ALECRIM TRINDADE, and HENRIQUE ALECRIM TRINDADE

MIRIAM RAMOS GUTJAHR, EVA GUTJAHR, ISADORA GUTJAHR, and MELAINE GUTJAHR

WANDA MOREIRA VIEIRA, RODRIGO MOREIRA COIMBRA VIEIRA, and CAROLINA MOREIRA COIMBRA VIEIRA

CATHERINE FISHER and LEONARDO FISHER

SILVIA LÚCIA PEIXOTO ARJONA, SILVANA PEIXOTO ARJONA, DANIELA PEIXOTO ARJONA, and WILLIAN PEIXOTO ARJONA

RG-00217

[coat of arms]                                                    3

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

NEUSA MARIA VICENTINE AMANDO DE BARROS, JULIANA AMANDO DE BARROS, LUCIANA AMANDO DE BARROS RODRIGUES, and MARIANA AMANDO DE BARROS

MARIA ADELAIDE DECAT MANHÃES, WALTER LUIS DECAT MANHÃES, MARIA FABIANA DECAT MANHÃES DA COSTA, and MARCELA MARIA DECAT MANHÃES

IVIANA ZIZZA ROMERO, LEONARDO ZIZZA ROMERO, ADRIANO ZIZZA ROMERO, and ROBERTO ZIZZA ROMERO

MARISETE APARECIDA STRAPASSON SIMIONI, ALEXANDRO SIMIONI, LISMARY SIMIONI, and ELISANGELA SIMIONI

SHOGHIEH TAEED KASHANI SHAIKHZADEH, FOAD SHAIKHZADEH, FARIBA SHAIKHZADEH, and FAEZEH SHAIKHZADEH SANTOS

ROSA NHUCH BOIANOVSKY, MAURO BOIANOVSKY, DANIELA BOIANOVSKY, ANDRÉ BOIANOVSKY, and CELSO BOIANOVSKY

CIBELE MONTEIRO DA ROCHA FERRÃO

RENATA OLIVEIRA DA SILVA CASTRO

FERNANDO LOBO VAZ DE MELLO, MARIA DA CONCEIÇÃO MAGALHÃES VAZ DE MELLO, and LUCIANA MAGALHÃES VAZ DE MELLO

AIRTON FRANCISCO RODRIGUES and MARIA DAS GRAÇAS DE OLIVEIRA RODRIGUES

JOSÉ ORVAL PALMA, ZÉLIA DE ALMEIDA PALMA, MARCELLO DE ALMEIDA PALMA, MARCOS DE ALMEIDA PALMA, and RENATA DE ALMEIDA PALMA

RG-00218

[coat of arms]                                                                          4

### THE JUDICIARY
#### SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

FATIMA APARECIDA VARGAS NOGUEIRA, CAMILA VARGAS NOGUEIRA, and VINICIUS VARGAS NOGUEIRA

ELIANA MESTRINELLI CREMASCO, EULER MESTRINELLI CREMASCO, ERIC MESTRINELLI CREMASCO, and EVANDRO MESTRINELLI CREMASCO

OLAVO AUGUSTO SOUZA CAMPOS DE SIQUEIRA FERREIRA and CECÍLIA MARIA DIAS CAMARGO, and

SIMONE PIRES FERREIRA have filed a legal action for damages against NORTHROP GRUMMAN CORPORATION and TELEFLEX CONTROL SYSTEMS, INCORPORATED, stating that they are immediate relatives (widows, children, parents, and siblings) of the victims JOSÉ RAHAL ABU ASSALI, GEORGE KLEPETAR, LUIS FERNANDO SAMPAIO GOUVÊA, GLIBERTO AQUINO, CARLOS MARIO FOURNIER VIEIRA, SÉRGIO APARECIDO BELINAT, JOSÉ PEREIRA DUARTE, GERALDO LUIS AREDE DE BARROS, MAURÍCIO F. SÁ FORTES, LUIS CARLOS SIMÕES DE ALMEIDA, LUIS CLAUIDO TAMIELLO, AGUINALDO BARBOSA DE FIGUEIREDO, HENRIQUE MARQUES TRINDADE, IVO ROBERTO GUTJAHR, ALBERTO COIMBRA VIEIRA, ROBERTO FISHER, WILLIAN ARJONA CHONG, LUIS ANTÔNIO AMANDO DE BARROS, WALTER LUIS MANHÃES, LUIS LAURO ROMERO, AMILTON SEBASTIÃO SIMIONI, MOHAMAD SHAIKHZADEH, DAVI LUIZ BOIANOVSKY, MARCELO DO AMARAL FERRÃO, CHRISTIANO DE GUSMÃO NETO, ALEXANDRE MAGALHÃES VAZ DE MELLO, RILTON DE OLIVEIRA RODRIGUES, MARTA DE ALMEIDA PALMA, JOSÉ WILSON NOGUEIRA, LAÉRCIO CREMASCO, OLAVO RUY CAMARGO DE SIQUEIRA FERREIRA, and AMAURI PIMENTA DA VEIGA, in view of the plane crash occurred near the Congonhas Airport, in this city of Sao Paulo, the state Capital, on October 31, 1996, as a result of the crash of the TAM airplane Fokker-100, Flight 402, en route to Santos Dumont Airport, in the city of Rio de Janeiro, which caused the death of all passengers and flight crew, with a total loss of ninety-nine (99) lives.

RG-00219

[coat of arms]                                   5

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

The plaintiffs allege that the cause of such crash was determined to be a manufacturing defect in the airplane's *thrust reverser*, which opened during take-off, in conjunction with a failure in the *teleflex* cable, both parts designed and manufactured by the codefendants, respectively, and that a manufacturing defect occurred and was the cause of the crash.

They further allege that the investigation performed on the crashed airplane concluded that the aforementioned equipment did not operate properly, and that indeed the manufacturers have failed to warn the public of the dangers of possible exposure.

They emphasize that the defendants are undeniably responsible for the faulty design and manufacture of those parts, being this the only cause of this tragic event, since there was negligence in the manufacture of such equipment.

They seek compensation for damages, and pain and suffering resulting therefrom, and request that the suit be approved in its entirety.

The interlocutory decision on pages 474/477 of the records, involved by the temporal preclusion order, had evaluated the issue related to the competence of the Brazilian Courts to trial and adjudicate on this case, authorizing the amendment of the complaint, in order to include Transportes Aéreos Regionais S.A. (TAM), however in vain, following the decision in favor of summoning the defendants (page 645 – 3rd volume).

Motions for inclusion in this action as joint plaintiffs were filed in separate brief (pages 480/486, and 522 – 3rd volume).

The plaintiffs listed on pages 636, 647, 652, 656, 658, 661, and 677 (3rd volume) have decided not to pursue the claim, which was accepted and homologated by the Court.

RG-00220

[coat of arms]                                                                                           6
                              THE JUDICIARY
                    SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

   The interlocutory decision on pages 761/770 (4th volume) established a bond in the amount of R$ 500.000,00 per victim, and also summoned the parties for a conciliation hearing.

   New motions for joint plaintiff interventions have been made (pages 775/784; 848/852 – 4th volume; pages 2342/44 – 12th volume, pages 2749/50, 2761/62, 2678/80 – 14th volume, and pages 1918/20 – 15th volume).

   The defendants acknowledged having been served (pages 699 and 706 – 3rd and 4th volumes).

   The conciliatory effort produced no effect whatsoever (pages 873 – 4th volume), followed by a settlement offer, without any positive result.

   The codefendant Teleflex pleaded its defense (pages 882/903 – 5th volume), where it raised a preliminary argument of passive legal incapacity *ad causam*, by claiming that the final report on the accident, prepared by the Air Force Ministry, does not state that *the feedback cable* was found to be defective.

   Teleflex emphasized the inappropriate opening of the airplane's right engine reverser, designed and manufactured by codefendant Northrop, asserting that TAM pilots did not get any warning from the airplane's alarm system indicators, which has jeopardized such identification.

   Teleflex also pointed out that the pilots should have retracted the landing gear, what would increase the possibility of the airplane flying at more than 15° feet per minute, however, they did prefer to push the throttle sticks, resulting in the plane's loss of power and crash, which demonstrates that their product worked and did not contribute to the crash.

RG-00221

[coat of arms]                                                                          7

## THE JUDICIARY
### SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Teleflex motioned for the impleader of the airplane manufacturer, the Netherlands company *Fokker Services B. V.*, and abatement of action.

Regarding the merit of the case, Teleflex claimed that *the feedback cable* broke down after the collision with the ground, and that it might have occurred breaking of other manufacturer's parts as well, since there was aggressive action of the pilots on the throttle, resulting in the split when the airplane crash was already inevitable.

Teleflex made a motion to dismiss the case, emphasizing that they have not at any time participated in that part's assembly and test process, and pointing out a third party at fault.

Codefendant Northrop, in its reply (pages 1078/1116 – 6th volume), emphasized Nair de Carvalho Jansein's lack of interest in acting, once he received the amount of R$ 150,000.00, which represented the settlement for his relative's death.

Northrop entered a motion to implead *Fokker Services B.B.* and Transportes Aéreos Regionais S/A, so that these companies would be part of the lawsuit as passive codefendant, thus avoiding an appeal.

In a separate brief (Case No. 1509/98 – Appendix C), they filed a motion for change of venue.

Regarding the grounds for the case, they emphasize that the engine reversion system is a complex system, and it is certain that "its relevant contribution to the reverser system lies in the hydraulic system, the operation of which has never been questioned by anyone" (sic – page 1097 – 6th volume).

Northrop does claim that the airplane crashed due to failure of the electric system erroneously designed and assembled by *Fokker*, which ended up engaging the reverser at the wrong time and inhibiting the failure warning to the pilots, who then took an unfortunate action, being those the two effective sources of the crash.

RG-00222

[coat of arms]                                                                                        8

**THE JUDICIARY**
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Northrop requests application of the Brazilian Air Code and Article 159 of the Civil Code, emphasizing lack of requirements for its responsibility.

Northrop also made a motion to dismiss the case, arguing that the compensation demanded cannot be used to improve the life standard of the victims' relatives, and that undue advantages should be avoided, by deducting the amounts eventually received as life insurance, mandatory insurance, and INSS (social security benefits), in the event compensation is paid.

Codefendant Northrop entered a motion of suspicion of partiality, supervening the stay of the judicial proceedings (pages 2092 – 11th volume), followed by the rendering of the Court Decision (pages 314/317 – Appendix D), written by the Honorable Judge DJALMA LOFRANO, of the denying the aforementioned motion.

The Court Decision (pages 2442/2450 – 13th volume) written by the Honorable **JORGE FARAH**, Associate Judge of the Sixth Panel of Judges of the Civil Court of Appeals of the State of Sao Paulo, maintained the decision that has determined the bond, and reducing the same to the sum of R$ 300.000,00 per victim.

The court order on page 2487 determined compliance with the deadline established in the Court Decision for the deposit of said bond, following the codefendant Northrop's motion to summon its legal representatives, which was denied (pages 2500/2502 – 13th volume).

The plaintiffs responded and requested that trial take place in the state (pages 2503/22 – 13th volume).

RG-00223

[coat of arms]                                                                          9

## THE JUDICIARY
### SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

The plaintiffs do claim that the codefendant is acting immorally, by not having deposited the bond ordered by the Court.

The defendants rejected the joint party interventions (pages 2800/2820, and 2812/28 14 – 15th volume).

The plea for change of venue was denied, the same occurring with the interlocutory appeal filed against the issue of summoning the legal representatives of codefendant Northrop (as per Judgments rendered by the Honorable Judge JORGE FARAH).

The Public Prosecution Office has opined in the Court records as required.

### RECITALS

The issue to be considered herein is a very special matter. The theme, in its most pure and exclusive concept, should not be judged by mankind. The hypothesis, above all, does invoke the search for the highest form of the Justice. Certainly not a formal, myopic, cold, almost inhuman justice. What has to be done here is to uncover the Spirit of the Law, referring to *Montesquieu* and all the philosophers of the world, such as Plato, Aristotle, Paul of Tarsus, Fustel de Coulanges, and many others.

The entire case does rest upon a tragedy experienced by all of the Brazilian people, in an episode broadcasted to the entire planet, about the tragic crash of the TAM airplane Fokker 100, which took off from Congonhas Airport, in this city of Sao Paulo, in its daily commute, well known as the "Sao Paulo — Rio de Janeiro air shuttle service", in that morning of October 31, 1996, by causing the death of ninety nine (99) people.

RG-00224

[coat of arms]                    THE JUDICIARY                                    10
                            SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

   To all people who come to read this sentence, I must confess this is a hard thing to deal with. The man, son, husband, father, brother, teacher, citizen, and a member that I am of this society of so many inconsistencies, feels at times powerless as a judge in face of so many the injustices, notwithstanding the fact that our country, Brazil, though very well-provided with Laws is not prodigal with Justice, in spite of the several serious and enlightened minds that compose the Judiciary of Sao Paulo, with whom I have had the honor of being familiar with during my thirteen (13) years on the bench.

   And also, it is very hard to say, even among the so-called first world countries, if there is any such country with a true concern for Justice. There are, of course, those countries that know how to produce consumption and individualism. The press, in all levels, already discloses plenty of such aspects to us all. We only have to be willing to see it.

   Therefore, it is very important to consider that Justice is not a task of consumption. It is a mission. A non-divine mission, taking into account that this Justice, the civil case Justice, might, at times not be representative of the *real* Justice (Article 3, I, of the Federal Constitution) that all of us, as a worthy and democratic society, wish to have. Man, however, in the capacity of Judge, has been entrusted by the society with a duty, because the State Judge is a free and fundamental arm of the democratic Rule of Law, of stating the written Law, without, however, losing sight that the citizens do expect the Judge to interpret, on their behalf *(citizenship rights,* Article 1, II of the Federal Constitution), the legislation, by making the letter of the Law rational, alive, proper, updated, human, positive, reliable, and specially Fair.

   So, it shall be understood by plaintiffs and defendants, by the honorable and hard working Counsels that so elegantly plea their cases in these records, by the Honorable Attorney General, by the dedicated employees of the 2nd Civil Office of this Court, and by society in general, that it seems to this Judge that there is no Justice to be made in this case, at least in this world of materialism and consumption.

[coat of arms]                                                                                11

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

It is impossible to calculate on the loss of so many lives, moreover after with the disappearing of all those smiles by the sword of despair and the unavoidable fate.

At this stage of my life, I really do not know if society should not rethink whether man does exist for society to use him as an authentic product, or whether the *human being* is the true root of society? It is a reflection for the present, but aimed at the future.

Once these necessary observations have been established, such as the naked picture of this case: the plaintiffs state that the plane crashed and their loved ones are dead, due to failure of the *reverser* and the *feedback cable*, products manufactured by the defendants Northrop Grumman Corporation and Teleflex Control Systems, Incorporated (corporation that belongs to the same corporate group Northrop Grumman Corporation); while the defendants do maintain that they have no responsibility at all in the event, arguing that there was no failure of the equipment supplied, and that TAM's flight crew fail to act appropriately, and therefore the victims' families enrichment by means of alleged moral damages is not admissible.

In this context, the voice I heard is the one saying that there must be someone hiding in the depths of impunity, remaining inside this case, in spite of the crudity of the issue, to find its culprit. And it is true that this case has distinguished itself as the proper vehicle for this discovery, in view of the fact that its ultimate end is to restore *social harmony*, by removing the anguish and antinomy and resuming the course of the civilized life.

In this regard, we resort to the wise considerations and solid contribution of the eminent Professor **GALENO DE LACERDA**, Senior Professor of the Law School of Porto Alegre, University of Rio Grande do Sul (publication *Tribuna da Magistratura*, Doctrine Section, April/99, pages 57/65).

RG-00226

[coat of arms]                    THE JUDICIARY                                    12
                         SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Before anything, one must ask is it possible (at a time when we see an evolution in the Law as a science, when we discuss the significance of diffused rights, of consumer rights, of the global problem of drug traffic, of the laws that penalize corporations for crimes against nature (Law 9,605/98), of community rights, of the new rights (value) of the human personality, of discrimination, of the fetus generated *in vitro*, of the incredible evolution of the Especial Civil Courts, etc.) to admit a true defense shield based in the impurity of denial.

As always, it is easy to make up explanations for non-liability. Uncommon, otherwise, is *proving*, with the determination that the case requires, the coherence in acting and faithful diligence at all instances of the production process, together with a non-compromising with a possible fault, imperfection, or defect, hidden or otherwise.

Having said that, it is not difficult to understand that the passengers of TAM Flight 402, the final consumers, the ones who purchased the tickets and who, by boarding the airplane, marked the beginning of the transportation contract, a typical obligation based on results, are the starting point for the decision in this case.

They are indeed.

In fact, we cannot ever forget that it is not the product (seen in its entirety) that exists for mankind, but quite the opposite: mankind is the reason for the product to exist. This relationship must not be inverted. It is, therefore, necessary to clarify this rationale.

Therefore, it is clear, whether for society, citizens, taxpayers, men, women, children, and for the State, that the passengers of TAM Flight 402 are not responsible for this tragedy.

RG-00227

[coat of arms]                                                                                    13

## THE JUDICIARY
### SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

       There is now the obligation of the State, represented herein by the judiciary branch, of finding the guilty party, whether it is the manufacturer of the airplane, the manufacturer of the reverser, the manufacturer of the other parts that make up this reverses, all of the aforementioned manufacturers, TAM, the pilot, the flight crew, ... fate?! Who or what?

       In truth, we have no way of knowing how many can be held accountable for this.

       Having considered all of the above, the crucial point of the case is based on the following: the product manufactured by the defendants, the so-called *"thrust reverser actuator,"* or the parts called *"feedback cable"* and *"turnbuckle,"* were found to be defective, especially in what concerns the fact that the failure in the reverser's electrical system could not be forecasted, as well as the consequences in its regular operation culminating in the inadvertent opening of the reverser, which compromised the thrust necessary for normal takeoff of TAM's Fokker 100 and resulted in a fatal 24-second flight and the subsequent tragic crash the aircraft, of which we do not need to be reminded.

       The first step to resolve this sensitive issue is evaluating the entire investigation conducted by the Air Force Ministry, which can be found in the final report signed by Air Force Brigadier Lieutenant Ronald Eduardo Jaeckel and by Colonel Douglas Ferreira Machado (pages 905/952).

[coat of arms]                                                        14

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Therefore, it shall be noted that this investigation is more than enough basis to render judgment on the matter, not only because of its power of persuasion, but also because it is pointless to postpone the conclusion of this case since, logically speaking, there is no reason to believe that additional evidence can be found, in view of the fact that all possible and admissible evidence is or should be contained in the records, even more by verifying the point of support of the proceedings. It is, for this reason, imperative to render summary judgment in this case, pursuant to Article 330, Paragraph I, of the Code of Civil Procedure.

It shall be noted that the aforementioned investigation report has the power of evidence, since it was prepared by people acting as public agents, thus having, indirectly, a solid foundation, and is assumed to be accurate, not having been in any way contested even by the defendants, which grants it higher procedural value and efficacy.

Following this line of reasoning, we have to established, at this point, that said report is not vague. On the contrary: the report is highly unequivocal, since it was prepared in an academic, scientific, and objective way and its conclusions were derived from factual material collected from the crash site of TAM's Fokker 100.

In addition, this body of evidence was collected during a long and thorough fourteen-month research process conducted by the Office of Investigation and Prevention of Aircraft Accidents of the Air Force Ministry, which also includes the inspection of the aforementioned parts (reverser and other components) and describes their functional complexity, making it possible for this court to use these parts as a central focus for the resolution of this important and complex case.

Actually, the detailed analysis contained therein, without omitting, as caution and moderation direct us to do so, the deduction of a balance of its conclusions and revelations, by mobilizing its entirety, without loss of harmony and reasonability.

RG-00229

[coat of arms]                                                    15
                    THE JUDICIARY
            SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Therefore, the aforementioned report declares that although the inspection tests performed in the system revealed that the "actuators were fully operational" (page 908), the detailed analysis of the "reverser" points out that the failure of the product (the reverser manufactured by the codefendant Northrop) was real, to the extent that:

"the analysis report on the failure of the reverser issued by the manufacturer for the homologation process <u>did not</u> contain all possible *inadvertent positive* conditions, and <u>did not</u> consider the possibility of a *dormant failure...*" particularly in the event of a "highly unlikely failure" (page 910).

Without prejudice, one of the conclusions in the final report issued by the Air Force General Staff (page 941), without implied senses, clearly states that:

"the investigation concluded that there was an inadvertent opening of the right engine reverser as soon as the airplane left the runway," prior to any actions by the pilots, which arouses deep concerns in all who may come to evaluate the extent of this report prepared by the experienced and responsible people of the Air Force Ministry.

In this prospect, one must firstly consider that the equipment, systems, and assemblies of an aircraft cannot, **under any circumstances**, be considered separately. No. All components (considered as products under the Consumer Protection Code) shall, ordinarily and necessarily, function in strict cooperation, especially from the point of view of the special consumption relationship, which states that transportation (an obligation based on results) seen as a whole – particularly air transportation – is an activity of the highest importance involving numerous lives, from which a unique and significant moral and legal responsibility is created, without elaboration, unnecessary in this case, on the evident risk inherent therein.

RG-00230

[coat of arms]                                                                16

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

The Air Force Ministry also states that "the manufacturer has not considered the possibility that the contacts may adhere" and therefore "the case was not analyzed," which justifies the assertion that

there was "a dormant failure" in the reverser (a failure that can occur without being detected), according to important description contained in the aforementioned document (page 911).

In addition, the analysis diagram of the reverser's failure, recently prepared by the manufacturer, **after the tragedy**, indicates that:

"even without considering the possibility of a dormant failure, it states that the probability of an *inadvertent opening of the reversers* is *approximately 10-6*" (very high percentage), therefore not meeting the "**requirements for airworthiness...**", according to what has been pointed out by the public agents of the Air Force Ministry (page 911).

In this same context, the tests performed on the reversers, on the actuation of the secondary lock of the doors of the turbine thrust reversers, clearly showed:

"*inconsistencies in the response of the part and the consequent lack of reliability presented by the reversers. The components that should meet aeronautical quality standards when put into operation, did experience an abnormal degree of deterioration not explained by the manufacturers, who have been researching for some time ways to optimize such parts.*" (page 912, g.n.), which is cause for attention and much concern.

RG-00231

[coat of arms]                                                                            17

## THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

        Upon deeper examination, one will find that the report was not more conclusive only because, foreign to its purposes, the conclusion was that TAM's Fokker 100 crashed because the

        "*secondary lock actuator of the reversers must be reevaluated and its reliability must increased*, by the addition of final impedance and electric resistance tests, prior to delivery and after assembly of the aircraft" (page 949, g.n.), which is at the very least unacceptable in air transportation industry, in a responsible environment dictated by prudence.

        In this light, after the investigation report concluded the all crew members had valid certificates of physical capacity and technical qualification and were rested, and that was the first takeoff of the day, and also that the pilot was experienced and the aircraft had undergone all required inspections and reviews, the investigators declared that the aforementioned fault occurred during the first (1st) second of the flight, without any audible or visual warnings, reversing the reverser cycle (open reverser), causing a very serious drop in power for four (4) seconds, which jeopardized the aircraft's performance (pages 941/942), resulting in the tragic events of which we do not need to be reminded.

        In addition, the aeronautical experts pointed out that the "**reverser unlocked**" procedure on takeoff

        "**was not practiced during the training of the company's crew members in the flight simulator,**" since the manufacturer stated that "**an opening of the reverser could not be actuated during flight due to the protection of the system's** *Switch Ground/Flight*" (page 942), a statement which was not accompanied by any reliable, adequate technical explanation capable of supporting the apparent assumption that a fault did not exist, and without the proof – so necessary in such cases – that the reverser was of the highest quality, as would have been required, what would then authorize an evaluation of the manufacturer's diligence, as established by the opinion of LUIZ GASTÃO PAES DE BARROS LEÃES (Manufacturer's Liability for the Product, Saraiva, 1987, pages 154/55).

[coat of arms]                                                                18

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

       So, what one can clearly see is that the airplane crash was not caused only and exclusively by faulty design of the electrical system assembled by Fokker or by Dowty Aerospace Hydraulics, which actuated the reverser at an inopportune time and prevented the warning of such failure to the pilots, who according to codefendant Northrop took incorrect action (sic. page 1099).

       No.

       The airplane crash occurred because codefendant Northrop, the manufacturer of the vital part so called "reverser," was not zealous, competent, or humble enough to foresee the possibility of a failure in the electrical system connected to such part and attributed to the component a status of independence that it did not possess because it is an integral part of a whole.

       The aforementioned codefendant Northrop did not conduct itself as required and did not alert the manufacturers of the other reverser components of the importance of the electrical part, under penalty of having a product with faulty performance, according to its own position evidenced in its defense brief.

       Northrop, the manufacturer of the reverser (a complex and interconnected system), should have been cautious enough to objectively foresee – as it was perfectly capable of doing – the possibility of failure of the electrical system which could eventually compromise the operation of its product. These two things are inseparable, and represent omission bordering on malicious fraud.

RG-00233

[coat of arms]                                                                                    19

### THE JUDICIARY
### SAO PAULO STATE SUPREME COURT

**2nd Civil Court of Regional Court III – Sao Paulo**

In fact, this omission is so grievous and so troubling that it affects us all.

What one can conclude, based on an unapologetic review of the report from the Air Force Ministry, and seeking to view this case as a portrait of mankind itself, is that in most cases, people do not accept their own faults. They would rather hide such faults even when their consciences urge them to correct them.

However, as in this case, when people lose their power and become dominated by the machines they build, they forget that the creation carries the virtues and faults of its creator, and that it is the responsibility of peaceful and humble men to duly research the foreseeable defects that may be hidden in the machine (its product of consumption), since it is certain that such defects are mankind's and not the machine's, even when we rationally accept mankind's limitations concerning technical and scientific knowledge at the moment of production.

It is therefore accepted as fact that there was failure in the reverser manufactured by codefendant Northrop, which inappropriately and inadvertently opened during the first second of the flight, without any intervention from the pilots and without audible or visual warning, and, on the other hand, the evidence did show the existence of defect or fault in the *feedback cable* manufactured by codefendant Teleflex Control Systems, Incorporated, which, consequently, exempts it from liability in this case.

Additionally, it is very important to state in writing that there is no reliable evidence that the flight crew acted improperly, especially the pilot and copilot, or even that such possible actions may have been the **sole cause** of the crash, even if one could admit some fault in the part of the command crew (page 1879).

RG-00234

[coat of arms]                                                                              20

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

No.

The record does not show any evidence that could lead one to conclude with a clear conscience that the sole cause of the crash of TAM's Fokker 100 was flight crew error, especially none of such categorical nature as the evidences contained in the aeronautical report. It should be pointed out that the experts did not fail to notice that:

"the manner in which the unexpected fault was presented to the flight crew and the lack of warnings of such fault, made it uncertain that their actions were intentional…" (page 1879), a fact which deserves the attention and concern of the adjudicator, and clearly indicates that the conduct of the pilots is not in any way connected to the cause of the inappropriate and inadvertent actuation of the reverser, pointing out that

"the fact that the crew was unaware of the fault, due to a lack of warning and information, was a determining factor for them to abandon normal procedures…" (page 1879 – 10th volume), which necessarily negates Northrop's arguments that the crash was caused by pilot error (sic – page 1099 – 6th volume).

Having considered the points above, we cannot and shall not separate the primary cause from its secondary effect. According to the very competent evidence produced, the airplane crash was, therefore, caused by the inappropriate and inadvertent opening of the reverser, and it was not humanly possible for the pilots (in just a few seconds) to overcome such fault, especially when considering the lack of warnings and information, as has been pointed out in the Air Force Ministry report.

This argument, not being supported by or grounded on evidence, indirectly jeopardizes common sense and reason. This even flies in the face of a serene and resolute interpretation of facts based on honest observation.

RG-00235

[coat of arms]                      THE JUDICIARY                        21
                      SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

This is, undoubtedly, the truth that emanates from the investigation conducted by the Air Force Ministry, in which the defendants have had ample participation, following all procedures without any hindrance, pursuant to Article 334, Paragraph III, of the Code of Civil Procedure.

One must remember at this moment, that uncontested facts do not require evidence, therefore there is no processing of such evidence (STJ, RTJ 93/162), and the evidentiary power of the aforementioned report must be stressed, since it was prepared immediately after the crash of the aircraft by public agents, being presumed as truth as are administrative acts in general, even if considered only in the realm of a simple circumstantial evidence.

Regarding this matter, PONTES DE MIRANDA, in his wisdom, explains the role of circumstantial evidence in the resolution of judicial proceedings, by teaching that:

"circumstantial evidence can bring more than presumption of fact — it can provide certainty or only constitute *hominis* assumption, it can provide the intimate element of proof. (Annotated Code of Civil Procedure, Paragraph III, page 419).

Similarly, Justice PEDRO CHAVES, in his opinion, explains that circumstantial evidence are of great importance to clarify a variety of issues (Evidence in Civil Court — Interpreted by the Courts, Records by Wilson Bussada. Ed. Sínteses, pages 177/78).

Absolutely nothing can be said to those that do not believe they make mistakes. For them, somebody else is always at fault. These people are left only with peace of mind — or torment — as consolation.

RG-00236

[cont of arms]                                                           22

### THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2ⁿᵈ Civil Court of Regional Court III – Sao Paulo

Having pondered the evidence collected, I can only to say to the families of the victims and plaintiffs in this case, to the attorneys, to the honorable District Attorney, and to society at large, that I can not see this case under any other light. I have been reflecting on this case for many months and within my human and intellectual limitations, I have to say that I feel it is just to acknowledge, as I do herein, that there was fault in the product manufactured by the aforementioned codefendant regarding information, conception, design, assembly, efficacy, and interconnection with hydraulic and electrical of the reverser, which **fundamentally** compromised its safety and reliability, and can be characterized as "product fault," which under Article 12, caption and fist paragraph, of the Consumer Protection Code, is unacceptable; therefore, it calls for compensation and invalidates the application of the old Article 159 of the Civil Code, which is inapplicable in this case.

In my understanding and by examining the evidence produced, which has not been contested by any of the parties, the codefendant did not even try to prove, as it was required to do, that their product (the reverser and its hydraulic components), is perfect, although claims of perfection would have damaged its credibility.

I shall also take the opportunity to state that such proof could have easily been produced by the defendants. They could have simply presented, along with their objection, as was their right (pursuant to Article 300 c/c Article 333, II, both from the Code of Civil Procedure - CPC), the evidence of how impeccable their product was, with the official disclosure of all tests and inspections performed on the operation (separately and within the reverser assembly) as a completely reliable part, component, or system (hydraulic) and immune to malfunctions, even dormant malfunctions as claimed in the Air Force Ministry report, and foreseeing (even after the exhaustive tests performed by the manufacturer) an occasional failure of the remaining systems of the aircraft, especially the electrical system and the system responsible for audible and visual warnings to the pilots and crew in the event of an irregularity, observing the principle of contingency (Article 300 of the Code of Civil Procedure).

RG-00237

[coat of arms]                                                                                23

### THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Without this evidence, and in order to provide a decision that guarantees the seriousness of this process, in order not to jeopardize the reliability of the legal system, and in a somewhat modern view of private law (particularly consumer law), one cannot, state that the defendant manufacturer of the *thrust reverser actuators* is not liable for the airplane crash. The defendant erred by omission when it did not consider a possible failure of the electrical system which could eventually compromise the normal performance of its product (reverser) and consequently result in this tragic event, especially when added to the lack of evidence of the reliability (perfection) of the aforementioned product.

Certainly, the words of attorney LUIZ CÉZAR RAMOS PEREIRA better describe this, in article written over than ten (10) years ago, but very appropriate to this case (06/13/2000 at 08:50 a.m.):

"Actually the manufacturer must prove that its product is perfect. In fact, it is easier for the manufacturer to produce this proof than it is to transfer this loss to the injured party. However, the manufacturer risks not being able to prove the injured party's claims, but this is a risk that cannot be transferred to the injured party, under any circumstance. The exculpatory proof must be firstly produced by the manufacturer, and then by the intermediary, if needed, but never by the injured party, since they have already suffered (or still suffers) the damage caused by the defect" (RI 654-54). The honorable attorney, an expert in International Private Law, also adds that

"The manufacturer must be punished, even when it places in the market a product that has no fault or defect, but that later comes to show fault or defect. The idea and philosophy here is that punishment is imposed for placing a product in the market that is not adequate for the use for which it was developed" (RT 654-55), especially when the manufacturer is certain, as one can

RG-00238

[coat of arms]                                                                    24

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

plainly deduce from the record, of the perfect operation of its product, and that it is, at a certain moment of development, immune to faults, and, blinded by the lack of humility or more likely by the eagerness to produce something for consumption, without considering, the possibility of fault which may compromise the safety and reliability of its product.

Without a doubt we do admire the defendant's designers. However, we must endeavor at all costs never to forget that there was an unforeseen but humanly foreseeable fault in the reverser, which calls for prevalence of the guarantee principle, one of the main points of Law 8,078/90.

Following the same line of reasoning, one must understand that the manufacturer cannot be exempted from liability by arguing ignorance that the product was faulty. Otherwise, the entire humanistic and logical sense of the Consumer Protection Act would be negated.

In this sense, Professor ODETE NOVAIS CARNEIRO QUEIROZ, states that

"even ignoring such defects, the supplier is not exempt from liability..." (page 46, g.n.). The idealistic Professor ANTONIO HERMAN DE VASCONCELOS BENJAMIN also comments that the inadequacy of the defect generates a presumption of fault *jure et de jure* (page 112). Under the same argument, the illustrious Professor MARIA HELENA DIAZ states that the supplier's liability for defects in quantity or quality by lack of safety, related to the responsibility towards the physical safety of the consumer, is clear, pointing out that faults due to inadequacy or malfunctioning generate the aforementioned absolute presumption, even in cases of rendering of services (page 45).

RG-00239

[coat of arms]                                                    25

**THE JUDICIARY**
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

In addition, jurists GABRIEL A. STIGLITZ and RUBÉN S. STIGLITZ, in a deep examination of the defense of consumers rights, state that *"The United Nations Guidelines"* mark *"a series of mandates,"* among which we highlight the *"the effective prevention and protection against practices that can jeopardize the economical interests of the consumers"* (Derechos y Defesa de los Consumidores [The Rights and Defenses of the Consumer], Ediciones La Rocca, Buenos Aires, 1994, page).

Prevention. Yes, that is the word. Prevention with responsibility. Prevention as a principle. Prevention as a link of trust. Prevention as a guarantee. Prevention as a point of support. Lastly, prevention in order to protect the user of the product. This is the sole reason for a model law to exist. A law that serves as a guide to the entire world, such as our Consumer Protection Laws, without jeopardizing the light emanating from the United Nations mandate.

We shall never forget – not ever – that the manufacturer's pride in a good product does is not in the present, but in the future. To this end, whoever so desires may read the report that records the finding of benzene residue in the famous *"Perrier"* bottled water *(Food and Drug Administration – FDA)* and learn of the manufacturer's position, its investments in correcting the mistake, and mainly the fact that it recognized a defect in the product and later regained its share of the market. With all due respect, there is a certain wisdom in the way the manufacturer conducted itself. The future is not patented, as is the product. Only the future will teach us. Until then...

The reverser failed; it did not work as it was supposed to, in spite of the manufacturer's diligence. It failed, we shall say once more, maybe not in any significant way, but, to our horror, it failed to work at an important moment, which was enough to cause, by itself, without a serious and decisive contributing factor, the crash of TAM's Fokker 100 airplane.

RG-00240

[coat of arms]                                                           26

**THE JUDICIARY**
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Had the reverser worked properly, what situation would we have today?!

This is a very delicate matter, but it should be said that we must not live under a system which always negates fault. All parts that should operate in conjunction with other parts impose joint liability of the manufacturers of all components (products), for the perfect harmony of the entire assembly. Using a simple analogy, the case of the reverser is not unlike a musician playing the tuba out of tune, compromising the entire orchestra and ruining the concert.

There is an objective, passive solidarity among all participants of the production process, and this creation is dictated by a unique legal model (articles 7, 18, 25, 28, and 34 of Law 8,078/90), an innovation worthy of praise as states the illustrious Doctor JOSÉ GERALDO BRITO FILOMENO (Brazilian Consumer Protection Code, annotated by the authors of the Bill, Forense Universitária, 2nd edition, page 75), accepting the right to a separate and independent appeal, as it is known.

So, the conclusion that reverser did not work is inescapable. Its efficacy and perfect operation were not proven. **It did not operate. That was the fault.** What comes out of that is not of interest to the consumer. No more, no less.

Regarding this matter, Doctor LUIZ ANTONIO RIZATTO NUÑES, an elite judge, a man who deals with the legal relationships in consumer matters every single day, a scholar and a specialist in this subject, states with a certain degree of subtlety that:

RG-00241

[coat of arms]

THE JUDICIARY                                    27
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

"*Failure, in turn, presumes the defect. There is defect without failure, but there is no failure without defect. The defect is an inherent and intrinsic characteristic of the product or service.*" (Comments on the Consumer Protection Code — Substantive Rights, Ed. Saraiva, 2000, page 157).

The malfunction is, therefore, the failure originated from the defect of not foreseeing the foreseeable, as already stated. The failure, states the illustrious Professor,

"**is connected to the defect but, in terms of damage caused to the consumer, is much more devastating**" (mentioned work, page 158).

Thus, it shall be concluded that the term "failure" used in article 12, *caption,* of the Consumer Protection Code, deserves a flexible interpretation.

The true exegesis comes from the illustrious RIZZATO NUNES:

"**As a rule for consumer protection, it shall be understood that the list of hypotheses considered serves merely as an example. Any other possibility connected to the product, <u>whether prior to, during, or after the manufacturing process, may imply the characterization of the defect — which always generates damages</u>**" (aforementioned book, page 160).

RG-00242

[coat of arms]                                                        28
                        **THE JUDICIARY**
              SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

In addition, Doctor CLÁUDIA LIMA MARQUES, after quoting
the Italian Professor GUIDO ALPA, states that:

"In regards to civil liability, the main value to be protected by
the Law must be the effective and fast compensation to the victims. To that end,
The CDC – Consumer Protection Code distances itself from the concept of guilt
and, under article 12, evolves to an objective liability, of the type known in
Europe as "non-culpable" liability.

"The tendency in comparative law is to attribute to the
manufacturer the extra-contractual liability for damages caused by defective
products. The CDC – Consumer Protection Code does adhere to such tendency,
modifying the Brazilian system which requires guilt (failure in the sphere of
activity) in order to generate liability." (Agreements on the Consumer Protection
Code, Consumer Law Library, 3rd edition, 3rd printing, 1999, Ed. RT, page 620).

If there is proof of damage caused to the plaintiffs, as well as the
causality relationship between the product and the damage (according to the findings
object of the evidence produced), with clear indication of the failure of the reverser
resulting from intrinsic defect, with clear indication of the party responsible for this
product and absent the exculpatory circumstance foreseen under article 12, 3rd
paragraph, of Law 8,078/90 (based on the idea that the manufacturer did not place the
product in the market; or that even if it did place the product in the market, the defect
does not exist, or that the guilt lies exclusively with consumer), the obligation to
indemnify or compensate is inescapable, and we must verify the wisdom and reach of
article 7 and its sole paragraph as well as articles 25, paragraphs 1 and 2, and article
34, all of them from the Consumer Protection Code, and it surely is unreasonable to
transfer the sole liability to a third party, particularly without concrete evidence
of its even more without the concrete proof that it is not connected to the
production cycle.

[coat of arms]                                                                29

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Therefore, although the Consumer Protection Code is being used and applied very cautiously, even though it has been in effect for ten (10) years, and in spite of its enormous power, as states the illustrious professor versed in civil law GUSTAVO TEPEDINO (Civil Law Matters, Ed. Renovar, 1999, page 237), it is possible to understand that its point of view is of a society confused and affected by technological complexity, with many products and mass advertising, all of it creating a certain disassociation of the product with the individual, and de-personalization of the protagonists of the consumption relationship, which has allowed the civil law professor to consider that

"The defect that generates an accident, commonly named safety defect, is not really related to the intrinsic capacity of the product to cause an accident, but to its nonconformity with a reasonable consumer expectation, based in the nature of the product or the service..." (aforementioned book, page 240), which, in a decisive step forward, brings the author to conclude that this has the purpose of assuring "the safety of the consumer" with the "conceptual superposing content over form" (page 241).

It shall be pointed out that "such basis of liability of the manufacturer must be imposed, considering that the real phenomena of the damage products connected to the industrial development is always the same, which makes the normative differentiation or discrimination of an injured party, contractual creditor, or third party unjustified" according to the teachings of the Portuguese commentator JOÃO GALVÃO DA SILVA (Civil Liability of the Manufacturer, Ed. Coimbra, Almedina, 1990, page 478; and aforementioned book, page 239), which neutralizes any attenuating dynamic due to theoretical malfunctioning of another component of the product (seen as a whole), by generating – without forgetting that the systematic of the Consumer Protection Code is supported in the objective responsibility, and therefore it does not require proof of guilt of the party legally responsible – the pure and objective obligation of compensating, which, by the way, leads GUSTAVO TEPEDINO to state that

[coat of arms]                                                                    30

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

---

"the party legally responsible cannot be exempted from the obligation to compensate based on the proof of the absence of guil" (aforementioned book, page 239), therefore, clarifying the fact that the consumers have a material and legitimate right to expect that the products they use are safe – a simple result of the so called

*"collective perception of a consumer society"* (JAMES J. MARINS DE SOUZA, *(Responsibility of the Manufacturer For Its Product,* Ed. RT, 1993, page 153).

In this context, the objective assignment of hidden defect can only be imputable to the manufacturer. Never to the product user.

Now, one should stop and remember that the consumer is vulnerable. It should be noted, a flare that emanates from the truth, that the vulnerability principle has a basic relevance in this world of consumption. This element should be rationally included and disclosed in this case. Then, taking the consumer into consideration, it should be added the need for an **actual equity** between the manufacturer and those listed under article 12, caption, of Law 8078/90. After all, it should be concluded that, without rationalizing this distance and without the manufacturer having to prove, **without delay,** as it can also be proven by reversal of the burden of proof (Article 6, VIII, Law 8078/90), the true past, present, and future efficacy of their product, there is no way, under the Law, to exempt the manufacturer from the obligation to remedy the damages suffered by the consumer, whatever they may be.

In this regard, the words of scholar MARIA TERESA Q. GONÇALVES have a special meaning:

RG-00245

[coat of arms]                    THE JUDICIARY                    31
                        SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

---

"The rights of the consumer are a direct consequence of the claim for true equity, of the recognition of the right of participation by all citizens, and the model of the social Rule of Law". (Protection of Consumers and Users, and the Spanish Constitution of 1978, Madrid, 1986, page 20).

The objective responsibility stemming from the consumption relationship stipulates, by logic order, that the manufacturer should account for all assumptions and for all stages of the so called "product fact", especially because the activity risk from the product and its respective usefulness (Article 6, VI, of the CDC – Consumer Protection Code) cannot and should not serve as a shield against the consumer, except, with all due respect, under the seal of misusing such Law (8078/90), and the constitutional principles of citizenship, of consumer protection and defense, of public order, and of social interests (Article 1, II, and Articles 5, XXXII, and 170, V, all from the Brazilian Federal Constitution), particularly in the area of consumer safety (Article 6, section I of Law 8078/90).

The consumer safety protection, without impediment, deserves special attention, and PARRA LUCAN makes an appropriate comment regarding the case at issue, in that:

"The health and safety problems are among the most important ones proposed by consumer protection legislation", pointing out that

"The protection of consumer's health and safety is a corollary of the right of human beings to life (and to physical integrity), acknowledged in our international and constitutional laws" (Comments extracted from the study by Dr. VIVIANE COÊLHO DE SÉLLOS, *Revista de Direito do Consumidor*, issue 11/130).

RG-00246

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2ⁿᵈ Civil Court of Regional Court III – Sao Paulo

The distinguished professor and jurist NELSON NERY JUNIOR (RDC, RI, vol. III, page 58) teaches based on this view. Professor LUIZ GASTÃO PAES DE BARROS LEÃES equally clarifies this matter showing the widespread dissemination of damages deriving from the use of defective products (*Manufacturer's Responsibility for the Product Fact*, Saraiva, page 12). All this to draw the judge's attention to the change in focus in order to avoid giving priority to the production activity over the consumer, who is the main reason for the product to exist, except with proof of a competence as forgotten as history (particularly as from the industrial revolution), which taught us so much, but the facts keep repeating themselves, and so do the resulting damages.

At this time, in order to pause for a brief moment form the reading of this sentence, we should be eternally reminded of the writings of ALAIN FINKIELKRAUT, where he discusses the relationship between the man and History, and he comments that contemporary man no longer considers himself an heir of the past, and that

"**true humanity is yet to come**" *(The Ingratitude*, Ed. Objetiva, 2000, page 175), which takes us to the depths of our lives and our responsibilities.

Under this light, it is not inappropriate to point out that, without getting into the theory social solidarity by LEON DUGUIT, that a man cannot be granted honor and dignity, either material, spiritual, or even anthropological, without first distributing Justice as a means to enforce social strength, and achieve citizenship.

First of all, the Consumer Protection Code is a humanistic law. It rationalizes the truth, balances the disparity of forces between contracting parties, and showers the legal relationship between man and the product with a good dose of moral principles.

RG-00247

[coat of arms]                                                                   33

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

This can certainly illustrate numerous opinions. Before that, however, it should be noted that many centenarian Codes and Laws are not aware of, and do not want to deal with mass production industry, the technological revolution, the middlemen, the current social model, the 21-century family, and the children of tomorrow.

For some, it seems better to applaud the war, since for them the lives destroyed have no meaning. For those people, what matters is to produce weapons, bombs, communication systems for uninhabitable places, war planes, etc. **Boosting consumption and making profits.** The defendants' are not seen as having a living heart, but that's what man sees in society, as we have learned just in the past fifty (50) years: Hiroshima, Vietnam, Iraq and the Gulf War, Palestine, Bosnia, Kosovo, and other manufacturers are a proof of this.

Even as we are aware of this, there is still a lack of benevolence, and an abundance of consumption.

Therefore, it is appropriate to remember the words of Professor **RICHARD PHILLIPS FEYNMAN**, a physicist who worked for the well-known Manhattan Project, the U.S. program which developed the atomic bomb, as he declared, with the authority of a Physics Nobel Prize winner:

"**We, then, really need to take a look at theories that do not work, and at sciences that are not science**" *(You Must be Kidding Mr. Feynman, translation of Cláudio Bentes David, Ed. UnB, Imprensa Oficial, 2000, page 377).*

And what else should we say…

[coat of arms]

THE JUDICIARY

SAO PAULO STATE SUPREME COURT

34

2ⁿᵈ Civil Court of Regional Court III – Sao Paulo

For all this, I believe, as teaches Professor Chiovenda, that to sentence is to feel that this is the only Justice to be attempted in this tragedy. What emanates from this, with all due respect, is the chorus of disappointment brought about by the discord.

For this reason, the codefendant must compensate for all damages claimed, with no exception whatever.

Seen under another light, some may claim as that this was the work of fatality.

It should, however, be taken into account that if a fatality occurred, it must be remedied by those who profited from an activity granted and supervised by the State. It is not appropriate to impute it to the negative scourge of the uncommitted omission, except to ratify the uneasiness, which shall not be done in this case.

It is simple, really quite simple, to lend our solidarity, sometimes merely a veiled solidarity, to the families affected by mourning and permanent grief.

Therefore, I feel that the claim is legal, appropriate, serious, well oriented, consistent with the modern law and its projection on society, particularly in the logic, consumption area, based on the equity, on the general principles of law and, most of all, FAIR.

RG-00249

[coat of arms]                    THE JUDICIARY                    35
              SAO PAULO STATE SUPREME COURT

2ⁿᵈ Civil Court of Regional Court III – Sao Paulo

Needless to say that the Civil Code – as established – and the Brazilian Air Code, as a natural nonidentity, are not applicable. As it is well known, this legislation is not applicable in instances such as in this case. Applicable, under penalty of denying the effect of a Law which has been drawing the world's attention (Mexico and Venezuela currently use our Consumer Protection Code as a model to reform their laws (according to Antonio Herman Benjamin, RT Informa, No. 7, May/June 2000, page 5)), is Law 8078/90, that is, the special Consumer Protection Code.

In this regard, the Honorable Supreme Court, even though the situation is not evidently similar to that of this case, recognized that there is no room for previously established compensation fees in case of an airplane crash (RESP 6052/SP, by Minister CLÁUDIO SANTOS), which is enough to discard the mistake resulting from the intention of not compensating, since an insufficient compensation is the same as no compensation.

ARAKEN DE ASSIS, a State of Minas Gerais Professor and Associate Justice, in an unparalleled vote (TJRS, Appeal 597.187.277), explains that the provisions of the Consumer Protection Code are applicable to the air transportation, which has been happening repeatedly (JTACSP, Lex, 152/173, reporting judge JOAQUIM GARCIA; Appeal 623.538/9, reporting judge TORRES JUNIOR, and Appeal 629.715/00, reporting judge ANTONIO DE PÁDUA FERRAZ NOGUEIRA), among others.

With all due respect, it should not be forgotten that the Air Code, seems to be more concerned with goods (cargo, luggage) than with human beings.

This is a sign of those times.

[coat of arms]          THE JUDICIARY          36
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

The distinguished RUI STOCO, in a well-known work, on a specific note, outlines that "most of the time, accidents happen not due to an omission, carelessness or incorrect performance of the air carrier, but due to an aircraft manufacturing or construction defect." (Civil Liability and its Jurisprudential Interpretation, RT, 4th edition, page 164), what is in keeping with the teachings of the Italian professor GUIDO ALPA (quoted by Prof. Cláudia Lima Marques, aforementioned work, page. 622), and of Professor and Public Prosecutor ANTÔNIO HERMAN BENJAMIN (Consumer Protection Code, Forense Universitária, 1991, page 55), all this being appropriate to the assumption discussed in these records.

Let it be known by the new generations, and the parents, children, wives, husbands, spouses, and siblings of these families reduced by the crash of TAM's Fokker 100, that they should rejoice in the fact that corrections are being made to gear to better judgments of such cases, which does not solve everything, but I believe that they contribute to reduce, perhaps even extinguish, conducts that focus on profit rather than the actual safety of human beings.

This, allow me to state, is the basis for democratic citizenship. Either the Law is implemented and applied with a humanistic and social mentality (Article 5 of LICC), even though this might imply criticism, without ever hurting common sense, or we shall have the frequent make-believe situation, which feeds disbelief and discredit.

It should be understood that this is not the victory of the weak over the economic superpower, as some may interpret this ruling. It is not. It is the command to allow for Law 8078/90, which emanated from the Federal Constitution, as previously indicated with great zeal, ethics, concern, comparison, legality, and vision, to flow into the arms of Justice.

RG-00251

[coat of arms]

THE JUDICIARY

SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

37

After reflecting a good deal about this case with conviction and certainty, I believe that the direct responsibility under Article 12 of Law 8078/90 (Consumer Protection Code) was not written by the legislators with a purpose other than safeguarding the consumer from the "pushing each other" or "assigning blame", seeking (as was already done in post-war Europe) to socialize the loss when such loss, as in this case, has a common cause and no responsibility on the part of the victims, or a specific third party; and I am sure that even the calamities can be forecasted, as professed by SERPA LOPES (Course of Civil Law, Ed. Freitas Bastos, 4th Edition, page 405).

In this particular instance, some insist in not seeing what the soul sees, and the rest of the people feel silently.

Therefore, very appropriate are the words of CARLOS MAXIMILIANO regarding interpretation of the Law. He reasons that in cases of this magnitude, the Judge should not perform a merely intellectual activity. In cases like this, "the Judge is a sociologist in action, a moralist in office, and he is responsible for making sure that the rules and regulations of human coexistence are complied, preventing and punishing violations" (Hermeneutics and the Application of the Law), Ed. Freitas Bastos, page), always concerned with the principles equity (LUIZ ANTONIO RIZZATTO NUNES, aforementioned work, page 21), and alert to the axioms; as ponders the distinguished CÂNDIDO RANGEL DINAMARCO, that

"the judge who is indifferent to society's axiological choices and who sticks to exaggerated literalism, tends to be unfair" *(The Instrumentality of the Judicial Process*, RT, 1987, page 274/75).

RG-00252

[coat of arms]                                                                38

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2ⁿᵈ Civil Court of Regional Court III – Sao Paulo

In view of all this, the claim is found with merit, being enough to establish a compensation, especially in the realm of pain and suffering, it is firm, humane, judicious, nondegrading, effective, and appropriate.

Prior to arbitration, it should be stressed that no amount at all is capable of restoring this very much serious mistreatment, an utter outrage.

As seen from a clear and open standpoint, there is no amount of money that can compensate for the premature death caused by a wrongful act so abrupt and violent, such as what occurred in this instance, in which the victims were reduced to unrecognizable corpses (pages 2157/2165).

Permanent suffering is inside us — it shakes the soul, disturbs awakening, floods the spirit, and generates anguish, disappointment, grief, loss of bearings, emptiness, suffering, pain, and is also causes an impotent and abysmal rage.

**It has no price, however high it may be. It is irreparable.**

Even though, compensation for pain and suffering has its purpose: to compensate for that which cannot be compensated, without losing track of its inherit punitive character.

Anyway, the Law has evolved. In the past, respectable opinions such as those of the distinguished GABBA LAFAIETE and LACERDA DE ALMEIDA, among others, represented the objectors to compensation for pain and suffering, as shown by CHRISTINO ALMEIDA DO VALLE (Pain and Suffering, AIDE Editora, 1999, page 18). Although, from the teachings of CARVALHO DE MENDONÇA, TEIXEIRA DE FREITAS, AGUIAR DIAS, CLÓVIS PONTES DE MIRANDA, PEDRO LESSA, and OROZIMBO NONATO (mentioned work, page 23), knowing that compensation for pain and suffering has never been denied by the Romans, raising the *actio injuriarum aestimatoria* (mentioned work, pages 31/32), and then compensation for damages began to be implemented at that time, thus repairing the mistake of those early arguments against compensation.

PEDRO LESSA said that money can compensate for pain and

RG-00253

[coat of arms]                                                                  39

### THE JUDICIARY
#### SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

suffering. However, there is no complete compensation, as n ideal, "because life cannot be restored" (mentioned work, page 74), and "pain takes away life's normalcy, changing it for the worse," adds PONTES DE MIRANDA *(Tratado de Direito Privado* (Common Law Treaty), RT, 3rd Edition, 1984, 1, XXVI, page 32, no. 2).

With today's progress, the modern doctrine professing compensation is rich, especially after the Brazilian Federal Constitution of 1988, and Abstract 37 by the distinguished Federal Supreme Court.

Honorable jurists, among which are CARLOS ALBERTO BITTAR *(Reparação Civil Por Danos Morais*, 3rd Edition), ANTONIO JEOVA SANTOS *(Dano Moral Indenizável*, LEJUR, 2nd Edition, 1999, page 234), YUSSEF SAID CAHALI *(Dano Moral*, RT, 2nd Edition, 4th issue), HUMBERTO THEODORO JR. *(Dano Moral*, Ed. Juarez de Oliveira, 3rd edition, 2000), CLAYTON REIS *(Avaliação do Dano Moral*, Ed. Forense, 2nd Edition, 1999), and ARTUR OSCAR DE OLIVEIRA DEDA *(A Reparação dos Danos Morais*, Ed. Saraiva, 2000), expose the level and the importance of identifying extra-pecuniary damages.

CLAYTON REIS, Professor and Judge in the State of Paraná, on a sensible hermeneutic work, states that:

"It is an injury which affects the physical and spiritual values, the honor, our ideologies, intimate peace, life in its multiple aspects, a person's personality, anyway, that which deeply affects not the assets, but affects the human beings to the core, disturbing the peace we all need in order to behave in a balanced way in the winding paths of our existence" (mentioned work, page 205); the compensation being imperative for the victim affected by a non-pecuniary offense, which represents "a form of penalizing the offender to deter him or her from committing new acts harmful to the interests of the individual and society" (mentioned work, page 205).

RG-00254

[coat of arms]                                                              40

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2ⁿᵈ Civil Court of Regional Court III – Sao Paulo

However, in this reality, we have not yet reached a mature stage of compensation for pain and suffering with regards to accurately establish a fair compensatory value, which makes it extremely difficult to find an appropriate amount to attenuate the true holocaust caused by the crash of TAM's Fokker 100.

Such task needs to be completed. According to a nearly unanimous opinion, the *quantum* should serve as a discouragement to new offenses, and represents a serious warning to whomever commits a wrongful act, for it should reflect on its property and potentiality. It cannot be so high so as to cause a sudden enrichment, but cannot as well be merely symbolic in such a way that it serves as encouragement to foster mockery and discredit at court rulings.

This symbolism, with all due respect to authoritative opposing voices, contaminates the very objective and usefulness of the judicial proceeding and should be avoided with shrewdness and wisdom, even though it might be noticed, in other instances, that there is a so called pain and suffering industry (RT 757/298), with the disclosure of millionaire compensations such as that in the amount of US$ 34,000,000.00 (according to **WLADIMIR VALLER**, *Dano à Pessoa e Sua Indenização*, RT 1994, page 257).

At this point, it should be stressed that in Europe – particularly in Italy, France, Spain, and Portugal – there is a decisive concern with full protection of claims for pain and suffering. In Uruguay, the compensation for non-property damages have reached increasing values; bearing in mind that in the United States of America and England these compensations **"are very high; in such a way to deeply repress the action of the injuring parties"**, all this in keeping with the research by the Professor of the Federal University of Paraná (mentioned work, pages 206/207), which deserves careful attention of the judges.

RG-00255

[coat of arms]                                                    41
THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Before going any further, it should be noticed that the lawsuit does not indicate that the plaintiffs are pursuing money just for the sake of money, nor that they seek revenge, retaliation or to get rich at the defendants' expense. They have already lost their riches. Nothing will compensate for that, and there is no immorality in pursuing that indemnification projected from the state of the human soul (RT 650/64, reporting Associate Justice WALTER MORAES), stressing that the **moral injury without a fair compensation would perpetuate the social and legal imbalance** (RT 631/29). This is even more serious and should be avoided, with the certainty that the judge is the interpreter of the values of his or her society, and should seek to interpret those values in search of social harmony, even unveiling them.

This is his or her greatest legal and social commitment.

The legal doctrine observes, based on a solid substantiation and translated into the compensatory and perhaps punitive nature of this indemnificatory mode, that the money, regarding pain and suffering, appears as an instrument capable of generating joy and this joy will be the fair price for the pain inflicted, as professed by **WILSON MELO DA SILVA** (*Dano Moral e sua Reparação*, pages 614/15), which, although bold, is undeniable.

The plaintiffs on this lawsuit, with painstaking patience, seek a satisfaction that nobody can provide them. And they must still sleep hearing the sound of the old, outdated, almost abject voice of those who claim for dismissal, due to lack of evidence of their inefficacy... and that the guilt lies with others, with third parties...

Would this be a crisis of mankind or a crisis of the Law, a crisis of man, of transition, of impunity. It is the crisis of civil procedure.

RG-00256

[coat of arms]

THE JUDICIARY                    — 42
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Actually, we – judges, lawyers, members of the Public Prosecution Service, Attorneys, Professors, University Students – should make our best efforts towards a change in the legal procedure, so far marked by an individualist sign, overcoming the myths of the traditional judicial procedure.

According to the teachings of the professor and great conductor of civil procedures, the respected Doctor ADA PELLEGRINI GRINOVER, to seek the efficacy of the legal action and draw from it a conclusion more consistent with certain basic requirements by the social rule of law, in such a way to make it operative on a material level, restructuring it and adapting it to the social and political scopes of the jurisdiction and to the reality of the contemporary society (*O Processo em Evolução*, Ed. Forense Universitária, 1998, pages 10 and 15).

Regarding this matter, the distinguished ORLANDO GOMES, a truly important personality in the Brazilian civil rights, wrote forty-five (45) years ago with extraordinary accuracy, that the juridical order disagreements are revealing factors of the crisis in the Law, particularly in regards to common law, asserting that:

"the whole law is about to be reconstructed and remade. From its philosophical matrixes to its technical notions. From its moral assumptions to the classification of its provisions.

Broadly speaking, we could state that common law is undergoing the terrible crisis of a dual personality.

RG-00257

[coat of arms]                                                                      43
## THE JUDICIARY
### SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Rooted in indefensible philosophical postulates, stratified in decrepit codes, oriented by obsolete criteria, modeled according to old-fashioned standards, bowed by excrescent precepts, constantly mutilated by innocuous partial reforms, which do not follow a univocal thinking, common law is nothing but a spectrum which is supported on the strength of a staggering tradition.

No matter how we cherish these principles, we should still strive to renew and rejuvenate them". (*A Crise do Direito*, Max Limonad, 1955, page 22).

Having said that, and despite its delay, the young and ethical Consumer Protection Code (Law No. 8078/90) cannot be overlooked. It deals with a Federal Law which is reassuring, strong, philosophical, real, noncasuistic, positive, filled with view of the future. Only its concrete application can reveal a new legal, entrepreneurial, social, and even governmental mentality, by building the basis of a moral and ethical compensation system, under the constitutional, which should not be weakened by the tradition of symbolism. Otherwise, with no hesitation, the disagreements described by **ORLANDO COMES** will continue to make up the pieces of a vicious circle.

**YUSSEF SAID CAHALI**, in his very appropriate words, quotes a Decision of the Appellate Court (TARS) so as to consider that "compensation for pain and suffering is not solely indemnificatory, but also pedagogic, as it serves as a deterrent, so that culpable such as the defendant's shall not happen again". (mentioned work, page 177).

Due to all this, the arbitration of pain and suffering depends on the specifics of each concrete case, in such a way as to allow the judge to adopt a proper criteria, argues with authority the eminent Minister **BARROS MONTEIRO** (Interlocutory Appeal 208837/RJ).

RG-00258

[coat of arms]                                          44

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

In this case, when it comes to the most significant moral wrongful act (violent death caused by wrongful act), committed by a quite diversified class of perpetrators (men, women, youngsters, fathers, mothers, individuals between twenty (20) and sixty (60) years of age, on average), and pointing out that the codefendant Northrop Grumman Corporation is one of the world's largest companies in the aerospace industry, it is reasonable and necessary to pay attention to some particulars.

The main characteristic of subjectivism, which sometimes leads to paradoxical comparisons is the mainline. However, judicial lottery should be avoided.

Therefore, a comparison should be made with some court decisions.

In fact, the honorable Superior Court of Sao Paulo, in a decision regarding damages for the discrimination of an HIV-positive young woman under 30 years of age by a corporation, ordered a compensation in the amount of 2,000 minimum salaries (currently approximately R$ 300,000.00 - Civil Court Appeal No. 85.534-4/3-00, 9th Panel of Common Law Judges, issued by reporting Associate Justice THYRSO SILVA).

The First Panel of Judges (Motion for Reconsideration No. 754.692/1, report by the Honorable Judge J. B. FRANCO DE GODOI), regarding the inclusion of the name of a Professor and Judge in the list of SERASA debtors, and in the list of BACEN for issuing bad check, and whose checkbook had been stolen at the premises of a bank branch, decided for compensation for pain and suffering in an amount equivalent to 1,000 minimum salaries.

The Higher Court of Rio de Janeiro (RT 693/198), in turn, in an exemplary Court Decision, reported by the honorable CARLOS ALBERTO MENEZES DIREITO, then an Associate Justice (currently serving as Minister of the Federal Supreme Court), in the famous case of a news report stating that singer NEY MATOGROSSO was suffering from a deadly disease, ordered compensation equivalent to 3,000 minimum salaries (currently approximately R$ 450,000.00).

RG-00259

[coat of arms]                                                          45

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

Keeping these references in mind, the Honorable Superior Court maintained the amount of the compensation at R$ 2,250,000.00 owed the widow and seven (7) children of a man electrocuted on his way home from work, while riding his bicycle and touched a high-voltage wire laying across the road (RESP 246181, Report by Minister ARI PARGENDLER).

As those who practice law are aware, there are a number of interesting precedents, such as: (a) the sentence in the amount of R$ 20,000.00 due to a unlawful act which caused the left foot of a minor to be amputated (RT 748/385); (b) the death of a penitentiary inmate caused by another inmate (RT 753/157); (c) the interruption of a pregnancy (200 minimum salaries – RT 759/349); (d) the offense against honor deriving from an unfounded theft accusation (400 minimum salaries – RT 734/468); (e) the death of a mother victimized by a traffic accident (1,250 minimum salaries – RT 769/365); (f) the receipt of a credit card without request, which generated undue records at the Credit Protection Service – SPC (100 minimum salaries – RT 747/221); (g) the infection contracted by a patient in a hospital (compensation calculated at four times the amount of pecuniary damages – JTJ, Lex, 162/68) and many others; all of this to show, with no majority vote, how arid is the search for a fair and satisfactory amount.

After the above considerations, we have to bear in mind that human life is only one. The rich and the poor can not be rendered unequal, although they actually are.

The fact is, that almost the totality the victims *in casu* were human beings, differentiated by an intellectual, professional, and economical strength, and pointing out that the deceased youngsters had a history that indicated a promising future, being also plausible to value the social and economic status of the aggrieved parties (JTJ, Lex, 196/9 1; Reporting Associate Justice REBOUÇAS –DE CARVALHO).

RG-00260

[coat of arms]                                                                          46

### THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

This is relevant data. Therefore, it can not be relegated.

And being aware of this fact and also having demostrated the lack of uniformity in finding the right compensation amount, without losing track of the need to have an exemplary judgment, but also pedagogic, and avoiding to demoralize such an advanced institution, by applying the punitive damage theory, as professed by the Jurist, Professor and Judge **CARLOS ALBERTO BITTAR**.

This way, the compensation should be able to enhance life, translate credibility, support hope, and trigger the opportunity of a better tomorrow, trying not to translate into a greater shock to the soul, already impacted by the grief of unacceptable deaths.

Therefore, we shall attempt to find an mount which shall make the defendant feel the damage it caused — its economical and financial possibility being uncontroversial, as already indicated.

The famous Jurist and Professor **CAIO MÁRIO DA SILVA PEREIRA**, after stressing its punitive and compensatory nature, warns that this compensation should be adjusted to

"an amount which provides pleasure as a compensation for the grief suffered,"

"in view of the offender's possessions and the personal situation of the offended party" *(Responsabilidade Civil*, Ed. Forense, 1992, No. 42, page 55), bearing in mind the gravity of the offense.

RG-00261

[coat of arms]                                                          47

### THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

By means of this educational process and referring the tragedy of TAM'S Fokker 100 crash to the dehumanization of the consumption relationship and the attachment to a materialistic consumption philosophy, and further seeking to consecrate the importance of the moral value, "which should be protected as much as, if not more, than property and interests protected under the Law" (RI 761/335), and counterbalancing all this, it should be noted that the victims of the fatal crash had a stable family and social situation. They enjoyed good reputation and dignity, in addition to a sound economic and financial situation, and since there is no proof that the codefendant Northrop Grumman Corporation – we repeat, one of the world's largest corporation in the aerospace industry – is unable to pay damages, I believe I am not offending the logic of life by finding the aforementioned manufacturer of the reverser guilty and ordering them to pay compensation for pain and suffering in the amount of R$ 2,000,000.00 (two million reals), approximately US$ 1,111,111.11 (one million, one hundred eleven thousand, one hundred eleven and 11/100 U.S. dollars) per victim's family. This amount will not make the victims rich, and may not diminish the permanent disturbance inflicted by one of the greatest disappointments a wrongful act can indeed cause to us all, avoiding this or that distinction, without setting aside the news disseminated by the media in general, that, for months, there have been attempts to reach a settlement for approximately US$ 800,000.00.

At this point, it would not be inappropriate to go deeper and state that at this time (June 2000) such amount would generate, if deposited on a savings account, a monthly income of approximately R$ 12,000.00 (twelve thousand reals), or US$ 6,666.67 (six thousand, six hundred sixty-six and 67/100 U.S. dollars), an amount that is not exorbitant, and is equally not far from the high value of this case, which deserves an extra thought, and that subsidizes the power of the premise that the compensation should not simply disappear.

It is hereby adjudged extra-pecuniary damages for pain and suffering.

RG-00262

[coat of arms]                                                                    48

**THE JUDICIARY**
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

In regards to the material damage claim, it is convenient to bear in mind the feasibility of setting forth general parameters within the aphorism *ad midi factor, dabo tibi jus* (the judge applies the Law to the fact, even though the former has not been invoked – STJRJTJ 21/432, RTJ 105/1024, 115/392, RIJSP, 43/138, 50/281, 93/185, 115/119, among others), accepted by the civil procedure system (**THEOTÔNIO NEGRÃO**, CPC – Code of Civil Procedure, and Procedural Law In Effect, 28th edition, annotation 11 to article 282), solely discarding the possibility of refunding funeral expenses, as these were not expressly requested on the complaint brief.

Actually, if there is no doubt (and there is certainty) of the obligation of codefendant Northrop Grumman Corporation to compensate, in light of the Consumer Protection Code, a straight-forward instruction will follow regarding the calculation of the immediate property damages suffered by the victims, which are connected to the payment of 2/3 of the last monthly salary earned by each one of the victims, taking into consideration their respective legally defined occupations, with the possibility, in the settlement phase, and as an exception that the case calls for (within the already underlined lawsuit effectiveness) of evidencing each one of these issues, which is not difficult and requires only submission of a copy of the Employment Record Book of each one and proof of the last monthly salary received, or an equivalent document. The likely lifetime period of sixty-five (65) years should prevail, as shall be detailed further in the provisions of this sentence.

It is essential to stress that codefendant Northrop Grumman Corporation did not specifically oppose this detailed analysis, although their objection stated the recognition of the express request for property damages (pages 1112/1116 – 6th volume) and it is safe to verify that the plaintiffs requested the specific judgment for payment of alimony (page 12, No. 31 – 1st volume), also not opposed by the aforementioned codefendant. This calls for the application of article 334, section III, of the Code of Civil Procedure, being therefore an unchallenged and uncontroverted matter, which is a transparent result of the principle probability (article 300 of the Code of Civil Procedure).

RG-00263

[coat of arms]                                                                49

### THE JUDICIARY
### SAO PAULO STATE SUPREME COURT

2ⁿᵈ Civil Court of Regional Court III – Sao Paulo

The impleader thesis and the connection deduced by codefendant Northrop need to be analyzed in another part of this lawsuit, in order to include as codefendants the companies **Fokker Services BV** and **Transportes Aéreos Regionais S/A.**; the numerous petitions to include joint defendants, after the rendering of the interlocutory judgment which determined that a bond should be provided (pages 761/770), are yet to be analyzed.

It should start by equating the impleader and its connecting link.

Although well written, this issue is not applicable, because the impleader

"**is a procedural complicating factor by excellence, and is incompatible with the purpose prescribed by Law 8,078, of 1990, of providing a quick and effective protection for all individuals or companies which acquire or use the product or service as an end user, and nobody else**" JTJ, Lex, 148/405, Reporting Associate Justice **SOUZA LIMA**, on the Consumer Protection Code and its Jurisprudential Interpretation, a work written by Professor and Judge **LUIZ ANTONIO RIZZATTO NUNES**, Ed. Saraiva, 2ⁿᵈ edition, 2000, page 413).

Likewise, one can also refer to the Superior Court Decision (JTJ, Lex, 183/175), Reporting Associate Justice **MAURICIO VIDIGAL**, and the Superior Court Decision reported by then Associate Justice, currently Honorable Minister **FRANCIULLI NETTO** (AI 32.628-4-SP, j. 02/18/97).

This contemporary, dynamic vision is the inescapable result of the wisdom of the provisions of Article 88 of the Consumer Protection Code, bearing in mind that the appeal is the natural recourse of the coplaintiffs before those against who they presume to have the right to redress. The path for these coplaintiffs is undoubtedly a separate recourse.

RG-00264

[coat of arms]                                                          50

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

RIZZATO NUNES further explains that:

"the required systematics of the regulatory text of the Consumer Protection Code leads to the conclusion that the intent of the rule is to *always* forbid impleaders in order to ensure the procedural speed in search of compensating the injured consumer..." (mentioned work, page 417).

Based on these grounds, impleaders are firmly forbidden in lawsuits supported by the Consumer Protection Code, and this is the opinion of ARRUDA ALVIM, TERESA ALVIM, EDUARDO ARRUDA ALVIM, and JAMES MARINS (Annotated Consumer Protection Code, Ed. RT, 2nd edition, page 413).

I therefore deny the impleader requested on pages 1086/1092 (6th volume) and rule out the connection thesis due to the absolute lack of identity between the cause of action and the **proximate cause**, pointing out that the latter is centered around an extracontractual obligation, within the meaning of the Consumer Protection Code, quite differently from those listed. It should be further stressed that the connection is device created to speed up the lawsuit (MOACYR AMARAL SANTOS, page 262) and its reason for being must not be corrupted, which would happen if the argument were brought up in the defense.

Regarding the joint action filed after temporary preclusion of the interlocutory judgment on page 817 (4th volume), it is important to consider that the Consumer Protection Code contains a rule regarding compulsoriness of joint actions associated with class actions involving the defense of equal individual interests, pursuant to Article 94 of Law 8,078/91, which is not applicable in this case.

Therefore, the hypothesis is of a facultative joint action by coplaintiffs, according to the Supreme Court Decision, stating that "on an indemnificatory proceeding, joint action is always facultative (whether it involves coplaintiffs or codefendants), and each one of the injured parties may, separately or jointly, to seek compensation in court" (Resp. 35.496-0, Reporting Minister DEMÓCRITO REINALDO – an appropriate quote from page 2801 – 15th volume).

RG-00265

[coat of arms]                                                            51

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

In addition, in view of the particulars of these proceedings, all motions for joint action interventions filed after the rendering of the decision on pages 761/770 shall be denied, since they would – if granted – jeopardize the principle of independent and impartial judge, flying in the face of the provisions of Article 251 of the Code of Civil Procedure.

So it must be, in order not to oppose the seriousness of the aforementioned principle, which also seeks to prevent the party from choosing the judge in the case, a moral claim, as is well outlined by the illustrious Minister ARI PARGENDLER (Resp. 87641/RS – page 2802 – 15th volume).

Within this meaning, I dismiss all motions made after the rendering of the decision on page 817 (4th volume).

However, I grant the inclusion requested on pages 480/486 (3rd volume) of the following plaintiffs: MARIA TERESA CAIADO BALASSIANO, DIANA CAIADO BALASSIANO, BRUNO CAIADO BALASSIANO, ANDRE LUIZ BARCELLOS RODRIGUES, ALEXANDRE AUGUSTO BARCELLOS RODRIGUES, and ANA CRISTINA BARCELLOS RODRIGUES, widow and children of Félix Elias Ballassiano and Francisco José Rodrigues, respectively, who were victims in this tragedy, as well as NAIR DE CARVALHO JANSTEIN, MARIA CHRISTINA JANSTEIN, and ELISABETH JANSTEIN, widow and daughters of Wolfgang Hans Janstein.

At the closing of this sentence, it should be added that the Law is not dissociated from History insofar as it is a part of the social fact.

The history of humankind is its germ.

RG-00266

[coat of arms]                                                                    52

**THE JUDICIARY**
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

The Law is not a result of human fantasy and – very often – it gives rise to new ways of thinking in a society, in view of its educational purpose. The Law, without undermining the importance of other sciences, is the link and channel, essential to the betterment of mankind, even more so in a much desired democratic society governed by the rule of law.

It is not appropriate to mock society's patience. The arrogance so skillfully disguised as an antiquated view of empty legal concepts should be frustrated and have no consequences in social harmony. It is imperative to avoid flying blind, in order for future generations to be able to use the true legal arteries leading to Justice and to real progress in social coexistence. This is a change that should be attempted by everyone, especially those of us who deal with the Law on a daily basis. It is an inner change, which has been quietly announced by some scholars.

Having said that, we move on to the decision.


**DECISION**


In view of the aforementioned, it is my opinion that the suit has merit, and the defendant Northrop Grumman Corporation is hereby sentenced to pay the amount of two million reals (R$ 2,000,000.00), equivalent to approximately US$ 1,111,111.11 (according to the currency exchange rate on 06/30/2000), for pain and suffering, to each one of the families affected by the tragedy, an amount that shall be monetarily corrected starting on 10/31/1996.

I further order it to pay, starting from the day of the accident, compensation for property damages equivalent to two thirds (2/3) of the last monthly salary received by each victim, bearing in mind that 1/3 of that salary would correspond to the minimum amount of money needed to support each victim had they survived, as it has a recurring nature (RT 443/340, 303/271, 201/178; RJTJESP, 78/200, 81/57, and JTCASP 117/67, in addition to other Court Decisions).

RG-00267

[coat of arms]                                                                    53

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

It is hereby stressed that the likely lifetime of the victims shall prevail, which is stipulated at sixty-five (65) years (RJTJSP, 62/101, 126/157, 129/203, just to mention a few Court Decisions).

Late payments are subject to interest, which shall not require a specific request (Abstract 254 of the Federal Supreme Court), counting from the payment due date, as set forth in Abstract 54, by the Supreme Court, an having the amount of the compulsory insurance deducted, as clearly stated in the jurisprudence (RUI STOCO, mentioned work, pages 812/13), with no bearing on social security benefits, by rule of its own legal nature.

In order to redeem the payable installments, the defendant shall gather funds capable of guaranteeing the full satisfaction of the obligation, pursuant to Article 602, caption, of the Code of Civil Procedure – CPC), and this obligation must be promptly met (Resp. 12.846-RJ, Reporting Judge EDUARDO RIBEIRO).

The Christmas Bonus (13th monthly salary) must be included, since it constitutes an integral part of the income that such a pension replaces (JTACSP, 113/310 and 117/67).

Monetary correction of the salary received by each victim shall, as applicable, comply with Abstract 490 by the Federal Supreme Court, to be calculated according to the provisions of Article 604 of the Code of Civil Procedure.

I finally acknowledge that the defendant Northrop Grumman shall be considered a litigant in bad faith, based on its noncompliance with the court-ordered bond, which was supported by the Superior Court Decision written by the Honorable Judge JORGE FARAH, since the deadline for said deposit has expired and no other decision exists which cancels this requirement.

RG-00268

[coat of arms]                                                                    54
                              THE JUDICIARY
                     SAO PAULO STATE SUPREME COURT

_____2nd Civil Court of Regional Court III – Sao Paulo_____

        Likewise, no explanation or justification can be found for such a bold procedural conduct, not as diplomatic as expected from a company of its size and respectability.

        Compliance with court orders is important for the well being of the procedural process and ethically imperative, pursuant to Article 17, Section IV, of the CPC – Code of Civil Procedure. The defendant's actions do not deserve praise and demonstrate arrogance, also hurting the dignity of the Justice system (article 600, item III, of the CPC – Code of Civil Procedure – in similar application).

        In this regard, the aforementioned defendant, a company existing under the laws of the State of Delaware, in the United States of America, known as a country which breathes democracy, failed to comply with a judicial order which was still in effect, believe it or not; an action that is not consistent with its own history and origins.

        It is appropriate to point out this paradox: The United States of America, sometimes, sets an example of pride and open heart to the entire world. And here, it is discouraging to see the defendant, an American company, failing to comply with a court order issued by the 1st Civil Appellate Court, which was not suspended by the Federal Supreme Court, as per the denial decision issued by the Honorable Minister **EDUARDO RIBEIRO**.

        As an example, we should mention a case judged in the American Justice System of *Chum Di*, a national of the People's Republic of China who left his country aboard a ship and on 6/6/1993, as it arrived in New York, jumped off the ship and was subsequently arrested.

        However, he filed a petition with an Immigration Judge alleging that he was prevented from having another child in his homeland and that his wife, having been ordered to undergo sterilization at a Chinese hospital, escaped and refused to go through with the procedure. The couple had their house seized by the State and subsequently sought refuge in the United States.

RG-00269

[coat of arms]                                                                    55

THE JUDICIARY
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III – Sao Paulo

He then applied for asylum, which was granted by the Board of Immigration Appeals, while a final judgment was not rendered, as reported by the idealist Professor and Judge of the Federal Regional Court, 4th Region (Porto Alegre – RS), Doctor **VALDIMIR PASSOS DE FREITAS**, in his Doctoral Thesis, considered today a very successful monograph *(A Constituição Federal e a Efetividade das Normas Ambientais [The Federal Constitution and the Effectiveness of Environmental Regulations]*, Ed. RT, 2000, pages 35/36), which is hereby used as a mere comparison between the aspiration which emanates from North America and the conduct shown in this proceeding.

Such an undemocratic discrepancy is not to be commended. The unwillingness to comply with the aforementioned court order cannot be seen as proper conduct for a litigant in good faith. It is a case of *improbus litigator*.

In view of all of these factors, I hereby order the defendant to pay each one of the families affected by this tragedy the amount equivalent to twenty per cent (20%) of the value of the matter in dispute, which I do based on Article 18, Second Paragraph of the CPC – Code of Civil Procedure).

By the burden of defeat principle, the defeated party shall be liable for all legal costs and attorneys fees, which I stipulate to be twenty per cent (20%) of the total amount still to be calculated.

This arbitration is a result of the efforts of the noble counsels for the plaintiffs, Doctor Irineu Strenger and Renato Guimarães Júnior, given the nature and significance of this case, its complexity, the degree of professional zeal shown, the amount of time required, and their unwavering diligence, which calls for the application of Article 20, Third Paragraph, Items "a," "b," "c," of the Code of Civil Procedure.

RG-00270

[coat of arms]                                                                    56

**THE JUDICIARY**
SAO PAULO STATE SUPREME COURT

2nd Civil Court of Regional Court III — Sao Paulo

---

I also declare this action ABATED without examining its merits (Article 267, VI, of the CPC — Code of Civil Procedure), in view of the fact that Teleflex Control Systems, Incorporated, who acknowledged its legal incapacity *ad causam*, being the plaintiffs responsible for costs and legal fees, which I establish at 15% of the value of the matter in dispute, with monetary correction applicable from the date of the filing of the action (Abstract 14 of the Honorable Federal Supreme Court — STJ).

The addition of new plaintiffs approved in this sentence (page 51) should be recorded annotated and reported to the distribution notary, without prejudice to the addition of joint parties on pages 775/776, a juridical-procedural resultant from the temporal preclusion of the interlocutory judgment of pages 817 (4th volume).

*P.R.I.*

Sao Paulo, June 30, 2000.

[signature]
RÔMULO RUSSO JÚNIOR
Court Judge

[stamp:  Acknowledged by the DA in Sao Paulo, on 07/04/00 [initials]
Nelson Luis Sampaio de Andrade — District Attorney]

[stamp:  I hereby certify that this Decision is filed with the Division of Records of this Courthouse. Sao Paulo 07/04/00. [initials]. I, [initials] have transcribed it.]

RG-00271





**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III — São Paulo

Processo nº 1.509/98

## VISTOS

**Relatório**

SANDRA LUIZA SIGNORELLI ASSALI, SAMIR SIGNORELLI ASSALI e RAFAELA SIGNORELLI ASSALI

SUZANA GRECO DE FRANÇA KLEPETAR, ANA CARINA DE FRANÇA KLEPETAR e DAVI DE FRANÇA KLEPETAR

HELOISA VAZ GUIMARÃES SAMPAIO GOUVÊA, ROBERTA VAZ GUIMARÃES SAMPAIO GOUVÊA, FERNANDO VAZ GUIMARÃES SAMPAIO GOUVÊA e CAMILA VAZ GUIMARÃES SAMPAIO GOUVÊA

LÚCIA BORDA DE BELLO AQUINO, FELIPE DE BORDA AQUINO e GABRIEL BORDA AQUINO

MARIA GUIOMAR AMBRA FOURNIER VIEIRA, MARIANA AMBRA FOURNIER VIEIRA e CASSIO SUPLICY VIEIRA NETO

RG-00272





**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III — São Paulo

MÔNICA KAUTZ BLEINAT, GISELA BLEINAT, PAULA BLEINAT e RODRIGO BLEINAT

TEREZINHA DE JESUS FERNANDES DUARTE, ERIC FERNANDES DUARTE e ELLEN FERNANDES DUARTE

MÁRCIA GONÇALVES DIAS DE BARROS, EDUARDO GONÇALVES DIAS DE BARROS e GABRIEL GONÇALVES DIAS DE BARROS

MARIA BIBIANA PINTO PIZARRO SÁ FORTES, CAMILLA PIZARRO SÁ FORTES e BRUNO PIZARRO SÁ FORTES

VENERANDA APARECIDA SIMÕES DE ALMEIDA, OLIVIA MARIA SIMÕES DE ALMEIDA e LUCAS SIMÕES DE ALMEIDA

DÉBORA REGINA GONÇALVES TAMIELLO, VITOR TAMIELLO, VANESSA TAMIELLO e VIVIAN TAMIELLO

MARIA DO CARMO BRANDÃO FIGUEIREDO e ANA CLARA BRANDÃO DE FIGUEIREDO

KATIA COSTA DE ALBUQUERQUE ALECRIM, ROBERTA ALECRIM TRINDADE e HENRIQUE ALECRIM TRINDADE

MIRIAM RAMOS GUTJAHR, EVA GUTJAHR, ISADORA GUTJAHR e MELAINE GUTJAHR

WANDA MOREIRA VIEIRA, RODRIGO MOREIRA COIMBRA VIEIRA e CAROLINA MOREIRA COIMBRA VIEIRA

CATHERINE FISHER e LEONARDO FISHER

SILVIA LÚCIA PEIXOTO ARJONA, SILVANA PEIXOTO ARJONA, DANIELA PEIXOTO ARJONA e WILLIAN PEIXOTO ARJONA

RG-00273



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

NEUSA MARIA VICENTINE AMANDO DE BARROS, JULIANA AMANDO DE BARROS, LUCIANA AMANDO DE BARROS RODRIGUES e MARIANA AMANDO DE BARROS

MARIA ADELAIDE DECAT MANHÃES, WALTER LUIS DECAT MANHÃES, MARIA FABIANA DECAT MANHÃES DA COSTA e MARCELA MARIA DECAT MANHÃES

IVIANA ZIZZA ROMERO, LEONARDO ZIZZA ROMERO, ADRIANO ZIZZA ROMERO e ROBERTO ZIZZA ROMERO

MARISETE APARECIDA STRAPASSON SIMINONI, ALEXANDRO SIMIONI, LISMARY SIMIONI e ELISANGELA SIMIONI

SHOGHIEH TAEED KASHANI SHAIKHZADEH, FOAD SHAIKHZADEH, FARIBA SHAIKHZADEH e FAEZEH SHAIKHZADEH SANTOS

ROSA NHUCH BOIANOVSKY, MAURO BOIANOVSKY, DANIELA BOIANOVSKY, ANDRÉ BOIANOVSKY e CELSO BOIANOVSKY

CIBELE MONTEIRO DA ROCHA FERRÃO

RENATA OLIVEIRA DA SILVA CASTRO

FERNANDO LOBO VAZ DE MELLO, MARIA DA CONCEIÇÃO MAGALHÃES VAZ DE MELLO e LUCIANA MAGALHÃES VAZ DE MELLO

AIRTON FRANCISCO RODRIGUES MARIA DAS GRAÇAS DE OLIVEIRA RODRIGUES

JOSÉ ORVAL PALMA, ZÉLIA DE ALMEIDA PALMA, MARCELLO DE ALMEIDA PALMA, MARCOS DE ALMEIDA PALMA e RENATA DE ALMEIDA PALMA

RG-00274



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

FATIMA APARECIDA VARGAS NOGUEIRA, CAMILA VARGAS NOGUEIRA e VINICIUS VARGAS NOGUEIRA

ELIANA MESTRINELLI CREMASCO, EULER MESTRINELLI CREMASCO, ERIC MESTRINELLI CREMASCO e EVANDRO MESTRINELLI CREMASCO

OLAVO AUGUSTO SOUZA CAMPOS DE SIQUEIRA FERREIRA e CECÍLIA MARIA DIAS CAMARGO e

SIMONE PIRES FERREIRA ajuizaram ação de indenização contra NORTHROP GRUMMAN CORPORATION e TELEFLEX CONTROL SYSTEMS, INCORPORATED, afirmando que são parentes diretos ( viúvas, filhos, pais, mães e irmãos ) das vítimas fatais JOSÉ RAHAL ABU ASSALI, GEORGE KLEPETAR, LUIS FERNANDO SAMPAIO GOUVÊA, GLIBERTO AQUINO, CARLOS MARIO FOURNIER VIEIRA, SÉRGIO APARECIDO BELINAT, JOSÉ PEREIRA DUARTE, GERALDO LUIS AREDE DE BARROS, MAURÍCIO F. SÁ FORTES, LUIS CARLOS SIMÕES DE ALMEIDA, LUIS CLAUDIO TAMIELLO, AGUINALDO BARBOSA DE FIGUEIREDO, HENRIQUE MARQUES TRINDADE, IVO ROBERTO GUTJAHR, ALBERTO COIMBRA VIEIRA, ROBERTO FISHER, WILLIAN ARJONA CHONG, LUIS ANTÔNIO AMANDO DE BARROS, WALTER LUIS MANHÃES, LUIS LAURO ROMERO, AMILTON SEBASTIÃO SIMIONI, MOHAMAD SHAIKHIZADEH, DAVI LUIZ BOIANOVSKY, MARCELO DO AMARAL FERRÃO, CHRISTIANO DE GUSMÃO NETO, ALEXANDRE MAGALHÃES VAZ DE MELLO, RILTON DE OLIVEIRA RODRIGUES, MARTA DE ALMEIDA PALMA, JOSÉ WILSON NOGUEIRA, LAÉRCIO CREMASCO, OLAVO RUY CAMARGO DE SIQUEIRA FERREIRA, AMAURI PIMENTA DA VEIGA, em razão do desastre aéreo ocorrido próximo ao aeroporto de Congonhas, nesta Capital, em 31 de Outubro de 1.996, decorrência da queda do avião Fokker-100, da TAM, vôo 402, com destino ao aeroporto Santos Dumont, na cidade do Rio de Janeiro, causando o óbito de todos os passageiros e tripulantes, no total de noventa e nove (99) vidas.

RG-00275



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo**

Asseveram que ficou apurado que a causa da referida queda deve-se a defeito de fabricação da peça da aeronave denominada " *thrust reverser* ", a qual abriu na hora de decolagem, além do defeito no cabo denominado " *teleflex* ", ambos projetados e fabricados pelas co-rés, respectivamente, tendo ocorrido defeito de fabricação, sendo esse o motivo do acidente.

Acrescentam que a perícia efetivada no avião acidentado concluiu que os aludidos equipamentos não funcionaram adequadamente, sendo certo que as fabricantes deixaram de alertar tecnicamente os perigos de sua eventual exposição.

Destacam que é incontestável a responsabilidade das rés por seu mau engenho, sendo essa a causa eficiente do triste episódio, ponderando que houve negligência na manufaturação dos mencionados equipamentos.

Requerem a reparação dos danos materiais e morais daí decorrentes e pedem a integral procedência da ação.

A decisão interlocutória de fls. 474/477, envolvida pela preclusão temporal, equacionara a questão alusiva à competência da Justiça brasileira para conhecer e decidir da causa, facultando-se a emenda da inicial, para a inclusão da pessoa jurídica Transportes Aéreos Regionais S. A. (TAM), mas, debalde, seguindo-se a determinação em favor da citação das rés (fls. 645 – 3º volume).

Por peça autônoma houve pedidos de admissão como litisconsortes ativos ( fls. 480/486 e 522 3º volume ).

Os co-autores de fls. 636, 647, 652, 656, 658, 661 e 677 (3º volume) desistiram da ação, o que foi homologado.

RG-00276



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

**Juizo de Direito da 2ª Vara Civel do Foro Regional III — São Paulo**

A decisão interlocutória de fls. 761/770 ( 4º volume ) arbitrou a caução na quantia de R$ 500.000,00 por vitima, convocando as partes para a audiência conciliatória, inclusive.

Novos pedidos de intervenção na qualidade de litisconsortes ativos foram formulados (fls. 775/784; 848/852 – 4º volume; fls. 2342/44 – 12º volume, fls. 2749/50, 2761/62, 2678/80 – 14º volume e fls. 1918/20 – 15º volume).

As rés deram-se por citadas (fls. 699 e 706 – 3º e 4º volumes ).

A tentativa conciliatória não produziu êxito (fls. 873 – 4º volume ), seguindo-se a proposta de acordo, sem resultado positivo.

A co-ré Teleflex deduziu sua defesa (fls. 882/903 – 5º volume ), onde levanta preliminar de ilegitimidade passiva *ad causam*, alegando que o relatório final sobre o acidente, elaborado pelo Ministério da Aeronáutica, não aponta que o *feedback cable* tenha apresentado defeito.

Destaca que ocorreu a abertura inoportuna do reversor do motor direito da aeronave, projetado e fabricado pela co-ré Northrop, sendo certo que os pilotos da TAM não receberam a indicação do sistema de alarme da aeronave, o que lhes prejudicou tal identificação.

Articula que os pilotos deveriam recolher o trem de pouso, o que aumentaria a possibilidade de subida da aeronave, um mais 15" pés por minuto, mas preferiram avançar as manetes de potência dos motores, dai advindo a perda de desempenho e queda da aeronave, o que demonstra que seu produto funcionou e não contribuiu para o acidente.

RG-00277



P O D E R   J U D I C I Á R I O
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Requer a denunciação da lide do fabricante do avião, a empresa holandesa *Fokker Services B.V.* e a extinção do feito.

No mérito, aponta que o *feedback cable* rompeu-se após o choque com o solo e que poderia ter ocorrido a ruptura de peças de outros fabricantes, tendo havido ação agressiva dos pilotos sobre a manete, daí ocorrendo a separação, quando a queda da aeronave já era inevitável.

Pede a improcedência da ação, destacando que não participou do processo de montagem e teste da peça, salientando a culpa de terceiro.

A co-ré Northrop, em sua resposta (fls. 1078/1116 – 6° volume ), destaca que falta interesse de agir de Nair de Carvalho Jansein, em face do recebimento da quantia de R$ 150.000,00, o que representara a quitação pelo óbito de seu parente.

Deduz denunciação da lide da *Fokker Services B.B.* e da Transportes Aéreos Regionais S/A, para que façam parte do pólo passivo da ação, evitando-se o regresso.

Articulam, em peça autônoma ( processo no. 1509/98 – apenso C ), exceção de incompetência do juízo.

No mérito, salientam que o sistema de reversão de motores é um sistema complexo, sendo certo que " sua contribuição relevante para o sistema do reservo é no sistema hidráulico, cujo funcionamento, impecável, não é questionado por quem quer que seja " (sic-fls. 1097 – 6° volume ).

Sustenta que a aeronave caiu por falha do sistema elétrico erroneamente projetado e montado pelo *Fokker*, que acabou acionando o reservo em momento inoportuno e inibindo o aviso do defeito aos pilotos, os quais tiveram atuação infeliz, sendo essas as duas fontes reais do acidente.

RG-00278



**P O D E R · J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo**

Pede a aplicação do Código Brasileiro da Aeronáutica e do art. 159 do Código Civil, destacando a ausência dos requisitos para sua responsabilidade.

Requer a improcedência, acentuando que a indenização pedida não pode prestar-se para melhorar o padrão de vida dos familiares das vítimas, devendo evitar-se o locupletamento indevido, deduzindo-se os valores eventualmente recebidos a título de seguro de vida, seguro obrigatório e do INSS, em eventual compensação.

A co-ré Northrop deduziu exceção de suspeição, sobrevindo a suspensão do curso do feito (fls. 2092 – 11º volume), seguindo-se a prolação do V. Acórdão (fls. 314/317 – Apenso D), relatado pelo eminente Desembargador **DJALMA LOFRANO**, rejeitando-se a aludida exceção.

O V. Acórdão (fls. 2442/2450 – 13º volume), relatado pelo culto Juiz **JORGE FARAH**, da Colenda Sexta Câmara do Egrégio Primeiro Tribunal de Alçada Cível de São Paulo, manteve a decisão que arbitrara a caução, reduzindo-a para a importância de R$ 300.000,00, por vítima.

O despacho de fls. 2487 determinou a observância do prazo constante do V. Acórdão para o depósito referente à referida caução, seguindo-se o pedido da co-ré Northrop, no sentido de que a intimação fosse efetivada na pessoa de seus representantes legais, o que não foi acolhido (fls. 2500/2502 – 13º volume).

Os autores deduziram réplica e requereram o julgamento no estado (fls. 2503/22 – 13º volume).

RG-00279



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo**

Os autores alegam que a co-ré age de forma imoral, posto que não efetuou o depósito da caução determinada.

As rés impugnaram as intervenções litisconsorciais (fls. 2800/2820 e 2812/2814 – 15º volume).

A exceção de incompetência foi desacolhida, o mesmo ocorrendo com o agravo de instrumento tirado contra a temática visando a intimação pessoal dos representantes legais da co-ré Northrop (cf. V. Arestos da lavra do culto Juiz JORGE FARAH).

O Ministério Público manifestou-se regularmente nos autos.

### FUNDAMENTAÇÃO

Trata-se de julgar uma causa especialíssima. O tema, na sua mais pura acepção, não deveria ser entregue ao homem. A hipótese reclama, antes de tudo, a busca da mais ampla realização de Justiça. Não - é certo - uma justiça formal, míope, fria, quase desumana. Aqui tem-se que descortinar o espírito das Leis, lembrando-se *Montesquieu* e os pensadores de todo o planeta, entre eles Platão, Aristóteles, Paulo de Tarso, Fustel de Coulanges e tantos outros.

O processo repousa um drama vivido por toda a sociedade brasileira, um episódio transmitido para todo o planeta, em torno da trágica queda da aeronave denominada Fokker 100, da TAM, decolando do aeroporto de Congonhas, nesta Capital, dentro do serviço diário desenvolvido na conhecida "ponte aérea São Paulo - Rio de Janeiro", naquela manhã de 31 de outubro de 1.996, com a morte coletiva de noventa e nove (99) pessoas.

RG-00280



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

### Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

A todos que venham a ler esta sentença preciso confessar minha dificuldade. O homem, filho, marido, pai, irmão, professor, cidadão, enfim o partícipe desta sociedade de tantas incongruências, sente-se, enquanto magistrado, por vezes, impotente diante das injustiças que sobrevoam nossas cabeças, posto que nosso Brasil é rico em Leis, mas não esbanja Justiça, apesar de tantas mentes sérias e iluminadas que compõem o Judiciário Paulista, com as quais tenho a honra conviver nesses treze (13) anos na judicatura.

Aliás, difícil dizer, mesmo naqueles países ditos de primeiro mundo econômico, se há terra que se preocupe, de fato, com a Justiça ? Há, com certeza, aquelas que sabem fabricar o consumo e o individualismo. A imprensa, em todos os níveis, já nos mostra, com suficiência, isso. Basta querer ver.

Assim frisado, é importante considerar que a Justiça não é tarefa de consumo. É missão. Missão não divina, posto que esta Justiça, do processo civil, pode, em algumas vezes, não ser a Justiça *real* ( art. 3º, I, da Constituição Federal) que todos nós, enquanto sociedade democrática, queremos. O homem, contudo, enquanto Juiz, tem o dever que lhe é confiado pela sociedade, porque o Juiz de Direito é um braço livre e fundamental do Estado democrático de Direito, de dizer o direito escrito na Lei, mas sem perder de vista que o cidadão espera que o Magistrado interprete, em seu nome (*pressuposto de cidadania*, art. 1º, II, da Constituição Federal)), o texto legal, tornando-o racional, vivo, adequado, atual, humano, positivo, confiável e especialmente Justo.

Entenda-se, assim, autores e réus, nobres e combativos advogados que funcionam tão elegantemente nestes autos, digno Promotor de Justiça, funcionários dedicados do 2º Ofício Cível deste Foro, sociedade em geral, que parece a este Juiz que não há nenhuma Justiça a ser feita neste caso, ao menos neste mundo da matéria e do consumo.




*P O D E R   J U D I C I Á R I O*    11

TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo**

Impossível avaliar a perda de tantas vidas, ainda mais com o desaparecimento desses sorrisos pela espada do desespero e do inevitável.

Não sei, a esta altura de minha vida, se a sociedade não deve repensar se o homem existe para a sociedade dele usufruir, como autêntico produto, ou se é o *ser* a verdadeira raiz da sociedade ? Trata-se de reflexão para o hoje, mas direcionada ao amanhã.

Cravadas essas necessárias observações, qual o retrato nú do processo: dizem os autores que a aeronave caiu e que faleceram seus entes queridos, por força da falha do *reverso* e do *feedback cable*, produto fabricado pelas rés Northrop Grumman Corporation e Teleflex Control Systems, Incorporated (pessoa jurídica pertencente ao mesmo grupo societário da Northrop Grumman Corporation); enquanto sustentam as rés que não têm culpa no evento, porque não houve falha do equipamento fornecido, tendo havido má atuação da tripulação da TAM, não cabendo o enriquecimento das famílias das vítimas à custo da alegação de dano moral.

Nesse horizonte, a voz que ouço é aquela de que há algum responsável escondido nas entranhas da impunidade, restando, dentro do processo, apesar da rudeza da causa, encontrar seu porto, sendo certo que o processo distingui-se por ser a instituição correta para essa descoberta, porquanto seu fim maior é o restabelecimento da *paz social*, afastando-se a angústia e a antinomia e retomando-se o curso da vida civilizada.

A esse respeito, confiram-se as lúcidas considerações e firme contribuição do eminente Professor **GALENO DE LACERDA**, Catedrático da Faculdade de Direito de Porte Alegre, Universidade do Rio Grande do Sul ( Tribuna da Magistratura, Caderno de Doutrina, abril/99, págs. 57/65).

RG-00282



**PODER JUDICIÁRIO**    12

TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

### Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Antes do mais, indague-se se será possível, em momento em que se verifica a evolução do direito enquanto ciência, já discutindo-se a profundidade dos direitos difusos, do direito do consumidor, da problemática internacional do narcotráfico, da Lei que penaliza a pessoa jurídica nos crimes ambientais ( Lei 9.605/98), dos direitos comunitários, dos novos direitos (valorização) da personalidade humana, da discriminação, do nascituro *in vitro*, da revolução de agilidade provocada dos Juizados Especiais Cíveis, etc., admitir-se o verdadeiro escudo defensivo baseado na impureza nevrálgica da negativa ?

Fácil, como sempre, montar explicações para a não responsabilidade. Pouco comum, ao revés, é **comprovar**, com a firmeza que o caso requer, a coerência no agir e sua fiel diligência em todos os momentos da marcha produtiva, ao lado do verdadeiro não comprometimento com a eventual falha, vício ou defeito, escondido ou não.

Superados esses registros, não é difícil dizer que o passageiro do vôo 402 da TAM, o consumidor final, aquele que adquiriu o bilhete de passagem e ao ingressar na aeronave marcou o início do respectivo contrato de transporte, típica obrigação de resultado, é o ponto de partida do juízo dedutivo em torno desta causa.

Sim. Ele é.

Com efeito, não se pode perder de mente que não é o produto (visto em seu todo) que existe para o homem, mas sim o homem que dá motivo para o nascimento do produto. Não se deve inverter esse foco. Necessário, pois, clarear tal raciocínio.

Assim não há nenhuma dúvida, quer para a sociedade organizada, cidadãos, contribuintes, homens, mulheres, crianças e para o próprio Estado, que o passageiro do vôo 402 da TAM não é responsável pela referida tragédia.

RG-00283





**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Subsiste, agora, a obrigação do Estado, representado pelo Poder Judiciário, localizar quem é o artífice desse magistério:    o fabricante do avião,    o fabricante da peça *reverso*, o fabricante de parte de outros componentes que compõem a peça *reverso*, todos os fabricantes,    a TAM, o piloto, a tripulação,    ... a fatalidade ? ! Quem ou o que ?

Não se sabe, dentro da verdade que vem do interior do ser, quantos podem ser incluídos nesse rol.

Feitas essas considerações, o ponto capital da causa está fincado na projeção da seguinte imagem:    o produto fabricado pelas rés, o denominado " ***thrust reverser actuators*** –" (reverso ou sistema de reversão de motores)    ou,    ainda, as    peças    denominadas " ***feedback cable e turnbuckle*** ", apresentara defeito ou vício, em especial na parte referente à não previsão da eventual pane no sistema elétrico do reversor e seus reflexos em seu regular, pleno e perfeito funcionamento, com a abertura inadvertida do reverso, daí resultando comprometida a potência necessária para a normal decolagem do Fokker 100, da TAM, com a fatal seqüência de apenas vinte e quatro segundos (24s) totais de vôo e, ato contínuo, o trágico choque da referida aeronave que não exige lembrança ?

O primeiro passo, para equação dessa delicada questão, é avaliar-se o conjunto da tarefa probatória produzida no seio do Ministério da Aeronáutica, materializada no relatório final subscrito pelo Tenente Brigadeiro do Ar Ronald Eduardo Jaeckel e pelo Coronel Aviador Douglas Ferreira Machado (fls. 905/952).



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

### Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Averbe-se, pois, que esse elemento probatório é mais do que suficiente para o imediato julgamento da causa, não só por seu poder de convencimento, mas também porque é inútil retardar o desfecho da ação, posto que não há, à luz da lógica, razão objetiva para a produção de prova outra, posto que todas aquelas provas possíveis e admissíveis já estão ou deveriam estar nos autos, ainda mais verificando-se o ponto fulcral do feito. Imperativo, por isso, o julgamento antecipado da lide, como impõe o artigo 330, inciso I, do Código de Processo Civil.

Registre-se, a propósito, que o aludido trabalho pericial tem força probatória, em especial porque elaborado por homens que o traçaram com a responsabilidade de agentes públicos, tendo por via oblíqua, base sólida, fluindo a presunção de seriedade, aliás, não maculada em nenhum momento do processo, nem mesmo pelas rés, o que lhe confere maior valor e eficácia processual.

Por essa trilha, fixe-se, neste instante, que o aludido relatório não é vago. Ao contrário. Tem ele fiel dose de convencimento, uma vez que realizado de modo pedagógico, científico, objetivo e cujas conclusões foram extraídas de todo o material fáctico recolhido no local da queda da aeronave Fokker 100, da TAM.

Ademais, este subsídio de prova foi extraído após longa e demorada pesquisa, a qual consumiu quatorze (14) meses do Sistema de Investigação e Prevenção de Acidentes Aeronáuticos, Departamento do Ministério da Aeronáutica, espelhando, ainda, o exame das aludidas peças ( reverso e demais componentes ) e sua complexidade funcional, tudo a viabilizar seu uso como ponto central para o deslinde deste importante e complexo processo.

De rigor, tanto por tanto, sua análise pormenorizada, sem deixar de prover, como manda a temperança e a cautela, a dedução de um balanço de suas conclusões e revelações, mobilizando-se seu todo, sem perda de harmonia e razoabilidade.

RG-00285



15



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III — São Paulo

Assim sendo, o aludido relatório afirma que embora os testes de inspeção realizados no sistema tenham revelado que os "atuadores estavam plenamente operacionais" (fls. 908), a análise cuidadosa do "reverso" destaca que a **falha do produto** (reverso **fabricado pela co-ré Northrop) era real,** na medida em que:

" o **relatório de análise de falha do reversor emitido pelo fabricante para o processo de homologação não apresentava todas as condições possíveis de** *inadvertent positive* **e não considerava a possibilidade de uma falha dormente** (*dormant fail*)..." em especial no plano da superveniência de uma "falha extremamente improvável" (fls. 910).

Sem prejuízo, uma das conclusões extraídas no relatório final do Estado-Maior da Aeronáutica ( fls. 941 ), sem entrelinhas, positiva que:

" a investigação constatou ter ocorrido uma abertura inadvertida do reverso do motor direito quando a aeronave deixou a pista ", antes de qualquer ação dos pilotos, o que sobressalta e ativa a preocupação de todos quantos possam avaliar o grau desse registro emanado dos experientes e responsáveis homens do Ministério da Aeronáutica.

Nesse garimpo, antes do mais, crave-se que os equipamentos, sistemas e instalações de uma aeronave não podem, sob o respaldo de nenhuma escusa, ser considerados isoladamente. Não. Todos os componentes (produtos para o código do consumidor) devem, ordinária e necessariamente, estar em cooperação irrestrita, especialmente da ótica da relação especial de consumo, cravando-se que o transporte (obrigação de resultado) – visto como um todo – ainda mais o transporte aéreo, é tarefa de altíssima importância, a qual envolve inúmeras vidas humanas, daí partindo uma singular e destacada responsabilidade moral e jurídico-objetiva, sem aprofundar-se, até porque não necessário , acerca do evidente risco daí inerente.

RG-00286



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

16

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Linhas adiante, o relatório do Ministério da Aeronáutica considera que "o fabricante não considerou a possibilidade de um colamento dos contatos" e por conseguinte " o caso não foi analisado ", o que justifica a afirmação de que

houvera "uma falha dormente" no reverso (falha que pode se instalar sem, contudo, ser percebida), tudo consoante importante desdobramento marcado na referida peça (fls. 911).

Além disso, o diagrama de análise de falha do reversor, feito recentemente pelo fabricante, após a referida tragédia, ressalva que:

" mesmo não levando em conta uma falha dormente, indica que a probabilidade de uma abertura *inadvertida dos reversores*, a qual *é da ordem de 10-6* " (percentual muito elevado), não satisfazendo, por isso, "os requisitos de aeronavegabilidade...", segundo o frisado pelos agentes públicos do Ministério da Aeronáutica (fls. 911).

Sem perder este contexto, os testes realizados, envolvendo os reversores, em favor da atuação da trava secundária das portas dos reversores de empuxo das turbinas mostraram, sem rebuscar, a

" *inconsistência nas respostas dos mesmos e a consequente falta de confiabilidade por eles apresentadas. Os componentes, que deveriam apresentar um padrão de qualidade aeronáutica, colocados em operação, sofrem uma deterioração anormal, inexplicada pelos próprios fabricantes que vêm, há algum tempo, pesquisando formas de otimização*" (fls. 912, g.n.), o que chama a atenção e alarma, alarma muito.

RG-00287



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo**

Aprofunde-se, ainda mais, para encontrar no espírito do referido relatório, que só não foi mais contundente porque alheio a seus objetivos, o diagnóstico de que o avião Fokker 100 da TAM caiu porque o

*"secondary lock actuator dos reversores devem ser reanalisados e ter a sua confiabilidade aumentada,* incluindo-se testes finais de impedância e resistência elétrica, pré-delivery e pós-montagem na aeronave"* (fls. 949, g.n.), o que, no mínimo, sob o governo da responsabilidade que pousa e repousa na asa da prudência, dentro do transporte aéreo, é inadmissível.

Por essa lente, após o relatório aeronáutico afirmar que os tripulantes estavam com seus certificados de capacidade física e de habilitação técnica válidos, descansados e que aquela era a primeira decolagem do dia, sendo o comandante experiente e a aeronave registrava a ordem e a atualização de suas revisões e inspeções, declararam os técnicos que a aludida anormalidade se pronunciou no primeiro (1º) segundo de vôo, não constatando-se a ocorrência de avisos sonoros e luminosos denunciadores dessa excepcionalidade, revertendo o ciclo do reverso (reverso aberto), produzindo na aeronave, por quatro (4) segundos uma grave queda de potência, deteriorando seu desempenho ( fls. 941/942 ), abrindo-se, então, a arquitetura que não exige exercício de memória.

Além disso, pontuam os *experts* da aeronáutica que o procedimento de **"reverser unlocked"** na decolagem

"deixou de ser treinado no simulador de vôo pelos tripulantes da empresa" , posto que esclarecera o fabricante que " uma abertura do reverso em vôo através do seu acionamento não seria possível, devido à proteção do "Switch Ground/Flight" do sistema selecionado ( fls. 942 ), o que não veio apoiado dentro de nenhuma explicação técnica equilibrada, adequada ou capaz de salvaguardar o estigma dessa aparente certeza do não vício, sem a pronta demonstração, a qual deveria acompanhar a contestação, tão necessária em situações tais, de que o reverso era da melhor qualidade, como exigir-se-ia, o que autorizaria a avaliação da diligência do fabricante, como pondera a doutrina de **LUIZ GASTÃO PAES DE BARROS LEÃES**(Responsabilidade do Fabricante pelo fato do produto, Saraiva, 1987, pág. 154/55).



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Assim, o que se vê, com claridade e senso de
não escamotear, é que o avião não caiu apenas e tão somente pela má
projeção do sistema elétrico montado pela Fokker ou pela Dowty Aerospace
Hydraulics, o qual acionou o reverso em momento inoportuno e inibiu o aviso
desse defeito aos pilotos, que, segundo a co-ré Northrop, tiveram atuação
infeliz (sic-fls. 1099).

Não.

O avião caiu porque o fabricante de peça tão
vital, a co-ré Northrop, como é o chamado "reverso", não teve o zêlo ou a
competência-humildade de prever a probabilidade de eventual mau
funcionamento do sistema elétrico a ele interligado e conferir a este
componente um *status* de independência que dito produto não possua, até
porque parte de um todo simétrico e ordenado.

Não se conduzira a referida co-ré Northrop,
como era exigível, no sentido de alertar os fabricantes dos demais competentes
que interagem com o reverso, do quão substancial é o funcionamento da parte
elétrica, sob pena do mau desempenho do seu produto, isto, diga-se, segundo a
sua própria ótica, de acordo com sua tese de contestação.

Era necessário, sem exagero, que o fabricante
do reverso (sistema complexo e enfeixado), a co-ré Northrop, tivesse a cautela
de prever, mas prever com um espírito sereno, claro e limpo de nuvens, como
lhe era de possível, a probabilidade da eventual falha do sistema elétrico e
eventualmente comprometedor do perfeito funcionamento de seu produto. Um
raciocínio é inseparável do outro, sob pena de tal representar omissão vizinha
ao dolo eventual.

RG-00289



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Aliás, a omissão desta providência é de tão elevada monta e de tal ordem preocupante que atormenta a todos.

O que é possível concluir, pela leitura do relatório do Ministério da Aeronáutica, não povoada pela desculpa, e procurando ver este processo como um retrato do próprio homem, é que este, na maioria das vezes, não aceita suas falhas. Prefere escondê-las dentro de si próprio, ainda que, dentro de seu "eu", seja alertado a corrigi-las.

Quando, no entanto, como aqui, o homem perde seu domínio e passa a ser dominado pela máquina que projeta, esquece-se que a criatura leva as virtudes e os defeitos do criador e cabe a ele, homem pacífico e humilde, pesquisar, diuturnamente, quais os defeitos previsíveis e talvez encobertos na máquina, seu produto de consumo, certo que esses defeitos são do homem e não da máquina, mesmo aceitando-se, até por racional, o limite e o nível humano de conhecimento técnico e científico compatível com o exato momento da produção.

Aceite-se, portanto, que houve falhas no reverso da co-ré Northrop, o qual abriu inoportuna e inadvertidamente no primeiro segundo de vôo, sem nenhum ato dos pilotos e sem a denúncia de avisos luminosos e sonoros, não transpirando da referida prova, de outra parte, a existência de vício ou defeito no *feedback cable*, produto da co-ré Teleflex Control Systemes, Incorporated, o que, por conseguinte, a isola na participação no evento danoso.

Além disso, é importante deixar escrito que não há nenhuma prova segura de que houvera a eventual ou episódica má atuação da tripulação, em especial do piloto e co-piloto, ou ainda de que essa possível conduta tenha desencadeado, **com exclusividade**, a queda do avião, ainda que se possa admitir alguma deficiência na aplicação de comando (fls. 1879).

RG-00290



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

20

Juizo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Não.

Não há nos autos, mormente com o mesmo perfil e caráter categórico do remanescente que brota do referido relatório aeronáutico, que permita, com tranquilidade, fixar-se que a causa única e exclusiva da malogro do Fokker 100 da TAM, foi a imperícia da tripulação, destacando-se que os *experts* não deixaram de perceber que:

" **a condição com que a inusitada anormalidade se apresentou à tripulação e a falta de avisos, indeterminou a intencionalidade da ação** ... " ( fls. 1879), o que merece registro e muita atenção do julgador, a indicar, com transparência, que a conduta dos pilotos está fora da linha de desdobramento causal provocado pelo inoportuno e inadvertido acionamento do reverso, pontuando-se que

" **o desconhecimento por parte dos tripulantes, por insuficiência de avisos e de informações sobre a anormalidade, foi determinante para que eles abandonassem a sequência normal de procedimentos** ... " (fls. 1.879 – 10º volume), o que, sem contraprova equivalente e na margem da vanglória, elimina, ordinária e necessariamente, a idéia da co-ré Northrop, no sentido de que a razão da queda da aeronave foi a atuação infeliz dos pilotos (sic – fls. 1099 - 6º volume).

Não se pode e não se deve, posto isto, distanciar a causa primária de seu efeito secundário. A queda da aeronave, portanto, foi provocada, segundo a abalizada prova produzida, pela inoportuna e inadvertida abertura do reverso, não sendo humanamente exigível dos pilotos ( em pouquíssimos segundos ), como asseveraram os técnicos do Ministério da Aeronáutica, superar essa anormalidade, máxime pela ausência de avisos e informações denunciadoras.

Essa temática, desprovida de elemento probatório que lhe conferisse base e razoabilidade, acaba, na via reflexa, maltratando o equilíbrio e a plausibilidade. Chega a causar sobressalto à gerência dos atributos da serenidade e da interpretação resoluta e comprometida com a franqueza.



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

21

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Esta é, sem reparos, a verdade que emana do conjunto do resultado da inspeção realizada pelo Ministério da Aeronáutica, sobre o qual as rés tiveram ampla participação, acompanhando todos os seus procedimentos sem nenhuma impugnação, o que chama a incidência do art. 334, inciso III, do Código de Processo Civil.

Lembre-se, exatamente agora, que não dependem de prova os fatos incontroversos; não havendo trânsito, pois, para a prova de fato não controvertido (STJ, RTJ 93/162), destacando-se a força probante que resulta do mencionado relatório, posto que realizado logo após a queda da aeronave, por agentes públicos, tendo, assim, a presunção de verdade dos atos administrativos em geral, ainda que possa ser considerado na quadra de um simples indício.

PONTES DE MIRANDA, a esse respeito, com sua autoridade, explica a utilidade dos indícios para a solução das lides, lecionando que

" ... o indício pode dar mais do que presunção – pode dar certeza, ou só compor a presunção *hominis*, pode dar elemento íntimo da prova " (Comentários ao Código de Processo Civil, III, pág. 419).

No mesmo tom, com expressividade, o Ministro PEDRO CHAVES, em voto magistral, semeia que é de larga validade a função esclarecedora dos indícios no deslinde das mais várias questões (Prova no Cível – Interpretada pelos Tribunais, registros de Wilson Bussada, Ed. Sínteses, págs. 177/78).

Nada, mas nada mesmo, pode ser dito àqueles que não acreditam que erram. O erro, para estes, é sempre do outro. Para estes só a paz da consciência é consolo, ou tormento.

RG-00292



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Dentro do balanço dos elementos de convicção amealhados, fixe-se aos Senhores e Senhoras familiares das vítimas e autores desta ação, aos Senhores Doutores Advogados, ao Doutor Promotor de Justiça, à sociedade em geral, que não consigo enxergar de outro modo esta causa, sobre a qual venho refletindo há vários e vários meses e nos meus limites humanos e intelectuais lhes digo que sinto justo reconhecer, como neste ato reconheço, que houve vício de informação, concepção, projeto, montagem, eficiência, interligação com a quadra hidráulica e elétrica do reverso, do produto fabricado pela mencionada co-ré, o que, na raiz, comprometerá sua segurança e confiabilidade, caracterizando-se, tanto por tanto, um autêntico "vício no produto", o qual o artigo 12, *caput* e parágrafo primeiro, do Código do Consumidor não admite, impondo-se, desse modo, o dever de indenizar, perdendo-se qualquer imagem de aplicação do antigo artigo 159 do Código Civil, o qual não guarda nenhuma sintonia com o universo desta causa.

Pelo que minha convicção me conduz e examinando-se a prova produzida, a qual não é impugnada por nenhuma das partes, tem-se que a co-demandada nem mesmo preocupou-se em tentar provar, como lhes cabia, que seu produto (o reverso e seus componentes hidráulico ), é perfeito, conquanto a perfeição tenha a foco autoflagelo e de ferir a credulidade.

Por oportuno, ademais, firme-se que tal prova era de simples produção às rés. Bastaria trazer, com a contestação, como era de império à co-ré (artigo 300 c/c artigo 333, II, ambos do CPC), a comprovação do quão impecável era seu produto, com a revelação oficial de todos os testes e verificações praticadas em torno do funcionamento isolado e em conjunto do reservo, enquanto peça, componente, ou sistema (hidráulico) plenamente confiável e imune ao mau funcionamento, ainda que dormente, como diz o laudo do Ministério da Aeronáutica e prevendo-se, como era fundamental (mesmo na fadiga investigatória do fabricante), uma eventual pane do remanescente do sistema da aeronave, em especial o elétrico e o de denúncia sonora ou luminosa de alguma irregularidade aos pilotos e tripulação, respeitando-se, ato único, o princípio processual da eventualidade (art. 300 do Cód. de Processo Civil).

RG-00293

23

3027

04



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Sem isso, não há, a bem de um juízo de salvaguarda da seriedade do processo, de não quebrantar a confiabilidade no sistema jurídico e dentro de uma visão moderna do direito privado, em especial o direito do consumidor, como dizer que a ré fabricante do *thrust reverser actuators* não tem responsabilidade pela queda do avião. Tem pela omissão de não rever a possível falha do sistema elétrico eventualmente comprometedor do regular, integral e pleno desempenho de seu produto (reverso) e, consequentemente, desencadeante de tudo o que assistimos, marcando-se a ausência de prova da eficiência – perfeição – do mencionado produto.

Melhores, por certo, são as palavras do advogado Doutor LUIZ CÉZAR RAMOS PEREIRA, em artigo escrito há mais de dez (dez) anos, mas atual como este sol de hoje (13.06.2000, 8,50 hs), no sentido de que:

" Na verdade o fabricante deverá provar que o seu produto é perfeito. Aliás, a prova produzida pelo fabricante é mais fácil de ser produzida, do que transferir este ônus ao lesado. Corre, porém, o fabricante, o risco de não conseguir provar o alegado pelo lesado, mas este é um risco que não pode ser transferido para o lesado, em hipótese alguma. A prova liberatória tem que ser fornecida primeiro pelo fabricante, depois pelo intermediário, se for o caso, mas nunca pelo lesado, pois, este já suportou ou suporta a lesão provocada pelo dano " (RT 654-54), acrescendo-se, ainda, nesse mergulho de coragem e verdade que emana das reflexões do ilustre advogado e especialista em Direito Internacional Privado, que

" O fabricante deve ser punido, mesmo quando põe no mercado produto que não apresenta vício ou defeito, mas posteriormente vem apresentá-los. A idéia e a filosofia que se aplica é que, se pune por um produto posto em circulação no mercado, que não é próprio para o uso a que foi desenvolvido " (RT 654-55), mormente quando

RG-00294



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

24

**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo.**

o fabricante crê, como se sente no caso dos autos, na certeza do perfeito funcionamento de seu produto, o qual é, em dado momento do projeto imune a vícios, sem dimensionar, talvez porque com os olhos vendados pelo não descortino da humildade, mas muito mais pelo afã do produzir para o consumo, a possibilidade de falha conjuntural comprometedora da segurança e da real confiabilidade de seu produto.

Homenageie-se, sem dúvida, os projetistas da ré. Não se deixe de reconhecer, custe o que custar, que houve vício não previsto, mas humanamente previsível, no reverso, o que impõe a prevalência do princípio da garantia, um dos vértices da Lei 8.078/90.

Entenda-se, por esse prisma, que o fabricante não se isenta de responsabilidade sob o argumento de desconhecer o vício do produto. Do contrário, cairia por terra todo o sentido humanístico e lógico do Código de Proteção ao Consumidor.

Nesse sentido, a Professora ODETE NOVAIS CARNEIRO QUEIROZ, leciona que

" mesmo desconhecendo tais vícios, o fornecedor não se isenta "" (pg. 46, g.n.), merecendo ressalva a prudente observação do idealista e Professor ANTONIO HERMAN DE VASCONCELLOS BENJAMIN, no tom de que a inadequação do vício de qualidade gera presunção *jure et de jure* de falha ( pg. 112), ditando a emérita Professora MARIA HELENA DINIZ, nesse perfil, que a responsabilidade do fornecedor por vício de quantidade e de qualidade por insegurança, relativo à tutela da incolumidade física do consumidor é objetiva, marcando-se que o vício de inadequação ou mau desempenho gera a referida presunção absoluta, mesmo em sede de prestação de serviços ( pág. 45 ).

RG-00295



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

25

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Além de tudo isto, os juristas **GABRIEL A. STIGLITZ e RUBÉN S. STIGLITZ**, em exame profundo sobre a defesa do direito dos consumidores, expressam que " *Las Directrices de las Naciones Unidas* ", marcam *"una serie de mandatos"*, entre os quais destaca-se a *"prevención y protección efectiva contras las práticas que puedan perjudicar los interesses económicos de los consumidores"* (Derechos y Defesa de los Consumidores, Ediciones La Rocca, Buenos Aires, 1994, pág.

Prevenção, sim, esta é a palavra. Prevenção com responsabilidade. Prevenção como princípio. Prevenção com elo de confiança. Prevenção como garantia. Prevenção como ponto de apoio. Prevenção, enfim, para que haja proteção do usuário do produto. Essa é a única razão de ser de uma Lei modelar, para o mundo todo, como é a **nossa Lei de consumo**, sem prejuízo, por natural e intuitivo, da luz que se distribui do enunciado ditado pelas Nações Unidas.

Não se esqueça, jamais, que o orgulho do bom produto não está no hoje, mas no amanhã. A esse propósito, leia-se, quem quiser, o relatório que registrara a existência de resíduos de benzeno na famosa água " *Perrier* " (*Food and Drug Administration* FDA) e constate-se a postura do fabricante, seu investimento na correção e fundamentalmente seu reconhecimento na falha e posterior reconquista de mercado. Há, *data venia*, certa educação nessa conduta. O futuro não é patenteado, como o produto. Dele virá o ensinamento. Até lá ...

O reverso falhou, não funcionou como previsto, apesar do empenho de seu fabricante. Falhou, repita-se, talvez em medida não expressiva, mas, **ao arrepio da alma**, deixou de funcionar em momento significativo e o suficiente para proporcionar - **sem a revelação de concausa outra, séria e decisiva** -, a queda da aeronave Fokker 100 da TAM.

RG-00296



26

**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III — São Paulo

Tivesse, portanto, funcionado o reverso, qual a expressão que teríamos hoje ?!

Por isso, é delicado, mas deve ser dito, que não se deve viver o regime da profissionalização do não dano. Tudo que deve funcionar coligado impõe a responsabilidade de todos os fabricantes de todos os componentes (produtos), a bem da harmonia do conjunto, tal e qual, em simples analogia desafiadora, pelo reverso, a desarmonia da orquestra pelo episódico, aparentemente secundário e sazonal, desafino do músico que toca a "tuba" e compromete todo o espetáculo.

Há, sem mais, solidariedade passiva objetiva entre todos os partícipes do processo produtivo, criação essa ditada por um modelo legal extraordinário (artigos 7, 18, 25, 28 e 34 da Lei 8.078/90), inovação merecedora de aplauso, como ensina o ilustre Doutor JOSÉ GERALDO BRITO FILOMENO    (Código Brasileiro de Defesa do Consumidor, comentado pelos autores do Anteprojeto, Forense Universitária, 2ª ed., pág. 75), autorizando-se o direito de regresso autônomo e independente, como é sabido.

Assim, não há como não concluir que o reverso não funcionou. Não era e não comprovou sua eficácia, sua perfeição. Dormia. Esse foi seu defeito. O que daí desbordar não é assunto que interesse ao consumidor. Nem mais, nem menos.

Neste instante, o Doutor LUIZ ANTONIO RIZZATTO NUNES, magistrado de escol, homem que tem a relação jurídica de consumo presente no seu dia a dia, estudioso e excepcional especialista no tema, mostra, com sutileza que:



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

27

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

" *O defeito, por sua vez, pressupõe o vício.* Há vício sem defeito, *mas não há defeito sem vício. O vício é uma característica inerente,* intrínseca do produto *ou serviço em si* " (Comentários ao Código de Defesa do Consumidor – Direito Material, Ed. Saraiva, 2000, pág. 157).

O não-funcionamento, pois, é o defeito originado do vício da imprevisão do previsível, como já marcado. O defeito, revela, o ilustre Professor, com sua autoridade,

" tem ligação com o vício, mas, em termos de dano causado ao consumidor, é mais devastador " ( ob. Cit., pág. 158).

Assim cravado, arremate-se que a expressão substantiva "defeito" escrita no art. 12, *caput*, do Código do Consumidor, merece interpretação elástica, expansiva mesmo.

Vem do eminente RIZZATTO NUNES a verdadeira exegese, no plano de que:

" Como norma protetora do consumidor deve-se entender que o elenco das hipóteses aventadas é meramente exemplificativo. Qualquer outra possibilidade ligada ao produto, <u>quer antes, durante ou após o processo de fabricação, pode implicar a qualificação do defeito – que sempre gera dano</u> " (ob. Cit., pág. 160).

RG-00298



28    3033

**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III — São Paulo

Além disso, em página criteriosa, a estudiosa e especialista Professora Doutora **CLÁUDIA LIMA MARQUES**, após citar o mestre italiano **GUIDO ALPA**, levanta que:

"Em matéria de responsabilidade civil, o principal valor a ser protegido pelo direito deve ser o efetivo e rápido ressarcimento das vítimas. O CDC para alcançar este fim afasta-se do conceito de culpa e evolui, no art. 12, para uma responsabilidade objetiva, do tipo conhecida na Europa como responsabilidade "não-culposa.

A tendência em direito comparado é atribuir ao *fabricante* a responsabilidade extracontratual pelos danos causados ao consumidor por produtos defeituosos. O CDC adere a essa tendência, modificando o sistema brasileiro que exige a culpa própria (falha na esfera de sua atividade) para a responsabilização " ( Contratos no Código de Defesa do Consumidor, Biblioteca do Direito do Consumidor, 3ª ed., 3ª tiragem, 1999, Ed. RT, pág. 620).

Se, tanto por tanto, existe a prova do dano causado aos autores, bem como o nexo de causalidade entre ele (dano) e o produto (consoante a revelação objeto da prova produzida), com a clara indicação do defeito do reverso, decorrente de vício intrínseco, sendo certa a indicação do responsável por esse produto e ausentes as excludentes de responsabilização previstas no art. 12, parágrafo 3º, da Lei 8.078/90 (no tom de que o fabricante não colocou o produto no mercado; que, embora haja colocado o produto no mercado, o defeito inexiste, ou que houve culpa exclusiva do consumidor), é inescapável o dever de indenizar, sem prejuízo de verificar-se a inteligência e o alcance do art. 7º e seu parágrafo único c/c os arts. 25, parágrafos 1º e 2º e 34, todos do Código de Proteção do Consumidor, certo que é incabível transferir-se a culpa exclusiva a terceiro, ainda mais sem a concreta demonstração de sua imunidade ao ciclo de produção.

RG-00299



PODER JUDICIÁRIO
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

29

**Juízo de Direito da 2ª Vara Cível do Foro Regional III — São Paulo**

Assim sendo, conquanto o Código de Defesa do Consumidor, mesmo após quase dez (10) anos de vigência, venha recebendo certa cerimônia em sua utilização e aplicação, apesar de sua enorme força normativa, como ensina o ilustre civilista **GUSTAVO TEPEDINO** ( Temas de Direito Civil, Ed. Renovar, 1999, pág. 237), é possível compreender sua ideologia é enxergar uma sociedade atarantada e afetada pela complexidade tecnológica, com produtos e produtos ao lado de propaganda em massa, tudo a criar certa desindividualização do produto e despersonalização dos protagonistas da relação de consumo, o que permitira ao mencionado mestre considerar que

" O defeito que gera acidente, comumente chamado de vício de insegurança, relaciona-se não propriamente à capacidade intrínseca ao produto — de provocá-lo, senão à sua desconformidade com uma razoável expectativa do consumidor, baseada na natureza do bem ou serviço ... " (ob. cit., pág. 240), o que, em avanço decisivo, leva o aludido autor a dizer que isto visa tutelar " a incolumidade do consumidor ", com a " sobreposição conceitual do conteúdo sobre a forma " (pág. 241).

Sublinhe-se, ademais, que " essa unidade de fundamento da responsabilidade do produtor impõe-se, pois o fenômeno real dos danos dos produtos conexos ao desenvolvimento industrial é sempre o mesmo, o que torna injustificada a diferenciação ou discriminação normativa do lesado, credor contratual ou terceiro consoante ensinamento do comentarista português JOÃO GALVÃO DA SILVA ( Responsabilidade Civil do Produtor, Coimbra, Ed. Almedina, 1990, pág. 478, ob. cit., pág. 239), o que neutraliza qualquer dinâmica atenuante pelo teórico mau funcionamento de componente outro do produto (visto como um todo), gerando - sem esquecer que a sistemática do Código de Defesa do Consumidor é apoiada na responsabilidade objetiva, prescindindo-se, por isso, da comprovação de culpa do responsável legal, assim, o puro e objetivo dever de indenizar, o que, a propósito, leva **GUSTAVO TEPEDINO** a afirmar que

50.TB.025

RG-00300



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

**Juízo de Direito da 2ª Vara Cível do Foro Regional III — São Paulo**

" não é dado ao responsável legal eximir-se do dever de indenizar com base na prova de ausência de culpa " (ob. cit., pág. 239), limpando-se os céus, portanto, em favor de que os consumidores têm o direito material e a legitimidade de expectar pela segurança dos produtos, simples somatória da chamada

" *concepção coletiva da sociedade de consumo* "
(JAMES J. MARINS DE SOUZA, Responsabilidade da Empresa pela Fato do Produto, Ed. RT, 1993, pág. 153).

Nessa quadra, a atribuição objetiva do vício oculto só pode ser debitada aos fabricantes. Jamais aos usuários do produto.

Pare-se, agora, para lembrar que o consumidor é vulnerável. Fixe-se, com ânimo que sabe da verdade, que o princípio da vulnerabilidade tem relevo basilar nesse mundo consumerista. Adite-se e difunda-se, com racionalidade, esse elemento ao caso dos autos. Em seguida, some-se a necessidade de uma **igualdade real** entre o fabricante e aqueles elencados no artigo 12, *caput*, da Lei 8.078/90, em face do consumidor. Concluir-se-á, afinal, que sem racionalizar-se essa distância e sem que o fabricante prove, **sem delongas**, como pode, também pela inversão do ônus da prova (artigo 6º, VIII, da Lei 8.078/90 ), a verdadeira eficácia passada, presente e futura de seu produto, não há, no campo jurídico, como escusá-lo do dever de reparar os danos suportados pelos consumidores, sejam eles quais forem.

Especiais, nessa parte, as palavras da estudiosa MARIA TERESA Q. GONÇALVES, ao dizer que:

30.18.025



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

" **Los derechos de los consumidores son una consecuencia direta de la reivindicación de una igualdad real**, del reconocimiento del derecho a la participación de todos los cuidadanos y del modelo del Estado social del Derecho" ( La Protección de los consumidores y usudrios y la Constitución española de 1978, Madri, 1986, pág. 20).

A responsabilidade objetiva que nasce da relação de consumo impõe, por ordem lógica, que o fabricante deve responder por todas as hipóteses e por todas as etapas do chamado "fato do produto", máxime porquanto o risco da atividade que vem do produto e sua respectiva serventia (art. 6º, VI, do CDC), não pode e não deve servir de anteparo contra o consumidor, salvo, *data venia*, com a chancela do malversar a mencionada Lei ( 8.078/90) e os princípios constitucionais da cidadania, da proteção e defesa do consumidor, da ordem pública e do interesse social (art. 1º II c/c arts. 5º, XXXII e 170, V, todos da Constituição da República Federativa do Brasil), especialmente dentro do terreno da segurança do consumidor (artigo 6º, inciso I, da Lei 8.078/90).

A proteção da segurança do consumidor, sem óbice nenhum, merece especial atenção, articulando **PARRA LUCAN**, comentário adequado ao caso em exame, no plano de que:

" **Los problemas de salud y seguridad son de los más importantes que planteá la protección del consumidor** ", averbando-se que

" **La protección de la salud y la seguridad de los consumidores es un corolário del próprio derecho a la vida (y la integridad física)** dela persona humana, **reconocido en los textos internacionales y constitucionales de nuestro entorno** " ( Comentários extraído do estudo da Dra. VIVIANE COÊLHO DE SÉLLOS, Revista de Direito do Consumidor, no. 11/130)

50.18.025

RG-00302



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo**

Por essa ótica, leciona o eminente catedrático e jurista NELSON NERY JÚNIOR (RDC, RT, vol. III, pág. 58). Em igualdade, desenlaça o Professor LUIZ GASTÃO PAES DE BARROS LEÃES, mostrando a incontrolável difusão de danos decorrentes do uso de produtos defeituosos ( A Responsabilidade do Fabricante pelo Fato do Produto, Saraiva, pág. 12), tudo a chamar a atenção do julgador para a alteração do enfoque voltado para não privilegiar a atividade produtiva, contra o consumidor, sua razão de ser, salvo com a prova da competência tão esquecida como a história (em especial a partir da revolução industrial), que ensina, ensina, mas os fatos repetem-se e com eles os danos.

Neste exato momento, anote-se, para sempre, para descansar um pouco na leitura desta sentença, o escrito de ALAIN FINKIELKRAUT, onde discute a relação do homem de hoje com a História, comentando que o homem contemporâneo parece que já não se considera como herdeiro de um passado, e que " a verdadeira humanidade ainda está por vir " ( A Ingratidão, Ed. Objetiva, 2000, pág. 175), o que nos remete às profundezas de nossos dias e responsabilidades.

Com essas diretrizes, não é demais desatar, sem chegar-se na teoria da solidariedade social de LEON DUGUIT, que não se pode dar honra e dignidade ao homem, material, espiritual e até antropológica, sem, primeiro, necessariamente, distribuir a Justiça como meio de aplicação de força social e da conquista da cidadania.

O Código do Consumidor é, antes de tudo, uma lei humanista. Racionaliza a verdade, tempera a disparidade de forças entre os contratantes e banha a relação jurídica, o ser e a coisa (produto) , com uma boa dose de moral.

30.18.025

RG-00303



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo**

É claro que isto pode trazer à lume inúmeras opiniões. Antes, porém, viva-se que muitos códigos centenários e Leis casuístas não conhecem e não quiseram conhecer a indústria de massa, a revolução tecnológica, os intermediários, o modelo societário atual, a família do século 21 e a criança do amanhã.

Parece que é melhor, para alguns, aplaudir a guerra, porque as vidas ceifadas pouco importam. Relevante, para esses, é produzir armas, bombas, sistemas de comunicação para lugares inóspitos, aeronaves de combate, etc... **Ostentar o consumo e lucrar**. Não é, com um coração vivo, o ânimo das rês, mas é o que o homem vê na sociedade, consoante nos ensinam apenas os últimos cinquenta (50) anos: Hiroshima, Vietnã, Iraque e o Golfo, Palestina, Bósnia, Kosovo e outros fabricantes que o digam.

Falta benquerença, sobra consumismo, mesmo fazendo-se ciência.

Por isso, não é demais trazer à lume as palavras do Professor **RICHARD PHILLIPS FEYNMAN**, físico que trabalhou no conhecido Projeto *Manhattan*, o programa norte-americano que desenvolveu a bomba atômica, ao desabafar com a autoridade de um titular do Prêmio Nobel de Física, que:

" **Então, realmente, precisamos dar uma olhada nas teorias que não funcionam e na ciência que não é ciência** " ( Deve Ser Brincadeira Sr. Faynman, tradução Cláudio Bentes David, Editora UnB, Imprensa Oficial, 2000, pág. 377).

O que mais dizer ...

RG-00304



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

34

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Sinto, por tudo isto, como leciona o mestre Chiovenda, que sentença é sentir, que esta é a única Justiça que pode ser tentada nesta tragédia. O que daí desbordar, *data venia*, é o coro que o desencanto faz a discórdia.

A co-ré, por isso, deve reparar todos os danos postulados, sem uma única exceção.

Por outra ótica, podem alguns, como queiram, sustentar o arrepio da fatalidade.

Desarme-se, contudo, que se fatalidade tivesse havido, deve ser ela reparada perante quem tem o lucro de atividade concedida e supervisionada pelo Estado . Não cabe debitá-la ao flagelo negativo da omissão descompromissada, salvo homologando-se o mal estar, o que não se fará.

Simples, simples mesmo, é rendermos nossa solidariedade, as vezes meramente velada, às famílias atingidas pelo luto e pela permanente dor.

Por isso, sinto que a pretensão é jurídica, adequada, séria, bem dirigida, consentânea com o direito moderno e sua projeção na sociedade, mormente na área de consumo, lógica, baseada na eqüidade, nos princípios gerais de direito e marcadamente JUSTA.

RG-00305



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo**

Nem é preciso dizer que não se aplica o Código Civil – como cravado – e, em natural não identidade, o Código Brasileiro do Ar. Essa legislação, como é sabido, não guarda incidência em hipóteses como a dos autos. Aplicável, sob pena de negativa de vigência de uma Lei que vem chamando a atenção do mundo (atualmente o México e a Venezuela utilizam o nosso Código do Consumidor como molde para a reforma de suas leis, ( cf. **Antonio Herman Benjamim**, RT Informa, no. 7, maio/junho 200, pág. 5), a Lei 8.078/90, ou seja, o especial Código do Consumidor.

Nesse sentido, o Egrégio Superior Tribunal de Justiça, ainda que em situação não idêntica àquela dos autos – até por evidente –, reconheceu que não há lugar nenhum para a indenização tarifada em caso de acidente aéreo (RESP 6052/SP, rel. Ministro **CLÁUDIO SANTOS**), o que já é bastante para afastar o engano que vem do ânimo do não indenizar, posto que indenização insuficiente é o mesmo que não reparar.

**ARAKEN DE ASSIS**, Professor e Desembargador Mineiro, em voto ímpar (TJRS, Ap. 597.187.277), explica que ao transporte aéreo se aplicam as disposições do Código do Consumidor, o que vem sendo repetido (JTACSP, Lex, 152/173, relator Juiz **JOAQUIM GARCIA**; Ap. 623.538/9, relator Juiz **TORRES JÚNIOR** e Ap. 629.715/00, relator Juiz **ANTONIO DE PÁDUA FERRAZ NOGUEIRA**), dentre outros.

Não se esqueça, com todo respeito, que o Código do Ar, *data venia*, parece mais preocupar-se com a mercadoria (carga, bagagem), do que com o homem.

Sinal daqueles tempos.



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

      Em outro momento, feche-se que o eminente RUI STOCO, em conhecida obra, em nota específica, desenha que no " mais das vezes, o acidente ocorre não por omissão, desídia ou má atuação do transportador aéreo, mas por defeito de construção ou fabricação da aeronave "     (Responsabilidade Civil e sua Interpretação Jurisprudencial, RT, 4ª ed., pág. 164),    o que se alinha às lições do mestre italiano GUIDO ALPA (    citação da Professora Cláudia Lima Marques, ob. cit., pág. 622) e do Professor e Promotor de Justiça      ANTÔNIO HERMAN BENJAMIN ( Código de Defesa do Consumidor, Forense Universitária, 1991, pág. 55), tudo apropriado à hipótese discutida nestes autos.

      Festeje-se, para as novas gerações, para os pais, filhos, mulheres, maridos, companheiros, irmãos dessas famílias reduzidas pela queda da Fokker 100 da TAM, que está havendo correção de rumo no julgamento de casos tais, o que se não resolve tudo, contribui, creio, para a diminuição, quiçá a extinção, de condutas mais assanhadas pelo lucro do que pela real segurança do homem.

      Isto, permita-se escrever, é a estirpe de uma cidadania democrática. Ou a Lei sai do papel e é aplicada com espírito humanístico e social (artigo 5º da LICC), ainda que isto importe em críticas, sem espancar – nunca – a sensatez, ou ter-se-á o frequente faz-de-conta, alimento da descrença e do descrédito.

      Não é, compreenda-se, a vitória do fraco sobre a super-potência econômica, como talvez estes ou aqueles venham a criticar esta sentença. Não é.    É o comando de deixar que a correnteza da Lei 8.078/90, com nascedouro na Constituição Federal, como apontado linhas atrás, escrita com tanto zelo, ética, preocupação, comparação, juridicidade, atualidade e visão de     futuro,       desemboque no mar da Justiça.

RG-00307





**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

37

Juizo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

          Tenho, assim, de forma segura e convicta, após muito refletir sobre este caso, que a responsabilidade objetiva declarada no artigo 12 da Lei 8.078/90 (Código de Proteção ao Consumidor) não foi escrita pelo legislador com vocação outra que não fosse salvaguardar o consumidor do famoso "empurra-empurra", ou "eu não", buscando-se, como já se fez na Europa, no pós-guerra, a socialização do prejuízo, quando este, como neste caso, tem causa comum e nenhuma responsabilidade por parte das vitimas, ou de terceiro seguramente definido, certo que até as calamidades podem ser previstas, consoante leciona SERPA LOPES (Curso de Direito Civil, Ed. Freitas Bastos, 4ª ed., pág. 405).

          No particular, alguns teimam, contudo, em não querer ver o que alma enxerga e a população sente silenciosa.

          Oportunas, por isso, as palavras de CARLOS MAXIMILIANO, ligadas à interpretação da lei, no raciocínio de que em casos da envergadura deste, não deve o Juiz desenvolver atividade meramente intelectual. Nestes casos, " o juiz é um sociólogo em ação, um moralista em exercício, competindo-lhe vigiar pela observância das normas reguladoras da coexistência humana, prevenindo e punindo as transgressões " (Hermenêutica e Aplicação do Direito, Ed. Freitas Bastos, pág. ), mantendo-se sempre a preocupação com a equidade ( LUIZ ANTONIO RIZZATTO NUNES, ob. cit., pág.21) , alertando-se para a axiologia, ponderando o sábio CÂNDIDO RANGEL DINAMARCO, que

          " o juiz indiferente às escolhas axiológicas da sociedade e que pretenda apegar-se a um exagerado literalismo exegético tende a ser injusto " (A instrumentalidade do Processo, RT, 1987, pág. 274/75).



P O D E R   J U D I C I Á R I O
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO



**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo**

Por tudo isto, é a justa a procedência da ação, bastando definir-se qual indenização, mormente na seara do dano moral, é firme, humana, ponderada, não aviltante, eficaz e adequada.

Antes do arbitramento, crave-se que nenhuma quantia é capaz de restaurar esse gravíssimo maltrato, fixo ultraje.

A morte antecipada por um ato ilícito, ainda mais tão abrupta e violenta, como aquela vivida neste caso, cujas vítimas fatais transformaram-se e ficaram reduzidas a cadáveres irreconhecíveis ( fls. 2157/2165 ), não tem, em visão clara e aberta, nenhuma compensação capaz de ser valorada em dinheiro.

O sofrimento – permanente - é interior, abala a alma, incomoda o acordar, deságua no espírito, gera angústia, decepção, aflição, perda do ponto de referência, vácuo, padecimento, dor e causa a cólera da impotência e do abismo.

**Não tem preço, por mais elevado que seja.**

É irreparável.

Mesmo assim, o reparo moral tem sua função: compensar o incompensável, sem perder de vista o caráter punitivo dele inerente.

De qualquer modo, o direito evoluiu. No passado, opiniões respeitáveis como as dos eminentes GABBA, LAFAIETE e LACERDA DE ALMEIDA, dentre outros, representavam a corrente dos opositores da reparação do dano moral, como mostra CHRISTINO ALMEIDA DO VALLE (Dano Moral, AIDE Editora, 1999, pág. 18), embora a partir dos ensinamentos de CARVALHO DE MENDONÇA, TEIXEIRA DE FREITAS, AGUIAR DIAS, CLÓVIS, PONTES DE MIRANDA, PEDRO LESSA e OROZIMBO NONATO (ob. cit., pág. 23), sabendo-se que a reparação dos danos morais nunca foi negada pelos romanos, levantando-se a *actio injuriarum aestimatoria* (ob. cit., págs. 31/32), começava-se a conquistar a possibilidade de indenizá-lo, restaurando-se o equívoco daquelas primeiras exegeses.



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO



**Juízo de Direito da 2ª Vara Cível do Foro Regional III — São Paulo**

PEDRO LESSA, aliás, dizia que o dinheiro pode compensar o dano moral. Contudo, não há compensação completa, como seria ideal, "porque a vida não pode ser restituída" (ob. cit., pág. 74) e a " dor retira a normalidade da vida, para pior ", completa PONTES DE MIRANDA (Tratado de Direito Privado, RT, 3ª ed., 1984, T. XXVI, pág. 32, n. 2).

Hoje, com o referido progresso, é rica a doutrina moderna em lecionar sua indenizabilidade, mormente a partir da Constituição Federal de 1.988 e do surgimento da Súmula 37 do Egrégio Superior Tribunal de Justiça.

Ilustres doutrinadores, entre os quais CARLOS ALBERTO BITTAR ( Reparação Civil por Danos Morais, 3ª ed., ), ANTONIO JEOVA SANTOS ( Dano moral Indenizável, LEJUR, 2ª ed., 1999, pág. 234) YUSSEF SAID CAHALI ( Dano Moral, RT, 2ª ed., 4ª tiragem), HUMBERTO THEODORO JR. (Dano Moral, Ed. Juarez de Oliveira, 3ª ed., 2000), CLAYTON REIS ( Avaliação do DanoMoral, Ed. Forense, 2ª ed., 1999) e ARTUR OSCAR DE OLIVEIRA DEDA ( A Rparação dos Danos Morais, Ed. Saraiva, 2000), descortinam o grau e a importância de indenizar o dano **extrapatrimonial**.

CLAYTON REIS, Professor e Magistrado no Paraná, em desenvolvimento hermenêutico sensato, ilumina que:

" Trata-se de uma lesão que atinge os valores físicos e espirituais, a honra, nossas ideologias, a paz íntima, a vida nos seus múltiplos aspectos, a personalidade da pessoa, enfim, aquela que afeta de forma profunda não os bens patrimoniais, mas que causa fissura no âmago do ser, perturbando-lhe a paz de que todos nós necessitamos para nos conduzir de forma equilibrada nos tortuosos caminhos da existência " ( ob. cit., pág. 205), impondo-se a compensação à vítima atingida pela ofensa não patrimonial, a qual representa " uma maneira de penalizar o ofensor para o fim de dissuadi-lo ao cometimento de novas ações lesivas ao interesse individual e social " (ob. cit., pág. 205).



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juizo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Nesse horizonte, no entanto, ainda não atingimos um estágio da madureza do reparo moral, na quadra pertinente à exata fixação do justo valor indenizatório, o que dificulta – sobremaneira – o encontro de uma soma adequada para atenuar o verdadeiro holocausto provocado pela queda do Fokker 100, da TAM.

Essa tarefa precisa ser vencida. O *quantum*, segundo a opinião quase unânime, deve servir como desestímulo a novas agressões, representando uma séria advertência ao autor do ilícito, devendo refletir em seu patrimônio e potencialidade, não podendo ser tão elevado que possa gerar o descanso do enriquecimento repentino, mas também não pode ser simplesmente simbólico que seja estímulo e adubo da zombaria e do descrédito das decisões judiciais.

Esse simbolismo, *data venia* das autorizadas vozes em sentido contrário, contamina o próprio fim e utilidade do processo, devendo ser evitado com argúcia e sabedoria, ainda que se perceba - em casos outros -, a já denominada indústria do dano moral (RT 757/298), com o anúncio de indenizações milionárias, como aquela de US$ 34.000.000,00 (cf. **WLADIMIR VALLER**, Dano à pessoa e sua indenização, RT, 1994, pág. 257).

A esta altura, margeie-se que na Europa, em particular na Itália, França, Espanha e Portugal, constata-se a decisiva preocupação com a tutela ampla dos danos morais. No Uruguai as indenizações sobre danos não patrimoniais vêm atingindo valores crescentes, sem esquecer-se que nos Estados Unidos da América e na Inglaterra essas reparações " **são elevadíssimas, de forma a reprimir de forma profunda a ação dos lesionadores** ", tudo consoante o retrato da pesquisa do Mestre da Universidade Federal do Paraná (ob. cit., págs. 206/207), o que merece registro e cuidadosa atenção do julgador.

RG-00311



41

**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

        Note-se, antes de prosseguir, que não salta do processo a imagem de que os autores perseguem dinheiro, por dinheiro, nem tampouco que almejam vingança, desforra, ou enriquecer-se à custa da ré. **Já perderam suas riquezas.** Nada lhes pagará, não havendo imoralidade na busca daquela indenização que se projeta dos estados d'alma humana (RT 650/64, relator Desembargador WALTER MORAES), adjetivando-se que a **lesão moral sem justa recomposição perpetuaria o desequilíbrio sócio jurídico** (RT 631/29), o que é mais grave e deve ser evitado, certo que o magistrado é o hermeneuta dos valores da sociedade na qual está inserido, devendo procurar interpretá-los na busca da paz social, desnudando-os, inclusive.

        Este é, sem devastar, seu maior compromisso legal e social.

        De uma forma ou de outra, observa a doutrina, com fundamentação sólida e traduzida no cunho compensatório e quiçá punitivo dessa modalidade indenizatória, que o dinheiro, no dano moral, aparece como um instrumento capaz de fazer gerar a alegria e esta alegria será o justo preço da dor causada, segundo dita o i. WILSON MELO DA SILVA (Dano Moral e sua Reparação, pags. 614/15), o que, ainda que seja ousado, não é de se negar.

        Buscam os autores desta ação, com a paciência dos monges, uma satisfação, que ninguém lhes quer dar. São, ainda, obrigados a dormir com o som da voz antiga e desatualizada, meio abjeta, daqueles que clamam pela improcedência, por falta de provas de sua ineficiência ... e de que a culpa é de terceiro, do alheio ...

        Será a crise da humanidade, ou a crise do direito, a crise do homem, a crise da transição, a crise da impunidade. É a crise do processo civil.

RG-00312



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

42—

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Nós, de fato, magistrados, advogados, membros do Ministério Público, Procuradores, Professores, Universitários, devemos empenhar nossos esforços para a transformação do processo, até agora marcado por um signo individualista, superando mitos da processualística tradicional.

Melhor, nas seguras lições da incansável Professora e condutora maior do processo civil na atualidade, a conhecida Doutora ADA PELLEGRINI GRINOVER, buscar a efetividade do processo, dele extraindo uma feição mais consentânea com certas exigências básicas do Estado social de direito, de modo a torná-lo operativo no plano substancial, reestruturando-o e adequando-o aos escopos sociais e políticos da jurisdição e à realidade da sociedade contemporânea ( O Processo em Evolução, Ed. Forense Universitária, 1998, págs. 10 e 15).

Nessa especificidade , o festejado ORLANDO GOMES, verdadeiro vulto do direito civil brasileiro, escrevera, há mais de quarenta e cinco (45) anos, mas com a espantosa atualidade, que os desajustamentos da ordem jurídica são reveladores da crise do direito, em especial do direito privado, positivando que:

" é todo um direito que está por se reconstituir e refazer. Desde as suas matrizes filosóficas às suas noções técnicas. Desde os seus pressupostos morais à nomenclatura dos seus institutos.
Em largos traços, poder-se-ia afirmar que o direito privado vive o terrível drama da dupla personalidade.

RG-00313



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

43.

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

     Enraizado em postulados filosóficos indefensáveis, estratificado em códigos decrépitos, orientado por critério obsoletos, modelado por padrões antiquados, vergado ao peso de preceitos excrescentes, mutilado, a cada instante, por inócuas reformas parciais que não obedecem a um pensamento unívoco, o direito civil não passa de um espectro, que se sustenta na força de uma tradição vacilante.

     Por mais carinhosa que seja a estima que devotemos ao seus preceitos codificados, maior ainda deve ser a nossa vontade de reanimá-los e rejuvenescê-los ". (A Crise do Direito, Max Limonad, 1955, pág. 22).

     Com tudo isto, apesar da tardança, não se pode desprezar o jovem e ético Código do Consumidor (Lei 8.078/90). Cuida-se de Lei Federal  reanimadora, forte, filosófica, real, não casuística, positiva e povoada por uma visão do amanhã. Só a sua concreta aplicação é que poderá descortinar uma nova mentalidade jurídica, empresarial, social e até estatal, afundando-se os pilares de uma indenização, vazada no dano moral, de feição constitucional, a qual não deve ficar fragilizada pela tradição do simbolismo. Do contrário, sem vacilações, os desajustamentos alinhados por **ORLANDO GOMES** continuarão e comporão as peças de um círculo vicioso.

     **YUSSEF SAID CAHALI**, em palavras muito oportunas, traz a citação de um V. Acórdão do TARS, a bem de considerar que " a indenização por dano moral não tem caráter unicamente indenizatório, mas também possui caráter pedagógico, ao servir de freio para que atos culpáveis como o da ré não voltem a se repetir " (ob. cit., pág. 177).

     O arbitramento do dano moral, por tudo isto, depende das particularidades de cada caso concreto, de modo a permitir a adoção de um critério próprio do julgador, pondera, com autoridade, o eminente Ministro **BARROS MONTEIRO** (Ag. 208837/RJ).

RG-00314



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Nessa espiral, tratando-se do mais expressivo ilícito moral (a morte violenta causada por ato ilícito), espalhado de forma tão heterogênea (homens, mulheres, jovens, pais, mães, pessoas entre vinte (20) e sessenta (60) anos de idade, em média) e destacado que a co-ré Northrop Grumman Corporation é uma das maiores empresas mundiais no cenário aeroespacial, é razoável e necessário dar atenção a algumas particularidades.

A marca do subjetivismo, que as vezes leva a comparações paradoxais, é a linha mestra. Deve ser evitada, contudo, a loteria jurídica.

Far-se-á, por isso, uma pequena comparação entre alguns V. Julgados.

Com efeito, o Egrégio Tribunal de Justiça de São Paulo, no julgamento de dano moral por discriminação de uma jovem, portadora de AIDS, por uma pessoa jurídica, com menos de trinta anos de idade, arbitrou indenização no valor de 2.000 salários mínimos ( hoje cerca de R$ 300.000,00 - Ap. cível 85.534-4/3-00, 9ª Câmara de Direito Privado, Relator Desembargador **THYRSO SILVA**).

Sem perder de conta, o Egrégio Primeiro Tribunal de Alçada (Emb. Infringentes nº 754.692/1, Relator o eminente Juiz **J.B. FRANCO DE GODOI**), na hipóteses da inclusão do nome de um Professor e Magistrado no rol dos devedores do SERASA e na lista do BACEN, pela emissão de cheque sem fundos, cuja talonário tinha sido objeto de furto nas dependências de uma agência bancária, arbitrara a indenização por dano moral na quantia que representar 1.000 salários mínimos.

Por sua vez, o Egrégio Tribunal de Justiça do Rio de Janeiro (RT 693/198), em V. Acórdão modelar, relatado pelo então Desembargador **CARLOS ALBERTO MENEZES DIREITO**, hoje nobre Ministro do Superior Tribunal de Justiça, no famoso caso da divulgação de notícia de que o cantor NEY MATOGROSSO era portador de enfermidade letal, arbitrara a indenização correspondente a 3.000 salários mínimos (hoje cerca de R$ 450.000,00).

RG-00315



45   3050



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III — São Paulo

Sem perder essas referências, o Egrégio Superior Tribunal de Justiça, manteve o valor da indenização de R$ 2.250.000,00, devida à viúva e sete (7) filhos de um homem eletrocutado na volta do trabalho, quando esbarrou com sua bicicleta no fio de alta tensão que estava atravessado no caminho (RESP 246181, Relator Ministro ARI PARGENDLER).

Tem-se, como os operadores do direito sabem, vários precedentes interessantes, por exemplo: a)- a condenação na quantia de R$ 20.000,00, por ato ilícito que gerou a amputação do pé esquerdo de um menor (RT 748/385); b)- a morte de presidiário ocasionada por outro detento ( RT 753/157); c)- a interrupção de uma gravidez (200 salários mínimos — RT 759/349); d)- a ofensa injusta à honra, decorrente da acusação infundada de furto ( 400 salários mínimos — RT 734/468); e)- a morte de uma mãe vítima de acidente de trânsito ( 1.250 salários mínimos, RT 769/365); f)- o envio de cartão de crédito sem solicitação, com o registro indevido no SPC (100 salários mínimos — RT 747/221); g)- infecção contraída por paciente em hospital ( quatro vezes o valor do custo da indenização a título de danos patrimoniais — JTJ, Lex, 162/68) e tantos outros, tudo a mostrar, sem maioria, o quão árida é a busca de um justo e equânime montante satisfatório.

Após essas considerações, bata-se que a vida humana é uma só. O rico e o pobre não podem ser desigualados, embora o sejam.

Certo é, in casu, que as vítimas, em sua quase totalidade, eram seres humanos que se diferenciavam por uma solidez intelectual, profissional e econômica, marcando-se que os jovens falecidos, pontuavam uma história que indicava um futuro promissor, havendo plausibilidade em aquilatar-se a posição socioeconômica dos ofendidos, ( JTJ, Lex, 196/91, Relator o Desembargador REBOUÇAS DE CARVALHO).

RG-00316



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

46    3052

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

É dado de relevo. Não deve, pois, ser relegado.

A par disso e já demonstrada a falta de uniformidade no encontro do correto valor, sem perder do fronte a necessidade de um julgamento **exemplar**, mas também pedagógico e evitando-se desmoralizar um instituto de tamanha vanguarda, aplicando-se a teoria do *"punitive damages"*, como lecionava o jurista, Professor e Magistrado **CARLOS ALBERTO BITTAR.**

A indenização, assim, deve ser    capaz de aprimorar a vida, traduzir credibilidade, ancorar esperança e decolar a oportunidade de um amanhã melhor, procurando não se traduzir em choque maior à alma atingida pela dor das mortes tão inaceitáveis.

Procurar-se-á descobrir, pois, uma soma que faça a ré sentir o dano que causara, sendo incontroversa sua possibilidade econômico-financeira, como frisado.

Deve essa indenização, adverte o grande Jurista e Professor **CAIO MÁRIO DA SILVA PEREIRA**, após ressaltar seu caráter punitivo e compensatório, ajustar-se a

" **uma soma que proporcione prazeres como** contrapartida do mal sofrido ", tendo

" **em vista as posses do ofensor e a situação** pessoal do ofendido "                         ( Responsabilidade Civil, Ed. Forense, 1992, n. 45, pág. 55), não escapando da mente a gravidade da falta.



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Por esse processo educativo e devotando-se, do verbo devotar, a tragédia da queda do Fokker 100, da TAM, à desumanização da relação de consumo e ao apego a um materialismo de filosofia consumista, procurando, ainda, consagrar a importância do valor moral, " **que se deve proteger tanto quanto, se não mais do que os bens materiais e interesses que a lei protege** " (RT 761/335) e sopesando todo esse conjunto, guardando-se que as vítimas fatais possuíam situação familiar e social estável, gozando de boa reputação e honradez, ao lado de saudável condição econômico-financeira e não existindo a revelação de impossibilidade material da co-ré Northop Grumman Corporation, - repita-se uma das maiores empresas mundiais no céu do consumo aeroespacial –, penso não ofender a lógica da vida a condenação, por dano moral, da referida fabricante da peça reverso, no pagamento da quantia de R$ 2.000.000,00 (dois milhões de reais) por família enlutada, cerca de US$ 1.111.111,11, quantia que não enriquece as vítimas e é capaz de não malbaratar a perturbação permanente proporcionada por uma das maiores decepções que um ato ilícito pode causar a todos, todos mesmo, evitando-se esta ou aquela distinção, sem pôr de lado as notícias veiculadas pela imprensa em geral, de que há tratativas de composição – há meses – pela quantia de cerca de US$ 800.000,00.

Nesse ponto, não é demais aprofundar-se que a referida importância produziria, nos dias de hoje (Junho de 2.000), se aplicada em caderneta de poupança, uma receita mensal de cerca de R$ 12.000,00 (doze mil reais) ou US$ 6.666,67, valor não anômalo e igualmente não distante da alta peculiaridade do processo, o que merece um instante a mais de reflexão e subsidia a pujança do primado de que a indenização não deve esvaziar-se por si mesma.

Arbitrado está, portanto, o dano moral, extrapatrimonial.

48 – 3053



**P O D E R    J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

No que concerne à pretensão de danos materiais, convém guardar-se a viabilidade da fixação de seus parâmetros gerais, dentro do aforisma *da mihi factum, dabo tibi jus* ( o juiz aplica o direito ao fato, ainda que aquele não tenha sido invocado – STJ- RJTJ 21/432, RTJ 105/1024, 115/392, RTJSP, 43/138, 50/281, 93/185, 115/119, dentre outros ) , acolhido pela sistemática processual civil ( **THEOTÔNIO NEGRÃO**, CPC e legislação processual em vigor, 28ª ed., nota 11 ao artigo 282), afastando-se apenas a possibilidade do reembolso das despesas com funeral, posto que não expressamente pedidas na inicial.

Com efeito, se dúvida não subsiste, portanto, de que havendo, como há, certeza no dever de indenizar da co-ré Northrop Grumman Corporation, à luz do Código do Consumidor, seguir-se-á a direção retilínea da composição dos imediatos danos patrimoniais experimentados pelas vítimas, os quais atrelam-se ao pagamento de 2/3 do último salário de cada um dos falecidos, enxergando-se  suas respectivas ocupações laborais lícitas e definidas, abrindo-se, na fase de liquidação, em tom excepcional, como a causa merece (dentro da já sublinhada efetividade do processo), a possibilidade de se comprovarem cada um desses focos, o que não é complexo e depende da simples juntada da cópia carteira de trabalho de cada qual e da comprovação do último salário percebido, ou elemento equivalente, prevalecendo o período de vida provável de sessenta e cinco (65) anos, como adiante pormenorizar-se-á, na parte dispositiva desta sentença.

Frise-se, porque fundamental, que a co-ré Northrop Grumman Corporation não impugnou especificamente esse crivo, embora a contestação registre o reconhecimento do expresso pedido de danos patrimoniais (fls. 1112/1116 – 6º volume), sendo seguro verificar-se que os autores pediram a exata condenação no pagamento de pensão alimentar ( fls. 12, n. 31 – 1º volume ), igualmente não contrariada pela referida co-ré, o que impõe a incidência do art. 334, inciso III, do Código de Processo Civil, tratando-se, assim, de matéria não impugnada e incontroversa, decorrência transparente do princípio da eventualidade  (art. 300 do Código de Processo Civil).

RG-00319



P O D E R   J U D I C I Á R I O
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Em outro ponto do processo, precisa ser apreciada a tese de denunciação da lide e conexão deduzida pela co-ré Northrop, em favor da inclusão no pólo passivo da lide das pessoas jurídicas **Fokker Services BV e Transportes Aéreos Regionais S/A;** carecendo de análise os inúmeros pedidos do ingresso de litisconsortes, após a prolação da decisão interlocutória que determinou a prestação de caução ( fls. 761/770 ).

Iniciar-se-á pela equação da denunciação da lide e elo conectivo.

Embora bem escrita, não é cabível essa temática ampliativa, posto que a denunciação da lide

" por ser um complicador processual por excelência, é incompatível com o objetivo traçado pela Lei 8.078, de 1.990, de fornecer proteção rápida e eficaz a toda pessoa física ou jurídica que adquire ou utiliza produto ou serviço como destinatário final, e a mais ninguém " JTJ, Lex, 148/405, Relator Desembargador SOUZA LIMA, *in* Código de Defesa do Consumidor e sua Interpretação Jurisprudencial, obra elaborada pelo Professor e Magistrado LUIZ ANTONIO RIZZATTO NUNES, Ed. Saraiva, 2ª ed., 2000, pág. 413).

No mesmo sentido, é o V. Acórdão (JTJ, Lex, 183/175), Relator o Desembargador MAURICIO VIDIGAL e aquele Relatado pelo então Desembargador, hoje ilustre Ministro FRANCIULLI NETTO (AI 32.628-4-SP, j. 18.2.97).

Essa dinâmica e visão moderna, tanto por tanto, é consequência inexorável da inteligência do artigo 88 do Código do Consumidor, lembrando-se que a ação de regresso é o caminho natural que os litisdenunciantes detém em face daquele (s) perante quem entendem possuir eventual direito regressivo. O caminho para estes, sem escape, é a ação autônoma regressiva.

RG-00320



50

**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo**

RIZZATO NUNES, ademais, explica que a;

" sistemática necessária do texto normativo do Código de Defesa do Consumidor leva à conclusão de que o que norma pretende é proibir *sempre* a denunciação da lide, como forma de garantir a celeridade processual em busca do benefício do consumidor lesado ..." (ob. cit., pág. 417).

Por esses fundamentos, é firme a proibição de denúncia da lide nas ações lastreadas no Código do Consumidor, sendo esse o magistério de **ARRUDA ALVIM, TERESA ALVIM, EDUARDO ARRUDA ALVIM e JAMES MARINS** ( Código do Consumidor Comentado, Ed. RT, 2ª ed., pág. 413).

Rejeito, assim, a denunciação requerida a fls. 1086/1092 ( 6º volume) e afasto a tese de conexão, por absoluta falta de identidade entre a causa de pedir próxima, distinguindo-se que a malha desta centra-se em dever extracontratual, sob a ótica do Código do Consumidor, bem diferente daquelas apontadas. Aprofunde-se, ainda, que a conexão é instituto imaginado para dar celeridade ao processo (MOACYR AMARAL SANTOS, pág. 262), sendo primoroso que não se desnature sua *ratio*, o que dar-se-ia com a imagem trazida na contestação.

Quanto ao litisconsórcio postulado após a preclusão temporal da decisão interlocutória de fls. 817 ( 4º volume ), é importante considerar que o Código do Consumidor contém regra direcionada à obrigatoriedade do litisconsórcio ligado às ações coletivas envolvendo a defesa de interesses individuais homogêneos, consoante dispõe o art. 94 da Lei 8.078/90. Não é o caso dos autos.

A hipótese, pois, é de litisconsórcio ativo facultativo, consoante, ademais, o V. Acórdão do Egrégio Superior Tribunal de Justiça, no plano de que " em ação indenizatória, o litisconsórcio é sempre facultativo, seja ativo ou passivo, podendo cada um dos prejudicados, isoladamente (ou em conjunto) pleitear, em juízo, o ressarcimento " (Resp 35.496-0, Relator o Ministro DEMÓCRITO REINALDO – oportuna citação de fls. 2801 – 15º volume ).

RG-00321



51

**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

**Juízo de Direito da 2ª Vara Cível do Foro Regional III — São Paulo**

Além disso, na especialidade deste processo, não é de se acolher os pedidos de intervenção litisconsorcial deduzidos após a prolação do despacho de fls. 761/770, porquanto tal — se admitido — teria o condão de ferir o princípio do Juiz natural, atingindo o texto do artigo 251 do Código de Processo Civil.

Assim deve ser, a bem de não contrariar a seriedade do apontado princípio, o qual também busca evitar que a parte escolha o juiz da causa, postulado de ordem moral, como muito bem gizado pelo eminente Ministro **ARI PARGENDLER** ( Resp. 87641/RS — fls. 2802 - 15º volume ).

Nessa modelagem, indefiro todos os pedidos deduzidos a partir da preclusão do despacho de fls. 817 ( 4º volume ).

Defiro, contudo, a inclusão no pólo ativo da ação, requerida a fls. 480/486 ( 3º volume ) por **MARIA TERESA CAIADO BALASSIANO, DIANA CAIADO BALASSIANO, BRUNO CAIADO BALASSIANO, ANDRÉ LUIZ BARCELLOS RODRIGUES, ALEXANDRE AUGUSTO BARCELLOS RODRIGUES** e **ANA CRISTINA BARCELLOS RODRIGUES**, viúva e filhos de Félix Elias Ballassiano e Francisco José Rodrigues, respectivamente, falecidos na referida tragédia, assim como em favor de **NAIR DE CARVALHO JANSTEIN, MARIA CHRISTINA JANSTEIN** e **ELISABETH JANSTEIN**, viúva e filhas de Wolfgang Hans Janstein.

Para fechar esta sentença, cubra-se que Direito não perde sua relação com a História, na medida em que participe do fato social.

A história dos povos é seu germe.



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

52

**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo**

Não é invenção da fantasia humana e – muitas vezes – é o direito que dá nascente a uma nova mentalidade à civilização, isto porque tem função educativa. É elo e canal – sem desprezo às funções das demais ciências – indispensável ao aprimoramento do próprio homem, enquanto pessoa humana, ainda mais no almejado Estado Democrático de Direito.

Não cabe zombar da paciência da sociedade. Frustada deve ficar a arrogância tão habilmente disfarçada em nome de uma ultrapassada visão de conceitos jurídicos vazios e sem nenhum resultado na paz social. É imperioso evitar-se o vôo cego, inclusive para que as futuras gerações façam uso das verdadeiras artérias jurídicas que levam à Justiça e ao real progresso na convivência social. É uma reforma que cada um de nós deve tentar, mormente aqueles, como nós, que vivem diariamente o direito. É a reforma íntima, a qual alguns sábios vêm silenciosamente anunciando.

Com essas referências, encaminhar-se-á ao dispositivo.

**DISPOSITIVO**

Em harmonia com o exposto, JULGO **PROCEDENTE** a ação e em consequência condeno a ré Northrop **Grumman Corporation** a pagar a quantia de R$ 2.000.0000,00 (dois milhões de reais), cerca de US$ 1.111.111,11 (na cotação de hoje, 30.06.2000), a título de dano moral a cada uma das famílias atingidas pelo luto, incidindo correção monetária a contar do dia 31.10.1996.

Condeno-a, ainda, a pagar, a partir do evento, a indenização, por danos materiais, correspondente a 2/3 (dois terços) do que cada vítima percebia em seu último salário, sabendo-se que 1/3 constituiria despesa mínima necessária para a sobrevivência do próprio finando, como é iterativo (RT 443/340, 303/271, 201/178; RJTJESP, 78/200, 81/57 e JTCASP 117/67, além de outros V. Julgados).

RG-00323



**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO



**Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo**

Fica ressalvado que prevalecerá o período de vida provável dos falecidos, o qual é estipulado em sessenta e cinco anos (65) de idade ( RJTJSP, 62/101, 126/157, 129/203, apenas para citar alguns V. Arestos).

O pagamento das parcelas vencidas será acrescido de juros moratórios, os quais não dependem de pedido ( Súmula 254 do Colendo Supremo Tribunal Federal), fluindo a partir do evento danoso, conforme disciplina a Súmula 54 do Egrégio Superior Tribunal de Justiça, deduzindo-se a verba atinente ao seguro obrigatório, como é tranqüilo na jurisprudência (**RUI STOCO**, ob. cit., págs. 812/13), sem alcance sobre aquelas de cunho previdenciário, por força de sua própria natureza jurídica.

Para o resgate das parcelas vincendas a ré deverá formar capital capaz de assegurar a inteira satisfação da obrigação, na forma do art. 602, *caput*, do CPC), certo que esse encargo deve ser prontamente atendido ( REsp 12.846-RJ, Relator o insigne Ministro **EDUARDO RIBEIRO**).

Incluir-se-á o 13º salário, posto que integrante da renumeração que o pensionamento substitui ( JTACSP, 113/310 e 117/67).

A atualização monetária do salário percebido por cada vítima poderá observar, no que couber, o regime da Súmula 490 do Colendo Supremo Tribunal Federal, tudo a ser apurado nos termos do artigo 604 do Código de Processo Civil.

Reconheço, por último, que a ré Northrop Grumman Corporation deve ser reputada litigante de má-fé, litigância essa alicerçada no descumprimento da ordem judicial de caução, a qual restou mantida pelo V. Acórdão relatado pelo culto Juiz **JORGE FARAH**, escoando o prazo para a realização do depósito determinado, margeando-se, de mais a mais, que não há nenhuma outra decisão em vigor que tenha suspenso sua eficácia.

RG-00324



**P O D E R   J U D I C I Á R I O**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO



**Juízo de Direito da 2ª Vara Cível do Foro Regional III — São Paulo**

Em igualdade, não se vê nenhuma explicação ou justificação para essa conduta processual tão corajosa, mas ao mesmo tempo muito pouco qualificada pela diplomacia que se esperava de uma empresa do porte e da respeitabilidade que dela naturalmente emana.

Trata-se, na claridade do bem estar processual e sua efetividade, de imperativo de natureza ética e decorrente do alcance do artigo 17, inciso IV, do CPC, aviltando-se que atos tais não merecem homenagem e traduzem ousadia, atentando, ainda, contra a dignidade da Justiça (artigo 600, III, do CPC — em aplicação analógica).

A esse propósito, a referida demandada, sociedade constituída segundo as Leis do Estado de *Delaware*, nos Estados Unidos da América, conhecido como um país que respira a democracia, deixa de cumprir, acredite-se, uma decisão judicial não suspensa, ato não adequado à sua própria história e origem.

Balanceie-se, porque oportuno, o paradoxo de ver que os Estados Unidos da América, - às vezes - dá exemplo de altivez e espírito aberto para toda a humanidade. Aqui, para desencorajar, a ré, empresa norte-americana, não cumpre decisão judicial mantida pelo Egrégio 1º Tribunal de Alçada Civil e não suspensa pelo Egrégio Superior Tribunal de Justiça, consoante despacho denegatório proferido pelo eminente Ministro **EDUARDO RIBEIRO**.

Para constar, cite-se, por exemplo, que na Justiça norte-americana há o interessante caso do cidadão *Chum Di*, da República Popular da China, que deixou seu país a bordo de um navio e em 06.06.1993, em Nova York, saltou ao mar para fugir nadando, sendo preso.

Peticionara, no entanto, ao Juiz de Imigração, alegando que se viu impedido de ter mais do que um filho em sua pátria mãe, sendo que sua mulher foi procurada para ser encaminhada a um hospital para ser esterilizada, tendo ela fugido e se recusado a submeter-se à esterilização. Tiveram eles a casa confiscada pelo Estado, combinando, na seqüência, a procura de abrigo nos Estados Unidos.

RG-00325



55

**PODER JUDICIÁRIO**
TRIBUNAL DE JUSTIÇA DO ESTADO DE SÃO PAULO

### Juízo de Direito da 2ª Vara Cível do Foro Regional III – São Paulo

Pedira, então, o direito de asilo, acatado na *Board os Immigration Appeals*, conquanto ausente julgamento definitivo, segundo registra outro idealista, Magistrado Federal do Tribunal Regional Federal da 4ª Região ( Porto Alegre - RS ) e Professor, o Doutor **VALDIMIR PASSOS DE FREITAS**, em sua tese de Doutorado, hoje monografia de largo sucesso     (A Constituição Federal e a Efetividade das Normas Ambientais, Ed. RT, 2000, pág. 35/36), o que é anotado para um mero juízo de comparação entre a aspiração que vem da América do Norte e a prática encenada neste processo.

Não é de aplaudir-se, assim, esse descompasso de não democracia. O não desejo de cumprir a referida ordem judicial não pode ser visto como litigância adequada ou de boa-fé. É o *improbus litigator*.

Por tudo isto, condeno-a a pagar a cada uma das famílias afetadas pela tragédia, a quantia que representar 20% (vinte por cento) sobre o valor dado à causa, o que faço com amparo no art. 18, parágrafo segundo, do CPC.

Por força do princípio da sucumbência, arcará a vencida com as custas e verba honorária, a qual arbitro em 20% (vinte por cento) sobre o total que restar apurado.

Esse arbitramento deve-se ao empenho dos nobres patronos dos autores, os Professores Doutores Irineu Strenger e Renato Guimarães Júnior, marcada a natureza e a importância da causa, sua complexidade, o grau de zelo profissional, o tempo exigido e a clara diligência deduzida, o que chama a incidência do art. 20, parágrafo terceiro, alíneas "a", "b" e "c", do Código de Processo Civil.

30.18.025

RG-00326