**PLAINTIFF'S STATEMENT**
**PURSUANT TO LOCAL CIVIL RULE 56.1**

1. Speiser, Krause, Nolan & Granito ("Speiser Krause") represented 64 surviving families in a United States court proceeding concerning the crash in Brazil of an aircraft operated by Transportes Aereos Regionais, S.A. Airlines.

2. Renato Guimaraes, Jr. ("Mr. Guimaraes"), a Brazilian attorney, also served as counsel to some or all of those families.

3. In the months preceding April 2000, Speiser Krause negotiated with the defendants in the TAM litigation in an effort to reach a settlement, but none of the families specifically gave Speiser Krause a settlement offer to convey on their behalf. (G. Lear Dep. 10/12/05, pp. 160-161).

4. None of the families gave Speiser Krause a range of numbers within which Speiser Krause would have authority to settle or negotiate. (G. Lear Dep. 10/12/05, pp. 160-161; G. Lear Dep. 4/23/07, pp. 76, 85-86; L. Ballen Dep., pp. 226-230).

5. Rather, it was Speiser Krause's belief that it had the families' full authority from their retainer agreements to negotiate as Speiser Krause deemed appropriate. (L. Ballen Dep., pp. 226-230).

6. However, the families <u>had</u> communicated to Speiser Krause that they wished to settle for "mid-Atlantic numbers" - the settlement value of a case in the United States, expected to be more than what could be attained in Brazil. (G. Lear Dep. 10/11/05, pp. 45-46).

7. Also, Mr. Guimaraes had previously communicated to Speiser Krause that he believed the clients would not accept anywhere near the settlement amounts proposed by Speiser Krause. (Riguera Aff. Ex. 24 (Doc. No. RG00178)).

8. Some families had already expressed frustration with the progress of the case before the settlement offers were presented. (G. Lear Dep. 10/12/05, p. 144).

9. In April 2000, Speiser Krause sent some of its attorneys to Brazil to meet with the families. (A. Ballen Dep., p. 72).

Guimaraes v. Speiser Krause  
Case No.: 05-CV-2210(DC)

10. Mr. Guimaraes attended some of these meetings at the request of his clients. (A. Ballen Dep., pp. 72, 129; L. Ballen Dep., p. 187).

11. In advance of these meetings, Speiser Krause did not inform the families what the settlement offer would be for each of them; in fact, according to Speiser Krause the clients were not supposed to have this information until Speiser Krause presented it at the meetings in Brazil. (L. Ballen Dep., p. 184).

12. Speiser Krause also did not inform Mr. Guimaraes about the settlement amounts in advance of the Brazil meetings. (G. Lear Dep. 4/23/07, pp. 208-209).

13. The first families that Speiser Krause met with when they arrived in Brazil were those most closely associated with Mr. Guimaraes. (L. Ballen Dep., p. 184).

14. The reception Speiser Krause received from these families concerning the settlement offers was "very negative."(L. Ballen Dep., p. 184).

15. According to Speiser Krause, at this juncture Mr. Guimaraes was fully cooperating with Speiser Krause and "being helpful," and had done nothing to allegedly interfere. (G. Lear Dep. 4/23/07, pp. 12, 174, 212).

16. After Speiser Krause presented the families with the settlement offers, there was a mixed reaction. Most of the families eventually accepted the offers, while some of the families rejected them. (G. Lear Dep. 4/23/07, pp. 117, 227).

17. Some of those who rejected it did so immediately, while others took longer. (G. Lear Dep. 4/23/07, pp. 98-99; L. Ballen Dep., p. 188).

18. Some families took a position, and later changed their minds. (G. Lear Dep. 4/23/07, pp. 24, 189).

19. Even Speiser Krause was hesitant to recommend all of the settlement offers, and did so "with regret or sadness," because of families who had lost major wage earners who had small children. (L.

Guimaraes v. Speiser Krause
Case No.: 05-CV-2210(DC)

Ballen Dep., pp. 187).

20. Mr. Guimaraes did not believe the settlements were sufficient compensation to the families and opposed them. (G. Lear Dep. 4/23/07, pp. 5-6).

21. This was particularly so after the Court in the Jabaquara Action ( a separate action Mr. Guimaraes had filed with Speiser Krause's knowledge in Brazil on behalf of the families after the California court dismissed the U.S. litigation on *forum non conveniens* grounds), awarded each family in excess of $1,111,111.11, plus 2/3 of the last annual salary earned by each decedent from the date of the accident until that decedent would have reached the age of 65, plus a 20% contempt of court penalty against Northrop for failing to post a bond that the Court had required, plus another 20% for attorneys fees. (G. Lear Dep. 4/23/07, pp. 5-6; Riguera Aff. Ex.24 (Doc No. RG00215-RG00326); L. Ballen Dep., p. 192).

22. Due to Mr. Guimaraes' criticism of the settlements and Speiser Krause, Speiser Krause has claimed tortious interference as to some (not all) of the clients who did not accept the settlements; specifically, those now represented by the law firm of Engstrom, Lipscomp & Lack (the "Lack Clients"). (Defendant's Responses to 02/26/07 Interrogatories, Nos. 6-7; G. Lear Dep. 4/23/07, pp. 10-11).

23. Speiser Krause has taken the position that it is only the relationship between the Lack Clients and Speiser Krause after the Jabaquara judgment that Mr. Guimaraes allegedly interfered with, not the proposed settlements themselves and not the retainer agreements. (G. Lear Dep. 4/23/07, p. 12).

24. Speiser Krause has admitted that it does not know why any particular family accepted or rejected the settlement offer, or selected new counsel. (G. Lear Dep. 4/23/07, pp. 14, 18, 53-55, 57, and 112).

25. The Lack Clients have submitted declarations to this Court attesting to the fact that nothing Mr.

Guimaraes v. Speiser Krause<br>Case No.: 05-CV-2210(DC)

      Guimaraes said or did was the motivation for their rejecting the settlements or changing counsel. (Riguera Aff. Exs. 2-12).

26. Speiser Krause has also admitted that a great many factors likely could have impacted the families' decision to not accept the settlement offers, including the fact that some of them may have been offended by the settlement amount. (G. Lear Dep. 4/23/07, p. 49).

27. Others may have been concerned that other families were getting more money in settlement. (G. Lear Dep. 4/23/07, p. 49).

28. Some clients had different expectations. (G. Lear Dep. 4/23/07, p. 52).

29. There were intra-family disputes over who would get the money. (A. Ballen Dep., p. 125; G. Lear Dep. 10/12/05, p. 134).

30. There were instances of split families. (A. Ballen Dep., p. 125).

31. Some families were influenced by third parties. (G. Lear Dep. 4/23/07, p. 52).

32. There were examples when a mistress, who may have standing as a survivor in Brazil, hired counsel to make a claim. (A. Ballen Dep., p. 125-126).

33. Some of the families were in "desperate straits," owing to escalating inflation in Brazil. (G. Lear Dep. 10/12/05, p. 170).

34. Some for some unknown reasons are not interested in receiving their money. (G. Lear Dep. 4/23/07, p. 9).

35. Some believe they will ultimately receive more from the Jabaquara judgment. (G. Lear Dep. 4/23/07, p. 11).

36. There were also problems with the insurer and TAM's counsel. (G. Lear Dep. 4/23/07, p. 220-221).

37. According to Speiser Krause, it was each families' right to elect to take the settlement or not. (G.

Lear Dep. 10/12/05, p. 121; G. Lear Dep. 4/23/07, p. 23).

38. Speiser Krause also concedes Mr. Guimaraes and any other Brazilian lawyer was privileged to criticize the settlements. (G. Lear Dep. 4/23/07, pp. 42, 47, 114, 227).

39. Moreover, Speiser Krause has admitted that Mr. Guimaraes had good intentions and believed he was acting in the families' best interests. (L. Ballen Dep., pp. 240-241).

40. Speiser Krause took no action to attempt to prevent the conduct on the part of Mr. Guimaraes of which they now complain. They did not contact the media and demand any retraction of any public statement. (G. Lear Dep. 4/23/07, p. 126).

41. They did not contact the clients and speak to them about any of Mr. Guimaraes' statements or actions (save for one belated letter). (G. Lear Dep. 4/23/07, p. 126).

42. Speiser Krause did not seek to have Mr. Guimaraes removed as counsel. (G. Lear Dep. 4/23/07, p. 129).

43. They did not file a bar grievance against him. (G. Lear Dep. 4/23/07, p. 130).

44. Speiser Krause did not remove itself from the case due to any inability to work with Mr. Guimaraes. (G. Lear Dep. 4/23/07, p. 130-131).

45. They did not seek any injunctive relief. (G. Lear Dep. 4/23/07, p. 131).

46. They did not claim to any legal authority with whom Mr. Guimaraes lodged a complaint that he had filed a false report or seek action on such a charge. (G. Lear Dep. 4/23/07, p. 131-132).

47. In fact, Mr. Lear knew what Mr. Guimaraes was doing and chose to <u>ignore him</u>. (G. Lear Dep. 4/23/07, p. 128).

48. Mr. Lear further testified that his firm never intended to make any claim against Mr. Guimaraes until Mr. Guimaraes filed this lawsuit. (G. Lear Dep. 4/23/07, p. 131).

49. None of the clients Speiser Krause claims Mr. Guimaraes interfered with has refused to pay Speiser Krause for the work Speiser Krause did. (G. Lear Dep. 4/23/07, p. 20).

50. Likewise, Speiser Krause never sent those clients an invoice and never filed any legal action against them. (G. Lear Dep. 4/23/07, p. 20).

51. Mr. Lack, the attorney who represents the clients in question, has never told Speiser Krause those clients would not pay for Speiser Krause's legal work. (G. Lear Dep. 4/23/07, p. 22).

52. Speiser Krause has filed liens with the California court which, if enforced, may fully compensate Speiser Krause for the damages it alleges here. (G. Lear Dep. 4/23/07, pp. 82-84. 231).

53. In fact, Speiser Krause's attorney has stated on the record that if it collects on the California liens it will dismiss its counterclaim. (G. Lear Dep. 4/23/07, p. 229).

54. Also, the settlement offers to the clients who did not accept may still be open. (G. Lear Dep. 4/23/07, pp. 23-24).

55. After the Jabaquara judgment was entered, Mr. Guimaraes granted Wanderly Minitti, another Brazilian attorney, a power of attorney authorizing him to seek to enforce the execution of the judgment in the United States through a letters rogatory procedure. (Guimaraes Dep. 10/7/05, p. 134; 11/17/05, pp. 77-78; Guimaraes Declaration dated 5/25/07, ¶ 3).

56. In compensation for his services, Mr. Minitti was to receive a certain percentage of any amounts collected from the TAM defendants through his efforts to enforce the Jabaquara judgment. (Guimaraes Declaration dated 5/25/07, ¶ 4; Minitti Amended Complaint, Ex. "D").

57. Mr. Minitti's efforts to enforce the Jabaquara judgment were ultimately unsuccessful, and he failed to recover anything on behalf of the victims of the TAM crash. (Guimaraes Dep. 10/7/05, pp. 139-140; 11/17/05, pp. 81-82; Guimaraes Declaration dated 5/25/07, ¶ 5).

Guimaraes v. Speiser Krause<br>Case No.: 05-CV-2210(DC)

58. In November 2004, Mr. Guimaraes learned for the first time that Mr. Minitti filed a lawsuit in this Court against Speiser Krause, styled <u>Dr. Wanderly Minitti v. Speiser, Krause, Nolan & Granito, P.C.</u>, Case No. 04 CV 07976 (DC)(RLE), in which he sought a judgment for 50% of the attorney's fees collected by Speiser Krause in connection with the TAM litigation. (Guimaraes Declaration dated 5/25/07, ¶ 7).

59. Mr. Guimaraes never authorized, encouraged or in any way caused Mr. Minitti to file suit against Speiser Krause. (Guimaraes Declaration dated 5/25/07, ¶ 8).

60. On the contrary, Mr. Guimaraes has consistently been opposed to Mr. Minitti's right to claim that he is entitled to a share of Speiser Krause's attorneys' fees, as it was Mr. Guimaraes who had the fee-sharing agreement with Speiser Krause. (Guimaraes Declaration dated 5/25/07, ¶ 9).