UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 05-CV-2210(DC)
THE HONORABLE DENNY CHIN

RENATO GUIMARAES, JR.,

       Plaintiff,

vs.

SPEISER, KRAUSE, NOLAN & GRANITO, a
professional corporation f/k/a SPEISER,
KRAUSE, MADOLE & LEAR, a professional
corporation,

       Defendant.

_____/

### MEMORANDUM OF LAW IN SUPPORT OF
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, RENATO GUIMARAES, JR. ("Mr. Guimaraes"), pursuant to Fed.R.Civ.P. 56, respectfully

submits this Memorandum of Law in Support of his Motion for Summary Judgment (the "Motion").

## INTRODUCTION

Plaintiff, Mr. Guimaraes, moves for the entry of Summary Judgment in his favor on Defendant,

SPEISER, KRAUSE, NOLAN & GRANITO's ("Speiser Krause") Counterclaims for tortious interference

and for indemnity. The evidence of record and well-settled New York law establishes that Mr. Guimaraes

did not, and could not, have interfered with any cognizable contract or relationship between Speiser Krause

and the clients it makes the subject of its claim. Rather, Speiser Krause has admitted in its deposition

testimony that it has no evidence that anything that Mr. Guimaraes said or did resulted in the clients' decision

to reject settlement offers and discontinue Speiser Krause's representation. Speiser Krause has also admitted

that Mr. Guimaraes was within his rights to advise these clients of his opinions on the settlement offers, and

that his motivations for doing so were consistent with his belief of what was in the best interests of those

1

clients. Moreover, Speiser Krause has testified as to a wide range of factors which could likely have motivated those clients to make their decision, none of which have anything to do with Mr. Guimaraes. Finally, Mr. Guimaraes has presented this Court with the Declarations of each of those clients, who attest categorically that their decision was financially motivated and not because of anything that Mr. Guimaraes said or did. As to the indemnification claim, it has absolutely no basis in law or fact, as there is simply no agreement or recognized entitlement that would obligate Mr. Guimaraes to indemnify Speiser Krause for Mr. Minitti's claims. Based on the undisputed facts and the applicable law, Mr. Guimaraes is entitled to Summary Judgment on Speiser Krause's Counterclaim.

## STATEMENT OF UNDISPUTED FACTS[1]

Speiser Krause represented 64 surviving families in a United States court proceeding concerning the crash in Brazil of an aircraft operated by Transportes Aereos Regionais, S.A. Airlines ("TAM Airlines"). Speiser Krause admits that Renato Guimaraes, a Brazilian attorney, also served as counsel to some or all of those families. The scope and terms of that retention, and Mr. Guimaraes' entitlement to compensation for his services, is in dispute; however, a resolution of such issues is not germane to this motion for summary judgment, which is directed to Speiser Krause's claims for tortious interference and indemnity.

In the months preceding April 2000, Speiser Krause negotiated with the defendants in the TAM litigation in an effort to reach a settlement. None of the families specifically gave Speiser Krause a settlement offer to convey on their behalf. (G. Lear Dep. 10/12/05, pp. 160-161). None of the families gave Speiser Krause a range of numbers within which Speiser Krause would have authority to settle or negotiate. (G. Lear Dep. 10/12/05, pp. 160-161; G. Lear Dep. 4/23/07, pp. 76, 85-86; L. Ballen Dep., pp. 226-230).

---

[1]All pleadings, deposition testimony excerpts, and documents cited in this memorandum are attached as exhibits to the Affidavit of Jose R. Riguera, Esq., sworn to on May 31, 2007 ("Riguera Aff.") The following conventions are used when citing these exhibits: deposition excerpts are cited as: "[deponent name] Dep. p. [page number]" (where a multi-day deposition was taken, the transcript is also identified by date); documents produced by the parties in response to discovery requests in this action are cited as "Doc. No. [production number]."

Rather, it was Speiser Krause's belief that it had the families' full authority from their retainer agreements to negotiate as Speiser Krause deemed appropriate. (L. Ballen Dep., pp. 226-230).

However, the families had communicated to Speiser Krause that they wished to settle for "mid-Atlantic numbers" - the settlement value of a case in the United States, expected to be more than what could be attained in Brazil. (G. Lear Dep. 10/11/05, pp. 45-46). There is documentary proof that Guimaraes believed the clients would not accept anywhere near the settlement amounts proposed by Speiser Krause. On February 14, 2000, Guimaraes wrote a letter to Speiser Krause in which he stated that he had met with one of the clients "... and she authorized me to tell you that she has a felling (sic), after so many conversations with so many average families, that most of them would accept a deal for the entire case, including those against TAM in Brazil, for R$ 3 (three) millions net, say after the payment of our fees ...." (Riguera Aff. Ex. 24 (Doc. No. RG00178)). And some families had expressed frustration already with the progress of the case. (G. Lear Dep. 10/12/05, p. 144). Ultimately, Speiser Krause and the defendants arrived at a settlement amount unknown to the clients, much less than what they expected, which Speiser Krause was then to present to the families for their approval and signature in Brazil.

In April 2000, Speiser Krause sent some of its attorneys to Brazil to meet with the families. (A. Ballen Dep., p. 72). Mr. Guimaraes attended some of these meetings at the request of his clients. (A. Ballen Dep., pp. 72, 129; L. Ballen Dep., p. 187). In advance of these meetings, Speiser Krause did not inform the families what the settlement offer would be for each of them. According to Leigh Ballen's deposition testimony, the clients were not supposed to have this information until Speiser Krause presented it at the meetings in Brazil. (L. Ballen Dep., p. 184). Mr. Lear also testified that he had no knowledge of Mr. Guimaraes being informed of the settlement amounts in advance of the Brazil meeting. (G. Lear Dep. 4/23/07, pp. 208-209).

The first families that Speiser Krause met with when they arrived in Brazil were those most closely associated with Mr. Guimaraes. (L. Ballen Dep., p. 184). The reception Speiser Krause received from these

3

families was "very negative."(L. Ballen Dep., p. 184). According to Leigh Ballen, a Speiser Krause attorney who was present for these meetings, "[t]hey had an obvious predisposition to news they were not yet supposed to have .... [a]rms crossed, looks of frustration." (L. Ballen Dep., p. 184). It is significant that this occurred at a time before Speiser Krause contends that Mr. Guimaraes tortiously interfered (or was even informed of the settlement amounts). In fact, according to Speiser Krause, at this juncture Mr. Guimaraes was fully cooperating with Speiser Krause and "being helpful," and Mr. Lear has admitted that Mr. Guimaraes did nothing to allegedly interfere prior to June 23, 2000. (G. Lear Dep. 4/23/07, pp. 12, 174, 212). Thus, whatever lack of receptivity these clients had to the settlement offers predates any allegation by Speiser Krause that Mr. Guimaraes acted inappropriately.

After Speiser Krause presented the families with the settlement offers, there was a mixed reaction. Most of the families eventually accepted the offers, while some of the families rejected them. (G. Lear Dep. 4/23/07, pp. 117, 227). Some of those who rejected it did so immediately, while others took longer. (G. Lear Dep. 4/23/07, pp. 98-99; L. Ballen Dep., p. 188). Some families took a position, and later changed their minds. (G. Lear Dep. 4/23/07, pp. 24, 189). Other families to this day have not yet made a decision. Even Speiser Krause was hesitant to recommend all of the settlement offers, and did so "with regret or sadness," because of families who had lost major wage earners who had small children. (L. Ballen Dep., pp. 187). It was obviously a difficult decision involving many factors, about which the families felt differently.

Mr. Guimaraes did not believe the settlements were sufficient compensation to the families and opposed them. (G. Lear Dep. 4/23/07, pp. 5-6). This was particularly so after the Court in the Jabaquara Action (a separate action Guimaraes had filed with Speiser Krause's knowledge in Brazil on behalf of the families after the California court dismissed the U.S. litigation on *forum non conveniens* grounds), awarded each family in excess of $1,111,111.11, plus 2/3 of the last annual salary earned by each decedent from the date of the accident until that decedent would have reached the age of 65, plus a 20% contempt of court penalty against Northrop for failing to post a bond that the Court had required, plus another 20% for

4

attorneys fees. (G. Lear Dep. 4/23/07, pp. 5-6; Riguera Aff. Ex. 24 (Doc No. RG00215-RG00326); L. Ballen

Dep., p. 192)). Mr. Guimaraes criticized the settlement offers, which were far below the amounts awarded

in the Jabaquara judgment, and Speiser Krause's role in negotiating and recommending them.

Due to Mr. Guimaraes' criticism of the settlements and Speiser Krause, Speiser Krause has claimed

tortious interference as to some (not all) of the clients who did not accept the settlements; specifically, those

now represented by the law firm of Engstrom, Lipscomp & Lack (the "Lack Clients"). The Lack Clients are

the family members of the following decedents who were victims of the TAM crash: Wolfgang Hans

Janstein, George Klepetar, William Arjona Chong, Jose Pereira Duarte, Alexandre M. Vaz de Mello, Rilton

De Oliveira Rodrigues, Zelia Menin, Mauro Rodrigues de Matos, and Ricardo Alan Calonico Maciel.

(Defendant's Responses to 02/26/07 Interrogatories, Nos. 6-7; G. Lear Dep. 4/23/07, pp. 10-11).[2]

In terms of the relationship allegedly interfered with, Mr. Lear, speaking as the Fed. R. Civ. P.

30(b)(6) representative of Speiser Krause (the most recent pronouncement by Speiser Krause of the firm's

position), has clarified in his deposition that it is only the relationship between these clients and Speiser

Krause after the Jabaquara judgment that Mr. Guimaraes allegedly interfered with, not the proposed

settlements themselves and not the retainer agreements:

> Q: I just want to, if I could, understand the relationship interfered with, was
> it the retainer agreement that you're claiming was interfered with?
>
> A: No, the retainers we already had.
>
> Q: Was it the settlement?
>
> A: The settlement, no, the settlement wasn't interfered with. The time of
> the settlement was April 2000, and Mr. Guimaraes at that time was being
> helpful.
>
> Q: Was it the relationship with the client in general?

---

[2]Although Speiser Krause has only identified eight clients in its discovery responses,
there are actually nine families currently represented by the Lack firm.

A: After Jabaquara, yes.

(G. Lear Dep. 4/23/07, p. 12)(emphasis added).

Speiser Krause has repeatedly admitted in deposition testimony that it does not know why any

particular family accepted or rejected the settlement offer, or selected new counsel.

Q: Do you know any reason that you can articulate why any of these eight did not accept the settlements?

A: Specifically for each family, no, I don't know what reasons they had for not accepting.

Q: And they might have all had different reasons; is that correct?

A: It's possible, sure.

(G. Lear Dep. 4/23/07, pp. 53-54).

Q: Have any of those people [the Lack Clients] spoken to you and told you the reason that they switched to Mr. Lack?

A. No, I don't believe they have, no.

(G. Lear Dep. 4/23/07, p. 14).

Q: Did you ever receive communications from any of these clients where they said why they wanted to change law firms?

A. Not to my knowledge.  If it's in the file it's in the file.

Q: I have not seen anything, that's why I am asking you, sir.

A: I haven't seen anything.

(G. Lear Dep. 4/23/07, p. 18).

Q: Did any of these clients articulate to Speiser Krause why they didn't want the settlement that was being proposed to them?

A: They never - No family member came to me and articulated that.

(G. Lear Dep. 4/23/07, pp. 54-55)(emphasis added).

A: ... I can't remember specifically discussing why, in answer to the questions you're asking, why they didn't accept the settlement.  I'm

assuming they didn't for different – <u>I just don't know, I just don't know why they didn't</u> .....

(G. Lear Dep. 4/23/07, p. 55).

Q: Did either of the Ballens ever tell you why these eight didn't accept the settlement?

A. No.

(G. Lear Dep. 4/23/07, p. 55).

Q: You weren't given a reason for their acceptance or rejection?

A: No.

(G. Lear Dep. 4/23/07, p. 57).

Q: My question is, can you identify any client who told Speiser Krause in substance that we will not take the settlement because of something that Dr. Guimaraes said or did?

A. Certainly no one told me, and it hadn't been reported to me by anyone else.

(G. Lear Dep. 4/23/07, p. 112).  Likewise, none of the attorneys for Speiser Krause testified in their deposition that any of the Lack Clients told them they rejected the settlement because of Mr. Guimaraes or even that they would have accepted the settlement otherwise.

In contrast, the families have submitted declarations to this Court attesting to the fact that nothing Mr. Guimaraes said or did was the motivation for their rejecting the settlements or changing counsel.  For example, Mr. Fernando Lobo Vas de Mello, one of the Lack Clients, attests:

1.    My name is **FERNANDO LOBO VAS DE MELLO**.  I am a citizen and resident of Brazil.  This declaration is based upon my personal knowledge.

2.    My family retained Speiser, Krause, Nolan & Granito ("Speiser, Krause") and Renato Guimaraes to represent my family in a lawsuit in the United States concerning an airplane crash that occurred on October 31, 1996 in a plane operated by Transportes Aereos Regionais, S.A. Airlines ("TAM Airlines") departing from Sao Paulo, Brazil.

3.    On or about April 2000, representatives of Speiser, Krause came to Brazil and

7

presented my family with a settlement offer.  I did not, and have not, accepted that settlement offer because I do not believe it is for a sufficient sum of money.

4.      In addition to rejecting the settlement offer, my family made a decision that we do not wish to be represented by Speiser, Krause.  For this reason we retained different counsel.

5.      My decision to reject the settlement offer and to cease using the services of Speiser, Krause was a financial decision and it was not influenced or caused by any dispute, or any events related to any dispute, between attorney Renato Guimaraes and Speiser, Krause.  I made this decision based upon what I felt was in my family's financial best interests.

6.      I have been informed that Speiser, Krause now contends that Mr. Guimaraes said or did something which influenced me to reject the settlement or to stop using the services of Speiser, Krause, but that is not accurate.

All of the Lack Clients have similarly attested in their Declarations.[3]

Speiser Krause has also admitted that a great many factors likely could have impacted the families' decision.  Some of them may have been offended by the settlement amount.  (G. Lear Dep. 4/23/07, p. 49).  Others may have been concerned that other families were getting more money in settlement.  (G. Lear Dep. 4/23/07, p. 49).  Some clients had different expectations.  (G. Lear Dep. 4/23/07, p. 52).  There were intra-family disputes over who would get the money.  (A. Ballen Dep., p. 125; G. Lear Dep. 10/12/05, p. 134).  There were instances of split families.  (A. Ballen Dep., p. 125).  Some families were influenced by third parties.  (G. Lear Dep. 4/23/07, p. 52).  There were examples when a mistress, who may have standing as a survivor in Brazil, hired counsel to make a claim.  (A. Ballen Dep., p. 125-126).  Some of the families were in "desperate straits," owing to escalating inflation in Brazil.  (G. Lear Dep. 10/12/05, p. 170).  Some, as Mr. Lear testified in his deposition, for "various reasons related to issues that are unknown to me simply for one reason or another are not interested in receiving their money." (G. Lear Dep. 4/23/07, p. 9).  Some believe

---

[3]See Declarations of Maria Das Gracas de Oliveira Rodrigues, Airton Francisco Rodrigues, Suzana Klepetar, Terezinha de Jesus Fernandes Duarte, Jaime Menin, Zelia de Oliveira Matos, Vanessa Pereira Ramos, Fernando Lobo Vaz de Mello, Maria Da Conceicao Magalhaes Vaz de Mello, Maria Christina Janstein, and Daniela Peixoto Arjona (Riguera Aff. Exs. 2-12).

8

they will ultimately receive more from the Jabaquara judgment.  (G. Lear Dep. 4/23/07, p. 11).  There were also problems with the insurer and TAM's counsel.  (G. Lear Dep. 4/23/07, p. 220-221).  All of the motivations have one thing in common — they had nothing to do with Mr. Guimaraes.

According to Speiser Krause, it was each family's right to elect to take the settlement or not.  (G. Lear Dep. 10/12/05, p. 121; G. Lear Dep. 4/23/07, p. 23).  Speiser Krause also concedes Mr. Guimaraes and any other Brazilian lawyer was privileged to criticize the settlements.  (G. Lear Dep. 4/23/07, pp. 42, 227). In fact. Mr. Lear testified that "I have no problem of him [Guimaraes] being critical of it." (G. Lear Dep. 4/23/07, p. 47).

> Q: Did Dr. Guimaraes ever tell you that the families' decision, those eight families' decision, to not continue with Speiser Krause was based on what Dr. Guimaraes said or did?
>
> A. Well, certainly he recommended to them that they not accept the settlement.
>
> Q: Well, he can do that as their lawyer, could he not?
>
> A: He can do whatever he wants, it's none of my business.

(G. Lear Dep. 4/23/07, p. 114).

Moreover, Speiser Krause has admitted that Mr. Guimaraes had good intentions and believed he was acting in the families' best interests:

> A. ... I don't believe he [Mr. Guimaraes] intends to harm anyone.  I believe he felt that that's what was best.
>
> Q: And didn't he think he was acting in the best interest of the families?
>
> A. I believe he thought that.

(L. Ballen Dep., pp. 240-241).

Speiser Krause took no action to attempt to prevent the conduct on the part of Mr. Guimaraes of which they now complain.  They did not contact the media and demand any retraction of any public statement. (G. Lear Dep. 4/23/07, p. 126).  They did not contact the clients and speak to them about any of

Mr. Guimaraes' statements or actions (save for one belated letter). (G. Lear Dep. 4/23/07, p. 126). Speiser Krause did not seek to have Mr. Guimaraes removed as counsel. (G. Lear Dep. 4/23/07, p. 129). They did not file a bar grievance against him. (G. Lear Dep. 4/23/07, p. 130).[4] Speiser Krause did not remove itself from the case due to any inability to work with Mr. Guimaraes. (G. Lear Dep. 4/23/07, p. 130-131). They did not seek any injunctive relief. (G. Lear Dep. 4/23/07, p. 131). They did not claim to any legal authority with whom Mr. Guimaraes lodged a complaint that he had filed a false report or seek action on such a charge. (G. Lear Dep. 4/23/07, p. 131-132). In fact, Mr. Lear testified that he knew what Mr. Guimaraes was doing and ignored him. (G. Lear Dep. 4/23/07, p. 128). Mr. Lear further testified that his firm never intended to make any claim against Mr. Guimaraes until this lawsuit:

> A: I never had any intention of taking action against Mr. Guimaraes until
> he filed a lawsuit against us ....

(G. Lear Dep. 4/23/07, p. 131).

None of the clients Speiser Krause claims Mr. Guimaraes interfered with has refused to pay Speiser Krause for the work Speiser Krause did. (G. Lear Dep. 4/23/07, p. 20). Likewise, Speiser Krause never sent those clients an invoice and never filed any legal action against them. (G. Lear Dep. 4/23/07, p. 20). Mr. Lack, the attorney who represents the clients in question, has never told Speiser Krause those clients would not pay for Speiser Krause's legal work. (G. Lear Dep. 4/23/07, p. 22).

Speiser Krause has filed liens with the California court which, if enforced, may fully compensate Speiser Krause for the damages it alleges here. (G. Lear Dep. 4/23/07, pp. 82-84. 231). In fact, Speiser Krause's attorney has stated on the record that if it collects on the California liens it will dismiss its counterclaim. (G. Lear Dep. 4/23/07, p. 229). Also, the settlement offers to the clients who did not accept

---

[4]One former TAM client, who is not one of the Lack Clients, filed a grievance against Mr. Guimaraes with the Ordem Dos Advogados Do Brasil, Secçâo de São Paulo ("OAB SP") - the Brazil bar association - due to his opposition to the settlements. The OAB SP found that Mr. Guimaraes did nothing wrong, and fully exonerated him in a unanimous decision. (Guimaraes Declaration dated 5/25/07, ¶ 10).

may still be open.  (G. Lear Dep. 4/23/07, pp. 23-24).

After the Jabaquara judgment was entered, Mr. Guimaraes granted Wanderly Minitti, another Brazilian attorney, a power of attorney authorizing him to seek to enforce the execution of the judgment in the United States through a letters rogatory procedure.  (Guimaraes Dep. 10/7/05, p. 134; 11/17/05, pp. 77-78; Guimaraes Declaration dated 5/25/07, ¶ 3).  In compensation for his services, Mr. Minitti was to receive a certain percentage of any amounts collected from the TAM defendants through his efforts to enforce the Jabaquara judgment.  (Guimaraes Declaration dated 5/25/07, ¶ 4; Minitti Amended Complaint, Ex. "D").  However, Mr. Minitti's efforts to enforce the Jabaquara judgment were ultimately unsuccessful, and he failed to recover anything on behalf of the victims of the TAM crash.  (Guimaraes Dep. 10/7/05, pp. 139-140; 11/17/05, pp. 81-82; Guimaraes Declaration dated 5/25/07, ¶ 5).

In November 2004, Mr. Guimaraes learned for the first time that Mr. Minitti filed a lawsuit in this Court against Speiser Krause, styled <u>Dr. Wanderly Minitti v. Speiser, Krause, Nolan & Granito, P.C.</u>, Case No. 04 CV 07976 (DC)(RLE) (the "Minitti Case"), in which he sought a judgment for 50% of the attorney's fees collected by Speiser Krause in connection with the TAM litigation.  (Guimaraes Declaration dated 5/25/07, ¶ 7).  Specifically, Mr. Minitti asserted claims for quantum meruit, unjust enrichment, conversion and punitive damages, alleging in essence that his work on the letters rogatory led to the Speiser Krause-negotiated settlements and that he was therefore entitled to 50% of the fees collected by Speiser Krause.  The Minitti case was consolidated with the instant case for purposes of discovery.  On December 19, 2006, this Court entered summary judgment in favor of Speiser Krause on all claims asserted by Mr. Minitti in the Minitti Case.

In its Counterclaim, Speiser Krause initially sought indemnity for any amounts for which Speiser Krause may have been found liable in the Minitti Case.  Since the Court has entered summary judgment against Minitti, there is nothing to be indemnified in this regard.  However, Speiser Krause recently obtained the Court's permission to amend its Counterclaim to seek indemnity for its cost in defending the Minitti

Case. (Memorandum Order dated May 21, 2007).

According to Speiser Krause, "Minitti claims to have been damaged by reason of Guimaraes' actions and inactions." See Counterclaim for Indemnity, ¶ 3. This is directly contradicted, however, by Minitti's Complaint and Amended Complaint, which Speiser Krause attached as exhibits to its Counterclaim. Minitti did not allege any wrongdoing whatsoever on the part of Mr. Guimaraes. Rather, Minitti alleged that Speiser Krause exclusively was the cause of his alleged damages. See Minitti Amended Complaint ¶¶ 20-25. Similarly, contrary to Speiser Krause's allegations, Mr. Minitti did not allege that Mr. Guimaraes did anything to cause or contribute to any of the damages he was seeking to recover from Speiser Krause.

Mr. Guimaraes never authorized, encouraged or in any way caused Mr. Minitti to file suit against Speiser Krause. (Guimaraes Declaration dated 5/25/07, ¶ 8). On the contrary, Mr. Guimaraes has consistently been opposed to Mr. Minitti's right to claim that he is entitled to a share of Speiser Krause's attorneys' fees, as it was Mr. Guimaraes who had the fee-sharing agreement with Speiser Krause. (Guimaraes Declaration dated 5/25/07, ¶ 9).

## ARGUMENT

I.  **GUIMARAES IS ENTITLED TO SUMMARY JUDGMENT ON THE TORTIOUS INTERFERENCE CLAIM**

    A.  **SPEISER KRAUSE DID NOT HAVE A CONTRACT OR BUSINESS RELATIONSHIP THAT CAN SUPPORT A CLAIM FOR TORTIOUS INTERFERENCE.**

Speiser Krause did not have a business relationship with which Mr. Guimaraes could interfere. "'The tort of intentional interference with prospective economic advantage requires a showing that through the intentional and wrongful acts of the defendant, identified third parties were prevented from entering into a business relationship with the plaintiff.' ... 'An essential element of the tort is that is that the plaintiff would have consummated a contract with another person but for the interference of the defendant.'" *Fuel Digital, Inc. v. Corinella*, 15 Misc.3d 1122(A) (N.Y. Sup. Ct. 2006) (citations omitted).

In this case, Speiser Krause cannot meet this burden. Prior to this tragic air disaster Speiser Krause had never represented any of these clients before, and there is no evidence (nor could there be) that Speiser Krause expected ever to do so again. The clients live in Brazil. Speiser Krause does not and cannot practice law in Brazil and has no office in Brazil. They do not even speak Portugese. Because there is no past history of any business relationship, and no expectancy of any in the future, the only "relationship" between the clients and Speiser Krause is their retainer agreements and a settlement that was <u>offered by **another party** to the **clients**, not to Speiser Krause, but never accepted</u>.

So far as the retainer agreements are concerned, Mr. Lear, the Fed. R. Civ. P. 30(b)(6) representative of Speiser Krause, has testified in deposition that it is <u>not</u> the retainer agreements with which Speiser Krause claims interference. (G. Lear Dep. 4/23/07, p. 12). This admission alone is dispositive. Even if Speiser Krause were to now make that claim in contravention of its corporate representative's sworn testimony, the retainer agreements were already consummated; they can still be enforced, as Mr. Lear acknowledges. In fact, the retainer agreements are the basis for multiple liens Speiser Krause has filed in the California court (albeit the clients have never refused to pay Speiser Krause, and Speiser Krause has not even sent them an invoice). Thus, Mr. Guimaraes cannot be claimed to have prevented that business relationship, as the above-cited case law requires.

Equally important, if what Speiser Krause alleges should have happened — that is, that the Lack Clients had accepted the settlement — the retainer agreements between them and Speiser Krause would expire by their own terms. This was not a relationship that by its nature would be ongoing, but rather, one that was intended to end upon the conclusion of the case. Still further, Speiser Krause has acknowledged that the clients were within their rights to select new counsel at any time (and Mr. Guimaraes was <u>already</u> their counsel). Finally, Mr. Guimaraes was a party himself to the retainer agreements and cannot interfere with his own contract. *Koret, Inc. v. Christian Dior, S.A.*, 554 N.Y.S.2d 867, 869 (N.Y. App. Div. 1990) ("It is well established that only a stranger to a contract, such as a third party, can be liable for tortious

13

interference with a contract."); *Bradford v. Weber*, 525 N.Y.S.2d 968, 970 (N.Y. App. Div. 1988) (holding that "a party to a contract cannot be held liable for intentional interference with that contract."). Accordingly, Speiser Krause cannot maintain an action for tortious interference with the retainer agreements.

Regarding the proposed settlement agreements, this also cannot support a claim for tortious interference. Just as with the retainer agreements, Mr. Lear admitted that the settlement agreements with the defendants were not the subject of the tortious interference claim (leaving it something of a mystery what such a claim would be).  (G. Lear Dep. 4/23/07, p. 12).  In addition to  Mr. Lear's admission, the settlement agreements cannot be the basis for a tortious interference claim because <u>Speiser Krause was not a party to those agreements — the proposed settlements were to be between the TAM defendants and the clients</u>. Speiser Krause had no rights under the proposed settlement agreements and therefore cannot sue for tortious interference with those agreements.

There is not a scrap of evidence in this case that any of the Lack Clients ever informed Speiser Krause they would accept the settlement offers.  How could they? Speiser Krause testified that it never discussed any settlement numbers with them (offers, ranges of offers, or otherwise) or their counsel before the meeting in Brazil.  Speiser Krause may have <u>hoped</u> they would accept the offer upon being presented with it out of the blue, but hope was all that Speiser Krause had.  Nothing in the record shows that the clients ever gave any indication they would accept the offer, and thus there was nothing sufficiently tangible with which Mr. Guimaraes could interfere.

What remains is Mr. Lear's claim that Speiser Krause somehow had a "relationship" with the clients apart from the retainer agreements and the settlements.[5]  But there is no evidence of such relationship.  Mr. Lear himself testified that he had not seen the clients in years and would not recognize them if he did.  (G.

---

[5]This argument is circular as the only thing Speiser Krause complains that certain clients did not do was to sign the settlement agreements - no other "relationship" or expectancy from that "relationship" has been articulated.

Lear Dep. 4/23/07, pp. 13-14).  He only met with them once during the entire litigation.  (G. Lear Dep. 10/11/05, p. 28).  There is no evidence of any other work Speiser Krause had performed or would ever again perform for these clients, whose only reason for dealing with Speiser Krause at all, and whose only relationship to one another, was the common misfortune of having a relative die on the same airplane.  There simply is no relationship between Speiser Krause and the Lack Clients save for Speiser Krause's disappointment that a settlement offer was made to them by another party which they did not accept, as Speiser Krause acknowledges is their right.

Based on the evidence of record and the applicable case law, Plaintiff's motion for summary judgement should be granted on the basis that there was no contract or business relationship with which Mr. Guimaraes could be claimed, or proven, to have interfered.

### B.    SPEISER KRAUSE CANNOT PROVE THE CAUSATION ELEMENT OF TORTIOUS INTERFERENCE.

[T]here is a cognizable cause of action known as interference with prospective advantage. This is a business tort. ...  Plaintiff must, however, aver or plead that but for the interference a contract would have been consummated, not just that it was reasonably certain that a contract would come into being. ...  In (*Williams & Co. v. Collins Tuttle & Co.*, 6 A.D.2d 302, 176 N.Y.S.2d 99), Judge Breitel, now Chief Judge, stated at page 306 ... that 'Where liability is to be imposed for preventing one from making a particular contract, the courts have required more than a showing of qualified probability that the contract would have been completed but for the tortious interference.  As a consequence plaintiff must Allege (emphasis supplied) at least that 'it would have received the contract'.' ... Judge Breitel went on to say that the 'would have received the contract' test is a stringent one.  It is even a more stringent test than 'reasonably certain' or 'reasonable expectation.'

*DeSantis v. City of Troy*, 371 N.Y.S.2d 310, 316 (N.Y. Sup. Ct. 1975) (citations omitted; emphasis added).

Speiser Krause cannot, in the face of its own admissions, ever hope to prove that Mr. Guimaraes caused the Lack Clients to refrain from settling the case.   Leigh Ballen has testified that before Mr. Guimaraes or his clients even knew what the settlement offers were (and during a time frame that Speiser Krause testified Mr. Guimaraes was not interfering and was being "helpful"), the clients were already

15

unreceptive to Speiser Krause at the meeting in Brazil. (L. Ballen Dep. p. 184). Mr. Lear has testified

repeatedly (as set forth in the statement of facts) that he has no idea whatsoever why the Lack Clients rejected

the settlement offers, and offered no testimonial evidence that Mr. Guimaraes caused it. He and other

attorneys at Speiser Krause have also testified as to a wide array of factors unrelated to Mr. Guimaraes that

influenced the various families during their decision making (that have nothing to do with Mr. Guimaraes),

and despite whatever Mr. Guimaraes said or did, the vast majority of the clients accepted the offer. Likewise,

other clients that Mr. Guimaraes is not accused of having interfered with also rejected (or at least have not

accepted) the settlement offers. No client has ever testified that they were influenced by anything Mr.

Guimaraes said or did. To the contrary, all of the Lack Clients have submitted sworn declarations attesting

that Mr. Guimaraes did not interfere. (Riguera Aff. Exs. 2-12). There is no evidence that the Lack Clients

would ever have accepted the settlement offers, or gave any indication that they would, absent anything Mr.

Guimaraes said or did. Far from meeting the stringent test cited above, and far from showing more than a

qualified probability, Speiser Krause had nothing more than bald hope that the clients would accept the offer

presented to them. Most tellingly, Speiser Krause met with each of the clients <u>face to face</u>, and informed them

of the settlement offers for the first time, before Mr. Guimaraes ever had a chance to interfere (had be been

so inclined) and <u>not one of their attorneys has ever testified that the Lack Clients had any interest in that offer

at all</u>. This is not a question of weighing the evidence, but the fact that Speiser Krause has no evidence of

causation whatsoever.

Summary judgment is appropriate where the non-movant calls upon the court to stack inferences in

support of the claim. *Griffin v. Ambika Corp.*, 103 F.Supp.2d 297 (S.D.N.Y. 2000) (holding that "guesswork

or theorizing" do not amount to permissible inferences under Title VII or any other cases.); *Zahr v. Wingate*

*Creek Acquisition Corp.*, 827 F. Supp. 1061, 1064 (S.D.N.Y. 1993) (holding that, as regards a motion for

summary judgment, the non-movant "[i]s not entitled to the benefit of unreasonable inferences, or inferences

at war with undisputed facts."). Yet that is precisely what Speiser Krause asks this Court to do. There is no

direct link between anything Mr. Guimaraes is accused of doing and the alleged harm, or even a way to show causation through a single inference.  Rather, this Court would have to find that:

(1)    Mr. Guimaraes criticized Speiser Krause and/or the settlement offers;

(2)    then infer that the clients knew he did;

(3)    then infer that the clients had no information or opinion to the contrary about their attorneys Speiser Krause;

(4)    then infer that the clients believed Mr. Guimaraes;

(5)    then infer that they disbelieved Speiser Krause's explanation for its own conduct, if any;

(6)    then infer that the clients were previously going to accept the settlement offers;

(7)    then infer that because they believed Mr. Guimaraes they declined the settlements;

(8)    then infer that they had no other compelling reason for rejecting the settlements that would have led them to make the same decision;

(9)    then infer that for all these years, rather than, as some other clients did, come to a different conclusion, change their mind, and accept the settlements, the Lack Clients have continued to be influenced by Mr. Guimaraes in spite of everything that has happened.

This is an absolutely staggering serious of inferences that would be based on pure conjecture and speculation that is utterly repudiated by the Lack Clients' sworn declarations and Speiser Krause's own deposition testimony.  Speiser Krause has admitted, over and over, that it is without knowledge of why the Lack Clients rejected the settlement offers.  Having made that admission they cannot fashion a claim for interference out of whole cloth by deciding, out of the many admitted factors impacting the clients' decision, that it was Mr. Guimaraes who caused them not to settle.  Accordingly, for Defendant's failure to show any evidence of causation, Plaintiff's motion for summary judgment should be granted.

17

**C.    GUIMARAES DID NOT ACT MALICIOUSLY OR WRONGFULLY.**

Speiser Krause admits that Mr. Guimaraes did not conduct himself maliciously, but rather, believed

he was acting in the best interests of his client:

> A. ... I don't believe he [Mr. Guimaraes] intends to harm anyone.  I believe
> he felt that that's what was best.
>
> Q: And didn't he think he was acting in the best interest of the families?
>
> A. I believe he thought that.

(L. Ballen Dep., pp. 240-241).

There is no dispute that all of Mr. Guimaraes' actions and statements were related to the case and

Speiser Krause's handling of the settlement of the case.  The various complaints Mr. Guimaraes lodged

against Speiser Krause with civil authorities, or expressed in court, enjoy a qualified privilege, both as to the

nature of those complaints to a regulatory or civil body and in his capacity as counsel.

> Defendant's statements to regulatory and law enforcement authorities are protected
> by a qualified privilege.  *Toker v. Pollak*, 44 N.Y.2d at 222, 405 N.Y.S.2d at 6
> (statements to a district attorney concerning alleged criminal activity are protected
> by qualified privilege rather than absolute immunity); *Baldwin v. Shell Oil Co.*, 71
> A.D.2d 907, 419 N.Y.S.2d 752 (2d Dep't 1979).  These statements are actionable
> only if plaintiff proves that they were false **and that defendant was motivated by
> malice in the sense of ill-will**.  *Stukuls*, 42 N.Y.2d at 280, 397 N.Y.S.2d at 745.
>
> Falsity, alone, does not establish an inference of malice, *Shapiro*, 7 N.Y.2d at 60,
> 194 N.Y.S.2d at 60, unless the falsity is consistent only with a desire to injure the
> plaintiff, *Fowles v. Bowen*, 30 N.Y. 20, 25-26, 11 N.Y.S. 698, 700 (1864).  A
> plaintiff must establish the defendant's subjective awareness of the probable falsity
> of its statements.  *Murphy v. Herfort*, 140 A.D.2d 415, 417, 528 N.Y.S.2d 117, 119
> (2d Dep't 1988), appeal denied, 73 N.Y.2d 872, 537 N.Y.S.2d 497 (1989).  Actual
> malice requires personal spite or ill will, or culpable recklessness or negligence.
> *Hoeppner v. Dunkirk Printing Co.*, 254 N.Y. 95, 106 (1930).

*Zeevi v. Union Bank of Switzerland*, No. 89 Civ. 4637(MGC), 1992 WL 8347 (S.D.N.Y. Jan. 29, 1992)

(emphasis added; internal quotations omitted).  "[T]o be actionable, the interference must be intentional and

not incidental to some other lawful purpose." *Health-Chem Corp. v. Baker*, 915 F.2d 805, 809 (2d Cir. 1990)

(citing *Alvord & Swift v. Stewart M. Muller Constr. Co.*, 385 N.E.2d 1238, 1241 (N.Y. 1978)).

While the Court in *Zeevi* found an issue of material fact was presented as to these issues, unlike in *Zeevi*, <u>the Defendants here admit that Mr. Guimaraes did not act maliciously</u>, which means that they cannot show the required elements to deprive Mr. Guimaraes of his qualified privilege to speak on these matters without incurring liability. Thus, Mr. Guimaraes cannot be said to have acted wrongfully if his conduct was privileged, and accordingly summary judgment should be entered on the claim for tortious interference.

**D.    THE TORTIOUS INTERFERENCE CLAIM IS BARRED BY THE STATUTE OF LIMITATIONS**

New York has a three year statute of limitations for tortious interference. N.Y. C.P.L.R. 214[4]; *Spinap Corp. v. Cafagno,* 756 N.Y.S.2d 86, 87 (N.Y. App. Div. 2003); *American Fed. Group v. Edelman,* 722 N.Y.S.2d 870, 870 (N.Y. App. Div. 2001). The events complained of by Speiser Krause began in the year 2000. Speiser Krause did not file its counterclaim until late 2006, and even the original case by Plaintiff in November 2004 was filed more than 3 years after the alleged interference (so even under a "relation back" analysis, it is time barred). Speiser Krause has testified that it was aware of actions by Mr. Guimaraes it deemed tortious interference as early as the summer of 2000, but chose to ignore him. Given these facts, Speiser Krause cannot maintain a claim against Mr. Guimaraes for tortious interference, and summary judgment should be entered on this count.

**II.    PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON SPEISER KRAUSE'S COUNTERCLAIM FOR INDEMNITY**

Speiser Krause is not entitled to indemnity from Guimaraes as a matter of law. The right to indemnification may arise from either an express indemnity agreement or, absent such agreement, an implied right to indemnification. *People's Democratic Republic of Yemen v. Goodpasture, Inc.,* 782 F.2d 346 (2d Cir. 1986); *Fromer v. Yogel,* 50 F. Supp.2d 227 (S.D.N.Y. 1999). There is no express agreement by which Mr. Guimaraes is obligated to indemnify Speiser Krause, nor does Speiser Krause allege such an agreement exists. Accordingly, Speiser Krause's claim for indemnity must necessarily arise, if at all, from an implied

19

right of indemnification.

It is well settled that the implied right to indemnification may arise in either of two sets of circumstances.

> In one, an implied right to indemnification may be based on the special nature of a contractual relationship between the parties. This has been called an "implied contract theory" of indemnity, or an "implied in fact" indemnity. A second set of circumstances in which indemnity may be found has been called "implied in law" indemnity. This is a tort-based right to indemnification found where there is a great disparity in the fault of two tortfeasors, and one of the tortfeasors has paid for a loss that was primarily the responsibility of the other.

*Goodpasture*, 782 F.2d at 351 (citations omitted).

In this case, Speiser Krause cannot meet its "heavy burden" of establishing a "special relationship" between itself and Guimaraes that would give rise to an implied contract theory of indemnity. *AXA Corporate Solutions Ins. Co. v. Lumbermens Mut. Cas. Co.*, No. 03 Civ. 8493(DAB), 2006 WL 1458306, at *8 (S.D.N.Y. May 25, 2006) (dismissing with prejudice Second Amended Complaint asserting claim for indemnification where plaintiff failed to plead a special relationship that was anything beyond a common business relationship where the parties had the right to negotiate and agree to express indemnification clauses).

Commencing in December 1996, Mr. Guimaraes and Speiser Krause negotiated the terms of a fee-sharing agreement concerning their joint representation of the family members of the TAM crash. In February 2007, after further telephonic discussions, Speiser Krause accepted Guimaraes' offer to work with Speiser Krause in exchange for 25% of the attorneys' fees it collected, and Speiser Krause confirmed the acceptance in writing. (Guimaraes Dep. 11/2/05, pp. 23-24, 162, 164; Riguera Aff. Ex. 24 (Doc. No. RG00004)). During the course of these discussions, the parties were free to negotiate and agree to express indemnification, and they did not do so. (Guimaraes Declaration dated 5/25/07, ¶ 10). There is absolutely no basis to now inject a right to indemnification where the parties themselves did not do so.

20

Indeed, Speiser Krause is estopped from arguing it should be indemnified under an implied in contract theory since the record is replete with Speiser Krause's assertions that it did not have any contractual relationship with Guimaraes. (See, e.g., Memorandum of Law in Support of Defendant's Motion for Summary Judgment at pp. 8-26; Affidavit of Gerard Lear dated 9/21/06 filed in support of Defendants Motion for Summary Judgment at ¶ 6; Defendant's Reply to Plaintiff's Statement of Purported Material Facts dated November 10, 2006; Reply Memorandum in Support of Defendant's Motion for Summary Judgment). On this record, Speiser Krause cannot establish the requisite elements for implied in fact indemnity.

The second implied theory of indemnification, "implied in law" indemnity, is also inapplicable in this case. This tort-based indemnification doctrine applies where one tortfeasor is held liable solely on account of the negligence of another, such that the negligence of the proposed indemnitee is "secondary," and the negligence of the proposed indemnitor is "primary," or "actual." *In the Matter of Poling Transp. Corp.*, 784 F. Supp. 1045 (S.D.N.Y. 1992). Thus, for example, "implied in law" indemnification is applied in favor of an indemnitee who is held vicariously liable for the tort of the indemnitor. *Id.* at 1049.

Speiser Krause alleges that Mr. Guimaraes' "actions and inactions" caused Mr. Minitti damage, which Mr. Minitti then sought to recover from Speiser Krause. See Counterclaim for Indemnity, ¶ 3. However, Mr. Minitti never claimed that Mr. Guimaraes caused him any harm, and there is no evidence that he did. Moreover, there is no proof that Mr. Guimaraes did anything to give rise to Mr. Minitti's claims against Speiser Krause (which the Court deemed to be meritless when it entered summary judgment in the Minitti Case). Mr. Minitti alone decided to sue Speiser Krause, without the authorization or consent of Mr. Guimaraes. Indeed, it would have been incongruous for Mr. Guimaraes to in any way encourage Mr. Minitti to sue Speiser Krause over the very attorneys' fees Mr. Guimaraes is seeking to recover in his own action against Speiser Krause. Thus, there is simply no cognizable theory under which Speiser Krause can properly claim indemnity from Mr. Guimaraes for any damages resulting from Mr. Minitti's decision to sue Speiser Krause. For these reasons, the Court should grant Mr. Guimaraes summary judgment on the indemnity counterclaim.

## CONCLUSION

For all of the foregoing reasons and citations of authority, Plaintiff's Motion for Summary Judgment should be granted.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing document has been electronically filed and a true and correct copy of the foregoing was also sent via Federal Express, this 31st day of May, 2007, to:

William J. Apuzzo, Esq.
Apuzzo & Chase, LLC
800 Third Avenue, Suite 800
New York, NY 10022

**BERMAN, KEAN & RIGUERA, P.A.**
2101 W. Commercial Blvd.
Suite 2800
Fort Lauderdale, FL 33309
Telephone: (954) 735-0000
Facsimile: (954) 735-3636

By: s/ Jose R. Riguera
      Richard E. Berman
      RB2715
      Jose R. Riguera
      Florida Bar No.: 860905 (Admitted *pro hac vice*)