**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| Table of Authorities | ........................................................................ | -ii- |
| The Material Issues of Fact | ....................................................... | 1 |
| **Argument** |  | 3 |
| I. | Summary Judgment Standard ........................................... | 3 |
| A. | Guimaraes Tortiously Interfered with Speiser Krause's Contracts and Business Relationships ...................... | 3 |
| 1. | Tortious Interference with Prospective Business Relations or Contract ................................... | 4 |
| a. | Guimaraes Acted "Wrongfully" ................... | 5 |
| b. | Guimaraes Acted Maliciously ................... | 8 |
| c. | Guimaraes Tortiously Interfered with Speiser Krause's Contracts and Business Relationships | 9 |
| d. | Guimaraes was not a Party to Speiser Krause's Retainer Agreements ...................................... | 11 |
| B. | Causation is an issue of Material Fact for the Jury ............... | 12 |
| C. | Plaintiff's Declarations Supplied by some of the 9 Lack Clients are Insufficient to Support Plaintiff's Motion ........... | 13 |
| D. | Plaintiff's Own Affidavit is also Insufficient Support for his Motion ....................................................... | 18 |
| E. | Speiser Krause's Tortious Interference Claim is Timely ........ | 18 |
| F. | Guimaraes' Maliciousness and Wrongfulness are Questions of Fact .............................................. | 19 |
| 1. | Guimaraes' "Intent" is an issue of fact .......................... | 19 |
| 2. | Guimaraes' Wrongful Acts Were Not Privileged ......... | 20 |
| II. | The Minitti Indemnity Claim ................................................ | 20 |
| **Conclusion** |  | 21 |

**TABLE OF AUTHORITIES**

**Page**

*Federal Cases*

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)                    3

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)    16

*Albert v. Loksen*, 239 F.3d 256, 275 (2d Cir. 2001)                          12

*Balderman v. United States Veterans Administration*, 870 F.2d at 60          3

*Banco Para el Comercio Exterior de Cuba v. First National City Bank*,
744 F.2d 237, 242-243 (2d Cir. 1984)                                        18-9

*Bozant v. Bank of New York*, 156 F.2d 787 (2d Cir. 1946)                     3

*Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir.1988)               3

*Doehler Metal Furniture Co. v. United States*, 149 F.2d 130, 135 (2d Cir. 1945)    3

*Finley v. Giacobbe*, 79 F.3d 1285, 1295 (2d Cir. 1996)                       12

*Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir.1997)                           17

*Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105, 108-109 (2d Cir. 1997)      4

*Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 205 (2d Cir. 1998)               10

*Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1319-20 (2d Cir.1975)   3

*Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir.1999)        14

*Ivy Mar Co., Inc. v. C.R. Seasons, Ltd.*, 1998 WL 704112, at *15 (EDNY Oct. 7, 1998)   4

*Nadel v. Play-by-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000)    4, 8

*Scutti Enterprises, LLC v. Park Place Entertainment Corp.*, 322 F.3d 211 (2d Cir. 2003)   9

*Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639 (2d Cir. 1988)          14

*St. Pierre v. Dyer*, 208 F.3d 394 (2d Cir.,2000)                            16

*Universal City Studios, Inc. v. Nintendo Co., Ltd*, 797 F.2d 70, 75 (2d Cir. 1986)    6

*A.F.C. Enters., Inc. v. N.Y. City School Const. Auth.*, No. 98 Civ. 4534,
2001 WL 1335010 (EDNY 2001)                                                 9

**TABLE OF AUTHORITIES**

**Page**

*Federal Cases (cont'd)*

*A.S. v. Ledes* 1999 WL 1243883 (SDNY 1999)                                     19

*CSC Holdings, Inc. v. Westchester Terrace at Crisfield Condominium,* 235 F. Supp.
243, 261 (SDNY 2002)                                                           5

*Davidcraft Corp. v. Danu Intern, Inc.* 1992 WL 162977 (SDNY 1992)             10

*Diematic Mfg. Corp. v. Packaging Industries, Inc.*, 412 F.Supp. 1367 (SDNY 1976)   19

*In re: Letter Rogatory Issued by Second Part of the III Civil Regional Court
of Jabaquara/Saude Sao Paulo, Brazil*, No. M-13-72(RO), 2001 WL 1033611 (SDNY)   7

*In re: Letter Rogatory Issued By the Second Part of the III
Civil Regional Court of Jabaquara/Saude, Sao Paulo, Brazil*, No.
01-MC-212(JC) 2002 WL 257822 (EDNY)                                            7

*In re Masters, Mates & Pilots Pension Plan and IRAP Litigation*, 150 F.R.D. 74
(S.D.N.Y.1993)                                                                 16

*Matsushita Electronics Corp. v. Loral Corp.*, 974 F.Supp. 345, 355 (SDNY 1997)   6

*Miteva v. Third Point Management Co., LLC*, 323 F. Supp. 2d 573 (SDNY 2004)   19

*Resorts and Motel Advancement Dev.*, 160 F.R.D. at 451, FN3                   19

*Union Carbide Corp. v. Montell N.V.* 944 F.Supp. 1119, 1138 (SDNY 1996)       13

*Viacom Intern. Inc. v. Tele-Communications, Inc.* 1994 WL 561377 (SDNY 1994)   10

*Wells Fargo Bank Northwest, N.A. v. Energy Ammonia Transp. Corp.*,
2002 WL 1343757 (SDNY 2002)                                                    10

*State Cases*

*Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 191-2, 818 N.E.2d 1100,
785 N.Y.S.2d 359 (2004)                                                        4, 9

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183 (1980)      4, 6

*Kosson v. Algaze*, 203 A.D.2d 112, 113 (1st Dept. 1994)(aff'd, 84 N.Y.2d 1019 (1995)   12

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.,* 87 N.Y.2d 614 (1996)     4, 5

*Anas v. Brown*, 269 A.D.2d 761, 702 N.Y.S.2d 732( 4th Dept. 2000)             9

**TABLE OF AUTHORITIES**

**Page**

*State Cases (Cont'd)*

*MLI Indus., Inc. v. New York State Urban Development Corp.*, 205 A.D.2d 998, 999,
613 N.Y.S.2d 997, 979 (3d Dept. 1994)                                             5

*M.J. & K. Co., Inc. v. Matthew Bender and Co., Inc.*, 220 A.D.2d 488, 490,
631 N.Y.S.2d 938 (2d Dept. 1995)                                                  4

*Steven Liker v. Joseph Weider* (___ A.D.2d 2007___) 2007 N.Y. Slip Op. 04797
(2d Dept., June 5, 2007)                                                          20

*Klepetar et. al v. Northrup [sic] Grumman Corp.*,
Case No 01-13502 CA (23) (Cir. Ct. 11th Jud. Cir., Miami-Dade Co., Fl. 11/15/03)  7


*Other Material*

Federal Rule of Civil Procedure 56                                               *passim*

*Restatement (Second) Torts* §766B                                               10

*Restatement, Torts (2d)* §767                                                   5

Restatement (Second) Torts, §768 (comment e)                                     9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

RENATO GUIMARAES, JR.,                                        Case No. 05-CV-2210(DC)

                          Plaintiff,

              -against-

SPEISER, KRAUSE, NOLAN & GRANITO,
a professional corporation, f/k/a SPEISER,
KRAUSE, MADOLE & LEAR, a professional
corporation,
                          Defendant.
-----------------------------------------------------------X


## DEFENDANT, SPEISER, KRAUSE NOLAN & GRANITO'S
## MEMORANDUM OF LAW IN OPPOSITION
## TO PLAINTIFF RENATO GUIMARAES, JR.'S
## MOTION FOR SUMMARY JUDGMENT


Defendant, Speiser, Krause, Nolan & Granito ("Speiser Krause") pursuant to Federal Rule

of Civil Procedure 56, respectfully submits this memorandum of law in opposition to plaintiff

Renato Guimaraes, Jr.'s ("Guimaraes") motion for Summary Judgment.


## THE MATERIAL ISSUES OF FACT

Speiser Krause respectfully refers the Court to its Local Civil Rule 56.1 statement ("Def's

56.1(b)") and exhibits accompanying the Affidavit of William J. Apuzzo ("Apuzzo Aff.") for the

facts material to this motion.  What follows is a concise summary thereof.

In 1997, Speiser Krause was retained by the 65 families of the victims of the October 31,

1996 crash of a Brazilian airliner operated by TAM (the "TAM Cases").  For a period of time,

Guimaraes assisted Speiser Krause as the "local counsel" on some of the TAM cases.  At all times,

1

Guimaraes was aware of Speiser Krause's retainer contracts with its TAM clients. Pursuant to its retention, Speiser Krause litigated the TAM cases in the United States of America. After several years of litigation Speiser Krause obtained offers of settlement from the defendants in those actions.

In April 2000 Speiser Krause scheduled and held individual meetings with its TAM clients to convey the defendants' settlement offers. Guimaraes was opposed to the settlement of the TAM cases. Most of the TAM clients settled their cases pursuant to the offers communicated by Speiser Krause. Guimaraes refused to perform any required tasks associated with formalizing the settlements. As a result, many of Speiser Krause's TAM clients fired Guimaraes and hired substitute Brazilian attorneys for this purpose.

Undeterred, and in furtherance of his opposition to settlement of the TAM cases, Guimaraes instituted a malicious libel campaign against Speiser Krause. In numerous communications, Guimaraes falsely accused Speiser Krause of criminal and unethical behavior. He carried that same message to the news media, the Brazilian Bar Association, a Brazilian Attorney General, several courts in the United States (including judges handling TAM cases), and a number of American law firms. Guimaraes employed his own false accusations as stepping stones towards his ultimate goals: convincing the TAM clients to fire Speiser Krause and substitute them with U.S. counsel of his choice, and raising his own profile to become the most prominent aviation attorney in Brazil. To date, at least nine TAM clients have fired Speiser Krause, and are represented by a Californian law firm that Mr. Guimaraes introduced these clients to. By Guimaraes' own admission, these nine clients are loyal to him. They also follow his advice.

As a result of its termination, Speiser Krause has lost the opportunity to receive a fee in the amount of 27% of sums recovered, as stated in its retainers with these clients.

2

## **ARGUMENT**

I.    SUMMARY JUDGMENT STANDARD

A motion for summary judgment may not properly be granted unless the "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. See, e.g., *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Balderman v. United States Veterans Administration*, 870 F.2d at 60. In ruling on the motion, the court is not entitled to weigh the evidence. *See, e.g., Id.*; *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1319-20 (2d Cir.1975). Rather, if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *See, e.g., Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir.1988). The Second Circuit Court of Appeals has held that where there is the slightest doubt as to the facts the motion for summary judgment should be denied. *Doehler Metal Furniture Co. v. United States*, 149 F.2d 130, 135 (2d Cir. 1945); *Bozant v. Bank of New York*, 156 F.2d 787 (2d Cir. 1946).

A.    <u>Guimaraes Tortiously Interfered with Speiser Krause's Contracts and Business Relationships</u>

As set forth below, Guimaraes offers a list of other possible motivations the Lack clients may have had in terminating Speiser Krause. Pl. Mem. at 8-9. After listing these other possibilities,

3

Guimaraes asks the Court to impermissibly infer that his own tortious acts had no effect on these clients' decisions to fire Speiser Krause. This fallacy relies on just the type of inference Federal Rule of Civil Procedure 56 disallows.

        1.    <u>Tortious Interference With Prospective Business Relations or Contract</u>

Tortious interference with prospective business relations claims require a plaintiff to show:

    (1) a business relationship between the plaintiff and a third party;

    (2) the defendant, knowing of that relationship, intentionally interferes with it;

    (3) the defendant acted with the sole purpose of harming plaintiff or used dishonest, unfair, or improper means; and

    (4) injury to the relationship.

*Nadel v. Play-by-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000); *Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105, 108-109 (2d Cir. 1997); *Ivy Mar Co., Inc. v. C.R. Seasons, Ltd.*, 1998 WL 704112, at *15 (EDNY Oct. 7, 1998). Tortious interference with prospective business relations lie when "the third party would have entered into or extended a contractual relationship with plaintiff but for the intentional and wrongful acts of the defendant." *M.J. & K. Co., Inc. v. Matthew Bender and Co., Inc.*, 220 A.D.2d 488, 490, 631 N.Y.S.2d 938 (2d Dept. 1995).

A plaintiff may show that the interference was accomplished through "wrongful" or "culpable" means, which include criminal or independently-tortious acts, fraud, misrepresentation, harassment with meritless litigation, and, in certain instances economic pressure. *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 191-2, 818 N.E.2d 1100, 785 N.Y.S.2d 359 (2004) *citing*, *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.,* 87 N.Y.2d 614 (1996); *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183 (1980). The cause of action remains viable even where the defendant

4

interferes via "lawful means," if it can be shown that the defendant "acted for the sole purpose of inflicting intentional harm." *NBT Bancorp*, 87 N.Y.2d at 621.

Whether the conduct which interfered with contractual relations is improper, and thus actionable, is determined by reference to a number of factors, including the nature of the conduct itself, the motives of the interfering party, the interests, if any, which it acts to protect, the interest with which it interferes, and the relationship between the parties. *MLI Indus., Inc. v. New York State Urban Development Corp.*, 205 A.D.2d 998, 999, 613 N.Y.S.2d 997, 979 (3d Dept. 1994); *CSC Holdings, Inc. v. Westchester Terrace at Crisfield Condominium,* 235 F. Supp. 243, 261 (SDNY 2002).

        a.     <u>Guimaraes Acted "Wrongfully"</u>

Guimaraes' campaign against Speiser Krause consisted of not one, but several independently-sufficient "wrongful acts" which all support Speiser Krause's tortious interference claim. As set forth in Speiser Krause's second counterclaim, most of these acts concern Guimaraes' defamation of Speiser Krause, while others, such as Guimaraes' attempts to have Speiser Krause criminally prosecuted based on false statements, border on the criminal.

First, Guimaraes misrepresented to the TAM clients that Speiser Krause had acted criminally in prosecution of the TAM Cases. "A representation is fraudulent when, to the knowledge and belief of its utterer, it is false in the sense in which it is intended to be understood by its recipient." *Restatement, Torts (2d)* §767. In September and October 2000, Guimaraes complained of "criminal behavior" Speiser Krause had undertaken. Apuzzo Aff., Exh. C (Doc. Nos. SK 0006555-6), D (Doc. Nos. SK 000653-4), and *Id.* at Exh. N, (Doc. Nos SK000645-000648). Guimaraes communicated these accusations to the TAM Clients, New York State Supreme Court Justice Jane Solomon and

5

others.  *Id.* In February 2001, Guimaraes swore that Speiser Krause was guilty of "high legal treason," (Apuzzo Aff., Exh B (Doc. No.  RG-00386-8)), and in February 2004, renewed this baseless attack. (Apuzzo Aff., Exh. F (Doc. No. SK-2938-41)) Guimaraes also advised the TAM clients that Speiser Krause had criminally lied to them, concealing evidence, (Apuzzo Aff., Exh. O, Doc. No. SK 00657-9), and that he asked the United States FBI to investigate. *Id. See also* Apuzzo Aff., Exh. C, (Doc No. SK 000655-6). These were  statements of fact, not opinion, and the TAM clients could only have understood them to mean that Speiser Krause had committed crimes against them.  In fact, the statements were untrue; Speiser Krause committed no crime, concealed no evidence, nor, to Guimaraes' great disappointment, was Speiser Krause ever investigated by the FBI, or disciplined by the OAB (Brazilian Bar Association) or any domestic Bar.  Apuzzo Aff., Exh A (Guimaraes 4/25/07 Dep., pp. 88-90). Guimaraes, as a practicing lawyer knew or should have known each of his statements to be untrue.

Guimaraes, a Brazilian attorney, is no stranger to the Courts.  His campaign to have the clients terminate Speiser Krause included the institution of numerous meritless lawsuits in the courts of the United States. Civil suits and criminal prosecutions can constitute wrongful means. *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191, 406 N.E.2d 445, 428 N.Y.S.2d 628, 632 (1980); *Matsushita Electronics Corp. v. Loral Corp.*, 974 F.Supp. 345, 355 (SDNY 1997). Even the threat of litigation can constitute tortious interference. *Universal City Studios, Inc. v. Nintendo Co., Ltd*, 797 F.2d 70, 75 (2d Cir. 1986). Litigation also may be wrongful if a party, having some belief in its merit, institutes or threatens to institute the claim in bad faith, intending only to harass and not to bring his or her claim to definitive adjudication. *Guard-Life, supra.* As Guimaraes has admitted, he attempted to thwart the TAM clients' acceptance of settlements in Brazil, filing

6

proceedings to stop their acceptance. Apuzzo Aff., Exh. A. (Guimaraes 4/25/07 Dep., p. 107). As Guimaraes admitted however, each settlement presented by a Speiser Krause client for acceptance by the Brazilian courts, was approved. Apuzzo Aff., Exh. A. (Guimaraes 4/25/07 Dep., p. 108-9). At the time he sought to have these settlements stopped, he knew it was against the clients' wishes, Apuzzo Aff., Exh. A.1 (Guimaraes 11/2/05 Dep. pp. 103-5), and that his actions in seeking to stop the settlements would harm Speiser Krause. *Id.*     Dr. Wanderley Minitti, acting under Mr. Guimaraes' authorization brought a letters rogatory proceeding in this District. *In re: Letter Rogatory Issued by Second Part of the III Civil Regional Court of Jabaquara/Saude Sao Paulo, Brazil*, No. M-13-72(RO), 2001 WL 1033611 (Owen, J) (Reproduced at Apuzzo Aff., Exh. P). The case was promptly dismissed. *Id.* Shortly thereafter, Guimaraes' authorized agents brought an action seeking similar relief in the U.S. District Court for the Eastern District of New York. *In re: Letter Rogatory Issued By the Second Part of the III Civil Regional Court of Jabaquara/Saude, Sao Paulo, Brazil*, No. 01-MC-212(JC) 2002 WL 257822 (Gleeson, J) (Reproduced at Apuzzo Aff., Exh. Q). Aside from directing the Clerk of that Court to officially serve process on a defendant in the Jabaquara case, Judge Gleeson granted no relief. *Id.* Undeterred, Guimaraes hired the Florida law firm of Herman & Mermelstein to bring yet another action, this time in Florida State court, to domesticate the Jabaquara judgment. *See, Klepetar et. al v. Northrup [sic] Grumman Corp.*, Case No 01-13502 CA (23) (Cir. Ct. 11th Jud. Cir., Miami-Dade Co., Fl. 11/15/03) (Reproduced at Apuzzo Aff., Exh. R). It may be of little surprise when that court also dismissed the case, finding Guimaraes was engaged in a course of "blatant forum shopping." *Id.*[1]

---

[1]Plaintiff's brief lists of number of actions Speiser Krause did <u>not</u> take to address Guimaraes' wrongful acts, including failing to institute litigation against its clients. (Pl. Mem. at 9-10). None of these acts are elements of – or even material to – a tortious interference claim. Neither is the demonstration of litigiousness on a Guimaraes-like

Third, Guimaraes sought to have Speiser Krause criminally prosecuted, and barred from entering the entire country of Brazil. Def's 56.1 ¶70; Apuzzo Aff. Exh. A, (Guimaraes 4/27/07 Dep., pp. 88-90, 152), Exh. F. Guimaraes wrote to the Brazilian attorney general, and the Brazilian Bar Association, complaining that Speiser Krause was making unlawful settlement offers with its clients, and was otherwise practicing law without a license in that country. Apuzzo Aff., Exh. A (Guimaraes 4/27/07 Dep., p 134. Essentially, he was soliciting the criminal prosecution of Speiser Krause's attorneys. As part of these tactics, Guimaraes intended for the Brazilian airport police to detain Speiser Krause's attorneys, thus preventing them from conferring with their clients. Apuzzo Aff. Exh. A, (Guimaraes 4/25/07 Dep., pp. 88-90). Guimaraes communicated his own solicitation of the Brazilian authorities to the TAM clients, in hopes that his groundless accusations would gain legitimacy in those clients' eyes. Guimaraes also advised the TAM clients that he had communicated with the US FBI regarding Speiser Krause's concealment of evidence. Apuzzo Aff., Exh. O (Doc No SK-00657-9).

        b.       Guimaraes Acted Maliciously

The Second Circuit has articulated a disjunctive standard for tortious interference claims: the defendant used wrongful means or acted with the "sole purpose" of harming the plaintiff. *Nadel v. Play-by-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000). Thus, in addition to being supportable by "wrongful acts," tortious interference claims are viable where the interfering party engaged in conduct solely out of malice or for the sole purpose of inflicting intentional harm upon

---

scale. For example, Speiser Krause does not dwell on Guimaraes' other lawsuits in California against the TAM defendant's insurers (including USAIG) for the alleged violation of his charging liens in the TAM cases, nor on his actions which seek to have the attorneys fees portions of the (now remanded) Jabaquara judgment domesticated in California, nor on Guimaraes' suits against former TAM clients in Brazil for fees.

the plaintiff. *Scutti Enterprises, LLC v. Park Place Entertainment Corp.*, 322 F.3d 211, 216 (2d Cir. 2003)(quoting Restatement (Second) Torts, §768 (comment e)). Whether the defendant acted with the "sole purpose" of harming the plaintiff is a question of material fact. *A.F.C. Enters., Inc. v. N.Y. City School Const. Auth.,* No. 98 Civ. 4534, 2001 WL 1335010 (EDNY 2001); *Anas v. Brown*, 269 A.D.2d 761, 702 N.Y.S.2d 732( 4th Dept. 2000). Guimaraes, upset by the "good tortious interference" he perceived against him regarding Speiser Krause's involvement in the Varig air crash cases, believed that it would be fair punishment for Speiser Krause to lose its fees for the cases in which they were substituted. Apuzzo Aff., Exh. A, (Guimaraes 4/25/07 Dep., pp 15-16).

c.     Guimaraes Tortiously Interfered with Speiser Krause's Contracts and Business Relationships

Speiser Krause's contingent retainers with its TAM clients are both contracts and representative of prospective economic opportunities. Unlike ordinary contracts, a client always has a right to discharge a lawyer, without cause. Where the retainer contract is contingent, the lawyer-client relationship is a prospective economic opportunity. If and when that lawyer is successful in recovering monetary damages for the client, he or she is entitled to be paid a fee based upon the terms of the contract of retainer. The economic opportunity is prospective, and the amount of the fee is a success-based percentage of the amount recovered on the client's behalf.

The degree of protection available to a plaintiff for tortious interference with his business or business relations is defined by the nature of the plaintiff's enforceable legal rights. *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189, 818 N.E.2d 1100, 785 N.Y.S.2d 359 (2004). There is no dispute that a law firm such as Speiser Krause has no right to seek specific performance of their retainer agreements. The TAM Clients could fire Speiser Krause, with or without cause. This does not,

9

however, allow Guimaraes to wrongfully or maliciously interfere with the attorney/client retainers or relationships in a manner that deprives Speiser Krause from realizing the economic benefits it was to receive. The tort covers any relationship leading to a potentially profitable contract. *Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 205 (2d Cir. 1998). An allegation that a party took action that prevented the performance of the terms of the contract is sufficient to plead a claim for tortious interference. *Wells Fargo Bank Northwest, N.A. v. Energy Ammonia Transp. Corp.*, 2002 WL 1343757 (SDNY 2002).

Tortious interference with prospective business opportunity encompasses the elements of tortious interference with contract. The tort can consist of inducing or otherwise causing a third party not to enter into <u>or continue</u> a relationship; or preventing the plaintiff from acquiring a contract. *Viacom Intern. Inc. v. Tele-Communications, Inc.* 1994 WL 561377 (SDNY 1994); *Restatement (Second) Torts* §766B ("A defendant who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation."). The tort even extends to pre-contractual relations, provided there was some reasonable expectation that a profitable relationship would result. *Davidcraft Corp. v. Danu Intern, Inc.* 1992 WL 162977 (SDNY 1992).

In the case at bar, Speiser Krause's contracts for legal services were contingent fee retainers. Under these agreements, Speiser Krause would only receive a fee upon successfully recovering money on its clients' behalf. After agreeing to, and executing the retainer agreements, Speiser Krause spent time, money, and effort litigating on behalf of these clients. Speiser Krause spent upwards of four years litigating these matters on both coasts of the United States. *See,* Pl's 56.1, ¶1, Apuzzo Aff., Exh. L. In the Spring of 2000, Speiser Krause received offers of settlement from the

10

TAM defendants and transmitted these offers to all of its TAM clients. Most of Speiser Krause's 65 TAM clients accepted these offers while some, including the nine clients who fired Speiser Krause, rejected the offers. The discharge and substitutions of Speiser Krause started in 2001, and continues to date, with the last substitution occurring in June 2007. (R. Maciel, Exh. H). Up to the date of each discharge and substitution, Speiser Krause had performed pursuant to its retainer contracts. Speiser Krause's prospective fee at the time of the discharge was based upon the amounts that the TAM defendants were willing to pay to settle each case. *See* Riguera Aff., Exh. 22, p. 5, §7. Speiser Krause earned these fees by diligently working on its clients' behalf. The TAM clients agreed to pay Speiser Krause a fee of 27% of amounts recovered from the TAM defendants. Once discharged, Speiser Krause could no longer perform legal services for a given TAM client. Guimaraes' tortious interference prevented Speiser Krause from performing on its existing retainer contracts with the nine TAM Clients.

        d.      Guimaraes was Not a Party to Speiser Krause's Retainer Agreements

Plaintiff argues that he could not have tortiously interfered with the retainer contracts, because he was a party to those contracts. Plaintiff also claims he could not have interfered with a prospective business opportunity because he was entitled to a portion of any fees earned. Guimaraes alleges he was a partner with Speiser Krause in the retainer contracts with the clients. This is untrue, and plaintiff has offered no evidence to support this claim in support of the instant motion. In any event, that premise is incorrect because the retainer contracts gave him no rights, nor did it impose any obligation upon him with respect to the clients. According to Guimaraes' Complaint and testimony, he had no contractual right to obtain fees directly from the TAM clients. Guimaraes was not a party the Speiser Krause's retainers; could not perform the retainer contracts in the United

States of America; nor could he specifically enforce these contracts against the clients. Guimaraes' only rights, if any, are derived from the agreement he alleges to have existed between himself and Speiser Krause, upon which he bases this lawsuit.

Guimaraes had no legal right against any of the settling TAM clients directly for 25% of fees based upon these Speiser Krause retainer agreements. At most, Guimaraes was merely an agent of Speiser Krause. Contract parties' agents are considered "third parties" against whom tortious interference claims may stand. *Finley v. Giacobbe*, 79 F.3d 1285, 1295 (2d Cir. 1996)(citing *Kosson v. Algaze*, 203 A.D.2d 112, 113 (1st Dept. 1994)(aff'd, 84 N.Y.2d 1019 (1995)). For example, a plaintiff employee may maintain an action for tortious interference with his or her employment contract against a co-worker if the co-worker acted outside the scope of his or her authority in interfering with the contract or committed an independent tortious act against the plaintiff. *Albert v. Loksen*, 239 F.3d 256, 275 (2d Cir. 2001).


B.    Causation is an Issue of Material Fact for the Jury

The undisputed facts show that the nine TAM clients fired Speiser Krause were those that most trusted Guimaraes, (Apuzzo Aff., Exh. A., p.71) and who were "very tied" to Guimaraes. Id. Mr. Guimaraes has admitted that it was his idea to have these clients fire Speiser Krause. Id. at p. 112. He has also admitted that he advised them to do so. Id. at p. 56. Guimaraes solicited U.S. law firms to replace Speiser Krause. Apuzzo Aff., Exhs. I, K. In fact, Guimaraes believed it was his duty to find lawyers to replace Speiser Krause. Apuzzo Aff., Exh. A, p. 112. These nine families followed his advice. Id. at pp. 124-125.

12

While Speiser Krause is without the proverbial "smoking gun" regarding its discharge by these nine clients, documents, affidavits and testimony on file reveal the strong, if not unavoidable inference that Guimaraes caused these clients to terminate Speiser Krause. "But for" causation is not required to be alleged; it is sufficient to allege that the defendants' acts led to the termination. *Union Carbide Corp. v. Montell N.V.* 944 F.Supp. 1119, 1138 (SDNY 1996). The effect of Guimaraes' wrongful acts had on the Lack clients' decision to terminate Speiser Krause is a jury question.

C.    Plaintiff's Declarations Supplied by some of the 9 Lack Clients are Insufficient to Support Plaintiff's Motion

In support of its motion for summary judgment, plaintiff submits "declarations" from the "Lack Clients" (Jose R. Riguera Affidavit, Exh. 2-12). In fact, all of the Lack Clients submitted the same exact declaration, apart from the names and signatures of the declarant, in support of plaintiff's motion for summary judgment. The declarations are so much like preprinted forms that they do not even state the name of the decedent that they are referable to. Such "check the box" and sign your name declarations are immediately suspect with regard to personal knowledge because they were obviously drafted by someone other that the signatories. It is incredible to believe that the multiple identical declarations submitted could have been created individually.

A summary judgment motion may be made with or without supporting affidavits, see Fed.R.Civ.P. 56(a); however, Rule 56 provides that if affidavits are submitted they "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e); *St. Pierre v. Dyer*, 208 F.3d 394 (2d Cir.,2000). Further, a court may "strike portions of an affidavit

13

that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements." *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir.1999).

In effect, the drafter of the boilerplate declarations supplanted the necessary personal knowledge of each declarant with his own words and phraseology. For example, the declarations refer to an alleged "dispute" between Guimareas and Speiser Krause, but fail to establish what the declarant knows about any dispute, nor how the declarant became aware of any alleged dispute. Without individualized, particularized facts constituting the basis of the declarants' own personal knowledge, and not the drafter's knowledge, and "[b]ecause there is no way to ascertain which portions of [the] affidavit were based on personal knowledge...the affidavit is insufficient under Rule 56 to support the motion for summary judgment." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639 (2d Cir. 1988).

Plaintiff's memorandum analyzes one of these declarations: "For example", plaintiff states, "Mr. Fernando Lobo Vas de Mello, one of the Lack Clients, attests..." (Plaintiff's Memorandum in Support, p. 7). Mr. Vas de Mello's declaration is less of an example of the Lack Client declarations, and more of an exemplar. The rote, boilerplate Lack Client declarations fail on their face, and should be stricken as conclusory and generalized. It fails to set forth such facts as would be admissible in evidence and the most critical points are based upon "information" and not personal knowledge.

The factually conclusory declaration simply mimics Guimaraes' defense to the tortious interference counterclaim. The specific reasons that the Lack Clients decided to "cease using the services of Speiser Krause" are vital to plaintiff's defense on the issue of tortious interference. The

14

Lack Client declarations echo the familiar cry of Guimaraes' innocence, without more. When the declarations in support of plaintiff's motion should clarify and solidify plaintiff's defense to the tortious interference claim, they do not.

Rather, the declarations imply that the Lack Clients' decision to retain new counsel was in the "family's financial best interests". Riguera Aff., Exhs 2-12 (inclusive), ¶5. Why was it in the Lack Clients' financial best interests to retain new counsel? Since Speiser Krause was on a contingent retainer, the Lack Clients were not paying anything out of pocket for their continued representation. Although the Lack Clients' rationale for declining a settlement offer may be justified by financial reasons, plaintiff has not explained how this justification applies to the decision to fire Speiser Krause. As a further example, a financial consideration could have been the immediate receipt of settlement funds as opposed to a long delay. This could not have been the finan

Specifically, in paragraph 4 of the Lack Client declaration, the declarant states "In addition to rejecting the settlement offer, my family made a decision that we do not wish to be represented by Speiser, Krause. For this reason we retained different counsel." In this paragraph, plaintiff specifically skirts the crux of defendant's claim of tortious interference, that Guimareas improperly caused the Lack Clients to retain new counsel. Although the declaration states, "[f]or this reason..." the declaration states no reason except that after firing Speiser Krause they were without counsel so they then retained different counsel. There is no dispute that Guimaraes substituted Speiser Krause with his choice of new counsel. Each of the identical declarations is designed by the drafter to lack necessary specificity. Tellingly, in Paragraph 6, the declarant does not say that Speiser Krause's contentions are untrue, or that that Guimareas did not influence the declarant to fire Speiser Krause. The declarant uses the phrase, "but that is not accurate." This softer phraseology avoids the

15

confrontation, and does not specifically deny the claim that they fired Speiser Krause under Guimaraes' wrongful influence, advice and the means he employed.

The fact that these declarations are identical should not be lightly cast aside. Such testimony, if offered at trial, would fail to support a decision on the merits for plaintiff. *In re Masters, Mates & Pilots Pension Plan and IRAP Litigation*, 150 F.R.D. 74 (S.D.N.Y.1993)("Plaintiff's affidavit, however, provides no specific factual information which, if offered at trial (whether or not in admissible form) would either show that these allegations are true, or support a decision on the merits in favor of plaintiff"). Plaintiff offers no reason or excuse for the use of such a boilerplate affidavit which was obviously drafted by Guimaraes and/or his lawyers.

"If the motion for summary judgment is not made and supported as provided in Rule 56, the Rule does not impose on the party opposing summary judgment an obligation to come forward with affidavits or other admissible evidence of his own." *St. Pierre v. Dyer*, 208 F.3d 394 (2d Cir.,2000)("In granting summary judgment, the district court inappropriately weighed the evidence, failed to draw all permissible inferences in favor of [the party opposing summary judgment], and imposed on him a burden to adduce evidence that was not warranted by the speculative affidavits supporting [movant's] motions"); See generally *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In the present case, plaintiff's motion is not properly supported as provided by Rule 56(e). It is incumbent on plaintiff to elicit personal, particularized, and non-conclusory statements from the Lack Clients. See *St. Pierre v. Dyer,* supra.

At most, the boilerplate Lack Client declarations only create ambiguities. The declarations do not speak to Guimaraes' motives in advising the Lack Clients to seek new counsel; they fail to expound upon the circumstances of their decisions. Since the court must resolve all ambiguities and

16

draw all factual inferences in favor of the party against whom summary judgment was sought, plaintiff's motion for summary judgment must be denied.

There is no dispute that the Lack clients are also Guimaraes' clients, and that he had a great deal of contact and influence in their decision to fire Speiser Krause. Guimaraes testified that these clients trusted him, were tied to him, and that it was his duty to substitute Speiser Krause with other United States counsel. The Lack declarations were drafted for the sole purpose of supporting Guimaraes. The Lack Client declarations are self-serving and raise questions as to the credibility of the declarants, which must be assessed at the time of trial. A party moving for summary judgment bears the burden of showing not only the absence of any genuine issue of fact requiring a trial, but also that there is no real question as to the credibility of its evidentiary material. *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir.1997)("It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment"). It should also be noted that the "Lack Clients" are non-party witnesses within plaintiff's exclusive influence. They live in Brazil, and neither Speiser Krause nor this court can compel their testimony in this action. Their written declarations cannot be deposed, as to their credibility, content or Guimaraes' influence.

For all the reasons above stated the declarations should be given little or no weight with respect to the truth or falsity of the factual allegations in the defendant's second counterclaim. If anything, the existence and submission of these declarations is silent testimony to the influence Guimaraes wields over the declarants, rasing material issues of fact, and rendering this matter inappropriate for summary judgment.

17

D.    Plaintiff's Own Affidavit is also Insufficient Support for his Motion

Guimaraes' affidavit in support fails to address the factual issues alleged in the second counterclaim. Guimaraes does not deny influence over the Lack clients, does not deny encouraging them to fire Speiser Krause, and does not deny assisting them in doing so. This is because he did, as shown by the evidence before this Court. Given plaintiff's failure to properly support his motion with evidence or factual assertions based on personal knowledge, Rule 56 does not impose on defendant an obligation to come forward with evidence to rebut the same. *Id.* Despite the lack of such burden, defendant proffers evidence which establishes that its claim is meritorious.

E.    Speiser Krause's Tortious Interference Claim is Timely

Guimaraes' wrongful acts resulted in Speiser Krause's firing by the nine Lack Clients. Plaintiff's wrongful acts in this regard began in 2000, and continue to date. Speiser Krause's termination by these clients started in 2001; the most recent was in June 2007. Apuzzo Aff., Exh. G. The instant action was commenced in Florida in 2004, and transferred to this Court in 2005. The evidence clearly shows that plaintiff's solicitation of U.S. law firms to replace Speiser Krause continued even after he commenced this lawsuit. Plaintiff has produced a privilege log documenting his correspondence to numerous U.S. law firms as late as 2005. These contacts were made for the purpose of replacing Speiser Krause as counsel to the TAM clients. (Apuzzo Aff., Exh. K). Speiser Krause has been unable to exhibit these documents because they remain with the Court, *in camera* pending a privilege determination.

Amendments of pleading brought pursuant to Rule 13(f) relate back to the original pleading under Rule 15(c), provided the claim arose out of the conduct, transaction, or occurrence set forth in the original pleading. Federal Rule of Civil Procedure 15(c)(2); *see also Banco Para el Comercio*

18

*Exterior de Cuba v. First National City Bank*, 744 F.2d 237, 242-243 (2d Cir. 1984). As long as the counterclaim defendant has adequate notice of the transactions forming the basis for the amended Answer and counterclaim, relation back is appropriate. *Diematic Mfg. Corp. v. Packaging Industries, Inc.*, 412 F.Supp. 1367, 1374 (SDNY 1976). Guimaraes was certainly aware of his own actions. Defendant's first Answer also contained affirmative defenses (¶¶ 48-51) which gave notice of plaintiff's wrongful acts. Therefore, this counterclaim is timely as it relates back to the original pleading, as well as to the wrongful acts which continued after that pleading was served. *Resorts and Motel Advancement Dev.*, 160 F.R.D. at 451, FN3; *A.S. v. Ledes* 1999 WL 1243883 (SDNY 1999).

F.    Guimaraes' Maliciousness and Wrongfulness are Questions of Fact

1.    Guimaraes' "intent" is an issue of fact

Given the wrongful and malicious methods he employed to accomplish his goals, the issue is a narrow one. Malicious motivation is an issue of material fact that may not be summarily adjudged. *Miteva v. Third Point Management Co., LLC*, 323 F. Supp. 2d 573 (SDNY 2004). Malice itself is a question of fact. But even if Guimaraes' actions were non-malicious, they were unlawful, meet this test, and constitute a jury question.

Speiser Krause does not "admit" that Guimaraes acted without malice because his motive is a fact question for the jury to determine in view of the malicious methods he used to get Speiser Krause fired. Speiser Krause's witnesses' subjective opinions that Guimaraes did not appear to be malicious must be weighed against the contrary evidence by the trier of facts.

19

2.    Guimaraes' Wrongful Acts Were Not Privileged

Guimaraes also attempts to characterize his wrongful conduct as privileged "criticism," even though that conduct exceeds all bounds of reasonableness. Guimaraes' wrongful conduct included, but was not limited to unfounded allegations of criminality on Speiser Krause's part, active interference with TAM Clients' settlements, and his campaign to replace Speiser Krause with American counsel of his own choosing, despite his cognizance of the valid retainers between Speiser Krause and its clients.

Unlawful accusations of criminality are not privileged defamatory statements. Guimaraes is even less able to hide behind the cloak of privilege when criminal means or malice were used to defame Speiser Krause. Falsely reporting that Speiser Krause committed a crime is in itself a criminal act. *Steven Liker v. Joseph Weider* (___ A.D.2d 2007___) 2007 N.Y. Slip Op. 04797 (2d Dept., June 5, 2007).


II.    The Minitti Indemnity Claim

Guimaraes authorized, by power of attorney authorized Wanderley Minitti, Plaintiff in the companion action, to attempt to enforce Guimaraes' Brazilian judgment in the USA. Minitti claimed to have spent hundreds of thousands of dollars pursuing these legal actions. Wanderley Minitti, some of Guimaraes' TAM Clients, and Guimaraes himself were to benefit from Wanderley Minitti's efforts. Wanderley Minitti was not successful in his attempts to domesticate the Jabaquara judgment in the USA, but he believed his actions assisted Speiser Krause in pressuring the TAM defendants to make offers of settlement. Based upon this theory, Wanderley Minitti sued Speiser Krause for part of its fee. Speiser Krause was successful in obtaining Summary Judgment dismissing Mintti's

20

complaint. Therefore, Speiser Krause withdraws its First Counterclaim for indemnification of the Minitti claim.

## CONCLUSION

Speiser Krause had contracts with its TAM clients to represent them on a contingent basis. Guimaraes was aware of Speiser Krause's relationships with these clients. Guimaraes used wrongful means to influence the TAM clients. He advised them to fire Speiser Krause, and to substitute U.S. counsel of his choosing. The facts prove that at least nine clients have fired Speiser Krause and retained substitute counsel. The facts prove that Speiser Krause had a prospective economic benefit amounting to 27% of the offers of settlement at the time Speiser Krause was substituted. The facts prove that had Guimaraes not tortiously interfered with the relationships between Speiser Krause and its clients, Speiser Krause would still be representing these clients. Plaintiff's motion for summary judgment on Speiser Krause's second counterclaim must be denied.

Dated: New York, New York
     June 29, 2007

Respectfully submitted,
Apuzzo & Chase

By: _____
William J. Apuzzo (WA-1312)
*Attorneys for Defendants*
800 Third Avenue - 8th Floor
New York, NY 10022
(212) 297-0885

21