**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

RENATO GUIMARAES, JR.,                                          Case No. 05-CV-2210(DC)

                                    Plaintiff,

              -against-                                          **AFFIDAVIT OF WILLIAM J. APUZZO**

SPEISER, KRAUSE, NOLAN & GRANITO,
a professional corporation, f/k/a SPEISER,
KRAUSE, MADOLE & LEAR, a professional
corporation,
                                    Defendant.
----------------------------------------------------------------X

STATE OF NEW YORK      )
COUNTY OF NEW YORK    ) ss.:

          WILLIAM J. APUZZO, being duly sworn, deposes and says:

1.        I am an attorney with Apuzzo & Chase, attorneys for defendant Speiser Krause Nolan &

          Granito ("Speiser Krause").  I submit this affidavit in opposition to plaintiff Renato

          Guimaraes, Jr.'s ("Guimaraes") motion for summary judgment on Speiser Krause's

          counterclaims.

2.        As of the date of this affidavit, your affiant has not received anything other than tele-

          facsimile copies of the declarations which are allegedly "sworn" by several of Speiser

          Krause's former TAM clients.  Unless the originals of each are filed, Speiser Krause

          requests that they be disregarded as evidence in support of plaintiff's motion.

3.        Annexed hereto as "Exhibit A" are relevant excerpts of the transcript of Guimaraes'

          deposition taken April 25, 2007.

4.      Annexed hereto as "Exhibit A.1" are relevant excerpts of the transcript of Guimaraes' deposition taken November 2, 2005.

5.      Annexed hereto as "Exhibit A.2" are relevant excerpts of the transcript of Guimaraes' deposition taken October 7, 2005.

6.      Annexed hereto as "Exhibit A.3" are relevant excerpts of the transcript of Gerard Lear's deposition taken October 11, 2005.

7.      Annexed hereto as "Exhibit A.4" are relevant excerpts of the transcript of Gerard Lear's deposition taken October 12, 2005.

8.      Annexed hereto as "Exhibit A.5" are relevant excerpts of the transcript of Gerard Lear's deposition taken April 23, 2007.

9.      Annexed hereto as "Exhibit A.6" are relevant excerpts of the transcript of Leigh Ballen's deposition taken October 10, 2005.

10.     Annexed hereto as "Exhibit A.7" are relevant excerpts of the transcript of Arthur Ballen's deposition taken October 11, 2005.

11.     Annexed hereto as "Exhibit A.8" are relevant excerpts of the transcript of Guimaraes' deposition taken November 7, 2005.

12.     Annexed hereto as "Exhibit B" is Guimaraes' affidavit dated February 6, 2001 (Doc. No. RG-00386-8).

13.     Annexed hereto as "Exhibit C" is a true and accurate copy of correspondence from Guimaraes to Hon. Jane Solomon dated October 13, 2000. (Doc. No. SK-000655-6).

14.     Annexed hereto as "Exhibit D" is a true and accurate copy of correspondence from Guimaraes to Amaro (Doc. No. SK-000653-4).

15.     Annexed hereto as "Exhibit E" is a true and accurate copy of correspondence from Guimaraes to the United States Federal Bureau of Investigation dated September 20, 2000. (Doc. No. SK-2927-9).

16.     Annexed hereto as "Exhibit F" is a true and accurate copy of correspondence from Guimaraes to Einhorn dated February 2004 (Doc. No. SK-2938-41).

17.     Annexed hereto as "Exhibit G" are true and accurate copies of documents concerning the substitution of Speiser Krause by the Lack Law Firm between 2006 and 2007.

18.     Annexed hereto as "Exhibit H" is a true and accurate copy of correspondence from Guimaraes to TAM Clients dated January 22, 2001. (Doc. No. SK-0002332-8).

19.    Annexed hereto as "Exhibit I" is a true and accurate copy of correspondence from
       Guimaraes to Wanderley Minitti dated December 22, 2000.

20.    Annexed hereto as "Exhibit J" is a true and accurate copy of correspondence from Arthur
       Ballen to Guimaraes dated November 9, 2000 (Doc. No. SK-000598).

21.    Annexed hereto as "Exhibit K" is a true and accurate copy of Guimaraes' privilege log
       dated April 24, 2007.

22.    Annexed hereto as "Exhibit L" is the affidavit of Gerard R. Lear sworn to June 28, 2007.

23.    Annexed hereto as "Exhibit M" is a true and accurate copy of correspondence from
       Guimaraes dated October 5, 2000.  (Doc. No. SK-000637-8).

24.    Annexed hereto as "Exhibit N" is a true and accurate copy of correspondence from
       Guimaraes dated October 9, 2000 (Doc. No. SK-000645-8).

25.    Annexed hereto as "Exhibit O" is a true and accurate copy of correspondence from
       Guimaraes dated October 18, 2000 (Doc. No. SK-000657-9).

26.    Annexed hereto as "Exhibit P" is a copy of the decision/order of the United States
       District Court for the Southern District of New York in the matter entitled: *In re: Letter
       Rogatory Issued by Second Part of the III Civil Regional Court of Jabaquara/Saude Sao*

*Paulo, Brazil*, No. M-13-72(RO), 2001 WL 1033611 (Owen, J), dated September 7, 2001.

27.    Annexed hereto as "Exhibit Q" is a copy of the decision/order of the United States District Court for the Eastern District of New York in the matter entitled *In re: Letter Rogatory Issued By the Second Part of the III Civil Regional Court of Jabaquara/Saude, Sao Paulo, Brazil*, No. 01-MC-212(JC) 2002 WL 257822 (Gleeson, J) , dated February 6, 2002.

28.    Annexed hereto as "Exhibit R" is a copy of the decision/order of the Circuit Court for the Eleventh Judicial Circuit of Miami-Date County, Flordia in the matter entitled *Klepetar et. al v. Northrup [sic] Grumman Corp.*, (Case No 01-13502 CA (23)) dated November 15, 2003.

29.    Speiser Krause's opposition is accompanied by its statement pursuant to Local Civil Rule 56.1(b), and a Memorandum of Law.

WHEREFORE, your deponent respectfully prays for an order denying the plaintiff's motion for summary judgment and for such other, further or different relief as this court deems just and proper.

WILLIAM J. APUZZO (WA 2127)

Sworn to before me this 29th
Day of June 2007

NICOLE APUZZO PILANNINO
Notary Public, State of New York
No. 02PI6021075
Qualified in Westchester County
Commission Expires 12/27/2009

**EXHIBIT "A"**

```
 1                     Renato Guimaraes
 2     anything, I even did not think of that.
 3          Q.     So, that would be a no?
 4          A.     Okay.
 5          Q.     Thank you.
 6                 Did you ever make a complaint that
 7     Arthur Ballen stayed at only expensive luxury
 8     hotels which caused a high cost to the TAM clients?
 9          A.     No, I was with him at the hotel most
10     of the time.
11          Q.     In California, you have several
12     lawsuits pending; is that correct?
13          A.     I have, I believe, just one, my one,
14     I think is just one against Northrop for my winning
15     attorney fee.  I may be wrong but my personal
16     lawsuit is against Northrop.
17          Q.     Maybe I could assist you.  You have a
18     case pending in Los Angeles which is against the
19     insurance company for Northrop; is that correct?
20          A.     It's the same case, yes.
21          Q.     And you have another case against
22     Northrop to domesticate your sucumbencia in the
23     Orange County action; correct?
24          A.     But in that case, the families are
25     the plaintiff, not me.
```

1                       Renato Guimaraes

2          Q.        I understand, but as part of that,

3     your sucumbencia, the 20 per cent fee, is part of

4     the Orange County action; is that correct?

5          A.        Yes.   I guess I get your meaning,

6     yes, I am involved but I am not the plaintiff, I am

7     the attorney for these people in Brazil but I am

8     not a party, I am an attorney, yes.

9          Q.        But you have an interest in the

10    outcome of that action?

11         A.        Yes, the more they get, the more will

12    be my fee, yes.   I'm sorry.

13         Q.        And in the Orange County action where

14    the clients, the TAM clients, are the plaintiffs,

15    how much would be the sucumbencia award if you are

16    successful?

17         A.        I understand that you don't have a

18    sucumbencia in U.S., only in Brazil.   It will be

19    today, it's not final yet, 20 per cent paid, not by

20    the client but by the losing party, Northrop in

21    this case.

22                    And the Sao Paulo Supreme Court even

23    diminish the award for the families, the damage for

24    the families, on the normal pain and suffering was

25    down.   Even though the Superior Court of Sao Paulo

1                    Renato Guimaraes

2       confirmed my previous 20 per cent merit for the

3       sucumbencia, for the fee to be paid by the losing

4       party, Northrop.

5            Q.      Is that sucumbencia award based upon

6       26 clients, 65 clients or the remaining eight

7       clients who have not yet settled?

8            A.      It's related to the winner party at

9       the end, that is discussion.  If some families are

10      entitled to that award, it's still going on, at the

11      final it will be a decision, family X, Y, Z is

12      entitled, A, B is not, I will have only 20 per cent

13      of the first one.

14           Q.      And if a client has settled his

15      action, that will not be included; correct?

16           A.      Not in the action, but as far as,

17      according to the Brazilian law, as far as Northrop

18      or whoever settle a case without respecting the

19      winning attorney fee, the attorney in Brazil has an

20      independent case against it, in this case Northrop.

21           Q.      The other case by Renato Guimaraes

22      against United States Aviation Insurance Company in

23      Los Angeles, do I understand correctly that you are

24      suing them because they paid Speiser Krause without

25      recognizing your lien for attorneys fees; is that

```
 1                    Renato Guimaraes
 2    correct?
 3          A.    Correct.
 4          Q.    And your prior testimony, I
 5    understand you worked on that case, on those cases,
 6    for 20 years; is that correct?
 7          A.    That's correct.
 8                MR. BERMAN:  I object based on
 9          relevancy.
10                MR. APUZZO:  Relevancy is not a
11          proper objection in the deposition, as
12          you know it, all right.  Object either to
13          form, privilege, you know the drill.
14                MR. BERMAN:  Compared to what you
15          were doing yesterday --
16                MR. APUZZO:  What I'm trying to do
17          is lay a foundation for questions so you
18          don't object that there's no foundation
19          for my questions.
20                Let me continue, please.
21          Q.    Those Varig clients, they terminated
22    you without any cause; correct?
23          A.    Without any --
24          Q.    Cause.
25          A.    The cause is Lloyd's of London don't
```

1                    Renato Guimaraes

2     want to pay the settlement I made, except they

3     fired me and put Speiser Krause, that's a good

4     tortious interference by Speiser Krause.

5          Q.      Now, there came a time when you found

6     out that attorney Luis Sampaio replaced you on the

7     Varig case; is that correct?

8          A.      Just to sign the settlement, yes.

9          Q.      So, just by signing the settlement,

10    he got, in one instance, $98,000 and the client

11    received less than he made; is that correct?

12         A.      In one case at least, yes, he got

13    more money than the little kid.

14         Q.      And there came a time when you found

15    out that Arthur Ballen was responsible for these

16    clients firing you and hiring Louis Sampaio;

17    correct?

18         A.      No.  I think the correct answer would

19    be co-responsible, Lloyd's of London, they hate me,

20    and Sampaio, too, of course, it was a team.

21         Q.      As a result of their actions, you

22    were not able to get a fee for 20 years worth of

23    work; is that correct?

24         A.      Not really, one or two families

25    voluntarily said Dr. Guimaraes, you know what you

                    Renato Guimaraes

1

2       Q.      So, with the assistance of the

3    interpreter, can you say that you were angry at

4    Speiser Krause?

5       A.      Not personal, I understand their

6    dirty tricks, I have to face it, human being, I

7    don't hate them.

8       Q.      Did you ever feel that you wanted to

9    get revenge against Speiser Krause for making you

10   lose the Varig fees after 20 years worth of work?

11      A.      No.  I am not the judge of the world,

12   I want my rights and if I may I will do my best to

13   prevent other people to suffering the same thing

14   from Speiser Krause, it's my duty, yes.

15      Q.      So, you would have liked to see them

16   punished for what they did?

17              MR. BERMAN:  Object to the form.

18      A.      I don't like anyone to be punished

19   but sometimes it's necessary, I don't like it but

20   that's the way life is.

21      Q.      But, in a case like this, you would

22   like to see them punished; correct?

23      A.      I would like that justice will be

24   made.

25      Q.      Now, if I understand your prior

1                           Renato Guimaraes

2                    MR. BERMAN:  Object as to form.

3          Q.      Can you answer the question?

4          A.      Can you repeat?

5          Q.      I'll repeat it.

6                    If Speiser Krause loses their fees on

7      those eight TAM clients that are now represented by

8      Walter Lack, would that be a fair punishment of

9      Speiser Krause?

10         A.      In Brazil it will be fair, at least

11     fair.

12         Q.      Did you report to anybody that

13     Speiser Krause committed crimes and treason?

14         A.      Yes, I did, a lot of times.  How,

15     because, again --

16                    MR. BERMAN:  No, just answer his

17               question.  You don't have to elaborate,

18               unless he asks you a next question.

19                    Is that all right if I tell him

20               that?

21                    MR. APUZZO:  That's all right.

22         Q.      Did you know that those statements

23     would harm the reputation of Speiser Krause and the

24     world legal community?

25         A.      Yes.

1                    Renato Guimaraes

2                    Mr. Guimaraes, can you identify this

3     Veja article?

4                    (The witness examines document.)

5          A.        Yes, sir.

6          Q.        What is Veja?

7          A.        It's a kind of Time Magazine for

8     Brazil, the leading by far magazine by Brazil, I

9     think is the fifth in the whole world, the first

10    one.

11         Q.        Does your photograph appear --

12         A.        On the second page, yes.  The first

13    one is the fellow who worked a few weeks with

14    Speiser Krause before he gave up in Sao Paulo, was

15    found to replace me.

16         Q.        And who was that fellow?

17         A.        Fernando.  Fernando is a nice man,

18    very good English, he has a family in this case.

19    He work free as an interpreter for us with Speiser

20    Krause and families in the beginning.  He was very

21    good.  He, at the beginning, he wrote Mr.

22    Guimaraes, in the official papers, criminal paper,

23    Mr. Guimaraes, what are you doing here, you are

24    saying bad things about Speiser Krause, I represent

25    Speiser Krause.  And I have five days to reply, and

46

1                           Renato Guimaraes
2      I did, and they gave up.
3               Q.      Is this Fernando Lootenberg?
4               A.      Yes, sir.
5               Q.      And he's an attorney in Brazil?
6               A.      In Sao Paulo, yes.  He's going up,
7      up, up.  And I said yes, I did, and I prove.
8               Q.      Can you tell us what the date of this
9      magazine article is?
10              A.      I believe it's on the first page,
11     sir, I think I put Veja, March 14, 2001.
12              Q.      And you refer to this as the document
13     that blew up the scandal?
14              A.      Yes.  It was between Speiser Krause
15     and families and myself, you know, everyone ring
16     the bell, telephone, what's going on, and the press
17     and so forth.
18              Q.      And you were interviewed for this
19     magazine article?
20              A.      Yes, and the picture was special for
21     this report.
22              Q.      Where were you interviewed?
23              A.      I was interviewed several times by
24     the reporter Marcello Carneiro whose name is here,
25     first page.  He was a journalist.  He called me

1                    Renato Guimaraes

2    by Speiser Krause) will take about 35 per cent.

3    The law firm is conning its clients.  Guimaraes

4    answered: "Speiser Krause betrays the families,

5    insisting only on infamous settlements, and defends

6    the interest of TAM."  And it continues, "Susannah

7    Klepetar, who's also an officer in the association,

8    disagrees (with the accuser.)"

9          A.      Say again, disagree --

10         Q.      "Disagrees and leaves horrified from

11   a meeting with the Americans, she switched from

12   Speiser Krause for another American law firm."

13                 My question is, when you refer to the

14   accuser, you're referring to Sandra Assali;

15   correct?

16         A.      You say --

17         Q.      Accuser.

18         A.      Yes, I refer to Sandra Assali.

19         Q.      Now, did you make this quote to Veja

20   Magazine, the one that we just read.

21                 (Whereupon the interpreter

22                 translates.)

23         A.      No.  Of course the writing belong to

24   the reporter.  The idea, of course, is mine and

25   Andre Martins, but the point is 35 per cent I think

1                          Renato Guimaraes

2    don't recall, it's not a common name.  I know her,

3    she has a problem on the neck, I will tell you in a

4    few minutes, I don't want to kill your time.

5                    MR. BERMAN:  If it comes to you,

6           please let counsel know.

7                    THE WITNESS:  Yes, I will.

8           Q.    Did Klepetar ever tell you that she

9    trusted you and not Speiser Krause?

10                   (Whereupon the interpreter

11          translates.)

12          A.    Yes, sure, lots of people said so.

13          Q.    No, no, Klepetar.

14          A.    Klepetar, yes, she was furious.

15          Q.    Did you tell her to switch attorneys

16   from Speiser Krause to an American attorney?

17          A.    Yes.  She asked me for -- I start

18   with Herman, not with --

19          Q.    Herman & Mermelstein?

20          A.    Yes.

21          Q.    And she followed your advice to

22   switch attorneys to Herman & Mermelstein?

23          A.    And I follow her wish.

24          Q.    Later on on that same page that we

25   were discussing, the paragraph starts "Proof of the

```
 1               Renato Guimaraes
 2           (Off the record at 11:50 a.m.)
 3           (Resuming at 11:55 a.m.)
 4   EXAMINATION CONTINUING BY MR. APUZZO:
 5           Q.    Mr. Guimaraes, can you turn to the
 6   page RG-823.  I'm just going to read a couple of
 7   sentences and I just want you to confirm that this
 8   was, in fact, said.
 9               "The betrayal scandal is in full
10   force in Brazil."  And, then, following, it says,
11   "The new story comes as a surprise to millions in
12   the legal profession internationally."
13               Was it your statement that the Veja
14   article would be read by millions in the legal
15   profession internationally?
16           A.    One sentence I try to say the new,
17   the breakthrough, new, is surprising millions
18   because Veja has over one million issues each week,
19   and the judiciary internationally, yes.
20           Q.    Did the Brazilian courts approve the
21   settlements for the families that did accept the
22   settlements?  It's not in the article, it's just a
23   question.
24           A.    I'm sorry, did the Brazilian --
25           Q.    Courts, did they approve the
```

```
 1                      Renato Guimaraes
 2      settlements for the families that accepted those
 3      settlements?
 4           A.      The first reaction from the curator
 5      of minors --
 6           Q.      No, no, you have to hear my
 7      question.  The Brazilian courts were required to
 8      approve settlements; is that correct?
 9           A.      Oh, I'm sorry, yes, they are.
10           Q.      And for those families that accepted
11      the settlements, the Brazilian court approved;
12      isn't that correct?
13                   (Whereupon the interpreter
14               translates.)
15           A.      I have to elaborate on that.  Yes and
16      not.
17           Q.      I understand, maybe the following
18      questions will help you.  Where you say in the next
19      paragraph on this, it starts "Everything out of
20      control of the courts and of the overseeing power
21      of the Department of Justice," then it says --
22           A.      Oh, okay, I see.
23           Q.      Following that, you make a statement
24      that the Brazilian courts no longer have control;
25      is that correct?
```

1                  Renato Guimaraes

2          A.      She is my client, she gave me

3      authorization.  In Brazil, you have two pieces, one

4      is the contract on the fee itself, and another one

5      is authorization to represent to the court.  Here

6      you have just one.

7          Q.      Do you expect to receive a fee for

8      the work that you're doing on the Klepetar case?

9          A.      It's up to her, you know, she's

10     religious, you know, a lovely lady, whatever she

11     decides, it's okay, I want to help her.

12         Q.      Is she one of the clients represented

13     by Walter Lack presently?

14         A.      Yes.

15         Q.      So, you have a deal with Walter Lack

16     for 25 per cent of the fees?

17         A.      Yes.

18         Q.      So, you will be getting a fee from

19     this lovely religious lady?

20         A.      Yes.

21         Q.      She can't refuse you this fee;

22     correct?

23         A.      Yes.  As with Speiser Krause, yes.

24         Q.      Turning to 838, RG-00838, do you see

25     down the page a little bit you enumerate four

1                      Renato Guimaraes

2       items, it starts "If Speiser Krause had accepted

3       the opinion held by the undersigned of 1.  Not

4       lying to the families "we lost our case in the

5       USA," then it continues on, 2, 3 and 4?

6              A.     Question is?

7              Q.     Do you see that in the document?

8              A.     Yes.

9              Q.     The question now is, it's correct

10      that Speiser Krause did lose the forum non

11      conveniens motion in California; is that correct?

12             A.     I believe it was on the stay, he did

13      not lose, I think the affect even today is the

14      stay.

15             Q.     Do you understand that Northrop

16      Grumman in California made a motion, an application

17      to the court, to dismiss the Brazilian clients in

18      California, or to stay the action?

19             A.     To stay.

20             Q.     And do you understand that the judge

21      granted their motion and stayed the actions in

22      California?

23             A.     Yes, that's the situation.

24             Q.     And do you understand that Speiser

25      Krause opposed the application of Northrop Grumman

1                       Renato Guimaraes

2           Q.      Yes.

3           A.      Well, the client, maybe.  I don't

4    recall if it was the client, his or her attorney,

5    local attorney who referred the case to us, Arthur

6    and Leigh and the translator which was Duda, I

7    believe.  It's a small room, you know, just between

8    the two beds and the bedroom, not a commercial or

9    business room, just for the first time.

10          Q.      And who said the words that we lost

11   the case on the merits?

12          A.      Mr. Arthur Ballen.

13          Q.      And he said that to the interpreter?

14          A.      Yes, to both, to the interpreter if

15   was there, I believe so, and to the client, and to

16   me.

17          Q.      And to you?

18          A.      Yes.

19          Q.      And you knew that they didn't lose

20   the case on the merits, is that correct, because

21   you received the letter from Tim Cook?

22          A.      Well, the letter from Tim Cook was

23   years ago, so we are talking, in the assumption we

24   both know we still have a chance in America, that's

25   because I insist to them please tell about the no

1                    Renato Guimaraes

2    deposit of the bond.

3                    And they, oh, Renato, you don't know

4    how this work, we are the boss, we know the

5    strategy.  I said okay, it's up to you, but don't

6    forget they are not following the rules in

7    California.  So, it was an understanding going on,

8    we still are there under a stay.

9                    And then came this surprise, and

10   true, we lost the case.  He did not say on the

11   merits but it was understood for us all done, threw

12   away.  That was shocking.

13           Q.    When was this conversation, can you

14   fix the date?

15           A.    When, those days was the holy week,

16   2000, April 2000.  We had many meetings, not the

17   first one.

18           Q.    When he said this, did you question

19   Mr. Ballen about the loss of the case in

20   California?

21           A.    Immediately, you know, it was my

22   instinct to say what we lost in front of the

23   client, and then on and on.  That was terrible.

24           Q.    But you knew from the prior letter

25   from Tim Cook that the case was not lost?

1                     Renato Guimaraes

2          A.     Not only this letter but in many many

3     conversations.  The fax to Tim Cook -- Our

4     understanding, how to break it, you know, the forum

5     non conveniens, and so far.

6                     I made two lawsuits, many people told

7     them I was crazy, two lawsuits to throw away the

8     Jabaquara case.  And I am right in the sense my

9     legal foundation was the real wish of the family,

10    the painful family.

11                    So, to have a case there in

12    California, not here in Brazil, what did this poor

13    family do in Brazil is to follow the order of the

14    California judge, they are obliged to do that.  But

15    the real wish of these people, they are willing to

16    have the judgement in California, that's the

17    Brazilian law.  But I lost, so it was we live 24

18    hours a day on this understanding, it was not the

19    Tim Cook letter.

20          Q.     When you heard this said by Arthur

21    Ballen, did you say anything to the client or

22    Arthur Ballen in that room?

23                    MR. BERMAN:  Objection.

24                    It's been asked and answered.

25                    (Whereupon the interpreter

1              Renato Guimaraes

2         A.    First all in Sao Paulo.  Some has

3    been dismissed, some are still on.  All in Sao

4    Paulo, none out of Sao Paulo.  Now we have out of

5    Sao Paulo but not at this time.

6         Q.    And do I understand correctly that

7    there was a suit in Sao Paulo by the association

8    against Speiser Krause concerning the attorney

9    fees?

10        A.    Yes.

11        Q.    And is that still pending?

12        A.    No, it is dismissed.

13        Q.    Last page, 841, it's RG-00841, you

14   make reference here concerning a proceeding

15   instituted with the Sao Paulo Branch of the

16   Brazilian Bar Association against Speiser Krause,

17   Proceeding Number 2405 of the Commission on

18   Prerogatives?

19             MR. BERMAN:  Is that correct?

20             THE INTERPRETER:  Yes.

21        Q.    Can you describe what is Proceeding

22   2405 that you refer to?

23        A.    After, you know, this problem calmed

24   down, I thought it was my imperative duty as a

25   shared member of that contract to tell to the same

```
 1                     Renato Guimaraes

 2     ethical commission of the bar what was going on.

 3     And to make a long story short, the conclusion,

 4     approve it, the conclusion was to send it, the bar,

 5     not me, the bar to send three letters.  I'm sure

 6     you have this copy, first to the federal prosecutor

 7     in Sao Paulo, second to U.S. Consulate, American

 8     Consulate in Sao Paulo, and the third to the police

 9     airport saying that Speiser Krause committed in

10     Brazil a crime in this case for doing what is not

11     possible for Brazilian attorneys.

12                     And this was approved but never said,

13     they changed.  I have my suspicion why this

14     happened but I have no evidence.  Anyhow, it never

15     got out there, but it was approved, I have copies

16     of that here.

17             Q.      Do I understand correctly that you

18     instituted this proceeding with the Brazilian Bar

19     Association?

20             A.      Yes, full of the documentation.  And

21     I recall the reporter for the Board of the

22     Committee was a very prominent attorney with great

23     experience in international affairs, he has a large

24     law firm, and he look at that very carefully.

25             Q.      And, to your knowledge, that
```

1                    Renato Guimaraes

2      proceeding by the Brazilian Bar Association against

3      Speiser Krause was dismissed?

4              A.      Yes, never send the letters, yes.

5                      MR. APUZZO:  Let's break now.

6                      (Off the record at 12:55 p.m.)

7                      (Resuming after recess at 1:40 p.m.)

8      EXAMINATION CONTINUING BY MR. APUZZO:

9              Q.      I'm going to show you, Mr. Guimaraes,

10     what has been marked for identification as Exhibit

11     B, and it's a series of documents.  I would like

12     you to review these.

13                     Let me identify them for the record,

14     the letters are all in Portuguese, for the most

15     part, generated on the letterhead of Renato

16     Guimaraes, Jr., and there's a range of Bates stamps

17     from SK-25, SK-26, SK-16, SK-17, SK-657, SK-658,

18     SK-659, SK-660, SK-15, SK-661, SK-662, SK-663,

19     SK-664, 665, 666, 667, 668 and 669.

20                     The reason why the Speiser Krause

21     Bates stamp are out of order is that we tried to

22     put these in some sort of chronological fashion.

23                     Dr. Guimaraes, in reviewing these

24     documents, can you tell us if these are all

25     documents in Portuguese that were generated by

1                    Renato Guimaraes

2   because I could not sleep and he made medicine for

3   my sleeping under stress.  And he's back to Brazil

4   and now he's willing to come here to testify in a

5   trial if possible.

6                    He has been in a trial here many

7   times because he was here in New York a clinical

8   director, and for dozens of people, drugs,

9   violence, crime, suicide, he has to say in the

10  courts, he is accustom to make the position.

11                   And one, two months ago, we met in

12  Brazil.  He is very organized, he has my record.

13  He is good because he is not affidavit by legal, he

14  knows my inner feelings.

15             Q.    Can you spell the doctor's name?

16                   THE INTERPRETER:  It is spelled

17             S-E-I-D-E-M-B-E-R-G.

18                   MR. BERMAN:  First name Cilio.

19             Q.    So, Dr. Guimaraes, on the second page

20  where you say, "Crimes of coercion during the

21  course of the legal action committed by Arthur and

22  Leigh Ballen" --

23             A.    No, no, physically by Sampaio.

24             Q.    On top you also say there's a crime

25  of coercion --

1                    Renato Guimaraes

2          A.       Yes, it's coercion.

3          Q.       And it violates Brazilian penal code

4     Article 344?

5          A.       Yes, it was committed by Arthur, by

6     the Ballens, but personally committed the act by

7     Sampaio, yes.

8          Q.       And you say that the punishment is

9     one to four years of incarceration and fine in the

10    amount of two to ten thousands cruzeiros in

11    addition.

12         A.       I did not say that, the law say that.

13              MR. BERMAN:   It's a quote of the

14         statute.

15         A.       Because violence, when someone is in

16    a lawsuit, it's a violation the judicial area.

17         Q.       Then you follow, "Concealment of

18    evidence, Thomas Frizzel - evidence of Northrop's

19    fault to be presented to the jury in California in

20    April, request of help from the FBI," that's the

21    Federal Bureau of Investigation?

22         A.       That's correct.

23         Q.       "The evidence in question was needed

24    for the case trials in Brazil."

25              You asked the FBI in the United

1                    Renato Guimaraes

2           A.      I don't know in this particular five

3     or six case, but assuming as general they did

4     approve has nothing to do with my merits here which

5     cover all 65 families, and I said according to the

6     Brazilian law it's illegal, because of the lie and

7     their lying.  And that's my comments, I hope will

8     be my answer to your question.

9           Q.      That is fine.  Did you bring also an

10    action in the Brazilian courts to nullify the

11    settlements?

12          A.      No, I made it to prevent the

13    argument, the settlements, not before, after.

14          Q.      So, you brought an action to present

15    the settlements after they were made but before

16    they were accepted?

17          A.      Right.  It's not technically an

18    action, it's just a request to the curator of minor

19    to do something.

20          Q.      And your requests were not granted?

21          A.      Yes, was granted.  Took a long time

22    until they fix some clauses.  Not all of them, the

23    pressure for the families, very strong, they

24    started emancipated, the minors, somehow they went

25    through the delay.

 1                   Renato Guimaraes

 2         Q.    So, the settlements were not illegal?

 3         A.    It was illegal.  Why, because of the

 4    lie, we lost the case, we did not tell the truth,

 5    we omitted the truth of the California judge.  For

 6    this aspect, yes.

 7         Q.    And did you make an application to

 8    prevent the settlements because of the lie?

 9               (Whereupon the interpreter

10          translates.)

11         A.    Because of the damage.

12         Q.    And even with the application to

13    prevent the settlements, they still went through;

14    correct?

15         A.    Yes, most of them.  Some regret, give

16    us -- argue with us in California, but most of them

17    did agree and they accept, well, Renato, you are a

18    dreamer, and so forth, I want my money, who pay for

19    the kids.  And they did receive the money.

20         Q.    And the court accepted those

21    settlements?

22         A.    Yes.

23         Q.    So, would that make the settlements

24    legal?

25         A.    No.  I believe the family has a case

1                    Renato Guimaraes

2    yet to do, if they wish, but that's another case.

3         Q.    A little bit further down, the next

4    paragraph, you make a statement, "I even had to ask

5    the Honorable FBI Director Thomas J. Pickard to" --

6         A.    I lost you.

7         Q.    After the settlements, skip down two,

8    starts out "Because we were never told about Mr.

9    Frizzel's evidence."

10        A.    Go ahead, and because of Frank

11   Granito.

12        Q.    Yes.

13              (The witness examines document.)

14        Q.    "Because of Mr. Frank Granito the

15   third, another attorney from Speiser Krause tried

16   to put down Mr. Frizzel to saying that he is pretty

17   junior," you say, "I even had to ask the Honorable

18   FBI Director Thomas J. Pickard to help us by

19   sending to the Jabaquara judge in Brazil a copy of

20   this crucial evidence."

21              So, does this follow, were you

22   telling this New York judge that Speiser Krause,

23   Mr. Granito was, in fact, concealing evidence here?

24        A.    Not only him, but the whole group of

25   Speiser Krause except Frizzel.  In fact, I tried to

```
1                    Renato Guimaraes
2         A.      As I had an explanation probably from
3    Herman, I say yes, that's true, but now you are
4    more sophisticated, I agree with you, I did not
5    represent 65 of these people.
6         Q.      On paragraph number three, the last
7    line, you say "They directed me to go to the United
8    States and interview lawyers for the purposes of
9    replacing Speiser Krause as United States
10   litigation attorneys."
11               Who directed you?
12        A.      Several of them, maybe Susannah
13   Klepetar, maybe Professor Fernando Lootenberg, but
14   the idea was partially mine, not them, and they
15   inquired, okay, try to see if you find somebody
16   there, and so forth.
17        Q.      So, the idea to go to the United
18   States to find new attorneys was basically yours
19   and they said okay, see what you can do Renato, get
20   us a good attorney; correct?
21               MR. BERMAN:   Object to the form.
22        A.      According to the decision I made of
23   my duty covered by 27 votes, it was my duty to do
24   that.  If I omitted, then I will be ethical
25   problem.  I should interfere, it was my duty, yes.
```

```
1                    Renato Guimaraes

2    working harder for more money, you know, who else

3    could be --

4                    MR. APUZZO:  Say this please in

5              Portuguese because maybe he's not

6              understanding.  It's very simple.

7         Q.      You make a statement here that

8    someone is being paid under the table, unlawfully

9    illegally, that's the inference.  My question is,

10   who is being paid under the table?

11                   MR. BERMAN:  Object to the form.

12        A.      My answer is, if I knew I will name

13   it.  If I do not know I leave in the air.

14        Q.      So, you're telling the clients and

15   colleagues that someone in the air is being paid

16   under the table, and you sometimes make statements

17   about people based upon your suspicions without any

18   evidence; correct?

19        A.      Always I make a question when the

20   situation is unexplained in a large unethical way,

21   yes.

22        Q.      I am showing the witness what has

23   been marked for identification as SK-2348 and 2349,

24   the first page is an English translation of the

25   second page, which is a letter on the letterhead of
```

1           Renato Guimaraes

2      missing five aviation firms from Miami.

3              (Insert)_____.

4              (Insert)_____.

5              (Insert)_____.

6              (Insert)_____.

7              (Insert)_____.

8      Q.      The next paragraph says, "All of the

9      families I have spoken to agreed to change in

10     representation, almost all the families are

11     accepting the replacement."

12             How many families did you speak to?

13     A.      How many I talk with?

14     Q.      Yes, to make a change in

15     representation?

16     A.      At that time, maybe not too many,

17     eight, ten, twelve, six, I don't recall how many.

18     Not a big number.

19     Q.      And all of the families you had

20     spoken to agreed to replace Speiser Krause; is that

21     correct?

22     A.      No, some ask, or their attorney ask,

23     some time to decide, let's see what happens, the

24     families make no decision yet.  It was a twilight

25     zone yet, and not easy yes or no.

1                    Renato Guimaraes

2          Q.     Certainly the four families that went

3    to Herman & Mermelstein, they were part of the

4    group that you advised to --

5          A.     They followed my duties.

6          Q.     They followed your advice?

7          A.     My duty to advise them.

8          Q.     And then there's an additional four

9    families now that are with Walter Lack's firm, they

10   also followed your duties --

11         A.     No, I think by the time -- I don't

12   think Walter Lack has too many.

13         Q.     He has eight?

14         A.     Herman -- I think it's the same

15   group, when Herman give up, they move to him.

16              MR. BERMAN:  Counsel, my

17              Portuguese is not too good, but there

18              appear to be things in the Portuguese

19              letter that are not in the English

20              version, there appears to be omissions,

21              it's not verbatim.

22              MR. APUZZO:  I didn't say it was

23              verbatim, I'm asking questions about the

24              letter.

25              MR. BERMAN:  I'm just pointing

```
 1                      Renato Guimaraes
 2   that point with Speiser Krause, not good.
 3          Q.     Did the OAB report Speiser Krause for
 4   committing a crime?
 5          A.     Yes, sir.  As I told you, Bar
 6   Association Sao Paulo approved my duties and
 7   approved the draft, three of them to the, again, to
 8   the prosecutor, federal prosecutor in Sao Paulo,
 9   U.S. Consulate and to airport police to take care
10   of Speiser Krause because of this crime according
11   to Bar Association there.
12          Q.     Just one final question here if I
13   can.  Walter Lack now represents eight clients,
14   correct, eight of your clients?
15          A.     In California?
16          Q.     Yes.
17          A.     I think nine.
18          Q.     Nine, there's a new one that's coming
19   in, yes, we don't have the name yet?
20          A.     I know the name.
21          Q.     What's the name of the new one, the
22   latest one?
23          A.     Vanessa, and her orphan Pedro, Pedro
24   the little boy.
25                      MR. APUZZO:  I thank you for that.
```

1              Renato Guimaraes

2              So, my question, again, those

3    settlements were not declared or judged to be a

4    nullity; correct?

5         A.    That's correct, they just reject in

6    the beginning.

7         Q.    Now, in point number two, you say

8    that "The Brazilian Bar Association, on account of

9    these evidences decided that foreign professionals

10   have entered Brazil in order to exercise advocacy

11   in an illegal manner."  Then it continues on, "I

12   grant with no doubts, be executed on the Brazilian

13   Bar Association's side, it is already null."

14             You're referring here to the

15   settlement agreements being null according to the

16   Brazilian Bar Association?

17             MR. BERMAN:  Object to the form.

18        Q.    Are you referring to the settlements

19   here?

20        A.    Yes, and I refer to the three

21   approved drafted letters I mentioned to you from

22   the Sao Paulo Bar to the U.S. Consulate and the

23   airport police.

24        Q.    Do you have copies of those letters?

25        A.    Yes, I am sure it's here, I'm sure,

1                    Renato Guimaraes

2    very important ones from the beginning.

3         Q.    So, you have copies of these letters

4    but they were never sent, you said?

5         A.    Yes, never sent by the Bar, yes, I

6    do.

7         Q.    But they sent you copies?

8         A.    Yes.  It's a proceeding there, I'm

9    meeting.

10        Q.    So, this last item, "The Federal

11   Police and the Attorney General's Office of the

12   Republic shall receive within some days OAB's

13   official letters in order to act against the SK's

14   scheme against the families."

15             Those are the letters that you were

16   referring to that were never sent; correct?

17        A.    That's correct.  It was approved but

18   never sent.  And this part of my defense which was

19   approved by 27 to zero.

20        Q.    And when you refer to the scheme of

21   Speiser Krause, what did you mean by that?

22             (Whereupon the interpreter

23             translates.)

24        A.    Well, understand not formal but to

25   reach a result which is not made by regular or

```
 1                        Renato Guimaraes

 2      my 26 and my 65 family for money, and so forth.

 3              Q.      I'm going to show you what's been

 4      marked as Exhibit K, and this is Bates stamped

 5      SK-2925, 2926.  It is a letter in Portuguese and

 6      it's dated 22nd May of 2001 on the letterhead of

 7      Renato Guimaraes, Jr.

 8                      Can you identify this letter?

 9                      (The witness examines document.)

10              A.      Yes, it's mine, yes, sir.

11              Q.      And who's it addressed to, who did

12      you send this letter to?

13              A.      I don't remember the name but it was

14      of course the criminal public prosecuting charge of

15      this case.

16              Q.      And is this a criminal complaint that

17      you filed against Speiser Krause?

18              A.      No, it's not a complaint, it's

19      information for the D.A. office.

20              Q.      And it was complaining about Speiser

21      Krause's --

22              A.      Complaining, yes, not technically a

23      motion, say so.

24              Q.      And what crime did you state in the

25      body of this letter that Speiser Krause committed?
```

1                    Renato Guimaraes

2        A.       I start referring to the Veja

3   Magazine in the third or fourth paragraph, say as

4   Veja published some weeks ago Speiser Krause

5   betrayed the families.  That's a crime, you are not

6   supposed to give to another party a document, you

7   are not supposed to change the truth, that's a

8   crime, that's what I am referring to.

9                    I ask the third criminal court in

10  Campinas, Speiser Krause make falsehood by taking

11  out my name on the about 31st page for retainer

12  agreement with the families.  And that's another

13  crime, you are not supposed to fabricate

14  documentation by taking somebody else's name.  And

15  that's two of them.  Article 344, Penal Code.

16                   Then, second paragraph on the second

17  page, I refer again to 65 families of absolutely

18  identical contract, and that they reprint the first

19  page without my name on it.

20                   Then I say at least intellectual, not

21  saying they ask computer, the mind, to take my name

22  off was to coerce me, to force me because of the

23  documentation falsehood to agree with them.  Things

24  like that.

25       Q.       That's sufficient, thank you.

1                      Renato Guimaraes

2       Brazilian.  And he promised but the man above him,

3       the director, never answered to me.

4            Q.      Basically, if I could sum it up, you

5       were saying Speiser Krause was concealing the

6       evidence that you needed in Brazil; correct?

7            A.      Yes.  Later on they produce in Brazil

8       evidence.

9            Q.      All right.  The next one, this is

10      Exhibit M, it's Bates stamped SK-2938 through

11      sk-2941.  It's a letter in English on the

12      stationery of Renato Guimaraes, Jr.  As best I can

13      discern the date, it's at the end, which says Miami

14      Super Ball Day, 2004, so I would imagine this is

15      sometime in January of 2004?

16                   MR. BERMAN:  End of January,

17           beginning of February.

18           Q.      Do you recognize this letter, it's

19      directed to ear Mr. Einhorn, I assume it was dear

20      Mr. Einhorn, do you recognize this letter?

21                   (The witness examines document.)

22           A.      More than that, I recognize one of

23      the attorneys in Miami, so please put on the list.

24      I don't know the whole name of the firm but I had

25      been personal with him, he showed interest, and so

```
 1                       Renato Guimaraes
 2    forth, I remember that.
 3          Q.      And Mr. Einhorn, do you know his
 4    first name?
 5          A.      No.  And you're correct again, it's
 6    dear, I made a mistake.
 7          Q.      I understand.
 8                  In the very first paragraph of this
 9    letter after you say, "We have great news from
10    Brazil," you say, "The Attorney General's office
11    shall direct sometime during this February a police
12    investigation against Arthur and his son Leigh
13    Ballen, lawyers with Speiser Krause, for having
14    charged and unilaterally collected or are still
15    charging and unilaterally collecting or trying to
16    charge and to collect as if their attorney rights
17    U.S. dollars $982,686.81 as a legal fee due to
18    Speiser Krause by 26 families when, in fact, the
19    families already had paid years before the very
20    same fee to the only legitimate creditors: Their
21    Brazilian attorneys, the ones who worked to obtain
22    to the families the so-called anticipatory, partial
23    awards from several TAM lawsuits or originate
24    solely in Brazil."  The rest is not consequential.
25                  So, in this letter, were you saying
```

1                       Renato Guimaraes

2    that Speiser Krause is guilty of civil theft?

3                   (Whereupon the interpreter

4             translates.)

5                   MR. BERMAN:  I object to the

6             form.

7             A.    Well, technically, it's not theft but

8    roubo, in Brazil is something in the arm,

9    violence.  That's a bad word if it's here, I don't

10   think it's here.

11            Q.    If you just look at the next single

12   line over here which is after the next paragraph,

13   "I do not know in American law, but this civil

14   theft or larceny in Brazil is a very serious

15   crime."

16            A.    It is.

17            Q.    So, were you not saying that Speiser

18   Krause was guilty of a series theft?

19            A.    Well, first you gave me a technical

20   name in Brazil which is assault, that's a roubo,

21   it's different, just the exact same point Mr.

22   Berman acquired two days ago of Mr. Lear, you are

23   charging, you, Speiser Krause for the duty --

24            Q.    I'm not asking for an explanation of

25   this, I just want to know if in this statement here

1                           Renato Guimaraes

2     you're saying that Speiser Krause was guilty of

3     theft.

4                    MR. CHASE:  Miss translator, we

5              have a distinction in the United States

6              between robbery which involves physical

7              violence or a threat of it and simple

8              theft which is taking of another's

9              property without the threat of violence,

10             and I believe that's the distinction.

11                   THE INTERPRETER:  But threat is

12             roubo in Portuguese.

13             Q.    Can you answer that question, these

14     are your words, is that correct, you use these

15     words?

16             A.    Yes, I use

17             Q.    And you said that in Brazil the

18     actions of Speiser Krause is civil theft or theft

19     or larceny?

20             A.    I don't know if it's correct

21     technically in American law, larceny, but what I

22     mean is inappropriate charge.

23             Q.    But in Brazilian law, it's theft;

24     correct?

25             A.    No, it's not theft technically.

```
 1                      Renato Guimaraes
 2         Q.      Did you write these words?
 3                 THE INTERPRETER:  It's undue charge.
 4         Q.      Did you write these words to Mr.
 5    Einhorn?
 6         A.      I did.
 7         Q.      My question is, either in Brazil or
 8    the United States, was Speiser Krause ever
 9    convicted of theft?
10         A.      No, no, it's not in -- I forgot to
11    put this, among the wrongdoing Speiser Krause
12    commit in Brazil, it's not even in Jabaquara, I'm
13    sure I did not put.
14         Q.      In Brazil or the United States, were
15    they ever convicted of theft?
16         A.      As far as I know, never.  It's not
17    theft it is undue --
18         Q.      Were they ever charged with a crime,
19    formally charged?
20         A.      No.  The prosecutor request more
21    additional evidence and I don't know yet if the
22    judge approve to return it.
23         Q.      Turning the page, it says once more
24    "Speiser Krause made an enormous unique mockery
25    justice at the cost of the future of the families."
```

1                    Renato Guimaraes

2          A.    Yes.

3          Q.    "By its criminal omission  (failure to

4    disclose a material fact)" and it goes on.

5                Now, my question is, was Speiser

6    Krause ever convicted of a criminal omission?

7          A.    No, I'm not saying that, I say they

8    commit it.

9          Q.    So, they were never arrested for a

10   criminal omission?

11         A.    No, they just did not discharge the

12   proper duty as they should.

13         Q.    I'm going to show you what has been

14   marked as Defendant's N for identification, please

15   take a look at this, Mr. Guimaraes.

16               (The witness examines document.)

17         Q.    N, like Nancy is designated SK-2953

18   through 2986.  It's a letter on Dr. Guimaraes'

19   letterhead, and it appears to be dated February

20   28th of 2002.  The letter or the document is in

21   Portuguese and it's followed by what appears to be

22   2985, SK-2986, which are also letters on Renato

23   Guimaraes' letterhead.

24               Mr. Guimaraes, do you recognize this

25   document?

```
 1                      Renato Guimaraes
 2              (The witness examines document.)
 3         A.      Yes, sir, I do.
 4         Q.      Can you just describe briefly what is
 5    this document?
 6         A.      This is, I believe, the very first
 7    lawsuit our new organization created after Sandra
 8    Assali did not discharge her presence in Abrapava.
 9    We try to help these people, this is a class action
10    where we ask the judge, another judge in Jabaquara,
11    I'm sorry, not Jabaquara in the Forum Central to
12    both, to Speiser Krause to be liable for the coming
13    settlement and, I recall, if I may advance it, this
14    case was dismissed, not on the merits only because
15    it was a personal right, so for lackness of
16    standing, a no government organization will have
17    rights or standard to ask for something private
18    which will be the damage of the family.
19         Q.      And when this lawsuit by the
20    association was dismissed, did any of the families
21    initiate their own individual lawsuits?
22         A.      If they wish by private lawsuit.
23         Q.      But did they do that?
24         A.      Not of my knowledge, none of them
25    did.
```

1           Renato Guimaraes

2           (Whereupon the interpreter

3       translates.)

4       A.      They were all in favor of their

5   money, they don't care of Renato's idea to reform

6   the world, I need the money for my kids and, yes,

7   they accept the settlement.

8       Q.      So, they didn't care about the

9   proceedings in New York, correct, they wanted the

10  money?

11          MR. BERMAN:  Object to the form.

12      A.      Yes, I think it's fair, they want a

13  solution for their economic.

14      Q.      And the same for California, they

15  didn't care about the proceedings in California,

16  they wanted the money?

17      A.      Yes, they say I want finished, I want

18  my money, forget about it.

19      Q.      Number four, you said "The Brazilian

20  Bar already took proper steps so the federal

21  prosecutor can formally charge Speiser Krause in

22  Federal Court with federal felony of illegal

23  exercise of the legal profession in Brazil

24  according to the Brazilian Penal Code."

25          Question, was Speiser Krause ever

1                    Renato Guimaraes

2    convicted of this charge of a federal crime?

3        A.        They did not, even was indicted

4    because the judge said we have no jurisdiction over

5    these people and I lost.  I appeal saying they made

6    it a crime in U.S., probably taking out my name of

7    the contract but the damage is here in Brazil and I

8    lost four to one.

9        Q.        In five you say, "Brazilian Bar also

10   took measures such as in the original, so that the

11   Brazilian State Department officially communicate

12   the U.S. State Department to take appropriate

13   actions in view of the criminal activities

14   committed by Speiser Krause in Brazil and against

15   the legitimate interests of the families of TAM

16   tragedy."

17                  My question is, what measures were

18   taken by the Brazilian Bar Association?

19       A.        As I told you, the Brazilian Bar in

20   Sao Paulo approve also a letter against the further

21   entrance in Brazil of Speiser Krause and that this

22   was made by the federal prosecutor, yes.

23       Q.        And you were the person who brought

24   this to the attention of the Brazilian Bar?

25       A.        Yes, to the Bar, yes.

1                       Renato Guimaraes

2            Q.      Look at number six, "The attorney

3    general of the State of Sao Paulo, the public

4    prosecutors and judges in those courts in which I

5    act in these lawsuits also are fully aware of these

6    illegal activities practiced by Speiser Krause in

7    Brazil."

8                    Now, my question is, did you also

9    make the attorney general, the public prosecutor

10   and the judges aware of the crimes of Speiser

11   Krause?

12           A.      The attorney general representative

13   in that chamber of the judge, yes.

14           Q.      But you were the person who made them

15   aware of these crimes?

16           A.      That's right.

17           Q.      Look at paragraph nine, the next

18   page, item four of Mr. Gerard R. Lear's affidavit,

19   "At least to the Brazilian ethical and legal

20   standards of a code of responsibilities of the

21   attorneys not only a plenty act of malpractice but

22   to be exact, an astonished case of high legal

23   treason in court because the nature and the scope

24   of such a statement only could be reasonably

25   conceived to be expected from a Northrop lawyer

**EXHIBIT "A.1"**

1                    Renato Guimaraes

2    Lloyds of London, Lino, L-I-N-O, Pereira

3    P-E-R-E-I-R-A, D-A-S-I-L-V-A.  Lino is an attorney

4    for Lloyds of London.  So, every accident in the

5    airplane in Brazil he is defendant, whoever, Varig,

6    TransBrazil and TAM.  He complained also against

7    me.  And I was cleared, the bar did not accept, the

8    merits say no, Renato behave very ethically in both

9    sense, and both did not appeal to the high level of

10   Brazilian bar.

11            Q.     Let's go to Mr. DaSilva's complaint,

12   when did he make that complaint about you?

13            A.     When I start -- It was after the Time

14   Magazine in Brazil, Veja Magazine public two page

15   star with my three declarations, Speiser Krause is

16   betraying the family.  Soon after that they all

17   together went to the bar association and made a

18   complaint against me.

19            Q.     What's this magazine?

20            A.     Veja, V-E-J-A.

21            Q.     And you contributed to this article

22   in Veja?

23            A.     Yes.  It's not an article, it was a

24   story about my big picture on one page and an

25   attorney representing, not Sampaio, an attorney

1           Renato Guimaraes

2    representing Speiser Krause, and say there is a

3    huge problem amongst attorneys about the fees.  And

4    they put my signature, they took a picture of my

5    signature and print there saying Speiser Krause is

6    betraying the families, they are protecting TAM and

7    Northrop, three times, and the quotation marks.

8              And one week later, exploded, three

9    or four complaints against me, to the bar.  Lino,

10   Sampaio, and some clients from Varig and Sandra

11   Assali.  I was clear from all them, only Sandra

12   appeal.

13        Q.    Do you have copies of these

14   complaints as part of your records?

15        A.    According to the Brazilian law, until

16   the end, it's not published to protect the

17   attorneys in the presumption of innocence.  I can

18   not, according to the Brazilian law, to show you

19   either the complaint or the decision made in favor

20   of me.  But those people published, Sandra Assali

21   published the complaint so I'm suing her in the

22   court, she broke the law.

23        Q.    Were you called upon by the OAB to

24   defend yourself against these complaints?

25        A.    Yes, I had to defend myself.

```
 1                    Renato Guimaraes
 2         Q.     And how did you know that there was a
 3    complaint if it's not --
 4         A.     Oh, the bar sent a notification to
 5    me, hey, there is complaint here, the deposition is
 6    here, you have, say, 15 days to present your
 7    defense.  And I did.  And I success.
 8              MR. APUZZO:  Counsel, I'm going to
 9              call upon you to please furnish copies of
10              these complaints the witness is
11              testifying to.
12                 (Production Request.)
13              MR. RIGUERA:  Just to clarify, he
14              just said they are confidential under
15              Brazilian law to some extent.
16              MR. APUZZO:  He said until the
17              case is closed, he said three of them are
18              closed.
19              MR. RIGUERA:  Maybe clarify it or
20              I can discuss it with him off the record.
21         Q.     Until such time the case is closed
22    and you're cleared, those documents are confidential?
23         A.     Right.
24         Q.     After the case is closed and you are
25    cleared, they're no longer confidential?
```

```
 1                      Renato Guimaraes

 2          A.      Right.

 3                  MR. APUZZO:  We would like to have

 4          copies of the complaint and your response

 5          to the complaint.

 6                  (Production Request.)

 7          A.      I can give you from the complaint who

 8    is closed.  The others are together because as part

 9    of my defense I told the bar these are not three

10    cases, just one.  They made it different issues but

11    they are all interlocked.  And they agreed with me,

12    so they put all together.  Even though I am anxious

13    to publish this, I can't because the bar says well,

14    it's over, but it's still together with the Assali,

15    so I have to wait.

16          Q.      Which complaint is completed, over,

17    you said there's one which is completed?

18          A.      The one completed I will give to my

19    attorney.  The Varig case is the one that is

20    completed, separate issue.

21                  MR. APUZZO:  Counselor, since he's

22          eluded to the fact that he does have

23          these complaints in his office, whether

24          or not he's under restrictions by the

25          Brazilian Bar Association not to release
```

ASA REPORTING SERVICE, INC.
(914) 588-3358

44

```
 1                      Renato Guimaraes
 2          them, the fact is he still has these
 3          complaints.
 4               What we're going to do is call
 5          upon you for the production of these
 6          complaints and you can mark them
 7          attorneys eyes only, strictly
 8          confidential, or however you want to mark
 9          them, but we still are requesting these
10          documents.
11               (Production Request.)
12          Q.    Now, Dr. Guimaraes, as I understand
13     your testimony, you said Sandra Assali published
14     her complaint?
15          A.    Yes, she did, she could not put my
16     name.
17               MR. RIGUERA:  Wait for a question.
18          Q.    Where did she publish that complaint?
19          A.    Internet.  And she tried to do
20     another web site.  They tried Veja, Veja refused,
21     so they sent it to another web site on the
22     computer.  They refused and told me that this lady
23     is behind you and doing that, so I went to the
24     court against her.
25          Q.    Did you make a copy of the complaint
```

```
 1                    Renato Guimaraes
 2    that Sandra Assali published on the internet?
 3          A.     Yes, I did.
 4                 MR. APUZZO:  We'll call upon
 5          counsel to please produce a copy of that.
 6                 (Production Request.)
 7          Q.     With respect to the article in Veja,
 8    did they interview you for information?
 9          A.     Yes.  An attorney in Rio said there's
10    something wrong, I don't understand, talk to
11    Renato.  I explained my position.  But they have
12    different sources, I never gave my letter to the
13    family, some family gave to Veja.
14          Q.     So, in other words, you didn't give
15    them your signature?
16          A.     No, but I give it to the whole 65
17    families, somebody gave to Veja.
18          Q.     And there was a telephone interview
19    with Veja?
20          A.     Yes.  Never personally.  Well, they
21    send a photographer to me, just took the picture,
22    did not make an interview.
23          Q.     Do you remember the name of the
24    person from Veja who interviewed you?
25          A.     It's in the magazine.  Yes, I know
```

1                          Renato Guimaraes

2      fee, there is no fee there for you to share;

3      correct?

4            A.      As long as Speiser Krause involved,

5      yes, but I have an opportunity to have it from

6      Walter Lack.

7            Q.      But not from Speiser Krause?

8            A.      No, of course.

9            Q.      So, are we correct that these ten

10     clients, total of ten clients, they discharged

11     Speiser Krause but they did not discharge you?

12           A.      No, they are the most trusted family,

13     they trust me, it's a big responsibility.

14           Q.      I'm sorry?

15           A.      These families are very very tied to

16     me.

17           Q.      So, they did not discharge you,

18     that's what my question was?

19           A.      No, they did not.

20           Q.      This is Exhibit 8.

21                   (Document handed to the witness.)

22           Q.      Have you seen this letter at any

23     time?

24           A.      No.  It's not a surprise for me but I

25     never read.  I thought somehow along the line they

1                        Renato Guimaraes

2       to the clients?

3               Q.      No, I'm going to go on to the next

4       one.

5                       When you refused to assist the TAM

6       clients in affecting the settlement agreements in

7       the Brazilian courts, when you did that, were you

8       acting contrary to Speiser Krause's interest?

9               A.      Obvious.

10              Q.      Were your actions in refusing to

11      assist the clients in accepting these settlements,

12      were these actions contrary to the objectives that

13      were made known to you by the TAM clients?

14                      THE INTERPRETER:  Repeat the

15              question.

16                      (The question referred to was read

17                      back by the Court Reporter.)

18              A.      Yes, they want the money, I want the

19      rule.

20              Q.      And in the same sequence, were your

21      actions also contrary to the objectives of Speiser

22      Krause?

23              A.      Yes.

24              Q.      What action did you take to prevent

25      the clients from accepting the settlements which

```
 1                    Renato Guimaraes
 2   Speiser Krause proposed to them?
 3           A.      After I have no chance to convince
 4   them anymore, I went to the attorney general
 5   office.  And by reading, I say something wrong has
 6   happened here, and I want to get out of my duties.
 7   It's a public interest, I go to my limit of my
 8   duties.  So, the attorney general should take care
 9   of it, and many agree with me.
10           Q.      Did you bring any law action in the
11   Brazilian court to nullify the settlement
12   agreements?
13           A.      I don't think we call lawsuit, it's a
14   kind of notification.
15           Q.      Is the notification filed in any of
16   the Brazilian courts?
17           A.      It's not the court itself, it's a
18   clerk, a department of the court, it's not in
19   litigation yet, it's a preparation, say so.
20           Q.      When you met with the attorney
21   general, what did he say to you and what did you
22   say to him?
23           A.      Sir, on this issue, I never talk
24   personally like us, we are doing now, with the
25   attorney general, I just filed my complaint, say
```

```
 1                    Renato Guimaraes
 2   so, to the offices so the clerk of the attorney
 3   general give a receipt and they made a decision.
 4   It's not a personal meeting, say so, it's a written
 5   motion to the attorney general.
 6              MR. APUZZO:  Mr. Guimaraes'
 7         counsel, if they will please get us
 8         copies of these documents that he sent to
 9         the attorney general.
10              (Production Request.)
11              MR. RIGUERA:  Okay.
12              MR. APUZZO:  And also copies of
13         the documents which were filed with the
14         clerk of the court to nullify the
15         settlement agreement.
16              (Production Request.)
17              MR. RIGUERA:  From my review, my
18         recollection, some of that may have been
19         produced already.  We'll do a search to
20         make sure we haven't missed anything, and
21         if we did, we'll provide it.
22         Q.    Exhibit 11 is a letter, the first two
23   pages which are designated as Bates stamped
24   SK000620 and 621 appear to be a translation of the
25   document following which is SK000622 and 623.  And
```

```
1                    Renato Guimaraes

2           which we produced, so I don't think

3           that's accurate either.

4           Q.    Is it your opinion that the English

5    translation of these documents is not correct?

6           A.    I have a presumption it's correct,

7    but I'm not experienced with word by word.

8           Q.    That's all I'm asking you.  If we had

9    to characterize what these letter were saying, are

10   these letters from you to the clients advising them

11   to reject the Speiser Krause settlements?

12          A.    This letter is direct to the clients

13   and their attorneys because many come to me and to

14   other attorneys, and it's my duty to have a summary

15   what's going on.

16                We want in Jabaquara two million

17   reais.  Part of it is enforceable right now.  And I

18   was in New York last month and --

19                MR. RIGUERA:  Renato, he's not asking

20          you to summarize the letter.  Listen to

21          the question.

22          Q.    If you had to say the purpose of

23   these letters, to characterize these letters, did

24   you tell the clients in these letters that they

25   should not accept the settlement proposed by
```

1                    Renato Guimaraes

2    Speiser Krause?

3         A.    Yes.  I think the main point is here,

4    my recommendation to not sign any agreement with

5    Speiser Krause which is, again, illegal, the same

6    story of illegal agreement from Lloyds of London in

7    Varig case.  Every case they make tricks on this.

8              In this case here they signed

9    $140,000 agreement well before Speiser Krause came

10   along.  And I succeed in all case but one to avoid

11   the $140,000 so, don't make mistake again, let's go

12   for it.  That's it.

13        Q.    So, you notified the families that

14   they could receive much more if they don't accept

15   the settlement from Speiser Krause and they wait

16   for the judgement in Jabaquara; correct?

17        A.    It's two pages long.  I have all

18   information for their independent judgement, so I

19   did not impose it, I did not direct it.  But the

20   underlying is this:  It's a big confusion, you have

21   more chance, I was in New York, Frizzel told me we

22   have a 75 per cent chance.  So, smart clients will

23   say wait a minute, I think I better talk with

24   Renato, things like that.

25              So, it's not a notification, it's a

```
 1                        Renato Guimaraes

 2                  (The witness examines document.)

 3          A.      Yes.

 4          Q.      And this is a letter that you were

 5    the author of?

 6          A.      Yes, the original in Portuguese, yes.

 7          Q.      And you sent this to your clients and

 8    colleagues?

 9          A.      Yes.

10          Q.      And your ex-clients?

11          A.      That's true.

12          Q.      In this letter, were you asking your

13    client to fire Speiser Krause?

14          A.      That's correct, to change, to replace

15    by --

16          Q.      All right, that's not sufficient.  I

17    have to move along because we want to finish this,

18    Dr. Guimaraes.

19                  MR. RIGUERA:  He's done with this

20          document.

21                  MR. APUZZO:  I can spend an hour

22          or two on this, but I'm not going to,

23          your attorney has to catch a plane.

24          Q.      Besides for the lawsuits that you

25    described that you brought against your ex-clients,
```

**EXHIBIT "A.2"**

1                    Renato Guimaraes, Jr.

2    Varig case, also?

3            A.        No, but they inject themselves and

4    made the families to fire me.

5            Q.        On the Varig case?

6            A.        Yes, sir.  And took all my money.

7            Q.        Did you ever make a claim against

8    Speiser & Krause for what you say they did on the

9    Varig case?

10           A.        A complaint against them, legally,

11   no.  I did my best in Brazil, but since I am a

12   foreigner not yet, no.

13           Q.        When did your clients receive money

14   on the Varig case?

15           A.        Could you repeat, please?

16           Q.        When did your clients receive their

17   money on the Varig case?

18           A.        After they fired me, even though

19   Varig has agreed with the proposal I present with

20   the family to Varig legal department.  And a few

21   days, or weeks, after that I receive the

22   information, the president of Varig has agreed, was

23   reasonable and they accept, but the case could not

24   move on.  Then, somehow, Lloyd's of London furnish

25   the information of my clients, and that's the end

**EXHIBIT "A.3"**

1              Gerard Lear

2      United States, you have no jurisdictional issues,

3      it is what it is, you try to get as close to that

4      with any case you have.

5          Q.      So, if you're in the mid Atlantic --

6          A.      That's just a term.  I'm not going

7      into whatever mid Atlantic is, it's a term you use,

8      we will do our best to get maximum value on the

9      case based on all the factors.

10         Q.      What did your firm do to determine

11     the value of each one of the plaintiffs' cases so

12     that you could inaugurate settlement conversations?

13         A.      Well, Leigh went and gathered all the

14     economic information he could, and the family and

15     damages information that was available from the

16     individual families, and tried to put together --

17     give us, give me, an idea of what the total value

18     of these cases might be.

19              And that took some time, it took

20     several months to do.

21         Q.      Where is that information that Leigh

22     gathered and compiled, because it has not been

23     produced?

24         A.      I thought it was produced, I thought

25     I saw it.  I have to look again, I thought there

1                              Gerard Lear

2    was a path.

3           Q.      What was produced is what we marked

4    for identification at the depositions, which were

5    letters with some grids attached, as well as

6    Exhibit 59, which had a spreadsheet of some

7    information.  But what wasn't produced was what

8    Leigh said was the transcription of his notes onto

9    the Speiser Krause system that he obtained from

10   each family member.

11          A.      That may be what it is --

12                  MR. APUZZO:  Objection.  Is that a

13          question?

14          Q.      Comma, do you know where that stuff

15   is?

16          A.      Right at this moment, I don't.

17                  MR. APUZZO:  Objection to form,

18          but you've answered.

19          A.      I have an idea what it is.  It was a

20   package put together for my benefit, trying to lead

21   up to any conversations I might have with the

22   insurers because insurers always want to know what

23   is this going to cost me.  That's their first

24   question, how much am I going to have to pay to get

25   a settlement.  If I say I'd like to settle, I've

1                          Gerard Lear

2      got 50, 60 cases.

3              Q.      They're also going to want to know

4      the elements of the damage for each particular

5      plaintiff?

6              A.      That could be a factor.

7              Q.      Was there ever a mediation of these

8      cases?

9              A.      With a mediator?

10             Q.      Yes, sir.

11             A.      No.

12             Q.      Did each case have a separate file?

13             A.      Yes.

14             Q.      Would each file contain information

15     on the family that file was open for?

16             A.      I believe it would, sure.

17             Q.      Would each file contain the economic

18     and non-economic damages as it related to that

19     family?

20             A.      I'm not sure how Leigh did the

21     filing.  I don't do the filing, but I would think

22     in order to keep any degree of context to it, he'd

23     know which cases are which, we'd have separate file

24     numbers for each case.

25             Q.      Did they have separate files?

1                          Gerard Lear

2          A.      Yes.

3          Q.      What would be contained in a file?

4          A.      Anything to do with the case.

5          Q.      That would include, then, the notes

6    relative to the economic and non-economic damages

7    suffered by that family so you can prepare a damage

8    package and analysis for settlement, would it not?

9          A.      Not necessarily, depends where we

10   were in the case.  What Leigh put in it, I couldn't

11   tell you, I didn't do Leigh's work.  I knew what

12   the results were but I didn't oversee the fact

13   where's this piece of paper, that piece of paper.

14   Each file may contain different items.

15         Q.      You reviewed his work?

16         A.      I reviewed the results of his work, I

17   didn't sit by his desk.

18         Q.      One of the things you asked him to do

19   was give you an analysis of the damages of each of

20   the plaintiffs?

21         A.      I knew that.  I was aware of the

22   families, how many children, what their economic

23   situation was, their earnings, the best we could

24   ascertain.

25         Q.      For the record, those are the

1                          Gerard Lear

2    documents we've requested.  That is the earnings

3    per family, the ages of the children, the claims by

4    the relatives that survived and, I guess, based on

5    what I heard earlier, some potential mistress

6    claims.  Was that stuff ever put together and

7    presented to you for your use in settlement

8    negotiations?

9           A.     I looked at the result of that.  I

10   don't recall looking at the individual itemizations

11   that went into the package.

12          Q.     So, what was actually given to you to

13   look at?

14          A.     Probably a synopsis of each family.

15          Q.     Is that in the form of a memorandum

16   per family, or what?

17          A.     It may have been a compilation.  It

18   may not have been per family.  It may have been a

19   package where it had the families itemized with the

20   information we would need that we could then go to

21   McGilchrist or Mirable, M-I-R-A-B-L-E, and try to

22   answer their question as to what was the universe

23   that we were dealing with.

24          Q.     Where is that documentation?

25          A.     Right now, I don't know.

.

**EXHIBIT "A.4"**

2          Q.       Did Arthur or Leigh report to you

3    since you were the person in charge of settlement

4    discussions any authority of the settlement

5    parameters that they had obtained or discussed with

6    the Brazilian plaintiffs prior to the time that

7    settlement discussions were inaugurated?

8          A.       I don't recall it.

9          Q.       Did you discuss the parameters of the

10   anticipated settlements with any of the Brazilian

11   attorneys prior to the time that you inaugurated

12   settlement discussions on behalf of the Brazilian

13   plaintiffs?

14         A.       I didn't have any anticipated

15   settlements until I talked to the defendants and

16   found out whether or not they would first make

17   offers and, if so, how much.

18         Q.       Did you discuss the expectations of

19   recovery with any of the Brazilian lawyers or any

20   of the Brazilian clients prior to inaugurating

21   settlement discussions?

22         A.       I don't know what you mean by

23   expectations, but there were no discussions I had

24   with anybody about that.

25         Q.       So, you gathered the information

ASA REPORTING SERVICE, INC.
(914) 588-3358

163

Gerard Lear

2    through Leigh Ballen and then you took that

3    information and used your judgement in conducting

4    settlement discussions; is that accurate?

5         A.      That's probably correct.

6              MR. BERMAN:  Off the record.

7              (Off the record at 12:25 p.m.)

8              (Resuming at 12:35 p.m.)

9         Q.      I'd like to show you what's been

10    Bates stamped SK1192 through SK1213, which are the

11    documents that your counsel identified this morning

12    was the foundation for the demand that you made,

13    and ask if you can identify those documents.

14              (The witness examines document.)

15         A.      Yes, those are the documents.

16              MR. BERMAN:  Could we put an Exhibit

17         number on those and then copy them?

18              MR. APUZZO:  Go ahead.

19              MR. BERMAN:  Let's mark these

20         then.

21              (Speiser Krause Valuations, marked

22         for identification, Exhibit 80.)

23         Q.      I'd like to show you Exhibit 80, sir,

24    and ask whether or not those were the documents

25    that you relied on to formulate your demands for

Gerard Lear

1

2      Q.      At any point?

3      A.      I'm not sure we needed to.  There

4  wasn't a requirement to get an actuary, we knew the

5  ages, income.

6      Q.      Did you know the medical --

7      A.      We did, Leigh would discuss with me

8  any special medical conditions, yes.

9      Q.      Were their family means discussed

10  with you?

11      A.      Yes.  We were aware a lot of families

12  were in desperate straits and that was the reason

13  we were pushing so hard, because of the inflation

14  in Brazil, we were doing our best to see if we

15  could help them.

16      Q.      Are there any other communications or

17  conversations that you had with any of the

18  Brazilian families that you haven't told us about

19  as best you can recall?

20      A.      If there are, I can't think of them.

21      Q.      Are there any other conversations or

22  communications that you had with Mr. Guimaraes that

23  you haven't told us about?

24              MR. APUZZO:  Asked and answered, but

25          answer again.

**EXHIBIT "A.5"**

1          Gerard Lear

2     amount, it's all in writing.

3          MR. BERMAN:   I've seen those, but

4     I've also seen some reference to a more

5     fixed group of perhaps others.

6          Q.     But you'd be speculating to anything

7     other than the ones represented by Walter Lack?

8          A.     There are others but I cannot sit

9     here and tell you what position every one of those

10    is in because they're not represented by Mr. Lack,

11    they nominally are still represented by us but, for

12    one reason or another, either don't want to take

13    the settlement, some of them still rely on

14    Jabaquara, on Mr. Guimaraes, and the potential for

15    Jabaquara, and others of them, as you say, have

16    family squabbles.   And the fact that the defendants

17    have at least implied to me, if not said, they're

18    not paying anymore money until all this becomes

19    clear, whatever that all is.

20         Q.     By the defendants, you mean?

21         A.     Mr. Bouscaren.

22         Q.     The insurers?

23         A.     Correct, right.   Grumman, for the

24    most part.   I haven't had many conversations with

25    London because they have pulled the plug on the

ASA REPORTING SERVICE, INC.
(914) 588-3358

Gerard Lear

1

2  most part.

3              Q.     I just want to, if I could,

4  understand the relationship interfered with, was it

5  the retainer agreement that you're claiming was

6  interfered with?

7              A.     No, the retainers we already had.

8              Q.     Was it the settlement?

9              A.     The settlement, no, the settlement

10  wasn't interfered with.  The time of the settlement

11  was April 2000, and Mr. Guimaraes at that time was

12  being helpful.

13              Q.     Was it the relationship with the

14  client in general?

15              A.     After the Jabaquara, yes.

16              Q.     After the Jabaquara judgment came

17  down?

18              A.     Yes, then it was the relationship

19  with the client, by us with the client, and there

20  was an active role by Mr. Guimaraes in attempting

21  to stop those people from accepting the settlement

22  and also the allegations of criminal activity by us

23  and having to negotiate the settlement.

24              Q.     Thank you.

25                     Have you met with each one of these

Gerard Lear

1

2     money, you can have criminal activity associated

3     with it, house break-ins, kidnapping, especially

4     down in that part of the world, even in the U.S.,

5     we're not immune.  My advice is always keep your

6     settlement confidential for that reason.

7                Q.      Do you think clients take that

8     advice?

9                A.      No, but I feel better having told

10    them what the ramifications are if you do that.  It

11    is a risk they take, a multi-million dollar

12    settlement in a newspaper, trust me, families are

13    not going to be pleased.

14                Q.      Notwithstanding that, you wouldn't be

15    surprised if these families spoke to each other

16    about these --

17                A.      Well, my understanding is that it was

18    happening.  And Renato, I know, published the

19    Berliner settlement himself, which I'm told was

20    three million dollars, I don't know, but that's my

21    understanding reading some of Renato's letters.

22                Q.      Didn't TAM publish their settlements?

23                A.      I don't know.  I read it in Renato's

24    correspondence, I can't believe TAM would have done

25    it, but you may know something I don't know.

ASA REPORTING SERVICE, INC.
(914) 588-3358

1                         Gerard Lear

2          Q.      The eight.

3          A.      I just have no knowledge of that.

4          Q.      Did Dr. Guimaraes ever tell you that

5     the families' decision, those eight families'

6     decision, to not continue with Speiser Krause was

7     based on what Dr. Guimaraes said or did?

8          A.      Well, certainly he recommended to

9     them that they not accept the settlement.

10         Q.      Well, he can do that as their lawyer,

11    could he not?

12         A.      He can do whatever he wants, it's

13    none of my business.

14         Q.      He can, lawyers give clients advice,

15    right?

16         A.      Whether -- and certainly in his

17    letters to the clients he related to them the

18    alleged criminal conduct by Speiser Krause, so what

19    influence that had on the clients, I guess is

20    between him and the clients.

21         Q.      But you don't know?

22         A.      I only know what I read.

23         Q.      They could have been influenced by

24    many other things as you pointed out earlier;

25    correct?

ASA REPORTING SERVICE, INC.
(914) 588-3358

1                          Gerard Lear

2    you could not any longer cooperate with co-counsel?

3                    MR. APUZZO:   Objection, but answer

4         it if you can.

5         A.      I don't think so.

6         Q.      Did you ever seek an injunction

7    against Mr. Guimaraes to stop him from engaging in

8    any of these actions?

9         A.      I don't believe we did, no.

10        Q.      Prior to initiating this counterclaim

11   which came, I guess in 2007, had you taken any

12   action against him for these activities that he

13   engaged in many many years earlier?

14        A.      I never had any intention of taking

15   action against Mr. Guimaraes until he filed a

16   lawsuit against us and it became known that he left

17   us with no options.

18        Q.      Did you ever file a complaint with

19   the authorities alleging that Mr. Guimaraes'

20   complaint that he made against you was false?

21        A.      Are you talking about the complaint

22   in this lawsuit?

23        Q.      No.

24        A.      What are you referring to?

25        Q.      You indicated earlier that he said

1                    Gerard Lear

2    you engaged in criminal actions, and maybe he did

3    that in Brazil, but did you ever file a complaint

4    with the criminal authorities alleging that Dr.

5    Guimaraes' complaint against you was false?

6         A.    No, I didn't.

7         Q.    Other than the letters that Mr.

8    Guimaraes wrote to the clients, do you have any

9    evidence to show that the clients were even aware

10   of the things that you claim the client did to

11   interfere with the client relationship?

12                MR. APUZZO:  Objection to form.

13                Answer if you can understand it.

14        A.    I don't understand it.

15        Q.    Dr. Guimaraes wrote letters to

16   clients; correct?  Other than the letters, there

17   are other things that you complain of that Mr.

18   Guimaraes did.  Do you have any evidence that the

19   clients were aware of any of these other actions

20   undertaken by Dr. Guimaraes?

21        A.    Several of the letters to the clients

22   list what he did.

23        Q.    Do they list everything?

24        A.    I don't know if it's everything, but

25   it's certainly enough.

1                          Gerard Lear

2          A.      Could be.

3          Q.        There were problems getting TAM to do

4   what TAM was supposed to do even at the request of

5   their own insurance carrier, isn't that another

6   reason?

7          A.      Possible.

8          Q.        There were clients who wouldn't

9   settle under any circumstances, I believe you've

10  written in other letters, isn't that also true?

11         A.      Not of these eight or nine, but there

12  are a couple in that category.

13         Q.      And most of them did settle?

14         A.      45, I believe is the number I've

15  heard, or that have actually received their money.

16         Q.      For which you have been paid your

17  full fee?

18         A.      I assume so.

19         Q.      Well, is there any reason you believe

20  you haven't been paid your full fee on those

21  settlements?

22         A.      I'm just assuming that we've been

23  paid our fee.

24         Q.      Now, if Mr. Guimaraes had cooperated

25  fully with you and effected the settlements on

1                              Gerard Lear

2      those matters where you were joint counsel on, he

3      would have been paid a fee; correct?

4              A.      I assume we would have -- Yes, if we

5      had managed to get this job done and with his

6      cooperation, I'm not dumb, certainly I would have

7      worked something out with Renato to compensate him

8      for that.

9              Q.      So, it was in his economic interest

10     to cooperate with you and get these cases settled

11     so he could be paid a fee?

12             A.      That's relative, it may have been in

13     his economic interest to push for Jabaquara because

14     maybe that was going to pay him more.

15             Q.      And how long is Jabaquara from --

16             A.      In my view, a long time.

17             Q.      10 years?

18             A.      At least.

19             Q.      So, it might be true that it would

20     have been in Renato's best interest from an

21     economic respective to cooperate with you and

22     settle the cases on the terms that you negotiated,

23     isn't that true?

24                     MR. APUZZO:  Objection.

25             A.      I guess you can argue that back and

1                          Gerard Lear

2      forth but the facts speak for themselves, he did

3      not cooperate.  Why not, I don't know, if I'm wrong

4      about Jabaquara, or something, I don't know.

5              Q.      Did Dr. Guimaraes indicate that he

6      was concerned that the widows and orphans were not

7      getting enough money?

8              A.      I got -- Relative to what?

9              Q.      Relative to how much money he thought

10     they should get, did he express that?

11             A.      I'm sure he did.

12             Q.      Is there anything wrong with him

13     expressing it?

14             A.      Not at all.

15             Q.      Did Dr. Guimaraes indicate that

16     expectations had been set higher based on earlier

17     communications from Arthur Ballen with the

18     plaintiffs thereby creating the belief in the

19     plaintiffs that they would receive more than the

20     settlement offers?

21             A.      Well, 45 people accepted it and got

22     their money, in fact, 54 accepted it and they

23     didn't seem to have any problem with expectations,

24     so I don't know.  These are all just things you're

25     throwing out, but I don't know the answer.


                  ASA REPORTING SERVICE, INC.
                      (914) 588-3358

1                         Gerard Lear

2          Q.      You're an experienced lawyer,

3    sometimes people accept offers because they need

4    the money, even if they think the offers are

5    inadequate, isn't that true?

6          A.      That can happen, it's part of life.

7          Q.      How has Speiser Krause been damaged

8    by the actions of Mr. Guimaraes?

9          A.      I already answered that this morning.

10         Q.      Can you quantify it for me?

11         A.      I did.

12         Q.      You told me you didn't know?

13                 MR. APUZZO:   This is with reference

14         to the counterclaim?

15                 MR. BERMAN:   Yes.

16         A.      We went over the numbers.

17         Q.      What I understand from this morning

18   was that the numbers depended upon what ultimately

19   happens in California on the amount of your lien.

20         A.      No, in fact, we told you it did not.

21         Q.      It's irrelevant to the lien?

22         A.      That's correct.   We went over this.

23         Q.      So, it's your belief that even if you

24   recover every penny of your lien that you still

25   have been damaged?

**EXHIBIT "A.6"**

1    Grumman?

2         A    Yes, USAIG.

3         Q    And what presentations were made by

4    your firm at the settlement meetings?

5                MR. APUZZO:  Objection to

6       form.

7         Q    What, if anything, did you present to

8    the TAM defendants in conjunction with the settlement

9    process?

10               MR. APUZZO:  Okay.

11        A    We made demands to them in writing on

12    all our cases.

13        Q    What form did those demands take?

14        A    Letters with a demand for each case.

15        Q    Each case had a separate demand

16    letter?

17        A    No.  No, there was a master demand

18    letter with an individual demand for each case.

19              MR. BERMAN:  Have those all

20       been produced?

21             MR. APUZZO:  I don't know.

22             MR. BERMAN:  I don't think so.

23        Q    Are those records that are maintained

24    at Speiser Krause?

25        A    Yes.

153

```
 1              Q        Who put together the individual

 2       demand packages?

 3              A        Myself, in coordination with Gerry

 4       Lear and information we got from Brazil.

 5              Q        What kind of information?

 6              A        Damage brochures, detailed damages

 7       information, booklets that were prepared by Beatriz

 8       Kopacek in Brazil.

 9              Q        Is she a lawyer?

10              A        No.

11              Q        What analysis was made of the

12       individual claims prior to presentation at a

13       settlement conference?

14              A        The amount of the decedent's

15       earnings, the position they held, the age of the

16       decedent, the existence of children and their ages,

17       the existence of a spouse and his or her age and, of

18       course, applicable law that we felt could be applied

19       to the case in the various jurisdictions.

20              Q        Was there a presentation made, a

21       Power Point presentation, graphs, charts?  Did you do

22       anything like that?

23              A        No.  We made a written demand

24       discussing the basics of each case and then the

25       in-person discussions centered more on liability and
```

- Leigh Ballen -

1    local attorney they might have, and oftentimes Renato

2    Guimaraes.

3              Q      Now, was Mr. Guimaraes present at any

4    of these meetings with you, your father and the

5    families when there was no local attorney present?

6              A      Yes.

7              Q      So, Mr. Guimaraes, as of May 2000,

8    was still working with Speiser Krause; is that

9    correct?

10             A      Yes.

11             Q      Do you remember the order in which

12   you conducted the meetings?

13             A      Which family went first?

14             Q      Yes.

15             A      I only remember that we started with

16   some of Renato's closest family contacts.

17             Q      Why do you remember that?

18             A      Because we got a very negative

19   initial reaction when they entered the room.  They

20   had an obvious predisposition to news that they were

21   not yet supposed to have.

22             Q      What do you mean by that?

23             A      Arms crossed, look of frustration.

24   It was a new sentiment that we were not expecting.

25             Q      Did you tell the clients at these

- Leigh Ballen -

185

1    meetings or at that first meeting that the case had

2    been lost in America?

3        A    Way prior to that.

4        Q    What did you tell them about losing

5    the case in America?

6        A    We never said that we lost the case

7    in America.

8        Q    You said way prior, what did you mean

9    by that?

10        A    The correspondence speaks for itself

11    as to the extent that we put them on notice in

12    writing about the specific status of the California,

13    New York action.

14        Q    I'm not talking about that.

15            In the settlement meetings

16    themselves, what did you tell the clients about the

17    status of the litigation in the United States?

18        A    We went through specifically where

19    the case is standing, California and in New York, to

20    the extent of the court's unwillingness to retain

21    jurisdiction for the Brazilian families absent

22    something happening in Brazil to cause the court to

23    revisit that issue, and that matters were not

24    proceeding well in New York.

25        Q    Why? What was happening in New York?

- Leigh Ballen -

1          A     I believe at the time that the

2     settlements occurred the New York court, we felt, was

3     either leaning towards FNC dismissal or had actually

4     entered an order.  I don't recall.

5          Q     Did you, at any time during these

6     meetings, tell the clients that the cases in the

7     United States had been lost and that if they didn't

8     take the settlements that were on the table they

9     would not get any money?

10          A     No.

11          Q     What precisely did you tell them in

12     that regard, if anything?

13          A     As I said before, the status of the

14     cases in California and New York, and that due to the

15     status of the cases in those places, that the

16     settlements, by enlarge, we thought were favorable in

17     light of the remaining venues which, in Brazil, is a

18     never-ending litigation process.

19          Q     So, you told them that the

20     proceedings in Brazil could go on for maybe many,

21     many years?

22          A     Usually local counsel -- we would ask

23     them if there was local counsel in the room.  We

24     would ask them their own opinion on that issue.  But,

25     after a while, it became quite clear that the

1       expectation that the families had, either from local

2       counsel or from their own experiences in life, in

3       other litigation and other matters in Brazilian cases

4       in Brazil, would go on for a long time.

5              Q       Did you recommend all of these

6       settlements?

7              A       I believe we did.

8              Q       You hesitated.  Are there some that

9       you may not have recommended?

10             A       There were cases where the families

11      had signed releases in Brazil and we felt that the

12      money we obtained on top of that, without hesitation,

13      we could recommend.

14                     Other families we gave

15      qualifications.  Some families had huge wage earners

16      with very young children.  And with regret or

17      sadness, we had to recommend in light of what we felt

18      were their prospects overall.  In some, I believe, we

19      recommended all settlements.

20             Q       In how many of these settlement

21      meetings did Mr. Guimaraes sit in on?

22             A       10 or 15, at least.

23             Q       Maybe more?

24             A       Maybe more, yeah.

25             Q       Over how many days did these

- Leigh Ballen -

239

1   you were recommending?

2           A       That the cases should continue on.

3           Q       Did he tell you that he thought that

4   the settlements were insufficient and that more money

5   should be obtained?

6           A       He may have written that, yes.

7           Q       Did you tell the clients that in

8   order to complete the settlements they had to fire

9   Mr. Guimaraes?

10          A       We told them that our understanding

11  was that if their counsel won't sign the dismissal,

12  they won't be able to get the funds and they need to

13  be represented by counsel who will respect their

14  wishes.

15          Q       Did you tell them that they had to

16  terminate the services of Mr. Guimaraes in order to

17  collect the settlement funds that you recommended?

18          A       I don't believe we told them to do

19  so.  I believe we told them what they would need to

20  do in order to dismiss a case of this type and to

21  accept a settlement and agreed to have counsel

22  stipulate to the dismissal.

23          Q       And that would necessitate the

24  removal of Mr. Guimaraes as counsel; is that correct?

25          A       My understanding of Brazilian law is

1    exactly.

2            Q      And that's what you told the clients?

3            A      That they would need counsel that

4    would represent them and agree to sign the dismissal.

5            Q      Do you have any reason to believe

6    that Mr. Guimaraes opposed the settlement, on any

7    basis, other than what he wrote to you which is he

8    thought that you should get more?

9            A      Yes.

10           Q      What reason is that?

11           A      General continuation of litigation,

12   generally.

13           Q      For which he was not going to get

14   paid unless the litigation was over?  I don't

15   understand.  Could you please explain?

16           A      Well, that's it.  That's it.  That --

17   the glory of being an aviation attorney on an ongoing

18   basis, as we were told he had done in other cases.

19           Q      So, you believe that Mr. Guimaraes

20   valued the glory of continuing the litigation over

21   the benefit to the widows and orphans?

22           A      Wholeheartedly.

23           Q      That's your belief?

24           A      Generally, although I don't believe

25   he intends to harm anyone.  I believe that he felt

.

**EXHIBIT "A.7"**

82

1                       Arthur Ballen

2    lawyer in reference to getting their money.  I do

3    not know what forms or other lawyers' advice or

4    actions would be other than help them get their

5    money.

6          Q.    Who other than Sampaio did the former

7    clients of Mr. Guimaraes hire?

8                MR. APUZZO:  Objection.

9          A.    I don't know.  I don't know who -- I

10   don't know.

11         Q.    Was there anyone other than Sampaio

12   hired?

13         A.    Yes.

14         Q.    Who?

15         A.    I don't know but I've seen them, many

16   many attorneys came in.

17         Q.    Well, the time frame I'm talking

18   about is after you had your settlement meetings

19   with the Brazilian clients and Mr. Guimaraes was

20   not happy with the amount of the settlement, how

21   many lawyers other than Mr. Sampaio were hired to

22   replace Mr. Guimaraes?

23         A.    It has not been established that Mr.

24   Guimaraes was unhappy with the amount of the

25   settlements.  He expressed to me a different reason

83

1                          Arthur Ballen

2      why he did not want the settlements to go through.

3              Q.      What did he tell you?

4              A.      He told me if the settlements went

5      through, he would lose his opportunity to be the

6      most prominent aviation attorney in the country, he

7      wanted the case to continue.

8              Q.      Forever?

9              A.      I don't know how long in his mind he

10     wanted it to go, but he wanted the case to

11     continue.

12             Q.      How much did the Jabaquara judgement

13     award to each of the plaintiffs?

14             A.      Two million reals which, at that

15     time, was $1,111,000.

16             Q.      Anything else?

17             A.      Yes, there was some provision for

18     future lost earnings, but I don't know what

19     amount.  There was also attorney fees of, best

20     guess, eight, nine million dollars.

21             Q.      Was the additional sum two thirds of

22     their net earnings up to age 65?

23             A.      I read the opinion, I wasn't sure

24     which it was for, one year or to the age 65, but

25     there was a statement in the opinion was two thirds

**EXHIBIT "A.8"**

1           Guimaraes

2      Q.     Exhibit RG 00182 through 184 and it's

3  Renato Guimaraes' Junior letter head dated

4  February 9, 2002 Speiser, Krause.  Exhibit

5  number 37 is identified as production RG 00185

6  and it's a letter from Renato Guimaraes to

7  Speiser, Krause dated March 1st of 2000.  The

8  letter is, referenced trip about clients to New

9  York.  The question I have, who were the widows

10  who accompanied president Assali to New York.

11      A.     Who?

12      Q.     Who were the widows that you referred

13  to here?  You say President Sandra Assali and

14  two other widows decided to go to New York.

15           Who were the other two widows?

16      A.     I never heard it.  I was sure Duda

17  was because Duda work as a translator because I

18  haven't heard of two other widows, not from my

19  26 families, so to speak, and that was the

20  beginning of the end because it was quite

21  surprise.  But you do not ask me that.

22      Q.     I appreciate that.

23           Did you understand that President

24  Assali and Duda were coming to New York to

25  listen to the settlement proposals?

1                  Guimaraes

2          A.     I learn after that.  I felt so

3    strange at that moment that she confessed, by

4    the way.

5          Q.     She confessed what?

6          A.     She have a dinner with the Speiser,

7    Krause in Washington D.C., gave Speiser, Krause

8    money and did not discuss the settlement which

9    was presented to Brazil one week later.

10         Q.     What is your relationship with Sandra

11   Assali today?

12         A.     Today, oh, I am suing her because she

13   put my reputation at risk.

14         Q.     Now I understood from your testimony

15   that there was the first widow's group with

16   Sandra Assali that's Abrapava?

17         A.     She was the president of the

18   Abrapava, yes.

19         Q.     And then there came a time when there

20   was a second widow's group; is that correct?

21         A.     No, she still is the president of

22   this --

23         Q.     No.

24                Wasn't there another group formed

25   besides for Abrapava?

ce88f693-1406-495f-b956-3ceca5607f09

**EXHIBIT "B"**

EXHIBIT
Guimaraes
D - II
4/25/07 CA
PENGAD 800-631-6989

## AFFIDAVIT

Dr. Renato Guimarães Jr., being duly sworn, according to Brazilian law upon his oath, deposes and writes:

1. I am the only Brazilian attorney for the 64 families along, together with *Speiser Krause*.

2. Many or even most of these 64 families are very much against the last professional behaviors of *Speiser Krause* but nevertheless they authorized in April *Speiser Krause* merely deal with proposals for an eventual agreement that never, as far as I know, was celebrated.

3 – Several of these 64 families already terminated with *Speiser Krause* as their attorneys, effective in these last three weeks, and many of them shall fired *Speiser Krause* in near future. As a condition for the proposals be accepted, *Speiser Krause* asked the families to fire me, but only 11 did, and several of them already have return to me under the Brazilian Bar and Judges' overview.

4 – The Brazilian Bar already took proper steps so the **Federal Prosecutor can formally charge *Speiser Krause* in Federal Court with federal felony of illegal exercise of the legal professional in Brazil**, according to the Brazilian Penal Code.

5 – The Brazilian Bar also toke measures so that the **Brazilian State Department officially communicate the US State Department to take appropriate actions in view of the criminal activities committed by *Speiser Krause* in Brazil and against the legitimate interests of the families** of *TAM* tragedy.

6 – The Attorney-General of the State of São Paulo, the Public Prosecutors and Judges in those Courts in which I act in these lawsuits also are fully aware of these illegal activities practiced by *Speiser Krause* in Brazil.

7 – **IT IS NOT TRUE**, AS FAR AS I KNOW, THAT THE FAMILIES HAD SETTLED WITH *NORTHROP GRUMMAN*. MANY OF THEM <u>ONLY AUTHORIZED</u> *SPEISER KRAUSE* TO DEAL WITH THE APRIL PROPOSAL WHICH NEVER MATERILIZIDED. THE TWO VERSIONS OF THE PROPOSAL THAT I EXAMINED WERE DRATED IN CONFLICT WITH THE



RG-00386

LAWS IN BRAZIL, ACCORDING TO ALL JUDGES AND
CURATORS OF MINORS WHOM I HAVE CONSULTED.

8 – I NOT ONLY DO ENDORSE the action of petitioner's
in seeking monthly alimony duties owed by *Northrop Grumman,*
according to the Jabaquara decision ruled in favor of the families,
but indeed I STRONGLY URGE, if I may, THIS COURT TO
DECIDE IN FAVOR OF THE FAMILIES because this is the only
way available to the families to recover their rights, due the
contempt of court grossly committed by *Northrop Grumman* in
Brazil, by refusing to make any deposit of the bounds so ordered
unanimously by the First Court of Appeal of Sao Paulo State, and
being so punished – but in vain – by the Brazilian Judge.

9 – Item 4 of Mr. Gerard R. Lear's Affidavit is, at least to
the Brazilian Ethical and Legal Standards of a Code of
Responsibilities of the Attorneys, not only a plenty act of
**malpractice** but, to be exact, an astonish case of high legal
**treason in Court** because the nature and the scope of such a
statement only could be reasonable conceived to be expected
from a *Northrop* lawyer instead – and never from an attorney for
the family, playing the opposite side.

10 – I have being told that it was Mr. Leigh Ballen, from
*Speiser Krause,* who was in Sao Paulo, and who made
arrangements to tell the families – in order to have them signing
similar letters as Ms. Hoogerheide's – that the Rogatory Letter
would not work out in New York because, believe or not, I had
"stolen" it from the Court and had taken it to New York, thus
without the authorization of the Brazilian Judge.

11 – At the time, I was in Miami, FL, working for two and
half weeks with Mr. Jeffrey M. Herman, Esq., from *Herman &
Mermelstein,* the law firm that is replacing *Speiser Krause* as
attorneys for the families, and most of the families could not
reach me easily. According to the Brazilian Law, foreigner
attorneys can not talk with a common client without the presence
of his or her Brazilian attorney when such attorneys have
conflicting opinions. Yesterday, Mr. Lear called Mr. Herman for
the first time and did admit that, since April, *Speiser Krause* did
almost nothing to the families in the California Court.

12 – In Miami, FL, several prestigious law firms - after
seeing some 120 pages of documents, including the manufacture
of **documentation falsehood** - told me, in separate meetings,
that *Speiser Krause, did make many things "very, very
wrong in Brazil".* These firms, among others, are *McDonald &*



RG-00387

*McDonald; Goldberg & Associates, P.A., Colson Hicks Edison, P.A., and Podhurst Orseck Josefsberg Eaton Meadow Olin & Persin, P.A.,* and, by telephone, *Omrani & Taub, P.C.,* from New York.

13 — One of them even told me that <u>I should give those documents to New York Bar so that those attorneys from *Speiser Krause* should be disbarred.</u>

14 — In fact, I am prepare to go to the Brazilian Court against Northrop and *TAM* again, this time to seek a judicial preventive declaration that can say - due the lies of *Speiser Krause* to the families and Mr. Lear's item 4 of his Affidavit to this Court -- that no proposal of agreement shall be approved by the Curator of Minors and by the Courts and, if it is somehow approved, then it shall be declared null because of its vicious fabrication of real will of the families.

15 — In the *Aviation Law/Insurance Symposium,* held in Daytona Beach, FL, last January, 15-16, Mr. Steven Marks, Esq., from *Podhurst Orseck Josefsberg Eaton Meadow Olin & Persin, P.A.,* in his speech on *Filing Foreign Aviation Claims in the U.S.,* give the Jabaquara decision as an example to alert those corporations that are always anxious to send a lawsuits presented in US Courts *(forum non conveniens)* to a foreign country, without the due care on the real, updated legal situation of that particular country, due the globalization of the legal information in these days. An active participant of the *Symposium,* <u>Mr. Russel Mirabile, Esq., V.P. & Director of Claims, USAIG, NY, NY, made a brief remark to me about Mr. Marks' statement</u>.

I declare under penalty of perjury under the laws of Brazil that the foregoing is true and correct.

Executed this 6th day of February, 2001, at Campinas, SP, Brazil.

*Renato Guimarães Jr.*

Renato Guimarães Jr.

Brazilian Bar, 80.113-SP

RG-00388

**EXHIBIT "C"**

RENATO GUIMARÃES JR.

*Doctor pela USP, Professor da UNICAMP*
*Master of Comparative Law, CJPU, IASP*
Fone (015) 3284-9903, 3284-4596 fax 3284-4313, 3285-3521, rua Francisco de Toledo, 511
Cidade Universitária - Distrito 410, Campinas, SP, Brazil



October 13, 2000.

The Honorable Judge Jane S. Solomon,
*Supreme Court of the State of New York, County of New York,*
United States of America.

EXHIBIT
Guimaraes
F-ID
4/25/07   CA
PENGAD 800-631-6989

*Index No. 120256/1997, Celia Berliner et al, v. Northrop Grumman*
*Corporation, TAM et al*

As a Brazilian attorney retained by the 65 families of the victims of the crash, I would like to respectfully present to this Court the official translation into English of the decision of the Honorable Judge Rômolo Russo Jr., of Sao Paulo, Jabaquara Region, Brazil, in which *Northrop Grumman* was found responsible and thus should pay US\$ 1,111,111,11 for non-economical losses, plus 66,66% of the earns of the respective victim to each family until when she or he would reach the age of 65. Teleflex was found not guilty. This decision is under appeals from both *Northrop* and the families. *Northrop* was also punished with the maximum fine of 20% for *contempt of court* ( *improbus litigator, dolus malus* ) because, well before the decision, *Northrop* refused to obey both the Judge and the Court of Appeals' orders to deposit US\$ 140,000.00 for each family as a guaranty for the then future execution in Brazil, where it has no assets. The Brazilian Superior Court of Justice, at the request of the families, already ordered a fast track for the last appeal of the families to rise the amount of the deposit, but, because, as said, *Northrop* has no assets here and because of its continuing *contempt of court*, the case in Brazil shall be fruitless.

Many families and Brazilian attorneys do not understand why this decision was not yet -- as far as we know -- presented to this Court, more than three months and one week after it was handed down, since *Northrop* and *Teleflex* should also be sued in Brazil by imposition of the Honorable Judge William McDonald, Superior Court of the State of California, County of Orange, on the families and on both parties, as a condition in the *forum non conveniens* issue, still pending, again, as far as we have been poorly informed. We have been told that the trial there is scheduled in the California Court to next April.

The anguish of the families is also growing because since last April *Speiser Krause* had came to Brazil several times only to press them to accept the enclosed offers made by *TAM, Northrop, Teleflex, Fokker* and others to settle all cases. This pressure even included *Speiser Krause's* arrangements



CONFIDENTIAL     SK  000655

to provide free Brazilian attorney to replace me as the local attorney for the single reason that my recommendation is against the deals, not only for its poor amount but also because of its illegality according to the Brazilian law. For this reason I have been substituted by five widows who desperately need money for the orphans. This behavior breaks our Code of Ethics and the law.

Also, Mr. Thomas Frizzell, Esq., a lawyer for *Speiser Krause* told me and my son last June in New York, that he did discovered evidences on *Northrop's* fault: *Northrop* had sent a new model of the *thrust reverse* to *Fokker* before the proper, more advanced type of aircraft had been in production. *"That accident was bound to happened, Renato, and your people were the unfortunate one"*, Mr. Frizzell explained to us in details.

But, because we were never told about Mr. Frizzell's evidences, and because Mr. Frank Granito, III, another attorney from *Speiser Krause*, tried to put down Mr. Frizzell to, saying that *"he is pretty junior"*. I even had to ask the Honorable *FBI Deputy Director*, Thomas J. Pickard, to help us by sending to the Jobaquara Judge, in Brazil, a copy of this crucial evidence.

Several families and their lawyers, included myself, no longer trust Arthur Baller, Leigh Ballen, Gerard Lear and Frank Granito, III, from the Speiser Krause law firm, but we do respect Thomas Frizzell. Maybe, Your Honor, there is some type of judicial safe-guarder to look over the aforementioned lawyers shoulder to verify what is really going on regarding the protection of families' rights in Court.

If it could be necessary to the Court, some families and I would be more than happy to provide full details on this utmost akward situation.

May I say, Your Honor, that throughout my life, as a Professor of Law and as a Public Prosecutor, now retired, for the State of Sao Paulo, I, like millions in this country, look to the legal system of America as a great inspiration for the fight, in court, of the little ones against the giants. For this very reason, Your Honor, I write to you on behalf of the 65 families.

Accept, Your Honor, our most deep feelings of due respect.

*Renato Grimaldi Jr.*

TOTAL P.03

CONFIDENTIAL    SK  000656

**EXHIBIT "D"**

EXHIBIT
Guimaraes
D-ID
4/25/07   CA

To: Commander Rolim Amaro, President of TAM
C/O: Attorney Luiz Eduardo Arena Alvarez
Rua Oscar Freire, 379, 18° Andar, CEP 01426-001
Phone: 282-8400; and

To: Northrop Grumman Corporation
C/O: Pinheiro Neto Advogados
Mr. Celso Cintra Mori
Rua Boa Vista, 254, 9° Andar - CEP - 01014-907
Phone: 237-8400

All the above addresses are in São Paulo, SP - Brazil

Dear Sirs.

Mr. Wanderley Minitti, from the Law Office of Richard S. Peskin, who represents me in the USA, delivered the attached copy to Speiser Krause on Friday, 10/6/00. He was not dignified with a reply from SK.

In order to prevent liability, preserve and protect my rights, and to formally manifest my intentions, you are hereby advised that, according to the powers of attorney titled Retainer Agreement, TAM Brazilian Fokker 100, October 31, 1996, granted by the 65 (sixty-five) families suing TAM and Northrop through the United States Justice System, I am entitled by contract to the usual and specific share of the lawyer fees charged jointly by Speiser Krause and I to our common clients.

Based on the guarantees assured by the Statute of the Brazilian Bar Association, Act 8906/94, you are hereby advised that no payment--either ordered by court, or obtained by settlement--resulting from these indemnification lawsuits, (even when I am not the attorney representing the families in Brazil against these companies), can be legally made to the families without my simultaneously receiving the share, to which I am entitled, of the respective fees common to Speiser Krause. SK is trying, against my advice, but in the interest of TAM and Northrop (as it is legally known by all of you from the judicial litigation proceedings), to revoke these facts with malicious intent.

More than merely trying to preserve my professional fees, the present caution protects the very ethical, legal and judicial essence of all transactions, in face of the described nullification of judicial acts, among others, in my formal accusation presented to the Attorney General in order to avoid any losses to the orphans, and also in my speeches against the agreement and its means, perverted by tergiversation and coercion.

As you must be well aware, last June in the United States copies of the same letter were sent to Peskin and to these other companies.

In order to reach a viable and lawful agreement, I suggest a conciliatory meeting, without hidden agendas, with the participation of all involved and the help of an impartial and competent mediator.



CONFIDENTIAL    SK   000653

Sincerely,

Crimes of Coercion during the course of the legal action committed by Arthur and Leigh Ballen:

Brazilian Penal Code, article 344:

"To use violence or severe threat (already consummated with the dismissal by the clients), with the intent of favoring one's own interest or the interest of a third party, against...any other person who serves...in a judicial action...

Punishment - one to four years of incarceration, fine in the amount of two to ten thousand Cruzeiros, in addition to the punishment correspondent to the violence committed."

Concealment of evidence:

Thomas Frizzel - evidence of Northrop's fault to be presented to the jury in California in April, - request of help from the FBI - the evidence in question was needed for the case trials in Brazil.

CONFIDENTIAL    SK  000654

**EXHIBIT "E"**

RENATO GUIMARÃES JR.

Doutor pela USP, Professor da UNICAMP
*Master of Comparative Law, GWU, IASP*
Fone (019) 3289-8989, 3289-8990-fax-3289-4315, 3289-2921, rua Francisco de Toledo, 511
Cidade Universitária - 13.083-470, Campinas, São Paulo - Brasil

Em 20, setembro, 2000.

Excelentíssimo Senhor
*Honorable* LOUIS J. FREEH
DD. Diretor do *Federal Bureau of Investigation,*
*US. Department of Justice,*
c/o Thomas J. Pickard, *Esquire*
*Deputy Director, FBI.*

Excelentíssimo Senhor Diretor:

O Juiz da 1ª Vara Criminal do Fórum Regional do Jabaquara, São Paulo, Ricardo Graccho, remeteu, dia 11 p.p., para o Excelentíssimo Senhor Procurador-Geral da Justiça de São Paulo *(Attorney General for the State of São Paulo )* o Inquérito Policial que investiga as causas da tragédia do avião *Fokker-100,* da *TAM,* Transportes Aéreos Regionais, há quase quatro anos, nesta Capital, com 99 mortes – sendo dois americanos . ( *U.S. citizens* ) e 10 casas destruídas, porque "há fortes indícios de que pessoa de relevo científico tinha informações... que o reverso poderia abrir... o seu fabricante, a *Northrop Grumman Corporation"* (doc. anexo).

O Juiz da 2ª Vara Cível, do mesmo Fórum, Rômolo Russo Júnior, em junho p.p., condenou a *Northrop Grumman Corporation* a pagar US$ 1,111,111.11, para cada uma das famílias das vítimas, só por danos morais, além de pensões de 66,66% do salário do respectivo morto, até a idade em que ele completaria 65 anos de vida. A *Northrop Grumman Corporation* também foi condenada a 20% de multa por litigância de má-fé *( contempt of court ),* por não ter obedecido à decisão do Egrégio Primeiro Tribunal de Alçada Civil do Estado de São Paulo *( Court of Appeals )* de depositar uma caução no Brasil para garantir a execução da condenação.

Há 65 famílias no processo, mas uma Ação Civil Pública *( class action ),* movida pela *Associação de Amparo às Famílias Castigadas por Acidentes Aéreos e Tragédias Antigas e Modernas,* tenta a mesma indenização para todas as 109 famílias vítimas.

A presença da *Northrop Grumman Corporation,* no Brasil – onde ela nada tem - para responder à ação, só foi possível graças à imposição do Juiz William McDonald, da Suprema Corte do Estado da Califórnia, *County*

of Orange, case 783990, consolidated with various cases, *Linda Andrews, individually and as Representative of the Estate of David Andrews, deseased, et al. v. Northrop Grumman Corporation, Teleflex Control System, Incorporated.*

A *Northrop Grumman Corporation* também está sendo processada, com outras rés, na *Supreme Court of the State of New York, Index nº 120256/1997, Celia Berliner, as administratrix of the Goods, Chattels and Credits which were of David Tobolla, deseased et al, v. Northrop Grumman Corporation, Fokker, TAM, et al.*

Ambos os processos, na Califórnia e em Nova York, encontram-se suspensos – aguardando as decisões no Brasil, a condição imposta na preliminar do *forum non conveniens* – para eventualmente ser concedida a jurisdição dos Estados Unidos, como garantia de devido processo de direito *( due process of law )* às 65 famílias.

A defesa das 65 famílias, nos Estados Unidos, está a cargo do Escritório de Advocacia *Speiser Krause*, com quem o signatário trabalha nesses processos. Em junho último, no Escritório da *Speiser Krause*, em Nova York, Thomas A. Frizzell, Jr., *Esquire*, o advogado que produziu a prova judicial da culpa da *Northrop Grumman Corporation*, confirmou-me a e a meu filho, longa e minuciosamente, como ele conseguira provar que a *Northrop Grumman Corporation* acabara enviando para a *Fokker* – por erro gravíssimo - um novo tipo de *reverso*, especial para um modelo mais avançado do *Fokker-100*, mas então ainda não em produção: "*essa tragédia já era para ter ocorrido antes*", concluiu. Foram também produzidos, conforme informação do Escritório da *Speiser Krause*, na Califórnia, "*boxes and boxes*" de evidências e depoimentos, no mesmo sentido, para desenvolver os processos relativos às duas famílias dos *US citizens*.

Assim, Senhor Diretor, em nome das 65 famílias que represento, junto com os colegas dos Estados Unidos, e de todas as demais famílias difusas que, como advogado da *Associação de Amparo às Famílias Castigadas por Acidentes Aéreos e Tragédias Antigas e Modernas*, tentamos proteger, peço, e peço sempre com o maior respeito, se digne Vossa Excelência tomar as devidas providências no sentido de obter, das fontes citadas, ou da *Speiser Krause*, ou das Cortes da Califórnia e de Nova York, como apropriado for, cópias de todas as provas e documentos, assim como apropriado for, <u>cópias de todas as provas e documentos</u>, assim produzidos a respeito das causas da tragédia oriundas do *reverso* fabricado pela *Northrop Grumman Corporation*, para serem, então, entregues, diretamente pelo *Federal Bureau of Investigation* ao *Attoney General for the State of São Paulo*, a fim de que o Inquérito Policial possa ser concluído como exigido pela respeitável decisão do MM. Juiz Ricardo Graccho.

A inestimável cooperação do *Federal Bureau of Investigation* com o Poder Judiciário do Brasil apenas confirma a crescente resposta dos dois e demais países à necessidade de mútua colaboração, entre as autoridades

responsáveis pelo cumprimento da lei, contra todas as formas de *"contemporary criminality"*, tema do presente *First World Congress of Public Prosecutors* em São Paulo, que tem a feliz participação do portador deste pedido, o *Deputy Director* Thomas J. Pickard, exatamente sobre a recíproca ajuda *"between criminal investigators and Prosecutors"*.

Gostaria de reconhecer, mais uma vez, que o *Federal Bureau of Investigation*, assim como o *Department of Justice* e algumas *States Attorneys General Offices*, sempre atenderam meus pedidos para cooperação, então como Promotor de Justiça do Estado de São Paulo, em vários casos importantes – especialmente quando tive a honra de presidir a *World Prosecutors Section* da *World Peace Through Law Center*, baseada em *Washington, D.C.* - mas, de longe, nenhum deles tão essencial como esta catástrofe, a maior da História de São Paulo.

Enquanto apresento a Vossa Excelência meus sentimentos da mais alta estima e profunda consideração, confirmo que, de acordo com a lei do Brasil, estou juntando aos autos dos processos, cópia deste pedido a Vossa Excelência.

Atenciosamente,

**EXHIBIT "F"**

EXHIBIT
Guimaraes
M-20
4/25/07  CA

# RENATO GUIMARÃES JR.

**Doutor pela USP, Professor da UNICAMP**
*Master of Comparative Law, GWU, IASP*
Fone: (019) 234-1214, 239-2921, fax 239-4315
Rua Ferreira Penteado, 709/83, 13.010-041, Campinas, SP

Ear Mr. Einhorn,

We have great news from Brazil !

The Attorney General Office shall direct, sometime during this February, a police investigation against Arthur and his son Leigh Ballen -- lawyers with Speiser Krause (SK) – for having charged and unilaterally collected, or are still charging and unilaterally collecting, or are trying to charge and to collect, as if they were their attorneys rights, US$ 982,686.81 as legal fee due to SK by 26 families when, in fact, the families already had paid, years before, the very same fee to the only legitimate creditors: their Brazilian attorneys, the only ones who had worked to obtain to the families these so called anticipatory, partial awards from several TAM lawsuits originate solely in Brazil, and not from that only one Northrop lawsuit, originate first in US, and that correspondent amount had been deposited already, years before, in the banking accounts of the families.

Moreover, the correct value due by the 26 families was only US$ 363.958,08, or **10%**, the contingency fee contracted by the Brazilian attorneys and the families, including the expenses - and nor that amount of US$ 982,686.81, almost three times more, 25% for the fees plus 2% - thus **27%** - for the expenses never proven to the families.

I do not know in American law, but this civil theft of theft or larceny in Brazil is a very serious crime.

These continuing felonies are called by the Brazilian Penal Code as *"apropriação indébita continuada"* (continuing undue appropriation or undue possession). It is so feasible because the families had or have to sign the settlement first and, only 20 days after the approval of the settlement by the Brazilian Judges and by the California Judge, then the money is deposited in a banking account in Santo Antonio, Texas, in the name of Speiser Krause and then it is sent - *less these crime or civil theft* – to the families banking account down in Brazil.

Well, since Dra. Luciana is doing a research on malpractice here in US I wondered whether it would not hurt if I could also venture myself in the same challenge, as I am waiting for your consideration on my three cases.

In the old day of my LLM in the earlier seventies at The George Washington University, I did not take any course in the subject, if it already existed at all that time as an independent discipline. Thus I only could remember of something on this subject within the broad area (curse) of Contract.

So after a few updating readings I came to conclusion, if I may, that, no matter in which jurisdiction my case be presented, it should be grounded, at least from a Civil Law country observer´s feelings, upon at least two theories: malpractices *and* for the breach of the fiduciary duty and - let me say, well beyond these rather limited negligent and ethical approaches -- also on the very ground of all the way into the very gross criminal conduct at large of a, say, pure conspiracy, where only the ancient Roman *malus dollus* governs the extreme social behavior at its worst.

Dr. Renato Guimarães Jr.
Página: 2

Speiser Krause (SK) long, consistent and sophisticate maneuvers - be indeed recovered.

Consider for instance - in another words - the fees (25%) plus expenses (2%) SK took (thus 27%) for itself upon the considerable values that I had already recovered through my 26 lawsuit against co-defender TAM in Brazil, nothing to say about the other families, out of 65, with fellow Brazilian attorneys, beside me, all and every of them for the 39 TAM cases without any connection at all with the Northrop case in California with its *forum non*, stay and so for.

Well, all 26 families already had paid (10%) for mine and several other attorneys' fees over the amounts each of families had received one, two and more years earlier. Even today, almost five years later, the families must accept that a substantial part of their money be so retained and stolen – without any legal reason at all - at the SK banking account in Santo Antonio, Texas, where Northrop, TAM (Lloyd´s, of London) and other defenders deposit the money due to the families down in Brazil.

In another words, SK charges and collects as it was SK own fee (25%) plus as it´s own expenses (2%) when, in fact, the due amount already years earlier had being received (but only as 10%, including expenses) by the Brazilian attorneys for their work and expenses in Brazil, without any cooperation at all from SK – nobody at SK even speaks one single word in Portuguese, except "money".

Therefore, the families "paid" twice (indeed "paid" once and was "stolen" latter) the same fee – and more (17% = 27% less 10%) for SK - for just one work already done.

Kindly look at the column "amounts" at left of the map of the 65 families' settlement numbers. On the top you can read "26" and, in the button, the sum of "US$ 3.639.580,81", or "22,78%" of the total of the settlement for the 26 families.

Imagine the amount for the other 39 families. And then add to the all 65 families.

Now, just look how much this "undue appropriation", as the Penal Codes call this crime in Civil Law Countries, represent to some family.

Take a look at the two orphans Fischer (son and daughter of Roberto Fischer, victim under the number 47 at the first, small column at the left of the same page of the settlement which SK arbitrary divided among the 26 families without ever showing how SK divided the US$ 40 million among them, which methodology and criteria were used, if any, and so for.

You will see that the "undue appropriation" by SK against the Fischer kids reached up to 27% (retained by SK in Texas) out the "74,96%", or "US$ 239.533,95" the kids had already received years ago, thanks to Renato´s and other Brazilian attorneys' (already paid but, again, as much as only 10%) by the kids at that time) legal work.

Thus, as you see, out of the US$ 319.533,95 (at the column "total", at the right of the same page) that the kids received, only 25%, or US$ 80.000.00, upon which amount it should be deducted by 27% for SK, assuming that SK had indeed

CONFIDENTIAL

battle in an American Court when, in fact, it was no more than another "bullshit", as Arthur Ballen put it latter on ("but they like it"), for the sole SK´s goal of a kind of utmost, ultimate ambulance chasing to seduce, to convince potential, many miserable clients under a monster fraud, to become SK clients.

And how about the "utmost good faith, honesty, integrity, fairness and fidelity" sustained by SK during all these years, up to this very time, February 2004, once its lawyers never told, as they must, to the California Judge that Northrop Grumman had committed "contempt of court" in Brazil.

Yes, Northrop had breached its commitment to the own American Court that they would obey - *as a condition under the* forum non *defense, under stay up today* – all the Brazilian Courts decisions (and that one on the bound was unanimous and by the Judges at the very Sao Paulo Supreme Court of Appeal for this cause.

But the order to deposit a bound in Brazil also never was obeyed, for which very illegal defiance Northrop Grumman was fined and, again, it never paid the fine at all.

And SK did not tell this to the California Judge.

Once more, SK made an enormous, unique Mockery Justice at the cost of the future of the families !

By its criminal omission – "failure to disclose a material fact" - of simply tell this true of this contempt of court by Northrop Grumman against the Brazilian Judiciary to the California Judge, Speiser Krause made a "miscarriage of Justice" not only at the Sao Paulo Court, but also in the California Court.

The same vicious of SK is presented in the "secret" private deposition and the handout of "relevant documents" in Brazil, under a hidden agreement among Northrop, TAM and others, but for only one single case, the one for only a particular window and her two orphans, Linda Andrews, of California – without any knowledge of any of the all 65 Brazilian families with some 100 orphans in desperate need for evidence. Ms. Linda settled for some US$ 6,700,000.00. Compare with the US$ 80,000.00, less 27% for SK fee (partially paid twice) and expenses for the Fischer orphans.

Gerard Lear, the managing partner of SK, signed and gave an affidavit to Northrop Grumman that introduced it before the New York Judge as its own defense against the Rogatory Letter issued by the Jabaquara Judge – the one who granted the US$ 1,111,111,11 and so forth awards to the families –that reads as follow:

> "...Considerable time and expense has been spent in drafting the settlement releases and other necessary documents in both English and Portuguese.

> "We in no way endorse the action of petitioner´s attorney in seeking partial enforcement against Northrop Grumman of the judgment of the Brazilian court at Jabaquara. That judgment came months after

CONFIDENTIAL

SK   2940

Dr. Renato Guimarães Jr.
Página: 4

But, the American Law:

> "*precludes the attorney from having any personal interests antagonistic*
> *without the knowledge or consent of the client... adverse interest may be*
> *liable... for fraud, actual or constructive...* liable for any loss sustained...
> paragraphs 237, 7... and 251, 7a."

And moreover:

> "*Practically any breach of violation... constitutes constructive fraud and is*
> *sufficient for this purpose. Non disclosure of an adverse interest fully*
> *inform or advise* (makes the attorney) *responsible as for fraud although*
> *without positive misrepresentation of intention to defraud.*"

Cleary, we are here well beyond the limits of the *"reasonableness of the
settlement"*, as Prof. Richard A. Posner put it, An Economic analysis of Law 570
(4th ed. 1992), nothing to say of *"infliction of emotional distress"*.

Thus, cases in America, since a US Supreme Court landmark decision back in
1850, as I read, over and over require from attorneys *"honorably and faith fully
discharged"* duties under the *"sterner principles of morality and justice"*.
Anything less than that would be viewed as a *"detriment of the rights of the
party"*.

Again, these are only guesses from a Civil Law attorney. Of course you have
incomparable, complete domain over the matter and certainly you are feeling
how deep the SK´s treason against the families in Brazil was and is.

They all thrust you will redeem them.

Thanks for your patience.

Miami, Super Ball Day, 2004.

(a) Renato Guimaraes Jr. (305) 534-8289
or Dra. Luciana (305) 416-0419 or (917) 4350-3299

CONFIDENTIAL

SK   2941

**EXHIBIT "G"**

MC-050

RECEIVED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER
SEP 08 2006
ALAN SLATER
Clerk of the Court

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

Steven C. Shuman, Esq. - SBN 82828
Engstrom, Lipscomb & Lack
10100 Santa Monica Boulevard, 16th Floor
Los Angeles, CA 90067
TELEPHONE NO.: (310) 552-3800    FAX NO. *(Optional):* (310) 552-9434
E-MAIL ADDRESS *(Optional):*
ATTORNEY FOR *(Name):* Plaintiffs

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER
SEP 08 2006
ALAN SLATER, Clerk of the Court
*J. Haines*
BY J. HAINES

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
STREET ADDRESS: 700 Civic Center Drive West
MAILING ADDRESS: Santa Ana, CA 92701
CITY AND ZIP CODE: Central Justice Center
BRANCH NAME:

CASE NAME: Andrews, et al. v. Northrop Grumman, et al.

| SUBSTITUTION OF ATTORNEY—CIVIL (Without Court Order) | CASE NUMBER: Dept. CX104<br>786149 C/W 783990 —*LEAD* |
|---|---|

THE COURT AND ALL PARTIES ARE NOTIFIED THAT *(name):* Silvana ARJONA FERRAZ ~~NOGUEIRA~~ makes the following substitution:

1. Former legal representative ☐ Party represented self ☑ Attorney *(name):* L/O SPEISER KRAUSE
2. New legal representative ☐ Party is representing self ☑ Attorney
   a. Name: Steven C. Shuman, Esq.     b. State Bar No. *(if applicable):* 82828
   c. Address *(number, street, city, ZIP, and law firm name, if applicable):*
      Engstrom, Lipscomb & Lack, 10100 Santa Monica Boulevard, 16th Floor, Los Angeles, CA 90067
      Telephone: (310) 552-3800; Facsimile: (310) 552-9434
   d. Telephone No. *(include area code):*
3. The party making this substitution is a ☑ plaintiff ☐ defendant ☐ petitioner ☐ respondent ☐ other *(specify):*
   Case No.: 786149

---

**\*NOTICE TO PARTIES APPLYING TO REPRESENT THEMSELVES**

- Guardian        • Personal Representative      • Guardian ad litem
- Conservator     • Probate fiduciary            • Unincorporated
- Trustee         • Corporation                    association

If you are applying as one of the parties on this list, you may NOT act as your own attorney in most cases. Use this form to substitute one attorney for another attorney. *SEEK LEGAL ADVICE BEFORE APPLYING TO REPRESENT YOURSELF.*

---

**NOTICE TO PARTIES WITHOUT ATTORNEYS**
A party representing himself or herself may wish to seek legal assistance. Failure to take timely and appropriate action in this case may result in serious legal consequences.

---

4. I consent to this substitution.    786149
   Date: *12 Junho*, 2006
   Silvana Arjona Ferraz Nogueira
   *(TYPE OR PRINT NAME)*                                    *S Ferraz Nogueira*
                                                              *Silvana P. Arjona*
                                                              *(SIGNATURE OF PARTY)*

5. ☑ I consent to this substitution.
   Date:          , 2006
   John J. Veth, Esq.     of Speiser Krause
   *(TYPE OR PRINT NAME)*                                    *(SIGNATURE OF FORMER ATTORNEY)*

6. ☑ I consent to this substitution.
   Date: 8/1/06
   Steven C. Shuman, Esq.
   *(TYPE OR PRINT NAME)*                                    *Steven C. Shuman*
                                                              *(SIGNATURE OF NEW ATTORNEY)*

(See reverse for proof of service by mail)

| Form Adopted For Mandatory Use<br>Judicial Council of California<br>MC-050 (Rev. January 1, 2005) | SUBSTITUTION OF ATTORNEY—CIVIL<br>(Without Court Order) | Page 1 of 2<br>Code of Civil Procedure, §§ 284(1), 285<br>Cal. Rules of Court, rule 376 |
|---|---|---|

American LegalNet, Inc.
www.USCourtForms.com

1    PROOF OF SERVICE

2
STATE OF CALIFORNIA          )
3                                              ) ss.
COUNTY OF LOS ANGELES        )
4

5         I am employed in the County of Los Angeles, State of California. I am over the age of 18 and
not a party to the within action; my business address is 10100 Santa Monica Boulevard, 16th floor,
6    Los Angeles, CA 90067.

7         On September 6, 2006, I served the foregoing document described as **SUBSTITUTION OF
ATTORNEY** on the interested party(ies) in this action by placing a true copy thereof enclosed in the
8    sealed envelopes addressed as follows:

9                          **SEE ATTACHED SERVICE LIST**

10   [X] BY MAIL:        I deposited such envelope in the mail at Los Angeles, California. The
envelope was mailed with postage thereon fully prepaid.
11

12   [ ] BY PERSONAL DELIVERY:    I caused such envelope to be delivered by hand to the offices of
the addressee.

13   [ ] VIA FACSIMILE: I caused all of the pages of the above entitled document to be sent to the
recipients noted above via electronic transfer (FAX) at the respective facsimile number(s) indicated
14   above. This document was transmitted by facsimile and transmission reported complete without
error.
15

16   [  ]  BY FEDERAL EXPRESS: I served the above-entitled document(s) via overnight mail in said
action by placing a true copy thereof in a sealed envelope in the designated area for Federal Express
pick-up.
17

18        I am readily familiar with the firm's practice of collection and processing correspondence for
mailing. It is deposited with U.S. Postal Service on that same day in the ordinary course of business.
I am aware that on motion of party served, service is presumed invalid if postal cancellation date or
19   postal meter date is more than 1 day after date of deposit for mailing in affidavit.

20        I declare under penalty of perjury under the laws of the State of California that the above is
true and correct.
21
          Executed on September 8, 2006, at Los Angeles, California.
22

23

24                                            _____
                                                   Leslie Jaramillo
25

26

27

28

236951.1

1

LINDA ANDREWS, *et al.* v. NORTHROP GRUMMAN CORPORATION, *et al.*

2

Orange County Superior Court Case No. 783990
*and Additional Consolidated Cases*

3

SERVICE LIST

4  John J. Veth, Esq.                                   Attorneys for Plaintiffs
   Douglas W. Schroeder, Esq.
5  SPEISER KRAUSE
   One Park Plaza, Suite 470
6  Irvine, CA 92614
   949-553-1421 ph.
7  949-553-1346 fx.

8  Edwin W. Green, Esq.                                 Attorneys for Defendant & Cross-
   Kimberly A. Donlon, Esq.                             Complainant Northrop Grumman Corp.
9  ALLEN MATKINS LECK GAMBLE &
   MALLORY
10 515 South Figueroa Street, Seventh Floor
   Los Angeles, CA 90071-3398
11 213-622-5555 ph.
   213-620-8816 fx.

12

13 A. Kristine Floyd, Esq.                              Attorneys for Defendant & Cross-
   Julie W. Russ, Esq.                                  Complainant Northrop Grumman Corp.
   ALLEN MATKINS LECK GAMBLE &
14 MALLORY LLP
   1900 Main Street, Fifth Floor
15 Irvine, CA 92614-7321
   Telephone: (949) 553-1313

16

17 Frank A. Silane, Esq.                                Attorneys for Cross Defendants Fokker
   CONDON & FORSYTH LLP                                 Aviation B.V., et al.
   1901 Avenue of the Stars, Suite 850
18 Los Angeles, CA 90067-4307
   310-557-2030 ph.
19 310-557-1299 fx.

20
                                                        Attorneys for Cross Defendants Fokker
21 Diane Westwood-Wilson, Esq.                          Aviation B.V., et al.
   CONDON & FORSYTH LLP
   7 Times Square
22 New York, New York 10036-6524
   212-894-6780 ph.
23 212-370-4483 fx.

24 Patricia Barlow, Esq.                                Attorneys for Defendants TAM Transportes
   LAW OFFICES OF PATRICIA BARLOW                       Aeros Meridionias S.A.
25 1312 Leavenworth Street
   San Francisco, CA 94109
26 415-977-1107 ph.
   415-977-1111 fx.

27

28

236951.1

**PROOF OF SERVICE**

1  James W. Hunt, Esq.                                    Attorneys for Defendant and Cross-
   Suzanne McNulty, Esq.                                  Complainant Teleflex Control Systems, Inc.
2  MENDES & MOUNT
   725 South Figueroa Street, 19th Floor
3  Los Angeles, CA 90017
   213- 955-7700
4  213- 955-7725

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

236951.1

**PROOF OF SERVICE**

MC-050

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Steven C. Shuman, Esq. - SBN 82828
Engstrom, Lipscomb & Lack
10100 Santa Monica Boulevard, 16th Floor
Los Angeles, CA 90067
TELEPHONE NO.: (310) 552-3800    FAX NO. (Optional): (310) 552-9434
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name): Plaintiffs

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
STREET ADDRESS: 700 Civic Center Drive West
MAILING ADDRESS: Santa Ana, CA 92701
CITY AND ZIP CODE: Central Justice Center
BRANCH NAME:

CASE NAME: Andrews, et al. v. Northrop Grumman, et al.

FOR COURT USE ONLY

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

AUG 22 2006

ALAN SLATER, Clerk of the Court
BY J. HAINES

| SUBSTITUTION OF ATTORNEY—CIVIL | CASE NUMBER: Dept. CX104 |
| (Without Court Order) | 786149 C/W 783990 |

THE COURT AND ALL PARTIES ARE NOTIFIED THAT (name): Silvia Lucia Peixoto Arjona makes the following substitution:

1. Former legal representative [ ] Party represented self [✓] Attorney (name): L/O SPEISER KRAUSE
2. New legal representative [ ] Party is representing self* [✓] Attorney
   a. Name: Steven C. Shuman, Esq.    b. State Bar No. (if applicable): 82828
   c. Address (number, street, city, ZIP, and law firm name, if applicable):
      Engstrom, Lipscomb & Lack, 10100 Santa Monica Boulevard, 16th Floor, Los Angeles, CA 90067
      Telephone: (310) 552-3800; Facsimile: (310) 552-9434
   d. Telephone No. (include area code):
3. The party making this substitution is a [✓] plaintiff [ ] defendant [ ] petitioner [ ] respondent [ ] other (specify):
   Case No 786149

*NOTICE TO PARTIES APPLYING TO REPRESENT THEMSELVES

• Guardian          • Personal Representative       • Guardian ad litem
• Conservator       • Probate fiduciary             • Unincorporated
• Trustee           • Corporation                     association

If you are applying as one of the parties on this list, you may NOT act as your own attorney in most cases. Use this form to substitute one attorney for another attorney. SEEK LEGAL ADVICE BEFORE APPLYING TO REPRESENT YOURSELF.

NOTICE TO PARTIES WITHOUT ATTORNEYS
A party representing himself or herself may wish to seek legal assistance. Failure to take timely and appropriate action in this case may result in serious legal consequences.

4. I consent to this substitution. 786149
Date: 12 Junio, 2006
Silvia Lucia Peixoto Arjona
_____
(TYPE OR PRINT NAME)                     (SIGNATURE OF PARTY)

5. [✓] I consent to this substitution.
Date: 8/8, 2006
John J. Vecth, Esq., of Speiser Krause
_____
(TYPE OR PRINT NAME)                     (SIGNATURE OF FORMER ATTORNEY)

6. [✓] I consent to this substitution.
Date: 8/1/06
Steven C. Shuman, Esq.
_____
(TYPE OR PRINT NAME)                     (SIGNATURE OF NEW ATTORNEY)

(See reverse for proof of service by mail)                              Page 1 of 2

Form Adopted For Mandatory Use
Judicial Council of California
MC-050 (Rev. January 1, 2005)

SUBSTITUTION OF ATTORNEY—CIVIL
(Without Court Order)

Code of Civil Procedure, §§ 284(1), 285;
Cal. Rules of Court, rule 376

American LegalNet, Inc.
www.USCourtForms.com

1      PROOF OF SERVICE

2

STATE OF CALIFORNIA          )
3                                          ) ss.
COUNTY OF LOS ANGELES        )

4

5          I am employed in the County of Los Angeles, State of California. I am over the age of 18 and
not a party to the within action; my business address is 10100 Santa Monica Boulevard, 16th floor,
6   Los Angeles, CA 90067.

7          On August 22, 2006, I served the foregoing document described as **SUBSTITUTION OF
ATTORNEY** on the interested party(ies) in this action by placing a true copy thereof enclosed in the
8   sealed envelopes addressed as follows:

9                     **SEE ATTACHED SERVICE LIST**

10  [X] BY MAIL:        I deposited such envelope in the mail at Los Angeles, California. The
envelope was mailed with postage thereon fully prepaid.
11

[ ] BY PERSONAL DELIVERY:    I caused such envelope to be delivered by hand to the offices of
12  the addressee.

13  [ ] VIA FACSIMILE: I caused all of the pages of the above entitled document to be sent to the
recipients noted above via electronic transfer (FAX) at the respective facsimile number(s) indicated
14  above. This document was transmitted by facsimile and transmission reported complete without
error.
15

[  ]  BY FEDERAL EXPRESS: I served the above-entitled document(s) via overnight mail in said
16  action by placing a true copy thereof in a sealed envelope in the designated area for Federal Express
pick-up.
17

         I am readily familiar with the firm's practice of collection and processing correspondence for
18  mailing. It is deposited with U.S. Postal Service on that same day in the ordinary course of business.
I am aware that on motion of party served, service is presumed invalid if postal cancellation date or
19  postal meter date is more than 1 day after date of deposit for mailing in affidavit.

20         I declare under penalty of perjury under the laws of the State of California that the above is
true and correct.
21

         Executed on August 22, 2006, at Los Angeles, California.
22

23

24                                    Leslie Jaramillo

25

26

27

28

@PFDesktop\::ODMA/PCDOCS/ELLHMDM/236951/1

**PROOF OF SERVICE**

1    LINDA ANDREWS, *et al.* v. NORTHROP GRUMMAN CORPORATION, *et al.*
     Orange County Superior Court Case No. 783990
2    *and Additional Consolidated Cases*

3                              SERVICE LIST

4    John J. Veth, Esq.                          Attorneys for Plaintiffs
     Douglas W. Schroeder, Esq.
5    SPEISER KRAUSE
     One Park Plaza, Suite 470
6    Irvine, CA 92614
     949-553-1421 ph.
7    949-553-1346 fx.

8    Edwin W. Green, Esq.                        Attorneys for Defendant & Cross-
     Kimberly A. Donlon, Esq.                    Complainant Northrop Grumman Corp.
9    ALLEN MATKINS LECK GAMBLE &
     MALLORY
10   515 South Figueroa Street, Seventh Floor
     Los Angeles, CA 90071-3398
11   213-622-5555 ph.
     213-620-8816 fx.
12
     A. Kristine Floyd, Esq.                     Attorneys for Defendant & Cross-
13   Julie W. Russ, Esq.                         Complainant Northrop Grumman Corp.
     ALLEN MATKINS LECK GAMBLE &
14   MALLORY LLP
     1900 Main Street, Fifth Floor
15   Irvine, CA 92614-7321
     Telephone: (949) 553-1313
16
     Frank A. Silane, Esq.                       Attorneys for Cross Defendants Fokker
17   CONDON & FORSYTH LLP                        Aviation B.V., et al.
     1901 Avenue of the Stars, Suite 850
18   Los Angeles, CA 90067-4307
     310-557-2030 ph.
19   310-557-1299 fx.

20                                               Attorneys for Cross Defendants Fokker
     Diane Westwood-Wilson, Esq.                 Aviation B.V., et al.
21   CONDON & FORSYTH LLP
     7 Times Square
22   New York, New York 10036-6524
     212-894-6780 ph.
23   212-370-4483 fx.

24   Patricia Barlow, Esq.                       Attorneys for Defendants TAM Transportes
     LAW OFFICES OF PATRICIA BARLOW              Aeros Meridionias S.A.
25   1312 Leavenworth Street
     San Francisco, CA 94109
26   415-977-1107 ph.
     415-977-1111 fx.

27

28

     @PFDesktop\:ODMA/PCDOCS/ELLHMDM/236951/1

                              **PROOF OF SERVICE**

1   James W. Hunt, Esq.                              Attorneys for Defendant and Cross-
    Suzanne McNulty, Esq.                            Complainant Teleflex Control Systems, Inc.
2   MENDES & MOUNT
    725 South Figueroa Street, 19th Floor
3   Los Angeles, CA 90017
    213- 955-7700
4   213- 955-7725

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

@PFDesktop\::ODMA/PCDOCS/ELLIIMDM/236951/1

**PROOF OF SERVICE**

RECEIVED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER
SEP 08 2006
ALAN SLATER
Clerk of the Court

MC-050

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Steven C. Shuman, Esq. - SBN 82828
Engstrom, Lipscomb & Lack
10100 Santa Monica Boulevard, 16th Floor
Los Angeles, CA 90067
TELEPHONE NO.: (310) 552-3800    FAX NO. (Optional): (310) 552-9434
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name): Plaintiffs

FOR COURT USE ONLY

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER
SEP 08 2006
ALAN SLATER, Clerk of the Court
BY J. HAINES

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
STREET ADDRESS: 700 Civic Center Drive West
MAILING ADDRESS: Santa Ana, CA 92701
CITY AND ZIP CODE: Central Justice Center
BRANCH NAME:

CASE NAME: Andrews, et al. v. Northrop Grumman, et al.

SUBSTITUTION OF ATTORNEY—CIVIL
(Without Court Order)

CASE NUMBER: Dept. CX104
786149 C/W 783990 — LEAD

THE COURT AND ALL PARTIES ARE NOTIFIED THAT (name): Silvana ARJONA FERRAZ NOGUEIRA makes the following substitution:

1. Former legal representative    ☐ Party represented self    ☑ Attorney (name): L/O SPEISER KRAUSE
2. New legal representative       ☐ Party is representing self*  ☑ Attorney
   a. Name: Steven C. Shuman, Esq.
   b. State Bar No. (if applicable): 82828
   c. Address (number, street, city, ZIP, and law firm name, if applicable):
   Engstrom, Lipscomb & Lack, 10100 Santa Monica Boulevard, 16th Floor, Los Angeles, CA 90067
   Telephone: (310) 552-3800; Facsimile: (310) 552-9434
   d. Telephone No. (include area code):
3. The party making this substitution is a   ☑ plaintiff   ☐ defendant   ☐ petitioner   ☐ respondent   ☐ other (specify):

Case No.: 786149

*NOTICE TO PARTIES APPLYING TO REPRESENT THEMSELVES

• Guardian          • Personal Representative      • Guardian ad litem
• Conservator       • Probate fiduciary            • Unincorporated
• Trustee           • Corporation                    association

If you are applying as one of the parties on this list, you may NOT act as your own attorney in most cases. Use this form to substitute one attorney for another attorney. SEEK LEGAL ADVICE BEFORE APPLYING TO REPRESENT YOURSELF.

NOTICE TO PARTIES WITHOUT ATTORNEYS
A party representing himself or herself may wish to seek legal assistance. Failure to take timely and appropriate action in this case may result in serious legal consequences.

786149
4. I consent to this substitution.
   Date: 12 Junho 2006
   Silvana Arjona Ferraz Nogueira
   (TYPE OR PRINT NAME)
   S. Ferraz Nogueira
   Silvana P. Arjona
   (SIGNATURE OF PARTY)

5. ☑ I consent to this substitution.
   Date: 8, 9, 2006
   John J. Vecchi, Esq., of Speiser Krause
   (TYPE OR PRINT NAME)
   (SIGNATURE OF FORMER ATTORNEY)

6. ☑ I consent to this substitution.
   Date: 8/1/06
   Steven C. Shuman, Esq.
   (TYPE OR PRINT NAME)
   Steven C. Shuman
   (SIGNATURE OF NEW ATTORNEY)

(See reverse for proof of service by mail)

Form Adopted For Mandatory Use
Judicial Council of California
MC-050 [Rev. January 1, 2005]

SUBSTITUTION OF ATTORNEY—CIVIL
(Without Court Order)

Page 1 of 2

Code of Civil Procedure, §§ 284(1), 285;
Cal. Rules of Court, rule 376

American LegalNet, Inc.
www.USCourtForms.com

1

PROOF OF SERVICE

2

STATE OF CALIFORNIA      )
3                                      ) ss.

COUNTY OF LOS ANGELES     )
4

5        I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 10100 Santa Monica Boulevard, 16th floor,
6 Los Angeles, CA 90067.

7        On September 6, 2006, I served the foregoing document described as **SUBSTITUTION OF ATTORNEY** on the interested party(ies) in this action by placing a true copy thereof enclosed in the
8 sealed envelopes addressed as follows:

9                             **SEE ATTACHED SERVICE LIST**

10 [X] BY MAIL:      I deposited such envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid.
11

12 [ ] BY PERSONAL DELIVERY:    I caused such envelope to be delivered by hand to the offices of the addressee.

13 [ ] VIA FACSIMILE: I caused all of the pages of the above entitled document to be sent to the recipients noted above via electronic transfer (FAX) at the respective facsimile number(s) indicated
14 above. This document was transmitted by facsimile and transmission reported complete without error.
15

16 [ ] BY FEDERAL EXPRESS: I served the above-entitled document(s) via overnight mail in said action by placing a true copy thereof in a sealed envelope in the designated area for Federal Express
17 pick-up.

18        I am readily familiar with the firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or
19 postal meter date is more than 1 day after date of deposit for mailing in affidavit.

20        I declare under penalty of perjury under the laws of the State of California that the above is true and correct.
21

22        Executed on September 8, 2006, at Los Angeles, California.

23

24                         _____
                        Leslie Jaramillo
25

26

27

28

236951.1

1       LINDA ANDREWS, *et al.* v. NORTHROP GRUMMAN CORPORATION, *et al.*
             Orange County Superior Court Case No. 783990
2                    *and Additional Consolidated Cases*

3                                SERVICE LIST

4    John J. Veth, Esq.                          Attorneys for Plaintiffs
     Douglas W. Schroeder, Esq.
5    SPEISER KRAUSE
     One Park Plaza, Suite 470
6    Irvine, CA 92614
     949-553-1421 ph.
7    949-553-1346 fx.

8    Edwin W. Green, Esq.                        Attorneys for Defendant & Cross-
     Kimberly A. Donlon, Esq.                    Complainant Northrop Grumman Corp.
9    ALLEN MATKINS LECK GAMBLE &
     MALLORY
10   515 South Figueroa Street, Seventh Floor
     Los Angeles, CA 90071-3398
11   213-622-5555 ph.
     213-620-8816 fx.
12
     A. Kristine Floyd, Esq.                     Attorneys for Defendant & Cross-
13   Julie W. Russ, Esq.                         Complainant Northrop Grumman Corp.
     ALLEN MATKINS LECK GAMBLE &
14   MALLORY LLP
     1900 Main Street, Fifth Floor
15   Irvine, CA 92614-7321
     Telephone: (949) 553-1313
16
     Frank A. Silane, Esq.                       Attorneys for Cross Defendants Fokker
17   CONDON & FORSYTH LLP                        Aviation B.V., et al.
     1901 Avenue of the Stars, Suite 850
18   Los Angeles, CA 90067-4307
     310-557-2030 ph.
19   310-557-1299 fx.

20                                               Attorneys for Cross Defendants Fokker
     Diane Westwood-Wilson, Esq.                 Aviation B.V., et al.
21   CONDON & FORSYTH LLP
     7 Times Square
22   New York, New York 10036-6524
     212-894-6780 ph.
23   212-370-4483 fx.

24   Patricia Barlow, Esq.                       Attorneys for Defendants TAM Transportes
     LAW OFFICES OF PATRICIA BARLOW              Aeros Meridionias S.A.
25   1312 Leavenworth Street
     San Francisco, CA 94109
26   415-977-1107 ph.
     415-977-1111 fx.

27

28

     236951.1

                           **PROOF OF SERVICE**

1    James W. Hunt, Esq.                                    Attorneys for Defendant and Cross-
     Suzanne McNulty, Esq.                                  Complainant Teleflex Control Systems, Inc.
2    MENDES & MOUNT
     725 South Figueroa Street, 19th Floor
3    Los Angeles, CA 90017
     213- 955-7700
4    213- 955-7725

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

236951.1

MC-050

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Steven C. Shuman, Esq. - SBN 82828<br>Engstrom, Lipscomb & Lack<br>10100 Santa Monica Boulevard, 16th Floor<br>Los Angeles, CA 90067<br>TELEPHONE NO.: (310) 552-3800    FAX NO. (Optional): (310) 552-9434<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): Plaintiffs | **FILED**<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ORANGE<br>CENTRAL JUSTICE CENTER<br><br>AUG 2 3 2006<br><br>ALAN SLATER, Clerk of the Court<br>*J. Haines*<br>BY J. HAINES |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
STREET ADDRESS: 700 Civic Center Drive West
MAILING ADDRESS: Santa Ana, CA 92701
CITY AND ZIP CODE: Central Justice Center
BRANCH NAME:

CASE NAME: Andrews, et al. v. Northrop Grumman, et al.

| SUBSTITUTION OF ATTORNEY—CIVIL<br>(Without Court Order) | CASE NUMBER: Dept. CX104<br>786149 C/W 783990 — *LEAD* |
|---|---|

THE COURT AND ALL PARTIES ARE NOTIFIED THAT (name): Daniela Peixoto Arjona    makes the following substitution:

1. Former legal representative   ☐ Party represented self   ☑ Attorney (name): L/O SPEISER KRAUSE
2. New legal representative   ☐ Party is representing self   ☑ Attorney
   a. Name: Steven C. Shuman, Esq.    b. State Bar No. (if applicable): 82828
   c. Address (number, street, city, ZIP, and law firm name, if applicable):
      Engstrom, Lipscomb & Lack, 10100 Santa Monica Boulevard, 16th Floor, Los Angeles, CA 90067
      Telephone: (310) 552-3800; Facsimile: (310) 552-9434
   d. Telephone No. (include area code):
3. The party making this substitution is a   ☑ plaintiff ☐ defendant ☐ petitioner ☐ respondent ☐ other (specify):

Case No. 786149

**NOTICE TO PARTIES APPLYING TO REPRESENT THEMSELVES**

| • Guardian | • Personal Representative | • Guardian ad litem |
|---|---|---|
| • Conservator | • Probate fiduciary | • Unincorporated |
| • Trustee | • Corporation | association |

If you are applying as one of the parties on this list, you may NOT act as your own attorney in most cases. Use this form to substitute one attorney for another attorney. SEEK LEGAL ADVICE BEFORE APPLYING TO REPRESENT YOURSELF.

**NOTICE TO PARTIES WITHOUT ATTORNEYS**
A party representing himself or herself may wish to seek legal assistance. Failure to take timely and appropriate action in this case may result in serious legal consequences.

4. I consent to this substitution. 786149
   Date: 05 June, 2006
   Daniela Peixoto Arjona
   (TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY)

5. ☑ I consent to this substitution.
   Date: 7-8, 2006
   John J. Veth, Esq. of Speiser Krause
   (TYPE OR PRINT NAME)                    (SIGNATURE OF FORMER ATTORNEY)

6. ☑ I consent to this substitution.
   Date: 8/11/06
   Steven C. Shuman, Esq.
   (TYPE OR PRINT NAME)                    (SIGNATURE OF NEW ATTORNEY)

(See reverse for proof of service by mail)    Page 1 of 2

1
PROOF OF SERVICE

2

STATE OF CALIFORNIA          )
3                            ) ss.
COUNTY OF LOS ANGELES        )

4

5        I am employed in the County of Los Angeles, State of California. I am over the age of 18 and
not a party to the within action; my business address is 10100 Santa Monica Boulevard, 16th floor,
6    Los Angeles, CA 90067.

7        On August 22, 2006, I served the foregoing document described as **SUBSTITUTION OF
ATTORNEY** on the interested party(ies) in this action by placing a true copy thereof enclosed in the
8    sealed envelopes addressed as follows:

9                        **SEE ATTACHED SERVICE LIST**

10   [X] BY MAIL:        I deposited such envelope in the mail at Los Angeles, California. The
envelope was mailed with postage thereon fully prepaid.
11

[ ] BY PERSONAL DELIVERY:    I caused such envelope to be delivered by hand to the offices of
12   the addressee.

13   [ ] VIA FACSIMILE: I caused all of the pages of the above entitled document to be sent to the
recipients noted above via electronic transfer (FAX) at the respective facsimile number(s) indicated
14   above. This document was transmitted by facsimile and transmission reported complete without
error.
15

[ ]   BY FEDERAL EXPRESS: I served the above-entitled document(s) via overnight mail in said
16   action by placing a true copy thereof in a sealed envelope in the designated area for Federal Express
pick-up.
17

I am readily familiar with the firm's practice of collection and processing correspondence for
18   mailing. It is deposited with U.S. Postal Service on that same day in the ordinary course of business.
I am aware that on motion of party served, service is presumed invalid if postal cancellation date or
19   postal meter date is more than 1 day after date of deposit for mailing in affidavit.

20       I declare under penalty of perjury under the laws of the State of California that the above is
true and correct.
21

Executed on August 22, 2006, at Los Angeles, California.
22

23

24                                                    Leslie Jaramillo

25

26

27

28

@PFDesktop\::ODMA/PCDOCS/ELLHMDM/236951/1

1

LINDA ANDREWS, *et al.* v. NORTHROP GRUMMAN CORPORATION, *et al.*

2

Orange County Superior Court Case No. 783990
*and Additional Consolidated Cases*

3

SERVICE LIST

4   John J. Veth, Esq.                                    Attorneys for Plaintiffs
    Douglas W. Schroeder, Esq.
5   SPEISER KRAUSE
    One Park Plaza, Suite 470
6   Irvine, CA 92614
    949-553-1421 ph.
7   949-553-1346 fx.

8   Edwin W. Green, Esq.                                  Attorneys for Defendant & Cross-
    Kimberly A. Donlon, Esq.                              Complainant Northrop Grumman Corp.
9   ALLEN MATKINS LECK GAMBLE &
    MALLORY
10  515 South Figueroa Street, Seventh Floor
    Los Angeles, CA 90071-3398
11  213-622-5555 ph.
    213-620-8816 fx.
12
    A. Kristine Floyd, Esq.                               Attorneys for Defendant & Cross-
13  Julie W. Russ, Esq.                                   Complainant Northrop Grumman Corp.
    ALLEN MATKINS LECK GAMBLE &
14  MALLORY LLP
    1900 Main Street, Fifth Floor
15  Irvine, CA 92614-7321
    Telephone: (949) 553-1313
16
    Frank A. Silane, Esq.                                 Attorneys for Cross Defendants Fokker
17  CONDON & FORSYTH LLP                                  Aviation B.V., et al.
    1901 Avenue of the Stars, Suite 850
18  Los Angeles, CA 90067-4307
    310-557-2030 ph.
19  310-557-1299 fx.

20                                                        Attorneys for Cross Defendants Fokker
                                                          Aviation B.V., et al.
21  Diane Westwood-Wilson, Esq.
    CONDON & FORSYTH LLP
22  7 Times Square
    New York, New York 10036-6524
    212-894-6780 ph.
23  212-370-4483 fx.

24  Patricia Barlow, Esq.                                 Attorneys for Defendants TAM Transportes
    LAW OFFICES OF PATRICIA BARLOW                        Aeros Meridionias S.A.
25  1312 Leavenworth Street
    San Francisco, CA 94109
26  415-977-1107 ph.
    415-977-1111 fx.

27

28

@PFDesktop\::ODMA/PCDOCS/ELLHMDM/236951/1

1  James W. Hunt, Esq.                          Attorneys for Defendant and Cross-
   Suzanne McNulty, Esq.                        Complainant Teleflex Control Systems, Inc.
2  MENDES & MOUNT
   725 South Figueroa Street, 19th Floor
3  Los Angeles, CA 90017
   213- 955-7700
4  213- 955-7725

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

@PFDesktop\::ODMA/PCDOCS/ELLHMDM/236951/1

# SPEISER KRAUSE

### A PROFESSIONAL CORPORATION

NEW YORK OFFICE
140 EAST 45TH STREET, 34TH FL.
NEW YORK, NEW YORK 10017
(212) 661-0011
FAX: (212) 953-6483

2300 CLARENDON BOULEVARD, SUITE 306
ARLINGTON, VIRGINIA 22201
(703) 522-7500  FAX: (703) 522-7905

CALIFORNIA OFFICE
ONE PARK PLAZA, SUITE 470
IRVINE, CALIFORNIA 92614
(949) 553-1421
FAX: (949) 553-1346



June 6, 2007

Steven C. Shuman
Engstrom, Lipscomb and Lack
10100 Santa Monica Blvd.
16th Floor
Los Angeles, CA  90067

> Re:  *Andrews v. Northrop Grumman Corporation and Consolidate Cases*
> *Ramos v. Northrop Grumman Corporation*
> **Our Case No. 729.950**

Dear Steve:

In response to your letter of May 23, 2007 enclosed please find the Substitution of Attorney form for Vanessa Ramos, on behalf of herself and her son, Pedro Ricardo Marciel, which I have executed.

Please contact me if anything else is needed.

Sincerely yours,

SPEISER KRAUSE

GERARD R. LEAR

GRL/kjm
Enclosure

cc:  William J. Appuzo, Esq.

MC-050

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Steven C. Shuman, Esq. - SBN 82828<br>Engstrom, Lipscomb & Lack<br>10100 Santa Monica Boulevard, 16th Floor<br>Los Angeles, CA 90067<br>TELEPHONE NO.: (310) 552-3800    FAX NO. *(Optional)*: (310) 552-9434<br>E-MAIL ADDRESS *(Optional)*:<br>ATTORNEY FOR *(Name)*: Plaintiffs | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
STREET ADDRESS: 700 Civic Center Drive West
MAILING ADDRESS: Santa Ana, CA 92701
CITY AND ZIP CODE: Central Justice Center
BRANCH NAME:

CASE NAME: Andrews, et al. v. Northrop Grumman, et al.

| SUBSTITUTION OF ATTORNEY—CIVIL<br>(Without Court Order) | CASE NUMBER:<br>786201 C/W 783990 |
|---|---|

THE COURT AND ALL PARTIES ARE NOTIFIED THAT *(name)*: Vanessa Pereira Ramos    makes the following substitution:

1. Former legal representative    ☐ Party represented self    ☑ Attorney *(name)*: L/O SPEISER KRAUSE
2. New legal representative    ☐ Party is representing self*    ☑ Attorney
   a. Name: Steven C. Shuman, Esq.    b. State Bar No. *(if applicable)*: 82828
   c. Address *(number, street, city, ZIP, and law firm name, if applicable)*:
      Engstrom, Lipscomb & Lack, 10100 Santa Monica Boulevard, 16th Floor, Los Angeles, CA 90067
      Telephone: (310) 552-3800; Facsimile: (310) 552-9434
   d. Telephone No. *(include area code)*:
3. The party making this substitution is a    ☑ plaintiff    ☐ defendant    ☐ petitioner    ☐ respondent    ☐ other *(specify)*:

**\*NOTICE TO PARTIES APPLYING TO REPRESENT THEMSELVES**

- Guardian
- Conservator
- Trustee
- Personal Representative
- Probate fiduciary
- Corporation
- Guardian ad litem
- Unincorporated association

If you are applying as one of the parties on this list, you may NOT act as your own attorney in most cases. Use this form to substitute one attorney for another attorney. SEEK LEGAL ADVICE BEFORE APPLYING TO REPRESENT YOURSELF.

**NOTICE TO PARTIES WITHOUT ATTORNEYS**
A party representing himself or herself may wish to seek legal assistance. Failure to take timely and appropriate action in this case may result in serious legal consequences.

4. I consent to this substitution.
   Date:                    , 2007
   Vanessa Pereira Ramos
   _(TYPE OR PRINT NAME)_                    _(SIGNATURE OF PARTY)_

5. ☑    I consent to this substitution.
   Date:
   GERARD LEAR, M. ESQ.
   _(TYPE OR PRINT NAME)_                    _(SIGNATURE OF FORMER ATTORNEY)_

6. ☑    I consent to this substitution.
   Date:
   Steven C. Shuman, Esq.
   _(TYPE OR PRINT NAME)_                    _(SIGNATURE OF NEW ATTORNEY)_

(See reverse for proof of service by mail)    Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
MC-050 [Rev. January 1, 2009]

SUBSTITUTION OF ATTORNEY—CIVIL
(Without Court Order)

Code of Civil Procedure, §§ 284(1), 285;
Cal. Rules of Court, rule 376
American LegalNet, Inc.
www.USCourtForms.com

.

.

**EXHIBIT "H"**

Renato Guimaraes, Jr. (Letterhead)

January 22, 2001.

FYI--attached yellow paper saying that this document is VERY IMPORTANT

Dear clients, ex-clients and colleagues:

The most important American authority on the Brazilian Justice, Mr. Keith S. Rosenn, from Miami University, who is married with a woman from Rio de Janeiro and who is author of many legal books suggested me a few law firms to replace SK. I presented our cases to these firms and to others. For approximately 3 hours I had an appointment with each firm, which are the following: McDonald & McDonuld .... All firms are from Miami, and through the telephone I was able to speak with Omrani & Taub, P.C., from NY, and through my attorney, Mr. Wanderley Minitti, I was able to contact Kreindler & Kreindler, also from NY. All the six consultations were enthusiastic and unanimous about the facts regarding the families.

All the firms condemned what SK was doing to the Brazilian families. None of the firms defended SK. All the firms, except one, which found our case too complex, wanted to replace SK. Two of the firms, because of their relation to SK, offered help to solve the problems of the agreements in a friendly way. Mr. Minitti has been working in New York with my attorney Richard Peskin since Christmas (mainly working on Letters Rogatory for 26 families). I chose to hire the firm Herman & Maermelstein (HM) from Miami. They will do for us what SK haven't done since April, which is basically defend the Brazilian families before the American Justice, where we were abandoned.

I only had time to consult two families and both decided to substitute SK for the HM. HM asked Judge McDonald to order Northrop to pay for the families the conviction of Jabaquara (R$2.000.000,00) for the moral damages + 66,66% of mensal compensation of each deceased. Also, HM will help me with the Police Investigation regarding the falsification of documents of Comte. Rolim's in failing to train the pilots, as well as the negligence of Northrop's employees who sent the wrong "reverse" to Fokker. SK never demonstrated interest for these facts, which I believe, could help us.

In only a week HM figured out, in California, most of what SK has kept from us since April, basically hiding the information that our case was submitted to Federal Court because of Fokker's request, and then returned to Judge McDonald, who adjurned the jury which was first scheduled to April 16.

## WHY THE JURY WAS ADJURNED?

Teleflex sued Fokker and TAM, the date of accident's 4 year anniversary, October 31, 2000. Teleflex's lawsuit was filed in Federal Court. On December 19, Fokker was able to transfer the action to Judge McDonald. This is a fight of more than hundred million dollars – only SK doesn't fight for the Brazilian Families. In a couple days, HM will demonstrate to judge McDonald what SK has denied doing since April, alleging that

SK    002332

Jabaquara's conviction is useless before the USA. All the 6 law firms that I consulted denied this information. We need to demonstrate the terrible behavior of Northrop in Brazil. They were convicted for their wrongful conduct and bad faith because they did not posted a bond, even though they promised judge McDonald that they would respect the Brazilian Justice. It is outrageous how our rights were abandoned and damaged because of SK omission and disinformation.

HM will ask to transfer all the 65 suits to California, even the families which never participated or the ones who gave up about the Jabaquara. Also, they will open a lawsuit for those families who never sued in the Brazilian Justice or USA Justice, as well as the families of the pilots and the houses that were destructed because of the crash. Everything that SK always rejected to do. This is the only way to revert all the damages that SK caused to all the families.

During the lectures of Aviation Law and Insurance sponsored by the University of Daytona Beach this week, many people commented about Jabaquara's conviction, which SK always attacked. In the last day of the lecture, I had an appointment with the Vice President of Northrop, Mr. Russel Mirabile, who wrote the letter that SK distributed to all families and he said that he is opened to discuss the agreement and he has affirmed that the settlement/agreement must be done according to the Brazilian Law. I told him that the new lawyers, who are replacing SK, would take care of this matter.

## WHY WE SHOULD CHANGE THE AMERICAN LAWYERS?

Because it is the only way that the Brazilian families: (1) will get a proposal of settlement; (a) with no risks; (b) much higher; (c) which can be approved by the Brazilian Authorities or (2) be allowed to receive the Northrop indemnities by the USA Justice.

## HOW MUCH IT WILL COST FOR THE FAMILIES TO CHANGE THE ATTORNEYS?

Nothing. To be honest, the cost will decrease from 25% (SK fees) to 24% (HS fees). And all the fees that SK has the right to receive for its services must be charged against HS, according to the USA law. They cannot charge the families for those fees. The attached documents can show you that matter as they repeat SK contracts.

It is important to notice that, for me, this replacement is not good because my portion is equal, proportionally, for both lawyers fees: for SK(25%) and for HS(24%). Do I lose 1%. No! I prefer, of course, to receive less proportionally, because what really interests me is the final amount and this amount will determine what every family will receive. Consequently, we have both the same interest because the more the families receive the better for all the lawyers.

The Delay? The April agreements/ settlements that were to be finalized within 20 days have not been executed. I can affirm that they will never succeed in the Brazilian Justice. The pressure to make better and quickly agreements can only be made by HS and not by

SK, which has been sued by OAB, MP and which states that we already lost before the American justice, another lie.

## WHICH FAMILIES HAVE REPLACED SK FOR HS?

I had the chance to speak with only two families. One of the families is the family of Prof. Fernando Lobo Vaz de Mello. Mr. Fernando elaborated a document regarding the possible causes of the crash. Mr. Fernando questioned the engineers from Fokker about the falsified letters written by Mr. Rolim. Mr. Fernando's letter prompted Fokker's representatives to contact SK. Then SK asked Mr. Fernando to stop the investigations because his actions were making damages to the settlement.

The other family is Ms. Suzana Klepetar's family. She is not my client but her attorney in Brazil, Ms. Lucimar Machado, also approved the change of SK for HM.

Why did I only speak to these 2 families? Because HS needed to take urgent measures in favor of all the 65 families. Only now, and because of this letter, I am being able to inform the families about this replacement. I ask all of the families to inform the other families about this replacement and the new course of the indemnities.

Great news: in Brazil, the legal authority responsible for the orphans was favorable about our request and the Judge of the Family Court, who convicted TAM with 7 identical sentences, will probably decide on February my request for these 7 families.

In NY, the Federal Judge scheduled for February 5 at 3pm. a meeting where Northrop will pay U$ ___ (illegible) for the 26 families which I represented in the conviction of Jabaquara.

Thank you for you trust.

Renato Guimaraes Jr.

SK   002334

*muito importante*

# RENATO GUIMARÃES JR.

**Doutor pela USP, Professor da UNICAMP**
*Master of Comparative Law, GWU, IASP*

Fone (019) 3289-6969, 3268-6969,fax 9789-4911, 3289-2921, Rua Francisco de Toledo, 511
Cidade Universitária - 13.083-470, Campinas, SP

Miami, Flórida, USA, Janeiro 22, 2001.-

*Prezados Clientes, ex-Clientes e colegas:*

A maior autoridade americana a respeito da Justiça no Brasil, o Prof. Keith
S. Rosenn - da Universidade de Miami, casado com uma carioca, autor dos livros
*(O )eito na Cultura Jurídica Brasileira, Corrupção e Reforma Política no Brasil*, etc.) e que
perito sobre o Direito Brasileiro na Justiça daqui - indicou-me algumas firmas para
substituir a *Speiser Krause* (SK). Apresentei nossos casos para elas e outras firmas.
Durante umas tres horas me reuni, separadamente, com cada uma delas, que são
as seguintes - *McDonald & McDonald*; *Goldberg & Associates, P.A.* e *Colson Hicks
Eidson, P. A.* e *Podhurst Orseck Josefsberg Eaton Meadow Olin & Perwin, P.A.*, todos
de Miami, por telefone com *Omrani & Taub, P.C.*, de Nova York e, através de meu
advogado, Dr. Wanderley Minitti, com a *Kreindler & Kreindler*, também de Nova
York. As seis consultas foram enfáticas e <u>unânimes</u> sobre os fatos com as famílias.

Todas condenaram o que a SK faz com as famílias do Brasil. Nenhuma
delas defendeu a SK. Todas, menos uma, que achou nosso caso muito complicado,
quiseram substituir SK. Duas delas, devido a ligações com a SK, se dispuseram a
resolver essa *novela* dos acordos amigavelmente. Após consultar o Dr. Wanderley
Minitti que, desde antes do Natal, trabalha em Nova York com meu advogado
Richard S. Peskin, no cumprimento da Rogatória ( *vide abaixo* ) para as 26 famílias
que representei na condenação do Jabaquara, optei por contratar a firma *Herman &
Mermelstein* (HM) daqui de Miami, para <u>fazer o que a SK não faz</u> desde abril -
defender as famílias do Brasil na Justiça dos USA, onde estávamos abandonados.

Tive tempo de consultar apenas duas famílias e ambas imediatamente
substituíram a SK pela HM, que <u>já pede</u> para o Juiz McDonald obrigar a *Northrop*
<u>pagar tudo deve a elas</u>, pela condenação no Jabaquara - os R$ 2.000.000,oo pelos
danos morais, mais 66,66% dos rendimentos mensais da vítima respectiva até
quando ela complementaria 65 anos de idade, e retroativas essas pensões à data da
tragédia. A HM também irá me ajudar no Inquérito Policial, tanto na falsidade
documental do Comte. Rolim sobre a dispensa do treinamento dos pilotos, como
na negligência do funcionário da *Northrop* que enviou o "reverso" errado para a
Fokker. A SK nunca se interessou por isso tudo - que tanto nos poderia ajudar.

Numa semana a HM descobriu, só na Califórnia, muito do que a SK nos
escondeu desde abril - que nosso caso foi parar na Justiça Federal, a pedido da



SK    002335

*Fokker*, e voltou para o Juiz McDonald, que adiou o Júri, que estava marcado para 16 de abril p.f.

Por que nosso Júri foi adiado ?

Porque a *Teleflex*, dentro de nosso processo na Califórnia, processou a *Fokker*, e a TAM - exatamente no dia em que a tragédia completou quatro anos, 31 de outubro de 2000 - pediu para o processo sair do Juiz McDonald e ir para a Justiça Federal. Agora, dia 19 de dezembro último, a *Fokker* conseguiu que o processo voltasse para o Juiz McDonald. É, pois, uma luta de dezenas, de mais de uma centena de milhões de dólares - só a SK não luta para as famílias brasileiras. Agora - neste dias - HM irá demonstrar ao Juiz McDonald, o que a SK sempre se negou a fazer desde abril - sob a alegação de que a condenação do Jabaquara é *imprestável* nos USA, coisa que todos os seis escritórios claramente negaram - demonstrar o horroroso comportamento da *Northrop* no Brasil, onde foi condenada por má-fé por não ter depositado a caução, apesar de ter prometido ao Juiz McDonald que obedeceria a Justiça do Brasil. É revoltante como nossos direitos foram abandonados e prejudicados com a omissão e desinformação da SK.

A HM pedirá para ele admitir na Califórnia todas as 65 famílias, mesmo aquelas que nunca entraram, ou desistiram, do Jabaquara. Também irá entrar com a mesma ação para aquelas famílias que nunca entraram na Justiça, seja do Brasil, seja dos Estados Unidos, assim como para as famílias da tripulação e das casas destruídas, tudo isso que a SK sempre rejeitou. Revertem-se assim os prejuizos que a SK causou a todas as famílias.

No *Simpósio de Direito Aeronáutico e Seguros*, realizado pela *Universidade Aeronáutica de Daytona Beach* nesta semana, foi muito comentada a condenação no Jabaquara, que a SK sempre atacou. No último dia do Simpósio, o próprio Vice-Presidente da seguradora da *Northrop*, Russell Mirabile - que escreveu aquela carta que a SK distribuiu a todos os senhores, em que desautorizava as discussões para um acordo que, através do Dr. Minitti, mantínhamos com o escritório *Pinheiro Neto*, defensor da *Northrop* - se reuniu comigo e confirmou que está, sim, aberto para discutir o acordo que, ele concordou, tem de ser feito conforme a Lei do Brasil. Eu disse a ele que os novos advogados, que substituem a SK, irão tratar e cuidar disso.

## POR QUE TROCAR DE ADVOGADOS AMERICANOS ?

Porque é o único meio de as famílias do Brasil (1) conseguirem uma proposta de acordo (a) sem riscos, (b) bem maior e (c) que possa ser aprovada pelos Curadores de Órfãos e homologada pelos Juízes, conforme as leis do Brasil ou, então, (2) conseguirem receber, na Justiça dos USA, as indenizações devidas pela *Northrop*, seja pelas condenações no Jabaquara, seja pelo Júri da Califórnia.

## QUAL O CUSTO, PARA AS FAMÍLIAS, DESSA TROCA ?

**NENHUM** ! Em verdade, o custo cai de 25% (da SK) para 24% (da HS). E tudo que a SK tenha de receber pelo trabalho e despesas nestes anos todos, terá de ser cobrado pela SK da HS, por força da lei dos USA – e não, absolutamente não, das famílias. Os documentos em anexo são claros nisso e repetem o contrato da SK.

Importante que todos saibam que, para mim, a troca é, em tese, pior, porque minha parcela também é igual, *proporcionalmente*, tanto nos honorários com a Sk (25%) como com a HS (24%). Perco 1% ? Não ! Prefiro, claro, *receber menos proporcionalmente* - nos 24% da HS e não nos 25% da SK - mas o que *interessa* é a *quantia final* a que tenho direito garantido pelas leis da OAB do Brasil e dos USA, e essa quantia é *determinada pelo que cada uma das 65 famílias receber*, seja por acordo, seja por condenação. Assim, *estamos no mesmo barco* - quanto mais as famílias receberem, melhor para todos os advogados delas - e desde que rápido.

*Demora* ? Os acordos de abril, para receber, *em 20 dias*, no Texas, até hoje, nada. E por certo jamais passarão na Justiça do Brasil. A pressão para acordo melhor e rápido – ou Júri nos USA - *só pode vir com a HS*, e *não* da SK, que está com casos na OAB, M.P., etc., e que diz que *já perdemos* nos USA, outra mentira.

## QUAIS FAMÍLIAS JÁ TROCARAM A SK E PELA A HS ?

As duas *únicas* com quem tive tempo de falar, daqui de Miami, nesta semana. Uma família é do Prof. Dr. Fernando Lobo Vaz de Mello, Engenheiro Nuclear formado na França e Coordenador da Pós-Graduação da Universidade Federal de Belo Horizonte, e sua esposa, Professora Conceição Magalhães, Catedrática de Inglês da mesma Universidade, e formada na Inglaterra. Perderam o único filho, Alexandre, que também estudou, como a irmã Luciana, na Europa. A Professora Conceição tem dado entrevistas de páginas inteiras sobre a tragédia em *O Estado*, o maior jornal de Minas. O Prof. Fernando tem elaborado laudo periciais sobre as causas do acidente, e muito tem ajudado a Justiça Civil e Criminal na aplicação da lei no Brasil. Quando ele questionou os Engenheiros da *Fokker* sobre a carta que Rolim falsificou como sendo de dispensa de treinamento dos pilotos, a *Fokker* contatou a SK que, atendendo-a, enviou longa carta ao Professor, pedindo para ele parar com as investigações dele *"para não prejudicar as propostas de acordo"*.

A outra família é da viúva Suzana Klepetar, co-fundadora e Diretora da ABRAPAVAA, e que muito tem trabalhado pelos direitos das famílias. Ela tem dois filhos e, após a morte do marido, teve de abrir uma pequena empresa para sustentar a família com dificuldades. Ela não é minha cliente no Brasil. A advogada



SK   002337

dela é a Dra. Lucimar M. Machado, que também apoiou a troca da SK pela HM.

Por que só falei com essas duas famílias ? Porque a HS precisava tomar providencias **urgentes** – a favor de todas 65 famílias e outras – com o Juiz McDonald, da Califórnia, tendo de ser os novos advogados a favor de pelo menos duas famílias, uma sobre danos **morais** (os pais de Alexandre não dependiam, por inteiro, economicamente dele e, pois, não tinham direito, ainda, a pensões mensais), e outra família, sobre danos **materiais**, que é o caso da maioria das famílias e como é a situação da família Klepetar. Só agora, com esta carta, é que estou podendo informar aos senhores todos desta troca, e peço a todos informarem as demais famílias e seus advogados sobre este novo rumo para as indenizações.

Mais óttimas notícias - no Brasil, a Curadora de Órfãos foi favorável a nosso pedido e o Juiz da 28ª Vara - que condenou a TAM com **sete** sentenças idênticas (ainda faltam duas, das nove ações) – deve decidir agora em fevereiro meu pedido para as sete famílias receberem já que os alimentos de mais de quatro anos que ganharam nas ações do Processo 3 - Amando de Barros, Romero, Lemos, Fischer, Lima, Manhões e Arjona - sem caução e com o desconto dos honorários de 10%.

➡ E em Nova York, o Juiz Federal marcou para o **próximo dia 5** de fevereiro, às 15 hs., a audiência em que a *Northrop* pagar US$ 8.642.802.94 para as 26 famílias que represento na condenação do Jabaquara e cuja Rogatória está sob os cuidados dos Drs Peskin e Minitti - este terá de ficar nos Estados Unidos até essa decisão. Em anexo está a cópia dos itens 15 a 18 da Rogatória que tem mais de 150 páginas.

Todas as outras famílias - mesmo as que desistiram ou que nunca entraram no Jabaquara - poderão ingressar com outras Rogatórias para receberem esses seus direitos alimentares mensais, mas a indenização por dano moral, no valor de R$ 2.000.000,oo, por família, ainda não pode ser cobrada. Ela, porém, será cobrada nos próximos dias na Califórnia (vide explicação acima), pela HM, mas, inicialmente, apenas para as famílias Magalhaes-Lobo Vaz de Mello e Klepetar. As demais, para conseguirem a cobrança essa totalidade da condenação no Jabaquara, terão de troca a SK pela HM, porque SK abandonou o processo delas desde abril.

Se os senhores preferirem, poderão conversar diretamente com a SM a cobrar em Miami, fone (305) 377-2200 ou fax (305) 377-2511, que já contraton uma telefonista brasileira e uma secretária que falam Português, além de todas as outras secretárias do escritório falarem Espanhol. Um secretária também deverá ser contratada no Brasil para ajudar as famílias. Eles deverão ir ao Brasil assim que sair o primeiro resultado nos Estados Unidos. Ou, é claro, os senhores poderão falar com o Dr. Minitti (11) 3051-6965, ou Dr. Freitas (11) 251-5424, que defende a família Arjona.

Muito obrigado pela confiança de todos, e sempre às ordens,

*Renato Guimarães Jr*

SK   002338

**EXHIBIT "I"**



## MANOEL ANTONIO SCHMIDT

Tradutor Público Juramentado e Intérprete Comercial
Matricula Nº 490 da Junta Comercial do Estado de São Paulo

Praça da Sé, 21 - 14º Andar - Conj. 1.409 - Tel.: (0xx11) 239-1077 - Fax: (0xx11) 3405-8603 - São Paulo - SP

LIVRO Nº    0251    FOLHA Nº       1 TRADUÇÃO Nº    I-53.359/001

I, the undersigned Sworn Translator and Commercial Interpreter, hereby CERTIFY this is the description and faithful translation of a DOCUMENT written in Portuguese, which I translate as follows:

ANEXO "A"

Renato Guimarães Jr.
P.H.D. by USP, Professor at UNICAMP
Master of Comparative Law, GWU, IASP
Phone No. (019) 3289-8989, 3289-8990  Fax No. 3289-4315
Rua Francisco de Toledo, 511
University - 13.083-470, Campinas SP

December 22, 2000.

Dr. Wanderley Minitti Esq.
Advocate at the Court of Law
of São Paulo, Capital

Dear Dr. Minitti

Confirming our deal, I hereby authorize you to retain a law firm in the United States not just to prosecute the Rogatory Letter, but also, upon acceptance by the families, to replace the law firm Speiser & Krause, with which I represent sixty five (65) Brazilian Families in the actions filed in California and New York and they failed to represent them for almost one year being limited to intermediate agreements with Northrop, Teleflex, TAM et al and their insurance companies, said agreements being null and void before the Brazilian laws, as I have stated in all litigations I acted before the Brazilian Justice Court and have communicated to the Honorable American Judges.

The legal fees to be established shall be in the same form, but inferior to those signed by Speiser & Krause, provided the same share be established to me.

Sincerely,

(s.) illegible
   Renato Guimarães Jr.
===================================================================
NOTHING ELSE was contained in said original, which I return with this faithful translation. In WITNESS WHEREOF, I have hereunto set my hand and seal of office, this February 19, 2001.

vb

Manoel Antonio Schmidt
Sworn Translator

INSCRIÇÃO: RG 3.441.239  -  CPF 346.307.328-53  -  PMSP (ISS) 8.545.237-8  -  IAPAS 110.591,000-74

0192394315          RENATO GUIMARÃES                    841 P01    DEC 22 '00  13

# RENATO GUIMARÃES JR.

Doutor pela USP, Professor da UNICAMP
*Master of Comparative Law, GWU, IASP*
Fone (019) 3289-8989, 3289-8990-fax-3289-4315, 3289-2921, rua Francisco de Toledo, 511
Cidade Universitária - 13.083-470, Campinas, SP

Em 22, dezembro, 2000.-

Ilmo. Sr.
Dr. Wanderley Minitti,
DD. Advogado no Foro de
São Paulo, Capital

Prezado Dr. Minitti,

Confirmando nossos entendimentos, autorizo o senhor a contratar Escritório de Advocacia nos Estados Unidos não só para o cumprimento da Carta Rogatória mas também, aceitando as famílias, substituir o Escritório *Speiser Krause*, com o qual represento 65 famílias brasileiras, nas ações na Califórnia e Nova York, e que há quase um ano deixaram de defendê-las, limitando-se a intermediar acordos com a *Northrop, Teleflex, TAM et al* e suas seguradoras, acordos esses vis e nulos de acordo com as Leis do Brasil, conforme tenho denunciado em todas as ações em que atuo na Justiça Brasileira - e comunicado aos dignos Juízes americanos.

Os honorários a ser estabelecidos deverão ser nos moldes, mas inferiores, aos firmados pela *Speiser Krause*, preservada a mesma participação minha.

Cordialmente,

*Renato Guimarães Jr.*

4

**EXHIBIT "J"**

# SPEISER KRAUSE
### A PROFESSIONAL CORPORATION

140 EAST 45TH STREET, 34TH FLOOR
NEW YORK, NEW YORK 10017
(212) 661-0011
FAX: (212) 953-6483

ONE PARK PLAZA, SUITE 470
IRVINE, CALIFORNIA 92614
(714) 553-1421
FAX: (714) 553-1344

2300 CLARENDON BOULEVARD
SUITE 306
ARLINGTON, VIRGINIA 22201

(703) 522-7500
Fax (703) 522-7905
November 9, 2000

900 JACKSON STREET, SUITE 750
DALLAS, TEXAS 75202-4427
(214) 752-4664
FAX: (214) 752-4774

201 SOUTH BISCAYNE BOULEVARD
MIAMI, FLORIDA 33131
(305) 375-0400
FAX: (305) 375-0357

**VIA FACSIMILE 011 55 19 289 4315**

Renato Guimaraes
rua Francisco de Toledo, 501
Cidade Universitaria
13.083-470 ~ Campinas, SP - Brazil

      RE:   TAM
            Our file #729.000

Dear Mr. Guimaraes:

      We have met with your representative, Dr. Wanderly Minniti, on several occasions in both Brazil and New York City in order to discuss the amount of attorney fees due you. However, as you are aware, Dr. Minniti insists that we pay him a fee of $900,000.00 USD for his own time and effort in handling *your* case. Further, Dr. Minniti will not discuss the merits of your claim until such time as his fee is paid. To put it short, the notion of paying a fee to Dr. Minniti is ludicrous, and his insistence upon that payment has crippled our ability to discuss the merits of your entitlement to attorney fees.

      On another matter, we are repeatedly alerted to your continuing efforts to convince other U.S. counsel to represent the TAM clients who have signed retainers with Speiser Krause. Not only is this a breach of any relationship which we might have had with you, it is actionable under U.S. law as tortious interference in a contractual/business relationship. Should you make further efforts in this regard, we will not recognize any claim by you for the payment of attorney fees.

      As always, we continue to offer you the opportunity to speak with us directly regarding your fees. Should you be willing to discuss this matter, please let us know.

                  Sincerely,

                  SPEISER KRAUSE

                  ARTHUR E. BALLEN

/js

TOTAL P.02

CONFIDENTIAL    SK 000598

**EXHIBIT "K"**

# BERMAN, KEAN & RIGUERA, P.A.

## ATTORNEYS AT LAW

2101 WEST COMMERCIAL BOULEVARD
SUITE 2800
FT. LAUDERDALE, FLORIDA 33309

TELEPHONE: (954) 735-0000
TELECOPIER: (954) 735-3636

RICHARD E. BERMAN••
MICHAEL I. KEAN**
JOSE R. RIGUERA

————

ANGEL ARMAS•
ORION G. CALLISON, III□
CRISTINA E. GROSCHEL
BRET L. LUSSKIN
BRIAN J. MCCARTHY••+
RICHARD A. SACHS
LAURA J. VARELA
ELENA WILDERMUTH***

OF COUNSEL

————

VINCENT J. ALTINO, P.A.
ROBERT S. FORMAN, P.A.
LILLIAN S. KACHMAR**
JEREMY B. BERMAN

Also Admitted NY Bar    ••
Also Admitted PA Bar    **
Also Admitted NJ Bar    +
Also Admitted AL Bar    □
Also Admitted 1L Bar    •
L.L.M. in Taxation      ***

April 24, 2007

**<u>Via Fax and U.S. Mail</u>**
William J. Apuzzo, Esq.
Apuzzo & Chase, LLC
800 Third Avenue, Suite 800
New York, NY 10022

> **Re:**    ***Guimaraes v. Speiser Krause***
> ***Case No.: 05-CV-2210(DC)***

Dear Mr. Apuzzo:

Please find enclosed Plaintiff's Privilege Log in connection with the supplemental production of documents recently submitted to your office.

Very truly yours,
***BERMAN, KEAN & RIGUERA, P.A.***

Jose R. Riguera

JRR/dlf
Enclosure
cc:    Richard E. Berman, Esq.

\\Server-MS\REBData\Guimaraes, Renato\1147-001\Letterhead\25354.wpd

## PRIVILEGE LOG

| DATES | DOCUMENT DESCRIPTION | PRIVILEGE |
|---|---|---|
| 7/18/00 | Correspondence from Renato Guimaraes to Richard S. Peskin re: dispute with Speiser Krause concerning TAM settlements | Attorney-Client and Work Product |
| 7/18/00 | Correspondence from Richard S. Peskin to Renato Guimaraes re: dispute with Speiser Krause concerning TAM settlements | Attorney-Client and Work Product |
| 10/17/00 | Correspondence from Renato Guimaraes to Richard S. Peskin re: enforcement of Jabaquara judgment | Attorney-Client and Work Product |
| 11/1/00 | Correspondence from Renato Guimaraes to Daniel Grunfeld re: possible representation of TAM families | Attorney-Client and Work Product |
| 1/18/01 | Correspondence from Jeffrey Herman to Renato Guimaraes re: possible representation of TAM families | Attorney-Client and Work Product |
| 1/19/01 | Correspondence from Jeffrey Herman to Vaz de Mello family re: retainer agreement for TAM litigation | Attorney-Client and Work Product |
| 1/22/01 | Correspondence from Renato Guimaraes to Jeffrey Herman re: TAM litigation | Attorney-Client and Work Product |
| 5/19/01 | Correspondence from Renato Guimaraes to Herman, Peskin, Minitti and Anselmo re: letters rogatory proceeding concerning TAM cases | Attorney-Client and Work Product |
| 8/27/01 | Correspondence from Jeffrey Herman to Renato Guimaraes re: settlement discussions concerning TAM cases | Attorney-Client and Work Product |
| 5/9/03 | Correspondence from Renato Guimaraes to Herman and Stuart re: upcoming hearing in California concerning TAM litigation | Attorney-Client and Work Product |
| Undated | Various correspondence from Renato Guimaraes to Herman & Mermelstein re: TAM litigation and settlement discussions | Attorney-Client and Work Product |
| Undated | Correspondence to Peskin, Minitti, Clito & Anselmo re TAM litigation | Attorney-Client and Work Product |
| 2/17/04-Present | Correspondence between Renato Guimaraes and Engstrom, Lipscomb & Lack re: possible representation of TAM families, possible representation of Guimaraes against Speiser Krause, and TAM litigation | Attorney-Client and Work Product |
| 11/15/04 | Correspondence from Renato Guimaraes to Steven C. Marks re TAM litigation | Attorney-Client and Work Product |

| 11/29/04 | Correspondence from Renato Guimaraes to Steven C. Marks re TAM litigation | Attorney-Client and Work Product |
| 3/28/05 | Correspondence from Renato Guimaraes to David Boies re: possible representation of TAM families | Attorney-Client and Work Product |
| 4/5/05 | Correspondence from Renato Guimaraes to Martin A. Feigenbaum re: possible representation of TAM families | Attorney-Client and Work Product |
| 4/12/05 | Correspondence from Renato Guimaraes to Daniel E. Vielleville re: possible representation of TAM families | Attorney-Client and Work Product |
| 4/16/05 | Correspondence from Renato Guimaraes to Martin A. Feigenbaum re: possible representation of TAM families | Attorney-Client and Work Product |
| 4/18/05 | Correspondence from Renato Guimaraes to Guy A. Lewis re: possible representation of TAM families | Attorney-Client and Work Product |
| Undated | Various correspondence from Renato Guimaraes to Guy A. Lewis re: possible representation of TAM families | Attorney-Client and Work Product |
| Undated | Correspondence from Renato Guimaraes to Eugene Andres and Jim Moore re: possible representation of TAM families | Attorney-Client and Work Product |

**EXHIBIT "L"**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

RENATO GUIMARAES, JR.,                                    Case No. 05-CV-2210(DC)

                                Plaintiff,

        -against-                                         **AFFIDAVIT OF GERARD LEAR**

SPEISER, KRAUSE, NOLAN & GRANITO,
a professional corporation, f/k/a SPEISER,
KRAUSE, MADOLE & LEAR, a professional
corporation,
                                Defendant.
-------------------------------------------------------X

State of Virginia     )
County of Arlington   ) ss.:

        Gerard R. Lear, being duly sworn, deposes and says:

1.      Our law firm, Speiser, Krause, Nolan & Granito ("Speiser Krause") represented the

        families of 65 of the victims of the crash of TAM Airlines flight 402, which occurred on

        October 31, 1996.


2.      Speiser Krause instituted legal actions against those parties sharing liability for the air

        crash. An action was instituted in the Supreme Court of the State of New York, County

        of Westchester. This case was transferred to, and litigated in, the Supreme Court of the

        State of New York, New York County. Speiser Krause also instituted actions against a

        number of defendants in the Superior Court of California.


3.      After three years of intensive and expensive litigation, the insurance carriers for the

        primarily liable defendants started to engage in meaningful settlement discussions.

4.    Our clients provided us with extensive damages information which included, but was not limited to the number of surviving family members of each victim, whether there were surviving minors, the victim's age, state of employment, annual earnings and the like.

5.    Using the information our clients had provided to us, and based upon our experience in litigating aviation disaster matters, Speiser Krause was able to estimate the value of each case for settlement negotiation purposes.  In negotiating settlement offer values we also considered the percentage of liability borne by each of the defendants, and the potential for United States courts to retain jurisdiction over the cases.  The defendants in the California proceeding moved to stay or dismiss those proceedings on *forum non conveniens* grounds, and that motion was granted.

6.    In April 2000 we received firm offers of settlement from the defendants which we communicated to our clients in Brazil.  Most of Speiser Krause's clients accepted the offers that were made, and those clients' cases settled.  These settlements were approved by the Brazilian courts.  These clients were paid, and we were paid our retainer fee of 25% of the amounts recovered on their behalf, plus 2% for the expenses we had incurred in litigating these matters on our client's behalf.  From our fees, we paid local Brazilian counsel who represented the families.

7.    Renato Guimaraes, Jr., a Brazilian attorney, represented some of the families.  He opposed the settlements which had been proposed by the defendants' insurers.  Mr. Guimaraes refused to assist those clients who wanted to settle.  He refused to draft or

complete documents, and refused to take the procedural steps before the Brazilian courts to effect the settlements, as the clients had wished. As a result, other Brazilian counsel completed the settlements and were paid a fee. Renato Guimaraes was not paid by Speiser Krause.

8.    The plaintiff initiated a course of conduct to convince the clients to fire Speiser Krause, and to replace Speiser Krause with other U.S. counsel. His conduct included defamatory writings which alleged that Speiser Krause was guilty of criminal acts, and was betraying its clients. Mr. Guimaraes made these statements to the Brazilian media, the Brazilian Bar Association, the Brazilian Attorney General, the United States Federal Bureau of Investigation, judges of the courts of the United States District Courts, judges of the New York State Supreme Court, Florida Circuit Court, California Superior Court, multiple United States law firms, and to the TAM clients, and their Brazilian family counsel. Plaintiff, Renato Guimaraes, as evidenced by the frequency, number and scope of his defamatory allegations, and by his own admission intended to severely injure Speiser Krause's finances and reputation. We continue to learn of the wrongful acts Renato Guimaraes committed against us.

9.    As a result of his influence, at least nine of our clients have discharged us and substituted our firm with other U.S. counsel (presently, the law firm of Engstrom, Lipscomb & Lack of California).

10.    It is undisputed that we had retainer agreements with these nine clients wherein Speiser

Krause was to receive 25% of the sums recovered, and 2% to reimburse our expenses.

11.     We were discharged by these clients without any cause being given by them concerning the quality of the representation we provided. We have learned that these nine clients are "very tied" to Mr. Guimaraes, are very loyal to him, and followed his advice to fire us. Since our retainers with these clients were contingent, our continued representation of them bore no risk out-of-pocket costs or fees to them, and there was no financial reason in that regard for them to discharge us. Any immediate financial needs expressed by these clients contrasts strongly with the offers of settlement the TAM defendants communicated to them over seven years ago.

12.     Speiser Krause negotiated a settlement on behalf of each of the nine clients that subsequently discharged our firm. After being discharged, we could not continue to litigate or negotiate on behalf of these clients. Speiser Krause's relationship with these clients carried a prospective economic interest. Specifically, based upon its retainer agreements, Speiser Krause expected to be paid a definite sum which was based upon the amounts we had negotiated in offers of settlement. Mr. Guimaraes, by convincing the clients to fire us destroyed our relationship with them, and with it, our opportunity to earn 27% of the damages these clients were to recover. Speiser Krause has filed charging liens against potential recoveries in these cases. None of these former clients or their present counsel have agreed that they will pay Speiser Krause the contract amount of 27% of the recovery. As such, we will have to resort to litigation to recover our fees, and precedent dictates that our recovery will be based on *quantum meruit*.

WHEREFORE, your deponent respectfully prays that the plaintiff's motion for summary judgment on our counterclaim for tortious interference be denied.

GERARD R. LEAR

Sworn to before me this 28th
day of June 2007.

Notary Public

My Commission Expires December 31, 2011

**EXHIBIT "M"**

LEGAL TRANSLATION SYSTEMS
32-69 31st Street, Long Island City, NY 11106 USA (212) 629-4541
academictranslations.com  e-mail: depaula@nyic.com

RENATO GUIMARAES JR
J.D.

On October 5, 2000

To Speiser Krause
Messrs. Arthur and Leigh Ballen
Hotel Maksoud Plaza, apartment 1507
Sao Paulo, SP – in hands

Ladies and gentlemen

I hereby confirm what I told you, about a week ago: that SK, and therefore, myself as well – by virtue of our contract, may have our legal representation powers removed by the 65 families, as set forth in our Retainer Letter power of attorney.

The reasons: there is growing evidence, since April, that you are no longer acting as attorneys for the families, in U.S. Courts. There is no information about any motion, by your, after late 1999, on behalf of the families' rights. Quite the opposite, your only attitude, since then, is to convince the families that the conditions of the settlement offer made in April, written by TAM's attorneys – and you do not know Portuguese or Brazilian law – are excellent and final. Such behavior appears, as several families told you, in April, that you shifted sides, representing our adversaries, the companies, rather than as attorneys specialized in Aviation Law. The judgment against Northrop is considered by SK – which always advise me to pressure the defendant as much as possible, so that the Judge in California would admit the Brazilian judgment in the USA – to be useless for the U.S. judiciary, in spite of the fact that bad faith (contempt of court) is not even mentioned in the legal brief you gave me. Therefore, it has been extremely difficult to try to convince these clients that you are not working for the defendants. SK's coercion against me – if I do not support their proposal – is illegal under Brazilian law, and especially after a judgment was obtained against Northrop – and Mr. Granito is trying to threaten me with a claim for damages, in the USA, if the settlement proposal fails, or your (threat) that you will refrain from paying my part of the legal fees relative to the legal actions brought by the 65 families in the USA and through widows Sandra Assali and Lucia Aquino. Also from false reports in the press, no doubt, at TAM's doing, insisting that the 26 families that I represent in Brazil against TAM dismiss me, and that will be provided a "free" attorney as my replacement, which has already taken place in five cases under sub judice investigation and by the Brazilian Bar Association, alleging that I was the obstacle for reaching a settlement – an infamy – which is harmful to the families, to us, to Justice and citizenship. All of this reinforces the idea that you have, for a long time, violated the sacred role of advocating the rights of families and their dozens of orphans, against economic and dirty power of mega companies. Another example: the evidence of serious fault, even willful misconduct by "somebody" at Northrop, according to the Jabaquara Criminal Court's decision, and which SK's lawyer, Thomas A. Frizzell, Jr., described to me and my son in detail, in my last trip to New York, whom Mr. Granito

CONFIDENTIAL     SK   000637

LEGAL TRANSLATION SYSTEMS
32-69 31st Street, Long Island City, NY 11106 USA (212) 629-4541
academictranslations.com e-mail: depaula@nyic.com

tried to discredit as "very young". I hope that the request made to the FBI's Deputy Director, Mr. Louis J. Freeh, is complied with, to wit: that a copy of the evidence produced by Mr. Frizzell - "boxes and boxes", according to Tim Cook – which SK never provided for appreciation by the Brazilian judiciary, which were never mentioned.

Therefore, I ask so that you and I do not lose our clients, that you urgently resume working as you did in Tim Cook's time, who managed to obtain a suspension of inconvenient forum in California, a fact both myself and the families are very proud of. Tell, or rather, I will tell President Russel M. Mirabile or Director Antony (sic) G. Bouscarem, from USAU – United States Aviation Underwrites, Managers, United States Aircraft Insurance Group, or Ken Kresa, Northrop's President, and President Rolim and Attorney Luiz Arena Alvarez, from TAM, that there isn't a slight chance that the proposed settlements will work in the Brazilian Judiciary (proven by my accusations, in the actions I am involved in, and my request, which has been suspended before the Federal Prosecutor's Office to initiate a civil investigation concerning these settlements), even if Renato Guimaraes Jr. is no longer, for any – any, I repeat – reason the Families' attorney. Several, and I mean, several honest and capable attorneys, prosecutors and judges, are very aware of this scandal, and they will in my absence – peacefully, in this country where a lot of strange deaths occur - strictly continue to defend the rights of these families, as well as my own.

Any more confrontation would be harmful and dangerous for all involved. We should actually respect everybody's (SK's, the families and my rights) rights in this case, with decent settlement offers and conditions, ensuring everyone has the freedom to decide, at their own will. Justice should not be subject to violence.

I reserve the right to use this letter as I deem suitable, to ensure Justice, for the families and myself – should it not be replied to, with a reasonable response, and shortly.

Sincerely
Renato Guimaraes Jr
Power of Attorney Wanderley Minitti

Translation Prepared by Carlos de Paula - 5 - 7/1/2004 - 4:46 PM
C:\TRAIND\MINITI 6.doc

CONFIDENTIAL        SK  000638

**EXHIBIT "N"**

LEGAL TRANSLATION SYSTEMS
32-69 31ˢᵗ Street, Long Island City, NY 11106 USA (212) 629-4541
academictranslations.com  e-mail: depaula@nyic.com

RENATO GUIMARAES JR
J.D.

On October 9, 2000

To Speiser Krause
c/o Arthur Ballen and/or Leigh Ballen
Hotel Maksoud Plaza, Al. Campinas, 150, phone 253-4411, apartment 1507
Sao Paulo, Capital

Ladies and gentlemen

My attorney Richard S. Peskin advise me that you, in a meeting with him, about two weeks ago in New York, alleged I had to receive from you – as a share that we agreed, by contract – 25% (twenty five percent) of the total 25% (twenty five per cent) that Speiser Krause and I jointly charged as professional fees relative to the 65 (sixty five) claims pending in the N.Y. and California courts, on behalf of the Brazilian and U.S. families, against TAM, Fokker, Teleflex, Northrop Grumman et al – but only relative to powers of attorney where my name appears next and then after Speiser Krause's name, in the first paragraph of the first page of our Retainer Agreement, TAM Brazilian Fokker 100, October 31, 1996, in which signatures are not shown, as they appear in the second page of the same instrument. These powers of attorney would number 30. In the other thirty and change where my name – strangely – no longer appears now, and in respect to those I would not have, any longer, rights to the 25% (twenty five percent) attorneys' fees: the attorney's right is being criminally violated.

You are hereby, unequivocally, notified – preventing further obligations and preserving and reiterating my rights, as well as formally indicating my intentions – that the above mentioned version if criminal – whether due to (a) a misrepresentation, if my name was innocently omitted in the original text, and now you want to apply a different meaning to our obvious agreement with all families which is both public and well known, object of several letter/fax communications among ourselves, and witnessed by dozens of relatives; or (b) documentary misrepresentation, with a willful act of materially allowing the false version of the celebrated contracts with the change of their respective first pages – which do no contain signatures, only Speiser Krause's initials, generally Mr. Arthur's – removing the original page containing my name, replacing it by another page, intentionally missing my name.

You are, as this day or as of the date in which any settlements might be signed, or as of the date where they are paid pursuant to Court orders, or extra judicially, in default of my share of 25% (twenty five percent) of our joint attorneys fees of 25% (twenty five percent).

I am enclosing hereto copies of two contracts, as mere examples: Sandra Luiz Signorelli Assali's is legitimate, containing my name; and Neusa Maria Vicentini Amando de Barros and daughters was (a) innocently legitimate, omitting my name in the original,

CONFIDENTIAL    SK  000645

**LEGAL TRANSLATION SYSTEMS**
32-69 31ʳᵗ Street, Long Island City, NY 11106 USA (212) 629-4541
academictranslations.com e-mail: depaula@nyic.com

and only now, Speiser Krause commits a crime of misrepresentation attempting to give the contract a meaning that does not correspond to the truth or (b) was willful, as, as page 1, containing my name, was replaced, after the contract had been celebrated, by another page willfully missing my name, thus a material misrepresentation, a physical falsification of a contract with the attempt of excluding my name, having legitimate and exclusive rights to 25% (twenty five percent) of the total 25% (twenty five percent) attorney fees.

I am also enclosing hereto, our original contract, signed in the USA by Speiser Krause, to be executed in American courts, and sent to Brazil by fax, wherein our total attorney fees were originally 33.33% (thirty three, point thirty three percent) and then lower, given the large number of plaintiffs who joined the case, to 25% (twenty five percent), for all 65 contracts, which all families know perfectly well.

I am also enclosing a list of our cases, with the specific damages awarded to each of the families, relative to which Speiser Krause and I share total attorneys fees of 25% (twenty five percent) which we charged the clients – where the total 25% (twenty five percent) – is to be shared in the following percentages: 75% (seventy five percent) to Speiser Krause and 25% (twenty five percent) to me.

Finally a circular letter wherein Speiser Krause authorizes me to inform all Brazilian colleagues that they – also uniformly, relative to all families that brought us clients to file proceedings in the U.S. Courts – would be entitled to 10% (ten percent) of Speiser Krause's share, that is, exclusively relative to the above indicated Speiser Krause share of 75% of the total 25% (twenty five percent) fee of the Court awards to each family, as a result of our work.

I reserve to use this notification where and how I deem appropriate, to ensure Justice and to defend my professional rights, should this letter not be reasonably replied to, within a short time.

Sincerely

Renato Guimaraes Jr
Power of Attorney Wanderley Minitti

Translation Prepared by Carlos de Paula - 7 - 7/1/2004 - 4:46 PM
C:\TRAIND\MINITI 6.doc

CONFIDENTIAL     SK  000646



RENATO GUIMARÃES JR.

Doutor pela USP, Professor da UNICAMP.
*Master of Comparative Law, GWU, IASP*
Fone (019) 3289-8989, 3289-8900, fax 3289-4315, 3289-2921, rua Francisco de Toledo, 511
Cidade Universitária - 13.083-470, Campinas, SP

Em 9, outubro, 2000.

Para *Speiser Krause*,
a/c Arthur Ballen e/ou Leigh Ballen
Hotel Maksoud Plaza, Al. Campinas, 150, fone 253-4411, apt. 1507
São Paulo, Capital

Prezados Senhores:

Meu advogado *Richard S. Peskin* me avisou que os senhores, na reunião que tiveram como ele, há duas semanas em New York, alegaram que eu teria a receber dos senhores - como parcela que nós, entre nós, contratamos - 25% ( vinte e cinco por cento ) sobre os totais 25% ( vinte e cinco por cento ) que a *Speiser Krause* e eu cobramos, em conjunto, como honorários profissionais, referentes às 65 ( sessenta e cinco ) indenizações em curso na Justiça de Nova York e na Califórnia, em nome das famílias do Brasil e dos Estados Unidos e contra a *TAM, Fokker, Teleflex, Northrop Grumman et al* – mas apenas nas procurações onde meu nome aparece ao lado e em seguida ao da *Speiser Krause*, logo no parágrafo "1", da primeira página de nosso *Retainer Agreement, TAM Brazilian Fokker 100, October 31, 1996*, na qual não aparecem as assinaturas, que foram feitas na segunda página do mesmo instrumento. Essas procurações seriam umas trinta. Noutras trinta e pouco onde meu nome – estranhamente – agora não aparece mais, eu não teria direito algum em nossos honorários de 25% ( vinte e cinco por cento ): violado, *criminosamente*, o direito do advogado !

Ficam os senhores, por meio desta notificação, inequivocamente cientes - e para prevenir responsabilidades, prover a conservação e ressalva de meus direitos, e manifestar minha intenção de modo formal - de que a versão acima é criminosa, seja ( a ) pelo delito de *falsidade ideológica*, se meu nome foi inocentemente omitido quando da redação original e, agora, os senhores pretendem inserir sentido diverso ao que obviamente contratamos com todas as famílias, como é público e notório, objeto de numerosas cartas-fax entre nós, e testemunhados por dezenas de familiares, ou seja ( b ) fato de pura *falsidade documental* cometida, com o dolo já no ato de, materialmente, permitir, depois, a versão falsa dos contratos celebrados, com a troca da primeira página - onde não constam as assinaturas, apenas a rubrica da *Speiser Krause*, geralmente do senhor Arthur – retirando a folha original, com meu nome, e substituindo-a por outra folha, já então propositada, dolosamente sem meu nome nela.

E ficam os senhores constituídos em mora, a partir de hoje, ou da data em que forem sendo assinados quaisquer acordos para negociação das indenizações, ou da data em que forem elas pagas por decisão judicial ou extrajudicialmente - sobre minha soma de 25% ( vinte e cinco por cento ) dos honorários profissionais comuns de 25% ( vinte e cinco por cento )

CONFIDENTIAL    SK  000647

Anexa a esta, a cópia de dois contratos, como mero exemplos: o de Sandra Luiza Signorelli Assali é legítimo, como meu nome nele; e o de Neusa Maria Vicentini Amando de Barros, e filhas, ou ( a ) *foi legítimo*, inocentemente, sem meu nome no original e, só agora, a *Speiser Krause* comete nele o crime de falsidade ideológica, tentando inserir no contrato a idéia que não corresponde à verdade, ou ( b ) *foi criminoso*, desde o momento em que a página "1", com meu nome, foi substituída, depois de celebrado o contrato, por outra igual mas já dolosamente sem meu nome sendo assim, tipo de falso material, fisicamente falsificado o contrato para tentar excluir meu nome como titular legítimo e exclusivo de 25% ( vinte e cinco por cento ) dos honorários totais de 25% ( vinte e cinco por cento ).



Junto a esta, também, nosso contrato original, assinado nos Estados Unidos pela *Speiser Krause*, para ser executado nas Cortes americanas, e enviado ao Brasil por *fax*, quando nossos honorários totais eram no valor inicial de 33,33 % ( trinta e três, trinta e três por cento ), e depois abaixados, graças ao elevado número de adesões, para 25% ( vinte e cinco por cento ) para todos os 65 contratos - como também todas as famílias perfeitamente sabem.

Em anexo, também, a lista de nossos casos, com os respectivos valores de indenizações de cada uma das famílias, em que nós, *Speiser Krause* e eu, partilhamos os honorários totais de 25% ( vinte e cinco por cento ) que cobramos delas, sendo - destes 25% ( vinte e cinco por cento ) totais - 75% ( setenta e cinco por cento ) para *Speiser Krause*, e 25% ( vinte e cinco por cento ) para mim.

Finalmente, carta circular em que a *Speiser Krause* me autoriza a informar a todos colegas brasileiros que tem eles – também *uniformemente*, para todas famílias que nos trouxessem clientes para entrar na Justiça dos Estados Unidos – direito à parcela de 10% ( dez por cento ) sobre a parcela da *Speiser Krause*, ou seja, sobre, exclusivamente, os 75% acima da *Speiser Krause*, que incidem em nossos honorários totais de 25% (vinte e cinco por cento) sobre o que cada família receber graças a nosso trabalho.

Reservo-me a usar esta notificação como e onde entender apropriado para a dignidade da Justiça e defesa de meus direitos profissionais, caso esta carta não mereça resposta razoável e em prazo curto.

Atenciosamente,

**EXHIBIT "O"**

# ESQUEMA *SPEISER KRAUSE*
## *Contra as Famílias Brasileiras*



*SK* garante a Renato Guimarães Jr. uma parcela dos honorários para a *SK* representar todas as famílias brasileiras nos USA contra a *Northrop:* 65 famílias contratam a *SK* e Guimarães.

Guimarães ajuda *SK*, na Califórnia, durante um mês para a preliminar da incompetência *(forum non conveniens)* da *Northrop*. *SK* garante que, se perder, irá apelar. O Juiz MacDonald suspende a ação e determina outra, idêntica, no Brasil. O Prof. Irineur Strenger e Guimarães entram contra a *Northrop* no Jabaquara.

As famílias entram no Fórum João Mendes contra a *TAM;* Guimarães representa 26 das 99 famílias de mortos.

*SK* aciona a *Northrop*, *TAM* e outras em New York, onde a *Fokker* faz acordo de cerca de US$ três milhões com uma viúva americana que continua acionando a *Northrop*. A ação de brasileiras continuam suspensas aguardando o desfecho da ação do Jabaquara contra a *Northrop*.

No Brasil, a *TAM* joga a culpa na *Northrop*, e a *Northrop*, na *TAM*. Guimarães vai à Holanda e obtém cópia do Relatório do Síndico da Falência do *Fokker* que prova que a *Northrop*, *TAM* e outras formam um *poll* para indenizarem as famílias. Guimarães prova, assim, nas ações no Brasil, a má fé da *Northrop* e da *TAM*.



Logo após, a *Northrop, TAM* e outros *(Lloyd's,* de Londres) oferecem, através da SK, US$ 40 milhões para acordo que termine com todas ações no Brasil e nos USA. Os Ballen dizem às famílias que a ação nos USA está praticamente perdida e que o acordo é excelente. Guimarães acha o acordo vil. *SK* o ameaça, impede que ele aconselhe as famílias, e se reune com elas sem o conhecimento dele.

Guimarães visita New York de surpresa e Thomas Frizzell, da *SK,* afirma que provou a culpa da *Northrop* e que as chances de vitória são de 75%. Guimarães contrata *Robert S. Perkin* como seu advogado.

O Juiz do Jabaquara condena a *Northrop* a US$ 1,1 milhão por danos morais por vítima e 2/3 dos vencimentos dela, retroativos pelos quatro anos desde a tragédia e até 65 anos da idade presumida, mais, por não ter depositado a caução ordenada pelo Tribunal, multa de 20% por *contempt of court* ( má fé, *improbus litigator ).*

*Pinheiro Neto*, defensor da *Northrop*, afirma que, autorizado pela condenada, pede que as famílias apresentem sua contra-proposta. O Dr. Wanderley Minitti, da *Perkin*, propõe 50% sobre a proposta anterior, exceto para os casos mais aberrantes.

*SK* divulga, às famílias, carta da *USAU*, seguradora da *Northrop*, desautorizando qualquer advogado, além da *SK,* para cuidar dos acordos. *SK* propõe que Guimarães apoie a proposta de acordo, nos termos anteriores à condenação do Jabaquara, em troca de Guimarães receber da *SK* menos do que tem direito - ou Guimarães será destituído por muitos de seus 26 clientes. Guimarães rejeita a proposta.

CONFIDENTIAL    SK  000658

Guimarães pede à Thomas Pickard, *FBI Deputy Director*, cópia da prova, sonegada pela SK, da culpa da *Northrop*.

*SK* diz às famílias que a "opinião" de Guimarães é o "obstáculo" ao acordo e, com apoio do advogado da *TAM* - que comete o crime de tergiversão, como advogado do corrupto fiscal do Governo, IRB, e da fiscalizada Seguradora Unibanco - arruma o advogado Arruda Sampaio para substituir Guimarães e, assim, assinar o acordo pelas famílias, "sem ônus" para elas. Guimarães já foi desconstituído, até agora, por seis famílias clientes.

Guimarães vai à OAB, ao Procurador-Geral de Justiça e manda, aos Juizes dos USA, cópia da condenação do Jabaquara, coisa que a SK deveria ter feito há mais de 100 dias.

São Paulo, October 18, 2000

*Renato Guimarães Jr.*

CONFIDENTIAL    SK  000659

**EXHIBIT "P"**

2001 WL 1033611 (S.D.N.Y.)
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
In re: LETTER ROGATORY ISSUED BY SECOND PART OF THE III CIVIL REGIONAL
COURT OF
JABAQUARA/SAUDE SAO PAULO, BRAZIL
No. M13-72 (RO).
Sept. 7, 2001.

*MEMORANDUM AND ORDER*

OWEN, J.
***1*** Before this Court is an application for an order requiring Northrop Grumman
Corporation to deposit approximately $8.6 million either with a Brazilian court or with
this Court, in compliance with an order from the Second Part of the Third Civil Regional
Court of Jabaquara/Saude, Sao Paulo, Brazil issued as a letter rogatory. The underlying
action in this case arises from a fatal airplane crash in Brazil in 1996, since which
settlement negotiations have been taking place. Seemingly unaware of the ongoing
settlement negotiations here in the United States, a trial was held in Brazil and the court
there rendered a judgment against the only defendant before it, Northrop Grumman.
[FN1] The instant application seeks enforcement of that judgment.

> FN1. The standards of this trial differed greatly from a trial in the United
> States. For example, the "trial" was based on paper submissions, the
> court did not agree to hear any testimony from Northrop Grumman's
> experts, and the court placed the burden on defendant to show that it
> was not responsible (this is one of many issues on appeal in Brazil).

The application is denied because venue is improper in this Court. Northrop Grumman
has no facilities in the Southern District of New York and service on it was effected in
Bethpage, Long Island, which is in the Eastern District of New York. Therefore the
appropriate venue for this action is the Eastern District, and although this is just a short
trip over the Brooklyn Bridge, any action in this Court beyond denying the application
based on improper venue and possibly transferring it to the Eastern District could be
declared invalid. The governing statute states that "the district court of a district in
which is filed a case laying venue in the wrong division or district shall dismiss, or if it be
in the interest of justice, transfer such case to any district or division in which it could
have been brought." 28 U.S.C. § 1406(a). Whether dismissal or transfer is appropriate
"lies within the sound discretion of the district court." *Minette v. Time Warner,* 997 F.2d
1023 (2d Cir.1993). In this instance, transfer is not appropriate. To exercise my
discretion in an informed manner, I have examined the merits and conclude this
application does not merit the order it seeks, and the interests of justice would not be
served by transferring it to another district.
However, since this application might be made anew in the Eastern District and this
Court became familiar with the issues through briefing and argument, it is worth
discussing three highly troubling aspects of this application. First, the foreign judgment
in question is not a final judgment but is on appeal in Brazil. At the time the appeal was
filed, the judgment was stayed by the trial court, and given this, it remains unclear why
the trial part signed a letter rogatory order.
Second, even absent a stay, this application amounts to an attempt to enforce a foreign
judgment through a letter rogatory, and the law is clear that a letter rogatory may not
be used for this purpose. Plaintiffs contend that they are not seeking enforcement or

recognition of a foreign judgment, but rather merely requesting that this Court execute a procedural act incapable of being implemented in Brazil. This contention reflects either confusion about what plaintiffs seeks or an attempt to mislead this Court about what it would be granting. Applying to this Court for an order requiring Northrop Grumman to deposit with a court the amount of the Brazilian judgment is applying for enforcement or recognition of a foreign judgment. The relevant statutory provision for a letter rogatory states that "the district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a). By its plain language, the provision only authorizes the use of letters rogatory for the production of testimony and evidence, _not_ for enforcement of a foreign judgment. _See Osario v. Harza Engineering Co._, 890 F.Supp 750, 753 (N.D.Ill.1995)("[T]here is no federal statute that authorizes a federal court to enforce a foreign judgment pursuant to a letter rogatory"); _In re Civil Rogatory Letters Filed by the Consulate of the U.S. of Mexico_, 640 F.Supp. 243, 244 (S.D.Tex.1986); _Tacul, S.A. v. Hartford Nat'l Bank & Trust Co._, 693 F.Supp. 1399, 1400 (D.Conn.1988). [FN2]

> FN2. Similarly, no treaty authorizes the use of letters rogatory to enforce foreign judgments.

**\*2** Third, there is a serious question regarding the authority of Richard Peskin, Esq., the attorney making this application, to act on behalf of the families affected by the crash. The very same families who Peskin and Dr. Minitti, a Brazilian attorney with whom Peskin works, purport to represent also have earlier signed retainer agreements with the firm of Speiser, Krause, Nolan & Granito. Acting on behalf of these families, Speiser, Krause reached a settlement agreement in April 2000 of the claims against Northrop Grumman and other defendants (Tam Airlines, Fokker Aircraft, the manufacturers of the aircraft, and Teleflex, the company that made the cables). In addition, the purported lead petitioner in Peskin's application to this Court has signed and put before me an affidavit rejecting any attempt by Peskin, et al., to act on her behalf. (_See_ Exhibit A, annexed hereto.)

At oral argument on this application, attorneys for Northrop Grumman and from Speiser, Krause explained the confusion as follows: this is a protracted and complicated international air crash litigation involving Brazilian decedents, a Brazilian airline, a foreign airframe manufacturer, and an American component part manufacturer. The earlier Speiser, Krause retainer agreements are with the families of 65 of the decedents to prosecute actions in the United States with Brazilian attorney Renato Guimaraes acting as local counsel on 26 of the retainers. A total settlement package in excess of $40 million was reached in April 2000; since then the multi-national, multi-lingual parties to the settlement have been working on approximately 10 different release drafts. Speiser, Krause remains the counsel of record for the families. The local counsel in Brazil, however, not satisfied with the settlement (it is unclear whether his dissatisfaction stemmed from his fee or from some other aspect of the settlement), asked a new set of lawyers, among them Peskin and Dr. Minitti, to pursue the action in Brazil. Peskin, applying to this Court claiming to represent plaintiffs, answered this contention by saying that the retainer agreements have both U.S. and local counsel on them, and that this application is a separate divergent action from the underlying case that Speiser, Krause is handling. However, Peskin offers no useful explanation of the latter contention and it appears these actions cannot be other than intimately related. The question of who is accredited here and who is not remains open.

Given the flawed and highly troubling aspects of this application, a court where venue is proper would likely deny this application for an order requiring Northrop Grumman to deposit $8.6 million with such court. Accordingly, venue being improper, the application

is denied and the action is dismissed.
So ordered.
S.D.N.Y.,2001.
In re Letter Rogatory Issued By Second Part of the III Civil Regional Court of
Jabaquara/Saude Sao Paulo, Brazil
2001 WL 1033611 (S.D.N.Y.)
END OF DOCUMENT

**EXHIBIT "Q"**

2002 WL 257822 (E.D.N.Y.)
<u>Motions, Pleadings and Filings</u>
Only the Westlaw citation is currently available.

United States District Court, E.D. New York.
In re: Letter Rogatory Issued By the Second Part of the III Civil Regional
Court of <u>Jabaquara/</u>Saude, Sao Paulo, Brazil
No. 01-MC-212(JC).
Feb. 6, 2002.
Richard S. Peskin, New York, for Petitioners.
<u>Frederick C. Schafrick</u>, Shea & Gardner, Washington, DC, <u>James P. Connors</u>, Jones
Hirsch Connors & Bull P.C., New York, for Respondent Northrop Grumman Corporation.

MEMORANDUM AND ORDER

<u>GLEESON</u>, District J.
***1** This case arises out of a plane crash in Brazil on October 31, 1996, in which 99
people were killed, and the resulting litigation in Brazil against, among others, Northrop
Grumman Corporation ("Northrop Grumman"), which made the airplane's "thrust
reverser." That litigation resulted, after trial, in a judgment rendered on June 30, 2000,
in the Second Part of the III Civil Regional Court of Jabaquara/Saude, in Sao Paulo. That
judgment established, in part, a schedule of "financial support payments" for the
families who lost relatives in the accident.
The financial support payments portion of the June 30, 2000, judgment is the subject of
a separate action in the Brazilian courts. According to Northrop Grumman's Brazilian
counsel, the separate action in Brazil is an attempt to "obtain provisional enforcement"
of the financial support payments. The letter rogatory that is the subject of this action
relates to this attempt at enforcement.
The letter rogatory was originally filed in the Southern District of New York. [FN1] In a
memorandum and order dated September 7, 2001, Judge Richard Owen denied this
application on the ground of improper venue. *In Re: Letter Rogatory Issued by Second
Part of the III Civil Regional Court of Jabaquara/Saude, Sao Paulo, Brazil,* No. M13-72
(RO), 2001 U.S. Dist. LEXIS 13753 (S.D.N.Y. Sept. 7, 2001). Anticipating that the letter
would be filed in this court, Judge Owen also addressed the merits of petitioners'
application, discussing three aspects that he found "highly troubling": (1) the foreign
judgment in question is on appeal and therefore not final; (2) a letter rogatory may not
be used to enforce a foreign judgment; (3) the attorney making the application may not
have the authority to act on behalf of the families affected by the crash. *Id.*

> FN1. Though the letter rogatory is addressed to the Southern District, its
> terms state that it can be applied to other United States courts as well.

In this court, Northrop Grumman was ordered to show cause why I should not enter an
order (a) requiring it to deposit $8,642,802.94 into an account with either this court or
the Brazilian court; (b) restraining any bank accounts necessary to secure such amount;
and (c) sequestering any assets necessary to secure such amount.
A. *The Deposit of Funds by Northrop Grumman*
It is well-established that letters rogatory are an impermissible method for enforcing a
foreign judgment in United States courts. *See, e.g., <u>Osario v. Harza Engineering Co.,
890 F.Supp. 750, 753 (N.D.Ill.1995)</u>* ("There is no federal statute that authorizes a
federal court to enforce a foreign judgment pursuant to a letter rogatory"); <u>*In re Civil
Rogatory Letters Filed by the Consulate of the U.S. of Mexico,* 640 F.Supp. 243, 244
(S.D.Tex.1986)</u>; <u>*Tacul, S.A. v. Hartford Nat'l Bank & Trust Co.,* 693 F.Supp. 1399, 1400</u>

(D.Conn.1988). Petitioners agree that a letter rogatory may not be used to enforce a foreign judgment, but insist that they are not attempting to enforce their Brazilian judgment. [FN2] Rather, they claim that they are asking only for performance of "the procedural act... requested by the foreign jurisdiction...of citing Northrop Grumman Corporation and further depositing or freezing the amount requested by the Brazilian court...." (Peskin Aff. ¶ 23.) I am not persuaded that, in substance, there is any difference between the relief petitioners seek and the relief they agree is unavailable to them. The $8,642,802.94 they want Northrop Grumman to deposit with a court will undoubtedly go to the petitioners in Brazil. Indeed, despite petitioners' careful phrasing of their request for relief, the letter rogatory itself asks for an "order of execution" requiring the deposit by the respondent. Accordingly, to the extent that the letter rogatory asks this court to order Northrop Grumman to deposit funds with this court or the court in Brazil, the request is denied.

> FN2. Therefore, I need not address whether petitioners may enforce the Brazilian judgment through an Article 53 proceeding pursuant to the New York Uniform Foreign Money-Judgments Recognition Act and brought under the jurisdiction of the diversity statute. See Seetransport v. Navimpex Cent Navala, 29 F.3d 79, 82 (2d Cir.1994) (French arbitration award enforceable as foreign money judgment under Article 53); In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India, in Dec. 1984, 809 F.2d 195, 204 (2d Cir.1987) (final Indian judgment enforceable under Article 53); Island
>
> Territory of Curacao v. Solitron Devices, Inc., 489 F.2d 1313, 1323 (2d Cir.1973) (Curacao arbitration award enforceable pursuant to Article 53).

*2 Similarly, to the extent that the petitioners seek provisional relief, such as "freezing" or "sequestering" respondent's assets, this request is also denied. The only authority cited in support of such relief is a Florida case, de Pacanins v. Pacanins, 650 So.2d 1028 (Fla.Ct.App.1995), in which an injunction was entered pursuant to the Uniform Foreign Money-Judgments Act as enacted in Florida. See also George A. Bermann, Provisional Relief in Transnational Litigation, 35 Colum. J. Transnat'l L. 553, 598 (1997) (discussing de Pacanins, and pointing out that the situations generally arise when "a foreign court issues an order of provisional relief in aid of its own proceedings, and the litigant in whose favor the order was issued then asks a U.S. court to enforce it"). But, as respondent points out, in de Pacanins, 650 So.2d at 1030, there was concern that the assets would be dissipated and unavailable to fulfill a judgment; petitioners have made no showing of such a danger here.

B. Service of the Provisional Enforcement Order on Northrop Grumman

In emphasizing that their application does not include enforcement of a judgment, petitioners point out that they merely want this court to "cite" the respondent, presumably referring to service on the respondent of the Brazilian provisional enforcement order. Indeed, the affidavit accompanying the Order to Show Cause describes the letter rogatory as "requested by a foreign jurisdiction... to serve respondent Northrop Grumman Corp. with notice that it is required to deposit...," and indicates that the letter rogatory mechanism was necessary in part due to Brazilian counsel's "refusal of acceptance of service in this proceeding in Brazil." (Peskin Affidavit, ¶ 24.) The Brazilian judge who issued the request also clearly contemplated that service of process was part of the request. See Tab 6 in the letter rogatory ("I favor the issue of a rogatory letter, for service.") (J. Russo, dated August 2, 2000). Finally, respondent clearly interpreted the application as encompassing such a request, as it argues that such a request is improper in its Memorandum of Law. (Respondent's Memorandum of

Law, at 19.)

Notwithstanding respondent's arguments to the contrary, this application seems proper. 28 U.S.C. § 1696 provides for service of documents in foreign and international litigation. It reads, in relevant part:

The district court of the district in which a person resides or is found may order service upon him of any document issued in connection with a proceeding in a foreign or international tribunal. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon application of any interested person and shall direct the manner of service. 28 U.S.C. § 1696(a).

Respondent makes two arguments in favor of denying the request insofar as it seeks service on Northrop Grumman of the order of provisional enforcement from the Brazilian court. First, it asserts that service would be improper because the letter rogatory "has not been transmitted through the Central Authority of the United States," and movants have not complied with "other technical requirements of the Convention and its Additional Protocol," referring to the Inter-American Convention on Letters Rogatory. (Respondent's Memorandum of Law, at 19.)

**\*3** I find this argument unpersuasive. Article 4 of the Convention, "Transmission of Letters Rogatory," says that letters rogatory may be transmitted to "the authority to which they are addressed by the interested parties, through judicial channels, diplomatic or consular agents, or the Central Authority of the State of origin or of the State of destination, as the case may be." Inter-American Convention on Letters Rogatory, Jan. 30, 1975, 14 I.L.M. 339 (entered into force Jan. 16, 1976) (*reprinted* following 28 U.S.C. § 1781). *Cf. Kreimerman v. Casa Veerkamp, S.A. de C.V.,* 22 F.3d 634, 644 (5th Cir.1994) (letter rogatory mechanism provided for in the Inter-American Convention does not preclude other methods of service); *Ackermann v. Levine,* 788 F.2d 830, 838 (2d Cir.1986) (service of process by registered mail, without a letter rogatory transmitted through the Central Authority, did not violate the Hague Service Convention).

The Additional Protocol applies "only to those procedural acts set forth in Article 2(a)," which does include service of process. Additional Protocol to the Inter-American Convention on Letters Rogatory, art. 1, May 8, 1979, 18 I.L.M. 1238 (entered into force June 14, 1980) (*reprinted* following 28 U.S.C. § 1781). But the Protocol is also defined as encompassing requests that are "made by a judicial or other adjudicatory authority of a State Party to a judicial or administrative authority of another State Party" *and* "are transmitted by a letter rogatory from the Central Authority of the State of origin to the Central Authority of the State of destination." *Id.* Since the request in this matter was not transmitted through the Central Authorities, as permitted by Article 4 of the convention, 28 U.S.C. § 1696, and 28 U.S.C. § 1781(b)(1) ("This section does not preclude... the transmittal of a letter rogatory or request directly from a foreign or international tribunal to the tribunal, officer, or agency in the United States to whom it is addressed and its return in the same manner"), the Additional Protocol does not apply.

Respondent's argument is also undercut by the plain language of 28 U.S.C. § 1696, which specifically authorizes this court to order service "pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal" *or* "upon application of any interested person." In this case, we have both a letter rogatory and an application of an interested person. *See also Service By United States Courts at the Request of Foreign Countries,* 28 Fed. Proc. L.Ed. 65:220 (1996) ("There has traditionally been a reluctance on the part of American courts to comply with letters rogatory... [28 U.S.C. § 1696] is intended to overcome this reluctance of United States courts by making clear that the courts' inherent authority to grant international judicial assistance includes the power to comply with letters rogatory.").

Second, respondent asserts that "Brazilian counsel has informed us that Article 210 of the Brazilian Code of Civil Procedure requires that letters rogatory be transmitted 'through the diplomatic service,' ' and therefore the letter rogatory has not been validly transmitted under Brazilian law. (Respondent's Memorandum of Law at 19; Giusti Decl.

¶ 17.) [FN3] If respondent wants to oppose the provisional enforcement order on grounds based in Brazilian law, I assume it is free to do so in the Brazilian court. *See* Hans Smit, *Recent Developments in International Litigation,* 35 S. Tex. L.Rev. 215, 231 (1994) ("It is for the Swiss courts to decide the consequences of the service.") (discussing an analogous case). Moreover, because the language of 28 U.S.C. § 1696 clearly states that "[s]ervice pursuant to this subsection does not, of itself, require the recognition or enforcement in the United States of a judgment, decree, or order rendered by a foreign or international tribunal," respondent is not unfairly prejudiced by such service. *See also Sprague & Rhodes Commodity Corp. v. Instituto Mexicano Del Cafe,* 566 F.2d 861 (2d Cir.1977) (service of Mexican letters rogatory pursuant to 28 U.S.C. § 1696 does not require recognition or enforcement of the Mexican judgment).

> FN3. According to the English translation provided by Northrop Grumman, Article 210 of the Brazilian Code of Civil Procedure reads: "Letter rogatory shall comply with the provisions of the international convention as to admissibility and method of performance, in the absence thereof, it shall be sent to the foreign judicial authority, by diplomatic means, after it has been translated into the language of the country in which the requested act is to be performed." (Respondent's Memorandum of Law, Exhibit I .) The language of this Article does not appear to preclude transmittal of the letter rogatory as it has occurred in this proceeding, and Northrop Grumman's counsel has not provided authority to demonstrate otherwise.

> In the absence of such authority, I reject Northrop Grumman's argument as contrary to the clearly contemplated procedure--in the Inter-American Convention, 28 U.S.C. § 1696 and 28 U.S.C. § 1781(b)--of courts in different countries communicating directly with each other, and providing assistance of precisely this nature. *Cf. Chemical Waste Management v. Hernandez,* 1997 WL 47811, at *2 (S.D.N.Y. Feb. 5, 1997) (upholding service as proper where court in Southern District of New York issued letters

> rogatory directly to a court in Mexico authorizing service on the respondent, and Mexican attorney indicated that under Mexican law, courts have the discretion to channel letters rogatory through the parties rather than the Central Authority); *Commodity Futures Trading Commission v. Nahas,* 738 F.2d 487, 494 (D.C.Cir.1984) (noting, in a case involving an administrative subpoena served on a Brazilian, that "Brazilian law requires that service of process by foreign nations be made pursuant to a letter rogatory *or* a letter of request transmitted through diplomatic channels.") (emphasis added).

**4* In exercising my discretion on this aspect of petitioners' application, I am influenced by respondent's insistence that it has not been properly served with the order of provisional enforcement. [FN4] In their brief, respondent's counsel emphasize that this order of provisional enforcement cannot be enforced or recognized in any way by this court because *"Northrop Grumman was never served in the proceeding."* (Respondent's Memorandum of Law, at 15; emphasis in original). Brazilian counsel relies on this lack of service as well in arguing that the order cannot be enforced. (Giusti Declaration, ¶ 12.)

FN4. By my count, Northrop Grumman has already received, directly or

indirectly, the order of provisional enforcement at least three times: (1) the attempted service on Brazilian counsel on July 12, 2000, which was refused; (2) service of the letter rogatory, which includes the "writ of summons and attachment" at Tab 20, on Northrop Grumman in Bethpage, New York, on November 28, 2001; (3) the order to show cause itself, which included the enforcement order as Exhibit K to the Peskin Affidavit.

To eliminate any ambiguity and in accordance with the letter rogatory, I direct the Clerk of this Court to serve process of the attached order of provisional enforcement from the Brazilian court on respondent's counsel and Northrop Grumman itself in Bethpage, New York. To the extent there is any question about the identity of the petitioners, it is answered by the attachments to the letter rogatory, as conceded by respondent's counsel at oral argument.

Finally, I emphasize that this order--and the resulting service of process on the respondent--does not constitute "recognition or enforcement in the United States of a judgment, decree, or order rendered" by the Brazilian court, in accordance with 28 U.S.C. § 1696. I draw no conclusions about any obligations that the respondent might have in Brazil as a result of being served with the order of provisional enforcement, and the respondent has no obligation to deposit any money with this court.

For the reasons stated, petitioners' application is granted in part, and denied in part. So Ordered.

E.D.N.Y.,2002.

In re Letter Rogatory

2002 WL 257822 (E.D.N.Y.)

Motions, Pleadings and Filings (Back to top)

• 1:01MC00212 (Docket) (Nov. 28, 2001)

END OF DOCUMENT

.

**EXHIBIT "R"**

856 - 435 - 4162            3155 - 3502

## IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO: 01-13502 CA (23)
Consolidated Cases

Suzana Greco de Franca KLEPETAR, *et al.*,

      Plaintiffs,

vs.

NORTHRUP GRUMMAN CORP., *et al.*,

      Defendants.



DEFENDANT'S EXHIBIT
M

_____/

## ORDER GRANTING DEFENDANTS MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT

THIS CAUSE came before this Court on October 17, 2002, on Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint on the basis of forum non conveniens. The Court having reviewed the motions, considered the arguments of counsel, reviewed the court file, and having been otherwise fully advised in the premises, the Court finds as follows:

1.    In this case, Plaintiffs are Brazilian nationals who reside in Sao Paulo, Brazil. On or about October 31, 1996, an airplane (owned by TAM-Transportes Aereos Meridionais, S.A., d/b/a TAM Airlines ("TAM")) crashed during takeoff into a residential neighborhood in Sao Paulo, Brazil. TAM Flight 402 ("Flight 402") crashed and burned resulting in the loss of 99 passengers, crew, and innocent bystanders on the ground. Flight 402 was scheduled to fly from Sao Paulo, Brazil to Rio de Janeiro, Brazil. Plaintiffs allege that a thrust reverser failed and engaged during the ascent causing Flight 402 to descend rather than ascend. Plaintiffs either owned property on the ground destroyed in the crash; or are part of the estate of bystanders; or passengers who died as a result of the crash.

2.    The seminal case as to forum non conveniens is *Kinney Sys., Inc. v. Continental Ins. Co.*, 674 So. 2d 86 (Fla. 1996). In that case, the Florida Supreme Court stated:

> Forum non conveniens is a common law doctrine addressing the problem that arises when a local court technically has jurisdiction over a suit but the cause of action may be fairly and more conveniently litigated elsewhere. Forum non conveniens also serves as a brake on the tendency of some plaintiffs to shop for the "best" jurisdiction in which to bring suit–a concern of special importance in the international context. Commentators generally have noted a growing trend in private international law of attempting to file suit in an

Page 1 of 4

SK 2723

American state even for injuries or breaches that occurred on foreign soil. There already is evidence the practice is growing to abusive levels in Florida.

\* \* \*

Nothing in our law establishes a policy that Florida must be a courthouse for the world, nor that the taxpayers of the state must pay to resolve disputes utterly unconnected with the state's interests.

*Id.*, 674 So. 2d at 88.

3.   *Kinney* requires the following:

[1]   As a prerequisite, the court must establish whether an adequate alternative forum exists which possesses jurisdiction over the whole case.

[2]   Next, the trial judge must consider all relevant factors of *private* interest, weighing in the balance a strong presumption against disturbing plaintiffs' initial forum choice.

[3]   If the trial judge finds this balance of private interests in equipoise or near equipoise, he must then determine whether or not factors of *public* interest tip the balance in favor of a trial in [another] forum.

[4]   If he decides that the balance favors such a ... forum, the trial judge must finally ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice.

*Id.*, 674 So. 2d at 90.

4.   The Florida Supreme Court went on to note the following salient points:

Based on the foregoing discussion, we are persuaded that the time has come for Florida to adopt the federal doctrine of forum non conveniens. The use of Florida courts to police activities even in the remotest parts of the globe is not a purpose for which our judiciary was created. Florida courts exist to judge matters with significant impact upon Florida's interests, especially in light of the fact that the taxpayers of this state pay for the operation of its judiciary. Nothing in our Constitution compels the taxpayers to spend their money even for the rankest forum shopping by out-of-state interests.

\* \* \*

We address two final points relevant to this case. First, under our holding today it now is immaterial how "corporate residency" is determined, because a corporation's various connections with Florida-if any-will only be factors to be weighed in the balance of conveniences, as outlined above. Therefore we answer all three parts of the certified question in the negative as qualified in this opinion. Even the fact that a corporation has its principal place of business in Florida does not necessarily preclude application of the doctrine of forum non conveniens. Instead, the trial court should gauge the situation using the "balance of conveniences" approach.

*Id.*, 674 So. 2d at 93.

5.   Applying *Kinney* here:  Brazil is, and was previously held by the California court-which first considered this matter-to be, an adequate alternative forum which possesses jurisdiction over the whole case. Next, a consideration of the Plaintiffs' private interests indicates that the case belongs in Brazil. For example, the Plaintiffs had adequate access to evidence and

Page 2 of 4

CONFIDENTIAL

relevant sites in Brazil because the accident occurred in Brazil; the Plaintiffs had adequate access to witnesses in Brazil as most of the witnesses [investigators, police, Plaintiffs, etc.] live in Brazil; adequate enforcement of judgments exists in Brazil [if necessary, Plaintiffs can domesticate the Brazilian judgment, *see infra*]; and the practicalities and expenses associated with the litigation in Florida would entail the expensive translation of documents from Portuguese to English, the use of translators, travel to and from Brazil of the witnesses, attempting to serve subpoenas upon foreign nationals, etc. There exists a strong presumption against disturbing a plaintiff's initial forum choice. Given the travel of this case, Florida was not the Plaintiffs' initial forum choice-at best it was the third choice. California and New York were both considered and tried by the Plaintiffs before landing in Florida.

6.    Next, the trial court considers the public interest of a trial in another forum. In broad terms, the inquiry focuses on whether the case has a general nexus with the forum sufficient to justify the forum's commitment of judicial time and resources to it. At best, this case has a tenuous nexus to Florida. There exists no reason to commit judicial resources to this case.

7.    Finally, the trial court must ensure that Plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice. Defendant Northrup Grumman Corp. agreed to submit to the jurisdiction of the Brazilian courts and waive the statute of limitations for a lawsuit arising out of this accident. There is no reason for these consolidated cases to visit Florida any longer.

8.    Domesticating the foreign judgment. Forum non conveniens usually applies where a plaintiff attempts to litigate a matter for the first time. Such is not the case here. Many of the Plaintiffs previously filed suit in California where the case was dismissed due to *forum non conveniens*.[1] The Plaintiffs then filed suit and prevailed in Brazil or participated in a settlement of their claims in Brazil. To date, the Plaintiffs were unsuccessful in collecting their judgment against Northrop Grumman in Brazil. Therefore, the Plaintiffs next traveled to New York where they attempted to enforce a letter rogatory against Northrop Grumman in the Southern District of New York. The Southern District of New York dismissed the action as it was filed in the wrong district court. The case then crossed the bridge to the Eastern District of New York where the case was dismissed.

9.    This case is about enforcing the Brazilian judgment. The Plaintiffs, through their counsel, are at a loss as to how to go about domesticating a foreign judgment in the United States.[2] In Florida, the correct procedure for domesticating a foreign money judgment does not require a judgment creditor to file a new lawsuit. *See e.g.*, *Cutler v. Harrison*, 792 So. 2d 574, 575 (Fla. 3d DCA 2001) (discussing a similar statute, §§ 55.501, *et seq.*, "The statute contemplates that ... [a] judgment creditor would file the judgment in Florida, without the necessity of filing a lawsuit, ..., and any litigation over the validity of the judgment would be initiated by Cutler as judgment debtor."). The correct procedure is found in §§ 55.601, *et seq.*, which provides for domesticating out-of-country foreign money-judgment. *See e.g.*, *Nadd v. Le Credit Lyonnais, S.A.*, 804 So. 2d 1226 (Fla. 2001).

10.    Teleflex claims that the Plaintiffs are barred from bringing a new claim in Florida where the very same claim was adjudicated in Brazil and Teleflex was cleared of any liability. *See*

---

[1] The Plaintiffs did not specify which of their number filed suit in California.

[2] The Eastern District of New York, in footnote two of its decision, gave the Plaintiffs a broad hint as to the use of the New York Uniform Foreign Money-Judgments Recognition Act. The Plaintiffs did not take the hint. Moreover, California has its own version of the Uniform Foreign Money-Judgments Recognition Act codified as West's Ann.Cal.C.C.P. §§ 1713-1713.8.

CONFIDENTIAL

SK    2725

*Barbado v. Green & Murphy, P.A.*, 758 So. 2d 1173 (Fla. 4th DCA 2000). Teleflex should file a motion for summary judgment and reassert this claim. Similarly, the Defendants' claims that the Plaintiffs' Complaints exceed the statute of limitations will not be considered here, but in a motion for summary judgment.

WHEREFORE, it is **ORDERED** and **ADJUDGED**:

1.  The Plaintiffs are engaged in blatant, transparent forum shopping. The Consolidated Complaint has no reason to stay in Florida. Moreover, the Plaintiffs could simply domesticate the Brazilian money judgment they previously received.

2.  The Defendants stipulated that they would submit to the jurisdiction of the adequate alternative forum of the Brazilian courts.

3.  Defendants' Motion to Dismiss is hereby **GRANTED** and the action is dismissed on the basis of forum non conveniens conditioned upon the Defendants' stipulation to submit to jurisdiction of the adequate alternative forum of the Brazilian courts.

DONE and ORDERED in chambers this January 15, 2003, at Miami-Dade County, Florida.

AMY STEELE DONNER
CIRCUIT COURT JUDGE

JAN 15 2003

AMY STEELE DONNER
Circuit Court Judge

Copies furnished to:
    Francis A. Anania, Esq.
    Richard M. Dunn, Esq.
    Raquel M. Gonzalez, Esq.
    Jeffrey M. Herman, Esq.
    Christopher E. Knight, Esq.
    Allison E. Salsbury, Esq.

TOTAL P.05

CONFIDENTIAL

SK    2726