## STATEMENT PURSUANT TO LOCAL CIVIL RULE 56.1(b)

1.    Speiser, Krause, Nolan & Granito ("Speiser Krause") represented 64 surviving families in

a United States court proceeding concerning the crash in Brazil of an aircraft operated by

Transportes Aereos Regionais, S.A. Airlines.

    A.    Admits that Speiser Krause represented 64 surviving families in the United States,

except Speiser Krause states that there were three (3) court proceedings relative to

this representation, not one.

2.    Renato Guimaraes, Jr. ("Mr. Guimaraes"), a Brazilian attorney, also served as counsel to

some or all of those families.

    A.    Admits that Mr. Guimaraes served as counsel to some, not all, of those families.

Doc. No. SK 000637 (Verified Translation of Guimaraes 10/5/00 Letter to
Speiser Krause concerning the "26 families that [he] represent[s].").

3.    In the months preceding April 2000, Speiser Krause negotiated with the defendants in the

TAM litigation in an effort to reach a settlement, but none of the families specifically gave

Speiser Krause a settlement offer to convey on their behalf. (G. Lear Dep. 10/12/05, pp.160-

161).

    A.    Admits that Speiser Krause negotiated with the defendants in the TAM litigation in

or about the stated time frame.  Denies that Speiser Krause was required to obtain a

1

specific settlement offer to convey to the TAM defendants on its clients' behalf. Answering further, Speiser Krause states that in advance of the settlement discussions each of its clients provided Speiser Krause with damages information. L. Ballen Depo. p. 152-153. Speiser Krause used the damages information to evaluate the clients' damages and to negotiate with the TAM defendants and their insurance carriers. Apuzzo Aff., Exh. A(3) (Lear 10/11/05 Dep., pp. 47-51).

4.    None of the families gave Speiser Krause a range of numbers within which Speiser Krause would have authority to settle or negotiate. (G. Lear Dep. 10/12/05, pp. 160-161; G. Lear Dep. 4/23/07, pp. 76, 85-86; L. Ballen Dep., pp. 226-230).

A.    Speiser Krause admits to not receiving a specific range of numbers within which Speiser Krause would have authority to settle or negotiate. Only the TAM clients could elect to settle by accepting the TAM defendants' offers. Speiser Krause's TAM clients provided Speiser Krause with damages information which allowed their cases to be evaluated, and enabled Speiser Krause to discuss these evaluations with the TAM defendants' insurance carriers. Apuzzo Aff., Exh. A(3) (G. Lear Dep. 10/11/05, pp. 48, 51); Riguera Aff., Exh. 23 (Interrogatory #16); Apuzzo Aff., Exh. A(6) (L. Ballen Dep., p. 152-153).

2

5.      Rather, it was Speiser Krause's belief that it had the families' full authority from their retainer agreements to negotiate as Speiser Krause deemed appropriate. (L. Ballen Dep., pp. 226-230).

A.      Admits that Speiser Krause had authority to negotiate on its clients' behalf.

6.      However, the families <u>had</u> communicated to Speiser Krause that they wished to settle for "mid-Atlantic numbers" - the settlement value of a case in the United States, expected to be more than what could be attained in Brazil. (G. Lear Dep. 10/11/05, pp. 45-46).

A.      Denied.  While some families asked whether Speiser Krause could obtain "mid-Atlantic settlement" values on their behalf, Speiser Krause inquired of the TAM Defendants' insurance carriers if settlement values in or about those ranges were attainable. Riguera Aff., Exh. 13, pp. 45-46.  Therefore, Speiser Krause denies that Statement #6 is accurate or supported by the citation provided, as required by Local Civil Rule 56.1(d).  Additionally, as Lear testified, Speiser Krause did its best to get maximum values on its TAM cases "based on all the factors."  (G. Lear Dep. 10/11/05, p. 47).

7.      Also, Mr. Guimaraes had previously communicated to Speiser Krause that he believed the clients would not accept anywhere near the settlement amounts proposed by Speiser Krause. (Riguera Aff., Ex. 24 (Doc. No. RG00178).

A.    Denied.  Speiser Krause proposed no settlements.  Instead, it communicated the TAM defendants' insurance carriers' offers to its clients.  Guimaraes never communicated previously to Speiser Krause that he believed the settlement amounts proposed by the TAM defendants' insurance carriers would not be rejected by Speiser Krause's TAM clients.  Document RG00178 is dated February 14, 2000, approximately three months prior to the TAM defendants' offers being communicated to the TAM clients, or to Mr. Guimaraes.  Apuzzo Aff., Exh. A., Guimaraes 4/25/07 Dep., pp. 167-168.  Therefore, Mr. Guimaraes could not have commented about the settlement offers in February 2000, because, as he testified, he was unaware of any offers at this time.  (Please refer to Plaintiff's Rule 56.1(a) Statement #12, below).  Instead, as Mr. Guimaraes told Arthur Ballen, Guimaraes opposed settlement of the TAM cases because if the cases settled Guimaraes "would lose his opportunity to be the most prominent aviation attorney in the country."  Apuzzo Aff., Exh A.7 (A. Ballen Dep., pp. 82-83).

8.    Some families had already expressed frustration with the progress of the case before the settlement offers were presented.  (G. Lear Dep., 10/12/05, p. 144).

A.    Denies that the material referenced  supports Statement #8.  The cited portion of the transcript of the Lear deposition does not refer to family frustration.  (G. Lear Dep., 10/12/05, p. 144).

4

9.    In April 2000, Speiser Krause sent some of its attorneys to Brazil to meet with the families. (A. Ballen dep., p. 72).

A.    Admit.

10.    Mr. Guimaraes attended some of these meetings at the request of his clients. (A. Ballen Dep., pp. 72, 129; L. Ballen Dep., p. 187).

A.    Admits Guimaraes attended some of the meetings. Denies information pertaining to any client request that he do so. Denies that the cited material supports the contention that such request was made.

11.    In advance of these meetings, Speiser Krause did not inform the families what the settlement offer would be for each of them; in fact, according to Speiser Krause the clients were not supposed to have this information until Speiser Krause presented it at the meetings in Brazil. (L. Ballen Dep., p. 184).

A.    Denied. In reality, Speiser Krause had discussed the TAM insurer's settlement offers with the president of the TAM flight 402 Widow's Association prior to its meetings with its clients in Brazil in April 2000. The president of the Widow's Association was the spokesperson for the majority of the families. Apuzzo Aff., Exh. A.8 (Guimaraes 11/17/05 Dep., p. 56, l. 23 - p.57, l.4 ("Q.: . . . Did you

5

understand that President Assali and Duda were coming to New York to listen to the Settlement Proposals? A.: I learn after that. . .")).

12.     Speiser Krause also did not inform Mr. Guimaraes about the settlement amounts in advance of the Brazil meetings. (G. Lear Dep. 4/23/07, pp. 208-209).

A.     Admits.

13.     The first families that Speiser Krause met with when they arrived in Brazil were those most closely associated with Mr. Guimaraes. (L. Ballen Dep., p. 184).

A.     Admits.

14.     The reception Speiser Krause received from these families concerning the settlement offers was "very negative." (L. Ballen Dep., p. 184).

A.     Denied.  The negative reaction that Leigh Ballen perceived at those meetings preceded Speiser Krause relaying the TAM defendants' offers.  Leigh Ballen perceived the negative reactions "when they entered the room." The clients' looks of frustration were in response to information that the New York Court and California courts were either leaning in favor of *forum non conveniens* dismissal, or had ruled in that regard. (L. Ballen Dep., pp. 184-187).

6

15.    According to Speiser Krause, at this juncture Mr. Guimaraes was fully cooperating with

Speiser Krause and "being helpful," and had done nothing to allegedly interfere.  (G. Lear

Dep. 4/23/07, pp. 12, 174, 212).

A.    Denied.  Mr. Lear testified that at or immediately after the Jabaquara decision was

issued, Mr. Guimaraes "did not cooperate" with Speiser Krause.  Apuzzo Aff., Exh.

A.5 (G. Lear Dep. 4/23/07, pp. 225-228). The Jabaquara decision was issued about

June 30, 2000, after the meetings with clients had commenced, and the settlement

processes and meetings continued for years after that.

16.    After Speiser Krause presented the families with the settlement offers, there was a mixed

reaction.  Most of the families eventually accepted the offers, while some of the families

rejected them.  (G. Lear Dep. 4/23/07, pp. 117, 227).

A.    Admits.

17.    Some of those who rejected it did so immediately, while others took longer. (G. Lear Dep.

4/23/07, pp. 98-99; L. Ballen Dep., p. 188).

A.    Admits that some of Speiser Krause's TAM clients accepted settlement offers soon

after they were presented in April 2000.  Admits that some of Speiser Krause's TAM

clients accepted settlement offers later.

18.    Some families took a position, and later changed their minds.  (G. Lear Dep. 4/23/07), pp.

24, 289).

7

A.    Admits.

19.    Even Speiser Krause was hesitant to recommend all of the settlement offers, and did so "with regret or sadness," because families who had lost major wage earners who had small children. (L. Ballen Dep., p. 187).

    A.    Speiser Krause denies that all settlement offers were recommended with regret or sadness, and states that some settlements were recommended "without hesitation." Id.

20.    Mr. Guimaraes did not believe the settlements were sufficient compensation to the families and opposed them. (G. Lear Dep. 4/23/07, pp. 5-6).

    A.    Admits that Guimaraes opposed the settlements, but denies that his opposition was grounded solely in his subjective belief that the settlements were insufficient to compensate the families. As Mr. Guimaraes told Arthur Ballen, Guimaraes opposed settlement of the TAM cases because settlement meant the loss of his opportunity to become "the most prominent aviation attorney" in Brazil. Apuzzo Aff., Exh. A.7 (A. Ballen Dep., pp. 82-83).

21.    This was particularly so after the Court in the Jabaquara Action (a separate action Mr. Guimaraes had filed with Speiser Krause's knowledge in Brazil on behalf of the families after the California court dismissed the U.S. litigation on *forum non conveniens* grounds), awarded each family in excess of $1,111,111.11, plus 2/3 of the last annual salary earned by

each decedent from the date of the accident until that decedent would have reached the age of 65, plus a 20% contempt of court penalty against Northrop for failing to post a bond that the Court had required, plus another 20% for attorneys fees. (G. Lear Dep. 4/23/07, pp. 5-6; Riguera Aff. Ex. 24 (Doc No. RG00215-RG00326); L. Ballen Dep., p. 192).

    A.    Admits that Guimaraes opposed the settlements "particularly" after the decision in Jabaquara, but denies that the Jabaquara decision was enforceable in the United States despite numerous failed attempts by Mr. Guimaraes and others working on his behalf to obtain domestic recognition of the Jabaquara judgment. Apuzzo Aff., Exh. A, (Guimaraes 4/25/07 Dep., p. 195-196).

22.    Due to Mr. Guimaraes' criticism of the settlements and Speiser Krause, Speiser Krause has claimed tortious interference as to some (not all) of the clients who did not accept the settlements; specifically, those now represented by the law firm of Engstrom, Lipscomp [*sic*, Lipscomb] & Lack (the "Lack Clients"). (Defendant's Responses to 02/26/07 Interrogatories, Nos. 6-7; G. Lear Dep. 4/23/07, pp. 10-11).

    A.    Speiser Krause admits that it has stated a tortious interference claim in this litigation against Guimaraes concerning the nine clients who fired Speiser Krause, but denies that this claim is based solely on Guimaraes' criticism of the settlement offers Speiser Krause communicated. That criticism is only a small part of Speiser Krause's tortious interference claim. Plaintiff's tortious interference claim is based

upon Guimaraes' numerous wrongful acts as set forth in Riguera Aff., Exh. 22 (Defendant's Responses to 2/26/07 Interrogatories, No. 2).

23. Speiser Krause has taken the position that it is only the relationship between the Lack Clients and Speiser Krause after the Jabaquara judgment that Mr. Guimaraes allegedly interfered with, not the proposed settlements themselves and not the retainer agreements. (G. Lear Dep. 4/23/07, p.12).

    A. Denied. The relationship Guimaraes interfered with was the relationship between Speiser Krause and its clients which was based upon the contract retainers between Speiser Krause and these clients, and Speiser Krause's performance thereunder as evidenced by Speiser Krause having received firm offers of settlement from the TAM defendants directed to the TAM clients. "And," as Mr. Lear testified "there was an active role by Mr. Guimaraes in attempting to stop those people from accepting the settlements and also the allegations of criminal activity by us and having to negotiate the settlements." Apuzzo Aff., Exh. A.5 (G. Lear Dep. 4/23/07, p. 12).

24. Speiser Krause has admitted that it does not know why any particular family accepted or rejected the settlement offer, or selected new counsel. (G. Lear Dep. 4/23/07, pp. 14, 18, 53-55, 57, and 112).

    A. Speiser Krause admits to being without personal knowledge as to why the nine Lack Clients discharged Speiser Krause, but states that the wrongful acts which Guimaraes committed in order to influence those clients' decisions to terminate Speiser Krause

10

is a question of fact. (G. Lear Dep. 4/23/07, p. 114). For example, as Guimaraes wrote: "Why should we change the American Lawyers? Because it is the only way that the Brazilian families: (1) will get a proposal of settlement (a) with no risks; (b) much higher; (c) which can be approved by the Brazilian authorities or (2) be allowed to receive the Northrop indemnities by the USA Justice." Apuzzo Aff., Exh. H., (Doc Nos. SK 2332 - SK2338). See also, Apuzzo Aff., Exh. A.1 (Guimaraes 11/2/05 Dep., p. 120)("Q.: In this letter, you were asking your clients to fire SK? A.: That's correct, to change, to replace. . ."). The nine lack clients are "very tied" to Mr. Guimaraes; (Apuzzo Aff., Exh. A.1, (Guimaraes 11/2/05 Dep., p.71, l. 9-16), and rely on Mr. Guimaraes. (G. Lear 4/23/07 Dep., p. 11). *See also,* Statements 92-97 herein.

25.    The Lack Clients have submitted declarations to this Court attesting to the fact that nothing Mr. Guimaraes said or did was the motivation for their rejecting the settlements or changing counsel. (Riguera Aff. Exs. 2-12).

    A.    Speiser Krause admits that Guimaraes has submitted documents which purport to be form-type declarations signed by some of the Lack Clients. Speiser Krause admits that these documents declare, in form or in substance, that Guimaraes' actions was not "the motivation" for rejecting the settlements or changing counsel. Speiser Krause states, however, that as set forth in its memoranda of law in opposition to the instant motion, and in the additional statements pursuant to Local Civil Rule 56.1(b), the Lack Client declarations should be given little or no weight, and are more

illustrative of the control Guimaraes exercises over those clients than anything else. Riguera Aff. Exs. 2-12.

26.    Speiser Krause has also admitted that a great many factors likely could have impacted the families' decision to not accept the settlement offers, including the fact that some of them may have been offended by the settlement amount. (G. Lear Dep. 4/23/07, p. 49).

   A.    Speiser Krause admits that a great many factors could have impacted the families' decisions to reject the settlement offers, including Guimaraes' wrongful acts.

27.    Others may have been concerned that other families were getting more money in settlement. (G. Lear Dep. 4/23/07, p. 49).

   A.    Mr. Guimaraes may have been the source of the clients concerns, if they existed, that other families were getting more money in settlement. As Mr. Lear testified, "And Renato, I know published the Berliner settlement himself" (G. Lear Dep. 4/23/07, p. 50). Berliner, an American, received a settlement of about $3,000,000 from the TAM defendants.

28.    Some clients had different expectations. (G. Lear Dep. 4/23/07, p. 52).

   A.    Admits. Guimaraes encouraged their false expectations. (G. Lear Dep. 4/23/07, p.p 49-52).

29.     There were intra-family disputes over who would get the money.  (A. Ballen Dep., p. 125;

        G. Lear Dep. 10/12/05, p. 134).

        A.      Admits.


30.     There were instances of split families.  (A. Ballen Dep., p. 125).

        A.      Admits.


31.     Some families were influenced by third parties.  (G. Lear Dep. 4/23/07, p. 52).

        A.      Admits.


32.     There were examples where a mistress, who may have standing as a survivor in Brazil, hired

        counsel to make a claim.  (A. Ballen Dep. pp. 125-126).

        A.      Admits.


33.     Some of the families were in "desperate straights," owing to escalating inflation in Brazil.

        (G. Lear Dep. 10/12/05, p. 170).

        A.      Admits.


34.     Some for some unknown reason are not interested in receiving their money.  (G. Lear Dep.

        4/23/07, p. 11).

        A.      Denies that the cited reference states that the clients are "not interested in receiving

                their money."   Instead, as Mr. Lear stated, some of the TAM clients appear

uninterested in accepting settlements by virtue of their reliance on, among other things, the Jabaquara decision, and Mr. Guimaraes. (G. Lear Dep. 4/23/07, p. 11).

35.   Some believe they will ultimately receive more from the Jabaquara judgment. (G. Lear Dep. 4/23/07, p. 11).

   A.   Speiser Krause is without information concerning the clients' beliefs regarding their ability to ultimately receive more [money] by pursuing the Jabaquara judgment rather than by negotiated settlement.   As Mr. Lear testified, the clients refusing negotiated settlement and interested in pursuing the matter in the Jabaquara court appear to be relying on Mr. Guimaraes. (G. Lear Dep. 4/23/07, p. 11).   These clients' beliefs regarding the effects of the proceedings in Jabaqara are based upon information supplied by Mr. Guimaraes.   Id.

36.   There were also problems with the insurer and TAM's counsel. (G. Lear Dep. 4/23/07, pp. 220-221).

   A.   Admits that there were also problems with the insurers and TAM's counsel in having settlement documentation completed.   Id.

37.   According to Speiser Krause, it was each families' right to elect to take the settlement or not. (G. Lear Dep. 10/12/05, p. 121; G. Lear Dep. 4/23/07, p. 23).

   A.   Admits that Speiser Krause believes that each family had a right to elect to take any settlement proposed to it, or not.

14

38.    Speiser Krause also concedes Mr. Guimaraes and any other Brazilian lawyer was privileged to criticize the settlements. (G. Lear Dep. 4/23/07, pp. 42, 47, 114, 227).

    A.    Admits that Mr. Guimaraes was privileged to criticize the settlements, denies however, that Mr. Guimaraes' resort to improper imputation of criminality by Speiser Krause in relaying the settlement offers was privileged. Guimaraes' misconduct in opposing the settlements against the known, expressed wishes of the TAM clients enjoyed no such privilege. Apuzzo Aff., Exh. A.1 (Guimaraes 11/2/05 Dep., pp. 103-105). Speiser Krause also denies that Guimaraes was privileged to publish multiple libels against Speiser Krause in order to impugn Speiser Krause's reputation in hopes that the clients would terminate Speiser Krause.

39.    Moreover, Speiser Krause has admitted that Mr. Guimaraes had good intentions and believed he was acting in the families best interests. (L. Ballen Dep., pp. 240-241).

    A.    Denied. As Leigh Ballen stated, Guimaraes valued the glory of continuing the litigation against the TAM defendants over the benefit to the TAM clients. (L. Ballen Dep. p. 239-240). Mr. Guimaraes is a very litigious person. Apuzzo Aff., Exh. A (Guimaraes 4/25/07 Dep. pp. 10-12, 78, 148, 153). Guimaraes expressed that the TAM cases represented his opportunity to become Brazil's most prominent aviation attorney. Apuzzo Aff., Exh. A.7 (A. Ballen Dep., p. 82-83).

40.     Speiser Krause took no action to attempt to prevent the conduct on the part of Mr. Guimaraes of which they now complain. They did not contact the media and demand any retraction of any public statement. (G. Lear Dep. 4/23/07, p. 126).

    A.     Admits that Speiser Krause did not contact the media to demand a retraction, but denies that it took no action. In fact, Speiser Krause warned Guimaraes against his "continuing efforts to convince other U.S. counsel to represent the TAM clients who have signed retainers with Speiser Krause. Not only is this a breach of any relationship we might have had with you, it is actionable under U.S. law as tortious interference in a contractual/business relationship." Apuzzo Aff., Exh. J. (Doc. No. SK000598 (Letter to R. Guimaraes)). Despite this express notice, Guimaraes continued to tortiously interfere with Speiser Krause's relationships with its clients, up to and including the last substitution by client Maciel in June 2007.

41.     They did not contact the clients and speak to them about any of Mr. Guimaraes' statements or actions (save for one belated letter). (G. Lear Dep. 4/23/07, p. 126).

    A.     Admits.

42.     Speiser Krause did not seek to have Mr. Guimaraes removed as counsel. (G. Lear Dep. 4/23/07, p. 129)

    A.     Admits.

43.     They did not file a bar grievance against him. (G. Lear Dep. 4/23/07, p. 130).

16

A.   Admits.

44.   Speiser Krause did not remove itself from the case due to any inability to work with Mr. Guimaraes. (G. Lear Dep. 4/23/07, p. 130-131).

    A.   Admits that "Speiser Krause did not remove itself" but states that it was in fact removed from representing the Lack Clients who terminated Speiser Krause at Guimaraes' behest. Riguera Aff. Exhs. 2-12.

45.   They did not seek injunctive relief. (G. Lear Dep. 4/23/07, p. 131).

    A.   Admits that Speiser Krause filed no formal legal proceeding which attempted to enjoin Guimaraes from continuing to cause the clients to fire Speiser Krause.

46.   They did not claim to any legal authority with whom Mr. Guimaraes lodged a complaint that he had filed a false report or seek action on such a charge. (G. Lear Dep. 4/23/07, p. 131-132).

    A.   Admits that Speiser Krause did not make a claim of a false report by Guimaraes to any legal authority with whom Mr. Guimaraes lodged a complaint. These entities include but are not limited to 1) the Brazilian Bar Association (OAB), (Apuzzo Aff., Exh. B); 2) the United States Federal Bureau of Investigation, (Apuzzo Aff. Exh. E); 3) Janet Reno or the United States Department of Justice to whom Mr. Guimaraes had written regarding Speiser Krause; 4) New York State Supreme Court, New York County Justice Solomon to whom Guimaraes wrote regarding the illegality by

Speiser Krause; (Apuzzo Aff., Exh. C); 5) United States District Court for the Eastern District of New York in the Letters Rogatory proceeding (Apuzzo Aff., Exh. H); or 6) United States District Court for the Southern District of New York (Apuzzo Aff., Exh. B).

47.     In fact, Mr. Lear knew what Mr. Guimaraes was doing and chose to <u>ignore him</u>. (G. Lear Dep. 4/23/07, p. 128).

    A.     Admits that Speiser Krause was aware of some (but not all) of the wrongful acts Mr. Guimaraes employed in order to convince Speiser Krause's clients to terminate Speiser Krause, and as to those tactics of which Speiser Krause was aware, admits that it chose to ignore Guimaraes. Speiser Krause continues to learn of Guimaraes' additional wrongful acts.

48.     Mr. Lear further testified that his firm never intended to make any claim against Mr. Guimaraes until Mr. Guimaraes filed this lawsuit.

    A.     Admits.

49.     None of the clients Speiser Krause claims Mr. Guimaraes interfered with has refused to pay Speiser Krause for the work Speiser Krause did. (G. Lear Dep. 4/23/07, p. 20).

    A.     Admits. Responding further, Speiser Krause states that no client that Mr. Guimaraes interfered with has agreed to pay Speiser Krause its fee subsequent to terminating

Speiser Krause, and further that Speiser Krause was discharged by the Lack clients without any cause on Speiser Krause's part.

50.    Likewise, Speiser Krause never sent those clients an invoice and never filed any legal action against them. (G. Lear Dep. 4/23/07, p. 20).

   A.    Admits except states that Speiser Krause filed charging liens.

          Lear Aff., ¶12.

51.    Mr. Lack, the attorney who represents the clients in question, has never told Speiser Krause those clients would not pay for Speiser Krause's legal work. (G. Lear Dep. 4/23/07, p. 22).

   A.    Speiser Krause admits this statement, except states further that Mr. Lack did not state that the Lack clients will pay Speiser Krause's fees pursuant to their contracts of retainer.

52.    Speiser Krause has filed liens with the California court which, if enforced, may fully compensate Speiser Krause for the damages it alleges here. (G. Lear Dep. 4/23/07, pp. 82-84, 231).

   A.    Speiser Krause admits to filing liens in the California courts regarding the Lack client cases, but denies the hypothetical speculation that "if enforced may fully compensate Speiser Krause. . ." Speiser Krause denies that this hypothetical speculation is a statement of undisputed material fact within the meaning of Local Civil Rule 56.1.

19

53. In fact, Speiser Krause's attorney has stated on the record that if it collects on the California liens it will dismiss its counterclaim. (G. Lear Dep. 4/23/07, p. 229).

    A. Speiser Krause denies statement #53 as colloquy of counsel in a deposition, rather than a statement of undisputed material fact pursuant to Local Civil Rule 56.1.

54. Also, the settlement offers to the clients who did not accept may still be open. (G. Lear Dep. 4/23/07, pp. 23-24).

    A. Admits the substance, but denies that Statement #54 is a statement of undisputed fact within the meaning of Local Civil Rule 56.1.

55. After the Jabaquara judgment was entered, Mr. Guimaraes granted Wanderly Minitti, another Brazilian attorney, a power of attorney authorizing him to seek to enforce the execution of the judgment in the United States through a letters rogatory procedure. (Guimaraes Dep. 10/7/05, p. 134; 11/17/05, pp. 77-78; Guimaraes Declaration dated 5/25/07, ¶3).

    A. Admits that Guimaraes granted Minitti power of attorney, but denies that it was limited in scope to the letters rogatory procedure. Apuzzo Aff., Exh. I (Guimaraes 12/22/00 letter to Wanderley Minitti (reproduced as Exhibit "C" to Minitti's Amended Complaint)). In this letter, Guimaraes actively encouraged Minitti to find replacement American counsel on behalf of Speiser Krause's TAM clients. Id. Guimaraes was aware of Speiser Krause's contractual relationships with its TAM clients at the time. Id.

56.    In compensation for his services, Mr. Minitti was to receive a certain percentage of any amounts collected from the TAM defendants through his efforts to enforce the Jabaquara judgment. (Guimaraes Declaration dated 5/25/07, ¶4; Minitti Amended Complaint, Ex. "D").

   A.    Admits that Guimaraes "substablished" his power of attorney to Minitti. In addition, Guimaraes authorized Minitti "to retain a law firm in the United States not just to prosecute the Rogatory Letter, but also, upon acceptance by the families, to replace the law firm of Speiser & Krause . . . as [Guimaraes] stated in all litigations [he] acted before the Brazilian Justice Court and have communicated to the Honorable American Judges." Apuzzo Aff., Exh. I (Guimaraes December 22, 2000 letter to Dr. Wanderley Minitti found at Exhibit "C" to Minitti's Amended Complaint). In that same letter, Guimaraes authorized Minitti to negotiate the fees to be charged by attorneys he hoped would replace Speiser Krause. On January 5, 2001, Guimaraes entered into a separate agreement among himself, Minitti and American attorney Richard Peskin whereby the three of them together would charge the TAM clients 24% (as opposed to the 25% payable to Speiser Krause under its retainers), referring to Letters Rogatory proceedings. Minitti Amended Complaint, Ex. D.

57.    Mr. Minitti's efforts to enforce the Jabaquara judgment were ultimately unsuccessful, and he failed to recover anything on behalf of the victims of the TAM crash. (Guimaraes Dep. 10/7/05, pp. 139-140; 11/17/05, pp.81-82; Guimaraes Declaration dated 5/25/07, ¶5).

A.    Speiser Krause admits that Minitti was unsuccessful in enforcing the Letters Rogatory relative to the Jabaquara judgment in the Southern and Eastern Districts of New York, and also in Florida State Court.

58.    In November 2004, Mr. Guimaraes learned for the first time that Mr. Minitti filed a lawsuit in this Court against Speiser Krause, styled <u>Dr. Wanderly Minitti v. Speiser Krause, Nolan & Granito, P.C.</u>, Case No. 04 CV 07976 (DC)(RLE), in which he sought a judgment for 50% of the attorney's fees collected by Speiser Krause in connection with the TAM litigation. (Guimaraes Declaration dated 5/25/07, ¶7).

A.    Speiser Krause admits that Minitti filed the referenced lawsuit in or around late 2004. Speiser Krause admits that the Minitti suit sought, among other things, up to 50% of the legal fees Speiser Krause had earned by virtue of representing its TAM clients. Speiser Krause can neither admit nor deny when Guimaraes first learned of the Minitti suit, but states in any event that Minitti bringing the said suit was the likely outcome of Guimaraes' promises to Minitti of payment.

59.    Mr. Guimaraes never authorized, encouraged or in any way caused Mr. Minitti to file suit against Speiser Krause (Guimaraes Declaration dated 5/25/07, ¶8).

A.    Denied. Guimaraes expressly authorized Minitti to pursue any and all actions he saw fit for the purposes of substituting Speiser Krause as attorneys for the TAM Clients. Apuzzo Aff, Exh. I (Guimaraes 12/22/00 letter to Minitti (Exhibit "C" to Minitti Amended Complaint)).

22

60.  On the contrary, Mr. Guimaraes has consistently been opposed to Mr. Minitti's right to claim that he is entitled to a share of Speiser Krause's attorneys' fees, at it was Mr. Guimaraes who had the fee-sharing agreement with Speiser Krause. (Guimaraes Declaration dated 5/25/07, ¶9).

   A.  Speiser Krause can neither admit nor deny the truth of Statement #60. Other than Guimaraes' statement contained in ¶9 of his 5/25/07 Declaration, Speiser Krause has no independent knowledge of Guimaraes opposing Minitti's action against Speiser Krause. Further, Speiser Krause denies it had a fee-sharing agreement with Renato Guimaraes. *See*, Amended Answer.

**Statement of Additional Material Facts Pursuant to Rule 56.1(b)**

61.  Renato Guimaraes continues to serve as Brazilian counsel to nine TAM clients.
     Apuzzo Aff. Exh. A. (Guimaraes 4/25/07 Dep., p. 129, l. 12-25).

62.  Speiser Krause continues to represent some TAM Clients, but the nine clients who are controlled by Renato Guimaraes are now represented by the law firm of Engstrom, Lipscomb & Lack. ("Lack").
     Apuzzo Aff., Exh. G.

63.    The last substitution of Speiser Krause by Lack occurred as recently as June 6, 2007. Previous substitutions were from 2001 - 2006. The last substitution was for the client Maciel.

Apuzzo Aff. Exhibit A (Guimaraes 4/25/07 Dep., p. 129, l. 12-29).

64.    The measure for computing Speiser Krause's damages is its prospective fees, to wit: the last amount offered by the TAM Defendants, up to the time Renato Guimaraes persuaded the nine clients to fire Speiser Krause.

Riguera Aff., Exh. 23, p.5, ¶7.

65.    None of the nine TAM clients have agreed to pay this amount to Speiser Krause.

Riguera Aff. Exh. 23.

66.    Guimaraes' has argued that because noone has refused to pay Speiser Krause, there can be no counterclaim. (Plaintiff's Memorandum in Support, p. 10). This is a conclusion of law. Id. It is also erroneous. Id. It also relies on flawed logic. Id.

67.    Starting in the year 2000, and continuing to date, the plaintiff Renato Guimaraes instituted a baseless, malicious, and unlawful campaign to urge Speiser Krause's TAM clients to fire Speiser Krause and to substitute other American counsel for Speiser Krause.

Riguera Aff., Exh. 23, Interrogatories, Page 3, ¶2. Apuzzo Aff., Exh. I (Exhibit "C" to Minitti Amended Complaint).

24

68.     These unlawful, defamatory attacks included statements by Guimaraes to the news media.

        Apuzzo Aff., Exh. A.1, (Guimaraes 11/2/05 Dep., p. 45, l. 1-12; p. 40 l. 13-25).

69.     Some examples of the wrongful means Renato Guimaraes maliciously used to persuade the

        TAM Clients to fire Speiser Krause and substitute counsel of <u>his</u> choice include:

        a.     On February 6, 2001, Renato Guimaraes submitted an affidavit in the United States

                District Court for the Southern District of New York.

                    Apuzzo Aff., Exh. B.

        b.     In that affidavit, Guimaraes swore that Speiser Krause had been charged with a

                federal felony in Brazil.

                    Apuzzo Aff., Exh. B.

        c.     This affidavit swore that the Brazilian Bar, communicated with the United States

                Department of State with regard to Speiser Krause's alleged criminal acts.

                    Apuzzo Aff. Exh. B.

        d.     Guimaraes' affidavit was false in this regard.

                Q.: "Was Speiser Krause ever convicted of this charge a Federal crime?"
                A.: "They did not, even was indicted, because the judge said we have no jurisdiction over the people and I lost.  I appeal saying they made it a crime in U.S., probably taking out my name of the Contract but the damage is here in Brazil and I lost four to one."

                    Apuzzo Aff. Exh. A. (Guimaraes 4/25/07 Dep., p.151, l. 25 - p.152, l. 8).

70.     Guimaraes attempted to have Speiser Krause's attorneys barred from entering Brazil.

        Apuzzo Aff. Exh. A., p. 152, l.19-25.

> Q:    As I told you, the Brazilian Bar in Sao Paolo approve also a letter against the further entrance in Brazil of Speiser Krause and that this was made by the Federal Prosecutor, yes.
>
> A:    And you were the person who brought this to the attention of the Brazilian Bar?
>
> Q.    Yes, to the Bar, yes.

71.    Guimaraes admitted making accusations of criminal conduct on Speiser Krause's part to Brazilian judges and officials.

> Apuzzo Aff., Exh. A, (Guimaraes 4/25/07 Dep., p. 153, l. 8-16):
> Q.    ...did you also make the Attorney General, the public prosecutor and the judges aware of the crimes of Speiser Krause?
>
> A.    The Attorney General representative in the chamber of the judge, yes.
>
> Q.    But you were the person who made them aware of these crimes?
>
> A.    That's right.

72.    Plaintiff not only falsely accused Speiser Krause of criminal behavior, but compounded this malicious conduct by implying in an affidavit submitted to the U.S. District Court for the Southern District of New York that Speiser Krause committed criminal acts in Brazil.
> Apuzzo Aff., Exh. B.

73.    Guimaraes also wrote, *ex-parte*, to the Hon. Jane Solomon in a TAM proceeding in the Supreme Court of the State of New York, New York County.
> Apuzzo Aff., Exh. C.

74.    Guimaraes' *ex-parte* letter to Justice Solomon complained that Speiser Krause was improperly pressuring its TAM clients to accept settlement offers.
> Apuzzo Aff., Exh. C.

75.    Guimaraes' *ex-parte* letter to Justice Solomon stated that Speiser Krause had violated the Brazilian Code of Ethics, and the law.
> Apuzzo Aff., Exh. C.

76.    Guimaraes' *ex-parte* letter to Justice Solomon stated that Speiser Krause was untrustworthy, and requested a court-appointed supervisor of Speiser Krause's actions in the TAM case.
> Apuzzo Aff., Exh. C. ("Some type of judicial safe-guarder to look over the aforementioned lawyers shoulders. . .").

77.     Guimaraes' *ex-parte* letter to Justice Solomon states that Speiser Krause was wrongfully concealing evidence.

> Apuzzo Aff., Exh. C.; Apuzzo Aff. Exh. A, (Guimaraes 4/25/07 Dep. p. 109, l. 21-25)
>
>> Q.: . . . [S]o, does this follow, were you telling this New York judge that Speiser Krause, Mr. Granito was, in fact, concealing evidence here?
>>
>> A.: Not only him, but the whole group of Speiser Krause, except for Frizell.

78.     Guimaraes falsely reported to Speiser Krause's TAM Clients that Speiser Krause was being disciplined for its bad conduct in the United States Courts.

> Id. at 120, l. 14-21.

79.     Guimaraes wrote to the Brazilian Prosecutor that Speiser Krause committed crimes by betraying its clients and falsifying documents.

> Id. at p. 138, l. 3 - p.139, l. 24.

80.     Guimaraes also accused Speiser Krause's lawyers Arthur and Leigh Ballen of criminal conduct in violation of Article 344 of the Brazilian Penal Code .

> Apuzzo Aff., Exh. D.; Apuzzo Aff. Exh. A (Guimaraes 4/25/07 Dep., p. 99, l. 24 - p.100, l. 7).

81.    Guimaraes drafted a letter to the Brazilian Bar Association (or "OAB") which accused Speiser Krause of committing crimes. Guimaraes' stated purpose in composing this letter was to inform the Brazilian federal prosecutor, the U.S. Consulate, and Brazilian Airport Police to "take care of Speiser Krause. . .:"

Id. at p.129, l. 5-11; p. 88, l. 23-25; p.89 l. 1-25; p. 90, l. 1-4.

82.    Guimaraes wrote to the United States Federal Bureau of Investigation, stating that Speiser Krause was guilty of the crime of concealing evidence.

Apuzzo Aff., Exh. E; Apuzzo Aff., Exh. A. p.101, l. 20-25.

Q.:    So, Speiser Krause was, in your view, concealing this evidence?

A.:    Yes.

Q.:    And that is a crime in Brazil?

A.:    Yes.

Apuzzo Aff. Exh. A., p. 142, l. 4-8:

Q.:    . . . Speiser Krause was concealing evidence. . .?

A.:    Yes . . .

83.    In February 2004, while Guimaraes was continuing his campaign against Speiser Krause, he wrote to attorney Robert Einhorn in Florida. This letter stated that the Brazilian Attorney General was investigating Speiser Krause for civil theft which "in Brazil is a very serious crime."

Apuzzo Aff., Exh. F.

84.    Guimaraes' February 2004 letter to Mr. Einhorn also accuses Speiser Krause of "criminal omission," treason, and other crimes, all in the hope that attorney Einhorn would assume representation of three of Speiser Krause's TAM Clients.

        Id., at p. 144, l. 11-16.


85.    Guimaraes' smear campaign against Speiser Krause extended to statements he gave to a reporter from *Veja* magazine, the leading Brazilian newsweekly and fifth in the whole world. In a news article published March 31, 2001, headlined "The War of Flight 402," which referred to the dispute between attorneys, Guimaraes stated: "Speiser Krause betrays the families, insisting upon only infamous settlements. . ."

        Apuzzo Aff., Exh. A. (Guimaraes 4/25/07 Aff., p. 45, l. 12.; p. 46, l. 10-24; p.52, l. 1-6).

86.    Speaking to reporters for that same article, Guimaraes stated in sum or substance that "the betrayal scandal is in full force in Brazil."

        Id. at p. 60, l. 9-10.



87.    The *Veja* article states "the new story comes as a surprise to millions in the legal profession internationally," and Guimaraes knew that his defamatory statements against Speiser Krause would be widely read.  Id. at p. 60, l. 10-19:

        Q.:    Was it your statement that the Veja article would be read by millions in the
               legal profession internationally?

> A.:    One sentence I try to say the new breakthrough, new, is surprising millions because *Veja* has over one million issues each week, and the judiciary internationally, yes.

88.    Guimaraes based his conduct on the false premise that the settlement offers were unlawful. Yet, despite Guimaraes' efforts to the contrary, the Brazilian courts approved every single one of the settlement offers submitted for approval.

> Id. at p. 133, l. 1-6; p.108, l. 12-22.

89.    Guimaraes knew that Speiser Krause was never charged with a crime, so his accusations in this regard recklessly defamed Speiser Krause.

> Id. at p. 146, l. 7-22.

> Q.:    Were they [Speiser Krause] ever charged with a crime; formally charged?

> A.:    No.  The prosecutor request more additional evidence and I don't know yet if the judge approve to return it.

90.    Guimaraes knew his defamatory statements would injure Speiser Krause's reputation.

> Id. at p. 26,  l. 12-15; 22-25.

> Q.:    Did you report to anybody that Speiser Krause committed crimes of treason?

> A.:    Yes, I did, a lot of times. . . .

> Q.:    Did you know that those statements would harm the reputation of Speiser Krause in the world legal community?

> A.:    Yes.

91.  Guimaraes admits his reckless, untrue accusations were based upon suspicion, and not upon evidence.

> Id. at p. 120, l. 14-21.

> Q.:  So, your telling the clients and colleagues that someone in the air is being paid under the table, and you sometimes make statements about people based upon your suspicions without any evidence, correct?

> A.:  Always I make a question when the situation is unexplained in a large unethical way, yes.

92.  The nine Lack clients who fired Speiser Krause were also clients of Renato Guimaraes.

> Id. at p. 129, ll 12-17.

93.  Guimaraes admits that the idea to have these clients terminate Speiser Krause was partially his.

> Id. at p. 112, l. 6-25; Apuzzo Aff., Exh. I (Exhibit C to Minitti Amended Complaint).

94.  Guimaraes, in fact, stated that it was his duty to interfere!  Guimaraes interfered with the contracts between Speiser Krause and its clients.

> Apuzzo Aff., Exh. A. (Guimaraes 4/25/07 Dep., p. 112, l. 6-25).

> Q.:  So, the idea to go to the United States to find new attorneys [for the TAM clients] was basically yours and they said 'okay see what you can do Renato, get us a good attorney,' correct?

> Mr. Berman: Object to form.

> A.:  According to the decision I made of my duty covered by 27 votes, it was my duty to do that.  If I omitted, then I will be ethical problem.  I should interfere, it was my duty, yes.

95.   The control Guimaraes exercised over his clients is further evidenced by those clients following the advice he gave to switch lawyers.

> Id. at p. 56, l. 15-23

> Q.:   Did you tell her to switch attorneys from Speiser Krause to an American Attorney?

> A.:   Yes.  She asked me for – I start with Herman, not with –

> Q.:   Herman & Mermelstein?

> A.:   Yes.

> Q.:   And she followed your advice to switch attorneys to Herman & Mermelstein?

> A.:   And I follow her wish.

> See also, Apuzzo Aff., Exh A(1), Guimaraes 11/2/05 Dep., p. 108, l. 22 - p. 109, l.7.

> Referring to letters Mr. Guimaraes wrote to the TAM clients:

> A.:   Yes.  I think the main point is here, my recommendation to not sign any agreement with Speiser Krause which is, again, illegal, the same story of illegal agreement from Lloyds of London in Varig case.  Every case they make tricks on this."

96.   Guimaraes admitted speaking with several of the families about changing representation.  He also admits that some of these families followed his "duty to advise them."

> Apuzzo Aff., Exh. A., (Guimaraes 4/25/07 Dep., p.124, l. 8-25; p.125, l. 1-7).  See also Apuzzo Aff., Exh I (Guimaraes 12/22/00 Letter to Minitti)

32

97.    Guimaraes had control over the clients who fired Speiser Krause.

Apuzzo Aff., Exh. A., (Guimaraes 4/25/07 Dep., p. 71, l. 9-16):

Q.    So are we correct that those ten clients, total of ten clients, they discharged Speiser Krause but they did not discharge you?

A.    No, they are the most trusted family[ies], they trust me, it's a big responsibility . . ."

A.    These families are very tied to me."

98.    Maria Das Gracas de Oliveira Rodrigues' declaration dated May 30, 2007 was drafted by Renato Guimaraes, his agents, representatives, or counsel.

Riguera Aff., Exh. 2.

99.    Maria Das Gracas de Oliveira Rodrigues executed her declaration dated May 30, 2007 at the request of Renato Guimaraes, his agents, representatives, or counsel.

Riguera Aff., Exh. 2.

100.    Maria Das Gracas de Oliveira Rodrigues executed her declaration dated May 30, 2007 under the supervision of Renato Guimaraes, his agents, representatives, or counsel.

Riguera Aff., Exh. 2.

101.    Maria Das Gracas de Oliveira Rodrigues is a member of one of the families who have the most trust in Renato Guimaraes, and are "very tied" to him.

33

Riguera Aff., Exh. 2; Apuzzo Aff., Exh. A., p. 71, l. 9-16.

102.    Airton Francisco Rodrigues' declaration dated May 30, 2007 was drafted by Renato
Guimaraes, his agents, representatives, or counsel.

Riguera Aff., Exh. 3.

103.    Airton Francisco Rodrigues executed her declaration dated May 30, 2007 at the request of
Renato Guimaraes, his agents, representatives, or counsel.

Riguera Aff., Exh. 3.

104.    Airton Francisco Rodrigues executed her declaration dated May 30, 2007 under the
supervision of Renato Guimaraes, his agents, representatives, or counsel.

Riguera Aff., Exh. 3.

105.    Airton Francisco Rodrigues is a member of one of the families who have the most trust in
Renato Guimaraes, and are "very tied" to him.

Riguera Aff., Exh. 3; Apuzzo Aff., Exh. A., p. 71, l. 9-16.

106.    Suzana Klepetar's declaration dated May 30, 2007 was drafted by Renato Guimaraes, his
agents, representatives, or counsel.

Riguera Aff., Exh. 4.

34

107.    Suzana Klepetar executed her declaration dated May 30, 2007 at the request of Renato
Guimaraes, his agents, representatives, or counsel.

Riguera Aff., Exh. 4.


108.    Suzana Klepetar executed her declaration dated May 30, 2007 under the supervision of
Renato Guimaraes, his agents, representatives, or counsel.

Riguera Aff., Exh. 4.


109.    Suzana Klepetar is a member of one of the families who have the most trust in Renato
Guimaraes, and are "very tied" to him.

Riguera Aff., Exh. 4; Apuzzo Aff., Exh. A., p. 71, l. 9-16.


110.    Terezinha de Jesus Fernandes Duarte's declaration dated May 30, 2007 was drafted by
Renato Guimaraes, his agents, representatives, or counsel.

Riguera Aff., Exh. 5.


111.    Terezinha de Jesus Fernandes Duarte executed her declaration dated May 30, 2007 at the
request of Renato Guimaraes, his agents, representatives, or counsel.

Riguera Aff., Exh. 5.


112.    Terezinha de Jesus Fernandes Duarte executed her declaration dated May 30, 2007 under the
supervision of Renato Guimaraes, his agents, representatives, or counsel.

35

Riguera Aff., Exh. 5.

113.    Terezinha de Jesus Fernandes Duarte is a member of one of the families who have the most

trust in Renato Guimaraes, and are "very tied" to him.

Riguera Aff., Exh. 5; Apuzzo Aff., Exh. A., p. 71, l. 9-16.

114.    Jaime Menin's declaration dated May 30, 2007 was drafted by Renato Guimaraes, his agents,

representatives, or counsel.

Riguera Aff., Exh. 6.

115.    Jaime Menin executed her declaration dated May 30, 2007 at the request of Renato

Guimaraes, his agents, representatives, or counsel.

Riguera Aff., Exh. 6.

116.    Jaime Menin executed her declaration dated May 30, 2007 under the supervision of Renato

Guimaraes, his agents, representatives, or counsel.

Riguera Aff., Exh. 6.

117.    Jaime Menin is a member of one of the families who have the most trust in Renato

Guimaraes, and are "very tied" to him.

Riguera Aff., Exh. 6; Apuzzo Aff., Exh. A., p. 71, l. 9-16.

118.   Zeila de Oliveira Matos's declaration dated May 30, 2007 was drafted by Renato Guimaraes, his agents, representatives, or counsel.

      Riguera Aff., Exh. 6.


119.   Zeila de Oliveira Matos executed her declaration dated May 30, 2007 at the request of Renato Guimaraes, his agents, representatives, or counsel.

      Riguera Aff., Exh. 7.


120.   Zeila de Oliveira Matos executed her declaration dated May 30, 2007 under the supervision of Renato Guimaraes, his agents, representatives, or counsel.

      Riguera Aff., Exh. 7.


121.   Zeila de Oliveira Matos is a member of one of the families who have the most trust in Renato Guimaraes, and are "very tied" to him.

      Riguera Aff., Exh. 7; Apuzzo Aff., Exh. A. (Guimaraes 4/25/07 Dep., p. 71, l. 9-16).


122.   Vanessa Pereira Ramos's declaration dated May 30, 2007 was drafted by Renato Guimaraes, his agents, representatives, or counsel.

      Riguera Aff., Exh. 8.


123.   Vanessa Pereira Ramos executed her declaration dated May 30, 2007 at the request of Renato Guimaraes, his agents, representatives, or counsel.

Riguera Aff., Exh. 8.

124.    Vanessa Pereira Ramos executed her declaration dated May 30, 2007 under the supervision of Renato Guimaraes, his agents, representatives, or counsel.

Riguera Aff., Exh. 8.

125.    Vanessa Pereira Ramos is a member of one of the families who have the most trust in Renato Guimaraes, and are "very tied" to him.

Riguera Aff., Exh. 8; Apuzzo Aff., Exh. A., p. 71, l. 9-16.

126.    Lobo Vaz De Mello's declaration dated May 30, 2007 was drafted by Renato Guimaraes, his agents, representatives, or counsel.

Riguera Aff., Exh. 9.

127.    Lobo Vaz De Mello executed her declaration dated May 30, 2007 at the request of Renato Guimaraes, his agents, representatives, or counsel.

Riguera Aff., Exh. 9.

128.    Lobo Vaz De Mello executed her declaration dated May 30, 2007 under the supervision of Renato Guimaraes, his agents, representatives, or counsel.

Riguera Aff., Exh. 9.

129.   Lobo Vaz De Mello is a member of one of the families who have the most trust in Renato
       Guimaraes, and are "very tied" to him.
       Riguera Aff., Exh. 9; Apuzzo Aff., Exh. A., p. 71, l. 9-16.


130.   Maria Da Conceicao Magalhaes Vaz de Mello's declaration dated May 30, 2007 was drafted
       by Renato Guimaraes, his agents, representatives, or counsel.
       Riguera Aff., Exh. 10.


131.   Maria Da Conceicao Magalhaes Vaz de Mello executed her declaration dated May 30, 2007
       at the request of Renato Guimaraes, his agents, representatives, or counsel.
       Riguera Aff., Exh. 10.


132.   Maria Da Conceicao Magalhaes Vaz de Mello executed her declaration dated May 30, 2007
       under the supervision of Renato Guimaraes, his agents, representatives, or counsel.
       Riguera Aff., Exh. 10.


133.   Maria Da Conceicao Magalhaes Vaz de Mello is a member of one of the families who have
       the most trust in Renato Guimaraes, and are "very tied" to him.
       Riguera Aff., Exh. 10; Apuzzo Aff., Exh. A., p. 71, l. 9-16.


134.   Maria Christina Janstein's declaration dated May 30, 2007 was drafted by Renato Guimaraes,
       his agents, representatives, or counsel.

Riguera Aff., Exh. 11.

135. Maria Christina Janstein executed her declaration dated May 30, 2007 at the request of Renato Guimaraes, his agents, representatives, or counsel.

Riguera Aff., Exh. 11.

136. Maria Christina Janstein executed her declaration dated May 30, 2007 under the supervision of Renato Guimaraes, his agents, representatives, or counsel.

Riguera Aff., Exh. 11.

137. Maria Christina Janstein is a member of one of the families who have the most trust in Renato Guimaraes, and are "very tied" to him.

Riguera Aff., Exh. 11; Apuzzo Aff., Exh. A., p. 71, l. 9-16.

138. Daniela Peixoto Arjona's declaration dated May 30, 2007 was drafted by Renato Guimaraes, his agents, representatives, or counsel.

Riguera Aff., Exh. 12.

139. Daniela Peixoto Arjona executed her declaration dated May 30, 2007 at the request of Renato Guimaraes, his agents, representatives, or counsel.

Riguera Aff., Exh. 12.

140.    Daniela Peixoto Arjona executed her declaration dated May 30, 2007 under the supervision

of Renato Guimaraes, his agents, representatives, or counsel.

       Riguera Aff., Exh. 12.


141.    Daniela Peixoto Arjona is a member of one of the families who have the most trust in Renato

Guimaraes, and are "very tied" to him.

       Riguera Aff., Exh. 12; Apuzzo Aff., Exh. A., p. 71, l. 9-16.


142.    In addition to employing wrongful means to interfere with Speiser Krause's prospective

economic opportunities, the facts show that Guimaraes was angry with Speiser Krause.

Guimaraes has alleged that Arthur Ballen, one of Speiser Krause's attorneys, caused him to

lose clients for whom he had been working for 20 years.  Guimaraes claimed that Mr.

Ballen's actions in regard to the Varig clients were "a good tortious interference by Speiser

Krause."

       Apuzzo Aff., Exh. A.,(Guimaraes 4/25/07 Dep., p. 16, l. 3-4); Exh. A.2 (Guimaraes

       10/7/05 Dep., p. 36, l. 3-6) (referring to another air crash case regarding a Varig

       airliner, Guimaraes states that Speiser Krause injected itself, making other families

       fire him: "Q.: on the Varig case? A. Yes, sir.  And took all of my money.")


143.    Guimaraes alleged that Speiser Krause played "dirty tricks" that made him unhappy.

       Apuzzo Aff., Exh. A., p. 17, l. 9-25.

144.    Guimaraes states that he had a duty to do his best to prevent other people from suffering the same thing at the hands of Speiser Krause.

>   Apuzzo Aff., Exh. A., p. 18, l. 12-14.

145.    Guimaraes stated that it would be fair to punish Speiser Krause by forfeiting the fees it earned in the cases of the TAM clients who fired Speiser Krause.

>   Apuzzo Aff., Exh. A., p. 26, l. 6-11.

146.    Guimaraes' actions regarding Speiser Krause were malicious.

>   Apuzzo Aff., Exh. A, p.70, l. 11-24:

>   Q.:    Do you understand that Speiser Krause will not receive a legal fee for those clients who have discharged them?

>   A.    I think Speiser Krause should pay all the families for what they have done.

>   Q.    I understand you're angry at Speiser Krause and your position, that's the reason you brought this lawsuit, but the question is, after the clients fired Speiser Krause, is it your understanding that Speiser Krause would not get a fee from these clients?

>   A.    Yes.

147.    Guimaraes admitted having libeled Speiser Krause to other law firms in the United States of America.

>   Apuzzo Aff., Exh. A, p. 76, l. 11 - p. 77, l. 11:

Q.    Let me ask you a question.  With regard to the serious ethical claims against

Speiser Krause, what did you tell Walter Lack?

A.    In general, I told him this family authorized me to look for another attorney

because they are not satisfied with Speiser Krause, they trust what I was

saying, what is in the magazine, they are not protecting the Brazilian families,

so on and so on.

Q.    What crime did Speiser Krause commit?

A.    In Brazil, if attorney change the sides, it's a crime.  If you ahve a conflict with

your client, you should stay away, you should not help a [G]erry Lear did

Northrop Gurmman.  It's a crime in Brazil.  And I put this in all papers in

Brazil, look at this, the guy gave affidavit, and so forth.  So, it's beyond

ethical, the guy go to jail in Brazil, never say something like that.  So that's

the seriousness of the issue I told Lack.

43